

NO. AP-76,207

IN THE
COURT OF CRIMINAL APPEALS
OF TEXAS

---

## JAMES GARFIELD BROADNAX
### Appellant

VS.

## THE STATE OF TEXAS
### Appellee

FILED IN
COURT OF CRIMINAL APPEALS

FEB 09 2011

Louise Pearson, Clerk

---

**APPEALING THE TRIAL COURT'S CAPITAL JUDGMENT
ASSESSING THE DEATH SENTENCE BASED ON JURY VERDICT
OF GUILTY AND ANSWERS TO SPECIAL ISSUES
IN CAUSE NUMBER F08-24677-Y FROM THE CRIMINAL
DISTRICT COURT NO. 7 OF DALLAS COUNTY, TEXAS
THE HONORABLE MIKE SNIPES, JUDGE PRESIDING**

---

BRIEF FOR APPELLANT

---

RECEIVED IN
COURT OF CRIMINAL APPEAL

FEB 08 2011

Louise Pearson, Clerk

JOHN TATUM
990 SOUTH SHERMAN STREET
RICHARDSON, TEXAS 75081
(972) 705-9200
BAR NO. 19672500
ATTORNEY FOR APPELLANT ON APPEAL ONLY

ORAL ARGUMENT IS REQUESTED

SCANNED

_____
DATE

## IDENTITIES OF PARTIES AND COUNSEL

HONORABLE MIKE SNIPES
    133 N. Industrial Blvd
    Frank Crowely Courts Bldg.
    Dallas, Texas 75207

JUDGE PRESIDING
CRIMINAL DISTRICT COURT NO. 7
OF DALLAS COUNTY, TEXAS

JAMES GARFIELD BROADNAX
    TDC#00999
    Polunsky Unit
    3872 FM 350 South
    Livingston, Texas 77351

APPELLANT

HONORABLE JOHN TATUM
    990 S. Sherman St.
    Richardson, Texas 75081
    SBOT#19672500

ATTORNEY FOR APPELLANT
(APPEAL)

HONORABLE DOUG PARKS
    321 Calm Water Lane
    Holly Lake Ranch, Texas 77765
    SBOT# 15520000

ATTORNEY FOR APPELLANT
(TRIAL)

HONORABLE BRAD LOLLAR
    1700 Commerce, Suite 450
    Dallas, Texas 75201
    SBOT# 12508700

ATTORNEY FOR APPELLANT
(TRIAL)

HONORABLE KERI MALLON
    Assistant Public Defender
    Frank Crowley Courts Building
    131 N. Industrial Blvd., LB2
    Dallas, Texas 75270-4399
    SBOT# 24049165

ATTORNEY FOR APPELLANT
(TRIAL)

HONORABLE CRAIG WATKINS
    133 N. Industrial Blvd
    Frank Crowely Courts Bldg.
    Dallas, Texas 75207

DISTRICT ATTORNEY
DALLAS COUNTY, TEXAS

HONORABLE DAVID ALEX
    133 N. Industrial Blvd
    Frank Crowely Courts Bldg.
    Dallas, Texas 75207
    SBOT# 24003256

ASSISTANT DISTRICT ATTORNEY
DALLAS COUNTY, TEXAS

HONORABLE ANDREA HANDLEY
    133 N. Industrial
    Frank Crowely Courts Bldg.
    Dallas, Texas 75207
    SBOT#08898800

ASSISTANT DISTRICT ATTORNEY
DALLAS COUNTY, TEXAS

# TABLE OF CONTENTS

PAGE

IDENTITIES OF PARTIES AND COUNSEL ............................... i-ii

TABLE OF CONTENTS .............................................. iii-vi

INDEX OF AUTHORITIES ........................................... vii-xvi

STATEMENT OF THE CASE ......................................... xvii

ISSUES PRESENTED .............................................. xviii-xxvi

STATEMENT OF FACTS ........................................... 1-11

    A.    Trial on the Merits
        The State

        1) Testimony of Amy Gruszecki M.D. ....................... 1
        2) Testimony of Clint McNear ............................. 1
        3) Testimony of Isabel Giannone .......................... 1-2
        4) Testimony of Susan Allen .............................. 2
        5) Testimony of James Nichols ........................... 2-3
        6) Testimony of Shaun Rabb .............................. 3
        7) Testimony of Jason Varghese ........................... 3
        8) Testimony of Haideh Mirmesdagh, M.D. ................. 3-4
        9) Testimony of Kimberly Leach .......................... 4-5
      10) Testimony of Christie Hicklen ......................... 5

    B.    Trial on the Merits
        The Defense did not present any evidence in the guilt/innocence stage of the trial.

    C.    The State on Punishment
        11) Testimony of Theresa Butler .......................... 5
        12) Testimony of Tracy Dyer, M.D. ........................ 5
        13) Testimony of Jean Swean ............................. 6
        14) Testimony of Deputy Richard Hamb .................... 6
        15) Testimony of Mark Turner ............................ 6
        16) Testimony of David Barger ........................... 6
        17) Testimony of Darrell Doty ............................ 6-7
        18) Testimony of Schesser Kirvin ......................... 7
        19) Testimony of Morris Contreras ........................ 7-8
        20) Testimony of Marcos Gutierrez ........................ 8
        21) Testimony of Matthew Utsey .......................... 8
        22) Testimony of Barrett Nelson .......................... 8-9
        23) Testimony of Melody Nelson .......................... 9-10

D.    The Defense on Punishment
  24) Testimony of Cheryl Silver, M.D. . . . . . . . . . . . . . . . . . . . . . . . . 10-11
  25) Testimony of Frank Lane, M.D. . . . . . . . . . . . . . . . . . . . . . . . 12-13
  26) Testimony of John Roache, M.D. . . . . . . . . . . . . . . . . . . . . . . 13-14
  27) Testimony of Clara Holyfield . . . . . . . . . . . . . . . . . . . . . . . . . 14-15
  28) Testimony of Teresa Thompson . . . . . . . . . . . . . . . . . . . . . . . 15
  29) Testimony of Audrey Kelly . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-17
  30) Testimony of Nicole Pfaff . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
  31) Testimony of Darrell Wynn . . . . . . . . . . . . . . . . . . . . . . . . . . 18
  32) Testimony of Vicki Briggs . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
  33) Testimony of Gary Aaron . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
  34) Testimony of Kevon Eason . . . . . . . . . . . . . . . . . . . . . . . . . . 18-19
  35) Testimony of Jackie Aaron . . . . . . . . . . . . . . . . . . . . . . . . . . 19-20
  36) Testimony of Tre'Vaun Miller . . . . . . . . . . . . . . . . . . . . . . . . 20
  37) Testimony of Keri Mallon & Deposition of Francine Mazone . . 20-21
  38) Testimony of Juanita Mayes . . . . . . . . . . . . . . . . . . . . . . . . . 21
  39) Testimony of Niquia Wynn . . . . . . . . . . . . . . . . . . . . . . . . . . 21-22
  40) Testimony of Darryl Maxwell . . . . . . . . . . . . . . . . . . . . . . . . 22

E.    The State on Rebuttal
  41) Testimony of David Barger . . . . . . . . . . . . . . . . . . . . . . . . . . 23
  42) Testimony of Elizabeth Lutton . . . . . . . . . . . . . . . . . . . . . . . 23
  43) Testimony of Jack Randall Price . . . . . . . . . . . . . . . . . . . . . . 23
  44) Testimony of Michael Swan . . . . . . . . . . . . . . . . . . . . . . . . . 23
  45) Testimony of Deborah Swan . . . . . . . . . . . . . . . . . . . . . . . . . 23

SUMMARY OF ISSUES    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23-24

ISSUES ON VOIR DIRE

  ISSUE NO. 1    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24-26
  ISSUE NO. 2    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26-27
  ISSUE NO. 3    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27-30
  ISSUE NO. 4    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30-31
  ISSUE NO. 5    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31-33
  ISSUE NO. 6    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33-35
  ISSUE NO. 7    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35-38
  ARGUMENT ON ISSUES NOS. 1-7 . . . . . . . . . . . . . . . . . . . . . . . . . 38-42
  ISSUE NO. 8    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43-47
  ISSUE NO. 9    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47-51
  ISSUE NO. 10    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51-54
  ISSUE NO. 11    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54-57
  ISSUE NO. 12    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57-59
  ISSUE NO. 13    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59-61
  ISSUE NO. 14    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61-64
  ISSUE NO. 15    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64-65
  ISSUE NO. 16    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66-67
  ISSUE NO. 17    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67-68

ISSUE NO. 18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68-69
ISSUE NO. 19 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70-73
ISSUE NO. 20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73-74
ISSUE NO. 21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74-76
ISSUE NO. 22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76-78
ISSUE NO. 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78-80
ARGUMENT ON ISSUES NOS. 8-23 . . . . . . . . . . . . . . . . . . . . . . . . . . 80-81
ISSUE NO. 24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81-82
ISSUE NO. 25 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82-83

**TRIAL GUILT/INNOCENCE ISSUES**
ISSUE NO. 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84-86
ISSUE NO. 27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86-92
ISSUE NO. 28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92-93
ISSUE NO. 29 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93-95
ISSUE NO. 30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96-100
ISSUE NO. 31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96-100
ISSUE NO. 32 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96-100
ISSUE NO. 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96-100
ISSUE NO. 34 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100-102

**TRIAL PUNISHMENT ISSUES**
ISSUE NO. 35 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103-104
ISSUE NO. 36 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105
ISSUE NO. 37 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106-107
ISSUE NO. 38 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108-110
ISSUE NO. 39 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108-110
ISSUE NO. 40 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108-110

**FEDERAL ISSUES**

ISSUE NO. 41 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111-112
ISSUE NO. 42 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112
ISSUE NO. 43 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112-114
ISSUE NO. 44 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114
ISSUE NO. 45 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114-115
ISSUE NO. 46 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115-117
ISSUE NO. 47 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117
ISSUE NO. 48 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118-119
ISSUE NO. 49 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118-119
ISSUE NO. 50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119
ISSUE NO. 51 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119-120
ISSUE NO. 52 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120
ISSUE NO. 53 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120-121
ISSUE NO. 54 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121-122
ISSUE NO. 55 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123-124
ISSUE NO. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

PRAYER            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

## INDEX OF AUTHORITIES

FEDERAL CASES

*Apprendi v. New Jersey*
530 U.S. 466 (2000), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

*Batson v. Kentucky*
476 U. S. 79, 106 S. C. 1712, 90 L. Ed. 2d 69 (1988) . . . . . . . . . . . . . . . . . . . . . . 38-43

*Blystone v. Pennsylvania*
494 U.S. 299 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

*Boyde v. California*
494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990) . . . . . . . . . . . . . . . . 117, 119

*Bush v. Gore*
531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). . . . . . . . . . . . . . . . . . . . . . . 123

*Callins v. Collins*
510 U.S. 114 S.Ct. at 1129-30, 127 L.Ed.2d at 437-39 . . . . . . . . . . . . . . . . . . . . 111,118

*Dawson v. Delaware*
503 U.S. 159 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

*Eddings v. Oklahoma*
455 U.S. 104, 112, 102 S. Ct. 869, 71 L.Ed.2d 1 (1982) . . . . . . . . . . . . . . . . . . . . . . 47,118

*F. Johnson v. Texas*
113 S.Ct. 2568 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

*Furman v. Georgia*
408 U.S. 238 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120,123

*Gilmore v. Taylor*
508 U.S. 333, 113 S.Ct. 2112, 124 L. Ed.2d 306 (1993) . . . . . . . . . . . . . . . . . . . . . 123

*Godfrey v. Georgia*
466 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) . . . . . . . . . . . . . . . . . . . . . . . 117

*Gregg v. Georgia*
428 U.S. 153, 189 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111,120,121

*Hayes v. Thaler*
361, Fed App. 563 (C.A.5 (Tex.)) 2010 WL 183395 . . . . . . . . . . . . . . . . . . . . . . . . 42

*Hudson v. Palmer*
468 U.S. 517 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

*Jackson v. Virginia*
443 U.S.307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) . . . . . . . . . . . . . . . . . 101,102,103

*Johnson v.Texas*
509 U.S. ___, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . 119

*Jones v. United States*
526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 115

*Jurek v. Texas*
428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

*Lewis v. Jeffers*
497 U.S. 766, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . 118

*Lisenba v. California*
314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166(1941) . . . . . . . . . . . . . . . . . . . . . . . 124

*Lockett v. Ohio*
438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 ( 1978) . . . . . . . . . . . . . . . . . . . . . . . . . 47,104,118

*Lowenfield v. Phelps*
484 U.S. at 240-41, 108 S.Ct. at 522, 98 L.Ed.2d . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

*Maine v. Moulton*
474 U.S. 159 (1984) ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*Massiah v. United States*
377 U.S. 201 (1964)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*Miller-El v. Drekte*
545 U.S. 231 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Miller-El v. Cockrell*
537 U.S. 322 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 41

*Mills v. Maryland*
486 U.S. 367, 383, 108 S.Ct. 1860, 1870, 100 L.Ed.2d 384 (1988) . . . . . . . . . . . . . . . . . . . 116

*Morgan v. Illinois*
504 U.S. 719 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46,47,54,58,61,65,66,69

**_Payne v. Tennessee_**
501 U.S. 808 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

**_Penry v. Johnson_**
121 S.Ct. 1910 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

**_Penry v. Lynaugh_**
492 U.S. 302 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112,118

**_Reed v. Quaterman_**
555 F3d 304 (45th Cir.2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

**_Ring v. Arizona_**
536 U.S.,122 S.Ct. 2428, 2443, 153 L.Ed.2d 556 (2002) . . . . . . . . . . . . . . . . . . . . . . . . 115

**_Ross v. Oklahoma_**
4897 U.S. 81 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

**_Saldano v. Texas_**
530 U.S. 1212 (2000)(mem.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

**_Sawyer v. Whitley_**
112 S. Ct. 2514, 2522-23 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

**_Spaziano v. Florida_**
468 U.S. 447-64 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120,121

**_Snyder v. Louisiana_**
128 S.Ct. 1203 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

**_Tenard v. Dretke_**
542 U.S. 274 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

**_U.S. v. Cohen_**
7896 F2d 20 (C.A. 2Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92,93

**_U.S. v. Irvin_**
87 F.3d 878 887 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

**_United States v. Lemon_**
723 F. 2d 922, 941 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

**_U.S. v. Polasek_**
162 F3d 878.887 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

*Wainwright v. Witt*
469 U.S. 412 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Walton v. Arizona*
497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) . . . . . . . . . . . . . . . . . . . . . . . . 118,119

*Woodson v. North Carolina*
428 U.S. 280, 305 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46,123

STATE CASES

*Abdullah v. State*
211 S.W. 3d 939 (Tex. Ct. App. Texarkana) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

*Anderson v. State*
633 S.W.2d 851, 854 (Tex. Crim.App. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Anderson v. State*
901 S.W.2d 946 (Tex. Crim. App. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

*Ardovina v. State*
143 Tex. Crim. 43, 156 S.W.2d 983, 984(1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

*Beasley v. State*
902 S.W.2d 452 (Tex. Crim. App. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104,105

*Benz v. State*
233 S.W.3d 847 (Tex. Crim. App. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

*Brewer v. Collins*
857 S.W.2d 819, 823 (Tex.App.-Houston [1st Dist] 1993, no pet.) . . . . . . . . . . . . . . . . . . . 109

*Brewington v. State*
802 S.W. 2d 691 (Tex. Crim. App. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

*Butler v. State*
769 S.W.2d 234, 239 (Tex. Crim.App. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

*Clark v. State*
717 S.W.2d 910, 916-17 (Tex. Crim. App. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45,46

*Coe v. State*
683 S.W.2d 431, 438 (Tex.Crim.App.1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

*Corbarrubio v. State*
675 S.W.2d 749 (Tex. Cr. App. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

*Cordova v. State*
733 S.W.2d 175, 182 (Tex. Cr. App. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Covarrubias v. Tex. Dep't of Criminal Justice-Inst. Div.*
52 S.W.3d 318, 324 (Tex.App.-Corpus Christi 2001, no pet.) . . . . . . . . . . . . . . . . . . . . 109

*Cuevas v. State*
575 S.W.2d 543 (Tex. Cr. App. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45,47

*Cumbo v. State*
760 S.W.2d 251 (Tex. Crim. App. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Demouchette v. State*
731 S.W.2d 75, 83 (Tex. Crim. App. 1986), cert denied, 482 U.S. 920 (1987) . . . . . . . . . . . . 81

*Elliot v. State*
858 S.W.2d 478, 487-488 (Tex. Cr. App. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

*Esteves v. State*
859 S. W. 2d 613 (Tex. App. – Houston [1st Dist.] 1993, pet. ref'd) . . . . . . . . . . . . . . . . . . . 38

*Everson v. State*
851 S. W. 2d 269 (Tex. Crim. App. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Faulder v. State*
745 S.W.2d 327 (Tex. Cr. App.. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Greer v. State*
No. 05-08-00146 (Tex. App.-Dallas June 9, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Harris v. State*
790 S.W.2d 568, 581 (Tex. Crim. App. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*Hernandez v. State*
757 S.W.2d 744 (Tex. Crim. App. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*Hernandez v. State*
842 S.W.2d 306 (Ct. App. San Antonio, 1993, pet ref'd) . . . . . . . . . . . . . . . . . . . . . . . . . 91

*Holberg v. State*
38 S.W.3d 137, 139 (Tex. Crim. App. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

*Holloway v. State*
613 S.W.2d 497 (Tex. Crim. App. 1981) ............................................ 103

*Hooper v. State*
100 Tex. Cr. R. 147, 272 S.W.493, 495 (1925) ..................................... 46

*Houston v. State*
663 S.W.2d 455, 456 (Tex. Crim.App.1984). ....................................... 101

*Huffman v. State*
746 S.W.2d 212 (Tex. Crim. App. 1988) ........................................... 106

*Jackson v. State*
160 S.W.3d 568, 574 (Tex. Crim. App. 2005) ................................... 84,85

*Janecka v. State*
739 S.W.2d 813, 832 (Tex. Cr. App. 1987) ......................................... 45

*Johnson v. State*
673 S.W.2d 190, 197 (Tex. Crim. App.1984) ...................................... 101

*Jones v. State*
944 S.W.2d 644, 651 (Tex. Crim. App.1996) ....................................... 99

*Jones v. State*
982 S.W.2d 386 (Tex. Crim. App. 1998) ........................................... 82

*Jurek v. State*
522 S.W.2d 934 (Tex. Cr. App. 1975) ............................................ 106

*Keeton v. State*
724 S. W. 2d 58, 65 n. 5 (Tex. Crim. App. 1987) .................................. 39

*Kelly v. State*
824 S.W.2d 568 (Tex. Crim. App. 1992) .......................................... 103

*Lawrence v. State*
700 S.W.2d 208 (Tex. Cr. App. 1985) ............................................ 114

*Linscomb v. State*
829 S. W. 2d 164, 166 (Tex. Crim. App. 1992) ..................................... 39

*Lopez v. State*
940 S. W. 2d 388 (Tex. App.-Austin, 1997) ........................................ 38

*Matson v. State*
819 S.W.2sd 839, 850 (Tex. Crim. App. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*Mayer v. State*
309 S.W.3d 552 (Tex. Crim. App. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

*Mays v. State*
726 S.W.2d 937, 950 (Tex. Cr. App. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*McFarlane v. State*
254 S.W.2d 136 (Tex. Cr. App. 1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

*McGinn v. State*
961 S.W.2d 161,168 (Tex. Crim. App. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

*Montgomery v. State*
810 S.W.2d 372, 376 (Tex. Crim. App.1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

*Mosley v. State*
983 S.W.2d 249, 263-64 (Tex. Crim. App. 1998)(op. on reh'g)
*cert denied*, 526 U.S. 1070 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

*Musick v. State*
862 S.W. 2d 794 (Tex. App. – El Paso 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*O'Bryan v. State*
591 S.W.2s 464, 480 (Tex. Cr. Ap. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

*Perkins v. State*
32 Tex. 109, 112(1869) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

*Perry v. Del Rio*
67 S.W.3d 85, 92 (Tex.2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

*Rachal v. State*
S.W. 2d 799, 816 (Tex. Crim. App. ) *cert denied*,
519 U.S. 1043, 117 S.Ct. 614, 1365 L.Ed.2d 539 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*Ramirez v. State*
862 S. W. 2d 648 (Tex. App. – Dallas 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38,40

*Reed v. State*
269 S.W.3d 619 (Tex. Ct. App.-San Antonio, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

**_Reese v. State_**
877 S.W.2d 328, 333 (Tex. Crim. App. 1994) ..................................... 124

**_Reeves v. State_**
806 S.W.2d 540, 543 (Tex. Crim.App.1990), cert. denied, –U.S.–, 111 S.Ct. 641, 113 L.Ed.2d
736 (1991) ........................................................ 101

**_Rojas v. State_**
986 S.W.2d 241, 249 (Tex. Crim. App.1998). ................................. 100

**_Roney v. State_**
 632 S.W.2d 598,603 (Tex. Cr. App. 1982) ..................................... 106

**_Ruffin v. State_**
2008 WL 5169555 (Tex. Crim. App. decided December 10, 2008) .................. 84,85

**_Salazar v. State_**
562 S.W.2d 480, 482 (Tex. Crim. App. 1978) ................................... 45

**_Salazar v. State_**
385 S.W.3rd 141 (Tex. Crim.App. 2001) ....................................... 97

**_Saldano v. State_**
232 S.W.3d 77 (Tex. Crim.App. 2007)  ...................................... 111

**_Santellan v. State_**
 939 S.W.2d 155 (Tex. Crim. App. 1997) .................................. 100,102

**_Sells v. State_**
121 S.W.3d 748 (Tex. Crim. App. ) ........................................ 93,94

**_Shaver v. State_**
280 S.W.2d 740, 742 (Tex. Crim.App. 1955) ................................... 45

**_Siena v. State_**
266 S.W.3d/72 )Tex. Ct. Appl.[1st.Dist.] 2008, pet. ref'd (2010) ...................... 105

**_Smith v. State_**
573 S.W.2d 763 (Tex. Cr. App. 1978) ....................................... 45,47

**_State v. Williams_**
392 So.2d 619, 631 (La.1980) (on rehearing) .................................. 116

*Whitsey v. State*
796 S. W. 2d 707, 713 (Tex. Crim. App. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Williams v. State*
565 S.W.2d 63, 65 (Tex. Cr. App. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Williams v. State*
692 S.W.2d 671, 676 (Tex.Crim.App.1984 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

*Wincott v. State*
59 S.W.3d 691, 698 (Tex. App.-Austin 2001, pet. ref'd) . . . . . . . . . . . . . . . . . . . . . . . . 104

*Wyatt v. State*
23 S.W.3d 18, 29 (Tex. Crim. App.2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99,100

*Young v. State*
826 S. W. 2d 141, 145 (Tex. Crim. App. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

STATE STATUTES

Tex. Code Crim. Proc. 38.36 (Vernon 2005), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85,87

Tex. Code Crim. Proc. 38.22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89,92

Tex. Code Crim. Proc. 38.23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89,92

TEX. CODE CRIM. PRO. ARTS. 37.071 & 37.0711 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111,121

Tex. Code Crim. P. Ann. Art. 35.16(c)(2)
(Vernon Supp. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59,61,64,65,67,68,70,73,74,83

Tex. Code Crim. P. Ann. Art. 35.16(a)(9)
(Vernon Supp. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59,61,64,65,67,68,70,73,74,83

Tex. Penal Code § 19.03 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

TEX. CODE CRIM. PROC. ANN. art. 37.071, §3(b)(1), (b)(2), (e) (Vernon Supp. 1999). . . . 117

TEX.CODE CRIM. PROC. ANN. art. 37.071 § 2(d)(2) (Vernon Supp. 1999) . . . . . . . . 113,115

TEX.CODE.CRIM. PROC. art. 37.071 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112,120,121

TEX.CODE CRIM. PROC. ANN. Art 38.03 (Vernon Supp. 1991) . . . . . . . . . . . . . . . . . . 100

Tex. Code Crim. Proc. Ann. art. 42.12 §§ 2(f)(2), 2(g) (Vernon Supp. 2001) . . . . . . . . . . . . . 113

Sec. 501.014 of the Texas Government Code . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

V.T. C. A., Penal Code § 19.03(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

## STATEMENT OF THE CASE

By an indictment filed on the 8th day of September, 2008, Appellant was charged in trial court cause number F08824667 with one count of capital murder. (C.R. Vol. 1 p. 2) The indictment alleged that Appellant intentionally or knowingly caused the death of Stephen Swan by shooting deceased the deceased with a firearm while said defendant was in the course of committing or attempting to commit the offense of robbery.  On January 29, 2009 Appellant was convicted of the offense of capital murder. (CR: Vol. 3 p. 635) The jury answered special issues such that a death sentence was imposed on February 2, 2009. (Clerk's Record Vol. 3 p. 698)

The testimony in the trial on the merits began on August 11, 2009.  The jury answered "Yes" to Special Issue No. 1and answered "No" to Special Issue No. 2.  In accordance with the previous verdict of guilty and answers to the special issues, the trial court entered a judgment and assessed Appellant's punishment at death.

On August 21, 2009, Appellant timely filed a Motion for New Trial that was subsequently denied by the court.  Notice of appeal was filed even though appeal to this Court is automatic. *See* Tex. Code Crim.Proc.Ann. art. 37.071,§ 2(g)(Vernon Supp. 2001)

## ISSUES PRESENTED

### VOIR DIRE ISSUES

**APPELLANT'S ISSUES NO.1**

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR, SHARRON MCCRANEY, IN VIOLATION OF THE DOCTRINE ESTABLISHED IN BATSON V. KENTUCKY

**APPELLANT'S ISSUES NO.2**

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR, MATTIE VATION, IN VIOLATION OF THE DOCTRINE ESTABLISHED IN BATSON V. KENTUCKY

**APPELLANT'S ISSUE NO. 3**

THE TRIAL COURT ERRED IN DENYING APPELLANT A HEARING ON HIS 'BATSON' CHALLENGE WITH REGARD TO JUROR, ANGELITA RIVERA, IN VIOLATION OF THE DOCTRINE ESTABLISHED IN BATSON V. KENTUCKY

**APPELLANT'S ISSUES NO.4**

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR, CURTIS RISER, IN VIOLATION OF THE DOCTRINE ESTABLISHED IN BATSON V. KENTUCKY

**APPELLANT'S ISSUES NO. 5**

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR, AGWNA LONG, IN VIOLATION OF THE DOCTRINE ESTABLISHED IN BATSON V. KENTUCKY

**APPELLANT'S ISSUES NO. 6**

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR, BETTY JACKSON, IN VIOLATION OF THE DOCTRINE ESTABLISHED IN BATSON V. KENTUCKY

**APPELLANT'S ISSUES NO. 7**

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR, DEDRICK MORRISON, IN VIOLATION OF THE DOCTRINE ESTABLISHED IN BATSON V. KENTUCKY

**APPELLANT'S ISSUE NO. 8**

THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON JON DESMOND

**APPELLANT'S ISSUE NO. 9**

THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON HELEN NOBLE

**APPELLANT'S ISSUE NO. 10**

THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON BILLY EUGENE HENRY

**APPELLANT'S ISSUE NO. 11**

THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON JOHN MCGUIRE, JR.

**APPELLANT'S ISSUE NO. 12**

THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON LISA DAVISON

**APPELLANT'S ISSUE NO. 13**

THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON BRUCE MCDONALD

**APPELLANT'S ISSUE NO. 14**

THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON TERESA RANDLEAS

**APPELLANT'S ISSUE NO. 15**

THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON JOHN CANTWELL

**APPELLANT'S ISSUE NO. 16**

THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON ALEXANDER KONKLE

**APPELLANT'S ISSUE NO. 17**

THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON LANCE BEDFORD

**APPELLANT'S ISSUE NO. 18**

THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON LYLE LIVINGSTON

**APPELLANT'S ISSUE NO. 19**

THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON JENNIFER STOCKTON

**APPELLANT'S ISSUE NO. 20**

THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON PATRICIA HODGES

**APPELLANT'S ISSUE NO. 21**

THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON CLARENCE WINFIELD

**APPELLANT'S ISSUE NO. 22**

THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON JOHN VESSELS

**APPELLANT'S ISSUE NO. 23**

THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON EMILY BLEVINS

**APPELLANT'S ISSUE NO. 24**

THE JURY AS CONSTITUTED WAS BIASED OR PREJUDICE WHICH DEPRIVED APPELLANT OF A FAIR TRIAL

APPELLANT'S ISSUE NO. 25

THE JURY AS CONSTITUTED WAS BIASED OR PREJUDICE
WHICH DEPRIVED APPELLANT OF A FAIR TRIAL

TRIAL ISSUES

APPELLANT'S ISSUE NO. 26

THE TRIAL COURT ERRED IN GRANTING THE STATE'S OBJECTION TO
PROFFERED EXPERT TESTIMONY EVIDENCE CONCERNING
"DIMINISHED CAPACITY" OR EVIDENCE CHALLENGING THE STATE'S EVIDENCE
ON MENS REA

APPELLANT'S ISSUE NO. 27

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION
AND MOTION TO SUPPRESS PROFFERED TESTIMONY OF
NEWS REPORTERS TO IN CUSTODY INTERVIEWS WITH APPELLANT
BECAUSE EACH REPORTER WAS A DEFACTO AGENT OF THE STATE

APPELLANT'S ISSUE NO. 28

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO
PHOTOGRAPHS AND CONTENTS SEIZED OF APPELLANT'S JAIL CELL

APPELLANT'S ISSUE NO. 29

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO
PHOTOGRAPHS OF PRISON

APPELLANT'S ISSUE NO. 30

THE TRIAL COURT ERRED IN ADMITTING NUMEROUS AUTOPSY PHOTOGRAPHS OF
MATTHEW BUTLER IN VIOLATION OF RULE 403, TEX. R. EVID., WHERE THE
PREJUDICIAL EFFECT OF THE EVIDENCE FAR OUTWEIGHED ANY PROBATIVE
VALUE

APPELLANT'S ISSUE NO. 31

THE TRIAL COURT ERRED IN ADMITTING NUMEROUS AUTOPSY PHOTOGRAPHS OF
STEPHEN SWAN IN VIOLATION OF RULE 403, TEX. R. EVID., WHERE THE
PREJUDICIAL EFFECT OF THE EVIDENCE FAR OUTWEIGHED
ANY PROBATIVE VALUE

**APPELLANT'S ISSUE NO. 32**

THE TRIAL COURT ERRED IN ADMITTING NUMEROUS CRIME SCENE PHOTOGRAPHS
OF STEPHEN SWAN IN VIOLATION OF RULE 403, TEX. R. EVID.,
WHERE THE PREJUDICIAL EFFECT OF THE EVIDENCE FAR OUTWEIGHED ANY
PROBATIVE VALUE

**APPELLANT'S ISSUE NO. 33**

THE TRIAL COURT ERRED IN ADMITTING NUMEROUS CRIME SCENE PHOTOGRAPHS
OF MATTHEW BUTLER IN VIOLATION OF RULE 403, TEX. R. EVID.,
WHERE THE PREJUDICIAL EFFECT OF THE EVIDENCE FAR OUTWEIGHED ANY
PROBATIVE VALUE

**APPELLANT'S ISSUE NO. 34**

THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUPPORT
THE CONVICTION FOR CAPITAL MURDER

**APPELLANT'S ISSUE NO.35**

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION
TO PROFFERED EXPERT TESTIMONY CONCERNING "GANG" AFFILIATION
IN THE PUNISHMENT STAGE OF THE TRIAL

**APPELLANT'S ISSUE NO. 36**

THE TRIAL COURT ERRED IN DENYING APPELLANT'S REQUESTED
LIMITING INSTRUCTION IN REGARD TO TESTIMONY FROM
WITNESS, BARRET KEITH NELSON, WHO TESTIFIED
AS AN EXPERT ON 'GANG EVIDENCE' IN THE PUNISHMENT STAGE OF THE TRIAL

**APPELLANT'S ISSUE NO. 37**

THE EVIDENCE IS LEGALLY INSUFFICIENT EVIDENCE TO SUPPORT THE JURY'S
ANSWER TO SPECIAL ISSUE NO. 1 IN THE PUNISHMENT
STAGE OF THE TRIAL

**APPELLANT'S ISSUE NO. 38**

THE TRIAL COURT'S JUDGEMENT ENTERED IN THIS CASE THAT ASSESS COSTS IN
THE AMOUNT OF $460.00 WHICH ACCORDING TO A STANDING GARNISHMENT ORDER
THAT ALLOWS THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE TO WITHDRAW
MONEY FROM DEFENDANT'S INMATE TRUST FUND ACCOUNT AND FORWARD THE
FUNDS TO THE DISTRICT CLERKTO PAY FOR COURT COSTS, FEES AND/OR FINES
ASSESSED IN THE UNDERLYING JUDGMENT OF CONVICTION FOR THE OFFENSE OF
CAPITAL MURDER ENTERED ON AUGUST 21, 2009 WAS IN VIOLATION OF THE
DEFENDANT'S RIGHT TO DUE PROCESS, BECAUSE THE ENTRY OF THE ORDER DID
NOT AFFORD APPELLANT NOTICE AND AN OPPORTUNITY TO BE HEARD ON THE
MATTER

**APPELLANT'S ISSUE NO. 39**

THE TRIAL COURT'S JUDGEMENT TO THE TEXAS DEPARTMENT OF CRIMINAL
JUSTICE TO WITHDRAW MONEY FROM DEFENDANT'S INMATE TRUST FUND
ACCOUNT AND FORWARD THE FUNDS TO THE DISTRICT CLERK TO PAY FOR COURT
COSTS, FEES AND/OR FINES ASSESSED IN THE UNDERLYINGJUDGMENT OF
CONVICTION FOR THE OFFENSE OF CAPITAL MURDER ENTERED ON AUGUST 21, 2009
DID NOT COMPLY WITH THE AUTHORIZING STATUTE, TEXAS GOVERNMENT CODE
SEC. 501-014 BECAUSE THE RECORD FAILS TO SHOW THAT APPELLANT WAS DULY
"NOTIFIED BY THE TRIAL COURT"

**APPELLANT'S ISSUE NO. 40**

THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUPPORT THE TRIAL COURT'S ORDER
ENTERED ON AUGUST 21, 2009 WHICH ALLOWS INMATE TRUST FUNDS TO BE PAID
TO THE DISTRICT CLERK IN THIS CAUSE

**FEDERAL ISSUES**

**APPELLANT'S ISSUE NO. 41**

THE STATUE UNDER WHICH APPELLANT WAS SENTENCED TO DEATH IS
UNCONSTITUTIONAL IN VIOLATION OF THE CRUEL AND UNUSUAL PUNISHMENT
PROHIBITION OF THE EIGHTH AMENDMENT BECAUSE IT ALLOWS THE JURY TOO
MUCH DISCRETION TO DETERMINE WHO SHOULD LIVE AND WHO SHOULD DIE AND
BECAUSE IT LACKS THE MINIMAL STANDARDS AND GUIDANCE NECESSARY FOR
THE JURY TO AVOID THE ARBITRARY AND CAPRICIOUS IMPOSITION OF THE DEATH
PENALTY

xxiii

**APPELLANT'S ISSUE NO. 42**

THE STATUTE UNDER WHICH APPELLANT WAS SENTENCED TO DEATH IS
UNCONSTITUTIONAL IN VIOLATION OF THE EIGHTH AMENDMENT AS INTERPRETED
IN *PENRY V. JOHNSON* BECAUSE THE MITIGATION SPECIAL ISSUE SENDS MIXED
SIGNALS TO THE JURY THEREBY RENDERING ANY VERDICT REACHED IN RESPONSE
TO THAT SPECIAL ISSUE INTOLERABLE AND UNRELIABLE

**APPELLANT'S ISSUE NO. 43**

THE STATUTE UNDER WHICH APPELLANT WAS SENTENCED TO DEATH IS
UNCONSTITUTIONAL IN VIOLATION OF THE DUE PROCESS REQUIREMENTS OF THE
FOURTEENTH AMENDMENT BECAUSE IT IMPLICITLY PUTS THE BURDEN OF
PROVING THE MITIGATION SPECIAL ISSUE ON APPELLANT RATHER THAN
REQUIRING A JURY FINDING AGAINST APPELLANT ON THAT ISSUE UNDER THE
BEYOND A REASONABLE DOUBT STANDARD

**APPELLANT'S ISSUE NO. 44**

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO HOLD ARTICLE
37.071 Sec. 2(E) AND (F) CONCERNING BURDEN OF PROOF UNCONSTITUTIONAL AS A
VIOLATION OF ARTICLE ONE Sec. 10 AND Sec. 13 OF THE TEXAS CONSTITUTION

**APPELLANT'S ISSUE NO. 45**

THE TEXAS DEATH PENALTY SCHEME VIOLATES DUE PROCESS PROTECTIONS OF
THE UNITED STATES CONSTITUTION BECAUSE THE PUNISHMENT SPECIAL ISSUE
RELATED TO MITIGATION FAILS TO REQUIRE THE STATE TO PROVE THE ABSENCE
OF SUFFICIENT MITIGATING CIRCUMSTANCES BEYOND A REASONABLE DOUBT,
CONTRARY TO *APPRENDI* AND ITS PROGENY

**APPELLANT'S ISSUE NO. 46**

THE TEXAS DEATH PENALTY SCHEME VIOLATED APPELLANT'S RIGHTS AGAINST
CRUEL AND UNUSUAL PUNISHMENT AND DUE PROCESS OF LAW UNDER THE EIGHTH
AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY
REQUIRING AT LEAST TEN "NO" VOTES FOR THE JURY TO RETURN A NEGATIVE
ANSWER TO THE PUNISHMENT SPECIAL ISSUES.

