
**AP-76207**

*The State Requests Oral Argument if Appellant Argues*

## AP-76,207

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

## JAMES GARFIELD BROADNAX,
*APPELLANT*

v.

## THE STATE OF TEXAS,
*APPELLEE*

ORIGINAL

---

*On appeal from Criminal District Court No. 7 of Dallas County, Texas*
*In Cause No. F08-24667-Y*

RECEIVED IN
COURT OF CRIMINAL APPEALS

**STATE'S BRIEF**

AUG -5 2011

---

Louise Pearson, Clerk

*Counsel of Record:*

CRAIG WATKINS
*CRIMINAL DISTRICT ATTORNEY*
DALLAS COUNTY, TEXAS

AMY SUE MELO MURPHY (SBN 24041545)
JOHANNA H. KUBALAK (SBN 24014297)
*ASSISTANT DISTRICT ATTORNEYS*
FRANK CROWLEY COURTS BLDG.
133 N. RIVERFRONT BLVD., LB-19
DALLAS, TEXAS 75207-4399
(214) 653-3639
(214) 653-3643 *fax*

*ATTORNEYS FOR THE STATE OF TEXAS*

FILED IN
COURT OF CRIMINAL APPEALS

AUG 09 2011

Louise Pearson, Clerk

SCANNED

DATE

ORIGINAL

*The State Requests Oral Argument if Appellant Argues*

AP-76,207

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

## JAMES GARFIELD BROADNAX,
*APPELLANT*

v.

## THE STATE OF TEXAS,
*APPELLEE*

---

*On appeal from Criminal District Court No. 7 of Dallas County, Texas
In Cause No. F08-24667-Y*

---

## STATE'S BRIEF

---

*Counsel of Record:*

CRAIG WATKINS
*CRIMINAL DISTRICT ATTORNEY*
DALLAS COUNTY, TEXAS

AMY SUE MELO MURPHY (SBN 24041545)
JOHANNA H. KUBALAK (SBN 24014297)
*ASSISTANT DISTRICT ATTORNEYS*
FRANK CROWLEY COURTS BLDG.
133 N. RIVERFRONT BLVD., LB-19
DALLAS, TEXAS 75207-4399
(214) 653-3639
(214) 653-3643 *fax*

*ATTORNEYS FOR THE STATE OF TEXAS*

# TABLE OF CONTENTS

TABLE OF CONTENTS......................................................................................................i

INDEX OF AUTHORITIES..............................................................................................v

STATEMENT OF THE CASE...........................................................................................1

STATEMENT OF FACTS ................................................................................................1

    A. EVIDENCE AT GUILT/INNOCENCE PHASE ................................................................1

    B. THE STATE'S PUNISHMENT EVIDENCE......................................................................4

    C. APPELLANT'S PUNISHMENT EVIDENCE.....................................................................5

SUMMARY OF ARGUMENT .........................................................................................6

ARGUMENT ....................................................................................................................9

    RESPONSE TO ISSUES 1 THROUGH 7: THE TRIAL COURT DID NOT ERR IN
    DENYING APPELLANT'S *BATSON* CHALLENGES...........................................................9

        *The State's Race-Neutral Explanations.* .................................................................*11*

        *Appellant Has Not Established by a Preponderance of the Evidence
        That the Strikes Were the Product of the State's Racial
        Discrimination.* ........................................................................................................*21*

        *Prospective Juror Robert Patterson* ......................................................................*22*

    RESPONSE TO ISSUES 8 THROUGH 23: THE TRIAL COURT DID NOT ERR
    IN DENYING APPELLANT'S CHALLENGES FOR CAUSE...............................................42

        *Appellant Has Not Preserved His Complaints Regarding Prospective
        Jurors Lance Bedford, Patricia Hodges, Clarence Winfield, and
        Emily Blevins.* .........................................................................................................*42*

        *The Trial Court Did Not Err in Denying Appellant's Challenges for
        Cause.* ......................................................................................................................*43*

        *Conclusion* ..............................................................................................................*68*

    RESPONSE TO ISSUES 24 AND 25: APPELLANT FAILS TO SHOW THAT HE
    WAS DEPRIVED OF A LAWFULLY CONSTITUTED JURY. ...........................................68

RESPONSE TO ISSUE 26: THE TRIAL COURT DID NOT ERR IN RULING THAT TESTIMONY REGARDING APPELLANT'S VOLUNTARY INTOXICATION WAS INADMISSIBLE. ............................................................... 69

RESPONSE TO ISSUE 27: THE TRIAL COURT DID NOT ERR IN DENYING APPELLANT'S MOTION TO SUPPRESS EVIDENCE OF APPELLANT'S INTERVIEWS WITH NEWS REPORTERS; THE REPORTERS WERE NOT ACTING AS AGENTS OF THE STATE. .............................................................. 71

RESPONSE TO ISSUES 30 THROUGH 33: THE TRIAL COURT DID NOT ERR IN ADMITTING AUTOPSY AND CRIME-SCENE PHOTOGRAPHS. ................................... 74

   *The Trial Court Did Not Abuse Its Discretion in Admitting the Autopsy Photographs.* ........................................................................ 76

   *The Trial Court Did Not Abuse Its Discretion in Admitting the Crime-Scene Photographs.* ............................................................... 76

   *Nevertheless, Appellant Was Not Harmed By the Admission of the Photographs.* ............................................................................... 78

RESPONSE TO ISSUE 34: THE EVIDENCE IS SUFFICIENT TO SUPPORT APPELLANT'S CONVICTION FOR CAPITAL MURDER. ................................................. 79

RESPONSE TO ISSUE 28: THE TRIAL COURT DID NOT ERR IN DENYING APPELLANT'S MOTION TO SUPPRESS PHOTOGRAPHS OF ITEMS FOUND IN HIS JAIL CELL; APPELLANT DID NOT HAVE A REASONABLE EXPECTATION OF PRIVACY IN HIS CELL. ................................................................ 81

RESPONSE TO ISSUE 29: THE TRIAL COURT DID NOT ERR IN ADMITTING PHOTOGRAPHS OF A TEXAS DEPARTMENT OF CRIMINAL JUSTICE PRISON FACILITY. ..................................................................................... 84

RESPONSE TO ISSUES 35 AND 36: THE TRIAL COURT DID NOT ERR IN ADMITTING TESTIMONY THAT APPELLANT WAS A MEMBER OF A STREET GANG; THE TRIAL COURT'S ERROR IN FAILING TO PROVIDE A LIMITING INSTRUCTION REGARDING THIS TESTIMONY WAS HARMLESS. ................. 87

   *The Trial Court Did Not Err in Admitting the Complained-of Testimony.* ....................................................................................... 87

   *Appellant Was Not Harmed By the Trial Court's Failure to Grant His Request for a Limiting Instruction.* ................................................ 90

RESPONSE TO ISSUE 37: THE EVIDENCE IS SUFFICIENT TO SUPPORT THE JURY'S FINDING THAT APPELLANT WOULD BE A FUTURE DANGER. ......................... 92

RESPONSE TO ISSUES 38 THROUGH 40: THIS COURT DOES NOT HAVE JURISDICTION OVER APPELLANT'S COMPLAINTS REGARDING THE GARNISHMENT OF HIS INMATE TRUST FUND ACCOUNT, AND THE RECORD DOES NOT SHOW THAT THE TRIAL COURT ASSESSED ATTORNEY FEES AS COURT COSTS. ............................................................................. 98

RESPONSE TO ISSUES 41, 48, AND 49: ARTICLE 37.071 IS NOT UNCONSTITUTIONAL FOR ALLOWING THE JURY TOO MUCH DISCRETION IN DECIDING BETWEEN LIFE AND DEATH. ............................................ 99

RESPONSE TO ISSUE 42: THE MITIGATION SPECIAL ISSUE IS NOT UNCONSTITUTIONAL FOR SENDING "MIXED SIGNALS" TO THE JURY. ...................... 100

RESPONSE TO ISSUES 43, 44, AND 45: ARTICLE 37.071 IS NOT UNCONSTITUTIONAL FOR FAILING TO ASSIGN TO THE STATE THE BURDEN OF PROOF ON THE MITIGATION SPECIAL ISSUE. .......................................... 101

RESPONSE TO ISSUE 46: THE "12/10 RULE" IS NOT UNCONSTITUTIONAL. ................................................................................................... 102

RESPONSE TO ISSUE 47: THE SPECIAL ISSUES ARE NOT UNCONSTITUTIONALLY VAGUE. ............................................................................. 103

RESPONSE TO ISSUE 50: ARTICLE 37.071 IS NOT UNCONSTITUTIONAL FOR FAILING TO REQUIRE THAT THE JURY CONSIDER MITIGATING EVIDENCE. ................................................................................................................. 104

RESPONSE TO ISSUE 51: THE MITIGATION SPECIAL ISSUE IS NOT UNCONSTITUTIONAL FOR FAILING TO PLACE ON THE STATE THE BURDEN OF PROOF REGARDING AGGRAVATING EVIDENCE. .................................... 105

RESPONSE TO ISSUE 52: THE MITIGATION SPECIAL ISSUE IS NOT UNCONSTITUTIONAL FOR PERMITTING THE JURY TO HAVE "OPEN-ENDED DISCRETION" IN EVALUATING MITIGATING EVIDENCE. ............................ 106

RESPONSE TO ISSUE 53: ARTICLE 37.071 IS NOT UNCONSTITUTIONAL BECAUSE IT DOES NOT ALLOW FOR "MEANINGFUL APPELLATE REVIEW" OF THE MITIGATION SPECIAL ISSUE. ........................................................ 107

RESPONSE TO ISSUE 54: THE TRIAL COURT DID NOT ERR IN OVERRULING APPELLANT'S MOTION TO QUASH THE INDICTMENT BASED ON "ENUMERATED CONSTITUTIONAL DEFECTS." ........................................ 108

iii

RESPONSE TO ISSUES 55 AND 56: APPELLANT HAS NOT DEMONSTRATED CUMULATIVE CONSTITUTIONAL ERROR. ...................................... 109

PRAYER ............................................................................................................. 111

CERTIFICATE OF SERVICE ............................................................................. 111

# INDEX OF AUTHORITIES

## *Cases*

*Allridge v. State,*
850 S.W.2d 471 (Tex. Crim. App. 1991) ................................................................. 64

*Apprendi v. New Jersey,*
530 U.S. 466 (2000) ................................................................................................ 101

*Batson v. Kentucky,*
476 U.S. 79 (1988) ...................................................................................................... 9

*Beasley v. State,*
902 S.W.2d 946 (Tex. Crim. App. 1995) ................................................................ 89

*Block v. Rutherford,*
468 U.S. 576 (1984) ................................................................................................. 83

*Blue v. State,*
125 S.W.3d 491 (Tex. Crim. App. 2003) ....................................................... 101, 102

*Bone v. State,*
77 S.W.3d 828 (Tex. Crim. App. 2002) .................................................................. 30

*Brooks v. State,*
323 S.W.3d 893 (Tex. Crim. App. 2010) ................................................................ 79

*Burns v. State,*
761 S.W.2d 353 (Tex. Crim. App. 1988) .............................................................. 107

*Callins v. Collins,*
510 U.S. 1141 (1994) (Blackmun, J., dissenting) ................................................... 99

*Cameron v. State,*
241 S.W.3d 15 (Tex. Crim. App. 2007) .................................................................. 88

*Chamberlain v. State,*
998 S.W.2d 230 (Tex. Crim. App. 1999) ................................................... 75, 77, 110

*Coble v. State,*
330 S.W.3d 253 (Tex. Crim. App. 2010) .............................................. 93, 100, 101, 103

*Colburn v. State,*
966 S.W.2d 511 (Tex. Crim. App. 1998) ................................................................ 46

*Colella v. State,*
    915 S.W.2d 834 (Tex. Crim. App. 1995) ........................................................ 96

*Coleman v. State,*
    881 S.W.2d 344 (Tex. Crim. App. 1994) ................................ 48, 59, 60, 62, 63, 66, 68

*Cooks v. State,*
    844 S.W.2d 697 (Tex. Crim. App. 1992) ........................................................ 61

*Cordova v. State,*
    733 S.W.2d 175 (Tex. Crim. App. 1987) ........................................................ 48

*Curry v. Bowman,*
    885 S.W.2d 421 (Tex. Crim. App. 1993) ........................................................ 27

*Davis v. State,*
    313 S.W.3d 317 (Tex. Crim. App. 2010) ........................................... 70, 71, 109

*Davis v. State,*
    329 S.W.3d 798 (Tex. Crim. App. 2010) ........................................... 56, 57, 108

*Eddings v. Oklahoma,*
    455 U.S. 104 (1982)........................................................................... 48

*Escamilla v. State,*
    143 S.W.3d 814 (Tex. Crim. App. 2004) 43, 44, 45, 69, 73, 74, 76, 100, 103, 105, 107,
    109

*Estrada v. State,*
    313 S.W.3d 274 (Tex. Crim. App. 2010) ........................................... 86, 96, 97

*Feldman v. State,*
    71 S.W.3d 738 (Tex. Crim. App. 2002) ........................................... 45, 49, 51

*Furman v. Georgia,*
    408 U.S. 238 (1972)......................................................................... 106

*Gamboa v. State,*
    296 S.W.3d 574 (Tex. Crim. App. 2009) ...................................................... 110

*Gardner v. State,*
    306 S.W.3d 274 (Tex. Crim. App. 2009) ................................ 47, 54, 57, 59, 60, 63, 66

*Gigliobianco v. State,*
    210 S.W.3d 637 (Tex. Crim. App. 2006) ....................................................... 89

*Gray v. State,*
    233 S.W.3d 295 (Tex. Crim. App. 2007) ....................................................... 69

*Greer v. State,*
    310 S.W.3d 11 (Tex. App.—Dallas 2009, no pet.) ....................................... 23

*Hernandez v. New York,*
    500 U.S. 352 (1991) ................................................................................. 29, 50

*Herrin v. State,*
    125 S.W.3d 436 (Tex. Crim. App. 2002) ..................................................... 80

*Hudson v. Palmer,*
    468 U.S. 517 (1984) ..................................................................................... 83

*In re Johnson,*
    280 S.W.3d 866 (Tex. Crim. App. 2008) ..................................................... 98

*In re Watkins,*
    No. 05-09-00932-CV, 2009 Tex. App. LEXIS 6393 (Tex. App.—Dallas Aug. 17,
    2009, orig. proceeding) ................................................................................ 25

*Jackson v. Virginia,*
    443 U.S. 307 (1979) ..................................................................................... 79

*Jones v. State,*
    944 S.W.2d 642 (Tex. Crim. App. 1996) ........................... 88, 89, 90, 92, 100

*Kelly v. State,*
    824 S.W.2d 568 (Tex. Crim. App. 1992) ..................................................... 88

*King v. State,*
    953 S.W.2d 266 (Tex. Crim. App. 1997) ..................................................... 91

*Ladd v. State,*
    3 S.W.3d 547 (Tex. Crim. App. 1999) ............................................. 75, 77, 103

*Lane v. State,*
    822 S.W.2d 35 (Tex. Crim. App. 1991) ................................................... 50, 51

*Linscomb v. State,*
    829 S.W.2d 164 (Tex. Crim. App. 1992) ..................................................... 26

*Lockett v. Ohio,*
    438 U.S. 586 (1978) ..................................................................................... 48

*Long v. State,*
   823 S.W.2d 259 (Tex. Crim. App. 1991) .................................................................. 78

*Martinez v. State,*
   327 S.W.3d 727 (Tex. Crim. App. 2010) ................................................................. 97

*Mason v. State,*
   905 S.W.2d 570 (Tex. Crim. App. 1995) ................................................................. 64

*Mayer v. State,*
   309 S.W.3d 552 (Tex. Crim. App. 2010) ................................................................. 98

*Mays v. State,*
   318 S.W.3d 368 (Tex. Crim. App. 2010) ......................................................... 97, 108

*McCoy v. State,*
   713 S.W.2d 940 (Tex. Crim. App. 1986) ........................................................... 63, 68

*McFarland v. State,*
   928 S.W.2d 482 (Tex. Crim. App. 1996) .............................................................. 107

*Miller-El v. Dretke,*
   545 U.S. 231 (2005)........................................................................... 21, 30, 40

*Montgomery v. State,*
   810 S.W.2d 372 (Tex. Crim. App. 1990) (op. on reh'g) ............................................ 89

*Moore v. State,*
   999 S.W.3d 385 (Tex. Crim. App. 1999) ......................................................... 105, 106

*Morris v. State,*
   940 S.W.2d 610 (Tex. Crim. App. 1996) .............................................................. 106

*Motilla v. State,*
   78 S.W.3d 352 (Tex. Crim. App. 2002) ................................................................. 91

*Murphy v. State,*
   112 S.W.3d 592 (Tex. Crim. App. 2003) ......................................................... 56, 103

*Narvaiz v. State,*
   840 S.W.2d 415 (Tex. Crim. App. 1992) .............................................................. 108

*Nichols v. State,*
   754 S.W.2d 185 (Tex. Crim. App. 1988) ............................................................... 65

*Paredes v. State,*
129 S.W.3d 530 (Tex. Crim. App. 2004) .................................................................. 85

*Paulson v. State,*
28 S.W.3d 571 (Tex. Crim. App. 2000) .................................................................. 56

*Pena v. State,*
285 S.W.3d 459 (Tex. Crim. App. 2009) ...................................................... 42, 43, 72

*Penry v. Johnson ("Penry II"),*
532 U.S. 782 (2001) .................................................................................. 100

*Perry v. State,*
158 S.W.3d 438 (Tex. Crim. App. 2004) ........................................................ 101, 102

*Pondexter v. State,*
942 S.W.2d 577 (Tex. Crim. App. 1996) ......................................................... 106, 109

*Powers v. Ohio,*
499 U.S. 400 (1991) .................................................................................... 27

*Prystash v. State,*
3 S.W.3d 522 (Tex. Crim. App. 1999) ............................................................ 103, 107

*Raby v. State,*
970 S.W.2d 1 (Tex. Crim. App. 1998) .................................................................. 104

*Ramos v. State,*
547 S.W.2d 33 (Tex. Crim. App. 1977) .................................................................. 71

*Rayford v. State,*
125 S.W.3d 521 (Tex. Crim. App. 2003) .......................... 100, 101, 102, 103, 109, 110

*Reed v. Quarterman,*
555 F.3d 364 (5th Cir. 2009) ................................................................... 9, 26, 29

*Ring v. Arizona,*
536 U.S. 584 (2002) .................................................................................. 101

*Rocha v. State,*
16 S.W.3d 1 (Tex. Crim. App. 2000) .................................................................. 108

*Rodriguez v. State,*
96 S.W.3d 398 (Tex. App.—Austin 2002, pet. ref'd) .................................................. 56

*Rogers v. State,*
    774 S.W.2d 247 (Tex. Crim. App. 1989) ............................................................ 64

*Sadler v. State,*
    977 S.W.2d 140 (Tex. Crim. App. 1998) ............................................................ 45

*Salazar v. State,*
    38 S.W.3d 141 (Tex. Crim. App. 2001) ............................................................. 75

*Saldano v. State,*
    232 S.W.3d 77 (Tex. Crim. App. 2007) ....... 43, 44, 46, 76, 99, 100, 105, 106, 107, 109

*Satterwhite v. State,*
    858 S.W.2d 412 (Tex. Crim. App. 1993) ........................................................... 109

*Schutz v. State,*
    63 S.W.3d 442 (Tex. Crim. App. 2001) ............................................................. 78

*Sells v. State,*
    121 S.W.3d 748 (Tex. Crim. App. 2003) ..................................................... 43, 85, 86, 87

*Shuffield v. State,*
    189 S.W.3d 782 (Tex. Crim. App. 2006) ........................................................... 77

*Skinner v. State,*
    956 S.W.2d 532 (Tex. Crim. App. 1997) ........................................................... 71

*Smith v. State,*
    297 S.W.3d 260 (Tex. Crim. App. 2009), *cert. denied*, 130 S. Ct. 1689 (U.S. 2010)  99,
    102, 106

*Snyder v. Louisiana,*
    552 U.S. 472 (2008) ....................................................................................... 24

*Solomon v. State,*
    49 S.W.3d 356 (Tex. Crim. App. 2001) ............................................................. 91

*Soria v. State,*
    933 S.W.2d 46 (Tex. Crim. App. 1996) ............................................................. 83

*State v. Hernandez,*
    842 S.W.2d 306 (Tex. App.—San Antonio 1992, pet. ref'd) ................................. 73

*Threadgill v. State,*
    146 S.W.3d 654 (Tex. Crim. App. 2004) . 45, 46, 49, 57, 58, 66, 67, 104, 105, 109, 110

*Tuilaepa v. California*,
   512 U.S. 967 (1994)................................................................ 105, 106

*United States v. Cohen*,
   796 F.2d 20 (2d Cir. 1986) ............................................................ 83, 84

*Valle v. State*,
   109 S.W.3d 500 (Tex. Crim. App. 2003) ............................................ 109

*Walder v. State*,
   85 S.W.3d 824 (Tex. App.—Waco 2002, no pet.) ............................... 74, 84

*Walton v. Arizona*,
   497 U.S. 639 (1990)........................................................................ 105

*Watkins v. State*,
   245 S.W.3d 444 (Tex. Crim. App. 2008) ............. 9, 10, 11, 21, 22, 26, 28, 29

*Williams v. State*,
   937 S.W.2d 479 (Tex. Crim. App. 1996) .......................................... 105

*Wood v. State*,
   18 S.W.3d 642 (Tex. Crim. App. 2000) ............................................ 109

*Young v. State*,
   826 S.W.2d 141 (Tex. Crim. App. 1991) ............................................ 29

**Statutes**

TEX. CODE CRIM. PROC. ANN. art. 35.16 (Vernon 2006) ...................... 45, 50, 64

TEX. CODE CRIM. PROC. ANN. art. 35.261 (Vernon 2006) .............................. 9

TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2 (Vernon Supp. 2010) 1, 46, 47, 86, 88, 102, 103

TEX. CODE CRIM. PROC. ANN. ch. 102 (Vernon 2006 & Supp. 2010). ............ 99

TEX. PEN. CODE ANN. § 8.04 (Vernon 2011)........................................... 70

**Rules**

TEX. R. APP. P. 33.1(a)...................... 29, 42, 46, 48, 50, 52, 53, 54, 58, 72, 88

TEX. R. APP. P. 38.1(h).......................................................... 74, 84, 108

TEX. R. APP. P. 44.2(b) .................................................................................... 78, 91

TEX. R. EVID. 401 ............................................................................................... 85

TEX. R. EVID. 403 .......................................................................................... 75, 89

**TO THE HONORABLE COURT OF CRIMINAL APPEALS OF TEXAS:**

The State of Texas submits this brief in reply to the brief of appellant, James Garfield Broadnax.

## STATEMENT OF THE CASE

A Dallas County jury found appellant guilty of capital murder. (CR: 698; RR47: 203). In accordance with the jury's answers to the special issues, the trial court sentenced appellant to death on August 20, 2009. (CR: 650-51, 698; RR54: 4-7). TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(b), (e)(1), (g) (Vernon Supp. 2010).