**APPELLANT'S ISSUE NO. 47**

THE TEXAS DEATH PENALTY SCHEME VIOLATED APPELLANT'S RIGHTS AGAINST
CRUEL AND UNUSUAL PUNISHMENT, AN IMPARTIAL JURY AND TO DUE PROCESS OF
LAW UNDER THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED
STATES CONSTITUTION BECAUSE OF VAGUE, UNDEFINED TERMS IN THE JURY
INSTRUCTIONS AT THE PUNISHMENT PHASE OF THE TRIAL THAT EFFECTIVELY
DETERMINE THE DIFFERENCE BETWEEN A LIFE SENTENCE AND THE IMPOSITION
OF THE DEATH PENALTY

**APPELLANT'S ISSUE NO. 48**

THE TEXAS DEATH PENALTY SCHEME DENIED APPELLANT DUE PROCESS OF LAW, AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION BECAUSE OF THE IMPOSSIBILITY OF SIMULTANEOUSLY RESTRICTING THE JURY'S DISCRETION TO IMPOSE THE DEATH PENALTY WHILE ALSO ALLOWING THE JURY UNLIMITED DISCRETION TO CONSIDER ALL EVIDENCE MILITATING AGAINST IMPOSITION OF THE DEATH PENALTY.

**APPELLANT'S ISSUE NO. 49**

THE TEXAS DEATH PENALTY SCHEME DENIED APPELLANT DUE COURSE OF LAW, AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT, IN VIOLATION OF ARTICLE I, §§ 13 AND 19, OF THE TEXAS CONSTITUTION BECAUSE OF THE IMPOSSIBILITY OF SIMULTANEOUSLY RESTRICTING THE JURY'S DISCRETION TO IMPOSE THE DEATH PENALTY WHILE ALSO ALLOWING THE JURY UNLIMITED DISCRETION TO CONSIDER ALL EVIDENCE MILITATING AGAINST IMPOSITION OF THE DEATH PENALTY

**APPELLANT'S ISSUE NO. 50**

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO HOLD ART. 37.071 Sec. 2(e) and (f) UNCONSTITUTIONAL BECAUSE SAID STATUTE FAILS TO REQUIRE THE ISSUE OF MITIGATION BE CONSIDERED BY THE JURY

**APPELLANT'S ISSUE NO. 51**

THE STATUTORY "PENRY" SPECIAL ISSUE IN TEX. CODE CRIM. PRO. ARTS. 37.071 & 37.0711 IS UNCONSTITUTIONAL BECAUSE IT FAILS TO PLACE THE BURDEN OF PROOF ON THE STATE REGARDING AGGRAVATING EVIDENCE

**APPELLANT'S ISSUE NO. 52**

THE STATUTORY "PENRY" SPECIAL ISSUE IS UNCONSTITUTIONAL UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE IT PERMITS THE VERY TYPE OF OPEN-ENDED DISCRETION CONDEMNED BY THE UNITED STATES SUPREME COURT IN FURMAN V. GEORGIA

**APPELLANT'S ISSUE NO. 53**

TEXAS' STATUTORY CAPITAL SENTENCING SCHEME IS UNCONSTITUTIONAL UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS BECAUSE IT DOES NOT PERMIT MEANINGFUL APPELLATE REVIEW

**APPELLANT'S ISSUE NO. 54**

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO QUASH THE INDICTMENT AS BEING UNCONSTITUTIONAL BASED ON THE ENUMERATED CONSTITUTIONAL DEFECTS OF THE TEXAS CAPITAL MURDER DEATH PENALTY LAW**

**APPELLANT'S ISSUE NO. 55**

**THE CUMULATIVE EFFECT OF THE ABOVE-ENUMERATED CONSTITUTIONAL VIOLATIONS DENIED APPELLANT DUE PROCESS OF LAW IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.**

**APPELLANT'S ISSUE NO. 56**

**THE CUMULATIVE EFFECT OF THE ABOVE-ENUMERATED CONSTITUTIONAL VIOLATIONS DENIED APPELLANT DUE COURSE OF LAW UNDER ARTICLE I, § 19, OF THE TEXAS CONSTITUTION.**

xxvi

## STATEMENT OF FACTS

*This case involves the shooting death of a victim during an aggravated robbery in which another victim was killed.*

### TRIAL ON THE MERITS

#### State's Evidence on guilt/innocence

*1)Testimony Amy Gruszecki M.D. :* Dr. Amy Gruszecki, a medical examiner with the Southwest Institute of Forensic Sciences, testified that she performed the autopsy on Stephen Louis Swan. (RR: Vol. 46 p. 15-16) She said the deceased was found dead on June 19th, 2008 at 1:20 a.m. (RR: Vol. 46 p. 21) She said he was 26 years old and 6'4" tall. (RR: Vol. 46 p. 21) She said he had a gunshot wound to the head with the entrance on the right temporal region. (RR: Vol. 46 p. 22) The gunshot wound was an intermediate range wound which meant that the gun was fired at a distance of six to eight inches away from the wound. (RR: Vol. 46 p. 25) The witness testified that Mr. Swan also had a gunshot wound to the left chest. (RR: Vol. 46 p. 25) She stated that the wound to the head would have been immediately severe. (RR: Vol. 46 p. 26) She stated that Stephen Swan died as a result of multiple gunshot wounds and the manner of death was homicide. (RR: Vol. 46 p. 35)

*2)Testimony of Clint McNear:* Clint McNear, an investigator with the Garland Police Department, said he assisted with the investigation of the double homicide of Stephen Swan and Matthew Butler along with lead detective, Detective Sweet. (RR: Vol. 46 p. 39) He said he interviewed Damarius Cummings and as a result, he and other officers went to the Junction Street Apartments. (RR: Vol. 46 p. 41) They went to the apartment of John Calhoun who gave them consent to search for a weapon. (RR: Vol. 46 p. 42) They found a weapon hidden under a mattress. (RR: Vol. 46 p. 42)

The Detective testified that he went to EZ Pawn in southeast Dallas and recovered some tools that had been pawned by Damarius Cummings and the Defendant. (RR: Vol. 46 p. 46) They determined that the tools came from the car which was taken from the crime scene. (RR: Vol. 46 p. 46) He said he personally watched a videotape from the pawn shop and saw Damarius Cummings and James Broadnax enter the store carrying some tools. The witness stated that the EZ Pawn receipt showed a driver's license information for Mr. Cummings with the date of 6/19/2008 and a time of 11:29 a.m. (RR: Vol. 46 p. 54-55)

*3) Testimony of Isabel Giannone:* Isabel Giannone, a forensic investigator for the Garland Police Department, testified that she was called to the crime scene at the front of Zion Gate Records in the early morning hours of June 19th, 2008. (RR: Vol. 46 p. 64) She saw two bodies on the floor with

1

gunshot wounds on the bodies. (RR: Vol. 46 p. 67) She said there was blood and cartridge casings on the floor. (RR: Vol. 46 p. 67)

The witness testified that the pockets of Stephen Swan appeared to have been turned inside out. (RR: Vol. 46 p. 78) She said Matthew Butler was found in the parking lot and had obvious signs of injury. (RR: Vol. 46 p. 86) She said the blood trail was consistent with Mr. Butler being shot near Mr. Swan and moving to the place where he was found. (RR: Vol. 46 p. 88) She said it appeared Mr. Swan had been shot in the back and had fallen to the ground. (RR: Vol. 46 p. 88)

She testified that she also examined a Crown Victoria in connection with this offense. (RR: Vol. 46 p. 106) She said that no blood evidence was found inside the car. (RR: Vol. 46 p. 119) She recovered clothing, a suitcase and red and black backpacks from the trunk of the car. (RR: Vol. 46 p. 119) She found a pipe, shirt, shop towels were found in the red backpack. (RR: Vol. 46 p. 120-121) A concealed handgun license belonging to Stephen Swan, a pair of Nike shoes were in the black backpack. (RR: Vol. 46 p. 121) She said the suitcase contained numerous items of clothing, a social security card and application for birth record in the name of James Broadnax. (RR: Vol. 46 p. 122)

*4)Testimony Susan Allen:* Susan Allen, a forensic firearm examiner testified that the Garland Police Department brought her six fired Remington .380 auto cartridge cases, four fired bullets and one fired part of a bullet. (RR: Vol. 46 p. 168) She also received a Browning 9 millimeter short with a magazine. (RR: Vol. 46 p. 169) She stated that she was able to identify all six cartridge cases to the Browning. (RR: Vol. 46 p. 179) She said the fired bullets were fired from the Browning 9 millimeter pistol. (RR: Vol. 46 p. 181)

*5)Testimony James Nichols:* James Nichols, a forensic scientist with the Texas Department of Public Safety Crime Laboratory in Garland, testified that performed DNA analysis on the evidence in this case. (RR: Vol. 46 p. 185) He stated that he relied upon a report prepared by Kimberly Mack, a forensic serologist, in preparing his DNA report. (RR: Vol. 46 p. 192) He said Ms. Mack performed a presumptive test for blood on some of the items, collected known blood standards of the victims, collected the front right and left pant pocket of Stephen Swan for DNA analysis, collected white Nike shoes for DNA analysis and collected a handgun for DNA analysis. (RR: Vol. 46 p. 192-194) A buccal swab was also taken from Damarius Cummings and James Broadnax. (RR: Vol. 46 p. 194)

The witness testified that the DNA profile from the swab of the left side of the pistol was consistent with the DNA profile of Stephen Swan. (RR: Vol. 46 p. 196) The Nike shoes contained DNA profiles of Matthew Butler. (RR: Vol. 46 p. 197) He said too many people handled the handgun which affected the quality of DNA. (RR: Vol. 46 p. 200) He said the DNA profile from the swab of the left

2

front pocket was consistent with a mixture from Stephen Swan, Damarius Cummings and at least two other individuals. On cross examination, the witness stated that the Defendant was excluded as a contributor to the right grip of the pistol. (RR: Vol. 46 p. 205)

6)*Testimony of Shaun Rabb:* Shaun Rabb, a reporter for KDFW Fox Channel 4 in Dallas, Texas, testified that on June 23, 2008 he interviewed the Defendant at the Dallas County Jail in the company of a photographer. (RR: Vol. 46 p. 212-220) He said he interviewed Mr. Broadnax and then Damarius Cummings. (RR: Vol. 46 p. 220) He said the interview was videotaped. (RR: Vol. 46 p. 222) He said the Defendant was willing to talk to him and he did not force him to talk with him. (RR: Vol. 46 p. 232) The videotaped interview was played for the jury. (RR: Vol. 46 p. 233)

7)*Testimony of Jason Varghese*: James Varghese, a licensed psychological assessor at the Law Sterrett Justice Center, stated that he does suicide risk assessments on inmates that are placed on suicide watch. (RR: Vol. 47 p. 19) He identified Defendant's Exhibit No. 4 as the questionnaire conducted on the Defendant when he first came in. (RR: Vol. 47 p. 25-26) Because Mr. Broadnax was brought in on a weekend of June 21st, 2008, he was not seen by a psych assessor or psychiatrist until June 23rd. (RR: Vol. 47 p. 27) He testified that the document showed that the patient was charged with murder of multiple persons, was irritable and angry, had no past psychiatric history but had audio hallucinations. (RR: Vol. 47 p. 30-31) The Defendant answered yes when asked if he was having hallucinations or paranoia. (RR: Vol. 47 p. 32) He stated that the Defendant was not taking any psychotropic medications. (RR: Vol. 47 p. 32) He noted that the Defendant began using drugs and alcohol at age seven or eight years. (RR: Vol. 47 p. 33) He said the Defendant told him that he had smoked a "blunt", marijuana laced with either PCP or formaldehyde. (RR: Vol. 47 p. 34) He said the Defendant was disheveled, agitated and overly expressive about his feelings. (RR: Vol. 47 p. 34-35) He referred the Defendant for a follow-up evaluation and noted that he was severely agitated and combative. (RR: Vol. 47 p. 36) The witness testified that the Defendant was placed on suicide precautions sometime on June, 23rd. (RR: Vol. 47 p. 37)

8)*Testimony of Haideh Mirmesdagh, M.D.:* Dr. Mirmesdagh, a psychiatrist, testified that on June 23rd, 2008, he evaluated the Defendant and made a one page report on his findings. (RR: Vol. 47 p. 72) He said the Defendant made the statement "I was high when I got here." (RR: Vol. 47 p. 76) He said the Defendant told him that his sister had some type of psychiatric diagnosis but he didn't know what it was. (RR: Vol. 47 p. 77) The witness wrote in the evaluation that the Defendant was disrespectful, irritable and angry. (RR: Vol. 47 p. 78) He noted that the Defendant was having hallucinations but the voices he was hearing were not giving him commands. (RR: Vol. 47 p. 79) He noted that he was having delusions and paranoia. (RR: Vol. 47 p. 80) He made the notation, "many drugs in the past" and noted

3

that the Defendant had been smoking marijuana on a daily basis since age 12. (RR: Vol. 47 p. 80) The last time the Defendant smoked marijuana was on June 21st, 2008. (RR: Vol. 47 p. 80)  He stated that a person can be having auditory hallucinations and not give an external response to those stimuli. (RR: Vol. 47 p. 88) He noted that the Defendant told him that he was hearing voices all the time. (RR: Vol. 47 p. 88)

  *9)Testimony of Kimberly Leach*: Kimberly Leach, a public information officer for the Dallas County Sheriff's Department, testified that she was working on the weekend of June 21st through June 23rd and was the person the media had to go through to interview an inmate. (RR: Vol. 47 p. 122) She said it was the Sheriff's Department policy for the media to fill out a request form and email or fax it to the whatever jail the inmate is located. (RR: Vol. 47 p. 125) She said if an inmate is in the psych ward of the West Tower, a medical person makes the call on whether an inmate has a right to speak or not. (RR: Vol. 47 p. 125) She recalled getting these forms from the locate news channels and the Dallas Morning News. (RR: Vol. 47 p. 126) She said she sent these requests to the West Tower and the jailer who was on duty at the time would have taken the request. (RR: Vol. 47 p. 126) She said it would be up to the particular jailer who received the fax whether or not there needed to be any medical clearance. (RR: Vol. 47 p. 126) She did not know if they checked with the medical people. (RR: Vol. 47 p. 127)

  The witness testified that she does not consider whether or not an inmate has a lawyer or has requested a lawyer when determining whether or not to allow an inmate to speak to the media. (RR: Vol. 47 p. 127) She said when the media calls, she doesn't find out whether or not the inmate has a lawyer or has requested one. (RR: Vol. 47 p. 131) She identified Defendant's Exhibit No. 11 as a page from the Sheriff's Department website which tells the media exactly what they've got to do to get an inmate interview. (RR: Vol. 47 p. 133) She said she faxed over the request to the lieutenant or the sergeant and did not make any attempt to find out what the Defendant's mental condition was at the time. (RR: Vol. 47 p. 134) She said at some point which she didn't recall, she looked at the Adult Identification System for information on the Defendant and found that the first entry on June 21st, 2008 the Defendant was on maximum custody level and under behavioral observation. (RR: Vol. 47 p. 135) She said she is supposed to be mindful of the constitutional rights of the inmate and of things that might prejudice the rights of suspects. (RR: Vol. 47 p. 137) She stated that she was also mindful of the constitutional rights of an inmate if he chooses to speak. (RR: Vol. 47 p. 137)

  She agreed that in this case she didn't check to see if Mr. Broadnax had a lawyer, didn't check to see what his mental condition was but facilitated the arrangement of the media to see Mr. Broadnax on June 23rd. (RR: Vol. 47 p. 138) She recalled going to the West Tower to one of the many medical

4

facilities in the jail. (RR: Vol. 47 p. 139) She stayed with the reporters while they interviewed the Defendant. (RR: Vol. 47 p. 139-140) She said that she scheduled the reporters twenty minutes apart. (RR: Vol. 47 p. 140) She said Mr. Cummings had also agreed to do interviews so she had to stagger the visits. (RR: Vol. 47 p. 140)

   *10)Testimony of Christie Hicklen:* The testimony of Christie Hicklen from a previous hearing was read by Ms. Keri Mallon. (RR: Vol. 47 p. 158) Ms. Hicklen testified that she works for the Dallas County Sheriff's Department as a detention service officer in mental health in the West Tower. (RR: Vol. 47 p. 158) She stated that she was the person who, on June 23rd, 2008, went and retrieved the Defendant and brought him to his interviews with the media. (RR: Vol. 47 p. 159) She said the Defendant was being held in closed behavioral observation where he could only leave if he was being interviewed by a psychiatric doctor. (RR: Vol. 47 p. 161) When she saw the news media setting up she said she asked the Defendant if he wanted to interview and he told her that he did. (RR: Vol. 47 p. 164) She said she placed him in the cell and waited outside until the interview was finished. (RR: Vol. 47 p. 164) She said that she didn't know anything about his diagnosis but knew he was on suicide watch. (RR: Vol. 47 p. 166)

***The jury found the Defendant guilt of capital murder as charged in the indictment. (RR: Vol. 47 p. 203)***
***The State on Punishment***

   *11)Testimony of Theresa Butler:* Theresa Butler, the mother of deceased Matthew Butler, testified that Matthew was her only child. (RR: Vol. 47 p. 29) She said he went to Collin County Community College and studied audio engineering. (RR: Vol. 48 p. 30-31) Her son married Jamie Butler and they had two children, Matthew, Jr. and Mikayla Grace. (RR: Vol. 48 p. 33) She said at the time of his death, he and Steve Swan had recorded a symphony orchestra and were working to finish it. (RR: Vol. 48 p. 36)

   *12)Testimony of Tracy Dyer, M.D.:* Dr. Dyer testified that she was a medical examiner at the(RR: Dallas County Medical Examiner's Office. (RR: Vol. 48 p. 39) She said she performed the autopsy on Matthew Butler. (RR: Vol. 48 p. 41) She said Mr. Butler died of multiple gunshot wounds and the manner of death was homicide. (RR: Vol. 48 p. 42) She said there was a gunshot wound to the right side of the victim's face which had stippling around the wound. (RR: Vol. 48 p. 46) On this wound the bullet went through the mandible, through the back of his tongue, through the soft tissues on the left side of his face and it exited on the left side of his face. (RR: Vol. 48 p. 47) She said the wound consistent with someone standing over the body and firing slightly down and from right to left. (RR: Vol. 48 p. 48) She described multiple gunshot wounds to the victim.

*13)Testimony of Jean Swan:* Jean Swan, the mother of the deceased Stephen Swan, testified that since her son was murdered, she has not been the same person. (RR: Vol. 48p. 63) She said Stephen taught himself music and trained himself on every instrument he played. (RR: Vol. 48 p. 64) She said he had written hundreds of songs. (RR: Vol. 48 p. 64)

*14) Testimony of Deputy Richard Hamb:* Dep. Richard Hamb, a fingerprint technician with the Dallas Sheriffs office, testified that he works in the identification section of the Dallas County Jail. (RR: Vol. 48 p. 67) and made a comparison of the prints in a certified packet of records and found that they were from the same person, James Broadnax. (RR: Vol. 48 p. 71)

*15)Testimony of Mark Turner:* Mark Turner, president and CEO of Value Added Communications in Plano, Texas, testified his company provides inmate telephone systems. (RR: Vol. 48 p. 73) He said they have a contract with the Dallas County Jail. (RR: Vol. 48 p. 74) He said that when an inmate makes a telephone call from the Dallas County Jail it was possible to record the conversation. (RR: Vol. 48 p. 74) He said State's Exhibit No. 425 was a printout of the inmate call records for James Broadnax between September 15th, 2008 and June 7th, 2009. (RR: Vol. 48 p. 78) He said that it was possible that someone could get someone else's pin number and make phone calls on that person's pin number. (RR: Vol. 48 p. 79) He said that after a certain amount of calls were made, the inmate would have to update their call list. (RR: Vol. 48 p. 80)

*16)Testimony of David Barger:* David Barger, an investigator for the Dallas District Attorney's Office, identified State's Exhibits Nos. 571 and 572 as CD's containing recorded phone conversations, State's Exhibits Nos. 546 through 558, based on the Defendant's AIS number. (RR: Vol. 48 p. 89) A phone call between the Defendant and Ms. Lakarrame Cole, the sister of co-defendant Damarius Cummings sister, was played for the jury. (RR: Vol. 48 p. 95-96) He stated that this call was made in January of this year, five months after the offense. (RR: Vol. 48 p. 97) The CD was played for the jury.

*17)Testimony of Darrell Doty:* Darrell Doty, an investigator for the District Attorney's Office, testified that on June 19th, 2009 he was asked by his supervisor to go to the jail and photograph some items in the Defendant's cell. (RR: Vol. 49 p. 36) He identified the photographs he took at the jail cell. (RR: Vol. 49 p. 37-38) Over defense objection the photographs were admitted into evidence. (RR: Vol. 38-39) He described the photographs to the jury. (RR: Vol. 49 p. 41) He said they found the blade portion of a disposable razor that had been disassembled. (RR: Vol. 49 p. 44-45) The witness testified that he photographed a pill of an undetermined medication that was found under magazine which was a violation of the rules. (RR: Vol. 49 p. 46) He said the Defendant had a book, The Art of War by Sun Tzu which would have been sent to him by someone outside the jail. (RR: Vol. 49 p. 47) He said the

6

Defendant had a pretty significant library of over forty books. (RR: Vol. 49 p. 49) Mr. Doty testified that he also found a Bible in the Defendant's cell which had pornography inside it which was also a violation of the rules. (RR: Vol. 49 p. 56) He said there were drawings of pitchforks and six pointed stars on paper and on the walls in the cell. (RR: Vol. 49 p. 58) He said G74D and Gangsta City,6336 was written on paper and the walls. (RR: Vol. 49 p. 59)

On cross examination the witness stated that a prisoner could have cut their hair with the razor. (RR: Vol. 49 p. 61) He didn't know if the pill was prescribed for the Defendant. (RR: Vol. 49 p. 61) He said there was no television or radio but the inmates could read and there was a rolling cart of books that they could use. (RR: Vol. 49 p. 61) He said inmates were allowed to receive books from outside the jail. (RR: Vol. 49 p. 62) He had not read the book, The Art of War, which was written by a Chinese general 2500 years ago. (RR: Vol. 49 p. 62) The witness said that he did not know why items the Defendant purchased off the commissary cart would have been seized during the search of his cell. (RR: Vol. 49 p. 67)

*18) Testimony of Schesser Rachel Kirvin:* Ms. Kirvin testified she worked for the Dallas County Sheriff's Department as a member of Special Response Team. (RR: Vol. 48 p. 132) She stated that on July 23, 2008 they performed shakedown of the Defendant's cell and the Defendant was taken down to the floor with minimum force. (RR: Vol. 48 p. 141) She told him to get against the wall but he asked her what would happen if he didn't listen to her so he was taken down. (RR: Vol.. 48 p. 142) She said after they placed on the ground, he began cursing and yelling. (RR: Vol. 48 p. 146) She said he was then taken to the nurse and was very combative. (RR: Vol. 48 p. 148)

On cross examination the witness testified that the shakedown occurred at 1:00 a.m. and the Defendant had been sleeping. (RR: Vol. 48 p. 155) She said this was the first time the Defendant's cell had a shakedown. (RR: Vol. 48 p. 156) She said no one was harmed. (RR: Vol. 48 p. 158) She identified Defendant's Exhibit No. 13 as a request from the Defendant to see a psychiatrist because he was seeing things, couldn't sleep and was paranoid. (RR: Vol. 48 p. 161)

*19) Testimony of Morris Contreras:* Morris Contreras, a detention service officer with the Dallas County Sheriff's Office, testified that on January 21, 2009 he broke up a fight in the gym between the Defendant and Tre'Vaun Miller. (RR: Vol. 48 p. 177-178) The men were pulled apart. (RR: Vol. 48 p. 178) On cross examination the witness stated that neither man wanted to see a nurse and neither man wanted to file any type of complaint. (RR: Vol. 48 p. 189)

7

**20) *Testimony of Marcos Gurierrez:*** Marcos Gurierrez, a jailer at the Dallas County Jail, testified that on May 12, 2009 he escorted the Defendant and Matthew Utsey back to court. (RR: Vol. 48 p. 202-203) He said the Defendant turned around and struck Mr. Utsey on the arm. (RR: Vol. 48 p. 207)

On cross examination the witness said that Mr. Broadnax did not tell him why he hit Mr. Utsey. (RR: Vol. 48 p 213) He said there were no injuries. (RR: Vol. 48 p. 214) He said he did not see Mr.Utsey spit on the Defendant. (RR: Vol. 48 p. 214) He said he wasn't with the inmates in the elevator. (RR: Vol. 48 p. 215)

**21) *Testimony of Matthew Utsey:*** Matthew Utsey, testified he had been incarcerated in the Dallas County Jail with the Defendant on the same cell block. (RR: Vol. 48 p. 220) He said the Defendant repeatedly told him that he was going to beat him and get him when he went to court with him. (RR: Vol. 48 p. 223) He said the Defendant hit him while they were on the way to court. (RR: Vol. 48 p. 224) He said he didn't spit on or kick the Defendant. (RR: Vol. 48 p. 232) On cross examination the witness testified that on May 34th, 2009 he got into a fight with an inmate and that was why he was living in a single cell near the Defendant. (RR: Vol. 48 p. 244) He denied calling the inmates around him names and taunting them. (RR: Vol. 48 p. 246) He denied telling an inmate the he was going to testify against them all. (RR: Vol. 48 p. 247) He said he did not try to sell his drugs to the inmates. (RR: Vol. 48 p. 248)

**22)*Testimony of Barrett Nelson:*** Barrett Nelson, an officer with the Dallas Police Department assigned to the gang unit, testified that members of the unit are all members of the Texas Gang Investigator Association. (RR: Vol. 49 p. 80) He said they go to apartment complexes to identify and arrest gang members who commit crimes. (RR: Vol. 49 p. 80) He said most gangs in the Dallas area have their own web sites which includes their history, colors and photographs. (RR: Vol. 49 p. 81) He said he was instructed by the prosecutor to find out about the gang named the Gangster Disciples. (RR: Vol. 49 p. 83) He said he reviewed media interviews given by the Defendant and saw him throw a gang sign. (RR: Vol. 49 p. 85) He said this was a self-admission of gang membership. (RR: Vol. 49 p. 85) He said the Defendant said "he wraps his flag around his pistol because he's a Folk." (RR: Vol. 49 p. 85) He said Folk is an allegiance of gangs in Chicago that are the Folk Nation. (RR: Vol. 49 p. 85) He said the Folk Nation is Gangster Disciples and most Crips. (RR: Vol. 49 p. 86) He said the Gangster Disciples have a symbol of a pitchfork pointed up. (RR: Vol. 49 p. 87) He said the flag is their bandana. (RR: Vol. 49 p. 87)

The witness testified that the Black Gangster Disciples started in Chicago and at first engaged in lawful and legal activities such as marching with Jesse Jackson in his operation PUSH. (RR: Vol. 49 p.

8

92) However, the gang eventually turned to violence and used selling drugs, robberies and murders as a way of funding the organization. (RR: Vol. 49 p. 92) He said the gang originated in the 1960's and was one of the oldest gangs in the country. (RR: Vol. 49 p. 93) He said the pitchfork was the sign of the Gangster Disciples. (RR: Vol. 49 p. 95) He said that in one of the Defendant's free style writings, he pays tribute to Larry Hoover, the original founder of the Black Gangster Disciples. (RR: Vol. 49 p. 97) He determined that the Defendant's call sign was "Boss." (RR: Vol. 49 p. 97)

The witness identified State's Exhibit 268 and 269 as notebooks which were found in a suitcase in the victim's car along with personal items of the Defendant. (RR: Vol. 49 p. 106) He said he connected the notebooks to the Defendant through the initials J.B., the call sign of Boss, and lyrics concerning robing, killing and selling dope. (RR: Vol. 49 p. 108) He said there were pitchforks depicted in the notebooks which indicated a member of the Gangster Disciples. (RR: Vol. 49 p. 109) He said there were numerous references to body bags and murder in the notebooks. (RR: Vol. 49 p. 119)

The Officer testified that there were notations in the notebook about the sale of hydroponically grown marijuana and how much the Defendant anticipated earning. (RR: Vol. 49 p. '29) He said there were also notes on methamphetamine and cocaine. (RR: Vol. 49 p. 130) He said both notebooks had indicators of Gangster Disciples activity. (RR: Vol. 49 p. 131)

*23)Testimony of Melody Nelson:* Melody Nelson, an assistant warden with the Texas Department of Criminal Justice Institutional Division, testified that she has been employed in the prison system for twenty years. (RR: Vol. 49 p. 142) She explained to the jury the duties of a correctional officer. (RR: Vol. 49 p. 143- 144) She described the number of inmates and the facilities for housing them. (RR: Vol. 49 p. 145-146) She said that the prison is a society which, besides inmates, includes medical personnel, chaplains, volunteers, counselors, clerks, mail room staff, law library staff and correctional officers. (RR: Vol. 49 p. 146-147) She stated that family members also come to the prisons for visitation. (RR: Vol. 49 p. 147)

The witness described for the jury the process an inmate goes through when they are sentenced and then classified. (RR: Vol. 49 p. 148-153) She stated that there classifications of G1 through G5 which were in the general population and not restricted to their cells for a long period of time. (RR: Vol. 49 p. 153) She explained the different levels of offender populations including administrative segregation. (RR: Vol. 49 p. 153- 163) She further described the housing classifications G1 through G5 and the type of work each performed. (RR: Vol. 49 p. 163-166) She testified that the biggest incentive for inmates to act right in prison was the possibility for parole. (RR: Vol. 49 p. 172) Using photographs, the witness described death row to the jury. (RR: Vol. 49 p. 176-181) She said that all ag-seg and death row

9

inmates must be escorted by a minimum staff members and wear handcuffs. (RR: Vol. 49 p. 181) G3 through G5 inmates did not need to be escorted or restrained. (RR: Vol. 49 p. 181)

The witness testified that death row inmates are divided into three categories, Level 1,2, and 3 with Level 3 inmates begin assaultive in nature and having fewer purchases from the commissary. (RR: Vol. 49 p. 212)

On cross examination Warden Nelson testified that Mr. Broadnax, having been convicted of capital murder, would never be classified as a G1 or G2. (RR: Vol. 49 p. 230) She thought there were 71 inmates serving a life sentence without parole in the TDCJ system. (RR: Vol. 49 p. 231) She said there have not been any predictions made as to whether or not these inmates were more or less violent in the penitentiary than any other inmate. (RR: Vol. 49 p. 232) She said a person convicted of capital murder and serving a life sentence without parole would not automatically go in as a G3 but would go through the classification process. (RR: Vol. 49 p. 234) She said a G3 inmate would only have visitation with immediate family members. (RR: Vol. 49 p. 236) She said they did not have any problems with inmates attacking their families. (RR: Vol. 49 p. 236)

The witness testified that they had ways of dealing with inmates who were violent towards others including sending them to ag seg, making them wear paper clothing and having their meals baked into a single loaf. (RR: Vol. 49 p. 244) She didn't know the statistics of the drop violent behavior after a certain age. (RR: Vol. 49 p. 246) She said the movements of the inmates are controlled while they are going to and from work. (RR: Vol. 49 p. 248)

*The Defense on Punishment*

*24)Testimony of Cheryl Silver, M.D.:* Dr. Silver, a professor in the Department of Rehabilitation Counseling at U.T. Southwestern, testified that when the brain develops throughout childhood, connections between neurons are being made which help the brain to work. (RR: Vol. 50 p. 30) She said the second phase of brain development is the process of pruning the branches that come out of the neurons. (RR: Vol. 50 p. 30) She said that the connections between neurons get more and more dense and finally start to prune away in adolescence and young adulthood. (RR: Vol. 50 p. 33) She said that research shows that the brain is not operating at its most efficient way until at least the age of 22. (RR: Vol. 50 p. 39)

Dr. Silver testified that a second process that happens in brain development through childhood and adolescence is the brain manufacturing a fatty substance that wraps around the axon of every neuron, or mylination. (RR: Vol. 50 p. 40) Mylination helps the speediness and timing of the messages that go around the brain. (RR: Vol. 50 p. 40) She said that mylination starts before a baby is born and there is

10

rapid mylination throughout childhood, adolescence and early adulthood. (RR: Vol. 50 p. 41) She said mylination starts from the bottom of the brain and moves up and goes from the back of the brain to the front of the brain so that the last part of the brain to be myelinated is the frontal lobe. (RR: Vol. 50 p. 42-43) She said that research has shown that the brain does not reach its adult level of being able to integrate information until into the 20's. (RR: Vol. 50 p. 44) She said that until the 20's, the brain does not have all of the efficient connections that would allow a person to make decisions. (RR: Vol. 50 p. 45) She stated that the brain of a 19 year old is not fully developed or functioning at the level that one would consider a normal adult. (RR: Vol. 50 p. 45) The witness testified that in the frontal lobe, the prefrontal cortex controls all a person's thinking, being able to come up with strategies, weighing one thing against another, thinking about consequences and deciding whether or not to act on impulses. (RR: Vol. 50 p. 46-47) She said this is what is called executive functions which includes learning from past mistakes and applying it to current situations. (RR: Vol. 50 p.47) The front portion of the frontal lobe which controls the executive function is the last part of the brain to develop. (RR: Vol. 50 p. 48)

Dr. Silver testified that the temporal lobe is a primitive part of the brain that has to do with emotions and motivations. (RR: Vol. 50 p. 48) She said the temporal lobe mylinates before the frontal lobes which means it works efficiently and will sometimes jump ahead of the less developed frontal lobes that are supposed to slow an person down and recognize risk. (RR: Vol. 50 p. 49) She said that in adolescence there is a tendency to act on emotions and to be very reactive about emotions and not engage the frontal lobes to think ab out whether something is good to do or not. (RR: Vol. 50 p. 50) She said it was accurate to describe the brain as having a well-developed accelerator but partly developed brakes. (RR: Vol. 50 p. 50) She said this would also make an adolescence more susceptible to peer pressure. (RR: Vol. 50 p. 50) She said that based on her research a 19 year old could act impulsively, be emotionally volatile, likely to take risks, act rashly, act without logic, be reactive to stress and focus on short term payoff versus the long-term consequences. (RR: Vol. 50 p. 52) She said genetics could affect brain development. (RR: Vol. 50 p. 52) She said a child being born under the influence of drugs or alcohol would have a significant effect on brain development. (RR: Vol. 50 p. 52)

*25) Testimony of Frank Lane, M.D.:* Dr. Lane, a psychiatrist working with the Parkland Jail Health System, testified that on July 11th, 2008 he received a request from Mr. Broadnax that read "I really need to see a psych. It's important. I'm seeing shit." (Defendant's Exhibit No. 13)(RR: Vol. 50 p. 80) He received another request the same day that read " I can't sleep. My mind is playing tricks on me or something. I'm seeing shit in my cell. I'm hearing voices talking to me. I'm paranoid, like somebody calling me all the time. I need help." (Defendant's Exhibit No. 14) (RR: Vol. 50 p. 81)   Dr. Lane

11

testified that the notes made by the nurse on July 12th, 2008 quoted the Defendant as saying "I see blood coming out of the walls; voices in my head." (RR: Vol. 50 p. 82) He said the nurse wrote that the Defendant was not reactive normally. (RR: Vol. 50 p.82) He said this meant that the Defendant had poor eye contact, frequent forehead rubbing, auditory and visual hallucinations since before arrest. (RR: Vol. 50 p. 82) He performed a follow up examination on July 20th. (RR: Vol. 50 p. 83)

The witness identified Defendant's Exhibits Nos. 20 through 33 as the records kept in the treatment of Mr. Broadnax. (RR: Vol. 50 p. 83) He said he wasn't the first psychiatrist to see Mr. Broadnax and before he first talked with him, he reviewed the notes made by the previous psychiatrist and staff. (RR: Vol. 50 p. 85) He said Dr. Mirmesdagh saw the Defendant on June 23rd, 2008. (RR: Vol. 50 p. 86) He said his notes state that Mr. Broadnax had no prior history of a diagnosis or treatment for mental illness and that there were multiple documentations of him denying mental illness. (RR: Vol. 50 p. 86) He said Mr. Broadnax claimed he was having hallucinations, sleep disturbance, mood disturbance, anxiety symptoms and nightmares. (RR: Vol. 50 p. 86) He said Mr. Broadnax told him: "I was on whack, you know, embalming fluid. My mind was not working right. Man, I had no memory of talking to that reporter or TV cameras or nothin'." (RR: Vol. 50 p. 86) He said whack was a street term for PCP. (RR: Vol. 50 p. 87)