## STATEMENT OF FACTS

### A. EVIDENCE AT GUILT/INNOCENCE PHASE

In the early morning hours of June 19, 2008, the bodies of Stephen Swan[1] and Matthew Butler were found outside their recording studio in Garland, Texas. (RR45: 67-72, 81, 86-88, 107). Both men had multiple gunshot wounds and were deceased by the time emergency personnel arrived. (RR45: 56; RR46: 21-22; RR48: 39-45).

The same day, appellant and his cousin, Demarius Cummings, arrived at appellant's aunt's house. (RR45: 199-200, 205, 210-11). While there, appellant told Evelyn Barg that he and Cummings had "hit a lick." (RR45: 211-12). Barg took this to mean that the men had stolen the Crown Victoria that they had arrived at the house in. (RR45: 205, 214-15). During the men's short stay at the house, Barg saw Stephen

---

[1] Appellant was charged with and found guilty of the murder of Stephen Swan in the course of committing or attempting to commit robbery. (CR: 2).

1

Swan's identification card and several of his credit cards. (RR45: 217-18, 228). After the men left, Barg saw a news report on the murders of Stephen and Matthew and realized that appellant and Cummings must have been involved. (RR45: 220-21). Barg called the police only fifteen minutes after the men had left. (RR45: 228).

That evening, appellant and Cummings were arrested in Texarkana, Texas, after police ran the vehicle identification number of the car in which they were driving – Stephen's Crown Victoria – and found that it was wanted in connection with a double homicide. (RR45: 105, 232-34, 250-52).

Following his arrest, appellant gave interviews to several media outlets. (RR45: 117, 270-71; RR46: 216, 219; SX18; SX403-SX407). In his multiple interviews, appellant admitted that he and Cummings took the train from Dallas to downtown Garland with the sole intention of robbing someone. After they had walked around for a time, appellant began to get desperate because the trains had stopped running and it was a "long walk back to Dallas." The men then saw Stephen and Matthew coming out of the music studio. Appellant asked Matthew[2] if he had a cigarette. When Matthew reached for one, appellant shot him and then turned and shot Matthew. When each man attempted to stand up, appellant shot him in the head; appellant shot Matthew twice in the head. Appellant and Cummings then "ran through their pockets" and stole Stephen's car. (SX18; SX403-SX407).

---

[2] In his interviews, appellant refers to the men as "the driver" and "the passenger." (SX18; SX403-407). The evidence at trial showed that Stephen was the owner of the car and suffered two gunshot wounds; the State, therefore, assumes that Stephen is the man appellant referred to as "the driver" and Matthew was the man appellant referred to as "the passenger." (RR45: 105; RR46: 21-22, 25).

2

The defensive theory at trial was that appellant was suffering from the effects of PCP at the time of the offense and at the time he gave the interviews to the media. (RR47: 187-91). In support of his theory, appellant called a witness who testified that at the time of the media interviews, appellant was in the Closed Behavioral Observation Unit of the Dallas County Jail. (RR47: 161-62).

In further support of his theory, appellant called a psychological assessor and a psychiatrist that worked at the Dallas County Jail. (RR47: 18, 69, 71). The psychological assessor testified that appellant told him that he had smoked marijuana laced with PCP, also known as "wet," two to three days prior to being booked into the jail. (RR47: 34). Appellant also told the assessor that he had auditory hallucinations and that he was paranoid because he thought he had been set up. (RR47: 31-32). The assessor placed him on suicidal precautions and referred him for a psychiatric follow up. (RR47: 36-37, 42).

The jail psychiatrist, Dr. Haideh Mirmesdagh, testified that appellant also told her that he was paranoid, had auditory hallucinations, and had last used drugs a few days prior. (RR47: 69, 71, 79-80). Dr. Mirmesdagh questioned if appellant was still suffering the effects of the drugs at the time. (RR47: 87-88). On cross examination, Dr. Mirmesdagh testified that appellant was put in the Closed Behavioral Observation Unit solely because he had been arrested for a multiple homicide. (RR47: 104). She also testified that in filling out her form, she relied on the information provided by appellant, that appellant's statements regarding his auditory hallucinations were not consistent with

3

others who have auditory hallucinations, and that she did not note any objective signs of his auditory hallucinations. (RR47: 92-96).

### B. THE STATE'S PUNISHMENT EVIDENCE

In addition to evidence of a prior misdemeanor and testimony from Matthew's mother, Stephen's brother, an assistant warden with the Texas Department of Criminal Justice, and the medical examiner, the State also presented evidence that during a search of appellant's cell, jail authorities found an individual razorblade and other contraband. (RR49: 43-47, 55-56).

The State also played several phone calls made by appellant while he was in jail. In the calls, appellant bragged about fighting with jail staff and other inmates, demonstrated a complete lack of remorse for the murders, threatened further violence against those in the jail, and admitted that he was not intoxicated at the time of the media interviews. (RR48: 96-98; RR52: 195-99, 203-07; SX544; SX545; SX552; SX592).

In addition, the State presented evidence that while in jail, appellant was involved in two separate fights with inmates, one while coming back from court and the other during recreation time. Appellant was also involved in a fight with a member of the jail's Special Response Team who was conducting a routine search of appellant's cell. (RR48: 131, 138-51, 179-80, 207-09, 230-32).

Finally, the State offered expert testimony from a member of the Dallas Police Department's Gang Unit. (RR49: 77-81). The expert, Barrett Nelson, testified that he reviewed the media tapes, appellant's phone calls, and items found in appellant's cell. (RR49: 83). Nelson concluded that appellant, through his own admissions, was a

4

member of the Gangster Disciples, a criminal street gang whose members often commit double homicides and aggravated robberies. (RR49: 83-125).

### C. APPELLANT'S PUNISHMENT EVIDENCE

At the punishment phase, appellant presented expert testimony on general brain development and the effects of PCP use on the human brain. According to Dr. Cheryl Silver, appellant's brain would not have been fully developed at the time of the offenses because he was only nineteen years old. (RR50: 45).

Dr. Frank Lane, a jail physician who treated appellant, testified that appellant told him that he was having hallucinations, was paranoid, and did not remember talking to the media. (RR50: 77-82, 86). Appellant also told him that he had used PCP at the time of the offense. Based on what Dr. Lane saw, he concluded that appellant was most likely suffering from mood and perceptual disturbances due to use of PCP. (RR50: 88-89). According to Dr. Lane, PCP can be stored in the fat cells of the brain and its effects can reoccur for some time after use of the drug. (RR50: 89-90). After a follow-up interview several months later, however, Dr. Lane opined that appellant was no longer suffering from the effects of PCP, but was rather suffering from post-traumatic stress disorder and an antisocial personality disorder. (RR50: 97-99). In addition, appellant called an addiction expert to testify at the punishment phase. The expert, based on his review of the arrest video, the media interviews, and appellant's medical records from the jail, opined that appellant was still under the effects of PCP at the time he gave the interviews to the media. (RR50: 171-72, 175-76, 200-01).

5

Appellant also called Tre'Vaun Miller, an inmate that appellant had fought with during their recreation time. (RR50: 280-81). According to Miller, he and appellant had been in a verbal disagreement for several days because Miller had complained about being in jail, and appellant told him to "Chill and give it up to God." (RR50: 284-85, 287). Miller was so upset by appellant's advice that when the officer in charge of recreation time was not looking, he assaulted appellant, who only hit him back in self-defense. (RR50: 286).

The majority of appellant's evidence at punishment focused on his childhood. Appellant presented several family members and family friends who testified that appellant had moved around throughout his childhood, that his mother was involved in multiple physically abusive relationships, that his mother was physically abusive to him and one of his sisters, and that he was often sent to live with an aunt who treated him poorly because he was a mixed race. (RR50: 232, 250, 255-57, 288-98, 300-02, 304-05; RR51: 33-35, 38-40, 42-43, 45-47, 54-55, 57-61, 74-76, 100, 229, 236-37, 260-61, 265-68; RR52: 39, 42-43, 46-47, 103-04, 160, 162, 168-70).

## SUMMARY OF ARGUMENT

The trial court properly denied appellant's *Batson* challenges to the State's exercise of peremptory challenges against seven minority veniremembers. Although the State struck all but one minority veniremember, appellant has not met his burden to show that the State's race-neutral explanations for exercising its peremptory challenges were disingenuous.

6

The trial court properly denied appellant's challenges for cause against sixteen prospective jurors. All of the denials were proper, and appellant has not shown that he was denied the use of a statutorily provided peremptory challenge.

Appellant's argument that he was deprived of a lawfully constituted jury is misplaced. Such an argument is only appropriate when there is an allegation that the trial court erred in granting a State's challenge for cause. Appellant has not made this argument on appeal.

The trial court properly denied appellant's request to present evidence of his diminished capacity. The experts' testimonies were proffered at the guilt stage of trial to show that appellant lacked the requisite mens rea, and this Court has held that such testimony is not admissible.

The trial court properly denied appellant's motion to suppress statements he made to multiple media outlets. There is nothing in the record to indicate that any of the news reporters were State agents.

The trial court properly denied appellant's objection to the autopsy and crime-scene photographs. The photographs aided the medical examiner and crime-scene investigator in their testimonies, and depict nothing more than the reality of appellant's brutal crimes.

The evidence is sufficient to support appellant's conviction. Contrary to appellant's assertions, the record is replete with evidence that the robbery was planned and was not a mere afterthought.

7

The trial court properly admitted photographs of items seized from appellant's cell. Appellant, a pretrial detainee, did not have a reasonable expectation of privacy in his cell.

The trial court properly admitted photographs of a Texas Department of Criminal Justice facility. The photographs depict the entire unit, including general population and death row, and were relevant in assisting the jury in answering the issue of future-dangerousness.

The trial court properly admitted testimony that appellant was in a criminal street gang. Moreover, although the trial court did not provide a limiting instruction on this testimony, the error was harmless. The State did not rely heavily on this evidence during its closing arguments and presented other testimony regarding the first special issue, including the facts of the brutal murders.

The evidence presented at trial was sufficient to support the jury's answer to the first special issue. The evidence presented to the jury showed appellant to be cold, callous, unremorseful, and delighting in his newfound notoriety.

This Court does not have jurisdiction over appellant's arguments regarding the garnishment of his inmate trust fund account. This Court has held that the garnishment of an inmate trust fund account is a civil matter. Furthermore, appellant has not shown that any of the court ordered costs were anything more than the statutorily-imposed fees the trial court was obligated to order appellant to pay.

8

This Court has repeatedly rejected all of appellant's constitutional attacks on the death-penalty scheme in Texas. Moreover, appellant has not shown any constitutional violations occurred. Accordingly, there is no harm to cumulate.

## ARGUMENT

### RESPONSE TO ISSUES 1 THROUGH 7: THE TRIAL COURT DID NOT ERR IN DENYING APPELLANT'S *BATSON* CHALLENGES.

In his first through seventh issues on appeal, appellant alleges that the State's explanations for striking seven prospective jurors were a pretext for racial discrimination in violation of *Batson v. Kentucky*, 476 U.S. 79 (1988). Specifically, appellant complains that the State used its peremptory challenges to strike all of the African-American veniremembers and one Hispanic juror.

The Texas Code of Criminal Procedure and the United States Constitution prohibit the use of peremptory challenges to exclude prospective jurors on the basis of race. TEX. CODE CRIM. PROC. ANN. art. 35.261(a) (Vernon 2006); *Batson*, 476 U.S. at 85; *Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008). Under *Batson*, a defendant must first make a prima facie showing that the prosecution exercised its peremptory challenges on the basis of race. *Reed v. Quarterman*, 555 F.3d 364, 368 (5th Cir. 2009). If the defendant makes that showing, the burden shifts to the prosecutor to present race-neutral explanations for striking the jurors in question. *Id.* The court must then determine whether the defendant has carried his burden of proving purposeful discrimination. *Id.*

At the second step of this process, the proponent of the strike need only tender an explanation that is race-neutral. *Watkins*, 245 S.W.3d at 447. The ultimate plausibility of

9

that race-neutral explanation is to be considered as part of the third step of the analysis, in which the trial court determines whether the opponent of the strike (usually the defendant) has satisfied his burden of persuasion to establish by a preponderance of the evidence that the strike was indeed the product of the proponent's racial discrimination. *Id.* Whether the opponent satisfies his burden of persuasion to show that the proponent's facially race-neutral explanation for his strike is pre-textual, not genuine, is a question of fact for the trial court to resolve in the first instance. *Id.*

Once the opponent of the challenged strike raises a question of purposeful discrimination, if the trial court then proceeds immediately to the second step by inquiring of the proponent whether he had a non-discriminatory purpose, this Court is to assume that the opponent has satisfied his step-one obligation to make a prima facie case of purposeful discrimination and address only the second and third steps. *See id.* This Court should not overturn the trial court's resolution of the *Batson* issue unless it determines that the trial court's ruling was clearly erroneous. *See id.* at 447-48. In assaying the record for clear error, *vel non*, this Court should consider the entire record of voir dire; it need not limit itself to arguments or considerations that the parties specifically called to the trial court's attention so long as those arguments or considerations are manifestly grounded in the appellate record. *Id.* at 448. But this Court should examine a trial court's conclusion that a facially race-neutral explanation for a peremptory challenge is genuine, rather than a pretext, with great deference, reversing only when that conclusion is, in view of the record as a whole, erroneous. *Id.*

10

*The State's Race-Neutral Explanations.*

Each time appellant made a *Batson* objection to the State's use of a peremptory challenge against a potential juror, the trial court immediately asked the State to provide explanations. (RR38: 9, 14, 21, 26, 44, 69, 72). Consequently, this Court is to assume that the opponent has satisfied his step-one obligation to make a prima facie case of purposeful discrimination and address only the second and third steps. *See Watkins*, 245 S.W.3d at 448.

## The State Struck All "3's"

One of the questions on the questionnaire asked potential jurors, "With reference to the death penalty, which of the following statements best represents your feelings?" (RR55-RR57). The State explained that it had struck everyone on the qualified-juror panel that had answered number 3: "Although I do not believe that the death penalty ever ought to be invoked, as long as the law provides for it, I could assess it under the proper set of circumstances." (CR: 36). This included non-minority veniremembers Sue McCormick, Johnny Sandford, and Carl Jackson, and minority veniremembers Shaven McCraney, Angelita Rivera, Curtis Riser, and Betty Jackson. (RR38: 8. 26, 30, 35-36, 69).

## Shaven McCraney

At the *Batson* hearing, the State explained that it had exercised a peremptory challenge against Shaven McCraney because she (1) listed herself as a "3"; (2) stated in her questionnaire that she was opposed to the death penalty; (3) was a single woman with no children who wanted to mentor young men who did not have a father-figure; (4)

11

seemed ill at ease during voir dire and could not look at appellant; and (5) stated that the only way she could assess the death penalty was if others propped her up. (RR38: 10-11). All of these explanations are supported by the record. McCraney listed herself as a "3." (RR55: McCraney Questionnaire, p.1).[3] Moreover, on the first page of her questionnaire, McCraney marked that she was in favor of the death penalty, but wrote in, "I check yes, but really I'm unsure. It depends on [the] situation I guess." (RR55: McCraney Questionnaire, p.1). In addition, during voir dire McCraney indicated that she had begun to mentor two teen-aged boys, who did not have a father at home, in an effort to keep them out of trouble. (RR10: 56-57). Also during her voir dire, the prosecutor asked McCraney to look at appellant; McCraney stated that she was nervous and uncomfortable with sitting in the same room as appellant because she knew the "decision" she would have to make. (RR10: 18). Finally, McCraney stated that she did not think she could assess the death penalty if she were to be the only person who would make that decision but, with several other people making the decision with her, she could assess the death penalty. (RR10: 23-24). Consequently, the record bears out the State's race-neutral explanations for exercising a peremptory strike against McCraney.

**Mattie Vation**

At the *Batson* hearing, the State explained that it exercised a peremptory challenge against Mattie Vation mainly due to her opposition to the death penalty. (RR38: 14-15,

---

[3] It is not clear based on the protracted correspondences between this Court and the court reporter whether the actual questionnaires of the qualified jurors are before this Court. The State is, however, in possession of three volumes of the reporter's record that include these questionnaires, copies of which can be delivered to this Court if necessary.

12

17). The State also explained that the use of drugs or alcohol at the time of the offense would automatically prevent Vation from imposing the death penalty, she has a brother and a nephew in prison, she had engaged in what the State considered jury nullification during a prior jury service, and she had indicated that when she heard about the crime on the news, she had felt compassion for the men who killed the victims. (RR10: 15-18). All of these explanations are supported by the record.

On the very first page of her questionnaire, Vation specifically stated that she was opposed to the death penalty because she believes in second chances and that innocent people had been killed. (RR55: Vation Questionnaire, p. 1). Indeed, during voir dire, Vation stated that she had problems with the death penalty because of all of the recent DNA exonerations. (RR11: 120-21).

Moreover, Vation stated that she had previously served on a jury in a DWI case and that she was able to convince the other members of the jury to acquit; her reason for wanting to find the defendant not guilty was because he was elderly and needed his driver's license. (RR11: 144). In addition, although Vation stated that she would not let it affect her decision in the case, Vation admitted to having compassion for appellant. (RR11: 128, 143, 155-56). Furthermore, Vation vacillated in her responses about whether appellant's use of drugs or alcohol at the time of the offense would automatically prevent her from assessing the death penalty; in her questionnaire, she stated that voluntary intoxication would automatically prevent her from assessing the death penalty and she attempted to change this answer during voir dire. (RR11: 134-35; RR55: Vation Questionnaire, p. 6). Indeed, the State challenged Vation for cause due to her views on

13

the death penalty and her beliefs on voluntary intoxication. (RR11: 172-74). Consequently, the record bears out the State's race-neutral explanations for exercising a peremptory strike against Vation.

**Angelita Rivera**

During the *Batson* hearing, the State explained that it exercised a peremptory challenge against Angelita Rivera because she (1) was not in favor of the death penalty; (2) listed rehabilitation as a primary goal of punishment; (3) stated that in deciding punishment, she would want to know if the defendant had availed himself of available resources, but was unable to articulate what such resources were; (4) would require the State to prove that appellant had been violent in the past; (5) had a relative that was murdered by another relative; and (6) did not think that the criminal justice system fairly protected the rights of the accused. (RR38: 22-24). The record supports the State's explanations.

Rivera's responses in her questionnaire and during voir dire demonstrate that she was strongly opposed to the death penalty. On the first page of her questionnaire, Rivera admitted that she was not in favor of the death penalty. (RR55: Rivera Questionnaire, p. 1). Moreover, during voir dire, although Rivera stated that she knew that the law allowed the death penalty and that she could follow the law, she repeatedly admitted that she had religious and moral convictions against the death penalty. (RR13: 175-77, 180). Furthermore, when she stated during voir dire that she could participate in a process that led to someone's death, the prosecutor commented that she seemed hesitant in her answer. (RR13: 187). Rivera responded, "The hesitation is that someone can participate

14

in putting somebody to death is just kind of, those words just kind of – you know, kind of slap you." (RR13: 187).

In addition, on her questionnaire, Rivera ranked "rehabilitation" as the primary objective of punishment. (RR55: Rivera Questionnaire, p. 8). During voir dire, Rivera affirmatively stated that she has witnessed people change and that she believes the judicial system provides rehabilitation, but not all inmates accept the help. (RR13: 177-79). Indeed, on her questionnaire, Rivera indicated that the death penalty should be reserved for a "psycho killer," whom she described as someone who has repeatedly killed and has not been rehabilitated. (RR13: 188).

Rivera also stated that in determining whether to assess the death penalty, she would want to know what resources a defendant had taken advantage of. (RR13: 181-85). She was unable to articulate, however, what such resources would be. (RR13: 181-85). In response to the State's question regarding what evidence she would need to determine if a defendant was going to be a future danger, Rivera stated, "There's got to be some hard core evidence for that to happen, and that would be the criminal record, his history of repeated offenses, repeated violence." (RR13: 192-93). Rivera also stated on her questionnaire that she strongly disagreed with the statement that the criminal justice system fairly protects the rights of persons accused of committing crimes. (RR55: Rivera Questionnaire, p. 7). Finally, Rivera stated that her uncle had killed her aunt in a murder/suicide crime. (RR13: 171). Consequently, the record bears out the State's race-neutral explanations for exercising a peremptory strike against Rivera.

## Curtis Riser

At the *Batson* hearing, the State explained that it exercised a peremptory challenge against Curtis Riser because he (1) listed himself as a "3," (2) ranked himself as a "1" in support of the death penalty, (3) believed that voluntary intoxication should be considered, (4) believed that prison rehabilitates, (5) has a cousin in prison for murder, (6) believed that the lack of a father-figure would be mitigating, and (7) indicated that he saw his son in appellant. (RR38: 27-29). The record supports all of these explanations.

At the conclusion of the State's listed explanations, it stressed that its primary reason for striking Riser was because he indicated he was a "3" on his questionnaire. (RR38: 29). Indeed, as discussed above, Riser identified himself as a "3" on his questionnaire. (RR55: Riser Questionnaire, p. 1). Moreover, in his questionnaire, Riser stated that he was not in favor of the death penalty because there have been too many innocent people convicted and listed himself as a "1" on the 10-point scale indicating support of the death penalty (1 being the lowest level of support, and 10 being the highest level of support). (RR55: Riser Questionnaire, pp. 1, 4).

On his questionnaire, Riser also admitted that he believed voluntary intoxication should be considered as mitigating because a person would not otherwise commit a crime. (RR55: Riser Questionnaire, p. 6). Riser further stated during voir dire that he could see his son in every black man that was in the courtroom, including the defendant, that his brother was once in prison for murder, and that he believed inmates would be less likely to commit acts of violence because they are kept "under control." (RR13: 249-50, 277-90). Moreover, although not listed by the State as a reason for the use of its strike,

16

Riser admitted that he served on a jury that found the defendant not guilty. (RR13: 254-55). Finally, Riser stated that he had good parents who taught him the value of hard work, and that he knew others did not have the same opportunities that he had growing up. (RR13: 239-40). Consequently, the record bears out the State's race-neutral explanations for exercising a peremptory strike against Riser.

**Agwana Long**

At the *Batson* hearing, the State explained that it exercised a peremptory challenge against Agawana Long because she (1) expressed mixed feelings regarding the death penalty, (2) thought that life without parole was the better punishment option, (3) believed that prison was a controlled environment, (4) limited future dangerousness to the crime of murder, (5) would automatically be prevented from imposing the death penalty if the defendant was intoxicated, (6) did not believe that a co-defendant should receive the same punishment as a shooter, and (7) has been on probation for theft. (RR38: 45-49).

At voir dire, Long admitted that on her questionnaire she indicated that she had mixed feelings about the death penalty. (RR30: 31). She explained that her responses in the questionnaire meant, "I'm for it on some cases and I'm against it on some other cases . . . depending on the situation." (RR30: 31). Long clarified that she was in favor of the death penalty in cases involving children and the elderly. (RR30: 33-35).

In addition, Long was adamant that she thought life without parole was the better punishment option. On page 5 of her questionnaire, Long stated that she thought a lifetime in prison was the equivalent to the death penalty and that she was "strongly in

17

favor" of life without parole because she believed it would force the defendant to think about the crime and "deal with it." (RR57: Long Questionnaire, p. 5). Long expressed these same beliefs during voir dire. (RR30: 41, 54-56).