He said he observed that the Defendant was alert and oriented but drowsy. (RR: Vol. 50 p. 87) He said his affect was blunted and tried to cooperate even though he was guarded. (RR: Vol. 50 p. 87) He said the Defendant didn't feel well, was depressed, agitated, suspicious and fearful. (RR: Vol. 50 p. 87) He said the Defendant was claiming auditory hallucinations but did not appear to be responding to internal stimuli. (RR: Vol. 50 p. 87)

The witness concluded the Defendant had substance induced psychosis, anxiety, versus malingering mental illness and antisocial personality traits. (RR: Vol. 50 p. 88) He said he gave him a functioning score of 70. (RR: Vol. 50 p. 88) He put the Defendant on the medications Trazodone, Benadryl, Bupropion, Cloazepam and Risperdal. (RR: Vol. 50 p 88) He concluded that the Defendant was suffering mood and perceptual disturbances from phencyclidine or PCP and marijuana. (RR: Vol. 50 p. 89) He stated that phencyclidine was a unique and dangerous drug which is deposited in fat and brain and can come out of storage up to four months later. (RR: Vol. 50 p. 90) He said the erratic release of the drug causes flashbacks, hallucinations, delusions and the inability to structure a thought in an ordinary fashion. (RR: Vol. 50 p. 90)

The witness testified that on October 6th, 2008, Mr. Broadnax told personnel that he felt like something was crawling on him and he needed his medication increased. (RR: Vol. 50 p. 94) He said he

12

continued to prescribe the same family of medications. (RR: Vol. 50 p. 95-96) He said Risperdal was to treat psychosis and Trazodone and Bupropion were for major depressive disorder or sleep disturbance. (RR: Vol. 50 p. 95) He said Clonazepam was for generalized anxiety disorder. (RR: Vol. 50 p. 95) He said on November 4th he noted that he was treating the Defendant for major depressive disorder, generalized anxiety disorder and schizoaffective disorder. (RR: Vol. 50 p. 96) He said schizoaffective disorder is a term used with there are symptoms that overlap between a mood disorder and a thought disorder. (RR: Vol. 50 p. 97) When he saw the Defendant on November 4th, he noted that the psychotic symptoms had improved because the toxic exposure was probably fading at that point. (RR: Vol. 50 p. 97) He said during this examination, the Defendant was drowsy, mentally slow, depressed and dysphoric. (RR: Vol. 50 p. 100) The Defendant was still fearful, had slow speech and he complained of decreased sleep pattern. (RR: Vol. 50 p. 101) He said the Defendant's global assessment of functioning score was 65. (RR: Vol. 50 p. 102) He said he continued to prescribe the medication to the Defendant through February, 2009. (RR: Vol. 50 p. 103-104)

*26) Testimony of John Roache, M.D.:* Dr. Roache, a professor in the Department of Psychiatry at the University of Texas Health Science Center, San Antonio and Chief of the Division of Alcohol and Drug Addiction. (RR: Vol. 50 p. 172) He stated that he has been doing work in the area of addiction for twenty six years. (RR: Vol. 50 p. 173) His work has focused on the effects of drugs of abuse and how it affects cognitive and performance behavior. (RR: Vol. 50 p. 173) He also has done a lot of work in the area of trying to understand why people abuse drugs, risk factors of genetics, environmental vulnerability and impulse control. (RR: Vol. 50 p. 173-174) He stated that he was a pharmacologist. (RR: Vol. 50 p. 174) He said most of his work as been in the area of alcohol, cocaine and methamphetamine dependence. (RR: Vol. 50 p. 175) He was also familiar with PCP and reviewed materials sent to him concerning James Broadnax. (RR: Vol. 50 p. 175) He viewed the videotapes of the initial interview by the police department and the in-dashboard camera of the arrest in Texarkana. (RR: Vol. 50 p. 175) He also viewed the media interviews from four different Dallas area news station.
(RR: Vol. 50 p. 175) He reviewed the medical records of Mr. Broadnax from the initial arrest through November, 2008. (RR: Vol. 50 p. 175-176)

The witness stated that based on everything he had seen and his knowledge of psycho-pharmacology, he was of the opinion that at the time of the offense, Mr. Broadnax was under the influence of marijuana and a wet blunt which was probably PCP and formaldehyde. (RR: Vol. 50 p. 177) He said Dr. Lane's diagnosis that Mr. Broadnax was exhibiting substance abuse induced psychosis was correct. (RR: Vol. 50 p. 177)

13

The witness testified that PCP or phencyclidine, was originally developed as an anesthetic tranquilizer and was taken off the market because a lot of patients had bizarre psychotic-like reactions after surgery. (RR: Vol. 50 p. 179) He said it causes hallucinations and in some cases, psychotic behavior. (RR: Vol. 50 p. 179) He said some of the side effect include depersonalization and derealization where people fell out of the ordinary or out of place. (RR: Vol. 50 p. 180) Another side effect of the drug was visual, auditory and tactile hallucinations and thought disorder where logical reasoning is not logical. (RR: Vol. 50 p. 180)

He testified that PCP can be stored in the body tissues and there can be persistent behavioral effects. (RR: Vol. 50 p. 181) He said there were cases in which patients came in intoxicated and showed sustained symptoms of disturbance of a psychotic nature over days to weeks following the intoxication. (RR: Vol. 50 p. 181)

The witness testified that the typical onset of schizophrenia was in late adolescence and young adulthood. (RR: Vol. 50 p. 184) He said it was the current opinion that the drug unmasks an underlying latent tendency. (RR: Vol. 50 p. 185) He said that in one interview given to the media by the Defendant, he talked about how he went into "that mode" and blanked out. (RR: Vol. 50 p. 186) He stated that this indicated to him that the Defendant was having psychotic effects from the PCP. (RR: Vol. 50 p. 186) He said the Defendant stated from the first mental health evaluation in the jail that he always hears voices which suggested an ongoing condition that pre-existed his arrest. (RR: Vol. 50 p. 186) He said this could be due to repeated cycles of drug use or to an underlying condition that previously existed prior to PCP use. (RR: Vol. 50 p. 186) He testified that science has very strong evidence that a substance abuse or emotional disturbance in parents has a genetic and biological inheritable factor for children. (RR: Vol. 50 p. 192)

*27)Testimony of Clara Holyfield:* Clara Holyfield, a second cousin of the Defendant, testified that cousin, Audrey Eason, was the mother of James Broadnax. (RR: Vol. 50 p. 222-223) She said his mother was in the Army and married to James Broadnax. (RR: Vol. 50 p. 224) She said Audrey had one younger child and two older children in addition to James. (RR: Vol. 50 p. 224-225) She said Audrey had her first child, Aaron, when she was seventeen years old and Betty Eason raised him. (RR: Vol. 50 p. 229) She said Audrey's two daughters lived with their father in Michigan. (RR: Vol. 50 p. 229-230) She did not know the identity of the Defendant's father. (RR: Vol. 50 p. 231) She testified that on one occasion she came home and the police were arresting Audrey on the charge of abusing one of her daughters. (RR: Vol. 50 p. 232) The witness testified that she had never seen the Defendant show any

14

sign of violence toward anyone. (RR: Vol. 50 p. 232) She said he was never disrespectful to his elders or mean to his siblings. (RR: Vol. 50 p. 233)

28) *Testimony of Teresa Thompson:* Teresa Thompson, the aunt of the Defendant, testified she lives in Eldorado, Arkansas and had lived in Texarkana, Arkansas. (RR: Vol. 50 p. 241) The Defendant's mother, Audrey, was her sister. (RR: Vol. 50 p. 242) She said she first go to know James when he was three or four years old and they had come to Hope, Arkansas to live. (RR: Vol. 50 p. 245) She said Betty Eason raised her sister's oldest son, Aaron. (RR: Vol. 50 p. 246) She said Audrey moved around a lot and James lived with her for a year when he was in the third grade. (RR: Vol. 50 p. 247) James went to school with her two children and she considered him her son. (RR: Vol. 50 p. 247) She said he never gave her any problems. (RR: Vol. 50 p. 249) She said he lived with her on four different occasions. (RR: Vol. 50 p.249) He was in the eleventh grade when he last lived with her and began skipping school. (RR: Vol. 50 p. 255) She said he then went to live with Betty Eason. (RR: Vol. 50 p. 255) The witness testified that James lived on and off with Betty Eason throughout his life. (RR: Vol. 50 p. 255) She said Betty didn't like James and treated him as an outcast. (RR: Vol. 50 p. 256) She said James had a white father and Betty called him a half breed. (RR: Vol. 50 p, 256)

29) *Testimony of Audrey Kelly:* Audrey Kelly, the mother of the Defendant, testified that she was raised by her aunt and uncle, Glen and Betty Eason in Hope, Arkansas. (RR: Vol. 50 p. 275-277) She said she and James lived in twelve different locations during his life. (RR: Vol. 50 p. 281) She said she was a long distance truck driver for many years and quit the working as a truck driver when her son was charged with capital murder. (RR: Vol. 50 p. 284)

She said her mother, Betty Eason, died in April of this year and her oldest son Aaron, was in jail in Waco, Texas for parole violation for sexual assault. (RR: Vol. 50 p. 285) In March, 1987 she enlisted in the Army and in 1988 divorced James Martin, the father of her daughters. (RR: Vol. 50 p. 296) While she was working as a pharmacy tech in the army at Fort Ord, she met another pharmacy tech, Woody Meggs, a white man, and they had an a liaison. (RR: Vol. 50 p. 297) She became pregnant with her son, James. (RR: Vol. 50 p. 297) She began dating James Broadnax and married him after she gave birth to James. (RR: Vol. 50 p. 298) After her son was born, she learned that James Broadnax had put his name on the birth certificate as being the father of the child. (RR: Vol. 50 p. 299) She said Woody Meggs saw James twice when he was two months old and has not seen him since. (RR: Vol. 50 p. 299) She said she told James that James Broadnax was not his biological father. (RR: Vol. 50 p. 300) She said she and James Broadnax were married for approximately two years and had one child. (RR: Vol. 50 p. 301) She was honorably discharged from the Army after serving two years and later she joined the Army reserves.

15

(RR: Vol. 50 p. 303) She said James Broadnax became abusive toward her so they divorced. (RR: Vol. 50 p. 305) She said she took her children and moved in with Betty Eason in Hope, Arkansas. (RR: Vol. 50 p. 305) She said when they were leaving, James Broadnax tried to stop her by ramming her car off the road. (RR: Vol. 50 p. 306) She said none of the children were seriously injured when the car flipped over. (RR: Vol. 50 p. 306)

She identified Defendant's Exhibit No. 40 as the medical records of her son James Broadnax from the incident in which she was run off the road. (RR: Vol. 51 p. 28) She said her ex-husband, James Garfield Broadnax, was arrested for this offense. (RR: Vol. 51 p. 30) She testified that he came to the apartment where she was living after the offense and took their infant son Michael. (RR: Vol. 51 p. 31) She said she called the police but was told he was the father and she couldn't file any charges against him. (RR: Vol. 51 p. 32) She said her ex-husband took their son to Oklahoma and she has only seen him once since that time. (RR: Vol. 51 p. 32) She said her son James has never seen his younger brother. (RR: Vol. 51 p. 32) She said they moved back to Arkansas and lived with her mother. (RR: Vol. 51 p. 33)

She testified that she joined the army reserves in 1991 and remained enlisted for ten or eleven years. (RR: Vol. 51 p. 35) In 1993 she married Darryl Maxwell and separated from him in 1996. (RR: Vol. 51 p. 37) She said that before she met Darryl Maxwell, she had a drinking problem and her two daughters went to live with their father in Michigan. (RR: Vol. 51 p 39-43) She said she spanked one of her daughters, broke her arm and had a criminal case filed against her. (RR: Vol. 51 p. 40) She was given probation but continued to have a drinking problem and eventually became involved with drugs. (RR: Vol. 51 p. 41)

She lived in Texarkana and met Richard Wimbley and was with him for six years. (RR: Vol. 51 p. 43) In 2001 she was arrested for writing bad checks and imprisoned at Newport, Arkansas for six months. (RR: Vol. 51 p. 44) She said Mr. Wimbley became abusive and at times James were try to intervene. (RR: Vol. 51 p. 45) She sent James to live with Betty Eason in Hope Arkansas while she was in the penitentiary. (RR: Vol. 51 p. 47) She said James had to leave Betty's house and live with her sister because Betty treated him differently because he was biracial. (RR: Vol. 51 p. 48-49) She said Betty did not like James. (RR: Vol. 51 p. 49) During this time, Mr. Wimbley was arrested, prosecuted and sent to prison for molesting her daughter, who had come from Michigan to live with her. (RR: Vol. 51 p. 52)

The witness testified that she eventually moved to Dallas and lived with her sister and then moved to San Antonio for a brief time. (RR: Vol. 51 p. 56) She and James then moved to Texarkana. She said the frequent moves hurt James' schoolwork. (RR: Vol. 51 p. 56) They moved back to Dallas

16

where she married Russell Kelly who was a truck driver. (RR: Vol. 51 p. 57) She said she accompanied him on his truck runs and leave James with her sister, Raleshia who lived in Garland. (RR: Vol. 51 p. 58-59) She said her son had witnessed Russell Kelly be physically and verbally abusive toward her and they did not have a good relationship. (RR: Vol. 51 p 60) A couple of months after she married Mr. Kelly, he went back to using drugs and they separated because of his crack habit. (RR: Vol. 51 p. 65-66)

Ms. Kelly testified that her son would usually be older than his classmates because of the amount of school he missed while they moved around. (RR: Vol. 51 p. 67) She said Russell Kelly came back to Texas and they moved to Fort Worth. (RR: Vol. 51 p. 69) They moved back to Texarkana after they separated again and James lived with her mother, Betty Eason. (RR: Vol. 51 p. 69) She moved to Nashville to be reunited with Russell while James lived with Alice Gatewood, another aunt. (RR: Vol. 51 p. 71) She eventually moved to Marietta, Georgia and her two daughters were living there also. (RR: Vol. 51 p. 74) She sent James money for a bus ticket and he joined them in Georgia. (RR: Vol. 51 p. 74-75) When she left to go back on the road driving a truck he stayed with her daughters. (RR: Vol. 51 p. 76) James went to Michigan with one of her grandchildren and lived there until 2008 when his mother separated again from Mr. Kelly and moved back to Dallas he joined her. (RR: Vol. 51 p. 81) Ms. Kelly testified that she has never known her son to be violent. (RR: Vol. 51 p. 91) She said Damarius Cummings stayed in and out of trouble. (RR: Vol. 51 p. 92) She said he has always been a good kid. (RR: Vol. 51 p. 93)

*30)Testimony of Nicole Pfaff:* Nicole Pfaff, an employee at MoneyGram International, identified Defendant's Exhibit No. 41 as records of transactions regarding James Broadnax. (RR: Vol. 51 p. 153) The first transaction showed a test question: "Who is Audrey?" (RR: Vol. 51 p. 153) She said that is was the company's policy for someone who wanted to receive a moneygram and did not have identification, to answer a test question. (RR: Vol. 51 p. 154)

*31)Testimony of Darrell Wynn:* Darrell Wynn, the former brother-in-law of James Broadnax, testified that he had been married to James' sister, NiQuia Wynn. (RR: Vol. 51 p. 156) He said James came to Michigan in at the end of January, 2008 and brought his son, Treybeon, back from Georgia. (RR: Vol. 51 p. 157) He said James stayed in Muskegon, Michigan until the end of April. (RR: Vol. 51 p. 159) He said he saw James on March 12th when he came over to his house that morning. (RR: Vol. 51 p. 160) He said James lived with them, a cousin and at the homeless shelter. (RR: Vol. 51 p. 161) He stated that he never knew James to be violent and had never seen him with a gun. (RR: Vol. 51 p. 164) He had never known James to be in a gang. (RR: Vol. 51 p. 164)

17

*32) Testimony of Vicki Biggs:* Vicki Biggs, the Defendant's aunt, testified that in January,2008 the Defendant brought her great nephew, Treybeon, to Michigan. (RR: Vol. 51 p. 188) She knew he stayed in Michigan for a few months and she saw him almost every day. (RR: Vol. 51 p. 189) She said James lived with her for awhile, with Trina and also had the rescue mission. (RR: Vol. 51 p. 189) She knew she saw James on the 13th of March because she recalled it being her brother's birthday and they had a barbeque on March 14th. (RR: Vol. 51 p. 190) She said James came to her house everyday and she would feed him. (RR: Vol. 51 p. 190) James was always respectful and never showed any signs of violence. (RR: Vol. 51 p. 191)

*33) Testimony of Gary Aaron:* Gary Aaron, cousin of the Defendant, testified that he lives in Eldorado, Arkansas and was a senior in high school. (RR: Vol. 51 p. 205) He said he was close to James and would see him when they visited Big Mamma (Betty Eason) and when they went to Texarkana and Mount Vernon. (RR: Vol. 51 p. 207) He recalled that James dreamed of being an architect. (RR: Vol. 51 p. 209) He knew that James' mother, Audrey, was married to Russell Kelly who abused her. (RR: Vol. 51 p. 210) He never knew James to be violent. (RR: Vol. 51 p. 212) He said that James was easy going and always joking. (RR: Vol. 51 p. 213) He said James counseled him to stay in school and told him that there wasn't any future on the streets. (RR: Vol. 51 p. 214) He said he has heard some of James' free style ray music and stated that the type of lyrics used were not unique to James. (RR: Vol. 51 p. 216) He said if the lyrics James used displayed a mind set towards violence it was just like the rest of the rappers in this genre. (RR: Vol. 51 p. 218) The witness testified that James wrote him from jail and advised him to stay in school, go to college and do something positive with his life. (RR: Vol. 51 p. 219) He said James told him to stay away from gangs. (RR: Vol. 51 p. 219)

*34) Testimony of Kevon Eason:* Kevon Eason, cousin of the Defendant, testified that he was currently attending Arkansas State University. (RR: Vol. 51 p. 228) He said he knew James to be an normal kid and never knew him to be violent. (RR: Vol. 51 p. 228) He stated that James never had a stable home and always moved around. (RR: Vol. 51 p. 229) He said on a few occasions, James lived with his family and they shared a room. (RR: Vol. 51 p. 231) James was never a problem for the family and seemed to enjoy being with them. (RR: Vol. 51 p. 231) He said James would talk to him about he felt misplaced and unwanted at times. (RR: Vol. 51 p. 234) He said James would cry about not being wanted or feeling loved by anyone. (RR: Vol. 51 p. 234) He said James stayed with Betty Eason or "Big Mama" on several occasions. (RR: Vol. 51 p. 235-236) He said they didn't have a good relationship and she would belittle him all the time. (RR: Vol. 51 p. 236) He said she treated everyone better than she treated James and would call him a dirty white boy. (RR: Vol. 51 p. 236) He said Big Mama would tell

18

James that his mother didn't want him and call him half baked. (RR: Vol. 51 p. 236-237) He said Big Mama would tell James that no one wanted him. (RR: Vol. 51 p. 237) Big Mama would kick him out of the house and wouldn't let him get anything to drink or eat. (RR: Vol. 51 p. 237)

The witness testified that James was at a lower class level than he should have been. (RR: Vol. 51 p. 239) He said James dropped out of school and wanted to get his GED. (RR: Vol. 51 p.241) He said that James stopped going to the GED classes because he had to walk four to five miles to take the classes. (RR: Vol. 51 p. 242) He knew that James wanted to be an architect. (RR: Vol. 51 p. 243) He said James wanted to go into Job Corps and was trying to get his birth certificate to get enrolled but couldn't find his mother so she could send it to him. (RR: Vol. 51 p. 243)

The witness testified that while James was in Michigan, he called him several times and told him about living in a shelter. (RR: Vol. 51 p. 245) He said James went to Dallas after leaving Michigan. (RR: Vol. 51 p. 245) He never knew James to be involved in a gang of any type and never knew him to violent. (RR: Vol. 51 p. 245) He said Big Mama always treated James' older brother, Aaron, better than James. (RR: Vol. 51 p. 246) He said Aaron couldn't do anything wrong and Big Mama always favored him over James. (RR: Vol. 51 p. 246)

**35)Testimony of Jackie Aaron:** Jackie Aaron, an aunt of the Defendant, testified that she lives in Eldorado, Arkansas and was raised as a sister to his mother, Audrey. (RR: Vol. 51 p. 256-257) She said Audrey tries to be a good mother and had good intentions but dropped James off with relatives too much. (RR: Vol. 51 p. 260) She said Audrey abandoned James too many times which made him somber and quiet. (RR: Vol. 51 p. 261) She said Audrey didn't physically abuse James but she did hear her verbally abuse him. (RR: Vol. 51 p. 261) She said James would get upset but wouldn't act out. (RR: Vol. 51 p. 262) She knew that Audrey had been abused by the men in her life and had seen the bruises on her. (RR: Vol. 51 p. 263) She knew that Audrey had abused NiQuia and was present when the police arrested Audrey and took her from the kids. (RR: Vol. 51 p. 263) She knew Audrey abused drugs and alcohol. (RR: Vol. 51 p. 264-265)

The witness testified that she knew Big Mamma physically and verbally abused James. (RR: Vol. 51 p. 265-266) She said Big Mamma hit James with her hand a lot and would throw things at him. (RR: Vol. 51 p. 266) She said Big Mamma would lock James out of the house in the summer and not allow him to have anything to drink. (RR: Vol. 51 p. 267) She said Big Mamma would not allow James to freely go to the refrigerator to eat as she did the other children. (RR: Vol. 51 p. 267) Big Mamma would call James a half breed and tell him he was nasty. (RR: Vol. 51 p. 268) Big Mamma would tell him that his mother was a disgrace for having him. (RR: Vol. 51 p. 268) She said Big Mamma said she did not

19

care for him. (RR: Vol. 51 p. 268) She said this hurt James and he would cry.  (RR: Vol. 51 p. 269) She said Big Mamma didn't like white people or Mexicans.  (RR: Vol. 51 p. 269) She said that when they were children they were not allowed to play with people of different races.  (RR: Vol. 51 p. 269)

She said Big Mamma doted on James' older brother, Aaron, and gave him her love, affection, money and time. (RR: Vol. 51 p. 269) She said that when Big Mamma hit James, he never retaliated and never hit her. (RR: Vol. 51 p. 270) She said she had never seen James in a fight and he was always respectful toward her. (RR: Vol. 51 p. 273) She never knew James to be involved in any gang activity. (RR: Vol. 51 p. 273)  Ms. Aaron stated that she thought the family let James down and when he reached out to them for help, they failed him.  (RR: Vol. 51 p. 274)

*36)Testimony of Tre'Vaun Miller:* Tre'Vaun Miller testified he was twenty years old and was currently incarcerated in the Dallas County Jail. (RR: Vol. 51 p. 278) He said he and the Defendant got into a fight in the recreation area in the west gym of the North Tower of the Dallas County Jail. (RR: Vol. 51 p. 281) He said he was moved to a single cell for too many jail violations and too many aggravated assaults. (RR: Vol. 51 p. 281) He said he knew of the Defendant because it was on the news. (RR: Vol. 51 p. 283)  He said he was yelling in his cell when James yelled to him to "just give it to God and let go." (RR: Vol. 51 p. 284) He said he didn't like anyone telling him positive advice so he decided to assault James. (RR: Vol. 51 p. 284) He said when he went to the gym, he assaulted James and James defended himself.  (RR: Vol. 51 p. 285) He said the guards came in to break up the fight. (RR: Vol. 51 p. 287)

*37)Testimony of Keri Mallon & Deposition of Francine Mazone:* Keri Mallon, an attorney, questioned Ms. Mazone at an earlier date. The deposition of Francine Mazone was read into the record. Ms. Mazone stated that James Broadnax lived in a crack infested neighborhood and his mother, Audrey, did not take good care of her son. (RR: Vol. 52 p. 9) She said James was always hungry and she often fed him. (RR: Vol. 52 p. 10) She took him to church and Sunday school every Sunday.  (RR: Vol. 52 p. 10) She stated that James always had his head down and never talked.  (RR: Vol. 52 p. 10)  She saw him once with a bump and bruise on his head and thought he had been abused. (RR: Vol. 52 p. 10) She said they lived in the projects and for approximately 4 months she took him to church with her. (RR: Vol. 52 p. 13) She said one day she went to pick him up for church and found that James and Audrey had moved. (RR: Vol. 52 p. 14)

*38)Deposition of Juanita Mayes:* The deposition of Juanita Mayes was read into the record.  She said James' mother, Audrey, moved around a lot and took James with her or would find a relative to look after him. (RR: Vol. 52 p. 39) She said James never had a stable living environment.  (RR: Vol. 52 p. 40)

She knew James feared certain people, including his brother Aaron. (RR: Vol. 52 p. 41) She said her sister Audrey beat James and on one occasion when James was six or seven years old, split his skin open on his back. (RR: Vol. 52 p. 42) She said James always had bruises and was always being beat. (RR: Vol. 52 p. 43)

Ms. Mayes stated that James lived with Betty Eason off and on most of his life. (RR: Vol. 52 p. 44) She said Betty was very mean to James and her granddaughter told her that Betty would not let James eat and they would have to sneak food out to him. (RR: Vol. 52 p. 47) She said Betty would beat James. (RR: Vol. 52 p. 47)   She said Betty was cruel to both Audrey and James. (RR: Vol. 52 p. 47) She said Betty always told James that he was half white. (RR: Vol. 52 p. 49) She said Betty would lock James out of the house without water in the heat of the summer. (RR: Vol. 52 p. 50) She said Audrey allowed Betty to verbally abuse James. (RR: Vol. 52 p. 51)

She said men ruled Audrey's life and she would drop James off with people she didn't know very much about. (RR: Vol. 52 p. 53) She thought Audrey had mental problems and had never seen her show any affection for James. (RR: Vol. 52 p. 54) She said James quit school because he didn't have any clothes and he was ashamed. (RR: Vol. 52 p. 55) She stated that she never knew James to be violent and never heard him argue with anyone. (RR: Vol. 52 p. 55-56)

*39)Testimony of Niquia Wynn*: NiQuia Marie Wynn testified she was twenty four years old and lived in Kennesaw, Georgia and had a five year old son, Tre'Vaun Wynn. (RR: Vol. 52 p. 52) She said when she lived with her mother, sister and James, they moved around a lot. (RR: Vol. 52 p. 102) She said her mother abused them all and had broken her arm. (RR: Vol. 52 p. 103) The children then went to live with Betty Eason who didn't treat them very well. (RR: Vol. 52 p. 103) She said her father learned of this and took her and her sister back to Michigan to live with him. (RR: Vol. 52 p. 103) She said she after her grandmother died, she went to live in Georgia and James lived with her awhile. (RR: Vol. 52 p. 106) She said he stayed with them a few months until James' girlfriend talked him into moving back to Texarkana. (RR: Vol. 52 p. 107) She said he returned to Georgia and again lived with them and took care of her son, Trevaun. (RR: Vol. 52 p. 108) She said he took good care of the boy and took him to Michigan in January or February, 2008. (RR: Vol. 52 p. 108) She said James was always helpful and respectful to her. (RR: Vol. 52 p. 109)

The witness testified that her older brother Aaron was in the Gangster Disciples. (RR: Vol. 52 p. 110) She said James talked about being in a gang but then hung out with rival gang members. (RR: Vol. 52 p. 111) She stated that she had never seen James violent or seen him in a fight. (RR: Vol. 52 p. 112)

21

She said he smoked weed on occasion. (RR: Vol. 52 p. 112) She thought he was easily influenced by others. (RR: Vol. 52 p. 112)

*40)Testimony of Darryl Maxwell:* Darryl Maxwell testified he was married to Defendant's mother, Audrey. (RR: Vol. 52 p. 148) He said before they married, they lived and worked in Hope, Arkansas and Audrey was arrested for writing hot checks. (RR: Vol. 52 p. 150) He said he helped her out and they were married and continued to live in Hope, Arkansas. (RR: Vol. 52 p. 153) He said when they married, he didn't know she had James because she never talked about him. (RR: Vol. 52 p. 153) He said he eventually came to know all of Audrey's children. (RR: Vol. 52 p. 154) He said they moved to Arkadelphia to be closer to his work and James was left behind at Aunt Betty's. (RR: Vol. 52 p. 155-156) The witness testified that he thought Audrey had three different personalities and could be very jealous. (RR: Vol. 52 p. 156) He said she put marks on him and would hit him. (RR: Vol. 52 p. 157-159) He said after a couple of years, James came to Arkadelphia and lived with them. (RR: Vol. 52 p. 161) When James arrived, he was dirty and didn't have a bath for months. (RR: Vol. 52 p. 161) He said when they cleaned his ears, a roach fell out of his ear. (RR: Vol. 52 p. 162) He said James came with a trash bag for his clothes and didn't own any toys. (RR: Vol. 52 p. 162) He said James was a good little boy, called him daddy and went everywhere with him. (RR: Vol. 52 p. 163) He said James stayed with them from ages four to seven, until the marriage broke apart. (RR: Vol. 52 p. 165)

He said James never caused any trouble but Aaron would need to be disciplined. (RR: Vol. 52 p. 167-168) He said on one occasion Audrey beat James and left marks down his back. (RR: Vol. 52 p. 169) He said he and Audrey separated and he didn't see James or Aaron again. (RR: Vol. 52 p. 171)

*The State on rebuttal.*

*41)Testimony of David Barger:*   The State recalled David Barger who testified that after the Defendant was found guilty, the Defendant made phone calls which were monitored. (RR: Vol. 52 p. 207) The phone calls were played for the jury. (RR: Vol. 52 p. 207)

*42)Testimony of Elizabeth Lutton:* Elizabeth Lutton, the legal adviser for the Dallas sheriff, identified State's Exhibit No. 596 as an affidavit and a commissary account for James Broadnax. (RR: Vol. 52 p. 233) She said the commissary account showed the Defendant receiving money from his mother, Audrey Kelly, and person named Brendan and a person named Megan. (RR: Vol. 52 p. 237)

*43)Testimony of Jack Randall Price.:* Dr. Price, a clinical and forensic psychologist, testified that he prepared a list of the characteristics of a psychopathic personality. (RR: Vol. 52 p. 243)  He said he received police reports, crime scene photographs and other information regarding this case. (RR: Vol. 52 p. 244) He said he would not be giving an opinion as to whether or not the Defendant was a

psychopath. (RR: Vol. 52 p. 244) He stated he never interviewed the Defendant. (RR: Vol. 52 p. 245) The witness testified that there were twenty characteristics of a psychopathic personality. (RR: Vol. 52 p. 246) Using a power point presentation, the witness described these characteristics to the jury. (RR: Vol. 52 p. 248-259)

*44)Michael Swan:* Michael Swan, the brother of Stephen Swan, testified that his brother was his best friend, a wonderful musician, programmer and scholar. (RR: Vol. 52 p.267) He said he and his sister relied upon their brother and his loss made life much harder. (RR: Vol. 52 p. 269) He said he no longer can play the drums because his brother wasn't there to play the guitar. (RR: Vol. 52 p. 271)

*45)Testimony of Deborah Swan:* Debbie Swan, the sister of Stephen Swan, testified that Stephen was her best friend and a very good musician. (RR: Vol. 52 p. 274) She said her brother and Matt Butler had a dual funeral because so many people wanted to say goodbye to them both. (RR: Vol. 52 p. 278) She said her brother had been diagnosed with cancer and had been declared in remission just before his death. (RR: Vol. 52 p. 280) She said that if two strangers approached her brother and Matt Butler, they would want to witness to them. (RR: Vol. 52 p. 284)

## SUMMARY OF ISSUES

Appellant raises issues in this brief that are categorized into the following groups: I. Issues on voir dire involving Appellant's *Batson* challenge; error in the trial court denying challenges for cause against 16 prospective jurors; II. Trial issues in which Appellant argues that the trial court erred in granting the State's objection to expert testimony on "diminished capacity" or evidence attacking the State's evidence on mens rea; the trial court erred in overruling Appellant's objection and motion to suppress testimony of news reporters and interviews of Appellant; Appellant further argues that the trial court erred in overruling his objection to photographs of prison, autopsy photographs and crime scene photographs; the evidence presented at trial was insufficient to support the conviction for capital murder; Appellant argues that the trial court erred when it overruled Appellant's objection to testimony concerning "gang" affiliation; the trial court further erred in denying Appellant's requested limiting instruction on the testimony of an expert witness who testified on 'gang evidence' in the punishment stage of the trial; the evidence was insufficient to support the jury's answer "yes" to Special Issue No. 1; Appellant argues in three issues that the trial court's order to TDCJ to withdraw money from Appellant's inmate trust fund account and forward the funds to the District Clerk to pay for court costs, fees or fines is in violation of Appellant's right to due process; III. Issues involving previously raised constitutional challenges that have been previously raised and denied by this Court in order to preserve these issues for possible future review in federal court.

## VOIR DIRE ISSUES

## APPELLANT'S ISSUE NO. 1

### THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR, SHARRON MCCRANEY IN VIOLATION OF THE DOCTRINE ESTABLISHED IN BATSON V. KENTUCKY
(Appellant's Issues Nos. 1-8 are grouped as each involves the same or similar issue of law.)

Appellant directs this Honorable Court's attention to Reporter's Record Volume 38 page 8 at which the trial court conducted a Batson Hearing and at which an objection by Appellant was made concerning the racially discriminatory manner in which the State exercised its peremptory challenges. Appellant specifically objected to the State's strike against Sharron McCraney, an African-American (RR: Vol. 38 p. 8) . The trial court denied Appellant's Batson Challenge. (RR: Vol. 38 p. 13) The State argued that Ms. McCraney was not in favor of the death penalty, was a single woman with no children who would want to mentor young adult men, and who was so nervous she would not look at the Defendant. (RR: Vol. 38 p. 10-11) Defense counsel argued (RR: Vol. 38 p. 12):

MR. LOLLAR: In regard to the explanations that have been tendered by the prosecutors here, we'd suggest that those are subjective explanations, that those are merely a pretext and will contribute to significant diminution of an oral representation on this jury. We would suggest that the characterizations of Ms. McCraney as being extremely nervous, we do not agree with. We think she was no more nervous than anybody else put in a position of walking into the room and finding a good 12, 156 people looking at her.

As the Court recalls, we did her examination down in the judicial conference room on the second floor of this courtroom. We recall that she did look at the defendant on many occasions during the course of her examination by both the defense and the State. We do not recall her saying that she needed to be propped up and supported in her decision-making. In fact, we recall her as having said that she would be able to assess the death penalty if the State met their burden.

Now all of this could have been cured if we had taken a videotape of the voir dire examination of the individual jurors as we suggested. That request was denied by the Court. We would suggest that what we're going to see here today are a bunch of suggestive explanations not

24

supported by the record, not supported by the written record, but which could have been presented and preserved for appellate court review.

We suggest that the excuses given by the State her today are pretext, and they're striking Ms. McCraney because of her race.

In reviewing the qualification stage of voir dire, the record shows that the State did not challenge Ms. McCraney for cause. (RR: Vol. 10 p. 83) Ms. McCraney indicated that once the Defendant was found guilty, she would wait to see the evidence before assessing punishment, either life in prison or death. (RR: Vol. 10 p. 41) She stated that it was possible that a person convicted of capital murder would be a future danger. (RR: Vol. 10 p. 42) She also agreed that "society" meant the prison population and employees. (RR: Vol. 10 p. 46) She understood the State's burden of proof. (RR: Vol. 10 p. 49-51) She agreed that she would consider mitigating circumstances. (RR: Vol. 10 p. 55) She stated that she did not think that not having a good father was an excuse. (RR: Vol. 10 p. 57)

Appellant argues that Ms. McCraney circled No. 2, "I believe that the death penalty is appropriate in some murder cases, and I could return a verdict in a proper case which assessed the death penalty." Appellant submits that every juror accepted by the State and every juror on the jury was ranked a "2". Ms. McCraney's answers to the voir dire questions of both the State and Defense showed an intelligent, thoughtful juror. She answered on her questionnaire that she was in favor of the death penalty.

## APPELLANT'S ISSUE NO. 2

## THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR, MATTIE VATION IN VIOLATION OF THE DOCTRINE ESTABLISHED IN BATSON V. KENTUCKY

Appellant directs this Honorable Court's attention to Reporter's Record Volume 38 page 14 at which the trial court conducted a Batson Hearing and at which an objection by Appellant was made concerning the racially discriminatory manner in which the State exercised its peremptory challenges. Appellant specifically objected to the State's strike against Mattie Vation (RR: Vol. 38 p. 14) . The trial court denied Appellant's Batson Challenge. (RR: Vol. 38 p. 19)

The State argued that Ms. Vation was not in favor of the death penalty, had a daughter with a drug addiction and listed rehabilitation as what was important in terms of punishment. (RR: Vol. 38 p. 15-16) The State further argued that Ms. Vation served on a jury where she stated she was instrumental in convincing the jury the defendant was innocent in a DWI case. (RR: Vol. 38 p. 16) Ms. Vation had a brother and nephew in prison. (RR: Vol. 38 p. 17) Defense counsel argued in response (RR: Vol. 38 p. 18):

MR. LOLLAR: And, Your Honor, we've discussed with the Court that the excuses given by the State here are merely pretext. We note that many of our jurors that have qualified have daughters, sons, or other close relatives that have drug-addiction problems. We note that many of the jurors who have qualified here have questionnaires full of compassion.