In her questionnaire, Long also admitted that a person's use of drugs or alcohol at the time of the offense would automatically prevent her from assessing the death penalty. (RR57: Long Questionnaire, p. 6). At voir dire, Long explained that this was because being intoxicated alters the thought process. (RR30: 66-67).

Long admitted during voir dire that she believed prison to be "more controlled than out in society" because inmates are watched by guards. (RR30: 49). Consequently, she thought that violence was less likely to occur in prison. (RR30: 50). In addition, at one point during voir dire, Long appeared to be under the impression that the State was required to prove that a defendant would commit the *same* offense in order to prove he was a future danger. (RR30: 50-51). Moreover, Long admitted that she did not think she could give a non-shooter the same sentence as the shooter. (RR30: 58).

Finally, on her questionnaire, Long admitted to receiving deferred-adjudication probation for an offense involving the inability to cover the amount of a check in 1999. (RR57: Long Questionnaire, p. 8). Consequently, the record bears out the State's race-neutral explanations for exercising a peremptory strike against Long.

**Betty Jackson**

At the *Batson* hearing, the State explained that it exercised a peremptory challenge against Betty Jackson because (1) she was a "3" and (2) she would only assess the death

18

penalty in cases that involved the sexual assault or murder of a child. (RR38: 70). The record supports these explanations.

As stated above, the State struck every juror, regardless of race, that responded that they were a "3." On the first page of her questionnaire, Jackson identified herself as a "3." (RR57: Jackson Questionnaire, p. 1). In addition, throughout her questionnaire and voir dire, Jackson repeatedly stated that she believed the death penalty was only appropriate in cases involving the sexual assault or murder of a child, and that she was otherwise opposed to the death penalty. (RR34: 23-26, 39-40, 47-49; RR57: Jackson Questionnaire, pp. 1, 4). Consequently, the record bears out the State's race-neutral explanations for exercising a peremptory strike against Jackson.

## Dedrick Morrison

At the *Batson* hearing, the State stressed that it exercised a peremptory challenge against Dedrick Morrison because he opposed the death penalty. (RR38: 72, 77). The State further explained that it struck Morrison because he (1) strongly believed that one could change while in prison, (2) would not impose the death penalty if the person was under the influence of drugs, (3) recently had a cousin that was killed by a police officer, and (4) believed that age was an important factor in deciding the case. (RR38: 72-77). The record supports these explanations.

On the first page of his questionnaire, Morrison stated that he was opposed to the death penalty. (RR57: Morrison Questionnaire, p. 1). In addition, he mentioned that the founder of the Crips had turned his life around in prison as an example of how people can change in prison. (RR57: Morrison Questionnaire, p. 5). During voir dire, Morrison

19

stated that all people will change over the course of time and that those who are confined will change either for the better or for the worse. (RR34: 118-19). In addition, Morrison indicated on his questionnaire that he believed that those who commit crimes while intoxicated do not realize what they have done until they sober up; consequently, he considered evidence of intoxication to be mitigating. (RR57: Morrison Questionnaire, p. 6).

Moreover, during voir dire Morrison spoke at length about his cousin who had been killed by an Austin police officer. (RR34: 93-94). Morrison explained that the killing was believed to have been intentional and sparked riots in Austin. (RR34: 96-97). He had tried to give his younger cousin advice and thought that someone in his family should have tried to reach out to him because he had been running with the wrong crowd. (RR34: 93-94, 103-05). Morrison also discussed the case with an investigator at the Dallas County District Attorney's Office who had indicated that the police officer who shot his cousin had not followed proper procedure. (RR34: 99-100).

Morrison also displayed distrust for law enforcement. In his questionnaire Morrison stated that he believed that police officers would try to "cover themselves when they have done the wrong things." (RR34: 108).

Finally, Morrison mentioned the fact that he had a good mentor that kept him off of the streets. (RR34: 129-31). Morrison further stated that his calling was to teach kids and keep them off of the streets. (RR34: 153, 161-62).

Therefore, the record bears out the State's race-neutral explanations for exercising a peremptory strike against Morrison.

## Conclusion

The record supports all of the State's proffered race-neutral explanations for exercising peremptory strikes against the seven prospective minority jurors. The trial court did not, therefore, clearly err to find that the State satisfied its step-two burden of production to tender explanations for its peremptory strikes that were race-neutral on their face. *See Watkins*, 245 S.W.3d at 451.

### *Appellant Has Not Established by a Preponderance of the Evidence That the Strikes Were the Product of the State's Racial Discrimination.*

This Court now must determine the plausibility of the State's race-neutral explanations. Recently, this Court has looked at the following factors when determining this third prong of *Batson*: (1) the proportionality of the State's strikes, (2) whether the State's explanations equally apply to non-minority veniremembers that the State did not challenge, (3) whether the State utilized its option to shuffle the jury panel, (4) whether the State directed questions expressly designed to elicit grounds for peremptory challenges disproportionately, and (5) whether the particular county in which the case was prosecuted has a formal policy to exclude minorities from jury service. *See Watkins*, 245 S.W.3d at 449-57 (relying on *Miller-El v. Dretke*, 545 U.S. 231, 240-64, 266 (2005)). This Court looks to the collective and cumulative impact of these non–exclusive factors in determining whether there is an inference of racial discrimination so powerful that it overcomes the deference given to trial courts. *See id.* at 449, 457.

Here, appellant argues that the State disproportionally struck minorities from the panel and that a comparative juror analysis demonstrates that the State did not strike

21

similarly-situated non-minorities.   The crux of appellant's argument is, however, that because the trial court sustained appellant's *Batson* challenge to prospective juror Robert Patterson, the entire jury selection was invalidated.  (App. Brief, pp. 39-42).

## The State's Use of Peremptory Challenges

The panel of qualified jurors consisted of 48 potential jurors; six potential jurors were African-American and two potential jurors were Hispanic.  (RR38: 38-39).  The State does not deny that it struck all six of the African-American jurors and one of the Hispanic jurors.  (RR38: 9, 14, 21, 26, 44, 51, 69, 72).  The State also does not deny that once appellant struck the final minority, a Hispanic woman, the jury consisted solely of white jurors.  (RR38: 82-83).  The fact that the State struck all the African-American veniremembers and one Hispanic veniremember is not, however, dispositive of whether the State's explanations were mere pretexts.  As this Court stated in *Watkins*, a reviewing court should look to *all* relevant factors in deciding whether the trial court's finding of no racial discrimination was clearly erroneous.  *Watkins*, 245 S.W.3d at 452.

### *Prospective Juror Robert Patterson*

After the completion of voir dire, the two judges who sat for the presiding judge for the individual voir dire proceedings oversaw the selection of the jury, including appellant's *Batson* challenges, which they denied.  (RR38: 1-79).  Although the presiding judge was present during the hearing, he did not participate.  (RR38: 1-79).  At the *Batson* hearing, the State explained that it exercised a peremptory strike against prospective juror Robert Patterson because he (1) did not believe in the death penalty; (2) served as the foreman on two criminal trials, one of which resulted in an acquittal for

22

murder; (3) did not believe that striking someone in the face was an act of criminal violence, and he would require the use of a gun or a knife to classify an act as an act of violence, (4) unilaterally brought up the concept of jury nullification; and (5) described a set of facts similar to those in the instant case as sufficiently mitigating to warrant a life sentence. (RR38: 51-66). These explanations are supported by the record. (RR31: 37, 56, 61, 67, 76-78). Indeed, the State's first, second, and fourth reasons for striking Patterson were elicited during appellant's examination. (RR31: 61, 67, 76-78). At the hearing, appellant's *Batson* objection was overruled by the two trial judges who presided over individual voir dire. (RR38: 68).

Several days after the jury was selected, however, the presiding judge of the court ordered each side to brief appellant's accusation regarding the State's exercise of a peremptory challenge against Robert Patterson, given particular reference to the Dallas Court of Appeals' opinion in *Greer v. State*, 310 S.W.3d 11 (Tex. App.—Dallas 2009, no pet.). (CR: 12, 14, 542-58; RR42: 5). On July 30, 2009, the presiding judge, not the two judges who had heard individual voir dire, held a hearing to reconsider the defense's challenge with respect to Patterson; despite the State's request to be allowed to present live testimony, the hearing consisted solely of arguments from each side. (RR42: 5, 7). At the commencement of the hearing, the presiding directly acknowledged the veracity of a number of the State's race-neutral explanations:

> In favor of the State, I mean, it is clear that Mr. Patterson did previously serve as a foreman on two occasions, one of those being where a not-guilty verdict was returned. And, also, that Mr. Patterson, on his own, came up with the notion of jury nullification, which is rather striking.

23

(RR42: 6).

During its argument, the State stressed that it mainly struck Patterson because he was opposed to the death penalty. (RR42: 7-12). Indeed, the State pointed out to the presiding judge that during individual voir dire, Patterson interrupted defense counsel to state that he did not "believe [he was] in favor of the death penalty." (RR31: 67; RR38: 9).

Later in the hearing, the presiding judge acknowledged the United States Supreme Court's decision in *Snyder v. Louisiana*, in which the Supreme Court stated, "Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility . . . and the best evidence of [discriminatory intent] often will be the demeanor of the attorney who exercises the challenge." *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008). (RR42: 19). The presiding judge stated that this factor weighed in favor of the State. (RR42: 19). The trial court made no statements to indicate that the State's peremptory strike was intentionally discriminatory in any way. Rather, the presiding judge went out of his way *not* to make such a finding. At one point during the hearing, it appeared that the presiding judge stated his belief that the State's explanations were, in fact, truthful. Specifically, the trial court stated:

> The problem in this case is, again, as I have said, one could conclude if I grant a Batson challenge that [the prosecutor]'s reasons for challenge were contextual [*sic*], that being false. That's – if I was a subjective finder of the intent of [the prosecutor] or his team, I would not conclude that.

(RR42: 34).

24

Despite the presiding judge's finding that the State's explanations were truthful, he went on to grant appellant's challenge, stating:

> I'm going to grant the Batson challenge and I'm going to do so because of the fact that there are no African-American jurors on this jury and there was a disproportionate number of African-Americans who were struck. *This is not to be considered in any way as some sort of negative context on any lawyers in this case.* It's because I simply have to look at the factors that are contained in the Miller-El and I make my decisions based on that.

(RR42: 35) (emphasis added). Despite the State's request that a new array be called, the trial court placed Patterson on the jury and effectively removed juror Emily Blevins[4] from the jury. (RR42: 35; RR45: 22). The State then filed a writ of mandamus against the trial court, which was denied by the Dallas Court of Appeals. (CR: 574). *See In re Watkins,* No. 05-09-00932-CV, 2009 Tex. App. LEXIS 6393 (Tex. App.—Dallas Aug. 17, 2009, orig. proceeding)

The presiding judge clearly did not find that the State's explanations for striking Patterson were pretexts, and indeed repeatedly assured the State that it believed the State's explanations. Instead, it appears that the trial court relied heavily on its mistaken belief that *Batson* and its progeny guarantee a right to have a racially diverse jury. (RR42: 5, 35). This belief was premised in large part on the Dallas Court of Appeals' opinion in *Greer.* Simply put, the presiding judge was giving *Greer* a meaning it does not have.

---

[4] Due to a physical illness suffered by another juror that occurred immediately prior to trial, Emily Blevins, who would have been removed when Patterson was placed on the jury, served on the jury. (RR45: 21-23).

This Court has specifically held that "[u]nder Batson, courts are not to be occupied principally with the extent to which members of any identifiable race were actually represented on the jury, but with whether the State was racially motivated in the exercise of its peremptory challenges against even one veniremember of discernible race." *Linscomb v. State*, 829 S.W.2d 164, 167 (Tex. Crim. App. 1992).

Moreover, in attempting to create a racially diverse jury, the presiding judge wholly abdicated its duty to properly conduct a *Batson* analysis. As stated above, under *Batson*, a defendant must first make a prima facie showing that the prosecution exercised its peremptory challenges on the basis of race. *Reed*, 555 F.3d at 368. If the defendant makes that showing, the burden shifts to the prosecutor to present race-neutral explanations for striking the jurors in question. *Id.* The court must then determine whether the defendant has carried his burden of proving purposeful discrimination. *Id.*

Here, the presiding judge sustained a *Batson* challenge *without* finding that the State's explanations were mere pretexts. Indeed, the presiding judge found the prosecutors to be credible individuals and noted that their concerns about Patterson were well-founded. The presiding judge's decision turned solely on the composition of the jury and the fact that the State had struck seven minority veniremembers. To the extent that *Miller-El* suggests that the court should take into consideration the use of the State's strikes, that factor alone is not dispositive. *See Watkins*, 245 S.W.3d at 451. Instead, as this Court explained in *Watkins*, in *Miller-El* it was the combined weight of all of the factors suggesting pretext that ultimately convinced the Supreme Court that the trial court erred in finding that the third step had not been met. *Id.*

26

Furthermore, in creating a racially diverse jury, the presiding judge effectively turned *Batson* on its head. Although the State acknowledges that this Court has held that in light of a *Batson* violation, the trial court may fashion its own remedy, such a remedy should not trample on the rights of jurors not to be excluded based solely on their race. *See Curry v. Bowman*, 885 S.W.2d 421, 424-25 (Tex. Crim. App. 1993). Appellant's challenge to the State's use of a peremptory challenge against Patterson was not sustained until *after* the jury was selected in this case. Consequently, this is not a case where a prospective juror was placed back onto the panel in the middle of jury selection. In order for the presiding judge to effectuate his racially diverse jury, he actively placed a veniremember on the jury because he was a minority and removed a juror because she was white. This action directly violates one of the rights that *Batson* seeks to protect – the right of the individual juror not to be excluded from jury service in violation of the Equal Protection Clause of the Fourteenth Amendment. *See id.* (citing *Powers v. Ohio*, 499 U.S. 400, 409 (1991)).

In sum, the presiding judge engaged in blatant judicial activism by attempting to create a racially diverse jury in direct contradiction to *Batson* and its progeny, and even went so far as to violate rights protected by the Fourteenth Amendment. Moreover, in "sustaining" the *Batson* challenge, the presiding judge did not make the necessary finding that the State's race-neutral explanations that were supported by the record were mere pretexts. Indeed, the presiding judge made his ruling without witnessing individual voir dire in this case. Contrary to appellant's assertions, this judicial activism on the part of the presiding judge does not show that the State's race-neutral explanations for exercising

27

peremptory strikes against McCraney, Vation, Rivera, Riser, Long, Jackson, and Morrison were disingenuous.

In any event, even if the presiding judge had, in fact, found the State's reasons for exercising its peremptory challenge against Patterson were pretextual, the striking of Patterson should merely be factored into the totality of the circumstances in deciding whether the trial court erred in failing to find that the seven prospective jurors at issue in this case were excluded based on their race. *See Watkins*, 245 S.W.3d at 455 (holding that the fact that the trial court sustained a *Batson* objection to the State's exercise of a peremptory challenge to one minority was merely one factor to be considered in determining whether the State's explanations for striking the other minorities were pretexts).

## Comparative Juror Analysis

Appellant argues that the prosecutor's stated reasons are a pretext for race discrimination because non-minority jurors with the same characteristic were not struck by the State. At the *Batson* hearing, the defense did not, however, cross-examine the prosecutor about his reasons. (RR38: 1-80).

Appellant should not be permitted to raise this claim for the first time on appeal. Appellant made a serious allegation of intentional race discrimination against the prosecutor at trial, which can result in severe personal and professional repercussions. He bases these allegations on the fact that the prosecutor did not strike similarly situated non-minority jurors. By failing to make this claim at trial, he denied the prosecutor the

28

opportunity to make a record about why he did not strike other jurors, and he denied the trial court an opportunity to rule on the claim.

Whether a prosecutor intended to discriminate on the basis of race is a question of historical fact that is properly decided in the trial courts. *See Hernandez v. New York*, 500 U.S. 352, 367 (1991). Instead, appellant asks this Court to find facts and make credibility determinations based on a record that appellant has rigged in his favor. State procedural rules demand that allegations of disparate treatment by the prosecutor be raised in the trial court, so that they can be properly answered by the State and decided by that court. *See* TEX. R. APP. P. 33.1(a); *Watkins*, 245 S.W.3d at 457-58 (Keller, P.J., concurring); *Young v. State*, 826 S.W.2d 141, 147-49 (Tex. Crim. App. 1991) (Campbell, J., dissenting).

The State acknowledges this Court's majority opinion in *Young* that a non-capital defendant is not required to raise a comparison analysis in the trial court to have evidence of such considered on appeal. *Young*, 826 S.W.2d at 146. The Fifth Circuit has applied *Young* to a capital case and criticized this Court's inconsistency in its application of the contemporaneous objection rule to *Batson* claims in capital cases. *Reed*, 555 F.3d at 370.

It is time for this Court to explicitly overrule *Young*. *See generally Watkins*, 245 S.W.3d at 457-58 (Keller, P.J., concurring); *Young*, 826 S.W.2d at 147-49 (Campbell, J., dissenting). Its majority - and the courts that rely on it - view the comparison analysis as merely an appellate argument that can be fairly addressed for the first time on appeal. In truth, it is a factual allegation of unfair treatment between jurors. If raised in the trial court, the prosecution's response could provide additional facts for the appellate court to

29

consider when it reviews the *Batson* ruling. If raised at trial successfully, the trial court can cure the error before trial even starts. If not raised in trial, the prosecutor's mental process and the trial judge's credibility decision concerning the non-strikes are simply omitted from the record. Jurors are not products of a set of cookie cutters, and the *unexplained* decision not to strike a non-minority juror who shares one trait in common with a minority juror is held against the State on appellate review. *See, e.g., Miller-El*, 545 U.S. at 244 (stating, "If, indeed, Fields's thoughts on rehabilitation did make the prosecutor uneasy, he should have worried about a number of white panel members he accepted with no *evident* reservations."). Giving the prosecutor an opportunity to explain his voir dire strategy and giving the trial court an opportunity to rule on it is critical to a fair appellate review.

At the very least, presumptions should be made in the prosecutor's favor on appeal when the matter has not been discussed at trial, much like the presumption against a finding of ineffective assistance of defense counsel. When a defense attorney is accused of violating his client's constitutional right to counsel, this Court has stated that "counsel should ordinarily be accorded an opportunity to explain her actions before being condemned as unprofessional and incompetent." *Bone v. State*, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002). A prosecutor's credibility is the heart of *Batson* review, and he or she should be accorded no less of an opportunity to explain his or her actions before being condemned as a racist and a liar.

30

This Court should conclude that the comparison analysis is not preserved for review or, alternatively, presume that the comparison analysis favors the prosecutor absent affirmative evidence on the record.

In any event, appellant has wholly failed to establish that the potential jurors who are the focus of his *Batson* challenge were similarly situated to non-minority potential jurors who were not struck.

### Shaven McCraney

On appeal, appellant alleges that the record shows that the State's explanations for exercising its peremptory challenge against Shaven McCraney were merely a pretext because she listed herself as a "2" and all jurors accepted by the State were "2s." (App. Brief, p. 25). Appellant misstates the record. As stated above, McCraney listed herself as a "3" on the questionnaire, and the State struck all potential jurors who listed themselves as a "3," regardless of race. (RR38: 8, 26, 30, 35-36, 69; RR55: McCraney Questionnaire, p. 1).

### Mattie Vation

Appellant further alleges that the record shows that the State's explanations for exercising its peremptory challenge against Mattie Vation were merely a pretext because (1) she listed herself as a "2" and every juror accepted by the State was a "2"; and (2) she listed herself as a "5" on the 10-point scale as did Elaine Clements and Kelly McDonald, who were accepted by the State. (App. Brief, p. 27).

Appellant is correct that Vation listed herself as a "2" and that all jurors accepted by the State were "2s." Appellant ignores, however, that Vation also affirmatively stated

31

on her questionnaire that she opposed the death penalty; none of the jurors accepted by the State, including Clements and McDonald, made the same affirmation. (RR55: Vation Questionnaire, p. 1; Clements Questionnaire, p. 1; McDonald Questionnaire, p.1).

*Angelita Rivera*

Appellant also alleges that the record shows that the State's explanations for exercising its peremptory challenge against Angelita Rivera were merely a pretext because (1) Alex Folz, Jerome Williams, and William Kreighbaum, who all sat on the jury, also voiced concerns about the death penalty; and (2) she listed herself a "2" and ranked herself an "8" on the 10-point scale, and Williams, Kimberly Morris, Folz, Clements, and McDonald, who were accepted by the State, were "7s" and "8s." (App. Brief, p. 29).

None of the jurors identified by appellant vacillated in the same manner as Rivera. As appellant correctly states, Rivera ranked herself an "8" on the 10-point scale, but she also affirmatively stated on the first page of her questionnaire that she was *not* in support of the death penalty. (RR55: Rivera Questionnaire, pp. 1, 4). None of the jurors identified by appellant made the same affirmation. (RR55: Williams Questionnaire, p. 1; Folz Questionnaire, p. 1; Clement's Questionnaire, p. 1; McDonald Questionnaire, p. 1; RR56: Morris Questionnaire, p. 1; RR57: Kreighbaum Questionnaire, p. 1).

Moreover, as stated above, although Rivera stated during voir dire that she knew that the law permitted the death penalty and that she could follow the law, she repeatedly admitted that she had religious and moral convictions against the death penalty. (RR13: 175-77, 180). Furthermore, when she stated during voir dire that she could participate in

32

a process that led to someone's death, the prosecutor commented that she seemed hesitant in her answer. (RR11: 187). Rivera responded, "The hesitation is that someone can participate in putting somebody to death is just kind of, those words just kind of – you know, kind of slap you." (RR13: 187).

In contrast, Jerome Williams stated during voir dire that despite his hesitation when responding to whether the State of Texas needs a death penalty, he supported the death penalty in cases involving an intentional murder. (RR7: 29, 66). Indeed, appellant challenged Williams for cause on the ground that he would automatically impose the death penalty if he found appellant guilty. (RR7: 90). Alex Folz stated that although he would not push for the existence of a death penalty, he was in favor of the death penalty. (RR13: 89-90; RR55: Folz Questionnaire, p. 1). Finally, William Kreighbaum did not think that the death penalty should be broadened to apply to all murder cases or that the death penalty should be automatically imposed but ranked himself a "10" on the 10-point scale. (RR32: 26, 48; RR57: Kreighbaum Questionnaire, pp. 1, 4). Consequently, Rivera was not, in fact, similarly situated to these non-minority jurors.

In addition, Rivera was not similarly situated to Kimberly Morris, Elaine Clements, or Kelly McDonald. Kimberly Morris did not vacillate in her response that the death penalty was appropriate in cases involving intentional murder. (RR22: 155-56). Elaine Clements stated that she would be fair to both sides and would not run from a death penalty case. (RR10: 99). Kelly McDonald stated that although she studied under a known death penalty opponent in college, she was not an opponent of the death penalty. (RR14: 206-11). These responses are not remotely similar to Rivera's vacillating

33

remarks and marked hesitation in responding to questions regarding her support of the death penalty.

*Curtis Riser*

On appeal, appellant alleges that the record shows that the State's explanations for exercising its peremptory challenge against Curtis Riser were merely a pretext because (1) Folz, Williams, and Kreighbaum also voiced concerns over the death penalty; and (2) William Stinson, who was accepted by the State, also thought that voluntary intoxication was a sufficient mitigating circumstance. (App. Brief, pp. 30-31).