We note that many people who have qualified here on the panel know people who have been in the penitentiary. And we would further suggest that that is an explanation with disproportionate impact on minorities since we know that 20 percent of the adult black male population in the country are incarcerated. So we feel that that question and that reason and that excuse by the State is an explanation with a disproportionate impact on minorities.

The excuse given by the State that she would look, in determining who would get the death penalty, to total brutality is something other jurors have told us, and many jurors have said things like that in their questionnaires as to what they would look for when determining who should get the death penalty.

26

And, finally, we have many people on this panel who have relatives, brother, nephew, cousins, etc. who have people close to them in the penitentiary.

So again, we suggest that the State has used this strike in a purely racial manner, and we would ask the Court to disallow the strike and to seat this juror on the panel.

Appellant further argues that Ms. Vation circled "2", "I believe that the death penalty is appropriate in some murder cases, and I could return a verdict in a proper case which assessed the death penalty." Ms. Vation ranked herself a "5" in how strongly she supported the death penalty. Appellant submits that every juror accepted by the State was ranked a "2" and the State accepted Elaine Clements and Kelly McDonald, who both ranked themselves a "5".

Appellant argues that the record supports his claim that this juror was qualified and had answers similar to other jurors who were qualified as jurors.

## APPELLANT'S ISSUE NO. 3

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR, ANGELITA RIVERA IN VIOLATION OF THE DOCTRINE ESTABLISHED IN BATSON V. KENTUCKY**

Appellant directs this Honorable Court's attention to Reporter's Record Volume 38 page 21 at which the trial court conducted a Batson Hearing and at which an objection by Appellant was made concerning the racially discriminatory manner in which the State exercised its peremptory challenges. Appellant specifically objected to the State's strike against Angelita Rivera (RR: Vol. 38 p. 21) . The trial court denied Appellant's Batson Challenge. (RR: Vol. 38 p. 26) Defense counsel argued (RR: Vol. 38 p. 21):

MR. LOLLAR: Well, the State's three for three. Three minority jurors who have qualified, they have used consecutive strikes on all three. We would ask that the Court to take judicial notice of the fact that Ms. Rivera is Hispanic American. We are tendering to the court reporter

27

Defense Exhibit Number - - Defense Exhibit Voir Dire Strike Number 3. We will suggest to the Court that the State has struck this juror solely because of her race. She's Hispanic American.

The State argued that Ms. Rivera was not in favor of the death penalty and had personal beliefs that would prevent her from returning a verdict of death. (RR: Vol. 38 p. 22) The State argued that Ms. Rivera had four children, no job and was going to study ministry. Ms. Handley stated that Ms. Rivera desperately wanted to sound intelligent but could not give a straight answer. (RR: Vol. 38 p. 22) Ms. Handley argued that Ms. Rivera didn't watch television or get out to have experiences and was only interested in her Christian beliefs and learning the ministry. (RR: Vol. 38 p. 24) The State further argued that Ms. Rivera should be struck because she had a relative that had been murdered by another relative. (RR: Vol. 38 p. 24)

Defense counsel answered the State's argument by stating (RR: Vol. 38 p. 24):

MR. LOLLAR: Yes, Your Honor. The defense would again suggest that the reasons given by the prosecutors here are merely pretext in order to accomplish their goal of racial discrimination in the seating of this jury. We fail to see how a juror who has had a relative murdered would somehow make that juror a better juror for the defendant. We don't see the logic in that at all.

Again, we would show - - we would say that when the prosecutor says that the juror showed hesitation and that they answered the questions as if they wanted to sound intelligent, these are again matters that could've been solved had we videotaped voir dire and would have had that record here before us.

We contest the suggestions made by the prosecutors that this juror was answering questions in such a way that she wanted to sound intelligent, or we also contest- - and we also contest that she showed hesitation. She had the law explained to her, and she said she could follow the law in each and every instance. She said she could assess the death penalty if the State does their job.

Again, we feel that the strike made by the State here is merely for purposes of a juror's race and note that they are three for three in that regard.

During voir dire examination, the State described the act of execution to Ms. Rivera and asked her if she could be part of something like that. She replied that "So, I have to say the truth. And the truth is I felt that, because of my religion or my convictions in the Lord, that the death penalty by the law is correct." (RR: Vol. 13 p. 176) Ms. Rivera did not believe her hope that

28

someone could be rehabilitated would be a factor in how she came to a verdict because she has to respect the law. (RR: Vol. 13 p. 178-179) Ms. Rivera repeatedly stated that she would follow the law. Ms. Rivera repeatedly stated that she could sentence someone to death. Ms. Rivera also stated that she could find a defendant to be a future danger if they had never been convicted of anything before. (RR: Vol. 13 p. 193) She thought it was possible to predict whether or not someone would continue to commit acts of violence. (RR: Vol. 13 p. 193) Ms. Rivera said she would require the State to prove to her only to beyond a reasonable doubt. (RR: Vol. 13 p. 199) Ms. Rivera would also consider circumstances of the offense, the defendant's background, age, criminal history, intoxication, sexual and physical abuse, neglect and poverty in determining Special Issue No. 3. (RR: Vol. 13 p. 209-212) The State challenged this juror on the grounds that she was raising the burden of proof on the State. (RR: Vol. 13 p. 220) The State argued that she was a vacillating juror. (RR: Vol. 13 p. 220) The State did not articulate the same reasons during the challenge as when they used a peremptory strike on Ms. Rivera.

Appellant argues that Alex Folz and Jerome Williams and William Kreighbaum, jurors accepted by the State, also voiced opinions that questioned the imposition of the death penalty. Appellant further argues that Ms. Rivera circled No. 2, "I believe that the death penalty is appropriate in some murder cases, and I could return a verdict in a proper case which assessed the death penalty." Ms. Long ranked herself a "8" in how strongly she supported the death penalty. Appellant submits that every juror accepted by the State was ranked a "2" and the State accepted Jerome Williams who also ranked himself a "8", Kimberly Morris and Alex Folz who ranked themselves a "7" and Elaine Clements and Kelly McDonald, who both ranked themselves a "5".

29

## APPELLANT'S ISSUE NO. 4

### THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR, CURTIS RISER IN VIOLATION OF THE DOCTRINE ESTABLISHED IN BATSON V. KENTUCKY

Appellant directs this Honorable Court's attention to Reporter's Record Volume 38 page 26 at which the trial court conducted a Batson Hearing and at which an objection by Appellant was made concerning the racially discriminatory manner in which the State exercised its peremptory challenges. Appellant specifically objected to the State's strike against Curtis Riser (RR: Vol. 38 p. 26) . The trial court denied Appellant's Batson Challenge. (RR: Vol. 38 p. 30)

The State argued that Mr. Riser was not in favor of the death penalty, thought the death penalty was used to often and thought everyone could change. (RR: Vol.38 p. 27) The State argued that Mr. Riser thought drugs and alcohol would influence a person and he had a cousin in prison. (RR: Vol. 38 p.28) Mr. Riser also stated that he had two good parents which the State considered a would be a benefit to the defense who would trace the Defendant's problems back to his parents. (RR: Vol. 38 p. 28) The State did not challenge Mr. Riser and stated that he was a qualified juror. (RR: Vol. 13 p. 326)

Defense counsel argued that many qualified jurors wrote in their questionnaires that they believe the penitentiary rehabilitates people. He further argued that many qualified people have friends or relatives in the penitentiary. He argued that it was illogical to strike a person who had two good parents. Defense counsel argued that the reasons given by the State were merely pretext to in order to accomplish their goal of racial discrimination in the seating of this jury. (RR: Vol. 38 p. 29-30) Appellant argues that Alex Folz and Jerome Williams and William

30

Kreighbaum, jurors accepted by the State, also voiced opinions that questioned the imposition of the death penalty. Appellant further argues that Juror No. 8, William Stinson, a white juror, specifically stated that he could consider voluntary intoxication to be a mitigating factor.

Mr. Riser stated when questioned during voir dire examination that he could be part of the death of another human being. (RR: Vol. 13 p. 244) He said if he was part of sentencing a person to death, he would tell his children that they went through the process and they made the decision. (RR: Vol. 13 p. 248-249)

### APPELLANT'S ISSUE NO. 5

### THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR, AGWANA LONG IN VIOLATION OF THE DOCTRINE ESTABLISHED IN BATSON V. KENTUCKY

Appellant directs this Honorable Court's attention to Reporter's Record Volume 38 page 44 at which the trial court conducted a Batson Hearing and at which an objection by Appellant was made concerning the racially discriminatory manner in which the State exercised its peremptory challenges. Appellant specifically objected to the State's strike against Agwana Long (RR: Vol. 38 p. 44) . The trial court denied Appellant's Batson Challenge. (RR: Vol. 38 p. 51)

The State argued that Ms. Long had mixed feelings about the death penalty and wanted to narrowly define the death penalty, giving death to people who killed children. (RR: Vol. 38 p. 45) The State thought she leaned toward pro life without parole. (RR: Vol. 38 p. 46) Ms. Handley argued that Ms. Long was unacceptable because she thought that a person in prison was more controlled and it was more unlikely to commit a violent offense. (RR: Vol. 38 p. 46) Ms. Long believed that intoxication was a mitigating circumstance. (RR: Vol. 38 p.47) Ms. Long

31

didn't know if she could give the death penalty to a non shooter.  (RR: Vol. 38 p. 48) Ms.

Handley stated that she thought Ms. Long favored the Defense .  (RR: Vol. 38 p. 49)

The Defense responded to the State's argument (RR: Vol. 38 p. 50):

MR. LOLLAR: Your Honor, again, we see that the State has lapsed into justifying their peremptory challenge in regard to minority defendant - - minority prospective jurors based on subjective things which although the record in written form will not reflect.

This is again a reason why the Court should have granted our motion to videotape the voir dire so that the appellate courts and this Court at this time would have the availability of going back and looking at the juror to see if in fact the recorded - - the video-recorded voir dire of the juror would show that she was doing a head/body nod when Mr. Parks was talking to her.

We think that such a subjective explanation of the reasons that the State is proffering for this strike are merely pretext.  The other things that the prosecutor relies on, the record will reflect that she qualified on every aspect of the law.  When the law part was explained to her, she said she could follow that law.  And when Special Issue No. 2 was explained to her, she said she could follow that law and hold the State to their burden of proof.

This is again a pretext for the striking of a minority juror that contributes to the body of strikes that we have seen here today and proves purposeful discrimination on the part of the State in exercise of peremptory challenges.

When being examined by the State, Ms. Long stated that she would never automatically answer any of the Special Issues so that a person did not receive a death sentence.  (RR: Vol. 30 p. 56) She stated that she could find a non-trigger person guilty of capital murder.  (RR: Vol. 30 p. 60) The State attempted to commit Ms. Long to whether or not she could assess death for a non-triggerman.  She stated that yes, she could do that based on the evidence.  (RR: Vol. 30 p. 64) She agreed with the law that voluntary intoxication is not a defense.  (RR: Vol. 30 p. 65) She stated that she thought a person was still responsible for their actions if they were voluntarily intoxicated.  (RR: Vol. 30 p. 66)  Appellant argues that Juror No. 8, William Stinson, a white juror, specifically stated that he could consider voluntary intoxication to be a mitigating factor.

Appellant further argues that Ms. Long circled No. 2, "I believe that the death penalty is appropriate in some murder cases, and I could return a verdict in a proper case which assessed

32

the death penalty." Ms. Long ranked herself a "7" in how strongly she supported the death penalty.  Appellant submits that every juror accepted by the State was ranked a "2" and the State accepted Kimberly Morris and Alex Folz, who ranked themselves a "7" and Elaine Clements and Kelly McDonald, who both ranked themselves a "5".  Appellant argues that Alex Folz and Jerome Williams and William Kreighbaum, jurors accepted by the State, also voiced opinions that questioned the imposition of the death penalty.

**APPELLANT'S ISSUE NO. 6**

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR, BETTY JACKSON, IN VIOLATION OF THE DOCTRINE ESTABLISHED IN <u>BATSON V. KENTUCKY</u>**

Appellant directs this Honorable Court's attention to Reporter's Record Volume 38 page 69 at which the trial court conducted a Batson Hearing and at which an objection by Appellant was made concerning the racially discriminatory manner in which the State exercised its peremptory challenges. Appellant specifically objected to the State's strike against Betty Jackson (RR: Vol. 38 p. 69) . The trial court denied Appellant's Batson Challenge.  (RR: Vol. 38 p. 71)

In the case of Ms. Jackson, an African-American juror, the State took a different approach than that they used with other jurors they perceived to be more sympathetic with their position. In this instance, they told the prospective juror that "...The only oath that you took at this point is to tell us the truth." Ms. Jackson answered "Right." Ms. Handley then told her "Not to follow the law, but just to tell us the truth." (RR: Vol. 34 p. 18) Appellant submits that during voir dire in every death case in this county, the State is notorious for qualifying jurors with the phrase "Can you follow the law?" They did not seek the simple yes or no answer that they would normally

33

illicit from more desirable jurors. It is obvious here that the State wanted the juror to talk themselves into disqualification.

The State asked Ms. Jackson if she could be an "intricate, instrumental part in the death of another human being....Do you believe that you're the right person for that kind of deal?" Ms. Jackson replied " Yes, I believe I am." (RR: Vol. 34 p. 23) Ms. Jackson opined that a sentence of life in prison was worse than that of death but went on to state that "I think I want to give the person the punishment I think is deserving of the crime." (RR: Vol. 34 p. 24)

Appellant argues that Alex Folz and Jerome Williams and William Kreighbaum, jurors accepted by the State, also voiced opinions that questioned the imposition of the death penalty. On the subject of her nephew being incarcerated for murder, Ms. Jackson stated that he was treated fairly and she thought he was "blessed" because he received an eight year sentence. She said he didn't actually commit the murder but he was culpable because he was there. (RR: Vol. 34 p. 33) Ms. Jackson said in voir dire examination that the State could prove to her beyond a reasonable doubt that someone would be a continuing threat to society in the penitentiary. (RR: Vol. 34 p. 59) She said she would hold the State to a reasonable doubt, not beyond any doubt. (RR: Vol. 34 p. 61) She stated that she could follow the law with regards to Special Issue No. 2, the law of parties issue. (RR: Vol. 34 p. 62) She stated on the questionnaire that "all things need to be considered" in mitigation of punishment. (RR: Vol. 34 p. 67) She said she would consider genetics, circumstances of birth, upbringing and environment being considered in mitigation. (RR: Vol. 34 p. 67) She stated that she could follow the law as given to her by the judge. (RR: Vol. 34 p. 70) She stated that she could answer Special Issue No. 3 as a "no" and would not automatically answer it "yes." (RR: Vol. 34 p. 72-73)

34

<u>**APPELLANT'S ISSUE NO. 7**</u>

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR, DEDRICK MORRISON, IN VIOLATION OF THE DOCTRINE ESTABLISHED IN <u>BATSON V. KENTUCKY</u>**

Appellant directs this Honorable Court's attention to Reporter's Record Volume 38 page 21 at which the trial court conducted a Batson Hearing and at which an objection by Appellant was made concerning the racially discriminatory manner in which the State exercised its peremptory challenges. Appellant specifically objected to the State's strike against (RR: Vol. 38 p. 71) . The trial court denied Appellant's Batson Challenge.  (RR: Vol. 38 p. 79)

Defense counsel argued (RR: Vol. 38 p. 71):

MR. LOLLAR: And, once again, Your Honor, the State is now eight for eight in striking juror 1062, Mr. Dedrick Morrison.  And so the record will recall and the Court will recall, his best friend is the chief investigator for the District Attorney's Office.
And we will offer his photograph in evidence here as Defendant's Voir Dire Strike Exhibit Number 8, again proving patternable discrimination on the part of the State of Texas in the exercise of their peremptory challenges in this case.  Every minority that has qualified, that has come up for consideration, the State has used their peremptory challenges to strike.  The pattern has become very clear.
There is nothing in the voir dire examination of Mr. Morrison which should give them any cause to want to strike him. The Court will recall he was the coached, and again, the State has used their peremptory challenges in an effort to purposely discriminate against these minority jurors in assurance that they have an all-white jury in this case.

The State argued that Mr. Morrison would consider intoxication as a mitigating circumstance which is what the Defense would be presenting.  (RR: Vol. 38 p. 74) The State didn't think Mr. Morrison understood life without parole.  (RR: Vol. 38 p. 75) Mr. Morrison had a second cousin killed by an Austin police officer. (RR: Vol. 38 p. 75)

The Defense argued (RR: Vol. 38 p. 77-78):

35

MR. LOLLAR: Well, as the Court will recall of this juror's voir dire examination, we contest that he talked in circles. We contest that he didn't get it. The cold record will reflect exactly what he had to say, since the State is basing their strike on their subjective views of how he testified.

Again, this is a juror who would benefit this Court and the appellate courts in this state to have been able to see a videotape of this juror's voir dire examination.

We suggest that the excuses given by the state in their exercise of this peremptory challenge is merely a pretext.

We note, now that we are closing towards the end of this jury selection, that the State has used their peremptory challenges to strike every minority candidate from this panel. It is their goal.

We suggest the pattern, not just the individual strikes but the collective pattern, that the use of their strikes of the stated reasons that they gave, should show that there has been purposeful discrimination on the part of the State here.

This is excuses that they give, supposedly race neutral, in order to ensure that what they're going to end up with is an all-white jury here in this case. The courts of this state and of this land are well familiar with the history fo the Dallas County District Attorney's office in uses of peremptory challenges in death penalty case to strike minority members.

I am reminded of a song by the Who where it says, "Meet the New Boss, Same as the Old Boss." We have see this examination, this voir dire process - -

MR. ALEX: Judge, I'm going to - -

MR. LOLLAR: - - strikes used by the State in this case exactly as we have seen the Dallas DA's office do over the course of time. It has shown purposeful discrimination in the exercise of the peremptory challenges used by the State in this case.

We would ask the Court in *Batson v. Kentucky* and under Article 35.261 of the Code to disallow the strike, the peremptory challenge of the State in this case.

We would ask in the alternative either that the juror be restored to the panel, or that the entire panel be quashed and we start again.

JUDGE BAIRD: The challenge will be denied.

Appellant submits that Mr. Morrison answered "no" to the question if he was in favor of the death penalty. Mr. Morrison then talked about accidental deaths not being suitable for the death penalty to which the State replied (RR: Vol. 34 p. 106):

Q....Okay. Mr. Morrison, we know that when you filled out this questionnaire that, as a juror, a potential juror, we didn't expect you to know what the law is in Texas as to what sort of acts if a person commits could result in the issue of being charged with capital murder.

Let me tell you that in Texas, for this kind of capital murder where there is a robbery, a felony, in this case a robbery and death, it's always - - the State always has to prove that the person's death was intentional, never an accident, never knowingly; in other words, never knowingly, never reckless, never criminal negligence.

36

It always has to be that the person who caused the other persons' death , that was what he set about doing.

A. Okay.

Appellant submits that this exchange explains Mr. Morrison's answer on the questionnaire and shows that Mr. Morrison could support the death penalty in light of the explanation given by the State.

The State asked Mr. Morrison if the death of his second cousin caused by a police officer would affect how he would "evaluate" a police officer's testimony as to whether or not they were being truthful, Mr. Morrison replied (RR: Vol. 34 p. 111):

A. No, it will be all right because - -
Q. Okay.
A. - -when you - - when something happens, it comes out.

In questioning Mr. Morrison's views about intoxication being an excuse for a person's actions the State asked him (RR: Vol. 34 p. 114):

Q. Okay. Well, let me stop you there, though.  But this is my question now.  Are you saying by the answer at the top of page six that if someone commits a crime and he or she is under the influence of drugs, okay, to the point to where he doesn't realize what he's done until he sobers up, now what ought to be the effect of that on the person who committed the crime that was using drugs?
A. He done it. That's the point.
Q. Okay.
A. It's done. Regardless of what goes on and happened, you done it.
Q. Okay.
A. It's a done deal. So the only thing you can do is sit there and remorse about what you have done because it's done.
Q. Okay.  I mean - -
A. There is nothing you can go back and change about it.
Q. So, it's not an excuse to say look, given the fact that you were high or something, we excuse you.  We know - -
A. There is no excuse.

37

Appellant argues that Mr. Morrison circled No. 2, "I believe that the death penalty is appropriate in some murder cases, and I could return a verdict in a proper case which assessed the death penalty." Appellant submits that every juror accepted by the State and every juror on the jury was ranked a "2". He did not rank himself 1-10 but wrote "yes" in answer to how strongly he felt about the death penalty. Appellant further argues that Juror No. 8, William Stinson, a white juror, specifically stated that he could consider voluntary intoxication to be a mitigating factor.

Appellant submits that the record supports the claim that the State violated the equal protection clause of the United States Constitution when it used its peremptory strikes against potential jurors Sharron McCraney, Mattie Vation, Angelita Rivera, Curtis Riser, Agwana Long, Betty Jackson, and Dedrick Morrison in a racially discriminatory manner contrary to the holding of *Batson v. Kentucky*, 476 U. S. 79, 106 S. C. 1712, 90 L. Ed. 2d 69 (1988). The State's proffered reasons for being neutral were in fact a pretext. *See Lopez v. State*, 940 S. W. 2d 388 (Tex. App.-Austin, 1997); *Musick v. State*, 862 S.W. 2d 794 (Tex. App. – El Paso 1999); *Ramirez v. State*, 862 S. W. 2d 648 (Tex. App. – Dallas 1993); *Esteves v. State*, 859 S. W. 2d 613 (Tex. App. – Houston [1ˢᵗ Dist.] 1993, pet. ref'd) and *Everson v. State*, 851 S. W. 2d 269 (Tex. Crim. App. 1993)

## ARGUMENT

The answers given by these jurors were similar to answers given by the non minority jurors. The answers these minority jurors gave on their questionnaires were also similar to the answers given by the non minority jurors. The reasons given by the State for the 8 strikes were frivolous, transparent and not supported by the record. The State used 8 of its strikes to strike 8 out of 8

38

minority jurors. The elected trial court Judge reversed the ruling of the visiting judge conducting voir dire, and granted Appellant's Batson challenge on Juror Robert Patterson. The trial court found that a disproportionate number of African-American jurors were struck by the State. The trial court stated that it based it's decision on the factors contained in *Miller-El v. Cockrell*.

In a pretrial hearing, the Honorable Mike Snipes made the following ruling during a Batson Hearing held on July 30, 2009, 24 days after the conclusion of voir dire and the selection of the jury. With regard to juror Robert Patterson, the trial court made the following ruling (RR: Vol. 42 p. 35):

> ...I'm going to grant the Batson challenge and I'm going to do so because of the fact that there are no African-American jurors on this jury and there was a disproportionate number of African-American who were struck. This is not to be considered in any way as some sort of negative context on any lawyers in this case. It's because I simply have to look at the factors that are contained in the Miller-El and I made my decision based on that.
> It is my intention to restore Mr. Patterson to the jury. ....

The Defendant has shown purposeful discrimination pursuant to *Miller-El v. Cockrell*, 537 U.S. 322 (2003) The exercise of even <u>one</u> peremptory challenge for racial reasons invalidates the entire jury selection and mandates a new trial. See. *Linscomb v. State*, 829 S. W. 2d 164, 166 (Tex. Crim. App. 1992); *Keeton v. State*, 724 S. W. 2d 58, 65 n. 5 (Tex. Crim. App. 1987) The aggrieved party need not show multiple instances of racial prejudice in jury selection to prove a constitutional violation. *Linscomb,* at 166. **Either of the two strikes by the State, or both, invalidate the jury selection process and mandate a new trial.**

Under *Batson*, one should be concerned with the question of whether the State was racially motivated in the exercise of its peremptory challenges against even one juror of discernable race.

Linscomb, at 167. Each of the prosecutor's explanations should be examined to determine whether the evidence supports the so-called "neutral" reasons for the strike or whether they are merely a pretext for a racially motivated peremptory challenge. *Whitsey v. State*, 796 S. W. 2d 707, 713 (Tex. Crim. App. 1989)

COMPARATIVE ANALYSIS—DISPARATE TREATMENT

The trial judge's decision on whether the Appellant proves a <u>Batson</u> claim turns, in part, on the trial court's observations during voir dire examination. As the voir dire supervisor, the trial judge can readily perceive discrepancies during jury selection process. These discrepancies may include:

(1) the prosecutor failing to question any of the minority jurors yet striking them anyway;
(2) the prosecutor striking minority jurors who gave answers similar to those of majority jurors whom the prosecutor did not strike; and
(3) the prosecutor striking minority jurors who had the same characteristics professionally, socially, religiously, etc. as majority jurors whom the prosecutor did not strike.

These factors may show disparate treatment of prospective jurors. These factors should enter into the trial judge's assessment of the prosecutor's credibility and eventually the trial judge's determination of the racial neutrality of the prosecutor's peremptory challenges. See *Young v. State*, 826 S. W. 2d 141, 145 (Tex. Crim. App. 1999).

In *Young v. State*, it was held that where the record shows there exists a disparate treatment in the use of a valid reason for the use of peremptory strikes, as in this case, then the trial court erred in its denial of the <u>Batson</u> challenge as the clearly erroneous standard is satisfied, as in this case where the only distinguishable factor, after a careful reading of the voir dire of all the jurors, between the jurors is race. The evidence in this case indicates that the trial judge erred in allowing the prosecution to strike eight jurors on the basis of race, despite the rationale offered

40

by the State to cover its true motivation. See *Ramirez v. State*, 862 S. W. 2d 648 (Tex. App. –

Dallas 1993). African-American veniremembers constituted 15% of the African-Americans on

the 47 member panel of qualified jurors, yet the State used 47% of its peremptory strikes to

eliminate 100% of the African-Americans on the panel.  Members of a minority race constituted

17% of the panel and the State used 53% of its peremptory strikes to eliminate 100% of the

minority veniremembers.

Appellant argues that the reinstatement of one African-American juror did not cure the harm

done to Appellant by the State's racially motivated strikes.  Other qualified African-American

jurors were struck for racial motives by the State.  The Court in *Greer v. State*, No. 05-08-00146

(Tex. App.-Dallas June 9, 2009) found it significant that the State in that case struck 100% of the

African-American jurors.  That Court referenced *Miller-El* in stating, "This remarkable

disproportionate use of peremptory strikes weighs heavily in our analysis."  The Supreme Court

in *Miller-El* stated that striking 10 of 11 available African-Americans were "remarkable" and not

likely caused by "[h]appenstance."  The fact that the State's reasons for striking these minority

veniremembers were, in large part, applied to other panel members who were not struck is

evidence pretext. *See Miller-El, supra* and *Snyder v. Louisiana*, 128 S.Ct. 1203 (2008).  The

disparate-treatment evidence in this case is strongly reinforced by the State's extremely

disproportionate use of peremptory strikes against African- Americans, just as it was in *Greer*.

Appellant submits that the State's reasons for striking jurors Sharron McCraney, Mattie

Vation, Angelita Rivera, Curtis Riser, Agwana Long, Betty Jackson, and Dedrick Morrison were

implausible or invalid and therefore, were pretexts for discrimination.  A comparative analysis

has demonstrated that non minority jurors; Alex Folz, Jerome Williams ,William Kreighbaum,

41.

Kimberly Morris, Elaine Clements and Kelly McDonald also gave similar answers to the same series of questions on voir dire.   In this case the trial court unreasonably failed to apply clearly established law to the facts by failing to examine not just the validity of the reason but the credibility of the prosecutor.  See *Hayes v. Thaler*, 361, Fed App. 563 (C.A.5 (Tex.)) 2010 WL 183395 citing *Miller-El v. Drekte*, 545 U.S. 231 (2005) and *Reed v. Quaterman*, 555 F3d 304 (45th Cir.2009) . As stated in footnote 10 of the *Hayes* decision:

"Any sense that the State trial judge implicitly found the prosecutor to be generally credible by the sustaining of the Batson challenge as to Hathaway, it is inconsistent to say the prosecutor is always credible about motivations and yet say that the prosecutor was not credible as to the motive in striking Hathaway."

Likewise, this would apply to the case at bar as the Court reinstated Juror Patterson to the jury after sustaining the Defense's Batson claim. Error of this magnitude demands a new trial because Appellant's fundamental right to a trial by a jury of his peers as promised to all citizen's accused of a crime in this country has been violated. Not even the most adamant sympathizer or supporter of prosecution in this state can in good faith call this harmless error.   Appellant submits that the trial court erred in overruling the attorney's challenges to the State's improper use of its peremptory challenges in a racially motivated manner that invalidates the trial as it occurred and causes Appellant to move for a new trial as this was not harmless error.

Appellant refers Court to Defendant's brief in Support of Batson Motion (C.R. Vol. 3 p 542-548)

42

APPELLANT'S ISSUE NO. 8

## THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON JON DESMOND

### SUMMARY OF VOIR DIRE OF VENIRE PERSON JON DESMOND

Appellant directs this Honorable Court's attention to Reporter's Record Volume 9 page 165 at which defense counsel made the following objection:

MR. PARKS: Your Honor, we would submit Mr. Desmond for cause for the reasons that he cannot give meaningful consideration to mitigating evidence that this defendant will rely upon in this case in the event he is found guilty of the offense, that is to say voluntary intoxication.

We understand that the law in the State of Texas does not define any particular thing as mitigation. However, we would refer the Court to Morgan versus Illinois which says that we are entitled to a jury that can give meaningful consideration to any - - and give effect to any mitigating evidence that is propounded or proffered by the defense. Even Justice Scalia in the assenting opinion in that case recognized that jurors who could not, for example, consider a bad childhood to ever be mitigating would be exclude from a jury.

This juror cannot consider our mitigation and ought to be excluded under Moran versus Illinois and the constitutional provisions that case relies upon. Additionally, Eddings versus Oklahoma.

THE COURT: It will be denied.

When asked whether or not he would make any automatic assumptions as to future dangerousness when the Defendant was found guilty of capital murder, Mr. Desmond replied " I don't think so." He repeated this answer again and when asked about his answer by the State, he corrected himself and stated that he would listen to everything and then make a decision. (RR: Vol. 9 p. 124) Appellant submits that the way this juror answered this question of future dangerousness showed that he had a predisposition to answer Special Issue No. 1 concerning future dangerousness as an automatic "yes." Mr. Desmond's elderly father had been a victim of an armed robbery in which he had been held hostage for several hours. (RR: Vol. 9 p. 136-137) Although Mr. Desmond stated that this incident would not influence him, Appellant submits that

43

this type of violent crime against someone as close as a father would certainly negatively affect a person's ability to judge another brutal robbery on its own merits. Mr. Desmond had also heard and saw the case on the television news. He spoke of seeing the distraught wife of one of the victims and photographs of the victims. (RR: Vol. 9 p. 139) He stated that the offense occurred in close proximity of where he worked and further stated that the murders were "horrific." (RR: Vol. 9 p. 139)

Appellant submits that Mr. Desmond demonstrated that he was an automatic death penalty proponent when he stated "If it's an intentional act where they intentionally went out to kill a specific person, then yes, I would say yes, they would probably need to be executed. " (RR: Vol. 9 p. 150) Mr. Desmond also stated that he would not consider alcohol or drug intoxication to be a mitigating factor. (RR: Vol. 9 p. 164-165)

Appellant has shown that Mr. Desmond would automatically give a death sentence for capital murder, would always find the defendant a future danger and would not consider intoxication as a mitigating factor. Appellant submits that the Trial Court erred in denying Appellant's challenge for cause. Appellant objected to seating of venire person, Jon Desmond, stating that Mr. Desmond was an objectionable juror. (RR: 9 p. 165-166) Because the Trial Court erred in denying Appellant's challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's bias against the Defendant, or as a matter of law against the law as relied upon the by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 38 p. 8)

It is fundamental that in all criminal prosecutions, an accused is entitled to an impartial jury composed of people who are unprejudiced, disinterested, equitable, and just who have not prejudged the merits of the case. *Shaver v. State*, 280 S.W.2d 740, 742 (Tex. Crim.App. 1955);

44

Tex. Const. Art. I, § 10. The voir dire process is designed to insure to the fullest extent possible, that such an impartial jury will perform the duty assigned to it. *Salazar v. State*, 562 S.W.2d 480, 482 (Tex. Crim. App. 1978).

Article 35.16(c)(2) of the Texas Code of Criminal Procedure, allows the defense to challenge for cause any prospective juror who has a bias or prejudice against any law applicable to the case upon which the defense is entitled to rely, either as a defense to the offense being prosecuted or as mitigation of the punishment therefor. *Clark v. State*, 717 S.W.2d 910, 916-17 (Tex. Crim. App. 1986); Tex. Code Crim. P. Ann. Art. 35.16(c)(2) (Vernon Supp. 1992). When a prospective juror is biased against the law, or shown to be biased as a matter of law, he must be excused when challenged, even if he states that he can set his bias aside and be a fair and impartial juror. *Clark*, 717 S.W.2d at 917; *Anderson v. State*, 633 S.W.2d 851, 854 (Tex. Crim.App. 1982).

In *Cumbo v. State*, 760 S.W.2d 251 (Tex. Crim. App. 1988) it was held:

> "In *Cuevas v. State*, 575 S.W.2d 543 (Tex. Cr. App. 1979), and *Smith v. State*, 573 S.W.2d 763 (Tex. Cr. App. 1978), the challenged veniremen were thoroughly questioned as to whether they could consider life imprisonment for a defendant found guilty of capital murder. The veniremen repeatedly indicated they would not consider life imprisonment in such a situation and evidence a strong conviction that death is the only appropriate punishment for one found guilty of capital murder. Under those circumstances, we held that the veniremen could not be rehabilitated by ritually reciting that they would "follow the evidence" in considering the special punishment issues. *CF. Janecka v. State,* 739 S.W.2d 813, 832 (Tex. Cr. App. 1987).
>
> In the instant case, as can be observed, the prospective juror Enderli evidence a strong conviction that death ought to be the appropriate penalty for one convicted of capital murder and that he could not consider life imprisonment for capital murder. He further evidenced that he would have difficulty in ever answering special issues numbers one and three. Enderli clearly was not rehabilitated by the court's "lecture" and his answers that he could put "that aside," do his duty as a jury and follow his oath.
>
> Where a prospective juror states his belief that he can set aside any influences and personal bias he may have, and the court overrules the challenge for cause, the court's

45

decision will be reviewed in light of *all* the answers given. *Faulder v. State*, 745 S.W.2d 327 (Tex. Cr. App.. 1987); *Cordova v. State*, 733 S.W.2d 175, 182 (Tex. Cr. App. 1987); *Mays v. State*, 726 S.W.2d 937, 950 (Tex. Cr. App. 1986); *Anderson v. State*, 633 S.W.2d 851, 854 (Tex. Cr. App. 1982). When, however, a prospective juror is shown to be biased as a matter of law, he *must* be excused when challenged, even if he states that he can set his bias aside and provide a fair trial. *Cordova*, supra, at 182; *Clark v. State*, 717 S.W.2d 910, 916, 917 (Tex. Cr. App. 1986); *Anderson*, supra, at 854; *Williams v. State*, 565 S.W.2d 63, 65 (Tex. Cr. App. 1978); *Hooper v. State*, 100 Tex. Cr. R. 147, 272 S.W.493, 495 (1925).

The trial court erred in overruling the challenge for cause. *Cuevas*, supra; *Smith*, supra. The appellant was forced to unnecessarily use a peremptory challenge, and having exhausted his allotment of such challenges was required to accept an "objectionable" juror on the jury. Appellant preserved his error."

Appellant submits that he is entitled to rely on the following federal law as it applies to jury selection in capital cases and that the complained of juror was biased against the law as a matter of law based on the prospective jurors voir dire examination.

Appellant argues that the Court's ruling in regard to this juror violates the holdings of *Morgan v. Illinois*, 504 U.S. 719 (1992) because general questions do not comply with the duty to ensure that the juror is unbiased. The Supreme Court has explicitly held that these questions are insufficient to ferret out bias:

"Can you follow the law?" "You can be fair, can't you?" " You can follow the Court's instructions, can't you?" A capital juror must be willing and able to accept and apply the statutory presumption of life. A death sentence cannot be automatic. *Woodson v. North Carolina*, 428 U.S. 280 (1976). Additionally, the law requires that a capital juror be able to consider and give effect to mitigating evidence. *Eddings v. Oklahoma*, 455 U.S. 104 (1982). That juror must be able to consider an individual defendant's mitigation. *Tennard v. Dreke*, 124

46

S.Ct. 2562 (2004) Thereby, a capital juror must be able to consider any relevant mitigating evidence from the defense. *Payne v. Tennessee*, 501 U.S. 808 (1991). Any potential juror who would automatically vote for the death penalty is challengeable for cause. *Morgan v. Illinois, supra*. See also *Wainwright v. Witt*, 469 U.S. 412 (1985). See also *Ross v. Oklahoma*, 4897 U.S. 81 (1988)

Since mitigation can be anything under *Lockett v. Ohio*, 438 U.S. 586 (1978) a prospective capital juror must be able to consider any mitigation evidence the defense seeks to rely upon. The trial court erred in overruling the challenge for cause. *Cuevas, supra; Smith, supra*. The appellant was forced to unnecessarily use a peremptory challenge, and having exhausted his allotment of such challenges was required to accept an "objectionable" juror on the jury. Appellant preserved his error."