First and foremost, as stated above, Riser listed himself as a "3" on the questionnaire, and the State struck all potential jurors who listed themselves as a "3," regardless of race. (RR38: 8, 26, 30, 35-36, 69; RR55: Riser Questionnaire, p. 1). In contrast, Folz, Williams, and Kreighbaum were "2s." (RR55: Folz Questionnaire, p. 1; Williams Questionnaire, p. 1; RR57: Kreighbaum Questionnaire, p. 1). Furthermore, Riser ranked himself a "1" on the 10-point scale, whereas Folz ranked himself a "7," Williams ranked himself an "8," and Kreighbaum ranked himself a "10." (RR55: Riser Questionnaire, p. 4; Folz Questionnaire, p. 4; Williams Questionnaire, p. 4; RR57: Kreighbaum Questionnaire, p. 4). Consequently, Riser was not in fact similarly situated with these non-minority jurors. Instead, Riser was more closely situated with non-minority potential juror Johnny Sanford, who was also a "3" and a "1"; the State also exercised a peremptory challenge against Sanford. (RR38: 30; RR55: Sanford Questionnaire, pp. 1, 4).

34

Nor was Riser similarly situated to Stinson. Appellant misstates Stinson's beliefs on voluntary intoxication in an effort to support his argument. Stinson did not state that he believed that voluntary intoxication was a sufficient mitigating circumstance; instead Stinson stated that he had a problem considering intoxication as mitigating but that he thought it was "reasonable." (RR27: 172-74). Riser, on the other hand, stated that he believed voluntary intoxication should be considered because a person would not commit a crime otherwise. (RR55: Riser Questionnaire, p. 6).

*Agwana Long*

Appellant alleges that the record shows that the State's explanations for exercising its peremptory challenge against Agwana Long were merely a pretext because (1) Stinson also thought that voluntary intoxication was a sufficient mitigating circumstance, (2) she was a "2" and ranked herself a "7" on the 10-point scale, and the State accepted Morris and Folz who also ranked themselves a "7," and Clements and McDonald, who ranked themselves a "5"; and (3) Folz, Williams, and Kreighbaum also voiced concerns over the death penalty. (App. Brief, pp. 32-33).

As stated above, appellant misstates Stinson's beliefs on voluntary intoxication in an effort to support his argument. Stinson did not state that he believed that voluntary intoxication was a sufficient mitigating circumstance; instead Stinson stated that he had a problem considering intoxication as mitigating but that he thought it was "reasonable." (RR27: 172-74). Long, on the other hand, affirmatively stated that a person's use of drugs or alcohol at the time of the offense would automatically prevent her from

35

assessing the death penalty. (RR57: Long Questionnaire, p. 6). Consequently, appellant has not shown that Long was similarly situated to Stinson.

Moreover, appellant has not shown that Long was similarly situated to Clements, McDonald, Folz, Williams, or Kreighbaum. Despite the fact that Long ranked herself as a "7" on the 10-point scale, Long was adamant that she thought life without parole was the better punishment option. On page 5 of her questionnaire, Long stated that she thought a lifetime in prison was the equivalent to the death penalty and that she was "strongly in favor" of life without parole because she believed it would force the defendant to think about the crime and "deal with it." (RR57: Long Questionnaire, p. 5). Long expressed these same beliefs during voir dire. (RR30: 41, 54-56).

In contrast, Jerome Williams stated during voir dire that despite his hesitation when responding to whether the State of Texas needs a death penalty, he supported the death penalty in cases involving an intentional murder. (RR7: 29, 66). Indeed, appellant challenged Williams for cause on the ground that he would automatically impose the death penalty if he found appellant guilty. (RR7: 90). Alex Folz stated that although he would not push for the existence of a death penalty, he was in favor of the death penalty. (RR13: 89-90; RR55: Folz Questionnaire, p. 1). William Kreighbaum did not think that the death penalty should be broadened to apply to all murder cases or that the death penalty should be automatically imposed; Kreighbaum also ranked himself a "10" on the 10-point scale. (RR32: 26, 48; RR57: Kreighbaum Questionnaire, pp. 1, 4). Elaine Clements stated that she would be fair to both sides and would not run from a death penalty case. (RR10: 99). Finally, Kelly McDonald stated that although she studied

36

under a known death penalty opponent in college, she was not an opponent of the death penalty. (RR14: 206-11). Consequently, Long was not, in fact, similarly situated to these non-minority jurors.

*Betty Jackson*

Appellant further alleges that the State's explanations for exercising its peremptory challenge against Betty Jackson were merely a pretext because Folz, Williams, and Kreighbaum also voiced concerns over the death penalty. (App. Brief, p. 34).

First and foremost, as stated above, Jackson listed herself as a "3" on the questionnaire, and the State struck all potential jurors who listed themselves as a "3," regardless of race. (RR38: 8, 26, 30, 35-36, 69; RR57: Jackson Questionnaire, p. 1). In contrast, Folz, Williams, and Kreighbaum were "2s." (RR55: Folz Questionnaire, p. 1; Williams Questionnaire, p. 1; RR57: Kreighbaum Questionnaire, p. 1). Moreover, as also stated above, throughout her questionnaire and voir dire, Jackson repeatedly stated that she believed the death penalty was only appropriate in cases involving the sexual assault or murder of a child, and that she was otherwise opposed to the death penalty. (RR34: 23-26, 39-40, 47-49; RR57: Jackson Questionnaire, pp. 1, 4).

In contrast, Jerome Williams stated during voir dire that despite his hesitation when responding to whether the State of Texas needs a death penalty, he supported the death penalty in cases involving an intentional murder. (RR7: 29, 66). Indeed, appellant challenged Williams for cause on the ground that he would automatically impose the death penalty if he found appellant guilty. (RR7: 90). Alex Folz stated that although he

37

would not push for the existence of a death penalty, he was in favor of the death penalty. (RR13: 89-90; RR55: Folz Questionnaire, p. 1). William Kreighbaum did not think that the death penalty should be broadened to apply to all murder cases or that the death penalty should be automatically imposed but ranked himself a "10" on the 10-point scale. (RR32: 26, 48; RR57: Kreighbaum Questionnaire, pp. 1, 4). Appellant has not, therefore, shown that Jackson was similarly situated to Williams, Folz, or Kreighbaum.

### Dedrick Morrison

Finally, appellant alleges that State's explanations for exercising its peremptory challenge against Dedrick Morrison were merely a pretext because (1) he listed himself as a "2," and all jurors accepted by the State were "2s"; and (2) Stinson also thought that voluntary intoxication was a sufficient mitigating circumstance. (App. Brief, p. 38).

Appellant is correct that Morrison listed himself as a "2" and that all jurors accepted by the State were "2s." Appellant ignores, however, that Morrison also affirmatively stated on his questionnaire that he opposed the death penalty; none of the jurors accepted by the State made the same affirmation. (RR55: Williams Questionnaire, p. 1; Clements Questionnaire, p. 1; Folz Questionnaire, p. 1; McDonald Questionnaire, p. 1; RR56: Morris Questionnaire, p. 1; Ferreira Questionnaire, p. 1; Woodward Questionnaire, p. 1; RR57: Zaidel Questionnaire, p. 1; Stinson Questionnaire, p. 1; Kreighbaum Questionnaire, p. 1; Winfield Questionnaire, p. 1; Vessels Questionnaire, p. 1; Blevins Questionnaire, p. 1; Fiddick Questionnaire, p. 1; McElroy Questionnaire, p. 1).

Furthermore, as stated above, appellant misstates Stinson's beliefs on voluntary intoxication in an effort to support his argument. Stinson did not state that he believed

38

that voluntary intoxication was a sufficient mitigating circumstance; instead Stinson stated that he had a problem considering intoxication as mitigating but that he thought it was "reasonable." (RR27: 172-74). Morrison, on the other hand, affirmatively stated that a person's use of drugs or alcohol at the time of the offense would automatically prevent him from assessing the death penalty. (RR57: Morrison Questionnaire, p. 8). Consequently, appellant has not shown that Morrison was similarly situated to Stinson.

### Conclusion

Appellant has wholly failed to show that any of the potential jurors that are the focus of his first seven issues on appeal were similarly-situated to non-minority jurors that were not struck by the State.

### Jury Shuffle, Disparate Questioning, and Formal Policy of Discrimination

Appellant does not argue on appeal that the State utilized its option to shuffle the jury panel in a manner that supports an inference of racial discrimination, that the State directed questions designed to set up peremptory challenges at a disproportionate rate to minority potential jurors, or that the record shows that the county had followed a formal policy of discrimination. (App. Brief, pp. 38-42).

The record before this Court shows that appellant was the only party to request a shuffle in this case. (CR[Supp1]: 96; RR4: 10). Consequently, this factor weighs in favor of the State. Moreover, the record before this Court is devoid of any evidence of a formal policy of discrimination at the time of appellant's trial. This factor too weighs in favor of the State. Finally, appellant does not point to any instances of disparate questioning by the State. Indeed, a review of the State's voir dire of all potential jurors

39

who ranked themselves a "3" on their questionnaire shows that prospective jurors that showed ambivalence towards the death penalty all received relatively the same description of the death penalty; most descriptions included the words "dead," "death warrant," and "gurney." (RR9: 187; RR10: 23; RR14: 21-22; RR18: 129; RR34: 20-21). Indeed, some of these prospective jurors were routinely asked, despite their race, to look at the defendant and then determine if they could assess the death penalty. (RR9: 192-93; RR10: 18-19; RR13: 249-50; RR14: 22-23). Consequently, there has been no showing, and appellant has not even attempted to show, that the prosecutor engaged in disparate questioning in this case. *Compare Miller-El*, 545 U.S. at 257 (prosecutors used a graphic script when describing the death penalty to African-American jurors who were ambivalent to the death penalty more often then with white jurors who also were ambivalent).

**Conclusion**

Appellant has not established by a preponderance of the evidence that the State's exercise of its peremptory challenges against the seven minority veniremembers were the product of racial discrimination. Although the State used eight of its fifteen strikes to strike minority veniremembers, appellant has not shown that the State's explanations apply equally to non-minority veniremembers that the State did not challenge, that the State improperly utilized its option to shuffle the jury, that the State directed questions expressly designed to elicit grounds for peremptory challenges disproportionately, or that there was a formal policy to exclude minorities from jury service. Moreover, the fact that the trial court placed Patterson on the jury in a misguided attempt to create a racially

40

diverse jury should not factor against the State when assessing the plausibility of its race-neutral reasons for exercising its peremptory challenges.

This is not a case, like *Miller-El*, where every relevant factor firmly supports a conclusion of pretext. The record before this Court supports the trial court's resolution of the fact question of pretext. Consequently, the trial court did not err in denying appellant's *Batson* challenges to the State's exercise of peremptory challenges against prospective jurors McCraney, Vation, Rivera, Riser, Long, Jackson, and Morrison. *See Watkins*, 245 S.W.3d at 456-57 (holding that the trial court did not err in denying a *Batson* challenge to the State's use of peremptory challenges against two African-American veniremembers where the State exercised its peremptory challenges against African-American veniremembers at a grossly disproportionate rate as compared to non-African-Americans, the State directed at least one line of questioning designed to ferret out objectionable jurors toward African-American veniremembers at twice the rate one would expect from random selection, the State's reasons were manifestly race-neutral, the State struck other, non-African-American veniremembers for the same reason it struck one, and it was apparent that the other was struck because she gave an answer that was different from, and more objectionable to the State than, the answers it received from non-African-Americans to the same line of questioning). This Court should, therefore, overrule appellant's first seven issues on appeal.

41

### RESPONSE TO ISSUES 8 THROUGH 23: THE TRIAL COURT DID NOT ERR IN DENYING APPELLANT'S CHALLENGES FOR CAUSE.

In issues eight through twenty-three, appellant contends that the trial court erred in denying his challenges to sixteen prospective jurors. In so doing, appellant argues, the trial court violated his right to a fair and unbiased jury under the United States Constitution, the Texas Constitution, and article 35.16(c)(2) of the Texas Code of Criminal Procedure.

### *Appellant Has Not Preserved His Complaints Regarding Prospective Jurors Lance Bedford, Patricia Hodges, Clarence Winfield, and Emily Blevins.*

On appeal, appellant alleges that the trial court erred in denying his challenges for cause to Lance Bedford (Issue Seventeen), Patricia Hodges (Issue Twenty), Clarence Winfield (Issue Twenty-one), and Emily Blevins (Issue Twenty-three). Appellant did not, however, challenge these jurors for cause in the trial court.[5] (RR26: 181; RR33: 20; RR34: 257; RR35: 189).

As a prerequisite to presenting a complaint for appellate review, the record must show that the complaint was made to the trial court by a timely request, objection, or motion and that the trial court either (1) ruled on the request, objection, or motion; or (2) refused to rule on the request, objection, or motion, and the complaining party objected to the refusal. TEX. R. APP. P. 33.1 (a). This Rule encompasses the concept of "party

---

[5] Appellant claims that his argument regarding Lance Bedford is preserved for this Court's review. In an effort to show that he challenged Bedford for cause, appellant gives what he claims to be a direct quote from the record, in which it appears that defense counsel is actually challenging Bedford for cause. (App. Brief, p. 87). Appellant has, however, altered the name contained in the direct quote to make it appear that Bedford was the subject of that particular challenge for cause; a review of the record shows that the challenge for cause that is quoted was actually regarding John Cantwell. (RR38: 39).

42

responsibility." *Pena v. State*, 285 S.W.3d 459, 463 (Tex. Crim. App. 2009). The complaining party bears the responsibility of clearly conveying to the trial judge the particular complaint, including the precise and proper application of the law as well as the underlying rationale. *Id.* at 463-64. In order to preserve for review a complaint that a particular prospective juror should have been struck for cause, the record must show that appellant asserted a clear and specific challenge for cause. *Escamilla v. State*, 143 S.W.3d 814, 822 (Tex. Crim. App. 2004); *Sells v. State*, 121 S.W.3d 748, 758 (Tex. Crim. App. 2003).

Because appellant did not challenge for cause prospective jurors Lance Bedford, Patricia Hodges, Clarence Winfield, and Emily Blevins during voir dire, appellant has not preserved his arguments regarding these prospective jurors. *See Escamilla*, 143 S.W.3d at 821-22. Appellant's seventeenth, twentieth, twenty-first, and twenty-third issues should, therefore, be overruled.

### *The Trial Court Did Not Err in Denying Appellant's Challenges for Cause.*

Harm from the erroneous denial of a defense challenge for cause occurs under the following circumstances: (1) a defendant exercises a peremptory challenge on a prospective juror whom the trial court erroneously failed to excuse for cause at the defendant's request, (2) the defendant uses all of his statutorily-allotted peremptory challenges, and (3) the trial court denies the defendant's request for an additional peremptory challenge to use on another prospective juror whom the defendant identifies as "objectionable" and who actually sits on the jury. *Saldano v. State*, 232 S.W.3d 77, 91 (Tex. Crim. App. 2007). When all these conditions are met, the defendant has been

43

wrongfully deprived of one of his statutory peremptory challenges in that he was forced to use a peremptory challenge to remove a prospective juror who should have been removed for cause. *See id.* If the defendant received additional peremptory challenges beyond the fifteen allotted by statute, he must show that the trial court erroneously denied a number of defense challenges for cause equal to at least one more than the number of additional peremptory challenges granted in order to demonstrate harm. *Escamilla*, 143 S.W.3d at 821.

After the trial court denied his challenges for cause, appellant used peremptory challenges to remove prospective jurors Jon Desmond, Helen Noble, Billy Henry, John Maguire, Lisa Davison, Bruce McDonald, Teresa Randleas, John Cantwell, Alexander Konkle, Lance Bedford, Lyle Livingston, and Jennifer Stockton. (RR38: 7, 31-37, 40-43). After appellant used his last statutorily-provided challenge to strike a prospective juror that he had not challenged for cause, appellant was granted an additional strike. (RR33: 85; RR38: 69). Appellant used the additional strike to strike Clarence Winfield, whom he had not challenged for cause, and requested an additional strike, which was denied; Winfield was seated on the jury, and appellant identified him as "objectionable." (RR34: 257; RR38: 80). Later, appellant requested an additional strike to remove John Vessels. (RR38: 81). That strike was denied, and Vessels was seated on the jury. (RR38: 81). Appellant also requested an additional strike to remove prospective juror Emily Blevins, who he explained was "objectionable." (RR35: 189; RR38: 82). Appellant's request was denied and Blevins was seated on the jury. (RR38: 82). Consequently, although appellant does not identify on appeal which of the seated jurors

44

was "objectionable," during voir dire, he identified Vessels, Winfield, and Blevins as objectionable jurors who were seated on the jury. Moreover, because appellant was granted one additional peremptory strike, he must show that the trial court erroneously denied at least two of his challenges for cause. *See Escamilla*, 143 S.W.3d at 821. Appellant has not met this burden.

A prospective juror may be challenged for cause if, among other reasons, he possesses a bias or prejudice in favor of or against the defendant or he possesses a bias against an aspect of the law upon which the State or the defendant is entitled to rely. *See* TEX. CODE CRIM. PROC. ANN. art. 35.16(a)(9), (b)(3), (c)(2) (Vernon 2006). A "bias against the law" is the refusal to consider or apply the relevant law. *Sadler v. State*, 977 S.W.2d 140, 142 (Tex. Crim. App. 1998). Before a prospective juror can be excused for bias, the law must be explained to him and he must be asked whether he can follow that law regardless of his personal views. *Threadgill v. State*, 146 S.W.3d 654, 667 (Tex. Crim. App. 2004). An appellant does not meet his burden of establishing that his challenge for cause is proper until he has shown that the prospective juror understood the requirement of the law and could not overcome his prejudice well enough to follow it. *See Feldman v. State*, 71 S.W.3d 738, 747 (Tex. Crim. App. 2002).

When reviewing a trial court's decision to deny a challenge for cause, the appellate court looks at the entire record to determine if there is sufficient evidence to support the ruling. *Id.* at 744. The appellate court reviews a trial court's ruling with "considerable" or "great" deference because the trial judge is in the best position to evaluate the prospective juror's demeanor and was present to observe the juror and listen

45

to his or her tone of voice. *Saldano*, 232 S.W.3d at 91; *Threadgill*, 146 S.W.3d at 667. Particular deference is given when the prospective juror's answers are vacillating, unclear, or contradictory. *Threadgill*, 146 S.W.3d at 667. The appellate court reverses a trial court's ruling on a challenge for cause "only if a clear abuse of discretion is evident." *Colburn v. State*, 966 S.W.2d 511, 517 (Tex. Crim. App. 1998). When the prospective juror is persistently uncertain about his or her ability to follow the law, the reviewing court does not second guess the trial court. *Id.*

**Issue 8: Jon Desmond**

In his eighth issue, appellant contends that prospective juror Jon Desmond should have been struck for cause because he (1) would always answer the first special issue[6] "yes" after finding appellant guilty; and (2) did not consider evidence of voluntary intoxication to be mitigating. (App. Brief, pp. 43-47).

In the trial court, appellant challenged Desmond solely on the ground that he did not consider evidence of voluntary intoxication to be mitigating. (RR9: 166). Consequently, appellant's argument that Desmond should have been struck because he would always answer the first issue "yes" is not properly before this Court. TEX. R. APP. 33.1(a).

In his juror questionnaire, Desmond indicated that he did not believe that voluntary intoxication should be considered when determining whether there were

---

[6] The first special issue asks "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(b)(1) (Vernon Supp. 2010).

46

sufficient mitigating circumstances to warrant a life sentence rather than a death sentence;[7] during his individual voir dire, Desmond stated that he still agreed with that response. (RR8: 164-65). Elsewhere during individual voir dire, Desmond indicated that he would be able to consider mitigating evidence. At one point, Desmond stated:

> Again, I'll say this again. There are exceptions to every rule. When I get to special issue number three, I am open to listen to all the arguments, go back through all the evidence, and if there is something that was missed and I feel that that person, even though he was found guilty and we went through special issues one and two, we got to number three, do I believe that he automatically should just be given the death penalty? No, there is always – There is always hope, let's put it that way.

(RR9: 161). Then, after defense counsel informed Desmond that each side needed a juror that would give mitigation evidence proper consideration, Desmond responded:

> Again, I'll say that I think of myself as a very fair person. I'll listen to all the arguments. And if I feel that the death penalty needs to be imposed, I will go that route. If I feel that there is something that is not quite right there, then I would not have any problem with going with life imprisonment.

(RR9: 162-63).

A juror is not required to consider any specific type of evidence or specific circumstances as either mitigating or aggravating, but he must be able to consider all evidence that he does find mitigating or aggravating in answering the special issues. *Gardner v. State*, 306 S.W.3d 274, 299 (Tex. Crim. App. 2009). Consequently, the trial court did not abuse its discretion in overruling appellant's challenge for cause based on

---

[7] During voir dire, all parties referred to the mitigation issue as the third special issue. Tex. Code Crim. Proc. Ann. art. 37.071, § 2(e)(1). At trial, however, there were only two special issues; mitigation was the second special issue in the jury charge. (CR: 636-43).

47

Desmond's opinion that evidence of voluntary intoxication was not *per se* mitigating. *See id.* at 299-300.    Moreover, Desmond indicated that he could consider mitigating evidence, which is all that is constitutionally required. *See Cordova v.* State, 733 S.W.2d 175, 189 (Tex. Crim. App. 1987) (citing *Eddings v.* Oklahoma, 455 U.S. 104 (1982), and *Lockett v. Ohio*, 438 U.S. 586 (1978)), and rejecting the argument that the Constitution mandates that jurors give weight to any particular fact that might be offered in mitigation); *see also Coleman v. State*, 881 S.W.2d 344, 352 (Tex. Crim. App. 1994) (holding that the trial court did not err in denying a challenge for cause for an inability to consider mitigating evidence where the record showed that the prospective juror could listen to the evidence with an open mind).

**Issue 9: Helen Noble**

In his ninth issue, appellant alleges that prospective juror Helen Noble should have been struck for cause because she (1) would always answer special issue one "yes"; (2) did not consider age, background, or intoxication to be mitigating evidence; (3) would always find a police officer more credible than other witnesses; and (4) had heard about the crimes on television and discussed them with her co-workers. (App. Brief, pp. 47-50).

In the trial court, appellant challenged Noble solely on the ground that she would always answer special issue number one "yes." (RR15: 102).    Consequently, the remainder of appellant's arguments are not properly before this Court. *See* TEX. R. APP. P. 33.1(a).

48

The record before this Court supports the trial court's implicit finding that Noble would, in fact, give proper consideration to the first special issue. In her questionnaire, Noble stated that a person who is convicted of a death-eligible crime should be sentenced to death. (RR15: 71-72). During individual voir dire, however, Noble explained that she answered that question based on her knowledge of the law prior to voir dire; prior to voir dire, she thought that the death penalty would be automatically imposed upon a finding of guilt. (RR15: 72-74). Moreover, although Noble believed that the death penalty should, in fact, be mandatory, in response to a hypothetical from the State, Noble agreed that a juror who automatically answered "yes" to the first special issue would not be following their oath as a juror. (RR15: 53, 74). The totality of Noble's voir dire responses indicates that her answer to the first special issue would not be dictated by the guilty verdict, but would, rather, be determined by an examination of all the evidence.