## APPELLANT'S ISSUE NO. 9

## THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON HELEN NOBLE

### SUMMARY OF VOIR DIRE OF VENIRE PERSON HELEN NOBLE

Appellant directs this Honorable Court's attention to Reporter's Record Volume 15 page 102 at which defense counsel made the following objection:

MR. PARKS: We do have a challenge for cause, your Honor.
I think that Ms. Noble plainly told us in plain and uncontroverted English that, with respect to special issue number one, that if she found that a person was guilty of capital murder, that she would automatically answer that question yes. I think that confirms what she told us in her questionnaire.
It was straightforwardly put to her. I gave her every opportunity to change her mind about that if she wished to, but she said that that would be a yes for her if she found someone guilty of capital murder.

47

We believe that she has a bias against the law that we are entitled to rely upon and is disqualified.

Defense counsel objected to the Court's ruling (RR: Vol. 15 p. 110-111):

MR. PARKS: We object to the Court's ruling - -

THE COURT: Okay.

MR. PARKS: - - in that we believe the Court is in error, that the Court's ruling deprives Mr. Broadnax of his due process rights under the fifth amendment of the United States Constitution, it deprives him of an impartial juror or jury under the provisions of the sixth amendment of the Constitution. It subjects him to cruel and unusual punishment under the eighth amendment and all of those equal protections of the law provided to him under the fourteenth amendment of the Constitution of the United States.

Furthermore, it deprives him of an impartial jury under the provisions of article 1, section 10 of the Texas Constitution. It deprives him of - - or it subjects him to cruel and unusual punishment under the provisions of article 1, section 13 of the Texas Constitution. It deprives him of due course of law under the provisions of article 1, section 19 of the Texas Constitution.

Further, your Honor, while we believe that this juror has clearly disqualified, even if there is some argument or some room for argument whether or not she was technically qualified, certainly the answers that she gave in her questionnaire, the answers that she gave me regarding special issue number one are such that her ability to serve as a fair and impartial juror in this case is called into question.

I understand that the Court has not previously been a part of the pretrial hearings in this case. The defense has filed a motion attacking the concurring opinion of the Court of Criminal Appeals in Treadgill versus State which refers to Jones versus State.

Jones is the case in which the Court of Criminal Appeals made it almost impossible for the defense to show reversible error in jury selection in a capital murder case where the issue did not involve a person's death use, a juror's death use.

In consideration of taking that away from the defense, the Court in Jones admonished the trial courts to make close calls in favor of the defense indicating that there was no use in putting jurors on the jury where it was a close issue whether or not they could be fair and impartial, that there were plenty of jurors from which to choose. And sort of in exchange for taking away our ability to reverse the Court, it admonishes trial court to be liberal in granting a defense challenges for cause. That admonition went totally unremarked by the bench in the State of Texas.

So that when Treadgill came along, four of the jurors joined in a concurring opinion and basically said, we told y'all in Jones that you needed to be liberal in your granting of challenges for cause from the defense. So, there's four judges sitting on that Court looking at these.

I filed a motion. I respectfully ask the Court to read that concurring opinion in Treadgill because I believe that this is the kind of juror about which the Court of Criminal Appeals was speaking.

Appellant submits that Ms. Noble would automatically give a death sentence if a defendant was found guilty of capital murder. The following occurred at RR: Vol. 15 p. 74)

48

Q. (By Mr. Parks): ... Almost 20 percent of the people who have served on capital murder juries believed, even after they finished their jury service, that the imposition of the death penalty was mandatory or required by law once they found a person guilty of capital murder.

Now, do you believe that?

A. I think I did believe that. I didn't know there was other, other choices that were - - that there was other, other choices that were - - that there was a choice and a choice and a choice. It was like it was either death penalty or in prison, that was the only two choices.

Q. Those are the only two choices.

A. But then it's like you can - - but the way you get to those two choices, there is this process.

Q. Okay.

A. That I didn't know that there was more of a process. So, there really isn't a cut and ied answer fo one or the other.

Q. Was it your belief at the time that if a person was convicted of capital murder for which the State was seeking death, that death was required?

A. Yes.

Q. It was mandatory? Do you believe that that's the way it ought to be?

A. I guess I have to say yes. You know, I hesitate, but yeah.

Ms. Noble was also unqualified because she had heard about the crime and lived near the location of the murders. (RR: Vol. 15 p. 74-75) She said she spoke about the murders with colleagues at work. (RR: Vol. 15 p. 75) Ms. Noble also had a bias toward police officers and stated on her questionnaire and in court that she thought police officers were more likely to tell the truth than the average person. (RR: Vol. 15 p. 76-77)

Appellant submits that Ms. Noble would automatically answer Special Issue No. 1 as a "yes". The following occurred at RR: Vol. 15 p. 90-91):

Q. (By Mr. Parks): And for some prospective jurors, Ms. Noble, quite obviously they feel that once they have found someone guilty and they know that this is a person who has killed another human because they wanted to ,and for no other reason, that that information alone would be sufficient for them to answer that question yes always. How do you feel about it?

A. I think it would be yes.

Q. And it's kind of a, you know, I'm answering - - I'm called upon to answer that question about the kind and type of person who would make a decision to kill someone else, and not just that, but during the commission of another felony. And the question doesn't ask me will he absolutely commit criminal acts of violence in the future. It asks me whether he probably will.

A. Yeah.

49

Q. And this is just the type and kind - - I mean, anybody that would do what this defendant has done would probably commit acts of violence in the future. That's a locked yes.
A. Uh-huh.
Q. Is that they way you feel about it?
A. Yes, I do, yes.
Q. And I thought probably it was, Ms. Nobel, based on the answers that you've given us in your questionnaire. You feel pretty strongly about people who kill other people. Would that be fair to say?
A. Yes.

Appellant submits that Ms. Noble was also unqualified because she could not consider mitigation. She stated that the Defendant's background or how they were raised did not make any difference to her. She stated (RR: Vol. 15 p. 94-95):

Q. Do any of those thing, do you believe, by the time you got to that special issue would make any difference to you?
A. Basically, no. I mean, I don't think it makes a difference whether it's a single family or where ever they grew up. That's not really going to have a whole lot of bearing on - - A person is who they are, not matter what their background was.

Ms. Noble stated that if the defendant was older than 18 years, age would not be a mitigating factor. (RR: Vol. 15 p. 96) She said intoxication would not have very much bearing in her mind. (RR: Vol. 9 p. 96) Appellant submits that the Trial Court erred in denying Appellant's challenge for cause. Appellant objected to seating of venire person, Helen Noble, stating that Ms. Noble was an objectionable juror. (RR: 15 p. 96) Because the Trial Court erred in denying Appellant's challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's bias against the Defendant, or as a matter of law against the law as relied upon the by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 38 p. 32) See authorities cited and argument in Issue No. 1 which are incorporated herein by reference.

50

APPELLANT'S ISSUE NO. 10

### THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON BILLY EUGENE HENRY

#### SUMMARY OF VOIR DIRE OF VENIRE PERSON BILLY EUGENE HENRY

Appellant directs this Honorable Court's attention to Reporter's Record Volume 15 page 193

at which defense counsel made the following objection:

MR. LOLLAR: First, we would suggest that the juror is unqualified to be a juror because he has stated to us, in the example where I gave him where a police officer testified one way and a defendant testified exactly the opposite, he said he would go with the police officer's testimony 100 percent of the time.

He said that unequivocally. He didn't back off of that. That's what he said. So he is going to automatically believe the testimony of a police officer over that of a defendant.

He is not a qualified juror under the laws of the State of Texas.

Secondly, he has told us quite clearly that circumstances such as drug usage, the life of defendant, the environment he grew up in, sexual abuse of a child, age, whether he was a follower or a leader in the circumstances of the offense, he would not consider as mitigating issue.

Now, we have rights under Eddings versus Oklahoma, which I'm sure the Court is aware of, and also under Standifer versus State to float the facts of our mitigation in this case to a juror ro see if they would even consider them. And he has said no, those are factors which he would not consider.

And I tell the Court now, and I will put it on the record now, that those are the mitigating factors which we intend to show in this case if we get to the point of having to show that to a jury.

So under Standifer, under Eddings, under – -

MR. PARKS: Penry.

MR. LOLLAR: - - Penry, Penry he is not a qualified juror. He will not even consider those mitigating factors which we intend to show in this case.

Appellant submits that Mr. Henry exhibited a bias toward law enforcement. He thought

police officers were more likely to tell the truth than the average citizen and thought they were

usually honest. (RR: Vol. 15 p. 133) He said he thought it was true that if a police officer was

going to testify, he would "automatically believe them before he even takes the stand and utters a

51

single word." (RR: Vol. 15 p. 133) He stated that in 100 percent of cases he was going to believe the police officer over the defendant. (RR: Vol. 15 p. 177)

Mr. Henry thought that the death penalty was the appropriate sentence for someone who has intentionally taken a life. (RR: Vol. 15 p. 171) He thought the death penalty was a deterrent to other criminals and would rather have the death penalty even if it means it's misused. (RR: Vol. 15 p. 173) He thought he number one objective of punishment was to punish the convicted and did not think rehabilitation worked for most criminals. (RR: Vol. 15 p. 173-174) He thought it was better that one innocent person be convicted than ten guilty people go free. (RR: Vol. 15 p. 174) He said he strongly believes in the death penalty, thought criminals got out of prison too early and didn't believe in rehabilitation. (RR: Vol. 15 p. 175) He thought the death penalty was used too seldom. (RR: Vol. 15 p. 175)

Appellant submits that Mr. Henry was also mitigation impaired. The following occurred at RR: Vol. 15 p. 190):

Q. (By Mr. Lollar): Okay. Let me see. Kind of ran some of those by you here on page eight. We asked you the question, some people feel genetic circumstances of birth, upbringing, environment should be considered when determining the proper punishment of someone convicted of a crime. What do you think? You said, no, I don't agree. They chose their path of crime.
Do you think that in this type of a situation, in answering special issue number three, that genetic circumstances of birth, upbringing or environment would ever be sufficient mitigating circumstances for you to ever avoid the imposition of the death penalty for a future danger capital murderer?
A: Not if I made it to that question, probably not.
Q. Okay. And we asked you on page six, could you ever give any consideration to those issues in answering special issue number three?
A. Probably not.
Q. Okay. How about drug usage? If you hear that a person might have voluntarily ingested drugs, some people would say that might be a sufficient mitigation circumstance.
A. No, I don't believe that drug use would fall into that area.
....

52

Q. How about sexual abuse of a child?

A. No.

Q. Okay. How about age?

A. No.

Q. No. So, age would never be something that you could consider as a mitigating factor?

A. Not if it made it all the way this far.

....

Q. Okay. How about whether or not the individual was the follower or the leader in this situation that got them to commit the capital murder?

A. No.

Q. It doesn't matter?

A. No.

Q. You wouldn't ever look at that?

A. I wouldn't think so.

Q. How about, for the intentional capital murderer that you believe is going to be a future danger, the fact that they didn't have a previous violent history?

A. I can't say that I wouldn't ever consider it, but probably not, but it is a possibility.

The answers on Mr. Henry's questionnaire and during voir dire show unequivocally that he would not give meaningful consideration to any mitigating circumstances presented by the defense. Appellant has shown that Mr. Henry was not a qualified juror under *Standifer, Eddings* and *Penry.*

Appellant submits that the Trial Court erred in denying Appellant's challenge for cause. Appellant objected to seating of venire person, Billy Eugene Henry, stating that Mr. Henry was an objectionable juror. (RR: 15 p.194-195) Because the Trial Court erred in denying Appellant's challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's bias against the Defendant, or as a matter of law against the law as relied upon the by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 38 p. 33) See authorities cited and argument in Issue No. 1 which are incorporated herein by reference.

53

## APPELLANT'S ISSUE NO. 11

### THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON JOHN McGUIRE, JR.

### SUMMARY OF VOIR DIRE OF VENIRE PERSON JOHN McGUIRE, JR.

Appellant directs this Honorable Court's attention to Reporter's Record Volume 17 page 83

at which defense counsel made the following objection:

MR. LOLLAR: If it will please the Court, thank you, your Honor. We feel that this juror has clearly expressed that he will pay no mind, he will not give meaningful consideration, he will not give any consideration to such mitigating factors as was already expressed to the Court we will present in Mr. Broadnax's defense should we arrive at that portion of the trial. Such mitigating factors recognized by the Supreme Court as age, lack of significant prior criminal history o violent behavior, life history that brought him to that point, and friends and relatives saying that this is aberrant behavior for him.
We fell that under the Supreme Court's rulings in Eddings versus Oklahoma, E-d-d-I---g-s; Morgan versus Illinois, and Lockett, L-o-c-k-e-t-t- , versus Ohio, this juror is not qualified juror to be considered on this type of a jury. We feel that the Supreme Court has clearly said that if a juror refuses to consider any relevant mitigating evidence, the juror is unqualified to sit. If they say that they would give it no weight, then they are not qualified to sit. If they say that the evidence, the mitigating evidence is irrelevant to them, and, again, if they would not give any such - - or such evidence any weigh at all, then the juror is not qualified to sit, so we suggest he is not qualified to sit in this case.

Appellant argues that the record shows that Mr. McGuire would automatically assess the

death penalty if he found the Defendant guilty of capital murder. The following occurred at RR:

Vol. 17 p. 58:

Q. (By Mr. Lollar) ... Okay. Now, a couple questions down below that, we asked you: do you think there are some crimes which call for the death penalty solely because of their severe facts and circumstances, regardless of whether or not the guilty person committed prior violent acts? And you said, yes, I don't believe a person should receive a lesser penalty because they haven't committed prior violent acts. So you mean just because they haven't?
A. That's correct.
Q. Is that correct?
A. That's correct.
Q. And is that the way you feel?

A. Yes.

Q. Okay. And in looking at that, are you saying that you don't believe that a person should receive a lesser penalty such as life without parole rather than the death penalty regardless of whether or not they've committed prior violent acts?

A. That wouldn't by my - - if that was - - you know, you get to the third question - -

Q. Okay.

A. - and it was obvious that the person intended to do it, obvious the person planned it out -

Q. Uh-huh.

A. - -and did everything, they could have been a choir boy until that time and I would still think that they should consider the death penalty.

Mr. McGuire so strongly supported the death penalty that he rated himself a 10 on the questionnaire. (RR: Vol. 17 p. 59) He thought the death penalty was a deterrent to others and didn't think life without parole had the same deterrent effect. (RR: Vol. 17 p. 60) The most important thing to Mr. McGuire in deciding whether or not to assess the death penalty was their intent. (RR: Vol. 17 p. 60) He stated on his questionnaire that he would not consider intoxication as mitigation if the person had voluntarily become intoxicated. (RR: Vol. 17 p. 63)

Appellant submits that Mr. McGuire would not give meaningful consideration to any testimony given by the defense's expert witnesses on mitigation. The following occurred at RR: Vol. 17 p. 64-65):

Q. ..Down at the bottom, we ask you: How would you feel about a psychiatrist, psychologist, or other mental health professional testifying on a capital murder case as an expert witness? And you say, I think that in most instances, they can provide valuable input. I also believe that the potential exists for them to be selected for the sole reason to support one side's opinion without regard to facts. ...

A. You know, again, back to a comment I made earlier, that may be as much from what you see and hear on TV.

Q. Uh-huh.

A. You know, an individual whose profession is to testify as a psychiatrist for defense attorneys - -

Q. Uh-huh.

A. - - that's what they do, you know.

Q. Okay.

55

A. They're not going to get selected by the defense attorney if they don't tend to lean towards, you know, testifying or define acts of an - -

Q. Okay.

A. - you know, I don't know how they would be biased.

Q. So if you were selected as a juror in a case such as this and we called a psychiatrist, would you think that that is a type of person who would have been selected by us because they tend to favor our position?

A. Default answer would be yeah.

Mr. McGuire was not qualified to be juror because he would not give meaningful consideration to mitigation presented by the defense. The following occurred at RR: Vol. 17 p. 79):

Q...- - okay, really there are no circumstances that can be shown to me which is going to let me avoid the imposition of the death penalty in that case. Okay? If you show me he's a capital murderer and I believe beyond a reasonable doubt he will continue to inflict violent acts on others, even in the penitentiary, that that does it for me, I'm not going to avoid a death sentence for that person.

A. Are you asking if I believe that?

Q. Yes.

A. I would be one of the people you would have to convince that that shouldn't be, you know.

Q. What shouldn't be?

A. That it shouldn't be the death penalty. So if I'm being told to take that in to consideration, I believe I would, but I would probably be one of the people who would say, you know, it would be very challenging for me to say there's some other reason why you shouldn't.

Q. Okay. All right.

A. So if I've answered 1 yes, I would - - Number 3 would be hard to answer anything but yes.

Mr. McGuire went on to state that he would not consider age, how a person was raised and whether he was raised in poverty or not, testimony of family and friends, or the fact that there had not been any previous violent acts by the Defendant in answering Special Issue No. 3.

Appellant submits that the Trial Court erred in denying Appellant's challenge for cause.

Appellant objected to seating of venire person, John McGuire, Jr., stating that Mr. McGuire was

an objectionable juror. (RR: 17 p. 85) Because the Trial Court erred in denying Appellant's

56

challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's

bias against the Defendant, or as a matter of law against the law as relied upon the by the

Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 38 p. 34) See authorities

cited and argument in  Issue No. 1 which are incorporated herein by reference.

**APPELLANT'S ISSUE NO. 12**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S  CHALLENGE FOR
CAUSE AGAINST VENIREPERSON LISA DAVISON**

**<u>SUMMARY OF VOIR DIRE OF VENIRE PERSON LISA DAVISON</u>**

Appellant directs this Honorable Court's attention to Reporter's Record Volume 18 page 93

at which defense counsel made the following objection:

MR. PARKS: We would challenge Ms. Davison for cause for the reason that based upon her
answered, Your Honor, she would - - Special Issue Number 3, the mitigation special issue, would
be of no consequence to her. While I admit that she said that she could answer that question yes,
that there were sufficient mitigating circumstances, she rejected as a - - as relevant to the
answering of that special issue all of the things, really, that the special issue calls upon her to
consider.  The defendant's character and his background, those things are irrelevant to her. She
said that.  She said that voluntary intoxication would not be a consideration for her at all.  She
said that on her questionnaire.  She said that in her responses to me. She said that age would not
be something that she'd consider.  She said that background, whether or not he had been sexually
abused, physically abused, mentally abused, lived in poverty, none of those things would be a
consideration for her.  That's exactly what Special Issue Number 3 speaks to.

She would not consider whether - - evidence that he was a follower and not a leader on the
issue. All of those are things that we believe this jury will hear and we'll asking the jury, if it
comes to that, to consider as sufficient mitigation to change a death sentence to a life sentence if
they get to that point.

And, consequently, to seat this juror would be a violation of Mr. Broadnax's rights under the
Eighth, Fourteenth, and Sixth Amendments of the United States Constitution, their equivalents in
the State Constitution, and would violate the Supreme Court's holdings on Lockett v. Ohio,
Morgan v. Illinois, and Eddings v. Oklahoma.

Appellant submits that Ms. Davison was so pro death penalty that she wrote on her

questionnaire that she thought the death penalty should be available for murder and other crimes

57

if necessary. She thought it should be up to the State to determine what cases should warrant the death penalty. Ms. Davison also felt very strongly in the concept of an "eye for an eye." She stated that she was raised believing in this concept. The following occurred at RR: Vol. 18 p. 64):

> Q. - - in the event that you find someone guilty of capital murder, then obviously you have found that that person took another person's life. Some jurors tell us that for them, an eye for an eye means just that. You proved to me that a person took a life, then I'm going - -
> A. Take a life.
> Q. - -to give the death penalty; is that the way you feel?
> A. Yes.
> Appellant submits that this exchange shows that Ms. Davison would automatically assess the

death penalty and would not consider the special issues, especially issues number one and three.

Appellant argues that Ms. Davison was not a qualified juror because she would not consider mitigating factors. She stated that voluntary intoxication, age, if the defendant was a leader or a follower would not be considered. She further stated that how a person was raised, if they were physically, sexually or mentally abused would not be factor because "we all have our battles." (RR: Vol. 18 p. 89) She stated that once the State has proven to her beyond any reasonable doubt that a defendant has intentionally killed someone else because they wanted to, that the right and proper punishment for that person is to lose their life also. (RR: Vol. 18 p. 90)

Appellant submits that the Trial Court erred in denying Appellant's challenge for cause. Appellant objected to seating of venire person, Lisa Davison, stating that Ms. Davison was an objectionable juror. (RR: 18 p. 93-95) Because the Trial Court erred in denying Appellant's challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's bias against the Defendant, or as a matter of law against the law as relied upon the by the

Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 38 p. 34) See authorities cited and argument in Issue No. 1 which are incorporated herein by reference.

**APPELLANT'S ISSUE NO. 13**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON BRUCE McDONALD**

**SUMMARY OF VOIR DIRE OF VENIRE PERSON BRUCE McDONALD**

Appellant directs this Honorable Court's attention to Reporter's Record Volume 20 page 86 at which defense counsel made the following objection:

MR. PARKS: First, I will challenge McDonald for the reason that he could not and would not consider voluntary intoxication in answering Special Issue Number 3. I think we've made it pretty clear in the record that that's something that will be a part of this defendant's mitigation case, if we reach that stage of the trial. And that under Lockett versus Ohio and Morgan versus Illinois and Eddings versus Oklahoma that we are entitled to a jury, a complete jury, which can at least consider those mitigation issues that will be presented in the case, and that the juror's refusal to consider any relevant mitigating evidence that will be presented and give it no weight whatsoever, as I believe Mr. McDonald has clearly indicated, is not qualified, and to seat him would be a violation of this defendant's rights under the Sixth, Eighth, and Fourteenth Amendments of the Constitution.

Additionally, we will challenge Mr. McDonald because of his view of beyond a reasonable doubt which is essentially no more than a preponderance of the evidence. He told Mr. Hikel that all it was going to take something more than 50 percent to convince him beyond a reasonable doubt. I revisited that with him. Mr. Hikel then followed up on him. I revisited with him. He said very clearly that if the State proved to him 50 percent or more that that would satisfy him with respect to beyond a reasonable doubt.

Now, I don't know what beyond a reasonable doubt is because we don't define it, but I know that it's more than a preponderance of the evidence, and I believe that he would not give this defendant the benefit of the law in that regard and it therefore disqualified.

Mr. McDonald was unqualified because he viewed reasonable doubt as something 50 percent or more, which is no more than the preponderance of the evidence. He stated "Well, I would think that a reasonable that, I guess, on a scale, more than 50 percent evidence." (RR: Vol. 20 p. 23) When asked by the Defense if reasonable doubt means more than 50 percent of the evidence,

59

Mr. McDonald agreed that the State had to prove to him from the evidence that it was more likely than not that the defendant was guilty as charged in the indictment for him to find guilt. (RR: Vol. 20 p. 69) He said that if the State had evidence that showed more than 50 percent on Special Issues 1&2, he would find them to be "yes." (RR: Vol. 20 p. 70)

Mr. McDonald expressed the opinion that he needed to see some remorse from the Defendant during the penalty stage of the trial. The following occurred at RR: Vol. 20 p. 65-66

Q. (By Mr. Parks) ...I guess on page 5, while I'm thinking about it, Mr. McDonald, I want to visit with you just a little bit about your response to that question down here as to what would be important to you in deciding whether a person receive the death sentence rather than a life sentence in a capital murder case, and you put remorse. And in discussing that more fully, you indicated to Mr. Hikel that you would basically base that on how - - how you perceived the defendant during the course of the trial? Did I misunderstand you?
A. That - - that's the only opportunity I would have to interact with a person on trial is from where I'm sitting and how they're sitting.
Q. Okay.
A. That may sound judgmental, but that's what you've asked, you know, 12 jurors to do is to be, you know, judgmental based on evidence that you've presented, and fortunately or unfortunately the defendant, sitting in juror box, is part of the presentation. And if he - -
Q. I - -
A. - -he or she sits there, and, I don't want to say, is not involved in the case or gives a nondescript, could-care-less, you know, inattentive type of attitude to what's going on around him, that would show, you know, I guess, he could care less whether he lives or dies.

Mr. McDonald's idea of wanting to see remorse put a very onerous burden on the defendant. A defendant's fate between life in prison or death should not hinge on whether or not a juror liked his looks or whether or not he thought the Defendant had the "right" attitude. This should have disqualified him as a juror in this death case.

Appellant argues that Mr. McDonald also could not consider voluntary intoxication as a mitigating circumstance. He could not answer the question concerning finding anything

60

mitigating after he had found someone to be a continuing danger to society and said only that he wouldn't know until he was confronted with the decision of life or death.  (RR: Vol. 20 p.85)

Appellant submits that the Trial Court erred in denying Appellant's challenge for cause. Appellant objected to seating of venire person, Bruce McDonald, stating that Mr. McDonald was an objectionable juror. (RR: 20 p. 89) Because the Trial Court erred in denying Appellant's challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's bias against the Defendant, or as a matter of law against the law as relied upon the by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 38 p. 34) See authorities cited and argument in  Issue No. 1 which are incorporated herein by reference.

## APPELLANT'S ISSUE NO. 14

### THE TRIAL COURT ERRED IN DENYING APPELLANT'S  CHALLENGE FOR CAUSE AGAINST VENIREPERSON TERESA RANDLEAS

### SUMMARY OF VOIR DIRE OF VENIRE PERSON TERESA RANDLEAS

Appellant directs this Honorable Court's attention to Reporter's Record Volume 21 page 92 at which defense counsel made the following objection:

MR. PARKS: ...We would first challenge the juror for the reason that she has a bias or prejudice against a portion of the law that the Defense is entitled to rely upon in that we are entitled to have a person sit - - all persons sit on the jury who would not - - or who could consider the answer to Special Issue Number 1 is no.  And this juror has clearly stated that if she finds a person guilty of capital murder she will, in all cases, answer Special Issue Number 1 yes.  So we believe that she is disqualified because of that.

Further, we believe that she is disqualified under the Eighth, Sixth and Fourteenth Amendments of the United State's Constitution and under the teaching of Lockett versus Ohio, Morgan versus Illinois and Eddings versus Oklahoma for the reason that she would not consider - - could not consider the defendant's use in answering Special Issue Number 3. And we are entitled to have a jury made up of persons who would not refuse to consider relevant mitigating evidence on behalf of the defendant, which she would do.

61

Ms. Randleas was not a qualified juror because she expressed the opinion that she would

assess the death penalty if the defendant was found guilty of capital murder. The following

occurred when the State was questioning her (RR: Vol. 21 p.38-39):

Q. ...Certain circumstances must be present in order for a person to receive the death penalty and those circumstances must be found in the facts of the case. If they are not in the facts of the case, if they are not in the evidence in the case, then the death penalty is not an option. Do you think that's fair?
A. I do, but on one hand when someone commits a murder intentionally and it's cold blooded and it's - - they have thought about it, and they knew that they were going to do it before they did it. I have a little problem with why do they not get the death penalty.

The State "rehabilitated" Ms. Randleas on this issue until she stated that she wouldn't

automatically answer "yes" to Special Issue No. 1. Appellant argues that this juror was

unqualified because she expressed her true feelings on both the questionnaire and during voir

dire and would automatically find a convicted capital murderer a continuing threat to society.

The following occurred that illustrates her position on Special Issue No. 1 is found at RR: Vol.

21 p. 83:

Q. ...Now, my bottom line question for you with respect to that question, Miss Randleas, is in all honesty if the State proved to you beyond a reasonable doubt that a defendant formed a goal to kill another person without legal excuse and justification and did it because that's what he wanted to do and did it during the course of the commission of another serious felony, would the facts of that case alone, just based on what convinced you that this person is guilty of capital murder, would that answer Special Issue Number 1 for you every time?
A. Yes.
Q. And I thought that that's the way you felt about it and that's what you've basically have been trying to tell us for some little while.
A. Uh-hum.
Q. All right. So essentially that's what the State is going to have to prove to you that the defendant is a capital murderer who intentionally took another person's life. And that fits basically with your philosophy. I think what you told us is perfectly plain that I believe we must stand firm on an eye for an eye. Is that kind of what you meant by that?
A. Yes.

Ms. Randleas also did not see any purpose in life in prison.  She stated (RR: Vol. 21 p. 85):

Q. ...You made a statement earlier that I wanted to follow-up on and just get your though about it because you said it and that was the end of it. It was in the form of a rhetorical question. You said, what good is life without parole, or something to that effect. Do you remember making that statement?

A. I do remember making that statement.

Q. Tell us what you mean by that, what your concerns, your thoughts are in that regard.

A. Well, this is, again, my feelings and my opinion - -

Q. Sure.

A. - but when someone is in prison for life, what kind of life is that? So, yeah, they are still alive, but they are caged.  They can't ever leave.

Q. Right.

A. And I just - - that's something that I have, you know, questions about as far as - -

Q. You see no real purpose in it.  Would that be fair to say?

A. Yeah, the purpose of it.

Ms. Randleas also had a bias toward law enforcement.  She answered "yes" to the question "Do you believe they are more likely to tell the truth than the average person?"  She further stated "they are naturally made up to hold up the law and protect the citizens. I realize there are bad in all aspects of life, but I respect the law and I hold a high opinion for those who serve to protect us." (RR: Vol. 21 57)  Trial court denied defense challenge.  RR: Vol. 21 p. 94) Ms. Randleas husband, ex-husband, brother-in-law and nephew were all police officers. (RR: Vol. 21 p. 69) Her stepfather had been murdered during a robbery of his home and the perpetrator never caught. (RR: Vol. 21 p. 69)

Appellant submits that Ms. Randleas would not consider the mitigation evidence that the defense would present.   She did not think age should be a mitigating factor.  (RR: Vol. 21 p. 88) She stated that if the defendant was over the age of 18, was not mentally retarded, there was no duress, self-defense, accident, mistake or insanity she would probably find him guilty and sentence him to death.  (RR: Vol. 21 p. 91)

Appellant has shown that this juror was not qualified.   Appellant submits that the Trial Court erred in denying Appellant's challenge for cause.   Appellant objected to seating of venire person, Teresa Randleas, stating that Ms. Randleas was an objectionable juror. (RR: 21 p. 92) Because the Trial Court erred in denying Appellant's challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's bias against the Defendant, or as a matter of law against the law as relied upon the by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 38 p. 37) See authorities cited and argument in  Issue No. 1 which are incorporated herein by reference.

## APPELLANT'S ISSUE NO. 15

### THE TRIAL COURT ERRED IN DENYING APPELLANT'S  CHALLENGE FOR CAUSE AGAINST VENIREPERSON JOHN CANTWELL

### SUMMARY OF VOIR DIRE OF VENIRE PERSON JOHN CANTWELL

Appellant directs this Honorable Court's attention to Reporter's Record Volume 24 page 92 at which defense counsel made the following objection:

MR. LOLLAR: We do have a challenge for cause, Your Honor, based on his response and with regard to Special Issue Number 3, the juror said he would not be able to view as mitigating circumstance evidence that a defendant was acting under the influence of alcohol or drugs.  He would not be able to look at a defendant's  history of possible abuse as a child.  Physical abuse, sexual abuse, mental abuse, those type of things.  He would not consider that.

So there were three issues there where he said that he would not pay consideration of them and would find them to be irrelevant.  He would give them no weight at all, which is contrary to the holdings of the United States Supreme Court in Lockett versus Ohio, Morgan versus Illinois, and Eddings versus Oklahoma.
So we feel the juror is no qualified insomuch as we've told the Court ,many times before, that those are some of the mitigating circumstances in which we intend to show in this case would we get to that portion of the trial.

The trial court denied Appellant's challenge for cause. RR: Vol. 24 p. 93)

64

Appellant argues that Mr. Cantwell would not give meaningful consideration to mitigating factors presented by the defense.  He answered "no" to the question concerning whether or not genetics, circumstances of birth, upbringing and environment should be considered in determining punishment.  (RR: Vol. 24 p. 83) He thought he would have a hard time considering voluntary intoxication as a mitigating circumstance.  (RR: Vol. 24 p. 87) He stated that he would not consider the life history of a defendant.  (RR: Vol. 24 p. 87) He stated that he would not consider physical, sexual or mental abuse as a child as a mitigating circumstance.  (RR: Vol. 24 p. 87-88)

Appellant has shown that this juror was not qualified.   Appellant submits that the Trial Court erred in denying Appellant's challenge for cause.  Appellant objected to seating of venire person, John Cantwell, stating that Mr. Cantwell was an objectionable juror. (RR: 24 p. 92-93) Because the Trial Court erred in denying Appellant's challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's bias against the Defendant, or as a matter of law against the law as relied upon the by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 38 p. 39) See authorities cited and argument in  Issue No. 1 which are incorporated herein by reference.

## APPELLANT'S ISSUE NO. 16

### THE TRIAL COURT ERRED IN DENYING APPELLANT'S  CHALLENGE FOR CAUSE AGAINST VENIREPERSON ALEXANDER KONKLE

### SUMMARY OF VOIR DIRE OF VENIRE PERSON ALEXANDER KONKLE

Appellant directs this Honorable Court's attention to Reporter's Record Volume 25 page 76 at which defense counsel made the following objection:

65

MR. PARKS: Your Honor, we would submit Mr.Konkle for two reasons. First, we would submit that he has pretty clearly advised us that he's an automatic yes on special issue number 1, and we'd also submit him for the reason that he could not give meaningful consideration to voluntary intoxication in answering special issue number 3; and that will be, no question about it, if we reach this stage of the trial, that will be evidence that we will submit as mitigating evidence in this case, and having a juror that would not give meaningful consideration would violate the Sixth, Eighth and Fourteenth Amendments of the Constitution and the teachings of logic in the Morgan v. Illinois and Eddings v. Oklahoma.

The trial court denied Appellant's challenge for cause. (RR: Vol. 25 p. 77)

Mr. Konkle believed in an eye for an eye and thought that every action has a reaction. (RR: Vol. 25 p. 14) In response to the question concerning genetics, circumstances of birth, upbringing and environment, Mr. Konkle stated "No, because people can change the environment that they live in and I believe that genetics has nothing to do with how a person turns out." (RR: Vol. 25 p. 46) At the end of their portion of voir dire, the State instructed the juror on what he needed to say in order to be a qualified juror. (RR: Vol. 25 p. 47-48)

Appellant argues that Mr. Konkle would automatically find the defendant a future danger and answer Special Issue No. 1 "yes". The following occurred at RR: Vol. 245 p. 63):

Q. So what jurors are allowed to do in our law is to say, Okay, now I have found this person guilty of capital murder. It's up to me to decide whether or not special issue number 1 should be answered yes. Well, what do I know? Well, I know that the defendant - - I'm going to look at the facts and circumstances of the case. I know the defendant intended to kill this guy, did it with no legal excuse or justification, and did it in order to get his property.

Now, is that enough for me to answer that question yes, or do I need more than that in order to answer that question?

A. I don't think I need more than that.

Q. You would need more than that?

A. I wouldn't.

Q. You would not need more than that?

A. Would not.

Appellant further argues that Mr. Konkle would not give meaningful consideration to genetics or voluntary intoxication. (RR: Vol. 25 p. 71-73) He stated "Well, if it was voluntary, it wouldn't be considered." (RR: Vol. 25 p. 73)

66

Appellant has shown that Mr. Konkle was not qualified to be a juror because he would automatically find the Defendant to be a future danger and would not give meaningful consideration to genetics and voluntary intoxication. Appellant submits that the Trial Court erred in denying Appellant's challenge for cause. Appellant objected to seating of venire person, Alexander Konkle, stating that Mr. Konkle was an objectionable juror. (RR: 25 76-77)p. 92-93) Because the Trial Court erred in denying Appellant's challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's bias against the Defendant, or as a matter of law against the law as relied upon the by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 38 p. 39) See authorities cited and argument in Issue No. 1 which are incorporated herein by reference.

## APPELLANT'S ISSUE NO. 17

### THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON LANCE BEDFORD

### SUMMARY OF VOIR DIRE OF VENIRE PERSON LANCE BEDFORD

Appellant directs this Honorable Court's attention to Reporter's Record Volume 38 page 39-40 at which defense counsel made the following objection:

MR. PARKS: Your Honor, based upon his interview, Mr. Bedford made it perfectly clear that he would be unable to and could not and would not consider, give meaningful consideration to the defendant's individual mitigating evidence to be presented in this case in violation of the Constitution of the United States. We therefore, renew our challenge for cause made at that time.
The trial court denied Appellant's challenge.

Mr. Bedford, a former Dallas police officer, stated in the questionnaire that he ranked himself a "9" in how strongly he felt about the death penalty. He thought the death penalty was a deterrent and thought the death penalty should be made available for murder. When answering Special Issue No. 3, Mr. Bedford was not sure about considering whether the Defendant was a

67

follower or a leader. (RR: Vol. 26 p. 176) He said he was not sure he could consider any of the mitigating factors. (RR: Vol. 26 p. 177)

Appellant has shown that Mr. Bedford was not qualified to be a juror. Appellant objected to seating of venire person, Lance Bedford, stating that Mr. Bedford was an objectionable juror. (RR: 25 76-77)p. 92-93) Because the Trial Court erred in denying Appellant's challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's bias against the Defendant, or as a matter of law against the law as relied upon the by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 38 p. 39) See authorities cited and argument in Issue No. 1 which are incorporated herein by reference.