Moreover, to the extent that Noble's remarks to defense counsel conflicted with her agreement with the State's hypothetical, the trial court was in the best position to resolve this conflict. *See Threadgill*, 146 S.W.3d at 667; *Feldman*, 71 S.W.3d at 748 (upholding the denial of a challenge for cause where, depending on who asked the question, the prospective juror vacillated on whether she would automatically return a "yes" answer to the future dangerousness issue).

## Issue 10: Billy Henry

In his tenth issue, appellant argues that prospective juror Billy Henry should have been struck for cause because he (1) would always find a police officer more credible than any other witness, (2) would not give proper consideration to mitigating evidence,

49

(3) would automatically give the death penalty if he found appellant guilty, and (4) strongly believed in the death penalty. (App. Brief, pp. 51-53).

At trial, appellant only challenged Henry on the grounds that he would always find a police officer more credible than other witnesses and he would not give proper consideration to mitigating evidence. (RR15: 194-95). Consequently, the remainder of appellant's arguments have not been preserved. *See* TEX. R. APP. P. 33.1(a).

### (1) Credibility of police officers

A defendant may insist on jurors who will impartially judge the credibility of witnesses. *Hernandez v. State*, 563 S.W.2d 947, 950 (Tex. Crim. App. 1978). A prospective juror who believes that a police officer would never lie under oath has an impermissible bias against the defendant under article 35.16(a)(9) of the Texas Code of Criminal Procedure. TEX. CODE CRIM. PROC. ANN. art. 35.16(a)(9); *Lane v. State*, 822 S.W.2d 35, 42 (Tex. Crim. App. 1991).

The record shows that although Henry indicated in his questionnaire that he believed police officers are more likely to tell the truth than other witnesses, he assured the State during voir dire that he would wait to assess the credibility of the witnesses once the witnesses were on the stand. (RR15: 132-33). During questioning by defense counsel, Henry stated, however, that police officers were more honest than others, and that he would side with a police officer's version of events over a defendant's version. (RR15: 176-78). After appellant challenged Henry for cause, the trial court brought Henry back into the courtroom and admonished him that a witness's credibility should be

determined from the stand. (RR15: 194-95, 200-02). Henry then stated that he could give every witness a "clean slate" regardless of their occupation. (RR15: 204).

Here again, this Court should defer to the trial court's resolution of the prospective juror's seemingly contradictory responses. *See Feldman*, 71 S.W.3d at 744. Given Henry's assurances that he could follow the law and not automatically believe a police officer's testimony, the trial court could have reasonably concluded that Henry was not biased against appellant. *See Lane*, 822 S.W.2d at 45 (holding that the trial court did not abuse its discretion in denying a challenge for cause where, although the prospective juror gave some responses indicating that she was predisposed to always believe police officers, she also said she would evaluate a police officer's credibility as she would any other witness's).

**(2) Special Issue Three**

Appellant further contends that Henry should have been struck for cause because his statements both in his questionnaire and during voir dire show that he would not give meaningful consideration to *any* mitigating evidence presented by appellant. (App. Brief, p. 53). In making this argument, appellant completely ignores the fact that after Henry was challenged for cause, the trial court brought him back into the courtroom and instructed him that he was required to give mitigating evidence meaningful consideration, and Henry assured the trial court that he would keep an open mind and give mitigating evidence meaningful consideration. (RR15: 202-04). Given Henry's assurances that he could follow the law, the trial court could have reasonably determined that Henry would follow the law, as required. *See Feldman*, 71 S.W.3d at 744.

51

**Issue 11: John Maguire, Jr.**

In his eleventh issue, appellant contends that prospective juror John Maguire, Jr. should have been struck for cause because he (1) would automatically answer "yes" to the first special issue, (2) rated himself a "ten," and (3) would not give mitigating evidence meaningful consideration. (App. Brief, pp. 54-57).

At trial, appellant only challenged Maguire on the ground that he was mitigation-impaired. (RR17: 84). Appellant has not, therefore, preserved his other two arguments for this Court's review. *See* TEX. R. APP. P. 33.1(a).

On appeal, appellant alleges that the trial court should have struck Maguire for cause because he did not consider evidence of voluntary intoxication or appellant's background or age as mitigating, because he would not consider testimony from appellant's family, and because he said that he would have a hard time answering the third special issue "yes." (App. Brief, pp. 54-56). (RR17: 63-69, 80-81).

As stated above, a juror is not required to consider any specific type of evidence or specific circumstances as either mitigating or aggravating, but he must be able to consider all evidence that he does find mitigating or aggravating in answering the special issues. *Gardner*, 306 S.W.3d at 299. Consequently, the trial court did not abuse its discretion in overruling appellant's challenge for cause based on Maguire's opinion that evidence of voluntary intoxication, background, and age were not *per se* mitigating. *See id.*

Moreover, appellant mischaracterizes Maguire's testimony during voir dire. Maguire stated that he would not close his mind to testimony from a defensive expert, he would take into account whether the time of the offense was the first time the defendant

52

had taken a certain drug, and he would consider evidence that a defendant did not typically act in the manner he did during the offense. (RR17: 63-64, 67, 80-82). Consequently, the record shows that Maguire would give mitigating evidence meaningful consideration, and the trial court did not err in denying appellant's challenge for cause. *See Coleman*, 881 S.W.2d at 352 (holding that the trial court did not err in denying a challenge for cause for an inability to consider mitigating evidence where the record showed that the prospective juror could listen to the evidence with an open mind).

**Issue 12: Lisa Davison**

In his twelfth issue, appellant contends that prospective juror Lisa Davison should have been struck for cause because (1) she is pro-death-penalty and (2) she would not give meaningful consideration to mitigating evidence. (App. Brief, pp. 57-59).

At trial, appellant solely challenged Davison on the ground that she was mitigation-impaired. (RR18: 93-95). Consequently, appellant has not preserved his argument that Davison was challengeable for cause because she was pro-death-penalty for this Court's review. *See* TEX. R. APP. P. 33.1(a).

On appeal, appellant alleges that Davison should have been struck for cause because during voir dire she stated that she did not consider voluntary intoxication, age, background or whether the defendant was a follower, to be mitigating. (App. Brief, p. 58). Contrary to appellant's assertions, Davison testified that although on her questionnaire she stated that she did not think that background, age, and drug use should be an "excuse," she could consider those facts. (RR18: 49-51). Moreover, Davison

53

stated that if there were mitigating circumstances, she "can't put the defendant to death." (RR18: 92).

As stated above, a juror is not required to consider any specific type of evidence or specific circumstances as either mitigating or aggravating, but he must be able to consider all evidence that he does find mitigating or aggravating in answering the special issues. *Gardner*, 306 S.W.3d at 299. Consequently, the trial court did not abuse its discretion in overruling appellant's challenge for cause based on Davison's opinion that evidence of voluntary intoxication, background, age, and whether the defendant was "a follower" were not *per se* mitigating. *See id.*

### Issue 13: Bruce McDonald

In his thirteenth issue, appellant alleges that prospective juror Bruce McDonald should have been struck for cause because he (1) would hold the State to a lower burden of proof, (2) wanted a show of remorse, and (3) would not consider evidence of voluntary intoxication to be mitigating. (App. Brief, pp. 59-61).

In the trial court, appellant challenged McDonald on the grounds that he would hold the State to a lower burden of proof and was mitigation-impaired. (RR20: 86-87). Consequently, appellant has not preserved for this Court's review his argument regarding McDonald's statement that he would base his verdict on a showing of remorse. *See* TEX. R. APP. P. 33.1(a).

54

## (1) Burden of Proof

Appellant contends that McDonald should have been struck for cause because he would hold the State to the lower burden of proof of preponderance of the evidence, not the beyond-a-reasonable-doubt burden of proof. (App. Brief, p. 59).

During voir dire, the State informed McDonald that the State of Texas does not define "reasonable doubt" and asked him what the standard meant to him. (RR20: 22-23). McDonald responded, "Well, I would think that a reasonable that, I guess, on a scale, more than 50 percent of the evidence." (RR20: 23). The State then posed the following scenario:

> All right. So, in other words, if I put on the case, you know, we put on our case, in any criminal case, bicycle theft or capital murder, and there's the close of evidence, you know, for the jurors to go back there and say, well, you know what, they didn't prove to me that an alien didn't come down and kill this guy, you know, that's possible. They didn't prove to me that, you know, maybe it was Jack the Ripper who did it, that's possible, but it's not reasonable. And so we can't sit there and think of possibilities to say because of these possibilities that exist, it causes me to have reasonable doubt. It has to be doubt that's based upon reason and common sense. Okay?

(RR20: 23). McDonald responded that he understood. (RR20:23).

Later, during the defense's questioning, McDonald again stated that "beyond a reasonable doubt" meant something that was more than fifty percent of the evidence. (RR20: 69-70). At the conclusion of voir dire, appellant challenged McDonald for cause, stating that he would hold the State to a preponderance-of-the-evidence burden of proof. (RR20: 87). In response, the State pointed out that McDonald did not say how much more than fifty percent he believed the standard of proof to be, that each juror is allowed

55

to have his own view of the reasonable-doubt standard, and that the issue of preponderance of the evidence was never explored with McDonald. (RR20: 88-89). The trial court denied appellant's challenge for cause. (RR20: 89).

"Reasonable doubt" is not statutorily defined. *See Rodriguez v. State*, 96 S.W.3d 398, 400-01 (Tex. App.—Austin 2002, pet. ref'd). Indeed, this Court has held that each juror is as competent as the courts to determine how to define the standard. *See Paulson v. State*, 28 S.W.3d 571, 573 (Tex. Crim. App. 2000). Moreover, this Court has held that "it is plain that prospective jurors may form their own definitions of proof beyond a reasonable doubt and they are not challengeable for cause based upon the type and amount of evidence they require to reach that level of confidence." *Murphy v. State*, 112 S.W.3d 592, 598 (Tex. Crim. App. 2003) (discussing reasonable doubt in the context of voir dire questioning on the burden of proof in answering the future-dangerousness issue). Consequently, McDonald was not challengeable for cause merely because he defined reasonable doubt as something more than fifty percent.

In addition, appellant has not shown that McDonald would, in fact, hold the State to the lower burden of proof of preponderance of the evidence. The proponent of a challenge for cause has the burden of establishing that the challenge is proper. *Davis v. State*, 329 S.W.3d 798, 807 (Tex. Crim. App. 2010). Here, although McDonald repeatedly informed defense counsel that his view of the beyond-a-reasonable-doubt standard was something more than fifty percent, counsel never explained the differing burdens of proof to McDonald or otherwise sought to clarify how much more than fifty percent he believed the burden to be. Because appellant did not meet his burden, the trial

56

court did not err in denying his challenge for cause. *See id.* ("The proponent does not meet this burden until he has shown that the venire member understood the requirements of the law and could not overcome his or her prejudice well enough to follow the law.").

Furthermore, to the extent that McDonald's answers can be construed as only requiring the State to meet the preponderance-of-the-evidence-burden of proof, McDonald did agree with the State's hypothetical that explained the theory behind the reasonable-doubt standard. (RR20: 23). The trial court could have, therefore, reasonably determined that McDonald understood the State's burden of proof, and this Court should defer to the trial court's determination. *Threadgill*, 146 S.W.3d at 667.

### (2) Third Special Issue

Appellant further argues that McDonald should have been struck for cause because he did not consider evidence of voluntary intoxication to be mitigating. (App. Brief, p. 60). Contrary to appellant's assertions, McDonald actually stated that he would not "consider it much." (RR20: 84). As stated above, a juror is not required to consider any specific type of evidence or specific circumstances as either mitigating or aggravating, but he must be able to consider all evidence that he does find mitigating or aggravating in answering the special issues. *Gardner*, 306 S.W.3d at 299. Consequently, the trial court did not abuse its discretion in overruling appellant's challenge for cause based on McDonald's opinion that he did not think that evidence of voluntary intoxication should be given much weight.

## Issue 14: Teresa Randleas

In his fourteenth issue, appellant alleges that prospective juror Teresa Randleas should have been struck for cause because she (1) would automatically answer the first special issue "yes," (2) did not consider the defendant's age to be a mitigating factor, and (3) had a bias towards law enforcement. (App. Brief, pp. 61-63).

At trial, appellant only challenged Randleas on the grounds that she would automatically answer the first special issue "yes" and was mitigation-impaired. (RR92-93). Appellant has not, therefore, preserved his argument regarding Randleas's alleged bias towards police officers for this Court's review. *See* TEX. R. APP. P. 33.1(a).

### (1) First Special Issue

Appellant argues that Randleas should have been struck because the record shows that she would automatically answer the first special issue "yes" after finding him guilty of capital murder. During voir dire, Randleas said that if a defendant killed someone without a motive, she would answer the first special issue "yes." (RR21: 83). Randleas further stated that she did not see the purpose of life without parole. (RR21: 85-86). Nevertheless, Randleas stated that she would not automatically answer the first special issue "yes" after finding appellant guilty of capital murder and would wait to answer all of the issues until after she heard the evidence. (RR21: 49-50, 58-59). Because Randleas vacillated in her responses regarding the first special issue, this Court should give particular deference to the trial court's implicit determination that Randleas would base her answer to the first special issue on an examination of the evidence. *Threadgill*, 146 S.W.3d at 667.

58

**(2) Third Special Issue**

Although on appeal appellant complains that Randleas should have been struck for cause because she would not consider age as a mitigating factor, at trial appellant challenged her because she would not consider intoxication. (App. Brief, p. 63). (RR21: 93-94). Neither of these arguments is viable.

During voir dire, Randleas stated that age would not be a mitigating factor for her, but that she was "open" to evidence regarding appellant's background, and that her views on voluntary intoxication would depend on the evidence that was presented. (RR21: 87-89). Randleas also stated that she would go into answering the third special issue with an open mind, would wait to answer the special issues until she heard all of the evidence, and would base her answers on the evidence that was presented. (RR21: 54-56, 58-59).

As stated above, a juror is not required to consider any specific type of evidence or specific circumstances as either mitigating or aggravating, but he must be able to consider all evidence that he does find mitigating or aggravating in answering the special issues. *Gardner*, 306 S.W.3d at 299. Consequently, the trial court did not abuse its discretion in overruling appellant's challenge for cause. *See id.* Moreover, the record shows that Randleas would give mitigating evidence meaningful consideration. *See Coleman*, 881 S.W.2d at 352 (holding that the trial court did not err in denying a challenge for cause for an inability to consider mitigating evidence where the record showed that the prospective juror could listen to the evidence with an open mind).

59

## Issue 15: John Cantwell

In his fifteenth issue, appellant alleges that prospective juror John Cantwell should have been struck for cause because he would not consider voluntary intoxication, background, and past abuse in deciding the third special issue. (App. Brief, pp. 64-65). Appellant misrepresents Cantwell's testimony. Further, Cantwell said that he would have a hard time giving evidence of voluntary intoxication consideration but "would try to give everything consideration." (RR24: 86-87). Cantwell did not think that abuse as a child was a "sufficient mitigating circumstance." (RR24: 87-88).

In any event, as stated above, a juror is not required to consider any specific type of evidence or specific circumstances as either mitigating or aggravating, but he must be able to consider all evidence that he does find mitigating or aggravating in answering the special issues. *Gardner*, 306 S.W.3d at 299. Consequently, the trial court did not abuse its discretion in overruling appellant's challenge for cause based on Cantwell's opinion that evidence of voluntary intoxication, background, and past abuse was not *per se* mitigating. *See id.* The record shows that Cantwell would give mitigating evidence meaningful consideration, and the trial court did not err in denying appellant's challenge for cause. *See Coleman*, 881 S.W.2d at 352 (holding that the trial court did not err in denying a challenge for cause for an inability to consider mitigating evidence where the record showed that the prospective juror could listen to the evidence with an open mind).

## Issue 16: Alexander Konkle

In his sixteenth issue, appellant alleges that prospective juror Alexander Konkle should have been struck for cause because he (1) would automatically answer special

60

issue one "yes" and (2) did not consider voluntary intoxication or upbringing as mitigating facts. (App. Brief, pp. 65-67).

### (1) First Special Issue

Appellant alleges that Konkle should have been struck for cause because he would not need more than the facts of the case to determine his answer to the first special issue. (App. Brief, p. 66). The future-dangerousness issue can, however, be decided solely on the facts of the offense. *Cooks v. State*, 844 S.W.2d 697, 713 (Tex. Crim. App. 1992) ("[T]he facts of the offense alone, if particularly heinous in nature, can be sufficient to support an affirmative response to the second special issue.").

Moreover, appellant wholly ignores other testimony from Konkle. During voir dire, Konkle stated that he would listen to all of the evidence and could presume that the answer to the first special issue was "no," and he agreed that he must listen to the evidence regarding the first special issue and not jump to conclusions based on his guilty verdict. (RR25: 15, 28-29, 34-36). The totality of Konkle's voir dire responses indicates, therefore, that his answer to the first special issue would not be dictated by the guilty verdict, but would, rather, be based on an examination of all of the evidence, including the facts of the offense. The trial court did not, therefore, err in denying appellant's challenge for cause.

### (2) Third Special Issue

Appellant further alleges that Konkle should have been struck for cause because he would not consider evidence of voluntary intoxication and a defendant's background as mitigating evidence. (App. Brief, pp. 66-67). (RR25: 67, 72). As repeatedly stated

61

above, a juror is not required to consider any specific type of evidence or specific circumstances as either mitigating or aggravating, but he must be able to consider all evidence that he does find mitigating or aggravating in answering the special issues. *Gardner*, 306 S.W.3d at 299.

Moreover, appellant ignores Konkle's description of how he thought that the third special issue should be determined:

> It does feel like you'll actually have to sit there and from everything that you've heard and whatnot, sit there and figure out in between his background and whether or not that he'd pose a problem or if it should be a life imprisonment instead of the death penalty.

(RR25: 70-71). Furthermore, Konkle stated that he could consider age and whether the defendant was a "follower" in answering the special issue. (RR25: 72-73). Given these responses, the trial court acted well within its discretion in denying appellant's challenge for cause. *See Coleman*, 881 S.W.2d at 352 (holding that the trial court did not err in denying a challenge for cause for an inability to consider mitigating evidence where the record showed that the prospective juror could listen to the evidence with an open mind).

**Issue 18: Lyle Livingston**

In his eighteenth issue, appellant alleges that prospective juror Lyle Livingston should have been struck for cause because he did not consider a defendant's age or the fact that the offense was outside of the defendant's normal character to be mitigating circumstances. (App. Brief, p. 69). (RR29: 79, 82). As repeatedly stated above, a juror is not required to consider any specific type of evidence or specific circumstances as either mitigating or aggravating, but he must be able to consider all evidence that he does

find mitigating or aggravating in answering the special issues. *Gardner*, 306 S.W.3d at 299.

Moreover, appellant wholly ignores Livingston's statements that he would consider prior abuse and that he "might" consider evidence of voluntary intoxication to be a mitigating circumstance. (RR29: 79-81). In addition, Livingston stated that he would listen to all of the evidence presented and would consider mitigating circumstances in answering the third special issue; he was merely unable to say what type of evidence would convince him to answer the issue "yes." (RR29: 49, 76-78). Given these responses, the trial court acted well within its discretion in denying appellant's challenge for cause. *See Coleman*, 881 S.W.2d at 352 (holding that the trial court did not err in denying a challenge for cause for an inability to consider mitigating evidence where the record showed that the prospective juror could listen to the evidence with an open mind); *see also McCoy v. State*, 713 S.W.2d 940, 951 (Tex. Crim. App. 1986) (holding that a prospective juror's inability to envision a situation in which he would respond "yes" or "no" to a special issue is not automatically grounds for reversing a trial court's ruling denying a challenge for cause).

**Issue 19: Jennifer Stockton**

In his nineteenth issue, appellant contends that prospective juror Jennifer Stockton should have been struck for cause because (1) her work schedule would not allow her to give the trial her full attention; (2) she was pro-death-penalty; and (3) she did not consider age, whether the defendant was a "follower," voluntary intoxication, or a defendant's upbringing as mitigating circumstances. (App. Brief, pp. 70-73).

63

**(1) Work Schedule**

Appellant alleges that Stockton should have been struck for cause because the "pressures of work and finances would make her the type of juror who would have difficulty in giving her full attention to the trial and who would want to be as expeditious as possible." (App. Brief, p. 71).

A challenge for cause can be properly asserted on grounds which are not specifically enumerated in Article 35.16 of the Texas Code of Criminal Procedure, where such a challenge is based on facts that show the prospective juror would be "incapable or unfit to serve on the jury." TEX. CODE CRIM. PROC. ANN. art. 35.16(a); *Allridge v. State*, 850 S.W.2d 471, 484 (Tex. Crim. App. 1991). These challenges, which are not based upon any ground specifically enumerated in the statutes, are ordinarily addressed to the sound discretion of the trial court. *Allridge*, 850 S.W.2d at 484-85. Typically, jurors are struck for cause in situations where the record shows that a preoccupation with business, school, personal problems, or family matters would keep the juror from giving the cause full attention. *See, e.g., Mason v. State*, 905 S.W.2d 570, 578 (Tex. Crim. App. 1995) (trial court did not err in granting challenge for cause where the prospective juror stated that he would have trouble concentrating and giving his full attention if he were to miss too much school); *Allridge*, 850 S.W.2d at 485 (trial court did not err in granting challenge for cause where prospective juror agreed that it would be difficult for him to concentrate because he would be concerned about his business); *Rogers v. State*, 774 S.W.2d 247, 253-54 (Tex. Crim. App. 1989) (trial court did not err in granting challenge for cause because the prospective juror's preoccupation with family matters would keep

64

her from giving the cause full attention); *Nichols v. State*, 754 S.W.2d 185, 193-94 (Tex. Crim. App. 1988) (trial court did not err in granting challenge for cause where prospective juror was so preoccupied with personal problems that he was unfit to serve).

Here, the trial court could have reasonably found that Stockton was fit to serve. In her questionnaire, Stockton noted that, if she were chosen as a juror in this case, she would have to work at night after serving on the jury. (RR29: 107). At voir dire, Stockton assured all parties that this would not affect her concentration. (RR29: 107). Indeed, in response to appellant's concerns that such a work schedule would leave her tired, Stockton explained that she would be getting the same amount of sleep that she typically got each night. (RR29: 160). Although Stockton also stated that she would suffer from a financial burden if the trial lasted for more than two weeks, the same can be said for almost any juror who was employed. (RR29: 158-59).

Given the high deference to be afforded to the trial court, the trial court could have concluded that Stockton was not overly preoccupied with work to the extent she would be unable to give this case her full attention. The trial court did not, therefore, abuse its discretion in denying appellant's challenge for cause.

### (2) Views on the Death Penalty

Appellant contends that Stockton should have been struck for cause because she stated that she would consider the cost of housing appellant in prison in deciding the special issues.

Before a prospective juror can be excused for bias, the law must be explained to her and she must be asked whether she can follow that law regardless of her personal

65

views. *Threadgill*, 146 S.W.3d at 667. Here, Stockton stated that she supported the death penalty because she did not think that inmates should receive luxuries after taking a human life and because she did not want the inmate to be a drain on taxpayers. (RR29: 163-67). Appellant did not, however, explain the law to Stockton or otherwise ask if she could follow the law regardless of these views. (RR5: 163-67). Consequently, the trial court did not err in denying appellant's challenge for cause.