**APPELLANT'S ISSUE NO. 18**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON LYLE LIVINGSTON**

**SUMMARY OF VOIR DIRE OF VENIRE PERSON LYLE LIVINGSTON**

Appellant directs this Honorable Court's attention to Reporter's Record Volume 29 page 86 at which defense counsel made the following objection:

MR. LOLLAR: Judge, we do have a challenge for cause.
Your Honor, the juror has plainly told us that many of the mitigating factors that we intend to show in this trial, in the event the defendant is found guilty of capital murder, he would give no mind to.
He tells us that he would not consider age of the defendant to be a mitigating factor. He would not consider whether the defendant was a follower or a leader in the circumstance of the offense. He tells us that he would not consider whether the behavior of the defendant on the day in question was aberrant behavior would be a mitigating factor to him.
He tells us that those factors would be irrelevant to him in answering special issue number three. And, therefore, under Lockett versus Ohio, Morgan versus Illinois, and Eddings versus Oklahoma, the juror is not qualified to sit as a juror in this case.
Trial court denied Appellant's challenge for cause. (RR: Vol. 29 p. 87)

Appellant submits that Mr. Livingston would not give meaningful consideration to the

mitigating circumstances of age of the Defendant, whether he was a leader or a follower, or the

Defendant's behavior on the day of the incident.  The following occurred at RR: Vol. 29 p.78:

Q. ..So, if a defendant turns out to be eighteen, nineteen, twenty, twenty-one, a youngish age like that, that is not something that you would look at to be a mitigating circumstance?
A. No.
Q. Okay.  And some people have told us, well, if I hear about a parties situation during the course of the evidence of the trial, and I find that the defendant was not the leader of that party group but was rather a follower, that that's something that might be of importance to them sufficiently mitigating to avoid a death sentence.  How do you feel about that, recognizing now that, you know, the evidence is still showing you the defendant is guilty of capital murder?
A. No......
Q. Some people tell us that if they hear from the friends and relatives of the defendant, the people that know him best, who tell them that this act that the defendant did on a particular day that go them here in the courtroom is kind of aberrant behavior for them, that they are normally not that way.  How do you feel about something like that?
A. I don't think I would take that - -
Q. Sorry?
A. I don't think I would take that as a mitigating circumstance.

Appellant has shown that Mr. Livingston was not qualified to be a juror because he would

not give meaningful consideration to mitigating factors the defense would present at trial.

Appellant submits that the Trial Court erred in denying Appellant's challenge for cause.

Appellant objected to seating of venire person, Lyle Livingston, stating that Mr. Livingston was

an objectionable juror. (RR: 29 p. 86-87) Because the Trial Court erred in denying Appellant's

challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's

bias against the Defendant, or as a matter of law against the law as relied upon the by the

Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 38 p. 42) See authorities

cited and argument in  Issue No. 1 which are incorporated herein by reference.

69

## APPELLANT'S ISSUE NO. 19

## THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON JENNIFER STOCKTON

### SUMMARY OF VOIR DIRE OF VENIRE PERSON JENNIFER STOCKTON

Appellant directs this Honorable Court's attention to Reporter's Record Volume 29 page 183

at which defense counsel made the following objection:

MR. PARKS: Yes, your Honor, we would challenge the juror.

You know, first, Judge, I would like for the Court to take into consideration the things that she has said in her questionnaire that indicate that Ms. Stockton is certainly not a person who is likely to be fair and impartial in a case of this kind.

She would be much too anxious, I believe, to execute somebody to save a few bucks. And that certainly is a consideration that I believe, under Jones and Threadgill, the Court ought to give consideration to.

In addition to that, I am very, very concerned with any juror who tells us that they have to work almost a full day after they have worked as a juror all day here and would have to work over the weekend. I thinking that surely, with as many jurors as we have brought down, we could manage to find jurors who could give their full attention.

And I'm not accusing her of lying when she says that she believes that she could do it. I think she probably believes she can do it. But she's never sat on a jury of this kind. She doesn't know the kind of work that we expect out of jurors and the kind of attention that we expect out of jurors.

And I think it's doing the entire criminal justice system a disservice, in addition to Mr. Broadnax, to force a person on a jury who would have those kinds of problems.

In addition to all of those, we submit the juror for the reason that she absolutely cannot and will not give consideration to any of the mitigating evidence that his defendant would proffer during the course of this trial.

She will not consider young age. She will not consider a follower rather than a leader. She will not consider voluntary intoxication. She will not consider background. She will not consider the manner in which he was raised. The very things that special issue number three calls upon to give consider to.

Now, I'm not - - I didn't pin her down to would she consider it to be mitigation. I didn't try to pin her down as to what weight she would give it. She said she just would not consider those things in answering special issue number three. And the law expects that Mr. Broadnax would be entitled to a jury who will at least consider special issue number three.

We are entitled to all of those things. She is disqualified under the teaching of Lockett v. Ohio, Morgan v. Illinois, Eddings versus Oklahoma, and under the eighth, fourteenth, fifth and sixth amendments of the constitution.

Trial court denied Appellant's challenge for cause. (RR: Vol. 29 p. 185)

70

Appellant submits that Ms. Stockton was not a qualified juror because she would have to work every day and/or night after serving on the jury all day. She stated on her questionnaire that she was the provider for her household and if would be difficult for her financially to serve on the jury. (RR: Vol. 29 p. 107) Appellant argues that these pressures of work and finances would make her the type of juror who would have difficulty in giving her full attention to the trial and who would want to be as expeditious as possible. She told defense counsel that she normally works daytime hours and would need to work weekends if she was selected for the jury. (RR: Vol. 29 p. 156) She worked as a speech pathologist in a hospital and had regular patients that the needed to see every day.

Ms. Stockton was also very pro-death penalty. She stated in her questionnaire that she was in favor of the death penalty because "I do not like the idea of my tax dollars paying for amenities for inmates accused of capital murder for life." (RR: Vol. 29 p. 163) She thought amenities was anything that a prisoner was allowed to do that was considered a luxury. (RR: Vol. 29 p. 163) She thought reading books and watching television were luxuries. (RR: Vol. 29 p. 163) She thought prison should be "an unpleasant place, not somewhere that you can go to enjoy the rest of your life." (RR: Vol. 29 p. 163)

Ms. Stockton also believed in an eye for and eye and stated "Whey should the defendant be allowed to survive in obviously a pleasant place, even though incarcerated, if you've just taken a life? She thought the purpose of the death penalty was to permanently remove the murderer from being a drain on the citizens' taxes. (RR: Vol. 29 p. 167)

Appellant argues that Ms. Stockton would not consider age a mitigating factor. The following occurred at RR: Vol. 29 p. 177:

71

Q. ...But, you know, some jurors say that if a person is on the lower range of that, eighteen, nineteen, twenty, something like that, that would be a consideration for them. Other jurors say that if they are old enough to be tried for the death penalty under the law, eighteen years of age, then age is not something that they would consider in the defendant's background, character, personal moral responsibility, those things. How do you fee about it?

A. I think eighteen is eighteen. Is you can serve and die for you country, you can sure make a decision to shoot somebody and pay the price for it.

Q. And let me just make sure I'm understanding you. What I'm hearing you say is that, for you, relative youth would not be a consideration in answering that question.

A. It would not.

Ms. Stockton would not consider voluntary intoxication, whether the defendant was a

follower or a leader, or if the action of the defendant was a aberration as a mitigating factor in

considering Special Issue No. 3. The following was found at RR: Vol. 29 p. 178-179):

Q. Do I take it from that that if you heard evidence of voluntary intoxication, when it comes to answering special issue number three, based on your answer there, that that would not be a consideration for you in answering that question?

A. It would not be.

Q. Okay. Sometimes, particularly if there is a special issue number two given, that would indicate that there is more than one person involved in the offense. You see how that works?

A. Yes.

Q. Some people tell us that whether or not a person was the follower rather than the leader, if there were more than two people, it might be a consideration for them in answering special issue number three. How do you feel about that?

A. That would not be - -

Q. Not?

A. That would not change my opinion on special issue number three.

Q. Sometimes you might hear from friends or family that know the defendant best who say that, well, you know, it may be - - apparently he did do the offense. The juror found him guilty of the offense. But this is an aberration for him. This is not the way he would typically be. Is that something that you thinking would be - -

A. No.

Q. - - a consideration for you in answering - -

A. They are not experts.

Q. I'm sorry?

A. They are not experts in criminal behavior.

Ms. Stockton stated that the defendant's background, whether or not he came from a

privileged background or was raised in poverty were of no importance to her. (RR: Vol. 29 p.

72

181) Appellant has shown that Ms. Stockton was not qualified to be a juror because she would not give meaningful consideration to mitigating factors the defense would present at trial. Appellant submits that the Trial Court erred in denying Appellant's challenge for cause. Appellant objected to seating of venire person, Jennifer Stockton, stating that Ms. Stockton was an objectionable juror. (RR: 29 p. 183-184) Because the Trial Court erred in denying Appellant's challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's bias against the Defendant, or as a matter of law against the law as relied upon the by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 38 p. 43) See authorities cited and argument in Issue No. 1 which are incorporated herein by reference.

## APPELLANT'S ISSUE NO. 20

### THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON PATRICIA HODGES

### SUMMARY OF VOIR DIRE OF VENIRE PERSON PATRICIA HODGES

Appellant directs this Honorable Court's attention to Reporter's Record Volume 38 page 68 at which defense counsel made the following objection:

MR. PARKS: Your Honor, based upon the examination of Patricia Hodges, I will tell you that this is not an acceptable juror to the defense for the reasons that she said that she could not consider voluntary intoxication meaningfully, which is mitigation - - individual mitigation evidence that we expect to come forward to this jury in this case.

Likewise, she was one of many jurors that the State used this, what I call, vigilante example to suggest to her that Special Issue Number 3, the mitigation issue, was there so that the juror could exercise the decision not to execute a person who's son was addicted to drugs by the neighborhood drug dealer, and that the police wouldn't do anything about it. And he finally went down, and he shot the person so he could steal his money and take it and give it over to the church.

My recollection is she seemed to ingest that example pretty wholeheartedly, so we consider she is not at all acceptable to us. Having already used our fifteenth peremptory challenge, we respectfully request the Court grant us an extra peremptory challenge to exercise on this particular juror.

73

JUDGE BAIRD: That request will be granted.

MR. PARKS: And so we exercise peremptory challenge number 16, Your Honor.

The following occurred at RR: Vol. 33 p. 80 which shows Ms. Hodges would not consider voluntary intoxication as a mitigating circumstance:

Q. ...Other jurors tell us no, that whatever else might or might not be mitigating, that voluntary intoxication, whether drugs or alcohol, would not be something they would consider when they answer special issue number three. And I think I understood you to say that that was your position in the matter.

A. Yes, Yes,

Appellant has shown that Ms. Hodges was not qualified to be a juror because she would not give meaningful consideration the mitigating factor of voluntary intoxication the defense would present at trial. Appellant submits that the Trial Court erred in denying Appellant's challenge for cause. Appellant objected to seating of venire person, Patricia Hodges, stating that Ms. Hodges was an objectionable juror. (RR: 38 p. 69) Because the Trial Court erred in denying Appellant's challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's bias against the Defendant, or as a matter of law against the law as relied upon the by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 38 p. 69) See authorities cited and argument in Issue No. 1 which are incorporated herein by reference.

## APPELLANT'S ISSUE NO. 21

### THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON CLARENCE WINFIELD

### SUMMARY OF VOIR DIRE OF VENIRE PERSON CLARENCE WINFIELD

Appellant directs this Honorable Court's attention to Reporter's Record Volume 38 page 79 at which defense counsel made the following objection:

MR. PARKS: Your Honor, may it please the Court. Mr. Winfield is not an acceptable juror to the defense. Mr. Winfield's examination will show that he was at least substantially impaired in his ability to give meaningful consideration to mitigation in this case and to this defendant's individual mitigation.

74

Also, we'll point out to the Court that Mr. Winfield was qualified by the use of vigilante, killing drug dealer and his money being taken to give to the church, that Mr. Winfield's fully and completely accepted a hit in the face as an act of criminal violence and that would be a continuing threat to society. For all of those reasons, he is not acceptable to the defense. We would respectfully request an additional strike to use on this juror.

JUDGE BAIRD: That request will be denied. Juror- - Mr. Winfield will now become juror number 10.

The following occurred at RR: Vol. 34 p. 205:

Q. And I think you've already said that, you know, punching my co-counsel here would be a criminal act of violence.

A. Right.

The State qualified Mr. Winfield by giving him a hypothetical involving a vigilante (RR: Vol. 34 p. 214):

Q. - - may be mitigating to them and that they would consider it. But the question in special issue number three is not whether it's mitigating, but does it rise to the level of being sufficiently mitigating, okay?

A. Okay.

Q. So that you would then over turn the sentence of death and give the individual a sentence of life without parole, okay?

So, in other words, you know, with the situation of the neighbor that then goes down and kills the local drug dealer.

A. Right.

Q. You know, you may find him guilty of capital murder because that's what the law would require may in those set of facts if you believe the State had proved it beyond a reasonable doubt. You may find in special issue number one that, yeah, he's going to be there with other drug dealers, so absolutely he's going to be a future danger. You may answer special issue number two yeah, he's the trigger person, yes.

So, you may have answered yes and yes after finding a person guilty of capital murder in that example I gave you. But in special issue number three some people tell us, hey, you know, his family had been poisoned by this man down the street and nobody was doing anything about it. He gave the money to charity. He turned himself in.

Also, do you understand how some people could find that maybe some of those circumstances would be sufficiently mitigating?

A. Sure.

Appellant has shown that Mr. Winfield was not qualified to be a juror because he would not

give meaningful consideration the mitigating factor of voluntary intoxication the defense would

75

present at trial. Appellant submits that the Trial Court erred in denying Appellant's challenge for cause. Appellant objected to seating of venire person, Clarence Winfield, stating that Mr. Winfield was an objectionable juror. (RR: 38 p. 79) See authorities cited and argument in Issue No. 1 which are incorporated herein by reference. Appellant submits that he has asserted a clear and specific challenges for cause clearly articulating grounds therefor; that he used a peremptory challenge on those jurors; that all his peremptory challenges were exhausted; that his request for additional strikes was denied; and, that an objectionable juror sat on the case.

## APPELLANT'S ISSUE NO. 22

### THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON JOHN VESSELS

### SUMMARY OF VOIR DIRE OF VENIRE PERSON JOHN VESSELS

Appellant directs this Honorable Court's attention to Reporter's Record Volume 35 page 80 at which defense counsel made the following objection:

MR. LOLLAR: Judge, we do challenge Mr. Vessels. He told us if he finds the defendant guilty of capital murder he's going to answer Special Issue No. 1 "yes" and can't think of anything that is going to mitigate against the death penalty in answer to Special Issue No. 3. We feel the juror is not qualified.
    The trial court denied Appellant's challenge for cause. (RR: Vol. 35 p. 81)

Appellant submits that Mr. Vessels was strongly in favor of the death penalty. The following occurred at RR: Vol. 35 p. 67-68):

Q. (By Mr. Lollar): Well, let me go through some of your answers that you gave us in your questionnaire. Here on Page 2 you tell us the best argument for the death penalty is, Willful taking of another person's life would be the forfeiture of the assailant's like - - should result in the forfeiture of the assailant's life.
A. Okay.
Q. Is that what you thought?
A. Yes.
Q. And I assume, obviously, that you told us the truth when you made the answers to your questionnaire.
A. Yes.

76

Q. And that is how you felt. When we go over here to Page 4 we ask you, For what crimes do you think the death penalty should be available in Texas and you said, First-degree murder or murder in the commission of a felony.

A. Okay.

Q. If we go over to Page 5 we ask you, Do you think spending a lifetime in prison is equivalent to the death penalty? And you said, No. We asked you, Which of the following accurately states your general belief regarding a sentence of life without the possibility of parole? And you told us you were strongly opposed that.

A. Right.

Q. And in explaining your response you said, I believe that lifetime incarceration is both a financial burden on society and morally the criminal deprived another person of their life and should not be allowed to suffer for years in a cell.

A. Right.

Q. And then we ask you, For what purposes, if any, do you believe life without the possibility serves? And your answer was nothing. And then the next one, What purposes, if any, do you believe the death penalty serves? And you said, it ends the actions someone may repeat if unused. If the death penalty is not used, they may repeat their willful taking of another person's life, is that what you meant there?

A. Yes, sir.

When asked if he could vote to give the defendant life without parole, Mr. Vessels stated "It is the law and I want to follow the same rules." (RR: Vol. 35 p. 72) Mr. Vessels further showed he would automatically answer "yes" to special issue no. 1 as shown by the following exchange (RR: Vol. 35 p. 75):

A. So basically you're asking me, do I think that if they can commit the crime once that's a guarantee they would do it again?

Q. (By Mr. Lollar): Not guaranteed. That's not what the question asks, Is there a probability?

A. And probability that they would do it again and if I think that's a true statement?

Q. Yes.

A. Yes.

When asked how he felt about the mitigation issue, he stated that he couldn't predict if anything would change his mind. (RR: Vol. 35 p. 79) He could not think of anything that would be a sufficiently mitigating circumstance. (RR: Vol. 35 p. 80)

77

Appellant submits that he has asserted a clear and specific challenges for cause clearly articulating grounds therefor; that he used a peremptory challenge on those jurors; that all his peremptory challenges were exhausted; that his request for additional strikes was denied; and, that an objectionable juror sat on the case. See authorities cited and argument in Issue No. 1 which are incorporated herein by reference.

Appellant suffered a detriment from the loss of the additional strike, in that two objectionable jurors were seated on the jury. Appellant has demonstrated harm, and thereby reversible error, in that Appellant has shown that the Trial Court erroneously denied challenges for cause on all nine venire members. Therefore, this Court should reverse and remand this cause for a new trial based on Appellant's Issue Nos. 1 through 14 on improper jury selection; which as a whole denied Appellant his right to due process in the selection of a capital murder – death penalty jury.

### · APPELLANT'S ISSUE NO. 23

### THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON EMILY BLEVINS

### SUMMARY OF VOIR DIRE OF VENIRE PERSON EMILY BLEVINS

. Appellant directs this Honorable Court's attention to Reporter's Record Volume 38 page 81 at which defense counsel made the following objection:

MR. PARKS: May it please the Court, this prospective juror, Emily Blevins, is not a juror who would be acceptable to the State - - to the defense for the following reasons: Ms. Blevins, although while she appeared to be more reasonable certainly than Mr. Vessels and Mr. Winfield again was given the hit- in-the-face example, and she also agreed that a hit in the face would be a criminal act of violence that would constitute a danger to society in her view. That caused me considerable concern.

She also indicated on page 5 of her questionnaire that she believed in an eye for an eye. And when we inquired about that, she said, "when a person commits murder, they have forfeited their right to decide." I'm not exactly sure what that means, but I would guess that she probably meant they have forfeited their right to live in that context.

78

For those reasons, she is not an acceptable juror to the defense, and we would respectfully request an additional strike for this juror.

JUDGE Baird: That will be denied. Ms. Blevins becomes juror number 12.

Ms. Blevins stated on the questionnaire the she believe in an "eye for an eye" and thought the death penalty was the ultimate deterrent for crime. (RR: Vol. 35 p. 130-132)

The following occurred at RR: Vol. 35 p. 149 which shows Ms. Blevins thought a hit in the face would be a criminal act of violence that would constitute a danger to society:

Q....So for example, my colleague is sitting right here taking notes and minding her business and I'm a bad guy. I decided I don't like her and I pop her in the face, good right hand and you witnessed that. Would you consider that act on my part towards my colleague to be a criminal act of violence?
A. Yes.
Q. What if now I'm in prison and she's in her cell writing letters to her mom, she's been sentenced for using crack and she got a two-year sentence and I'm there for whatever I'm there for. And I don't like her and I just sucker punch her in the face for no reason at all. Would that be in your mind an act of violence?
A. Yes.

Appellant submits that this hypothetical was used by the State of an unprovoked hit in the face by a defendant to show future criminal acts of violence was a way to have the potential juror accept a very low liberal standard of "criminal acts of violence." Ms. Belvins accepted this viewpoint, demonstrating that she would not need to know if the Defendant had committed any other acts violence worse than that of a slap in the face.

Appellant submits that he has asserted a clear and specific challenges for cause clearly articulating grounds therefor; that he used a peremptory challenge on those jurors; that all his peremptory challenges were exhausted; that his request for additional strikes was denied; and, that an objectionable juror sat on the case. See authorities cited and argument in Issue No. 1 which are incorporated herein by reference.

79

Appellant suffered a detriment from the loss of the additional strike, in that two objectionable jurors were seated on the jury. Appellant has demonstrated harm, and thereby reversible error, in that Appellant has shown that the Trial Court erroneously denied challenges for cause on all nine venire members. Therefore, this Court should reverse and remand this cause for a new trial based on Appellant's Issue Nos. 1 through 15 on improper jury selection; which as a whole denied Appellant his right to due process in the selection of a capital murder – death penalty jury.

## SUMMARY OF OBJECTIONS IN SELECTION PROCEDURE

Appellant made challenges for cause against venire members. The Trial Court denied each challenge for cause. The Trial Court had granted Appellant two additional peremptory strikes. In each challenge of a juror, Appellant requested additional strikes but was denied. Therefore, objectionable and biased jurors to the defense were seated on the Jury. Appellant suffered a detriment from the loss of the additional peremptory strikes. The Trial Court abused its discretion in denying Appellant's challenge for cause against venire members Jon Desmond, Helen Noble, Billy Henry, John McGuire, Lisa Davison, Bruce McDonald, Teresa Randleas, John Cantwell, Alexander Konkle, Lyle Livingston, Jennifer Stockton, Patricia Hodges, Clarence Winfield, John Vessels and Emily Blevins for the specific reason stated in each issue.

## ARGUMENTS AND AUTHORITIES

**(Issues Nos. 8-23 are combined for additional argument
in that they contain similar issues of law.)**

Appellant submits that when the trial court errs in overruling a challenge for cause against a venire member, the defendant is harmed only if he uses a peremptory strike to remove the venire

member and thereafter suffers a detriment from the loss of the strike. *Demouchette v. State*, 731 S.W.2d 75, 83 (Tex. Crim. App. 1986), cert denied, 482 U.S. 920 (1987).

A review of the record to determine if Appellant preserved error to complain of the propriety of the Trial Court's ruling on his challenge for cause reflects the following:

(1)  The voir dire of the complained of venire members was recorded and transcribed.
(2)  Appellant timely asserted a clear and specific challenge for cause against each venire member.
(3)  Appellant clearly articulated the grounds of the challenge for cause against the venire member.
(4)  The Trial Court denied Appellant's challenge for Cause against each venire member.
(5)  Appellant exhausted all of his peremptory strikes. (RR: 38 p. 80)

Based on the record, Appellant preserved error to complain of the propriety of the Trial Court's ruling on his challenges for cause. *Harris*, 790 S.W. 2d 581 (Tex. Crim. App. 1989). See *Hernandez v. State*, 757 S.W.2d 744 (Tex. Crim. App. 1988). These errors in the voir dire process denied Appellant his right to due process and a fair trial.

## APPELLANT'S ISSUE NO. 24

### THE JURY AS CONSTITUTED WAS BIASED OR PREJUDICED WHICH DEPRIVED APPELLANT OF A FAIR TRIAL (FEDERAL CONSTITUTIONAL ISSUE)

Appellant submits that the trial court's actions in relation to overruling Appellant's objections to the trial court's actions in reference to each juror complained about previously deprived Appellant of a lawfully constituted unbiased and non prejudicial group of jurors, all of which should have been qualified according to the law by the standards of the U.S. Constitution and or interpreting Federal Court opinions. Appellant submits that one or all or any combination

81

of errors as previously complained about concerning jury selection constitute a violation of the United States Constitution.

Appellant has suffered injury by denying him due process guaranteed by the 'constitution' in applying law of jury selection to the case at bar. It is a violation of due process to provide for a wrong with no remedy (i.e. *Jones v. State*, 982 S.W.2d 386 (Tex. Crim. App. 1998) and its holding concerning reversible error is constitutionally illusory erroneous and barbaric in its application. It's misuse on appeal by application to other than trivial trial error is itself a violation of constitutional due process.

To grant Appellant rights of voir dire, but hold that a violation of the same is not a denial of due process of the highest order is a deceit upon the citizens of this State that potentially stand accused of an offense, as it usurps each citizen's right to fair and impartial jury as in the case at bar, where the State and trial court take advantage of the defendant having to use its peremptory challenges in a matter in an attempt to have a fair trial by correcting the trial court's errors. See all dissents in *Jones* that fights for basic ideals of fairness for all citizens and non citizens of this State as to criminal litigation jurisprudence in jury trial.

### APPELLANT'S ISSUE NO. 25

### THE JURY AS CONSTITUTED WAS BIASED OR PREJUDICED WHICH DEPRIVED APPELLANT OF A FAIR TRIAL (STATE CONSTITUTION ISSUE)

Appellant submits that the trial court's actions in relation to overruling Appellant's objections to the trial court's actions in reference to each juror complained about previously deprived Appellant of a lawfully constituted unbiased and non prejudicial group of jurors, all of

82

which should have been qualified according to the law.  Art. 35.16 C.C. P. Appellant submits that one or all or any combination of errors as previously complained about concerning jury selection constitute a violation of Constitution of the State of Texas Article One, Section 10.

Appellant has suffered injury by denying him due process guaranteed by Art. 35.16 C.C. P. in applying law of jury selection to the case at bar.  It is a violation of due process to provide for a wrong with no remedy (i.e. *Jones v. State*, 982 S.W.2d 386 (Tex. Crim. App. 1998) and its holding concerning reversible error is constitutionally illusory erroneous and barbaric in its application.  It's misuse on appeal by application to other than trivial trial error is itself a violation of constitutional due process.

To grant Appellant rights of voir dire, but hold that a violation of the same is not a denial of due process of the highest order is a deceit upon the citizens of this State that potentially stand accused of an offense, as it usurps each citizen's right to fair and impartial jury as in the case at bar, where the State and trial court take advantage of the defendant having to use its peremptory challenges in a matter in an attempt to have a fair trial by correcting the trial court's errors.  See all dissents in *Jones* that fights for basic ideals of fairness for all citizens and non citizens of this State as to criminal litigation jurisprudence in jury trial.

83

## TRIAL ISSUES

## APPELLANT'S ISSUE NO. 26

## THE TRIAL COURT ERRED IN GRANTING THE STATE'S OBJECTION TO PROFFERED EXPERT TESTIMONY EVIDENCE CONCERNING "DIMINISHED CAPACITY" OR EVIDENCE CHALLENGING THE STATE'S EVIDENCE ON MENS REA

Appellant directs this Honorable Court to Reporter's Record Volume 42 pages 37-44 at

which the following occurred:

THE COURT: All right. As I understand it, Mr. Lollar, you hope to introduce evidence during the case in chief on guilt or innocence regarding diminished capacity.
Is that correct, sir?
MR. LOLLAR: Regarding the defendant's mental state at the time of the commission of the offense as it would relate to the culpable mental state of the defendant in the hopes of negating the State's proof as regard ro an intentional act committed by the defendant.
THE COURT: And your brief is styled, "Trial Brief Regarding Diminished Capacity."
MR. LOLLAR: Yes, and I think that's part of the confusion about the whole line of cases is calling it diminished capacity because there is diminished capacity. Then there is what we have in Texas, which is simply pointing out to the jury that because of the defendant's mental state at the time of the commission of the offense allowable under 3836, that that goes to their - - the State's lack of proof about the culpable mental state required for a conviction of capital murder.
Now, that's where all the confusion in these cases comes from, is by calling it diminished capacity. We can call it whatever we want to call it. It's a lack - - It's not a defense and not offered as a defense. It's simply a lack of proof.
. . .
THE COURT: Do you wish to be heard further?
MR. LOLLAR: Well, Judge, I will simply restate that we are not offering it as a defense. Not as any type of defense, not as an affirmative defense or otherwise. We're simply saying it goes to lack of proof on the part of the State's evidence to negate that a culpable mens rea required of the offense of capital murder.
We think what's permissible under Jackson v. State, 160 S.W. 3$^d$, 568 (Tex. Crim. App. 2003) under Ruffin v. State, 270 S.W.3d 586 (Tex. Crim. App. 2008) under Mays v. State, 2009-TX-0424, 527, and under the federal authority, Park versus Arizona, 548 US, 2006.
THE COURT: Is that it?
MR. LOLLAR: And specifically because in a prosecution for murder, Article 3836 explicitly allows evidence as to the - - "All relevant facts and circumstances going to show the condition of the mind of the accused at the time fo the offense." It's specifically allowed under state statute.

THE COURT: Mr. Alex, are you asking the Court to deny the Defense the opportunity to put both Dr. Roach and Dr. Platt on at all during the case in chief, or only in a specific and limited way?

MR. ALEX: I'm - - I'm saying that their testimony is only relevant in punishment, Judge, because the statue specifically says it. It can't be offered as a defense and the case law all says that includes lesser included offenses.

The trial court denied Appellant from presenting the testimony of Dr. Platt and Dr. Roach to be submitted before the jury.

Appellant relies on the cases of *Jackson v. State*, 160 S.W.3d 568 (Tex. Crim. App. 2005) and the most current case on the subject matter, *Ruffin v. State*, 270 S.W.3d 586 (Tex. Crim. App. 2008) which held that "relevant evidence may be presented which the jury may consider to negate the 'mens rea' element of an offense. Article 38.36 as stated in Jackson that either party may offer testimony as to "all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense."

The testimony of Dr. Platt, and Dr. Roach (RR: Vol. 41 p. 91-109) (originally questioned in a sub rosa hearing which preserved the witness' testimony (RR: Vol. 39)) is clearly relevant to the issue of whether Appellant intended to shoot the victim or whether, because of mental disease or delusion he believed he was not shooting. (See *Ruffin* p. 8.) Expert evidence may be necessary to explain Appellant's mental state and when and how paranoid delusions may distort a person's auditory and visual perceptions is admissible as it relates to whether Appellant intended to shoot the victim.

Appellant suffered irreparable harm by denying him the due process and his statutory right to present evidence in support of his position to attack and challenge the State's evidence on the issue of mens rea in the guilt/innocence stage of the trial, especially since this element might determine what offense Appellant might be convicted, which in turn would determine what

85

punishment is applicable, life without parole or death, as the only punishment attached to the

indicted offense of capital murder in this state.

## APPELLANT'S ISSUE NO. 27

### THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION AND MOTION TO SUPPRESS PROFFERED TESTIMONY OF NEWS REPORTERS TO IN CUSTODY INTERVIEWS WITH APPELLANT BECAUSE EACH REPORTER WAS A DEFACTO AGENT OF THE STATE

Appellant directs this Honorable Court's attention to a pretrial sub rosa hearing in Reporter's

Record Volume 43 at which four separate news reporters testified about each witness's

involvement with an interview conducted of the Defendant while in the custody of the Dallas

County Sheriff in the Dallas County Jail.

Appellant objected to the introduction into evidence pursuant to a motion to suppress any

interview evidence as follows (RR: Vol. 43 p. 102-115):

Mr. Lollar: Your Honor, specifically, we would object – well, I've got specific objections to two of the stations' reports, and then global objections to all of the stations' reports.

The specific objections are in regard to the report from Channel 5, Ellen Goldberg. You will recall that Kimberly Leach, in talking about that specific interview, believed that she had the signed release from the defendant down in her office, and she was going to supplement that record after she left the Court the other day.

To my knowledge, she has never supplemented that record, and the record does not show a signed consent from Mr. Broadnax to do that interview here today.

As Ms. Goldberg testified, she didn't know anything about that. That wasn't her deal. But you will recall Kim Leach said she thought she had a signed, written interview request form from the defendant. She was going to go get it and bring it back to the Court. I don't think that's happened.

. . .

Mr. Lollar: The evidence does not show that he consented to it. Number one, there's no written consent. As they all stated was policy that they wouldn't have come over to interview him without it or allowed it to happen without it, and we don't have that piece of evidence and it's relevant to this inquiry.

That's in regards to Ellen Goldberg with the defendant, we make that objection specifically.

86

And with regard to the Channel 8 interview conducted by Rebecca Lopez, again, the Court will recall the testimony that the Garland Police Department subpoenaed the unedited tape the day it was aired, June 23rd, 2008.

Ms. Lopez indicated that they keep those tapes for at least a week before they edit them. It is unclear to me as to why we do not have an unedited version of that interview. All that has been given to the State, given to me, and shown to the Court is the edited version of her 15-minute interview with the defendant. We would object to that. As Ms. Lopez indicated, when you do an edited tape like that, they take what they consider to be the highlights, or most outrageous things, or the most striking things.

We think it's inherently unfair to be allowed to play an edited version of a 15-minute interview where they take 10 or 15 seconds of what the defendant has to say and play that to the jury. We feel that that's just unfair and is not – shouldn't be allowed to play to the jury if it is just an edited version of it.

So those are our two specific objections to those reporters.

. . .

Mr. Lollar: Globally, our objection to the introduction of these tapes are under the Fifth, Sixth, Eight and 14 Amendments of the United States Constitution, Article I, Section 92, 13, 15 and 19, the Texas State Constitution and Article 38.23 of the Texas Code of Criminal Procedure.

We would suggest to the Court that what the Court has seen here is a concerted effort by law enforcement that being the Sheriff's office to get these reporters up to see the defendant in violation of his constitutional rights.

We suggest that the defendant – the evidence shows that the defendant had twice requested appointment of counsel. That had not been complied with. Yet by the time the Sheriff's Department allowed the defendant to be interviewed, clearly he was in custody. He was in the custody of the Dallas County Jail, and without the cooperation of the Sheriff's Department, as all these reporters stated they would not be able to get up to see the defendant.

Secondly, we suggest because the defendant was in the mental state he was, it was a violation of the sheriff's own written policies to allow a defendant to be interviewed in the mental state that he was. The record clearly shows that at the time the defendant was interviewed, he had been seen by the psychiatric staff at the jail. They had noted psychiatric problems. They had ordered him confined in the closed behavioral cell in the psych unit of the medical ward of the third and fourth floor of the West Tower.

He had been interviewed by a psych assessor and by a psychiatrist who denoted that he was delusional and having auditory hallucinations. They, on June 23rd, referred him for a full psych evaluation on the 24th, and the records will show that at that time, he was diagnosed as being psychotic due to the polysubstance drug usage.

The records and the testimony that you heard indicate that Ms. Leach says she sent over the request form to the West Tower, and you've heard from the actual jailer who took that. I believe her name was Ms. Denkins, or something like that. We heard from her last week. But you will recall the testimony that she took the request form. She did not second-guess, was her testimony, the request or the instruction to go get his signature. She made no attempt to give him any kind of warnings, according to her testimony. She made no attempt to talk to the medical staff or psychiatric staff about the appropriateness of letting him out of a closed behavioral cell in the psych unit to see reporters and to be recorded. She merely did what she was told to do.

87

The Court has seen videotapes, and obviously the defendant's appearance and his, I guess you'd say the way he said things, shows that there's a disturbance of the mind. I mean, you would think if you are meeting anybody for the first time, you might want to comb your hair. If you knew you were going to be on television, you might want to comb it more. But instead, you see him in the appearance he was in all four of these interviews.

You heard his responses to the questioning by the reporters. You've heard him say things like, you know, he will say hi to my mom and then a minute later he will turn to the guards who were in the room with him and ask, Did I say that I wanted to say hi to my mom when he just said that less than a minute before.

The tapes clearly indicate his mind is not in a normal state and the records reflect indeed he was psychotic at the time he was given these interviews. We feel that under those stated reasons, his Fifth Amendment right not to incriminate himself, were violated. The right to counsel has been violated in violations of the Fifth Amendment. His right to a fair trial had been violated by all of these proceedings conducted through the Dallas County Sheriff's Office, which is a law-enforcement agency that had care, custody and control of the defendant at the time he had allowed them to have them despite their written procedures and policies, which would deny a person of his mental condition being allowed by the Sheriff's Department to make statements to the press.

The records reflect that I was not appointed by this Court until the next day following these interviews, and at that time I immediately cut off his access to the press and to other law-enforcement agencies.

We feel that under his constitutional rights, his rights have been violated and the Court should suppress the admission of all these videotapes.

We feel that under Article 38.23, that the Texas Legislature has recognized that evidence obtained in violation of a defendant's constitutional rights shouldn't be allowed into evidence in his trial.

So we feel that under all of these stated reasons, Judge, the Sheriff's Department used the press to get what the police could not get, and that was a confession from the defendant. They did it while he was in a state of psychosis as is given by the medical records, and will be proven during trial of the testimony of the psych assessor and psychiatrist who saw him on the morning of Jun 23rd.