### (3) Third Special Issue

Appellant further alleges that Stockton should have been struck for cause because she did not consider age, whether the defendant was a "follower," voluntary intoxication, or a defendant's upbringing as mitigating circumstances. (App. Brief, pp. 72-73). As repeatedly stated above, a juror is not required to consider any specific type of evidence or specific circumstances as either mitigating or aggravating, but he must be able to consider all evidence that he does find mitigating or aggravating in answering the special issues. *Gardner*, 306 S.W.3d at 299.

Moreover, appellant ignores Stockton's statements that she would have to hear the evidence regarding prior abuse before she could decide if it was mitigating, and that she would consider the mitigating evidence that was presented and go into deliberations with an open mind. (RR29: 148-49). Given these responses, the trial court acted well within its discretion in denying appellant's challenge for cause. *See Coleman*, 881 S.W.2d at 352 (holding that the trial court did not err in denying a challenge for cause for an inability to consider mitigating evidence where the record showed that the prospective juror could listen to the evidence with an open mind).

66

## Issue 22: John Vessels

In his twenty-second issue, appellant maintains that prospective juror John Vessels should have been struck for cause because he (1) would automatically answer the first special issue "yes" and (2) could not articulate what circumstances he would deem mitigating. (App. Brief, pp. 76-78).

### (1) First Special Issue

According to appellant, Vessels's statement that he believed there was a probability that if someone committed a crime once, they could commit the crime again showed that he would automatically answer the first special issue "yes." (App. Brief, p. 77). (RR35: 75). A review of the totality of Vessels's responses shows, however, that his answer to the first special issue would not be dictated by the guilty verdict, but would rather be based on an examination of all of the evidence, including the facts of the offense. Vessels stated that he understood that just because a defendant committed murder does not automatically mean that he is a future danger and that the State has the burden of proof. (RR35: 49). Moreover, to the extent that Vessels vacillated in his responses regarding the first special issue, this Court should give particular deference to the trial court's implicit determination that Vessels would wait to answer the first special issue until he heard the evidence. *See Threadgill*, 146 S.W.3d at 667.

### (2) Third Special Issue

Appellant further contends that Vessels should have been struck for cause because was unable to think of what he would consider to be mitigating evidence off the top of his head. (App. Brief, p. 77). (RR35: 79-80). This Court has held that a prospective juror's

67

inability to envision a situation in which he would respond "yes" or "no" to a special issue is not automatically grounds for reversing a trial court's ruling denying a challenge for cause. *McCoy*, 713 S.W.2d at 951.

Here, Vessels stated that even though he had found a defendant guilty of capital murder, he could answer the third special issue with an open mind. (RR35: 56). Furthermore, Vessels stated he felt that mitigating circumstances existed that would allow him to answer the third special issue "yes"; he just could not think of what would constitute a mitigating circumstance off the top of his head. (RR35: 56, 80). Given these responses, the trial court acted well within its discretion in denying appellant's challenge for cause. *See Coleman*, 881 S.W.2d at 352 (holding that the trial court did not err in denying a challenge for cause for an inability to consider mitigating evidence where the record showed that the prospective juror could listen to the evidence with an open mind).

### *Conclusion*

Because appellant has not shown two erroneous rulings on his challenges for cause, he has not shown this Court that he was denied the use of a statutorily provided peremptory strike. Appellant's eighth through twenty-third issues should be overruled.

### RESPONSE TO ISSUES 24 AND 25: APPELLANT FAILS TO SHOW THAT HE WAS DEPRIVED OF A LAWFULLY CONSTITUTED JURY.

In his twenty-fourth and twenty-fifth issues, appellant argues that the trial court's denial of his challenges for cause deprived him of a lawfully constituted jury and that he suffered a violation of his rights under the state and federal constitutions and under article 35.16 of the code of criminal procedure. Based on the arguments presented and the cases

68

cited, appellant appears to be presenting a harm analysis for the erroneous *granting* of a State's challenge for cause. (App. Brief, pp. 81-83). Appellant has only alleged that the trial court erred in *denying* his challenges for cause; the harm for the erroneous denial of a challenge for cause is, as discussed above, the loss of a peremptory challenge. *See Escamilla*, 143 S.W.3d at 821. Consequently, appellant's harm analysis is misplaced.

Furthermore, if applicable, appellant has not shown that he was deprived of a lawfully constituted jury. There is nothing to indicate that the jury, as constituted, was biased or prejudiced, and appellant does not point to any proof of unfairness. Appellant's complaint regarding *Jones* is foreclosed by well-established law. *See Gray v. State*, 233 S.W.3d 295, 299 (Tex. Crim. App. 2007). The trial court did not deny appellant his constitutional or statutory rights in the jury-selection process. This Court should, therefore, overrule appellant's twenty-fourth and twenty-fifth issues.

### RESPONSE TO ISSUE 26: THE TRIAL COURT DID NOT ERR IN RULING THAT TESTIMONY REGARDING APPELLANT'S VOLUNTARY INTOXICATION WAS INADMISSIBLE.

In his twenty-sixth issue on appeal, appellant claims that the trial court erred in denying his request to present evidence of his diminished capacity at the time of the offense. (App. Brief, pp. 84-86).

In pretrial hearings, appellant requested that the trial court make an advanced ruling on expert testimony he sought to present during the guilt stage of trial. (RR39: 3-4; RR42: 38-42). Both experts were permitted to testify at the hearings. Dr. John Roache testified that he was an expert in the effects of drug abuse in humans and that his expert testimony at trial would be that at the time of the offense and during the media

69

interviews, appellant was under the influence of marijuana and PCP and was suffering mental disorders due to the abuse of those drugs. (RR39: 20, 24, 30-31, 35-36). Lance Platt, a drug recognition expert, testified that his expert testimony would be that appellant "very well could have been under the influence" of marijuana and PCP ("wet") at the time of the offense. (RR41: 94-95, 103-04). On appeal, as he did at trial, appellant argues that these experts' testimonies regarding his diminished capacity were admissible to negate the *mens rea* of the underlying offense.

"There is no such thing as an 'affirmative defense of diminished capacity' in Texas (other than insanity), but evidence of a mental disease or defect may be relevant and admissible to rebut or disprove the defendant's culpable *mens rea*." *Davis v. State*, 313 S.W.3d 317, 328 (Tex. Crim. App. 2010). In *Davis*, this Court held that testimony regarding the effects of crack cocaine use on the ability to control impulses was not evidence of a mental disease or defect, but was, rather, evidence of voluntary intoxication, the admissibility of which is governed by a specific statute. *Id.* In the instant case, the proffered testimonies focused around appellant's use of drugs and the effects those drugs had on his behavior at the time of the offense. (RR39: 20, 24, 30-31, 35-36; RR41: 94-95, 103-04). Consequently, contrary to appellant's assertions, the testimonies presented a question of voluntary intoxication, not of a mental disease or defect.

Section 8.04(a) of the Texas Penal Code provides that "[v]oluntary intoxication does not constitute a defense to the commission of a crime." TEX. PEN. CODE ANN. § 8.04(a) (Vernon 2011); *Davis*, 313 S.W.3d at 328. In *Ramos v. State*, this Court

70

construed the statute as prohibiting any attempt to use intoxication to rebut or disprove a defendant's *mens rea*. *Ramos v. State*, 547 S.W.2d 33, 33-34 (Tex. Crim. App. 1977); *see also Davis*, 313 S.W.3d at 328; *Skinner v. State*, 956 S.W.2d 532, 543 (Tex. Crim. App. 1997). Because the experts' testimonies were proffered at the guilt stage of trial to show that appellant lacked the requisite *mens rea*, the trial court did not err in holding that the testimonies were inadmissible. *See Davis*, 313 S.W.3d at 329. Appellant's twenty-sixth issue should be overruled.

### RESPONSE TO ISSUE 27: THE TRIAL COURT DID NOT ERR IN DENYING APPELLANT'S MOTION TO SUPPRESS EVIDENCE OF APPELLANT'S INTERVIEWS WITH NEWS REPORTERS; THE REPORTERS WERE NOT ACTING AS AGENTS OF THE STATE.

The State understands appellant's argument in his twenty-seventh issue on appeal to be that the trial court erred in denying his motion to suppress evidence of his interviews with the media because the reporters[8] were agents of the State and took his statement in violation of articles 38.22 and 38.23 of the Texas Code of Criminal Procedure and the Sixth Amendment to the United States Constitution. The crux of appellant's argument appears to be that because the Dallas County Sheriff's Office did not comply with standard procedures, the news reporters became de facto agents of the State. (App. Brief, p. 91). Appellant does not, however, explain what procedures were violated and how the alleged violation of those procedures made the reporters de facto agents of the State.

---

[8] In his brief, appellant only references the testimony of one reporter, Shaun Rabb. (App. Brief, pp. 89-91). Four reporters were, however, the subject of appellant's motion to suppress. (RR43: 4-98).

71

Nevertheless, appellant's argument is not preserved for this Court's review. As a prerequisite to presenting a complaint for appellate review, the record must show that the complaint was made to the trial court by a timely request, objection, or motion and that the trial court either (1) ruled on the request, objection, or motion; or (2) refused to rule on the request, objection, or motion, and the complaining party objected to the refusal. TEX. R. APP. P. 33.1(a). This Rule encompasses the concept of "party responsibility." *Pena v. State*, 285 S.W.3d 459, 463 (Tex. Crim. App. 2009). The complaining party bears the responsibility of clearly conveying to the trial judge the particular complaint, including the precise and proper application of the law as well as the underlying rationale. *Id.* at 463-64.

First and foremost, appellant did not make this specific argument at trial. Although, during his lengthy argument to the trial court, appellant referenced the fact that he was interviewed by the media despite the fact that those in behavioral observation are not usually allowed such interviews, appellant did not make any claims that this discrepancy made the reporters de facto agents of the State. (RR43: 102-10). Instead, appellant's references to jail procedures were made in support of his argument that he was not in a proper state of mind to make statements to the media and to bolster his argument regarding his lack of consent to the interviews. (RR43: 102-10). Because appellant did not argue in the trial court that the reporters became de facto agents of the State, he has not preserved his argument for this Court's review. TEX. R. APP. P. 33.1(a).

Moreover, the trial court did not make a ruling on this argument. At the conclusion of the suppression hearing, the trial court specifically stated that it was relying

72

on this Court's opinion in *Escamilla v. State*, 143 S.W.3d 814 (Tex. Crim. App. 2009), in seeking to determine whether an agency relationship between the reporters and the State existed. (RR43: 111-13). Because the trial court did not rule on whether the reporters were de facto agents of the State due to an alleged violation of procedure, appellant's argument has not been preserved.

In any event, the trial court's ruling in this case was proper. As stated above, in denying appellant's motion to suppress, the trial court specifically stated that it was relying on this Court's opinion in *Escamilla*. (RR43: 111-13). In *Escamilla*, this Court looked at the entire record to determine whether an agency relationship had been created between a reporter and the State, noting that the creation of an agency between law enforcement and non-law-enforcement personnel depends upon the existence of an agreement between them at the time of the elicitation. *Escamilla*, 143 S.W.3d at 824 (citing *State v. Hernandez*, 842 S.W.2d 306, 314 (Tex. App.—San Antonio 1992, pet. ref'd)).

Here, all of the reporters testified that they were not employed by law enforcement, that their respective stations had elicited the interviews, and that no law enforcement officer had asked them to conduct the interviews. (RR43: 5, 7, 10, 36-37, 40-64, 66, 84-85, 88-89). Because none of the reporters had even spoken to law enforcement officers about the content of their interviews prior to their respective interviews, as in *Escamilla*, the record before this Court clearly does not present the scenario where the police employed the reporters to deliberately elicit incriminating statements from an in-custody defendant solely for the purpose of helping the police

73

gather evidence against the defendant. *See Escamilla*, 143 S.W.3d at 824 (holding that no agency relationship existed where an officer expressed to a reporter a hope that Escamilla would incriminate himself during the interview because such a statement was not an offer to the reporter to act as an agent). Appellant's twenty-seventh issue should be overruled.

### RESPONSE TO ISSUES 30 THROUGH 33: THE TRIAL COURT DID NOT ERR IN ADMITTING AUTOPSY AND CRIME-SCENE PHOTOGRAPHS.

In his thirtieth through thirty-third issues on appeal, appellant complains that the trial court erred in overruling his objections to the autopsy and crime-scene photographs. The State understands appellant's argument to be that the photographs were more prejudicial than probative.

First and foremost, appellant's argument in these issues is inadequately briefed. Rule 38.1 of the Texas Rules of Appellate Procedure requires that a brief contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record. TEX. R. APP. P. 38.1(h); *see, e.g., Walder v. State*, 85 S.W.3d 824, 826 (Tex. App.—Waco 2002, no pet.) (setting forth the elements necessary to satisfy the mandatory requirement of a "clear and concise argument" pursuant to Rule 38.1). Here, appellant merely gives a bare description of each photograph he challenges and cites the factors to be used in determining whether a photograph has an undue tendency to suggest a decision on an improper basis. (App. Brief, pp. 96-100). Appellant does not, however, explain how the factors apply to this case or otherwise attempt to explain how his cited authorities apply to the case at hand. At most, appellant argues that the number of

74

photographs was prejudicial, but in making that argument, appellant contends that twelve photographs were improperly admitted, while the remainder of his argument complains about the admission of a total of twenty-five photographs. Appellant's argument is improperly briefed, and this Court should resolve issues thirty through thirty-three against him.

Nevertheless, the trial court did not err admitting the complained-of photographs. Under Rule 403, all relevant evidence is admissible unless "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403. A trial court's decision to admit photographs over a Rule 403 objection is reviewed under an abuse of discretion standard. *Salazar v. State*, 38 S.W.3d 141, 151 (Tex. Crim. App. 2001). In performing a Rule 403 analysis, the trial court must consider "the host of factors affecting probativeness . . . and balance those factors against the tendency, if any, that the photographs have to encourage resolution of material issues on an inappropriate emotional basis." *Ladd v. State*, 3 S.W.3d 547, 568 (Tex. Crim. App. 1999). Relevant factors that may be considered in making this determination include the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black-and-white or color, whether they are close-up, whether the body is naked or clothed, the availability of other means of proof, and other circumstances unique to the individual case. *Chamberlain v. State*, 998 S.W.2d 230, 237 (Tex. Crim. App. 1999).

### The Trial Court Did Not Abuse Its Discretion in Admitting the Autopsy Photographs.

In his thirtieth and thirty-first issues, appellant complains that the trial court erred in admitting State's Exhibits 409 through 417 (Stephen's autopsy photographs) and 428 through 431[9] (Matthew's autopsy photographs). Although these thirteen photographs are in color and contain images of gunshot wounds and deceased bodies, at a pretrial hearing, the trial court specifically stated that it had conducted the requisite balancing test pursuant to Rule 403 and that the photographs were admissible and likely to help aid the medical examiner's testimony. (RR44: 22). Indeed, the record reflects that the medical examiner used the photographs to help explain her testimony regarding the gunshot wounds each victim sustained, including how she used the stippling patterns to determine which wounds were entrance wounds and which were exit wounds. (RR46: 29-34; RR48: 44-45). This Court has repeatedly held that a trial court does not abuse its discretion in admitting autopsy photographs over a Rule 403 objection where they help to explain the medical examiner's testimony describing the victim's various wounds for which appellant is responsible. *See Escamilla*, 143 S.W.3d at 826; *Saldano v. State*, 232 S.W.3d 77, 101-02 (Tex. Crim. App. 2007). Appellant's issues should be overruled.

### The Trial Court Did Not Abuse Its Discretion in Admitting the Crime-Scene Photographs.

In his thirty-second and thirty-third issues on appeal, appellant complains about the admission of sixteen color crime-scene photographs.[10] These sixteen photographs

---

[9] These photographs were admitted during the punishment phase of trial. (RR48: 43).

[10] At trial, the trial court held that State's Exhibit 52 was inadmissible because it contained an image of a cross on one of the bodies. (RR46: 96).

76

depict Stephen's and Matthew's bodies as they were found in front of the recording studio. (RR46: 72-92; SX: SX: 29-32, 34-36, 43, 45-51, 53-54).

This Court has held that "[v]isual evidence accompanying testimony is most persuasive and often gives the fact finder a point of comparison against which to test the credibility of a witness and the validity of his conclusions." *Chamberlain*, 998 S.W.2d at 237. Here, all of the complained-of photographs were used by the crime-scene investigator as she described the state in which the bodies were found. (RR46: 72-92). Although the photographs depict deceased, bloody bodies, they depict nothing more than the reality of the brutal crimes, which included a double murder and the callous execution of the victims as they attempted to get away, and they helped the jury to understand the verbal testimony regarding the crime scene and the manner in which the bodies were found. Moreover, although there are sixteen photographs of the crime scene, at the pretrial hearing, the State informed the trial court that it in fact had approximately seventy photographs of the crime scene that it was not seeking to introduce because they depicted the same injuries at different angles. (RR44: 16). Consequently, the probative value of the photographs was not substantially outweighed by their prejudicial effect and thus, the trial court did not abuse its discretion in admitting the photographs. *See Shuffield v. State*, 189 S.W.3d 782, 787-88 (Tex. Crim. App. 2006) (holding that the trial court did not abuse its discretion in admitting crime-scene photographs where they were probative of the crime scene and injuries received by the victim, were necessary in developing the State's case, and were not overly gruesome); *Ladd*, 3 S.W.3d at 568 (holding that the trial court did not abuse its discretion in admitting ten photographs of

77

the victim's body, including autopsy photos, because the photographs depicted the manner of death and were no more gruesome than the crime); *Long v. State*, 823 S.W.2d 259, 273 (Tex. Crim. App. 1991) (holding that the trial court did not abuse its discretion in admitting thirteen photographs of the victims' bodies at the crime scene because the photographs were limited in number, reflected the manner of death, and had to be viewed together to get an accurate assessment of the injuries sustained by the victims). Appellant's issues should, therefore, be overruled.

### *Nevertheless, Appellant Was Not Harmed By the Admission of the Photographs.*

Even if the trial court erred in admitting the complained-of photographs, appellant was not harmed by their admission. The erroneous admission of photographs is non-constitutional error governed by Rule of Appellate Procedure 44.2(b). *See* TEX. R. APP. P. 44.2(b). In assessing the harm from such error, this Court reviews the entire record to determine whether the error had more than a slight influence on the jury. *See Schutz v. State*, 63 S.W.3d 442, 444 (Tex. Crim. App. 2001). This means that this Court considers everything in the record, including testimony and physical evidence, the nature of the evidence supporting the verdict, and arguments to the jury. *Id.*

Here, there was overwhelming evidence that supports the jury's verdict in this case other than the photographs. Appellant was seen in possession of Stephen's identification card, credit cards, and car the day of the murders. (RR45: 205, 214-15, 217-18, 228). Moreover, appellant was arrested while driving Stephen's car in Texarkana. (RR45: 105, 232-34, 250-52). Finally, and most significantly, appellant gave interviews to several media outlets detailing the planning and commission of the robbery

78

that led to the murders and providing details surrounding the murders, including how he executed each man as he attempted to get away. (RR45: 117, 270-71; RR46: 216, 229, SX18; SX403-SX407). Accordingly, taking the entire record into consideration, appellant was not harmed by the admission of the autopsy and crime-scene photographs.

### RESPONSE TO ISSUE 34: THE EVIDENCE IS SUFFICIENT TO SUPPORT APPELLANT'S CONVICTION FOR CAPITAL MURDER.

In his thirty-fourth issue on appeal, appellant contends that the evidence is insufficient to support his capital murder conviction. As the State understands appellant's argument, he contends that the State failed to show a nexus between Stephen's murder and the robbery. (App. Brief, pp. 100-02). According to appellant, there is no evidence in the record to support his conviction because the robbery was only a mere afterthought of the murder. (App. Brief, p. 102).

The relevant question in a sufficiency review is whether, considering all the evidence in the light most favorable to the verdict, the jury was rationally justified in finding guilt beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). The reviewing court is required to defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *See Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 899.

A person commits capital murder, as alleged in this case, if he intentionally commits murder in the course of committing or attempting to commit robbery. *See* TEX. PEN. CODE ANN. § 19.03(a)(2) (Vernon 2011); (CR: 2). For a murder involving theft to

79

constitute a capital murder committed in the course of robbery, the intent to rob must be formulated before or at the time of the murder. *Herrin v. State*, 125 S.W.3d 436, 441 (Tex. Crim. App. 2002). Proof that the robbery was committed as an afterthought and unrelated to the murder is not sufficient. *Id.*

Contrary to appellant's assertions, the record is replete with evidence that appellant planned to commit robbery prior to the murders. In his interview with Steven Pickett, a reporter with Channel 11, appellant stated that he got up that morning and "plotted" a robbery. (RR45: 117; SX403-SX404). Appellant grabbed his pistol, put his "flag" on it, and boarded a train to downtown Garland with his cousin. Appellant's cousin got scared, so appellant grabbed the gun, approached the victims, and chatted with them. When Matthew reached for a cigarette, he shot both men. Appellant and his cousin then "ran through" Stephen's and Matthew's pockets and stole Stephen's car. (SX403-SX404).

In his interview with Ellen Goldberg, a reporter for Channel 5, appellant stated that his plan was to "hit a lick." (RR45: 270, 276; SX18, SX405). To facilitate his plan, appellant boarded a train to downtown Garland because that is "where the rich white folks live" and he was going to rob one of them. Appellant and his cousin walked around Garland and as it got late, they became nervous because it was a "long walk back to Dallas." When they spotted Stephen and Matthew, they chatted with them and shot the men after Matthew reached for a cigarette. After both men were shot, appellant "ran their pockets" and "hopped" in Stephen's car. (SX405).

80

In his interview with Shaun Rabb, a reporter for Channel 4, appellant again stated that he wanted to "hit a lick" in Garland because "that's where all the rich white folks live at." (RR46: 216, 233; SX406-SX407). Appellant stated that he needed "something to happen" because it was a "long walk back to Dallas." Again, appellant admitted that he shot both men. In this interview, appellant further admitted that someone was going to get robbed that night because that was the plan and he "didn't go out there for nuthin'." (SX407).

Consequently, the evidence, when viewed in the light most favorable to the verdict, shows that appellant went to Garland and approached the victim with the specific intent to commit a robbery and that the murder was committed to facilitate the robbery. Consequently, the jury was rationally justified in finding guilt beyond a reasonable doubt. *See Robertson v. State*, 871 S.W.2d 701, 705-06 (holding that the evidence was sufficient to support capital murder conviction where Robertson confessed to taking the victim's valuables and was found in possession of them after the murder). Appellant's thirty-fourth issue should be overruled.

### RESPONSE TO ISSUE 28: THE TRIAL COURT DID NOT ERR IN DENYING APPELLANT'S MOTION TO SUPPRESS PHOTOGRAPHS OF ITEMS FOUND IN HIS JAIL CELL; APPELLANT DID NOT HAVE A REASONABLE EXPECTATION OF PRIVACY IN HIS CELL.