Mr. Lollar: In response to the voluntariness of the defendant, the Court, of course, recognizes that at the time he was being made to talk to the press, he did not have the present ability, he had not had the opportunity to consult with an attorney, and he did not have, because of his mental state, the ability to voluntarily consent.

The Court: Thank you, Mr. Lollar.

With regard to the argument about it not being fair on the edited tape from Channel 8, the Court notes that to the extent the tape may or may not have been edited, it certainly was not done so at the direction of the State or any law enforcement officers. Whatever Channel 8 did on this, they did.

The tape is not inadmissible on those grounds and anything that you might be able to point out for the jury goes to the weight, not the admissibility.

With regard to whether the defendant consented to the interview on Channel 5, whether he did or whether he didn't, vis-a-vis any written form, he not only consented on the tape, he begged

88

to be heard. And the issue of whether he consented to that interview is fanciful, in the Court's view, from the defense prospective.

Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom.

The question has to be by law enforcement officers or by agents of law enforcement. The person claiming there is an agency relationship between the interrogator and the police has the burden of proving it.

On this record we cannot conclude that the reporter was acting as a State agent when he interviewed appellant.

Now to the extent that there was any egregious conduct, and I'm not saying there was by law enforcement in that case, it would go well beyond anything even argued about in this case.

So the issue of whether the defense was able to prove an agency relationship, which they must in order for their argument to succeed, is not even a close one.

The Motion to Suppress all of the statements is summarily denied. And all of that testimony will be allowed.

. . .

## ARGUMENTS AND AUTHORITIES

Appellant submits that the use of the videotape and testimony of the news reporter violated Articles 38.22 and 38.23 of the Code of Criminal Procedure.

The State gained a statement from an accused who was in custody based on question and answers from a person who was not a police officer, but who had great assistance from law enforcement and who, by evidence of his actions, was acting as an agent for the state/police in taking the Defendant's statement contrary to Arts. 38.22 and 38.23 C.C.P. and the Sixth Amendment to the U.S. Constitution. The record reflects that reporter Shaun Rabb did not inquire about whether or not Mr. Broadnax had requested appointment of counsel. (RR: Vol. 43 p. 17) He was not aware of anyone else at Channel 4 News inquiring and he assumed that no one at the news channel had inquired. (RR: Vol. 43 p. 18) He was not aware that Mr. Broadnax had requested appointment of counsel during his arraignment in the early morning hours of June 21st. (RR: Vol. 43 p. 17) Mr. Rabb testified that he was not aware that Mr. Broadnax had been evaluated at the time of book in and was referred to the psychiatric department in the medical

89

wing of the Dallas County Jail. (RR: Vol. 43 p. 18) Mr. Rabb stated that Kim Leach personally took him and the cameraman from the Sheriff's Office to the jail. (RR: Vol. 43 p. 21) He said he did not recall if he was taken to the third floor of the West Tower where the closed behavioral observation tank in the psych ward was located. (RR: Vol. 43 p. 21) He said they set up the camera in a nondescript visitor's booth and Mr. Broadnax was brought in a few minutes later. (RR: Vol. 43 p. 22) He said he was not aware if any medical or psychiatric staff was consulted before Mr. Broadnax was taken out of the closed observation cell in the psych ward to do the interview. (RR: Vol. 43 p. 22) He did not recall uniformed officers seen standing in the room with Mr. Broadnax in the videotape while the interview took place. (RR: Vol. 43 p. 23)

Mr. Rabb was not aware that on the morning of the interview, Mr. Broadnax had been seen by the 'psych assessor' who said he was delusional and having auditory hallucinations on the morning of June 23 and he was referred for further psychiatric evaluation. He was not aware that when Mr. Broadnax was further evaluated, he was noted as possibly substance dependent psychosis. (RR: Vol. 43 p. 25)

Mr. Rabb recalled that Mr. Broadnax told him that he had been smoking prior to the occurrence of the murders but, because he had not reviewed the tape, did not recall if Mr. Broadnax talked about blanking out during the murders. (RR: Vol. 43 p. 26) Mr. Rabb stated that no one Mirandized Mr. Broadnax in his presence. (RR: Vol. 43 p. 27) He was aware that after the interview, Mr. Broadnax was placed in suicide precaution for three days. (RR: Vol. 43 p. 27) He was not aware that Mr. Lollar had been appointed Mr. Broadnax's attorney on June 24th, the day after the interview. He did not question Mr. Broadnax about having an attorney. (RR: Vol. 43 p. 29) He was not aware that the Dallas County Jail policies and procedures allows interviews from

90

the media to be denied to a reporter based on the current mental condition of the defendant at the time of the request. (RR: Vol. 43 p. 29)

Appellant also objected to the admission of the live testimony and videotape because, at the time the tape was made, the Sheriff's Department's policy governing the access of the media for visitation purposes and purposes of taking statements from inmates was not complied with according to the testimony of Ms. Leach. (RR: Vol. 41 p. 8-65)

Appellant further argues that there is no witness testimony that would show that any consent made by the Defendant was a valid consent. The procedure in effect when the statement and interview was taken were not complied with by the Sheriff's personnel . There is no showing in the record of what was explained to him and whether he was told that he didn't have to give an interview or any of the admonishments that should have been given to him prior to him being granted an interview.

In the case of *Hernandez v. State*, 842 S.W.2d 306 (Ct. App. San Antonio, 1993, pet ref'd) it was held that the Supreme Court of the United States in the case of *Massiah v. United States*, 377 U.S. 201 (1964) and extending through the case of *Maine v. Moulton*, 474 U.S. 159 (1984) it was held that once formal criminal proceedings begin, the Sixth Amendment renders inadmissible in the prosecutions case in chief statements "deliberately elicited from a defendant without the express waiver of the right of counsel." The Court discussed the illegal purpose of the State's attempt to circumvent this rule by use of an "agent." The issue is whether the reporter became an agent of the State as argued in the pre-trial context.

Appellant submits that the news reporters became the State's agent de facto when Sheriff's officer failed to comply with standard procedures for news interviews. All evidence of this

91

interview should have been suppressed as a result of a violation of Arts. 38.22 and 38.23 C.C.P. and the sixth amendment to the United States Constitution. Appellant suffered prejudicial harm by the introduction of this testimony before the jury, because the inadmissible testimony showed a callous indifference to human life.

## APPELLANT'S ISSUE NO 28

## THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO PHOTOGRAPHS AND CONTENTS SEIZED FROM APPELLANT'S JAIL CELL

Appellant directs this Honorable Court's attention to Reporter's Record Volume 48 page 17, 43 and 122 at which during a pretrial hearing Appellant, objected to evidence seized pursuant to a search of Appellant's cell in the Dallas County Jail, where he was being detained pending trial. Objections were made to State Exhibit Numbers 497, 498, 499, 428 - 452. Appellant objected that the warrantless search was unreasonable in violation of the Fourth Amendment to the United States Constitution and should have been suppressed.

Generally, the Fourth Amendment provides no protection of a prisoner's claim of privacy right in his prison cell. *Hudson v. Palmer*, 468 U.S. 517 (1984). However, Appellant was a pretrial detainee, not a convicted person in prison. Appellant argued that the rationale stated in *U.S. v. Cohen*, 7896 F2d 20 (C.A. 2Cir. 1986) was applicable and that in the case at bar the search was originated and organized by the Dallas County District Attorney's Office for evidence to be used at Appellant's trial and not for any valid administrative or security purpose and should be excluded. A hearing was had, Reporter's Record Volume 48 page 122-129 and at Volume 49 pages 3-10 at which the trial court overruled Appellant's objection. The cell search was intended

92

solely to bolster that prosecution's case against a pretrial detainee awaiting his day in court. No institutional need was served.

Appellant, therefore; retained a limited right of privacy that was violated by the warrantless search in the case at bar. The incidents of evidence recovered as a result of the search should have been suppressed. The trial court reversibly erred in denying Appellant his fourth amendment constitutional right of process in this incident and as such Appellant suffered the prejudicial effect of the search results being admitted to the jury as evidence of future dangerousness. The only proper remedy is to reverse this case for a new punishment hearing. See *U.S. v. Cohen, ibid.*

## APPELLANT'S ISSUE NO. 29

### THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO PHOTOGRAPHS OF PRISON

Appellant directs this Honorable Court's attention to Volume 48 page 171 at which the defense objected to the State's proffer of photographs of prison it intended to offer into evidence. The defense stated it was relying on the holding in *Sells v. State*, 121 S.W.3d 748 (Tex. Crim. App. 2003).

The State offered State Exhibits Nos.:
#508- Polunsky Unit Death Row 2 tier cell block
#509- Polunsky Unit Death Row view of cells from inside view
#510- Polunsky Unit Death Row Cell
#511- Polunsky Unit Death Row cell further inside
#512- Polunsky Unit Death Row toilet and sink inside cell
#513- Polunsky Unit Death Row electric fencing, barbed wire
#514-Polunsky Unit Death Row indoor "recreational" area
#515-Polunsky Unit Death Row outdoor rec area, gates
#516-Polunsky Unit Death Row outdoor rec area inside unit
#517-Polunsky Unit Death Row "Pipe Chase" locked door
#518-Polunsky Unit Death Row shower
#519-Polunsky Unit Death Row visitation window with phones
#520-Polunsky Unit General Population Dormitory
#521-Polunsky Unit General Population Dormitory aisle of multiple banks
#522-Polunsky Unit General Population Dormitory bunk

93

#523-Polunsky Unit General Population Dormitory Day Room Televisions
#524-Polunsky Unit General Population Dormitory outside rec area volleyball court
#525-blank
#526-Polunsky Unit General Population Cell
#527-Polunsky Unit General Population three tier cell block
#528-Polunsky Unit General Population Shower area
#529-Polunsky Unit General Population phones in day room
#530-Polunsky Unit General Population dining hall
#531-Polunsky Unit General Population three tier cell block
#532-Polunsky Unit General Population dining hall
#533-Polunsky Unit General Population contact visitation (indoor)
#534-Polunsky Unit General Population contact visitation (outdoor)
#535-Polunsky Unit General Population  cell (2) inside cell
#536-Polunsky Unit General Population outdoor rec area -weights

These exhibits were offered in Reporter's Record Volume 49 page 176 and the trial court overruled the previous objections raised pursuant to the *Sells* case made by the defense in a pretrial hearing.

In the *Sells* case, Appellant complains in point of error three, four and five that the trial court erred under Texas Rule of Evidence 403, the Eighth Amendment to the United States Constitution, and the Due Process Clause of the Fourteenth Amendment, when it held inadmissible Defendant's Exhibit two, a videotape depicting the administrative segregation facilities of a Texas prison unit. As in the *Sells* case, in this case no evidence was offered that the circumstances portrayed in the videotape would specifically apply to Appellant in his situation.

In the *Sells* case, the trial court questioning the relevancy of the videotape, sustained the State's objection, noting that the tape showed only one aspect of prison life and did not portray the prison system's entire method of operation. The judge further held that any probative value the tape had was substantially outweighed by the danger of misleading the jury as to all aspects of the Texas prison system.

94

On appellate review a trial court's admission or exclusion of evidence is subject to an abuse of discretion standard. *Rachal v. State*, S.W. 2d 799, 816 (Tex. Crim. App. ) *cert denied*, 519 U.S. 1043, 117 S.Ct. 614, 1365 L.Ed.2d 539 (1996). Texas Rules of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Further, except as otherwise provided by statute or rule, a jury is entitled to have before it "all possible relevant information about the individual defendant whose fate it must determine." Appellant herein argues that the multitude of photographs was not offered as information about the individual defendant or about how the individual defendant might be handled. It portrayed only one aspect of an entire system and offered only general information about some procedures used in that system. That others have been controlled in the prison system or that certain procedures are in place without specifically connecting those procedures to appellant was not evidence of consequence to the jury's factual determination of whether *appellant* would pose a continuing threat to society. *See Matson v. State*, 819 S.W.2sd 839, 850 (Tex. Crim. App. 1991).

Appellant argues that this Court should provide equal legal effect of its ruling to the State and the defense and rule as in the *Sells* case that the trial court abused its discretion and should have excluded the evidence for the same rationale the trial court used in '*Sells*' to exclude the defendant's like kind evidence the State was allowed to use in the case at bar.

Appellant was prejudiced by this inadmissible testimony and denied due process of law in that if a defendant is prohibited from using the same type of evidence in the same type of prosecution, then in this case the State should also be held to the same standard.

95

## APPELLANT'S ISSUE NO. 30

### THE TRIAL COURT ERRED IN ADMITTING NUMEROUS AUTOPSY PHOTOGRAPHS OF VICTIM MATTHEW BUTLER IN VIOLATION OF RULE 403, TEX. R. EVID., WHERE THE PREJUDICIAL EFFECT OF THE EVIDENCE FAR OUTWEIGHED ANY PROBATIVE VALUE

## APPELLANT'S ISSUE NO. 31

### THE TRIAL COURT ERRED IN ADMITTING NUMEROUS AUTOPSY PHOTOGRAPHS OF EXTRANEOUS VICTIM, STEPHEN SWAN, IN VIOLATION OF RULE 403, TEX. R. EVID., WHERE THE PREJUDICIAL EFFECT OF THE EVIDENCE FAR OUTWEIGHED ANY PROBATIVE VALUE

## APPELLANT'S ISSUE NO. 32

### THE TRIAL COURT ERRED IN ADMITTING NUMEROUS CRIME SCENE PHOTOGRAPHS OF STEPHEN SWAN IN VIOLATION OF RULE 403, TEX. R. EVID.,WHERE THE PREJUDICIAL EFFECT OF THE EVIDENCE FAR OUTWEIGHED ANY PROBATIVE VALUE

## APPELLANT'S ISSUE NO. 33

### THE TRIAL COURT ERRED IN ADMITTING NUMEROUS CRIME SCENE PHOTOGRAPHS OF MATTHEW BUTLER IN VIOLATION OF RULE 403, TEX. R. EVID., WHERE THE PREJUDICIAL EFFECT OF THE EVIDENCE FAR OUTWEIGHED ANY PROBATIVE VALUE
### (These four issues are presented together as each involves similar facts and the same issue of law)

Appellant directs this Honorable Court's attention to Reporter's Record Volume 44 page 15 at which Appellant's counsel made the following objection:

MR. LOLLAR: In regard to a group of photographs from the - - first from the crime scene, we would object specifically to State's Exhibit Number 29, 30, 31, 32, 34, 35 and 36. We object under Rules 401, 402 and 403, and would suggest whatever probative value they have is outweighed by their prejudicial value.

The State argued that the color crimes scene photographs were necessary to show specific intent to kill. Mr. Lollar argued that the injuries shown in the crime scene photographs were also shown in the autopsy photographs and that the jury did not need to be shown that many graphic

96

photographs of the crime scene. He stated that showing so many graphic photographs violated

Rule 403. The trial court found the photographs more probative than prejudicial and overruled

Appellant's objection. (RR: Vol. 44 p. 17-18) See *Salazar v. State*, 385 S.W.3rd 141 (Tex. Crim. App. 2001)

> The objectionable photographs contained the following images:
> #29 -close up of side of very bloody head showing bullet wound
> #30-close up of frontal view of very bloody head
> #31-full length view of the body showing a river of blood from the head wound
> #32-closer view of body showing a river of blood from the head wound
> #34-close up view of chest with shirt pulled back showing a bullet wound
> #35-extreme close up of head wound
> #36-close up view of back and side of head in a puddle of blood

> The trial court overruled Appellant's objections and admitted the above photographs at trial.

(Rep. R. Vol. 37 p. 44).

Appellant directs this Honorable Court's attention to Reporter's Record Volume 44 page 18 at

which Appellant's counsel objected to the crime scene photographs of Mr. Butler for the same

reasons as stated in objection of the crime scene photographs of Mr. Swan. He specifically

objected to State's Exhibits Numbers 43, 45-54.

> The objectionable photographs contained the following images:

> .#43-close of view of head laying in a pool of blood
> #45-full length view of body laying face down in a large pool of blood
> #46- very close up view of extremely bloody face and head
> #47-view of back with the shirt pulled up to show bullet wound to shoulder
> #48- view of bullet wound to chest with shirt pulled up
> #49- close up view of bullet wound to chest
> #50- close up view of bullet wound to arm
> #51- view of bullet wound
> #53-full length view of body laying spread eagle with a large pool of blood and river of blood flowing from the body
> #54-close up of left hand

The Court overruled Appellant's objection to State's Exhibits 43, 45-51, 53, and 54. The trial court without ruling on State's Exhibit No.52, a photograph of the deceased hand showing a ring with a cross on it. (RR: Vol.44 page 20) The State did not offer State's Exhibit No. 52 at trial.

Appellant directs this Honorable Court's attention to Reporter's Record Volume 44 page 20 at which Appellant's counsel objected to the autopsy photographs of Matthew Butler:

MR. LOLLAR: Your Honor, in regards to the autopsy photographs, I believe these regard Mr. Butler. We would object to State's Exhibits 428, 430 and 431, again, because we believe the probative value is outweighed by the prejudicial value and they're not relevant under Rules 401, 2903 and 304.

The objectionable autopsy photographs contained the following images:

#428- frontal view of deceased's torso covered with blood and hands bagged
#430- frontal view of nude body showing bullet wounds
#431- frontal view of nude body showing legs with genitals covered by paper and tag on toe

The trial court overruled Appellant's objections and admitted the above photographs at trial. (Rep.R.Vol. 44 p. 21).

Appellant directs this Honorable Court's attention to Reporter's Record Volume 44 page 21 at which Appellant's counsel objected to the crime scene photographs of Mr. Swan for the same reasons as stated in objection of the crime scene photographs of Mr. Butler. He specifically objected to State's Exhibits Numbers 409-417.

The objectionable photographs contained the following images:

#409-closeup view of deceased's face with mouth open
#410-frontal view of clothed with shirt pulled up and hands bagged
#411-front view of clothed legs with hands bagged
#412-closeup view of side of head showing bullet wound
#413-front view of nude body showing legs, toe tag and genitals covered by paper
#414-closeup view of side of head showing bullet wound
#415-closer view of the side of the head showing bullet wound
#416-frontal view of nude torso showing bullet wound to the left chest
#417-extreme closeup view of the bullet wound to the chest

98

The trial court overruled Appellant's objections and admitted the above photographs at trial. (Rep. R. Vol. 44 p. 22).

## ARGUMENT AND AUTHORITIES

Rule 403 of the Texas Rules of Evidence states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by consideration of undue delay, or needless presentation of cumulative evidence.

Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Montgomery v. State,* 810 S.W.2d 372, 376 (Tex. Crim. App.1990) (op. on original submission). A trial court's decision will not be disturbed on appeal unless it falls outside the zone of reasonable disagreement. *Jones v. State,* 944 S.W.2d 644, 651 (Tex. Crim. App.1996).

Many factors should be used in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice. These factors include:

- the number of exhibits offered,
- the gruesomeness of the exhibits,
- the detail in the exhibits,
- size of the photographs,
- whether the photographs are in color or black and white,
- whether the photos are close-up, and
- whether the body depicted is clothed or naked.

See *Wyatt v. State,* 23 S.W.3d 18, 29 (Tex. Crim. App.2000). The availability of other means of proof and the circumstances unique to each individual case should also be noted. *Id.* Autopsy photographs are generally admissible unless they depict mutilation of the victim caused by the autopsy itself. *Rojas v. State,* 986 S.W.2d 241, 249 (Tex. Crim. App.1998). See also *Santellan v. State,* 939 S.W.2d 155 (Tex. Crim. App. 1997)

99

Appellant asserts that the trial court erred in allowing the State to introduce these 12 color photographs in what appears to be an attempt by the prosecution to introduce evidence meant to appeal to emotion rather than the fact finding process. Specifically, the number of exhibits offered - 12 - was excessive, especially in light of the other evidence used, crime scene photographs. Taken together, the prejudicial effect of the State's photographs far outweighed any possible probative value. *Wyatt v. State*, 23 S.W.3d at 29.

The unfairly prejudicial effect of the above listed photographs influenced the jury in a prejudicial manner and denied Appellant a fair trial especially in light of the fact that there was no controverted issue as to cause of death. The trial court judgement and sentence should be reversed and the case remanded.

## APPELLANT'S ISSUE NO. 34

## THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUPPORT THE CONVICTION FOR CAPITAL MURDER

Appellant submits that the evidence presented at trial was not sufficient to support the conviction for capital murder. A killing and unrelated taking of property do not constitute capital murder under felony-murder section; state must prove nexus between murder and theft, i.e., that murder occurred in order to facilitate taking of property. V.T. C. A., Penal Code § 19.03(a)(2). Appellant argues that the State failed to show the nexus between the murder and the theft; that the murder occurred in order for Appellant to take Complainant's property.

Standard of Review

When an Appellant questions the sufficiency of evidence, the Appellate Court reviews the evidence in the light most favorable to the verdict. The Court must determine whether any rational trier of fact could have found each element of the crime beyond a reasonable

100

doubt. *Jackson v. Virginia*, 443 U.S.307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Butler v. State*, 769 S.W.2d 234, 239 (Tex. Crim.App. 1989). This standard of review applies to circumstantial evidence cases as well as to direct evidence cases. *Houston v. State*, 663 S.W.2d 455, 456 (Tex. Crim.App.1984).

Texas law requires that the State establish:(1) the offense was actually committed; and (2) the accused was the person who either committed or participated in the crime. See *Johnson v. State*, 673 S.W.2d 190, 197 (Tex. Crim. App.1984). The State must prove more than just a plausible explanation of the crime. *Reeves v. State*, 806 S.W.2d 540, 543 (Tex. Crim.App.1990), cert. denied, –U.S.–, 111 S.Ct. 641, 113 L.Ed.2d 736 (1991). While the trier of fact is the sole judge of the weight and credibility of the witnesses, *Coe v. State*, 683 S.W.2d 431, 438 (Tex.Crim.App.1984); *Williams v. State*, 692 S.W.2d 671, 676 (Tex.Crim.App.1984), a guilty verdict should not be allowed to stand merely because the defendant was found to be the most likely perpetrator. A defendant, even the most likely defendant, is presumed to be innocent unless his guilty is established beyond reasonable doubt. See TEX.CODE CRIM. PROC. ANN. Art 38.03 (Vernon Supp. 1991); see also *Ardovina v. State*, 143 Tex. Crim. 43, 156 S.W.2d 983, 984(1941); *Perkins v. State*, 32 Tex. 109, 112(1869).

The State must exclude every reasonable hypothesis raised by the evidence that tends to exculpate the accused. A review of the testimony shows that the record is insufficient to show Appellant participated in the offense of Capital Murder. The sufficiency of the

101

evidence in this case is based on many circumstances where the State's evidence fails to meet the burden of proof.

Appellant argues that the State failed to present sufficient evidence to support the conviction for capital murder. The evidence shows that the Defendant and Damarius Cummings were intoxicated and high on PCP at the time of the offense. There was no DNA belonging to the Defendant on the weapon. Detective James Nichols testified that the Defendant was excluded as a contributor to the right grip of the pistol. (RR: Vol. 46 p. 205) There was no evidence that the murder occurred in order to facilitate taking of property. V.T. C. A., Penal Code § 19.03(a)(2).

In summary, viewing all of the evidence in the light most favorable to the State and giving full play to the responsibility of the trier of fact to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts, no rational trier of fact could have found beyond a reasonable doubt that Appellant was guilty of capital murder due to lack of a tie or nexus between the killing and the taking of $10.00 which was only an after thought as shown by the evidence.. See *Jackson*, 443 U.S. at 318-19, 99 S.Ct. At 2788-90; *Santellan v. State*, 939 S.W.2d 155, 160 (Tex. Crim. App.1997). The record establishes, at best, only a "mere modicum" of evidence of Appellant's guilt, which will not support a conviction beyond a reasonable doubt. See *McGinn v. State*, 961 S.W.2d 161,168 (Tex. Crim. App. 1998)(citing *Jackson*, 443 U.S. at 320, 99 S.Ct. at 2789). Appellant submits that there is no evidence in the record to support his conviction for <u>capital</u> murder.

102

## PUNISHMENT ISSUES

### APPELLANT'S ISSUE NO. 35

### THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO PROFFERED EXPERT TESTIMONY CONCERNING "GANG" AFFILIATION IN THE PUNISHMENT STAGE OF THE TRIAL

Appellant directs this Honorable Court's attention to Reporters Record Volume 40 page 6 at which defense counsel made the following objection:

MR. PARKS: ...I think his testimony will not be relevant under Rule 401. To the extent that it might be relevant, it is excluded under rule 403 as being - - the probative value is substantially outweighed by unfair prejudice.

We also object to it in that it is a violation of the 1st and 14th Amendment to the United States Constitution.

The trial court overruled Appellant's objection (RR: Vol. 40 p. 37):

THE COURT: ...The Court concluded that the testimony is sufficiently reliable and relevant, would assist the trier of facts in understanding the evidence and this is as to future dangerousness, and that the witness has sufficiently tied the facts of this case to the evidence that he has proffered. The probative value of the testimony is not as substantially outweighed by the prejudicial effect.

Appellant submits that witness, Barret Keith Nelson, was not qualified as an expert witness legally capable of giving an opinion concerning extraneous conduct of others without a proper nexus or connection to the Defendant. The trial court overruled Appellant's objection to this form of testimony from this witness and allowed the witness to give expert opinion. A review of the predicate evidence presented by the State failed to qualify witness, Nelson, as an expert witness pursuant to *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992). The evidence proffered by this witness did not at the time of the proffer would not aid the jury in finding a relevant fact. Additionally, general character evidence may not be offered to show that a defendant acted in conformity therewith. See *Brewington v. State*, 802 S.W. 2d 691 (Tex. Crim. App. 1991) and *Holloway v. State*, 613 S.W.2d 497 (Tex. Crim. App. 1981).

"Guilt by association" has been rejected in Texas. Indeed, the mere presence of an accused in the company of another is not enough to connect a defendant to a charged offense. *Wincott v.*

103

*State*, 59 S.W.3d 691, 698 (Tex. App.-Austin 2001, pet. ref'd) (finding association with another may be offered as corroboration, but only when facts and circumstances sufficiently connect the accused with commission of the crime).

When gang evidence is admitted during trial, guilt by association becomes a "genuine concern." *U.S. v. Irvin*, 87 F.3d 878 887 (5th Cir. 1996) (finding of abuse of discretion where "highly charged gang-affiliation" was admitted to serve as a substitute for direct evidence against a passenger in a stopped vehicle found to contain drugs); *U.S. v. Polasek*, 162 F3d 878.887 (5th Cir. 1998)(noting court had repeatedly characterized guilt by association evidence as "highly prejudicial").

Appellant cites this Honorable Court to the dissenting opinion by Judge Maloney in *Beasley v. State*, 902 S.W.2d 452 (Tex. Crim. App. 1995) and moves this Court to consider the nexus requirement expressed in the dissenting opinion as rational requirements to avoid undue prejudice of such evidence without a showing that the defendant was involved in current criminal activity that followed directly from his alleged gang membership. The failure to properly link Appellant to the general gang evidence fails to particularize the punishment evidence to Appellant and as such also violates the principles established in *Lockett v. Ohio* 438 U.S. ( 1978). The State's evidence fails to provide this linkage and thereby conflicts with the holding in *United States v. Lemon*, 723 F. 2d 922, 941 (D.C. Cir. 1983) and *Dawson v. Delaware*, 503 U.S. 159 (1992).

Appellant's right to a fair punishment hearing was denied due to this general prejudicial evidence of gang activity without an appropriate linkage to Appellant `as one who endorses or promotes the gang activities. The prejudice to Appellant greatly outweighed any probative value.

104

<u>APPELLANT'S ISSUE NO. 36</u>

## THE TRIAL COURT ERRED IN DENYING APPELLANT'S REQUESTED LIMITING INSTRUCTION IN REGARD TO TESTIMONY FROM WITNESS, BARRET KEITH NELSON, WHO TESTIFIED AS AN EXPERT ON 'GANG EVIDENCE' IN THE PUNISHMENT STAGE OF THE TRIAL

In the previous Issue, Appellant raises the error that the trial court overruled his objection to expert opinion evidence concerning gang membership. The court further erred by having decided to admit this evidence and refused to give a limiting instruction as to such evidence as requested by Appellant's counsel. See Reporter's Record Volume 40 p. 35. The Court said it would take up the issue of the limiting instruction later. (P. 38). In Reporter's Record Volume 49 p. 74 the expert opinion testimony of Officer Barnett Nelson was offered and the Court declined to give a limiting instruction. (p. 76)

Appellant submits that it was error for the Court to deny Appellant' s request for a limiting instruction on this reputation and/or character evidence pursuant to the authority in *Beasley v.State*, 902 S.W.12d 457 (Tex. Crim. App. 1995) and *Anderson v. State*, 901 S.W.2d 946 (Tex. Crim. App. 1995). See Texas Rules of Evidence 105(a). The trial court erred in failing to give an instruction as to how the jury is to consider this evidence as approved in the case of *Siena v. State*, 266 S.W.3d/72 )Tex. Ct. Appl.[1st.Dist.] 2008, pet. ref'd (2010). This error was prejudicial and harmful in nature to Appellant's constitutional right to fair trial and due process that would limit the jury's consideration of such evidence.

<u>**APPELLANT'S ISSUE NO. 37**</u>

**THE EVIDENCE IS LEGALLY INSUFFICIENT EVIDENCE TO SUPPORT THE JURY'S ANSWER TO SPECIAL ISSUE NO. 1 IN THE PUNISHMENT STAGE OF THE TRIAL**

Appellant argues that there was insufficient evidence of future dangerousness because he had no prior violent criminal background and the defense witnesses testified that he essentially was a low risk for future dangerousness.

In the case of *Huffman v. State*, 746 S.W.2d 212 (Tex. Crim. App. 1988) it was held that:
"In *Roney v. State,* 632 S.W.2d 598,603 (Tex. Cr. App. 1982), this court wrote: "Although this was a senseless murder, that fact is true of every murder in the course of a robbery. The facts of this offense, standing alone, do not carry the marks of a 'calculated and cold-blooded crime,' such as appeared in *O'Bryan v. State*, 591 S.W.2s 464, 480 (Tex. Cr. Ap. 1979), where the defendant for months planned the candy poisoning of his own child to collect life insurance. To support a 'yes' answer to the second punishment issue, the evidence must show beyond a reasonable doubt that there is a probability appellant would commit criminal acts of violence that would constitute a *continuing* threat to society. To hold that the facts of *this* offense, standing alone, would support such a verdict, would mean that virtually every murder in the course of a robbery would warrant the death penalty. Such a construction would destroy the purpose of the punishment stage in capital murder cases, which is to provide a reasonable and controlled decision on whether the death penalty should be imposed, and to guard against its capricious and arbitrary imposition. *Jurek v. State,* 522 S.W.2d 934 (Tex. Cr. App. 1975); *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976)."

*Benz v. State*, 233 S.W.3d 847 (Tex. Crim. App. 2007). This Court should reform the judgement to life imprisonment. *Holberg v. State* 38 S.W.3d 137, 139 (Tex. Crim. App. 2000) and Art. 44.251 (a).

According to the State's evidence in the instant murder case the murder was clearly senseless and unnecessary. There was no showing that the murder was originally intended. Given the circumstances of the offense, as brutal and uncalled for as they were, this Court should hold that there was sufficient evidence to support the affirmative finding in question standing alone.

The only prior conviction of the Defendant was a misdemeanor possession of a small amount of marijuana for which he received a $600 fine. There were no previous convictions of anything that would show the Defendant was violent. The State presented testimony that the Defendant engaged in a fist fight with Tre'Vaun Miller while awaiting trial. Mr. Miller testified for the defense and stated that he was yelling in his cell when James yelled to him to "just give it to God and let go." (RR: Vol. 51 p. 284) He said he didn't like anyone telling him positive advice so he decided to assault James. (RR: Vol. 51 p. 284) He said when he went to the gym, he assaulted James and James defended himself. (RR: Vol. 51 p. 285) He said the guards came in to break up the fight. (RR: Vol. 51 p. 287)

The State offered evidence from a fellow inmate, Matthew Utsey, who testified the Defendant hit him while they were on the way to court. (RR: Vol. 48 p. 224) The officer escorting them, Marcos Gurierrez, testified the Defendant turned around and struck Mr. Utsey on the arm. (RR: Vol. 48 p. 207) The witness said that Mr. Broadnax did not tell him why he hit Mr. Utsey. (RR: Vol. 48 p 213) He said there were no injuries. (RR: Vol. 48 p. 214) Mr. Utsey testified that Mr. Broadnax threatened him. (RR: Vol. 48 p. 224) However, there was no evidence presented to substantiate these accusations. None of the evidence presented at the punishment hearing showed that there was a probability that the Defendant would be a continuing threat to society (prison for life). The only evidence of violence was a punch on the arm and unsubstantiated threats to a fellow inmate of dubious character. Appellant submits that the evidence was insufficient to support the jury's affirmative answer to Special Issue No. 1.

## APPELLANT'S ISSUE NO. 38

**THE TRIAL COURT'S JUDGEMENT ENTERED IN THIS CASE THAT ASSESS COSTS IN THE AMOUNT OF $460.00 WHICH ACCORDING TO A STANDING GARNISHMENT ORDER THAT ALLOWS THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE TO WITHDRAW MONEY FROM DEFENDANT'S INMATE TRUST FUND ACCOUNT AND FORWARD THE FUNDS TO THE DISTRICT CLERK TO PAY FOR COURT COSTS ASSESSED IN THE UNDERLYING JUDGMENT OF CONVICTION FOR THE OFFENSE OF CAPITAL MURDER ENTERED ON AUGUST 21, 2009 WAS IN VIOLATION OF THE DEFENDANT'S RIGHT TO DUE PROCESS, BECAUSE THE ENTRY OF THAT PART OF THE JUDGEMENT DID NOT AFFORD APPELLANT NOTICE AND AN OPPORTUNITY TO BE HEARD ON THE MATTER**

## APPELLANT'S ISSUE NO. 39

**THE TRIAL COURT'S JUDGEMENT TO THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE TO WITHDRAW MONEY FROM DEFENDANT'S INMATE TRUST FUND ACCOUNT AND FORWARD THE FUNDS TO THE DISTRICT CLERK TO PAY FOR COURT COSTS ASSESSED IN THE UNDERLYING JUDGMENT OF CONVICTION FOR THE OFFENSE OF CAPITAL MURDER ENTERED ON AUGUST 21, 2009 DID NOT COMPLY WITH THE AUTHORIZING STATUTE, TEXAS GOVERNMENT CODE SEC. 501-014 BECAUSE THE RECORD FAILS TO SHOW THAT APPELLANT WAS DULY "NOTIFIED BY THE TRIAL COURT"**

## APPELLANT'S ISSUE NO. 40

**THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUPPORT THE PART OF THE TRIAL COURT'S JUDGEMENT ENTERED ON AUGUST 21, 2009 WHICH ALLOWS INMATE TRUST FUNDS TO BE PAID TO THE DISTRICT CLERK IN THIS CAUSE FOR COURT COSTS**

**(These three issues are presented together as they invoke the same facts and very similar issues of law.)**

Appellant submits that the part of the judgement entered by the trial court on August 21, 2009 that assess court costs that are garnished from Appellant's inmate trust fund account (Clerk's Record P. 698-699) (1) denied Appellant due process and (2) failed to actually notify him, a statutory requirement to Sec. 501.014 of the Texas Government Code. Initially, upon the enactment of this law and commenced enforcement by trial courts in criminal cases, there was an

108

issue about appealability and jurisdiction. Appellant submits that the issue of appealability and

jurisdiction to hear the appeal of this issue has been resolved in such a manner that permits him to

present these two issues on direct appeal of this criminal conviction to the Court of Appeals.

*Reed v. State*, 269 S.W.3d 619 (Tex. Ct. App.-San Antonio, 2008) and *Abdullah v. State*, 211

S.W. 3d 939 (Tex. Ct. App. Texarkana). See also discussion about lack of jurisdiction on

mandamus type of action involving same type of order by Court of Criminal Appeals, 280 S.W.3d

866 (Tex. Crim. App. 2008)

Appellant argues that a review of the record in this case shows that there are no pleadings,

evidence or issue brought up during the trial of this cause that (1) gives notice of this issue to

Appellant (2) or gives Appellant any opportunity to contest or be heard on the issue in order to

protect his private property interest in any future funds to be deposited in any inmate trust account

that is used for commissary, etc. (See *Reed v. State, supra* discussion at page 4 that cites to

website,http:11www.tdcj.state.tx.us/finance/comm&trust/comm&trust-home. htm as to have this

process wireless).

Appellant submits that the '*Reed*' case presents an overview of the due process violation and

governing law when it was states as follows:

### "Due Process

The Fourteenth Amendment of the United States Constitution guards against deprivation of life, liberty, or property by the State without due process of law. U.S. CONST. amend. XIV. Similarly, Article I, Section 19 of the Texas Constitution requires due course of law. TEX. CONST. art. I, § 19; *Perry v. Del Rio,* 67 S.W.3d 85, 92 (Tex.2001). At a minimum, due course requires notice and an opportunity to be heard, at a meaningful time and in a meaningful manner. *Perry,* 67 S.W.3d at 92.