In his twenty-eighth issue on appeal, appellant contends that the trial court erred in denying his motion to suppress evidence of items found during a search of his cell

81

conducted by jail personnel.[11]  The State understands appellant's argument to be that he retained a limited expectation of privacy in the contents of his cell because he was a pretrial detainee and the search was used to bolster the State's case against him.  (App. Brief, pp. 92-93).  Appellant's contention is wholly without merit.

During the punishment phase, the State offered photographs of items found in appellant's cell during a search of the cell by jail personnel.  (RR48: 120-21; SX6-SX12; SX456-SX484; SX496-SX505).[12]  In hearings held outside the presence of the jury, appellant objected to the admission of these photographs because it appeared the search was not a routine search conducted by the Dallas County Sheriff's Office, but instead was a search done at the request of the Dallas County District Attorney's Office (the DA's office).  (RR48: 122-28).  During one of the hearings, David Barger, an investigator with the D.A.'s office testified that as part of his investigation of this case, he and other staff members of the DA's office had listened to numerous hours of appellant's recorded telephone conversations from the jail.  (RR49: 24-30).  Based on the content of those calls and because the DA's office was concerned about the safety of those who work at the jail, a decision was made to notify jail personnel about the violent nature of the calls.

---

[11] On appeal, appellant complains about the admissibility of photographs of the contents of his cell and of items that were seized from his cell.  The State did not offer the actual contents of appellant's cell, only photographs of the items found in the cell.  Consequently, the issue on appeal is only the legality of the search of appellant's cell, not the seizure of any items from appellant's cell.

[12] On appeal, appellant complains about the admission of State's Exhibits 497 through 499 and 428 through 452. State's Exhibits 428 through 452 are not, however, photographs of appellant's cell; instead, they are autopsy photographs.  (SX428-SX452).  Consequently, the only exhibits that are relevant to the substance of appellant's argument are State's Exhibits 497 through 499.  Notwithstanding the fact that appellant has failed to address all of the exhibits offered at trial in his argument on appeal, the State will address the admissibility of all of the photographs of appellant's cell that were offered at trial.

82

(RR49: 30).  Barger further testified that a search of appellant's cell was already scheduled to occur and that the D.A.'s office merely requested that the search be scheduled for a time that would allow one of their investigators to document the search. (RR49: 30-34).

In overruling appellant's objection, the trial court specifically stated that the search of appellant's cell was valid under this Court's opinion in *Soria v. State*, 933 S.W.2d 46 (Tex. Crim. App. 1996).  (RR49: 8-9, 34).  In *Soria*, this Court noted that the Supreme Court has held that a prisoner has no Fourth Amendment expectation of privacy in his cell.  *Soria*, 933 S.W.2d at 60 (citing *Hudson v. Palmer*, 468 U.S. 517 (1984)).  This Court further noted that a shakedown search of a pretrial detainee's cell does not violate the Fourth Amendment or due process.  *Id.* (citing *Block v. Rutherford*, 468 U.S. 576 (1984)).  Here, contrary to appellant's assertions, the shakedown search of his cell, although documented by the District Attorney's Office, did not violate the Fourth Amendment.  *See id.*

Appellant does not address this Court's holding in *Soria* in his argument on appeal.  Instead, appellant directs this Court to *United States v. Cohen*, a Second Circuit opinion.  *United States v. Cohen*, 796 F.2d 20 (2d Cir. 1986).  Appellant does not, however, explain the holding of *Cohen*, how the holding applies to the facts of this case, or why this Court should rely on *Cohen* instead of its own precedent.  Nevertheless, *Cohen* is not instructive to this case.

In *Cohen*, the Second Circuit held that a prison detainee retains an expectation of privacy in his cell sufficient to challenge an investigatory search initiated by the

prosecution. *Id.* at 24. Here, the evidence showed that unlike in *Cohen*, the search was not initiated by the DA's office but was already planned and merely scheduled at a time when the DA's office could attend. Consequently, even if *Cohen* were binding on this Court, its holding does not apply to the facts of this case.

Because under this Court's own precedent the search was valid, the trial court did not err in admitting photographs of items found in appellant's jail cell at the punishment phase of trial. Appellant's twenty-eighth issue should, therefore, be overruled.

### RESPONSE TO ISSUE 29: THE TRIAL COURT DID NOT ERR IN ADMITTING PHOTOGRAPHS OF A TEXAS DEPARTMENT OF CRIMINAL JUSTICE PRISON FACILITY.

In his twenty-ninth issue on appeal, appellant complains that the trial court erred in admitting photographs of a Texas Department of Criminal Justice Facility. As the State understands appellant's argument, he contends that the photographs were not relevant. Appellant's contention is wholly without merit.[13]

As an initial matter, appellant has not adequately briefed this issue. As stated above, Rule 38.1 of the Texas Rules of Appellate Procedure requires that a brief contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record. TEX. R. APP. P. 38.1(h), 71.3; *see, e.g., Walder v. State*, 85 S.W.3d 824, 826 (Tex. App.—Waco 2002, no pet.) (setting forth the elements necessary

---

[13] Appellant directs this Court's attention to volume 48, page 171 of the Reporter's Record in this case to show that he preserved his argument for appellate review. (App. Brief, p. 93). In that portion of the record, appellant's objection and the trial court's ruling are not clear. Nevertheless, the specific objection and ruling were made clear in a hearing held the day the testimony was presented to the jury. (RR49: 9-10). Consequently, although preservation is not easily ascertained from the record citations provided by appellant, a complete review of the record shows that his complaint was, in fact, specifically presented to the trial court.

84

to satisfy the mandatory requirement of a "clear and concise argument" pursuant to Rule 38.1). Here, appellant's argument is essentially numerous block quotes from this Court's opinion in *Sells v. State*, 131 S.W.3d 748 (Tex. Crim. App. 2003), with the word "photographs" substituted for "videotape." (App. Brief, pp. 93-95). Appellant does not adequately explain why the photographs in this case are similar to the videotape at issue in *Sells*. In addition, although appellant quotes portions of the opinion that dealt with the relevancy of the videotape, he has not set forth any argument regarding the relevancy of the numerous photographs in this case. (App. Brief, p. 92). Because appellant has not properly briefed this issue, it should be overruled.

In any event, the State will assume that because appellant cites to Rule of Evidence 401, his argument is that the photographs of the Polunsky Unit were not relevant. This argument is wholly without merit.

A trial court's decision to admit or exclude photographs is reviewed under an abuse of discretion standard. *Paredes v. State*, 129 S.W.3d 530, 539 (Tex. Crim. App. 2004). Relevant evidence is evidence that has a tendency to make the existence of a fact that is of consequence more probable or less probable than it would be without the evidence. TEX. R. EVID. 401. Further, except as otherwise provided by statute or rule, a jury is entitled to have before it "all possible relevant information about the individual whose fate it must determine." *Sells*, 121 S.W.3d at 766.

At the punishment stage of this capital murder trial, the jury was called upon to determine whether there was a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society. TEX. CODE CRIM. PROC.

85

ANN. art. 37.071, § 2(b)(1) (Vernon Supp. 2010). This Court has held that "society" includes both prison and non-prison populations. *Estrada v. State*, 313 S.W.3d 274, 281 (Tex. Crim. App. 2010). The photographs at issue depict the entire Polunsky Unit, including an aerial view of the unit, general population housing and facilities, and death row. (SX508-SX536).[14] The assistant warden used these photographs to describe the differing aspects of prison life, including living conditions of both general population and death row. (RR49: 177-215). Consequently, the photographs were used to show the jury what constitutes a prison society, something that most, if not all, jurors were not likely to know prior to viewing the photographs. Because the photographs assisted the jury in determining one of the special issues, the photographs were relevant. The trial court did not, therefore, abuse its discretion in admitting the photographs.

Nevertheless, appellant insists that this Court rely on its opinion in *Sells*. At issue in *Sells* was a fifty-seven-minute videotape that showed the physical facilities of an administrative segregation unit in the Texas Department of Criminal Justice and the buildings in which those units are housed. *Sells*, 121 S.W.3d at 765. The videotape was offered at the punishment stage by the defense to assist the jury "in determining whether or not a prison system can, in fact, control [Sells]." *Id.* The trial court ruled that the videotape was not relevant because it showed only one aspect of prison life and did not portray the prison system's entire method of operation; additionally, the trial court ruled

---

[14] The State also used a videotape that showed the operations of the Ellis and Polunsky Units. (RR49: 198; SX453). Appellant does not complain about the admission of the videotape on appeal.

86

that any probative value the tape had was substantially outweighed by the danger of misleading the jury as to all aspects of the Texas prison system. *Id.* at 765-66. This Court held on appeal that the trial court did not err in excluding the videotape. *Id.* at 766.

*Sells* is entirely distinguishable from the instant case. As stated above, the complained-of photographs depict every aspect of prison life at the Polunsky Unit. (SX508-SX536). Moreover, the photographs were not offered to show that appellant could or could not be controlled while in prison. Instead, the photographs were used by the State to give the jury an inside view of all aspects of prison life.

The photographs in this case were relevant to the issue of future dangerousness. The trial court did not abuse its discretion in admitting the photographs. Appellant's twenty-ninth issue should be overruled.

### RESPONSE TO ISSUES 35 AND 36: THE TRIAL COURT DID NOT ERR IN ADMITTING TESTIMONY THAT APPELLANT WAS A MEMBER OF A STREET GANG; THE TRIAL COURT'S ERROR IN FAILING TO PROVIDE A LIMITING INSTRUCTION REGARDING THIS TESTIMONY WAS HARMLESS.

In his thirty-fifth issue on appeal, appellant contends that the trial court erred in admitting testimony regarding his membership in a criminal street gang. In his thirty-sixth issue, appellant complains that the trial court erred in not providing a simultaneous limiting instruction to the jury regarding this testimony.

### *The Trial Court Did Not Err in Admitting the Complained-of Testimony.*

On appeal, appellant argues that the trial court erred in admitting the testimony of Officer Barrett Keith Nelson, a member of the Dallas Police Department's Gang Unit. One of appellant's arguments appears to be that Officer Nelson was not a qualified expert

pursuant to this Court's opinion in *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992). (App. Brief, p. 103). Appellant did not challenge Officer Nelson's qualifications as a gang expert in the trial court. He has not, therefore, preserved this argument for review. *See* TEX. R. APP. P. 33.1(a).

Appellant also appears to argue that the evidence was not relevant pursuant to Rule of Evidence 401 and was unduly prejudicial pursuant to Rule of Evidence 403. This Court reviews the trial court's admission or exclusion of evidence under an abuse of discretion standard and will not disturb the trial court's decision as long as the court operated within its discretion. *Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007).

At the pretrial hearing to determine the admissibility of Officer Nelson's testimony, the officer testified that appellant had self-admitted to membership in the Gangster Disciples in his interviews to the media, in a phone call to his mother, in the graffiti on his cell wall, and in art, letters, and other writings found in his notebooks. (RR40: 13-29). Officer Nelson further testified that the Gangster Disciples is a criminal gang involved in multiple criminal activities. (RR40: 29). Officer Nelson repeated this same testimony before the jury during the punishment phase of trial. (RR49: 83-130).

At the punishment phase of a capital trial, evidence regarding a defendant's character is relevant. TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(a) (Vernon Supp. 2010); *Jones v. State*, 944 S.W.2d 642, 652 (Tex. Crim. App. 1996). This Court has repeatedly held that evidence of gang membership is relevant to show the character of the defendant. *See Jones*, 944 S.W.2d at 653; *see also Beasley v. State*, 902 S.W.2d 946, 950

88

(Tex. Crim. App. 1995) (gang membership relevant to show character in non-capital sentencing). Appellant does not offer any argument as to why this Court's holdings do not apply to the instant case. This Court should, therefore, overrule appellant's thirty-fifth issue.

Appellant also appears to argue that the officer's testimony was unduly prejudicial under Rule of Evidence 403. Under Rule 403, all relevant evidence is admissible unless "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403. The trial court conducts a balancing test in determining whether to admit or exclude the evidence. *Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006). Relevant evidence is presumed admissible and more probative than prejudicial. *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1990) (op. on reh'g).

The State understands appellant's argument to be that because the State failed to show a connection between him and the Gangster Disciples' criminal activities, the evidence was unduly prejudicial. In support of this argument, appellant directs this Court to the dissenting opinion in *Beasley* and asks this Court to adopt a nexus requirement to avoid undue prejudice as suggested by the dissent in that case. (App. Brief, p. 104). Appellant does not, however, explain why the evidence in this case is unduly prejudicial.

Nevertheless, the probative value of the officer's testimony was not substantially outweighed by its prejudice. All testimony and physical evidence will likely be prejudicial to one party or the other. *Jones*, 944 S.W.2d at 653. It is only where there

89

exists a clear disparity between the degree of prejudice of the offered evidence and its probative value that Rule 403 is applicable. *Id.* Here, evidence that appellant was a member of the Gangster Disciples, a gang that once had a legitimate political purpose but was currently engaged in multiple criminal activities, was undoubtedly prejudicial to appellant. Nonetheless, that prejudice did not outweigh the evidence's probative value to assist the jury in understanding appellant's character in the punishment phase of a capital trial. *See id.* (holding that evidence that Jones was a member of a criminal street gang was not unduly prejudicial). Appellant's thirty-fifth issue should be overruled.

### *Appellant Was Not Harmed By the Trial Court's Failure to Grant His Request for a Limiting Instruction.*

In his thirty-sixth issue on appeal, appellant complains that the trial court erred in denying his request for a limiting instruction at the time that Officer Nelson testified. Appellant maintains that the failure to give a contemporaneous limiting instruction violated Texas Rule of Evidence 105(a). (App. Brief, p. 105).

Immediately prior to Officer Nelson's testimony during punishment, appellant requested a limiting instruction. (RR49: 74). The trial court ruled that appellant was not entitled to the instruction. (RR49: 75-76). This Court has held that Rule 105(a) requires a limiting instruction, upon proper request, when evidence is admitted. *Jones*, 944 S.W.2d at 653. This Court has further held that a trial court errs when it denies a defendant's request for a limiting instruction regarding evidence of the defendant's gang membership. *Id.* at 654. The trial court's error is subject to a harmless error analysis. *Id.* at 653.

90

Violations of the rules of evidence are non-constitutional; thus, this Court must disregard the error unless it affected appellant's substantial rights. TEX. R. APP. P. 44.2(b); *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001). A substantial right is affected when the error had a substantial and injurious effect or influence on the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). In analyzing harm, this Court considers the entire record. *See Motilla v. State*, 78 S.W.3d 352, 355-56 (Tex. Crim. App. 2002).

Appellant does not explain how he was harmed by the trial court's error. Nevertheless, a review of the entire record shows that the harm was limited. First and foremost, although Officer Nelson testified that the Gangster Disciples are known to commit murders and aggravated robberies and to sell drugs, he did not testify that appellant was involved in any of this activity as a member of the gang. (RR49: 91-92). In addition, the jury charge instructed the jury that it could not consider evidence of extraneous offenses unless it found and believed beyond a reasonable doubt that appellant committed such other offenses, if any were committed. (CR: 642).

Moreover, the State presented other evidence at the punishment hearing. The State played several phone calls made by appellant while he was in jail. In the calls, appellant bragged about fighting with jail staff and other inmates, demonstrated a complete lack of remorse for the murders, threatened further violence against those in the jail, and admitted that he was not intoxicated at the time of the media interviews. (RR48: 96-98; RR52: 195-99, 203-07; SX544; SX545; SX552; SX592). In addition, the State presented evidence that while in jail, appellant was involved in two separate fights with

91

inmates, one while coming back from court and the other during recreation time. Appellant was also involved in a fight with a member of the jail's Special Response Team who was conducting a routine search of appellant's cell. (RR48: 131, 138-51, 179-80, 207-09, 230-32).

Finally, the State did not heavily rely on the gang-membership evidence during its closing arguments. Although the State's argument spans approximately thirty-seven pages, appellant's membership in the Gangster Disciples is only mentioned briefly for a total of, at most, four pages. (RR53: 10-31, 65-81). Instead, the State focused on appellant's statements to the media and on comparing appellant's known characteristics to those of a psychopath, as presented during the State's rebuttal.

Consequently, the record before this Court shows that appellant's substantial rights were not affected; thus, the trial court's error in refusing the limiting instruction was harmless. *See Jones*, 944 S.W.2d at 654 (holding that error in refusing Jones's request for a limiting instruction on gang evidence was harmless where the witness did not testify that Jones was involved in the gang's criminal activity, the State introduced other evidence at punishment, and the jury charge included a limiting instruction). This Court should, therefore, overrule appellant's thirty-sixth issue.

### RESPONSE TO ISSUE 37: THE EVIDENCE IS SUFFICIENT TO SUPPORT THE JURY'S FINDING THAT APPELLANT WOULD BE A FUTURE DANGER.

In his thirty-seventh issue on appeal, appellant alleges that the evidence is insufficient to support the jury's answer to special issue number one, future dangerousness. Appellant's argument is without merit.

92

In assessing the legal sufficiency of the evidence to support future dangerousness, this Court views the evidence in the light most favorable to the jury's findings and determines whether any rational trier of fact could have found beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. *Coble v. State*, 330 S.W.3d 253, 265 (Tex. Crim. App. 2010). Only if, after reviewing all of the record evidence, this Court concludes that a rational jury would necessarily have entertained a reasonable doubt about the defendant's future dangerousness, will it find that the evidence is legally insufficient. *Id.*

At the punishment hearing, the jury was presented ample evidence from which it could have determined that there was a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society.

The jury heard numerous recordings of appellant's phone calls while he was in jail. In the calls, appellant blatantly bragged about fighting with another inmate and with one of the members of the jail's Special Response Team. (RR48: 96-99; SX544-SX545). Appellant also made threats of future violence against his defense attorney because he was not happy with the way the attorney had handled the plea negotiations and against one of the jail's maintenance men because he had accidentally unplugged appellant's phone as he was cleaning. (RR48: 98; RR52: 195-99; SX544; SX552). Appellant further boasted that he did not need a "shank" to commit future violence because he had hands. (RR48: 98; SX544).

93

Finally, appellant made numerous statements in the calls that demonstrated his complete lack of remorse for the two murders. Appellant stated that he did not regret the murders, said "fuck [the victims'] family," and admitted that he had pretended to be temporarily insane at the time of the murders and that he was not intoxicated at the time he gave his media interviews. (RR48: 97-98; SX544-SX545). Indeed, in a call made the day the jury had found appellant guilty in the instant case, appellant is jocular when talking about the fact that the jury did not take long in reaching its verdict. (RR52: 203-07; SX592).

Moreover, the State showed the jury the contents of appellant's jail cell. (RR49: 37-56). The photographs of appellant's cell showed that appellant had secreted medication and a razor blade that had been removed from a full razor. (RR49: 43-46). The jury also saw freestyle raps that appellant had written in which he bragged about the murders. (RR49: 50-52).

Furthermore, the jury heard that appellant had been involved in multiple physical altercations during his stay at the jail. Schesser Kirvin, a member of the Dallas County Jail's Special Response Team (SRT), testified that in July 2008, she and other members of the SRT went to appellant's cell to conduct a routine shakedown. (RR48: 131, 137-38). Kirvin knew that appellant was new to the jail and she informed him of the proper procedure for a shakedown; appellant was to face the wall, put his elbows against the wall, and was not allowed to look around. (RR48: 138-41). Appellant turned to her and aggressively asked what would happen if he did not obey her orders. (RR48: 141-42). When appellant turned around again, Kirvin was fearful that he was going to strike her,

94

and so all four officers "took him down." (RR48: 145-47). During the struggle, appellant yelled and cursed at the officers. (RR48: 145-47). As part of standard protocol, the officers took appellant to the nurse; appellant was combative and "very out of control" on the way to the nurse's station. (RR48: 146-48). At the nurse's station, appellant was uncooperative, told the nurse that he did not like to follow the rules, and continued to "stare" at the officers. (RR48: 150-51).

Morris Contreras, a Detention Service Officer at the jail, testified that he witnessed a fight between appellant and Tre'Vaun Miller in the jail's gymnasium. (RR48: 173, 177, 179). According to Contreras, when he and another officer attempted to pull the men apart, appellant was still attempting to hit Miller, who was not reciprocating. (RR48: 180). In phone calls made by appellant at the time of the fight, appellant boasted that he would fight with Miller, who had been yelling down the cell block, and announced that "when the doors open, let that be the bell." (RR48: 195-96; SX563).

Matthew Utsey, a fellow inmate at the jail, testified that appellant had repeatedly threatened to beat him up because Utsey refused to give appellant his medication. (RR48: 223-26). The day that Utsey was scheduled to be released from jail, he and appellant were moved from the courthouse to jail at the same time. (RR48: 230-31). As they were being moved, Utsey saw appellant suddenly swing at his head; Utsey was able to duck, and the blow hit his arm instead. (RR48: 232). Utsey testified that the sudden assault was unprovoked. (RR48: 232, 246-49).

In his argument on appeal, appellant contends that the only evidence of future dangerousness was the evidence of his fights with Miller and Utsey. According to

95

appellant, the jury should not have relied on this evidence because (1) Miller ultimately testified that appellant hit him in self-defense and (2) Utsey was untrustworthy. The jury was, however, the sole judge of the witnesses' credibility and the weight to be given to their testimony. *See Colella v. State*, 915 S.W.2d 834, 843-44 (Tex. Crim. App. 1995).

Most importantly, the jury was presented with the evidence of the actual offense in this case, including appellant's callous remarks about the murders in his interviews with the media. In these interviews, appellant admits that he went to Garland that night with the intent to rob unsuspecting victims for their "money, car, whatever the fuck else came with it." (RR45: 117, 270-71; RR46: 216, 219; SX18; SX403-SX407). He further admits that he shot each man in the head when they attempted to get up. (RR45: 227; SX405). Finally, in his interview with Ellen Goldberg, appellant stated that if he was given a life sentence, he would kill someone else. (RR45: 227; SX405).

Appellant appears to argue that this Court should hold that the jury could not have found that he was a future danger based on the facts of this offense alone. In support of his argument, appellant cites to older cases from this Court, which decided that the evidence was insufficient to support an affirmative answer to the future-dangerousness special issue primarily because the facts of the offense were insufficient to support such an answer and because there was no other evidence, such as psychiatric or nonpsychiatric opinion testimony, that would support a finding of future dangerousness. (App. Brief, p. 106). *See Estrada v. State*, 313 S.W.3d 274, 284 (Tex. Crim. App. 2010) (discussing the cases cited by appellant). This Court has held, however, that each case must be resolved on its own facts. *Id.* Here, the evidence shows that appellant hunted for victims, shot and

96

killed two innocent men for their possessions, and then boasted on television about his crimes. These facts, alone, are sufficient to support the jury's answer to the future-dangerousness issue.

In sum, the evidence presented to the jury throughout the trial shows appellant to be cold, callous, unremorseful, and delighting in his newfound notoriety. The evidence was, therefore, sufficient to support the jury's answer. *See Martinez v. State*, 327 S.W.3d 727, 735 (Tex. Crim. App. 2010) (holding that the evidence was sufficient to support the jury's answer to the future-dangerousness issue where, among other things, the defendant showed a continued lack of remorse); *Estrada*, 313 S.W.3d at 284 (evidence of Estrada's unremorseful, premeditated, brutal murders was sufficient to support jury's answer to the future-dangerousness special issue); *Mays v. State*, 318 S.W.3d 368, 390-91 (Tex. Crim. App. 2010) ("Viewed in the light most favorable to the jury's verdict, the circumstances of this offense, including the evidence that he deliberately killed two police officers, as well as the evidence of appellant's prior confrontations with authority figures, support a finding that there is a probability that appellant would commit future acts of violence (quite possibly against authority figures) in prison."). Appellant's argument should be overruled.