A procedural due process claim must establish (1) an existing liberty or property interest and (2) the procedures provided were constitutionally insufficient. *Id.* "A prison inmate has a property interest in his inmate trust account." *Covarrubias v. Tex. Dep't of Criminal Justice-Inst. Div.,* 52 S.W.3d 318, 324 (Tex.App.-Corpus Christi 2001, no pet.); *Brewer v. Collins,* 857 S.W.2d 819,

823 (Tex.App.-Houston [1st Dist] 1993, no pet.). Reed, therefore, meets the first requirement. Thus, the question to be answered is what process is due before money from Reed's inmate trust account can be applied toward court costs.

Appellant submits that in the case at bar the applicable statute does not provide for (1) notice to Appellant or an opportunity to be heard prior to any withdrawal of money from the inmate's account. Also the record does not show that Appellant received a copy of the Court's post judgment order (Clerk's Record p. 31). Appellant submits that he has been denied due process as to his property interest in his inmate trust fund by the entry of the assessment of costs in the judgment in this case ex parte order (Clerk's Record p. 698-699) and moves this Honorable Court to hold that the entry of the complained part of the judgement is unconstitutional on its face and as it will be applied in the future for the reasons presented herein.

Additionally, the evidence is legally insufficient to support the entry of the complained of order as the record is void of any evidence to support the dollar number assessed as costs in this matter. See *Mayer v. State,* 309 S.W.3d 552 (Tex. Crim. App. 2010)

## FEDERAL CONSTITUTIONAL ISSUES

*(The following Constitutional Issues have been previously submitted to this Honorable Court; which previously has turned them down. See Saldano v. State, 232 S.W.3d 77 (Tex. Crim.App. 2007) Appellant submits these issues in this case not to cause unnecessary litigation but to invite this Court to review any prior stand on any issue and more importantly to preserve each issue for further review in the Federal Court system; which has final constitutional power of review.)*

## APPELLANT'S ISSUE NO. 41

## THE STATUE UNDER WHICH APPELLANT WAS SENTENCED TO DEATH IS UNCONSTITUTIONAL IN VIOLATION OF THE CRUEL AND UNUSUAL PUNISHMENT PROHIBITION OF THE EIGHTH AMENDMENT BECAUSE IT ALLOWS THE JURY TOO MUCH DISCRETION TO DETERMINE WHO SHOULD LIVE AND WHO SHOULD DIE AND BECAUSE IT LACKS THE MINIMAL STANDARDS AND GUIDANCE NECESSARY FOR THE JURY TO AVOID THE ARBITRARY AND CAPRICIOUS IMPOSITION OF THE DEATH PENALTY

The Texas Legislature reacted to *Penry* [1] by amending article 37.071 to include a mitigation instruction. *See* Tex. Code Crim. Proc. Ann. art. 37.071, § 2(e)(1)(Vernon Supp. 2001). This instruction in effect allows the jury to impose a life sentence if, in their sole discretion, they choose to do so. *See id.*

As Justice Blackmun noted in his dissent to denial of certiorari in *Callins v. Collins,* to comply with the mandates of the Eighth Amendment, the death penalty must be fairly administered with reasonable consistency. *See Callins v. Collins,* 114 S. Ct. 1127, 1129 (1994) (mem.)(Blackmun, J., dissenting). In its current formulation, the Texas scheme does not insure such a reasonably consistent application of the ultimate penalty. Therefore, the statute should be found unconstitutional.

The very nature of the mitigation special issue allows the jury to decide, without any guidance, who should live and who should die. The mitigation special issue allows juries to decide what, if anything, is "mitigation" and to completely disregard any such mitigation evidence if they so choose. Thus, the instruction allows juries to kill a defendant simply because they are afraid of a person who is different, whether that difference is race,[2] unsightliness, mental illness, or a difference relating to a host of other improper considerations. The arbitrariness and capriciousness that results from this unfettered discretion renders the present scheme unconstitutional. *See Gregg,* 428 U.S. at 189.

---

[1] *See Penry v. Lynaugh, 492 U.S. 302, 322-28 (1989).*

[2] *Cf.* James Kimberly et al., *More Racial Testimony Found in Capital Cases,* Hous. Chron., June 9, 2000, at A1 (Discussing testimony of expert asserting race as a factor that contributes to future dangerousness that caused the U.S. Supreme Court to overturn a Texas death penalty sentence); *Saldano v. Texas,* 530 U.S. 1212 (2000)(mem.).

111

Under these circumstances, this Court should declare the statutory scheme under which Appellant was convicted and sentenced to death unconstitutional in violation of the Eighth Amendment and vacate his death sentence.

### APPELLANT'S ISSUE NO. 42

**THE STATUTE UNDER WHICH APPELLANT WAS SENTENCED TO DEATH IS UNCONSTITUTIONAL IN VIOLATION OF THE EIGHTH AMENDMENT AS INTERPRETED IN *PENRY V. JOHNSON* BECAUSE THE MITIGATION SPECIAL ISSUE SENDS MIXED SIGNALS TO THE JURY THEREBY RENDERING ANY VERDICT REACHED IN RESPONSE TO THAT SPECIAL ISSUE INTOLERABLE AND UNRELIABLE**

This Court should hold that the Texas death penalty scheme violates the Eight Amendment under the Supreme Court's decision in *Penry v. Johnson,* 121 S.Ct. 1910 (2001) (hereinafter *"Penry II"*). While the opinion in that case only repudiated a judicially-crafted mitigation instruction, the statutory mitigation special issue given in Appellant's case is similarly vulnerable to the criticism that is sends "mixed signals" to the jury. Because the mitigation special issue submitted to the jury pursuant to the dictates of article 37.07 sent "mixed signals" to the jury, that statute is unconstitutional in violation of the Eighth Amendment as interpreted in *Penry* . Consequently, Appellant's conviction was secured in violation of his right to Eighth Amendment rights as applicable via the Due Process clause of the Fourteenth Amendment. Therefore, this Court should reverse Appellant's conviction and sentence, and remand this cause to the trial court.

### APPELLANT'S ISSUE NO. 43

**THE STATUTE UNDER WHICH APPELLANT WAS SENTENCED TO DEATH IS UNCONSTITUTIONAL IN VIOLATION OF THE DUE PROCESS REQUIREMENTS OF THE FOURTEENTH AMENDMENT BECAUSE IT IMPLICITLY PUTS THE BURDEN OF PROVING THE MITIGATION SPECIAL ISSUE ON APPELLANT RATHER THAN REQUIRING A JURY FINDING AGAINST APPELLANT ON THAT ISSUE UNDER THE BEYOND A REASONABLE DOUBT STANDARD**

Under the Texas statutory scheme, Appellant's jury was not instructed on a burden of proof on the mitigation special issue. *See Lawton,* 913 S.W.2d at 557 ("the Texas legislature has not assigned a burden of proof regarding mitigating evidence"). Moreover, because of the juxtaposition of the reasonable doubt instruction with the Special Issue Number 2, the jury could have read the charge to mean that Appellant had the burden of proving beyond a reasonable doubt mitigation sufficient to warrant life rather than death. *See id.* ("the burden is implicitly placed upon appellant to produce and persuade the jury that circumstances exist which mitigate against the imposition of death in his case").

112

The Supreme Court's recent decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), NECESSITATES A FINDING THAT THE Texas death penalty scheme is unconstitutional because it does not place the burden of proof on the State that would require the jury to find beyond a reasonable doubt that there are no mitigating circumstances sufficient to warrant the imposition of life rather than death.

*Apprendi* should be applied to article 37.071, section 2(e)(1). Under that statute, a jury is asked to decide:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

*See* Tex. Code. Crim. Proc. Ann. art. 37.071, § 2(e)(1) (Vernon Supp. 2001). As stated above, that issue was submitted to the jury in this instant case.

The jury was also instructed that if ten or more jurors answer the special issue in the affirmative, a sentence of life imprisonment would be imposed. *See* Tex. Code Crim. Proc. Ann. art 37.071,§ 2(f)(2)(Vernon Supp. 2001). Although they could not be instructed as such, if the jurors had reached a stalemate and been unable to agree, a sentence of life imprisonment would have been imposed. *See* Tex. Code Crim. Proc. Ann. art. 42.12 §2(g)(Vernon Sup. 2001). Thus, in Appellant's trial, *the absence of a jury decision on the mitigation issue would have automatically capped Appellant's punishment at life imprisonment.* Only if all twelve jurors answer in the negative, as was the case here, could the death penalty have been imposed. *See* Tex. Code Crim. Proc. Ann. art. 42.12 §§ 2(f)(2), 2(g) (Vernon Supp. 2001).

Thus, section 2(e)(1) plainly fits the mold of an issue on which *a factual determination raises the maximum punishment which is available.* The factual issue involves a comparison, but that does not later its factual character. This Court has held that there is no burden of proof with respect to the mitigation issue, at least on the face of the statute. *See Lawton*, 913 S.W. 2d at 557. In practice, however, "the burden is implicitly placed upon appellant to produce and persuade the jury that circumstances exist which mitigate against the imposition of death in his case." *See id.* If so, the construction of the statute in *Lawton* is 180 degrees opposite to the principles of *Apprendi*, but even the lack of any specific assignment of the burden is at odds with *Apprendi*. Even the most compelling evidence of diminished personal culpability can come up short when the genuine *Penry* question is converted into a comparison against repulsive facts. In fact, the net effect can be even worse than that. As demonstrated by other cases where attorneys have sought to waive[3] the mitigation issue because this weighing brings in additional damaging evidence, this weighing

---

[3]*See, e.g. Mosley v. State*, 983 S.W.2d 249, 263-64 (Tex. Crim. App. 1998)(op. on reh'g). *cert denied*, 526 U.S. 1070 (1999).

113

process sometimes turns a purported "mitigation" question into an additional vehicle for the State to throw even more evidence into the kettle of jury deliberations.

Because the statute under which Appellant was sentenced to die does not require the jury to enter a negative finding on the mitigation special issue only if the State had proven beyond a reasonable doubt that there was not mitigating evidence sufficient to warrant imposition of a life sentence rather than death, that statute is unconstitutional. Consequently, Appellant's conviction was secured in violation of his right to Due Process as secured by the Fourteenth Amendment as interpreted in *Apprendi*. Therefore, this Court should reverse Appellant's conviction and sentence, and remand this cause to the trial court.

## APPELLANT'S ISSUE NO. 44

### THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO HOLD ARTICLE 37.071 Sec. 2(E) AND (F) CONCERNING BURDEN OF PROOF UNCONSTITUTIONAL AS A VIOLATION OF ARTICLE ONE SEC. 10 AND SEC. 13 OF THE TEXAS CONSTITUTION

The trial court denied Appellant's Motion to Hold articles 37.071 Sec. 2(E) and (F). The infirmities in the statute discussed in the previous issue are also violative of State Constitutional Law. Under the "due course of law" provision of the Texas Constitution, Article I Sec. 10, the citizens of this state are guaranteed that any punishment for an offense will be in accordance with the law. *McFarlane v. State*, 254 S.W.2d 136, 136 (Tex. Cr. App. 1953). When the burden of proof is shifted to the Defendant, the State's burden has essentially been reduced. See e.g., *Corbarrubio v. State*, 675 S.W.2d 749 (Tex. Cr. App. 1983) overruled in part, *Lawrence v. State*, 700 S.W.2d 208 (Tex. Cr. App. 1985), and *Elliot v. State*, 858 S.W.2d 478, 487-488 (Tex. Cr. App. 1993). Such a punishment, based on a reduced burden, is not in accordance with Texas law and is unconstitutional.

## APPELLANT'S ISSUE NO. 45

### THE TEXAS DEATH PENALTY SCHEME VIOLATES DUE PROCESS PROTECTIONS OF THE UNITED STATES CONSTITUTION BECAUSE THE PUNISHMENT SPECIAL ISSUE RELATED TO MITIGATION FAILS TO REQUIRE THE STATE TO PROVE THE ABSENCE OF SUFFICIENT MITIGATING CIRCUMSTANCES BEYOND A REASONABLE DOUBT, CONTRARY TO *APPRENDI* AND ITS PROGENY

The current "mitigation" special issue in Texas, and the one applied in this case was as follows:
Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

114

Consistent with current Texas law, the jury charge did not impose any burden of proof as to mitigation on either the State or Appellant. Appellant's Motion on the unconstitionality of the burden of proof on this special issue was denied by the trial court.

Recently, the United States Supreme Court declared that Arizona's capital sentencing scheme violates the Sixth Amendment's jury trial guarantee because Arizona trial judges determined whether aggravating factors existed which justified imposition of the death penalty. *See Ring v. Arizona,* 536 U.S.,122 S.Ct. 2428, 2443, 153 L.Ed.2d 556 (2002). Applying the holdings from its previous decisions in *Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) and *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the Supreme Court stated: "[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Jones,* 526 U.S. at 243 n. 6, 119 S.Ct. 1215. "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact--no matter how the State labels it--must be found by a jury beyond a reasonable doubt." *Apprendi,* 530 U.S. at 482-83, 120 S.Ct. 2348. Therefore, that which has the effect of increasing punishment beyond a maximum statutory sentence must be considered the functional equivalent of an element of an offense

greater than the one covered by the jury's guilty verdict. *Id.,* 530 U.S. at 495, 120 S.Ct. 2348.

The trial court imposition of the death sentence should be reversed.

**APPELLANT'S ISSUE NO. 46**

**THE TEXAS DEATH PENALTY SCHEME VIOLATED APPELLANT'S RIGHTS AGAINST CRUEL AND UNUSUAL PUNISHMENT AND DUE PROCESS OF LAW UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY REQUIRING AT LEAST TEN "NO" VOTES FOR THE JURY TO RETURN A NEGATIVE ANSWER TO THE PUNISHMENT SPECIAL ISSUES.**

All twelve jurors must answer the first special issue (future dangerousness) affirmatively before the trial court may impose the death penalty; a life sentence, on the other hand, requires that at least ten jurors answer a special issue negatively. *See* TEX.CODE CRIM. PROC. ANN. art. 37.071 § 2(d)(2) (Vernon Supp. 1999). Unanimity must also exist for the jury to enter a negative finding on the mitigation issue, while only ten jurors must vote to grant leniency. *See id.* § 2(f)(2). The trial court here instructed the jury accordingly. The failure of a capital jury to garner the requisite number of votes either way results in a life sentence. *See id.* § 2(g). Neither the trial court, parties, nor counsel may disclose to the jury members that their failure to unanimously agree on an answer to either special issue results in a life sentence. *See id.* § 2(a). This feature of article 37.071 creates the potential for considerable confusion among reasonable jurors.

115

A. The "Majority Rules" Harm Analysis

Texas' 12/10 Rule generates the danger that confused jurors otherwise predisposed to hold-out on voting for a death sentence will conform to a "majority-rules" mentality. Potential holdout jurors may reasonably believe that their votes in favor of a life sentence are worthless unless nine others join them. If a majority of other jurors are firmly voting "yes", holdouts may feel obligated to vote "yes" since there would appear to be no possibility of a life sentence and the jury has been instructed to return a verdict. *See Mills v. Maryland*, 486 U.S. 367, 383, 108 S.Ct. 1860, 1870, 100 L.Ed.2d 384 (1988) ("common sense ... suggest[s] that juries do not leave blanks and do not report themselves as deadlocked over

mitigating circumstances after reasonable deliberation [citation omitted] unless they are expressly instructed to do so.").

Put another way, Texas' 12/10 Rule is a built-in impermissible "dynamite charge", which has been recognized as a possible Eighth Amendment violation in the capital sentencing context. *See Lowenfield v. Phelps*, 484 U.S. at 240-41, 108 S.Ct. at 522, 98 L.Ed.2d. In this way, Article 37.071's 12/10 Rule injects arbitrariness into the proceedings and creates the potential for unreliable sentencing determinations - a constitutional violation of the highest order in the capital sentencing context. *See State v. Williams*, 392 So.2d 619, 631 (La.1980) (on rehearing). In *Williams*, the court stated:

> "In the present case the jurors were not fully informed of the consequences of their votes and the penalties which could result in each eventuality ... *Instead, the members of the sentencing body were left to speculate as to what the outcome would be in the event there was no unanimity.* Under these circumstances, individual jurors could rationally surmise that in the event of a disagreement a new sentencing hearing, and perhaps a new trial, before another jury would be required. [emphasis added.] *Id.*"

B. The *Mills* Principle

The 12/10 Rule also violates the Eighth Amendment principle in *Mills v. Maryland*, that it is unconstitutional to instruct capital sentencing jurors in a manner leaving reasonable jurors to believe that their individual vote in favor of returning a life sentence based on particular mitigating factors is worthless unless some threshold number of jurors agree that particular mitigating factors exist. That is, a constitutional violation occurs if a reasonable juror could interpret the jury charge to instruct the jury that there must be a meeting of the minds among some threshold number of jurors as to whether the mitigating evidence offered by the capital defendant warrants either a negative answer to the first special or second special issue, or an affirmative response to the third, thus resulting in the imposition of a life sentence. *Mills v. Maryland*, 486 U.S. at 373-75, 108 S.Ct. at 1864-65, 100 L.Ed.2d. Unless jurors are informed of the

result of a deadlock in such a situation, the risk that one or more jurors will give into a "majority rules" mentality is too great under the Eighth Amendment.

116

Therefore, reasonable jurors could have believed that they had no ability to give mitigating effect to any and all types of mitigating circumstances unless at least nine other jurors also voted for life. Because "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevent[ed] the consideration of constitutionally relevant [mitigating] evidence," *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990), Appellant was sentenced to death in an unconstitutional manner. For these reasons, the judgment of the trial court should be reversed and the cause remanded for a new trial.

## APPELLANT'S ISSUE NO. 47

**THE TEXAS DEATH PENALTY SCHEME VIOLATED APPELLANT'S RIGHTS AGAINST CRUEL AND UNUSUAL PUNISHMENT, AN IMPARTIAL JURY AND TO DUE PROCESS OF LAW UNDER THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION BECAUSE OF VAGUE, UNDEFINED TERMS IN THE JURY INSTRUCTIONS AT THE PUNISHMENT PHASE OF THE TRIAL THAT EFFECTIVELY DETERMINE THE DIFFERENCE BETWEEN A LIFE SENTENCE AND THE IMPOSITION OF THE DEATH PENALTY.**

## ARGUMENT AND AUTHORITIES

At the conclusion of the punishment phase, the trial court submitted to the jury the two statutory special issues (see TEX. CODE CRIM. PROC. ANN. art. 37.071, §3(b)(1), (b)(2), (e) (Vernon Supp. 1999).

The trial court did not define certain critical terms appearing in these questions, namely, "probability", "continuing threat to society", and "criminal acts of violence", which terms are so vague and indefinite as to be violative of Appellant's fundamental constitutional rights. Consequently, the jury was deprived of any instructions concerning the meaning of these crucial terms in the special issues.

The failure to define the operative words and phrases violated the constitutional requirement that each statutory aggravating circumstance genuinely narrow the class of persons eligible for the death penalty and reasonably justify the imposition of the death penalty. This is raised as a fundamental error since no objection appears in the record. *See Godfrey v. Georgia*, 466 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). Because the trial court failed to charge the jury in a constitutionally adequate manner so that its determinations are rationally reviewable, there was no rational process justifying the imposition of the death penalty upon this Appellant in comparison to other cases in which other defendants received a life sentence. This failure to properly instruct the jury violated Appellant's rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

Because the Texas special issues contain terms that are unconstitutionally vague, any of the special issues are unconstitutional as applied to Appellant. His death sentence must therefore be vacated. *See Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990); *Lewis v. Jeffers*, 497 U.S. 766, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990).

117

## APPELLANT'S ISSUE NO. 48

**THE TEXAS DEATH PENALTY SCHEME DENIED APPELLANT DUE PROCESS OF LAW, AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION BECAUSE OF THE IMPOSSIBILITY OF SIMULTANEOUSLY RESTRICTING THE JURY'S DISCRETION TO IMPOSE THE DEATH PENALTY WHILE ALSO ALLOWING THE JURY UNLIMITED DISCRETION TO CONSIDER ALL EVIDENCE MILITATING AGAINST IMPOSITION OF THE DEATH PENALTY.**

## APPELLANT'S ISSUE NO. 49

**THE TEXAS DEATH PENALTY SCHEME DENIED APPELLANT DUE COURSE OF LAW, AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT, IN VIOLATION OF ARTICLE I, §§ 13 AND 19, OF THE TEXAS CONSTITUTION BECAUSE OF THE IMPOSSIBILITY OF SIMULTANEOUSLY RESTRICTING THE JURY'S DISCRETION TO IMPOSE THE DEATH PENALTY WHILE ALSO ALLOWING THE JURY UNLIMITED DISCRETION TO CONSIDER ALL EVIDENCE MILITATING AGAINST IMPOSITION OF THE DEATH PENALTY.**

**(These two issues are combined in that they contain similar facts and issues of law.)**

## ARGUMENT AND AUTHORITIES

Justice Blackmun of the United States Supreme Court concluded that the death penalty, as currently administered in this country, is unconstitutional. *See Callins v. Collins*, 510 U.S. 1141, 114 S.Ct. 1127, 1129, 127 L.Ed.2d 435, 449 (1994) (Blackmun, J., dissenting). Justice Blackmun summarized his position in the following excerpt:

It is tempting, when faced with conflicting constitutional commands, to sacrifice one for the other or to assume that an acceptable balance between them already has been struck. In the context of the death penalty, however, such jurisprudential maneuvers are wholly inappropriate. The death penalty must be imposed "fairly, and with reasonable consistency, or not at all." *Eddings v. Oklahoma*, 455 U.S. 104, 112, 102 S. Ct. 869, 71 L.Ed.2d 1 (1982).

To be fair, a capital sentencing scheme must treat each person convicted of a capital offense with that "degree of respect due to the uniqueness of the individual." *Lockett v. Ohio*, 455 U.S. 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (plurality opinion). That means affording the sentencer the power and discretion to grant mercy in a particular case, and probing avenues for the consideration of any and all relevant mitigating evidence that would justify a sentence less than death. Reasonable consistency, on the other hand, requires that the death penalty be inflicted evenhandedly, in accordance with reason and objective standards, rather than by whim, caprice, or prejudice. Finally, because human error is inevitable, and because our criminal justice system is less than perfect, searching appellate review of death sentences and their underlying convictions is a prerequisite to a constitutional death penalty scheme.

On their face, these goals of individual fairness, reasonable consistency, and absence of error appear to be attainable. Courts are in the very business of erecting procedural devices from which fair, equitable, and reliable outcomes are presumed to flow. Yet, in the death penalty area, this Court, in my view, has

118

engaged in a futile effort to balance these constitutional demands, and now is retreating not only from the *Furman* promise of consistency and rationality, but from the requirement of individualized sentencing as well.

The Texas capital sentencing scheme fails to adhere to principled guidelines in weighing punishment evidence. The focus upon aggravating circumstances, to the exclusion of mitigating evidence, clearly violates the constitutional mandate of individualized sentencing. *See Penry v. Lynough*, 492 U.S. 302, 319, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256, 278-79 (1989). The federal and state constitutions prohibit the imposition of the death penalty until a scheme is employed which eliminates the sentencer's total discretion to inflict death while simultaneously permitting unrestricted consideration of mitigating evidence. Therefore, this Court should commute Appellant's death sentence to imprisonment for life.

## APPELLANT'S ISSUE NO. 50

### THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO HOLD ART. 37.071 Sec. 2(e) and (f) UNCONSTITUTIONAL BECAUSE SAID STATUTE FAILS TO REQUIRE THE ISSUE OF MITIGATION BE CONSIDERED BY THE JURY

Article 37.071 Sec. 2 (c)and (f), submitted to a jury upon conviction of capital murder.

This statute is unconstitutional because it fails to require that mitigation be considered. A juror is required to consider all mitigation. After the juror has considered the mitigation, it is then up to the juror to determine what effect to give the mitigation. Failure to mandate consideration of mitigating evidence makes this statute unconstitutional in violation of the Eighth Amendment.

Capital murder statutes that have survived constitutional scrutiny all require that the jury be told that it must consider all mitigating evidence. E.G. *Johnson v. Texas,* 113 S.Ct. 2658 (1993); *Boyde v. Califronia,* 494 U.S. 370 (1990); *Blystone v. Pennsylvania,* 494 U.S. 299 (1990).

## APPELLANT'S ISSUE NO. 51

### THE STATUTORY "PENRY" SPECIAL ISSUE IN TEX. CODE CRIM. PRO. ARTS. 37.071 & 37.0711 IS UNCONSTITUTIONAL BECAUSE IT FAILS TO PLACE THE BURDEN OF PROOF ON THE STATE REGARDING AGGRAVATING EVIDENCE

The Supreme Court has held that the Eighth Amendment requires the State to prove the existence of aggravating factors during the capital punishment phase. See, *e.g., Walton v. Arizona,* 100 S.Ct. 3047, 3055 (1990) (state's "method of allocating the burdens of proof" during capital sentencing phase cannot "lessen the State's burden ... to prove the existence of aggravating factors"). In order to understand why *Walton* applies to the statutory "Penry" special issue, the Court must recognize that this special issue is a conduit for aggravating (as well as mitigating) factors. By asking jurors to determine whether there are "*sufficient..* Mitigating circumstances,*" TEX. CODE CRIM. PRO. Art. 37.071, Sec. (e), the statutory special issue in

119

effect tells jurors to consider any possible aggravating factors that may outweigh the mitigating factors present in the case. Although the statue does not explicitly use the term "aggravating circumstance," clearly that is how the statute does not explicitly use the term "aggravating circumstance," clearly that is how a reasonable juror would interpret the statute. *F. Johnson v. Texas*, 113 S.Ct. 2568 (1993)(describing jurors' determination of answer to "future dangerousness" special issue to require balancing of aggravating and mitigating circumstances). Because the statute is silent about whether the State or the defense has the burden of proof on aggravating factors, and moreover, because the language of the special issue implies that the burden to disprove aggravating circumstances is on the defense, the statute is unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution.

**APPELLANT'S ISSUE NO. 52**

**THE STATUTORY "PENRY" SPECIAL ISSUE IS UNCONSTITUTIONAL UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE IT PERMITS THE VERY TYPE OF OPEN-ENDED DISCRETION CONDEMNED BY THE UNITED STATES SUPREME COURT IN FURMAN V. GEORGIA**

In *Furman v. Georgia*, 408 U.S. 238 (1972), in which the Supreme Court struck down capital punishment as it then was being administered, the chief constitutional infirmity that controlling Members of the Court pointed to in their respective concurring opinions was arbitrariness. In particular, the Court condemned the open-ended, unstructured discretion that was given to capital sentencing juries. *See also*, *Gregg v. Georgia*, 428 U.S. 153 (1976); *Spaziano v. Florida*, 468 U.S. 447-64 (1984).

Rather than submit such an open-ended, unstructured sentencing issue, the Eighth Amendment requires a trial court in the sentencing phase of a capital case to instead submit a charge that adequately structures the jury's sentencing discretion regarding mitigating and aggravating factors. *Cf Gregg v. Georgia*, 428 U.S. 153 (1976) (discussing Georgia's post *Furman* capital sentencing statute). Unless such an instruction is submitted in this case, a death sentence returned by Defendant's jury would violate the Eighth and Fourteenth Amendments.

**APPELLANT'S ISSUE NO. 53**

**TEXAS' STATUTORY CAPITAL SENTENCING SCHEME IS UNCONSTITUTIONAL UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS BECAUSE IT DOES NOT PERMIT MEANINGFUL APPELLATE REVIEW**

As discussed above, the pivotal sentencing issue in Texas capital cases - the statutory "*Penry*" special issue– does not specify the types of mitigating or aggravating factors relevant to a capital sentencing jury's deliberations during the punishment phase. Rather, the jury is simply asked whether there are "sufficient mitigating circumstance or circumstances" to warrant a life sentence rather than a death sentence. See TEX.

120

CODE CRIM. PRO. Arts. 37.071 and 37.0711 (Vernon 1994). In a larger sense, however, the *"Penry"* special issue requires Texas juries to perform the same functions that other states' post-Furman capital sentencing juries perform: (i) the threshold finding of particular aggravating and mitigating circumstances; and (ii) the balancing process, whereby jurors determine whether the mitigating factors outweigh aggravating factors. *Cf. Gregg v. Georgia* 428 U.S. 153 (1976) (discussing Georgia's post- Furman's statute).

Appellant contends that Texas' unstructured sentencing scheme is unconstitutional because it does not permit meaningful appellate review, which is not only required by a Texas statute but also is a prerequisite to a constitutionally implemented capital sentencing scheme. Because the second statutory special issue is open-ended and unstructured– i.e., not enumerating a list of mitigating and aggravating factors and not requiring jurors to make specific "findings" in this regard – the Court of Criminal appeals has no way to know which aggravating and mitigating factors that jurors considered. Thus, the appellate court has no way to know how, and indeed whether, the jury considered all of the constitutionally relevant mitigating evidence offered at trial. In this way, meaningful appellate review is impossible. The Supreme Court has recognized that an appellate court is in a virtually impossible position to review a jury's consideration of mitigating and aggravating evidence without knowing which factors the jury in fact considered. See *Sawyer v. Whitley,* 112 S. Ct. 2514, 2522-23 (1992) (noting "how difficult [a] task" a reviewing court faces in "assess[ing] how jurors" reacted to mitigating and aggravating evidence "particularly considering the breadth of those factors that a jury .. must be allowed to consider" without knowing how jurors actually considered the totality of the evidence.)

Because the Court of Criminal Appeals is required by statute and by the Constitution to review the sufficiency of the evidence supporting a jury's negative answer to the statutory *"Penry"* special issue, the open-ended and unstructured nature of Arts. 37.071 and 37.0711, which prevents meaningful appellate review, renders the Texas capital sentencing stature unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution.

## APPELLANT'S ISSUE NO. 54

### THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO QUASH THE INDICTMENT AS BEING UNCONSTITUTIONAL BASED ON THE ENUMERATED CONSTITUTIONAL DEFECTS OF THE TEXAS CAPITAL MURDER DEATH PENALTY LAW

Appellant filed a Motion to Quash the indictment (Clerk's Record Supplemental Vol. 1 pp. 31-43 for raising numerous constitutional issues concerning the death penalty. The Trial Court denied the Motion.

121

## ARGUMENTS AND AUTHORITIES

Appellant presented these issues in this motion, partly in an effort to avoid any claim of waiver for further review even though this Court has previously resolved the issues adversely to Appellant's position.

The Texas capital punishment scheme does not permit the jury to consider and give effect to all the mitigating circumstances which exist concerning the defendant in violation of the Eighth and Fourteenth Amendment of the United States Constitution and/or Article 1 Sec. 10, 13 and 14 of the Texas Constitution.

The Texas scheme unconstitutionally chills the defendant's ability to present relevant mitigation evidence which results in ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendment to the United States Constitution and Art. 1 Sec. 10 of the Texas Constitution.

The Texas death penalty scheme gives prosecutor's unfettered discretion to elect to proceed with the death penalty in violation of the Eighth and Fourteenth Amendment to the United States Constitution.

The Texas Death Penalty Statute, at 37.071 violates the Eighth and Fourteenth Amendment to the United States Constitution because jurors are not informed that a failure to agree on a special issue will result in life imprisonment.

The Texas Death Penalty Statute, at 37.071 violates the Eighth and Fourteenth Amendment to the United States Constitution because it does not provide for an option of a life sentence without parole.

The Texas Death Penalty Statute, art 37.071 violates the Eighth and Fourteenth Amendment to the United States Constitution because the procedure by which the death penalty is imposed in Texas denies the defendant protection from cruel and unusual punishment.

The Texas Death Penalty Statute, at 37.071 violates the Eighth and Fourteenth Amendment to the United States Constitution because the jurors are not adequately guided by the three issues to present the jury from acting in an arbitrary and capricious manner.

The Texas Death Penalty Statute, at 37.071 violates the Eighth and Fourteenth Amendment to the United States Constitution because punishment issues no. 1 and 3 have been answered by the finding of guilt of capital murder and the second issue does not provide an adequate test of probability for juror guidance in determining the issue.

The Texas Death Penalty Statute, at 37.071 violates the Eighth and Fourteenth Amendment to the United States Constitution because there is no proportionality review on appeal.

The Texas Death Penalty Statute, at 37.071 violates the Eighth and Fourteenth Amendment to the United States Constitution because the requirement to execute peremptory challenges prior to examination of the entire jury panel denies Appellant effective assistance of counsel.

The trial court erred in overruling the Motion to Quash the indictment which denied Appellant his constitutional right to a fair trial.

122

## APPELLANT'S ISSUE NO. 55

**THE CUMULATIVE EFFECT OF THE ABOVE-ENUMERATED CONSTITUTIONAL VIOLATIONS DENIED APPELLANT DUE PROCESS OF LAW IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.**

Appellant respectfully directs this Honorable Court's attention to Clerk's Record page 179.

The Eighth Amendment to the United States Constitution requires a greater degree of accuracy and fact finding than would be true in a noncapital case. *Gilmore v. Taylor*, 508 U.S. 333, 113 S.Ct. 2112, 124 L. Ed.2d 306 (1993) and *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

Tex.C. Crim. P. 37.071 fails to provide a method by which the state determines the death-worthiness of the Defendant. This failure eliminates rationality and consistency in the decision to seek death and violates the Defendant's right to equal protection and due process as set out in the 5th and 14th Amendment to the United States Constitution, Article 1, Sections 13 and 19 of the Texas Constitution and Tex. C. Crim Proc. Art.1.04.

The decision as to which defendant is to be subjected to the death penalty varies from county to county. There are likely 254 different methods in determining which cases shall be prosecuted as capital cases and in which of those the penalty of death will be sought. Often the decision can turn on the county's willingness to fund the defense, the race of the defendant, the age, sex, race or status of the victim in the community. When a court orders a statewide remedy, there must be at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied. *Bush v. Gore*, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000).

As the right to life is guaranteed by the Constitution certainly the life of a citizen demands as much consideration and protection as does a voter. The right to life is a fundamental one. *Furman v. Georgia*, 408 U.S. 238, 359 (1972). The failure of the State to set forth uniform and specific standards to determine against whom a death sentence will be sought, violates the principles set forth in the United States Constitution.

The Texas Death Penalty scheme magnifies the arbitrary and freakish manner in which the death penalty is imposed in the state, all in violation of the Due Process clause of the 5th Amendment to the United State Constitution and the prohibition against the imposition of Cruel and Unusual Punishment of the 8th Amendment. Specifically, the potentially arbitrary and capricious discretion of the county prosecutors is made worse by the fact that (a) Tex.C. Crim. P. Art. 37.071 does not require a proportionality review to be performed on sentences of death; (b )Texas juries are not told that their failure to agree on any of the sentencing phase special issues will result in a life sentence. Jurors are in fact told that ten (10) of them must agree in order to return a verdict in favor of the Defendant; (c) the Governor of Texas does not have

123

independent authority to grant Clemency and can only do so upon recommendation of the Texas Board of Pardons and Parole; (d) the Texas Board of Pardons and Parole does not meet when considering Clemency petitions and "faxes" or "calls in" their votes; (e) counsel for Clemency petitioners are denied compensation for their assistance provided to a condemned inmate, essentially denying him counsel in the final hour of life. Clerk's Record Supplemental Volume 1 p. 39 and p 49-51.

**APPELLANT'S ISSUE NO. 56**

**THE CUMULATIVE EFFECT OF THE ABOVE-ENUMERATED CONSTITUTIONAL VIOLATIONS DENIED APPELLANT DUE COURSE OF LAW UNDER ARTICLE I, § 19, OF THE TEXAS CONSTITUTION.**

Due process in both the federal and state constitutions requires that Appellant receive the fundamental fairness necessary to the due administration of justice. *Lisenba v. California*, 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166(1941); *Reese v. State*, 877 S.W.2d 328, 333 (Tex. Crim. App. 1994). Appellant cites many constitutional and statutory violations in the issues contained in Appellant's Brief. If this Court deems that none of these reasons taken alone justify reversing the trial court's judgment, then Appellant prays the Court consider the cumulative effect of the errors in the trial court. Constitutional breaches so permeated the voir dire and trial of Appellant's case so as to deprive her of the "fundamental fairness" implicit in the Fifth and Fourteenth Amendments, as well as Article I, Section 19. Consequently, the trial court's judgment should be reversed, and the cause remanded for a new trial.

124

**PRAYER**

WHEREFORE, PREMISES CONSIDERED, there being reversible error appearing in the record of the

trial of the case, Appellant prays this Honorable Court reverse the judgment of the trial court and remand for

a new trial.

Respectfully submitted,

John Tatum
Counsel for Appellant

**CERTIFICATE OF SERVICE**

I, JOHN TATUM, do hereby certify that a true and correct copy of the foregoing Brief for

Appellant was delivered to Craig Watkins, Criminal District Attorney, Appellate Section, 11th floor, Frank

Crowley Criminal Courts Building, Dallas, Texas 75207, on this /0 day of February, 2011.

John Tatum

**CERTIFICATE OF SERVICE**

The undersigned attorney for Appellant certifies that a true and correct copy of the foregoing brief was

mailed , postage prepaid, to James Broadnax,  TDC#999549  at the Polunsky Unit 3872 FM 350 South,

Livingston, Texas 77351, by U.S. Mail this the /0 day of ____ February 2011.

John Tatum

125