**RESPONSE TO ISSUES 38 THROUGH 40:  THIS COURT DOES NOT HAVE JURISDICTION OVER APPELLANT'S COMPLAINTS REGARDING THE GARNISHMENT OF HIS INMATE TRUST FUND ACCOUNT, AND THE RECORD DOES NOT SHOW THAT THE TRIAL COURT ASSESSED ATTORNEY FEES AS COURT COSTS.**

In his thirty-eighth and thirty-ninth issues, appellant alleges that the trial court's imposition of court costs in this case violates his right to due process and section 501.014 of the Texas Government Code. In his fortieth issue, appellant alleges that the evidence is legally insufficient to support the amount of court costs imposed by the trial court.

First and foremost, this Court does not have jurisdiction over the allegations raised in appellant's thirty-eighth and thirty-ninth issues. The State deciphers appellant's allegations on appeal to be that his inmate trust fund will be garnished to pay these fees. (App. Brief, pp. 108-110). In *In re Johnson*, this Court held that issues regarding the garnishment of inmate trust fund accounts under the Texas Government Code do not involve "criminal matters" and, consequently, this Court does not have jurisdiction to hear such claims. *In re Johnson*, 280 S.W.3d 866, 874 (Tex. Crim. App. 2008). Appellant's allegations should, therefore, be dismissed.

In his fortieth issue, appellant merely alleges that "the evidence is insufficient to support entry of the complained of order as the record is void of any evidence to support the dollar number assessed as costs in this matter." (App. Brief, p. 110). Appellant then directs this Court to its opinion in *Mayer v. State*, 309 S.W.3d 552 (Tex. Crim. App. 2010). *Mayer* dealt with the duty of the trial court to ascertain a defendant's ability to pay prior to ordering the defendant to pay costs related to his court-appointed attorney. *Id.* at 553. There is no indication in the record before this Court that the costs assessed by

98

the trial court in this case were anything more than the statutorily-imposed costs the trial court was obligated to order appellant to pay. (CR: 698); *see* TEX. CODE CRIM. PROC. ANN. ch. 102 (Vernon 2006 & Supp. 2010). Appellant's issue should be overruled.

### RESPONSE TO ISSUES 41, 48, AND 49: ARTICLE 37.071 IS NOT UNCONSTITUTIONAL FOR ALLOWING THE JURY TOO MUCH DISCRETION IN DECIDING BETWEEN LIFE AND DEATH.

In three issues on appeal, appellant challenges the constitutionality of Texas's death-penalty statute for its alleged failure to sufficiently limit the jury's discretion to impose the death penalty. In his forty-first issue, appellant contends that article 37.071 violates the Eighth Amendment's prohibition against cruel and unusual punishment because it allows the jury too much discretion in sentencing and because it lacks the minimal standards and guidance necessary to avoid the arbitrary and capricious imposition of the death penalty. In his forty-eighth and forty-ninth issues, appellant argues that article 37.071 violates his rights under the federal and state constitutions to due process and due course of law as well as the prohibitions against cruel and unusual punishment because it is impossible to simultaneously restrict the jury's discretion to impose the death penalty while also allowing the jury unlimited discretion to consider mitigating evidence. Appellant relies on Justice Blackmun's dissenting opinion in *Callins v. Collins*, 510 U.S. 1141, 1143-59 (1994) (Blackmun, J., dissenting), to support his arguments.

This Court has repeatedly rejected claims identical to those raised in issues forty-one, forty-eight, and forty-nine. *See Smith v. State*, 297 S.W.3d 260, 278 (Tex. Crim. App. 2009), *cert. denied*, 130 S. Ct. 1689 (U.S. 2010); *Saldano v. State*, 232 S.W.3d 77,

108-09 (Tex. Crim. App. 2007); *Escamilla v. State*, 143 S.W.3d 814, 828 (Tex. Crim. App. 2004); *Rayford v. State*, 125 S.W.3d 521, 532 (Tex. Crim. App. 2003). Appellant makes no meaningful attempt to persuade this Court to revisit these prior holdings.[15] Accordingly, his forty-first, forty-eighth, and forty-ninth issues should be overruled.

### RESPONSE TO ISSUE 42: THE MITIGATION SPECIAL ISSUE IS NOT UNCONSTITUTIONAL FOR SENDING "MIXED SIGNALS" TO THE JURY.

In his forty-second issue on appeal, appellant contends that article 37.071 violates the Eighth Amendment to the United States Constitution, as interpreted in *Penry v. Johnson* ("*Penry II*"), 532 U.S. 782 (2001). He argues that the mitigation special issue sends "mixed signals" to the jury and thereby renders any verdict reached in response to that issue "intolerable and unreliable." (App. Brief, p. 112).

Appellant wholly fails to explain how the mitigation instruction given in this case sent a "mixed signal" to the jury. Nevertheless, this Court has repeatedly rejected attempts to equate the statutory mitigation instruction provided by article 37.071 with the judicially-crafted nullification instruction at issue in *Penry II*. *See Coble v. State*, 330 S.W.3d 253, 296-97 (Tex. Crim. App. 2010), *cert. denied*, 2011 U.S. LEXIS 4622 (U.S. June 20, 2011); *Saldano*, 232 S.W.3d at 107-09; *Escamilla*, 143 S.W.3d at 828; *Jones v. State*, 119 S.W.3d 766, 790 (Tex. Crim. App. 2003); *see also Penry II*, 532 U.S. at 803

---

[15] As a preface to his arguments concerning issues forty-one through fifty-six, appellant acknowledges that this Court has previously rejected the constitutional claims raised in these issues. He states that he presents these issues "not to cause unnecessary litigation but to invite this Court to review any prior stand on any issue and more importantly to preserve each issue for further review in the Federal Court system." (App. Brief, p. 111).

(noting that the "brevity and clarity" of Texas's statutorily mandated mitigation instruction distinguished it from the supplemental instruction provided in that case). Appellant does not assert any novel legal arguments to support his claims. His forty-second issue should, therefore, be overruled.

**RESPONSE TO ISSUES 43, 44, AND 45: ARTICLE 37.071 IS NOT UNCONSTITUTIONAL FOR FAILING TO ASSIGN TO THE STATE THE BURDEN OF PROOF ON THE MITIGATION SPECIAL ISSUE.**

Appellant brings three issues on appeal challenging what he contends is an improper allocation of the burden of proof on the mitigation special issue. Specifically, he contends in his forty-third through forty-fifth issues that article 37.071 violates the due process and due course of law provisions of the United States and Texas Constitutions because it implicitly places on the defendant the burden of proof regarding mitigating circumstances. Appellant argues that under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002), the State should bear the burden of proving beyond a reasonable doubt the absence of mitigating circumstances sufficient to warrant a life sentence.

This Court has held that neither party bears the burden of proof on the mitigation special issue. *See Blue v. State*, 125 S.W.3d 491, 501 (Tex. Crim. App. 2003). Moreover, this Court has repeatedly rejected the claim that *Apprendi* and *Ring* require the State to prove beyond a reasonable doubt that the mitigation special issue should be answered in the negative. *See, e.g., Coble*, 330 S.W.3d at 296; *Perry v. State*, 158 S.W.3d 438, 446-47 (Tex. Crim. App. 2004); *Rayford*, 125 S.W.3d at 533-34; *Blue*, 125 S.W.3d at 501. Specifically, this Court has held that neither *Apprendi* nor *Ring* apply to

101

the mitigation special issue because by the time the jury reaches that issue, the State has already demonstrated the defendant's eligibility for a death sentence. A negative answer on mitigation cannot, therefore, increase the authorized punishment beyond the prescribed statutory maximum of death. *See Perry*, 158 S.W.3d at 446-47; *Rayford*, 125 S.W.3d at 533-34; *Blue*, 125 S.W.3d at 501.

Appellant does not offer any reason for this Court to reconsider its prior holdings concerning the inapplicability of *Apprendi* and *Ring* to Texas's death-penalty scheme. Consequently, appellant's forty-third, forty-fourth, and forty-fifth issues should be overruled.

**RESPONSE TO ISSUE 46: THE "12/10 RULE" IS NOT UNCONSTITUTIONAL.**

In his forty-sixth issue on appeal, appellant contends that Texas's death-penalty scheme violates the Eighth Amendment's prohibition against cruel and unusual punishment and the Fourteenth Amendment's right to due process by requiring at least ten "no" votes in order for the jury to return a negative answer to the future-dangerousness special issue and at least ten "yes" votes in order for the jury to return an affirmative answer to the mitigation special issue. *See* TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(d)(2), (f)(2). He argues that the ten-vote requirement might dissuade jurors from voting for a life sentence out of a belief that their votes would be "worthless" unless nine other jurors joined with them. (App. Brief, p. 4).

This Court has repeatedly and consistently rejected identical attacks on the constitutionality of the so-called "12/10 Rule." *See, e.g., Smith*, 297 S.W.3d at 278;

*Escamilla*, 143 S.W.3d at 828; *Rayford*, 125 S.W.3d at 532; *Prystash v. State*, 3 S.W.3d 522, 536-37 (Tex. Crim. App. 1999). Appellant makes no new arguments that would call these prior holdings into question. His forty-sixth issue should, therefore, be overruled.

### RESPONSE TO ISSUE 47: THE SPECIAL ISSUES ARE NOT UNCONSTITUTIONALLY VAGUE.

In his forty-seventh issue on appeal, appellant claims that the trial court erred in failing to define the terms "probability," "criminal acts of violence," and "continuing threat to society" in connection with the first special issue. *See* TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(b)(1). He argues that the failure to define these "vague and indefinite" terms precludes a rational appellate review of the jury's finding on the future-dangerousness issue and violates his rights under the Sixth, Eighth, and Fourteenth Amendments. (App. Brief, p. 117).

This Court has repeatedly held that the terms "probability," "criminal acts of violence," and "continuing threat to society" are not unconstitutionally vague and that the jury is presumed to understand them without an instruction. *See Murphy v. State*, 112 S.W.3d 592, 606 (Tex. Crim. App. 2003); *Feldman v. State*, 71 S.W.3d 738, 757 (Tex. Crim. App. 2002); *Ladd v. State*, 3 S.W.3d 547, 572 (Tex. Crim. App. 1999); *see also Coble*, 330 S.W.3d at 297 (noting that this Court has repeatedly rejected claims concerning the constitutionality of the undefined terms in the first special issue and declining to revisit this precedent). Appellant does not assert any novel legal arguments to support his claim. Accordingly, the trial court did not err in failing to define these terms in the jury charge, and appellant's forty-ninth issue should be overruled.

103

**RESPONSE TO ISSUE 50: ARTICLE 37.071 IS NOT UNCONSTITUTIONAL FOR FAILING TO REQUIRE THAT THE JURY CONSIDER MITIGATING EVIDENCE.**

In his fiftieth issue on appeal, appellant contends that the trial court erred in denying his motion to find article 37.071 unconstitutional under the Eighth Amendment because the statute fails to *require* that mitigating evidence be considered by the jury. He argues that in order to survive constitutional scrutiny, a death-penalty statute must "require that the jury be told that it must consider all mitigating evidence." (App. Brief, p. 119).

When mitigating evidence is presented, the Constitution requires a vehicle by which the jury can consider and give effect to mitigating evidence relevant to a defendant's background, character, or the circumstances of the crime. *Threadgill v. State*, 146 S.W.3d 654, 671 (Tex. Crim. App. 2004) (citing *Raby v. State*, 970 S.W.2d 1, 8 (Tex. Crim. App. 1998)). Article 37.071 provides that the jury "shall" answer the following issue:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.

TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(e)(1). Appellant fails to explain how this provision, which by its terms expressly requires the jury to consider mitigating evidence, is nevertheless constitutionally inadequate. *See Threadgill*, 146 S.W.3d at 671. Moreover, this Court has repeatedly rejected claims that Texas's death-penalty law is unconstitutional because it fails to mandate consideration of mitigating evidence. *See,*

104

*e.g., Saldano*, 232 S.W.3d at 108-09; *Threadgill*, 146 S.W.3d at 671; *Escamilla*, 143 S.W.3d at 828-29. The trial court did not, therefore, err in denying appellant's motion. His fiftieth issue should be overruled.

### RESPONSE TO ISSUE 51: THE MITIGATION SPECIAL ISSUE IS NOT UNCONSTITUTIONAL FOR FAILING TO PLACE ON THE STATE THE BURDEN OF PROOF REGARDING AGGRAVATING EVIDENCE.

In his fifty-first issue on appeal, appellant contends that the mitigation special issue violates the Eighth and Fourteenth Amendments because it fails to require the State to prove the existence of aggravating factors warranting a death sentence. He argues that the mitigation issue is a "conduit for aggravating (as well as mitigating) factors" because it effectively instructs the jurors to consider any possible aggravating factors that may outweigh the mitigating factors present in the case. (App. Brief, p. 119). Relying on *Walton v. Arizona*, 497 U.S. 639 (1990), he maintains that the federal constitution requires the State to prove the existence of any such aggravating factors.

This Court has specifically rejected this precise argument. *See Moore v. State*, 999 S.W.3d 385, 408 (Tex. Crim. App. 1999); *Williams v. State*, 937 S.W.2d 479, 491 (Tex. Crim. App. 1996). In *Williams*, this Court held that because Texas law imposes upon the State the burden of proving certain prescribed aggravating elements that narrow the eligibility for the death penalty, a burden of proof need not be imposed for aggravating circumstances that might be considered in conjunction with the open-ended mitigation issue. *Williams*, 937 S.W.2d at 491 (citing *Tuilaepa v. California*, 512 U.S. 967, 978-80 (1994)). Appellant does not attempt to persuade this Court to depart from precedent on this issue. Consequently, his fifty-first issue should be overruled.

RESPONSE TO ISSUE 52:  THE MITIGATION SPECIAL ISSUE IS NOT UNCONSTITUTIONAL FOR PERMITTING THE JURY TO HAVE "OPEN-ENDED DISCRETION" IN EVALUATING MITIGATING EVIDENCE.

In his fifty-second issue on appeal, appellant claims that the mitigation special issue is unconstitutional under the Eighth and Fourteenth Amendments because it permits the very type of open-ended discretion condemned by the United States Supreme Court in *Furman v. Georgia*, 408 U.S. 238 (1972).   He argues that the Eighth Amendment requires a trial court to submit a charge that "adequately structures the jury's sentencing discretion regarding mitigating and aggravating factors." (App. Brief, p. 120).

This Court has distinguished the open-ended discretion prohibited by *Furman* with the discretion given to juries under Texas's mitigation special issue.  *See Pondexter v. State*, 942 S.W.2d 577, 586-87 (Tex. Crim. App. 1996).  In *Pondexter*, this Court noted that the *Furman* Court was concerned with the open-ended discretion permitted by statutes that failed to narrow the category of people who were eligible for the death penalty.  *Pondexter*, 942 S.W.2d at 587.   This Court observed that there was no prohibition against allowing juries to decide what evidence is mitigating and how much weight to give that evidence.  *Id.*  Indeed, as both this Court and the Supreme Court have recognized, such determinations are best left to the jury.   *Id.* (citing *Tuilaepa v. California*, 512 U.S. 967, 979-80 (1994); *Morris v. State*, 940 S.W.2d 610, 614 (Tex. Crim. App. 1996)).

This Court has consistently rejected attempts equate the discretion permitted juries under the mitigation special issue with the open-ended discretion prohibited by *Furman*. *See, e.g., Smith*, 297 S.W.3d at 278; *Saldano*, 232 S.W.3d at 108-09; *Moore*, 999 S.W.2d

106

at 408. Appellant raises nothing new to justify abandoning these prior holdings. His fifty-second issue should, therefore, be overruled.

### RESPONSE TO ISSUE 53: ARTICLE 37.071 IS NOT UNCONSTITUTIONAL BECAUSE IT DOES NOT ALLOW FOR "MEANINGFUL APPELLATE REVIEW" OF THE MITIGATION SPECIAL ISSUE.

In his fifty-third issue on appeal, appellant contends that Texas's statutory death-penalty scheme is unconstitutional under the Eighth and Fourteenth Amendments because it does not permit "meaningful appellate review" of the jury's answer to the mitigation special issue. (App. Brief, p. 120-21). He claims that this Court is constitutionally required to review the sufficiency of the evidence supporting the jury's negative answer to the mitigation special issue and that such review is made impossible by the "open-ended and unstructured nature" of article 37.071. (App. Brief, p. 121).

Contrary to appellant's argument, this Court has held that the constitutionality of article 37.071 is not contingent upon appellate review of the mitigation special issue. *See McFarland v. State*, 928 S.W.2d 482, 499 (Tex. Crim. App. 1996). As long as the jury is not precluded from hearing and giving effect to mitigating evidence, this Court has never regarded appellate review of mitigating evidence to be an essential component of a constitutionally acceptable capital-punishment scheme. *Id.*; *see also Burns v. State*, 761 S.W.2d 353, 356 n.4 (Tex. Crim. App. 1988) (noting that "it is doubtful whether Eighth Amendment or Due Process considerations absolutely require this Court to reweigh punishment evidence"). This Court has continued to consistently hold that appellate review of the jury's answer to the mitigation special issue is not constitutionally required. *See, e.g., Saldano*, 232 S.W.3d at 108-09; *Escamilla*, 143 S.W.3d at 829; *Prystash*, 3

S.W.3d at 536. Appellant raises no new arguments to support his claim. Thus, his fifty-third issue should be overruled.

### RESPONSE TO ISSUE 54: THE TRIAL COURT DID NOT ERR IN OVERRULING APPELLANT'S MOTION TO QUASH THE INDICTMENT BASED ON "ENUMERATED CONSTITUTIONAL DEFECTS."

In his fifty-fourth issue on appeal, appellant contends that the trial court erred in overruling his motion to quash the indictment based on certain "enumerated constitutional defects" in Texas's death-penalty scheme. (App. Brief, p. 121). This issue presents nothing for review.

This Court has held that the right to appellate review in Texas extends only to complaints made in accordance with the published rules of appellate procedure. *Narvaiz v. State*, 840 S.W.2d 415, 429 (Tex. Crim. App. 1992). As stated previously, these rules require that an appellant's brief "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(h). Conclusory assertions of error, unsupported by substantive legal analysis, present nothing for review. *See Rocha v. State*, 16 S.W.3d 1, 20 (Tex. Crim. App. 2000). Moreover, this Court has held that an issue that embraces more than one legal theory is multifarious and risks rejects on that basis alone. *See Davis v. State*, 329 S.W.3d 798, 803 (Tex. Crim. App. 2010); *Mays v. State*, 318 S.W.3d 368, 385 (Tex. Crim. App. 2010), *cert. denied*, 131 S. Ct. 1606 (U.S. 2011).

Here, appellant asserts ten separate constitutional challenges to article 37.071 in a single issue on appeal. Appellant devotes one sentence to presenting each of these challenges and provides absolutely no argument to support the contentions made.

108

Moreover, aside from referring to various constitutional provisions, appellant cites no authority to support his claims. Without adequate briefing, the State cannot respond to appellant's complaints. Appellant's fifty-fourth issue should be overruled as multifarious and inadequately briefed. *See Wood v. State*, 18 S.W.3d 642, 649 n.6 (Tex. Crim. App. 2000).

Furthermore, as appellant acknowledges at the outset of this issue, this Court has previously addressed and rejected identical challenges to Texas's death-penalty statute. *See, e.g., Davis*, 313 S.W.3d at 354-55; *Threadgill*, 146 S.W.3d at 671, 673; *Rayford*, 125 S.W.3d at 534; *Valle v. State*, 109 S.W.3d 500, 504 (Tex. Crim. App. 2003); *Pondexter*, 942 S.W.2d at 586, 588; *Satterwhite v. State*, 858 S.W.2d 412, 428 (Tex. Crim. App. 1993); *see also Saldano*, 232 S.W.3d at 108-09 (overruling claim that the trial court should have granted the defendant's motion to set aside the indictment based on "enumerated constitutional defects" in the capital-punishment scheme); *Escamilla*, 143 S.W.3d at 829 (rejecting as meritless the defendant's complaint that the trial court should have quashed the indictment because of "enumerated constitutional defects" in Texas death-penalty law). Appellant neither challenges the reasoning of this existing case law nor asserts any novel legal arguments to support his claims. Under these circumstances, appellant's fifty-fourth issue should be overruled.

### RESPONSE TO ISSUES 55 AND 56: APPELLANT HAS NOT DEMONSTRATED CUMULATIVE CONSTITUTIONAL ERROR.

In his fifty-fifth and fifty-sixth issues on appeal, appellant asks this Court to consider the cumulative effect of the constitutional violations alleged in the preceding

issues. He argues that, considered together, these constitutional violations denied him due process and due course of law under the federal and state constitutions. This argument is without merit.

As an initial matter, although appellant titles his fifty-fifth issue as a cumulative-error complaint based on constitutional claims raised in the preceding issues, he then proceeds to raise an additional claim that was not asserted elsewhere in his brief. Specifically, he contends that Texas's death-penalty scheme is unconstitutional under the Fifth, Eighth, and Fourteenth Amendments because it fails to provide a method by which the State determines the "death-worthiness" of a defendant. (App. Brief, p. 123). He argues the decision as to which defendant will be subjected to the death penalty varies widely from county to county across the state and that the lack of consistent standards renders the system arbitrary and capricious. This Court has previously rejected such arguments. *See Threadgill*, 146 S.W.3d at 671-72; *Rayford*, 125 S.W.3d at 534. Appellant's claims should likewise be overruled.

Regarding appellant's cumulative-error complaint, this Court has recognized that a number of individual errors may be found harmful in their cumulative effect. *See Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999). But this Court has never held that non-errors may, in their cumulative effect, cause error. *Gamboa v. State*, 296 S.W.3d 574, 585 (Tex. Crim. App. 2009). Here, appellant has not demonstrated in his previous issues on appeal that any constitutional violations occurred. Accordingly, there is no harm to cumulate. *See Rayford*, 125 S.W.3d at 535. Appellant's fifty-fifth and fifty-sixth issues should be overruled.

110

## PRAYER

The State prays that this Honorable Court will affirm the judgment of the trial court.

Respectfully submitted,

CRAIG WATKINS
*CRIMINAL DISTRICT ATTORNEY*
DALLAS COUNTY, TEXAS

AMY SUE MELO MURPHY
*ASSISTANT DISTRICT ATTORNEY*
STATE BAR NO. 24041545
FRANK CROWLEY COURTS BLDG.
133 N. RIVERFRONT BLVD., LB-19
DALLAS, TEXAS 75207-4399
(214) 653-3639
(214) 653-3643 *fax*

## CERTIFICATE OF SERVICE

I certify that a true copy of the foregoing State's brief has been served on John Tatum, Attorney for appellant, 990 South Sherman Street, Richardson, Texas, 75081, via United States Mail on August 3, 2011.

AMY SUE MELO MURPHY

Ship Date: 04AUG11
ActWgt: 60.0 LB
AD: 3358010/INET3180

Bar Code

111