# TAMES Barcode Cover Sheet



5b0b1ca012514723a6acb97b5c07016c

| | |
|---|---|
| **Case Number:** | WR-81,573-01 |
| **Style:** | Broadnax, James Garfield |
| **Event Date:** | 5/30/2014 |
| **Event Details:** | Unassigned/This Court/RR RECEIVED/11.071/ |
| **Filename:** | WR-81,573-01 RR RECEIVED 11.071 5-30-2014--vol. 2 of 4 vols |
| **Document Description:** | RECORD |
| **Document Remarks:** | vol. 2 of 4 vols--chronological index |
| **Document(s):** | |
| **Generated By:** | bhooper |
| **Generated On:** | 7/22/2014 8:47:20 AM |



SCANNED

APR 05 2016

Case 3:15-cv-01758-N    Document 42-16    Filed 06/29/16    Page 2 of 13    PageID 12036

REPORTER'S RECORD

TRIAL COURT CAUSE NO. WR08-24667-Y

| THE STATE OF TEXAS | * | IN THE CRIMINAL |
| VS. | * | DISTRICT COURT 7 |
| JAMES BROADNAX | * | DALLAS COUNTY, TEXAS |

----------------------------------------

WRIT HEARING

DECEMBER 6, 2012

VOLUME 2 OF 4 VOLUMES

----------------------------------------

On the 6th day of December, 2012, the following proceedings came on to be heard in the above-entitled and -numbered cause before the HONORABLE MICHAEL SNIPES, Judge Presiding, held in Dallas, Dallas County, Texas; Proceedings reported by machine shorthand; Computer-aided transcription.

---

**3**

CHRONOLOGICAL INDEX

| | Page | Volume |
|---|---|---|
| Status of case | 6 | 2 |
| Issues | 7 | 2 |

RECEIVED IN
COURT OF CRIMINAL APPEALS

MAY 30 2014

Abel Acosta, Clerk

---

**2**

APPEARANCES

For the State:
  Ms. Amy Murphy
  133 N. Riverfront Blvd.
  Dallas, TX  75207

For the Defense:
  Ms. Lydia Brandt
  Dallas, TX

---

**4**

ALPHABETICAL INDEX

(No witnesses)

---

EXHIBIT INDEX

| No. | Description | Iden. | Admtd. | Volume |
|---|---|---|---|---|
| DX1-23 | Sheriff's Dept. Records | 27 | 27 | 2 |
| | Various affidavits | | | |

PROCEEDINGS

December 6, 2012

THE COURT: On the record.

Ms. Brandt, what do you have as being the writ cause number?

MS. BRANDT: As far as I know, the Writ cause number is the same as the trial number. Instead of F08, it would be WRO8-24667.

THE COURT: Do you agree with that, Ms. Murphy?

MS. MURPHY: It is either W or WR. I have W.

THE COURT: And are you lead counsel for the State?

MS. MURPHY: Yes, I am.

THE COURT: This is Cause Number WR-24667, the State of Texas vs. Broadnax. This is a writ hearing.

And what was the date of conviction, and where are we in the procedural context of direct appeal, Ms. Murphy?

MS. MURPHY: His direct appeal has been confirmed by the Court of Appeals. His cert in the United States Supreme Court was denied, and now we are at the State's proceeding.

THE COURT: So has he exhausted all of his direct appeal?

MS. MURPHY: Yes, Your Honor.

THE COURT: And I have scheduled all day tomorrow. This case took less than two weeks to try, and so I want to make sure all of Mr. Broadnax's rights are observed and upheld. But at the same time, I like to think that I'm known for moving efficiently so I plan to do that in here, also. But I have allocated all day tomorrow and as much of this morning as is necessary for this. And if we don't get done tomorrow, that is okay, too.

The trial I had scheduled for the 10th, Ms. Patel has asked out of that. So we have the 10th open, as well as the 11th. So if we have to, we can go then. And I ask that the lawyers be professionally courteous to each other at all times.

Ms. Brandt, will you tell me so I can write this down factually what exactly it is that you see as the issues that you want to address today.

MS. BRANDT: My issue, Judge, has to do with the media request issue. What I am asking for in the motion that I provided you a copy of is a motion for court-ordered discovery, court-ordered Brady material from the Dallas D.A.

THE COURT: Court-ordered discovery of what?

MS. BRANDT: Specifically, I have detailed a request for the depositions of -- of persons, the appropriate persons within Channels 4, 5, 8 and 11 who had any kind of direct contact with law enforcement by which the media initially learned of the criminal offense conduct of Mr. Broadnax in Garland, the arrest in Texarkana and the days following when Mr. Broadnax was transferred to and incarcerated in Garland, and also then Mr. Broadnax was transferred to the Garland County Jail.

The second request that I have got, if you want me to list the requests first and make the argument. Would you like me to do that?

THE COURT: Yes, please.

MS. BRANDT: The second request I have got -- and that is in the proposed order that I'm reading from that is on there. The second request is to be allowed to take the depositions of the nine individuals that are listed in this proposed order, Demarius Cummings, Franklin Davis, Licho Escamilla, Justin Jones. Chloe Menager, Cliff Jenkins; William Palmer, Charles Payne, Gary Wayne Pettigrew and Robert Sparks.

The third request, as to the due diligence necessary and produce any kind of correspondence, by way

9

of example but not limitation, emails, telephone messages, faxes, letters to or from the Dallas Sheriff's Office, Dallas Police Department or D.A.'s office to Channels 4, 5, 8, 11, 21, 33, Dallas Morning News, Telemundo and Univision, and it is for the nine individuals that I listed before, and Mr. Broadnax.

And finally, Your Honor, the last request is to allow us the necessary time to conduct discovery to allow the defense to do due diligence as far as Brady obligation and report back to you with what has been produced. And if it shows additional proof, then we will have the hearing tomorrow, on December 7th, but at that point in time in the future we be allowed to call witnesses.

Do you want me to provide my argument now?

THE COURT: Let me ask you a question. First, by way of typos, you have 21 and 22 at the bottom of the pages. I take it that is not correct.

MS. BRANDT: It was originally at the end, and I realized after I did that, that I should be separating out the order. When I had typed it, it's just put it in order. That is why it goes from 19. And I think after that on my word processor it goes 20, 21 and 22. So this would have been at the end of this particular motion. So it is all here.

10

He would also like --

THE COURT: What ends at 19?

MS. BRANDT: What ends at 19 is the exhibits page on the page. If you get to 20, that would have been the actual order -- or the order that I would have drafted.

THE COURT: Would you come show that to me?

MS. BRANDT: Sure. You go to page 19.

THE COURT: And then also you have got a March 15, 2012. I assume that is 2013.

MS. BRANDT: I'm sorry. That is correct.

THE COURT: Okay. Before I let you get into the meat of your argument, what on earth do all these other defendants have to do with this case?

MS. BRANDT: It is our position that the Texas Defense Act is unconstitutional prior to its enactment in 2002. The defendants in 2002 were being appointed defense counsel at the time that they were arraigned and requested counsel. Forty-three jurisdictions in the United States -- Rothgery, R-O-T-H-G-E-R-Y, it's a case that was decided June 23rd, 2008. And it was decided on the very day that Mr. Broadnax was being interviewed by the media.

What the United States Supreme Court said in that case is that there are 43 states that appointed

11

counsel either before, at -- or immediately at the time of arraignment. And that Texas is only one of a handful of jurisdictions that delays the appointment of counsel to some other time. And the Court said in that particular case that it was provided with no acceptable reason for the delay in that because this is contrary to the ABA recommendations and positions.

Our position is that what these individuals show is this history of delays in appointment and also the harm that is being caused. There is a gap between the arraignment of Mr. Broadnax, which was on June 21st. He had been booked in at the Garland Jail on the 19th. On the 20th, the media was already requesting the Dallas Sheriff's Department to have access to Mr. Broadnax, even though he was not in the Dallas County Jail at that time. The gap is a gap that has been exploited by the media, we believe, at the solicitation, the encouragement or is being facilitated by law enforcement so that this particular -- the confessions that are being given can be used by the prosecution.

If you take a look at that -- we have a business records affidavit on here. On the second page, the Dallas County Sheriff's Department is actually putting together a sample request letter and providing it to the media so they can let the media in. And you

12

will notice in here the language, things like, We would like to give you your opportunity to tell your side of story. Please sign below so the sheriff's department can notify us as soon as you get the response.

B, which is the Broadnax media request for Fox 4, and WFAA Channel 8 -- is that 2?

COURT REPORTER: I only have one that you gave me, so it would be 2.

MS. BRANDT: When you compare the media form that the Dallas Sheriff's Office is providing against the media request letters that were actually being submitted by the media, you can see substantially the same, or in some cases identical, language the media is using. Things like, for example, on the Fox 4 media request, you will be given this opportunity to tell your side of the story. Please notify the Sheriff's Department as soon as they deliver this letter. And so we have got some facilitation that is going on here to help get media quick access.

We also know -- if I could -- take a look at Exhibit C. And is that 3? Is that Exhibit 3?

COURT REPORTER: Is that all included in the same one you're talking about or not?

MS. BRANDT: No, it's the next exhibit.

COURT REPORTER: Which is contained within

Defendant's Exhibit 1?

MS. BRANDT: Defendant's Exhibit 1 is Exhibit A.

THE COURT: Ms. Brandt, why don't you come up and show her?

MS. BRANDT: Sure.

THE COURT: I've got all the exhibits.

COURT REPORTER: I've got a big packet here.

MS. BRANDT: Go to --

COURT REPORTER: You have --

MS. BRANDT: Here's the actual exhibit list. So Exhibit A would be 1, Exhibit B would be 2. They're all marked C, D, E.

COURT REPORTER: Okay. Okay. Okay.

THE COURT: Straight, Haze?

COURT REPORTER: Yes, sir.

MS. BRANDT: So are we still using Defendant's Exhibit 1 within C or A?

COURT REPORTER: So you can either say State's Exhibit 1 Exhibit blah, blah, blah, inside of that if you want to refer a particular exhibit within it.

MS. BRANDT: So I am now looking at Defense Exhibit 1 and Exhibit C within that. This is a Janet Cook letter to Sheriff Lupe Gonzales (sic). She talks in there -- it is dated January 14th, 2009. And this goes also to show the encouragement, solicitation, facilitation of the media access by law enforcement to -- by law enforcement to the media. And in here, Ms. Payne (sic) is saying, I was not accessed to my client. My client was denied access to his attorney and investigator by the sheriff's department in --

THE COURT: You mean Ms. Cook? You said Ms. Payne.

MS. BRANDT: I'm sorry. Ms. Cook, who represents Charlie Patrick Payne. She goes on to say, I believe it was done intentionally to allow Fox News to get in and interview a potential death penalty defendant. The interview would not have happened without the sheriff's office aiding Fox News to have access to my client and denying me access. My investigator and I were there prior to Fox 4's arrival and were kept waiting 15 minutes before they were taken upstairs. So we have two sources of facilitating the media quick access to defendants.

What we have tried to do, Judge, is figure out what the actual link is between the media and the law enforcement. In the government's answer, they are saying the media is not a state agent and they relied on your ruling at trial to support that.

I would point the Court out to -- it is again Exhibit 1, but Exhibit D within that. It is the affidavit of Ms. Burdett. Ms. Burdett knows a reporter for the Fort Worth Star Telegram. She had -- and the reporter for the -- or a former reporter for the Fort Worth Star Telegram was a woman by the name of Diane Hunt. Ms. Burdett asked Ms. Hunt how is it --

THE COURT: I don't have that.

MS. BRANDT: I'm on page 10, media --

THE COURT: The affidavit of Mary Burdett?

MS. BRANDT: Yes, sir. And so that is Exhibit B to Exhibit 1, which is this motion.

Ms. Burdett asked Ms. Hunt how the media outlets initially learned of a capital offense and the defendant's involvement. What we had in the course of the suppression hearings were questions and answers to and from the reporters about how do they get this assignment and know Mr. Broadnax was there. And it was pretty much limited to, well, we were sent over by our assignments editors, or we got some very vague responses such as We got notified.

What we know here from Mary Burdett's affidavit, because she is asking generally how does the media first get contact. What she is saying here in paragraph five, she says Ms. Hunt, although she wasn't assigned to the actual jail beat, quote -- and I'm looking at paragraph five -- other reporters are assigned to the jail beat and they keep tabs on what is happening regarding requests and charges. These reporters utilized a variety of means in order to acquire this information, but it includes the use of contacts and relationships with law enforcement who sometimes give the reporters a, quote, heads-up, close quote, if a big arrest is about to be made or has been made. These are relationships that are developed over the course of time between media and law enforcement as part of a reporter's professional efforts to report the news.

So what we see here is we've got an actual relationship or professional relationship where the media and law enforcement are being in communication with one another. And what we don't know in the case of Mr. Broadnax, is if that happened here. We tried to find that out in the course of our investigation. And if I can point you out, these are exhibits -- it is Defense Exhibit 1 and it is Exhibit E, the affidavit of Cliff Jenkins, and then Exhibit F, which is my affidavit.

In his affidavit, Mr. Jenkins talks about going to the various channels. He had asked

17

specifically for them to give him information about the communications and how they first discovered the -- about this particular offense. I mean, there is hundreds and thousands of cases that come into Dallas County and into the Dallas County criminal courts. How does a reporter zero in on one particular defendant and not another one? They have to have some source to identify the high profile versus the ordinary garden variety type of case that's not necessarily newsworthy for them or would sell newspapers.

When Mr. Jenkins contacted the various reporters -- when he contacted specifically -- and I'm looking at his affidavit. This is the affidavit that was Exhibit 24 in the habeas petition, and it follows -- it is part of Exhibit E. He talked about going to Channel 8 and also to Channel 4. This is on Page 2 of his affidavit that was dated December 16, 2011. And neither of those channels would talk to him. What they did was they claimed 1st Amendment privilege.

THE COURT: What did you say the date was?

MS. BRANDT: I'm sorry. The date of his affidavit?

THE COURT: Yeah.

MS. BRANDT: It was December 16, 2011. Do you see it, or do you want me to point it out to you?

18

THE COURT: The affidavit that I have --

MS. BRANDT: Behind it, it says tab 24.

THE COURT: Okay.

MS. BRANDT: If you look on paragraphs -- I'm looking at Page 2 of that December 16, 2011, paragraphs B and C, where he is talking about going to Channel 8 and what he got back was -- he met with two attorneys who stated they preferred not to give information about how they knew when a suspect was incarcerated in the Dallas jail system and they stated there are laws to protect them from giving out that information.

With respect to Fox 4, he had contacted the Fox 4 assignments editor. And when he got a return call back, the assignments editor said that he did not want to give out that kind of information. He was -- so we weren't able to get to who is the actual source who first learned of the offense, the arrest, the incarceration and then transfer of Mr. Broadnax from Texarkana to Garland and then into Dallas County.

THE COURT: Can I interrupt you for a second?

MS. BRANDT: Sure.

THE COURT: These defendants that you got here, what's the commonality of them?

19

MS. BRANDT: All of them have had a delay in counsel. There has been the one working day rule that was brought about through the enactment of the Texas Defense Fairness Act that became effective January 1, 2002. And our position is that in the gap between the defendant's request for counsel and the actual appointment when it gets to the assigned court, that being the State is exploiting or using that opportunity to exploit the media work product for its benefit.

What we know -- and I'm looking at page 9 of my motion and citing to Maine v. Moulton, M-O-U-L-T-O-N, 474 U.S. 159 at page 176. What the Supreme Court is saying, that the knowing exploitation by the State of the opportunity to confront the accused without counsel being present is as much a breach of State's obligation not to circumvent the rights of assistance of counsel as is the intentional creation of such an opportunity. And it is our position that the Dallas County Sheriff's Office is giving immediate and very quick and fast access to these high profile defendants to the media so they can do the media interviews.

And often what is happening, as in the case of Mr. Broadnax, the media interviewed Mr. Broadnax on June 23rd. Mr. Broadnax was in the psych unit. He was undergoing a psychotic break during the time this all

20

was happening. It was testified to by the jail psychiatrist. And he didn't have the wherewithal to make a determination and he had no one there to advise him. He is either left talking to the jailers, trying to make that decision on his own or talking to other people as to what he should do. So we have got someone who is very disadvantaged. He doesn't have the education. He came from a background of poverty and abuse. He's going through psychosis at that time. And unlike other states that would have appointed counsel at the very time of arraignment -- and, in fact, in Dallas County, prior to the enactment of this 2002 provision in the Texas Fair Defense Act, counsel was being called by the magistrate judge at the very time that the individual invoked counsel. And counsel had to get down there to see the capital defendant at that time.

So what is happening is because of this gap, the one working day gap, we have got the State of Texas who is exploiting -- knowingly exploiting this particular opportunity to make that happen.

THE COURT: To go back to my question, what do they have in common? The reason I ask that is, three I recognize as having been here. So I was wondering if it was just questions that arise in CDC 7.

MS. BRANDT: No, sir. This is happening

across the board. And it is happening to capital defendants, and this is a function of the way the procedures have changed as a result of the Texas Fair Defense Act. And in fact, the procedures and policies in Dallas County, the written policies in -- there was one that I think it was dated May 2007 that was applicable to Mr. Broadnax. And then the subsequent ones came out in 2009 and the current one in 2011 are inputting this one working day rule. And this one working day rule is not just a day. The, quote, working day doesn't include Saturdays, it doesn't include Sundays, it doesn't include holidays. So if a defendant gets arraigned, let's say, a quarter to midnight on Friday, Saturday and Sunday, there's no appointment of counsel until this new provision that was enacted in 2002. As opposed to prior to that time, the magistrate would pick up the phone, he would call the defense attorney. And he'd say -- let's say it was 10 o'clock at night, and maybe the attorney is in bed. And he'd pick up the phone and the attorney can say, yes, I want the case. But if he wants the case, that attorney has to get out of bed and get down to the jail to talk to and interview his client.

With the passage of this one working day rule, Saturday can go by, Sunday can go by, if Monday is

before there's all this time lapse. And the case went to Judge Burns and got to you the following day, the 24th, which is the first day that Mr. Broadnax was appointed counsel. And by that time, you can't unring the bell. It is just too late.

So what we're seeing here is a common custom and practice and also a systemic problem here in Dallas County where capital defendants are not being given their 6th Amendment right to counsel, which it is Mr. Broadnax's opinion that he was entitled to at the time of arraignment. Not just the right to request counsel, but the actual right to have counsel appointed, to have to come down and speak with him and interview him and protect his rights to keep these things from happening.

And these other individuals, Demarius Cummings, Franklin Davis, Justin Jones, Chloe Menager, William Palmer, Charles Payne, Gary Wayne Pettigrew and Robert Sparks, all had the media at them on or before counsel was appointed, and they had microphones in their faces. And of course, the reporters are in superior position to these individuals. The reporters are well-educated. They have an army of lawyers behind them, as we saw with the affidavit of Cliff Jenkins and mine where they're saying we're not going to talk

22

24

a holiday, it will go by. And what we saw here is that on a -- I believe on June 20, let's see -- June 23rd was a Monday. By June 20th, the press had already started to send letters to the public information officer in the Dallas Sheriff's Department wanting to interview Mr. Broadnax, who wasn't even in the Dallas County Jail yet.

So let's assume -- and what happened in this particular case, the case goes first to Judge Burns, because of the numbering system. And you had gotten Demarius Cummings, which had the lower case system. And so what happened is Mr. Broadnax's right to counsel or appointment of counsel was delayed even further because Judge Burns did not call counsel because he wasn't the, quote, assigned judge. And so another day goes by, which was Monday. And by that time, the media had already interviewed Mr. Broadnax without any opportunity for him to have an attorney to advise him to say should I, shouldn't I or -- the attorneys are fiduciaries. And in the case with Mr. Broadnax and so many of these individuals, and Chloe Menager is another one for example, they have mental impairment. And fiduciaries like a lawyer is in the best position to prevent those kinds of interviews from happening, and they can only do that if they're there at the inception of the case

because of 1st amendment privilege. And these individuals are very sophisticated. They have great communication skills.

These poor capital defendants are in a very poor situation and the reporters really do have superior access and the kind of mental and educational and emotional support systems like the silk-stocking law firms to protect their rights, but no one is here to protect the rights of these individuals I have listed here.

With respect to the Brady obligation -- with respect to the Brady obligation, what the government has said, and this is what I had mentioned before, is that they had relied on your ruling, that the media were not state agents. And I don't think that that statement can be made or supported until we actually learn what the source is of the actual communication and the contact, the first contact by which the media learned of the offense, the arrest and the incarceration. Because the media had to know somehow, somewhere, some way that Mr. Broadnax was going to be transferred to the Dallas County Jail. Because at the time that the media had requested on June 20th that Public Information Officer Kim Leach and the Dallas County Sheriff's Office physically allowed them access to Mr. Broadnax,

**25**

Mr. Broadnax wasn't even booked in yet.

So what we are looking for is emails, telephone messages, faxes, letters to various law enforcement to the Dallas County Sheriff's Office from the Dallas District Attorney's Office.

THE COURT: Do you have any authority for this?

MS. BRANDT: Well, that's why I'm coming to the court for this because we got stopped when we tried to talk to the media themselves. That is the reason why we're coming to the court because we're not able to develop this information because of all the various assertions by all of the different parties, and we can't go forward to prove it. We can't even get to talk to the media before the hearing, or before, you know, we started this because of 1st Amendment privilege.

THE COURT: Do you have any authority for me being able to do this? Let's say I wanted to.

MS. BRANDT: I believe you can, Judge. I mean, this is part of our -- these are all Brady obligations. They have -- they can't hide behind their privilege because there is no privilege when this communication is going out to a third party, such as law enforcement or to reporters on the beat. I mean, their privilege with respect to their sources is between what

**26**

is going on within their organization. Once this information starts to get filtered out to third parties who are not protected under that umbrella, that information is no longer privileged.

And with respect to the District Attorney's Office, it is our position they can't hide behind work product or work privilege because it very clearly is Brady material. That if, in fact, this information does show that there were these communications, that there were encouragements, solicitations, facilitations, of the media access so that the government could benefit from this and introduce the videotape into the trial of a defendant, then we have the right to know that so -- because what it does is it proves our case for us.

We did try, as I had pled -- on page -- pages 14 and 15, we had made requests to the Dallas Police Department, the Dallas District Attorney's Office, the Dallas Sheriff's Department, asking them to produce this documentation to or from the media outlets and the -- the various law enforcement agencies. And to date, we have not received that information.

I do note that the State has served me with a motion to quash the subpoena served on the Dallas District Attorney's Office, and that was filed December 4th. And my understanding from an email I received from

**27**

Lisa Smith, who heads up the State's writ office, that the State was going to be taking that up today.

Could I answer any questions for you?

THE COURT: Possibly. Okay. Thank you.

MS. BRANDT: Your Honor, could I ask that these exhibits be admitted into evidence?

THE COURT: They're all admitted for record purposes.

(Defendant's Exhibits 1-23 admitted for record purposes.)

MS. BRANDT: Thank you.

THE COURT: Okay. Ms. Murphy?

MS. MURPHY: Just generally.

The time for investigating her claim has passed. Counsel was appointed while the direct appeal was still pending. She filed her writ application last December. So the time for investigating all the claims that you alleged -- for her to investigate all the claims that she alleged in her writ application was prior to filing the application.

THE COURT: Talk to me, not her.

MS. MURPHY: Okay.

THE COURT: Thank you.

MR. MURPHY: It has been a year since she filed the application. And I didn't file mine until

**28**

this summer. We agreed -- all parties agreed to push this hearing from December. So we're past the statute of limitations for the timeline.

Based on what she has alleged in the Motion for Discovery, she didn't even really try to investigate until -- she didn't send subpoenas until November 30. And she knew for quite a while it was going on on December 7.

As far as her -- the State understands that the claims are -- about the media are challenging the constitutionality of the statute which I've alleged in the State's response is not cognizable under the writ of habeas corpus.

As far as her arguments about the 6th Amendment and right to counsel, none of the evidence requested is going to show whether or not it was a critical stage. That's the key issue under the 6th Amendment, was it a critical stage. A right to counsel at a critical stage. None of what she has requested, the correspondence with the media, with other capital defendants or the defendant, is going to show it was a critical stage. And the allegation in the writ is that there was a victim in the claim that trial counsel is ineffective for not raising. And it all boils down to critical stage. And nothing is going to show that.

And, Your Honor, the State is willing to stipulate that under the 1st Amendment, the media has access to the defendant, and that the sheriff's office is in compliance with the 1st Amendment in allowing the media to have access to defendants. The State is more than willing to stipulate to that fact, that the media can and does have access to capital defendants. So all of this becomes irrelevant, all of the evidence she's asking for becomes irrelevant because the State will stipulate that, yes, the media has access to capital defendants.

And she hasn't shown -- Broadnax hasn't shown any -- any reason for this Court to order the media, who was asserting their 1st Amendment right, to violate the 1st Amendment. She hasn't shown any authority that this Court can actually say, media, I know you're asserting a 1st Amendment right, but please give this information to the defendant.

And the State would also like to note for the record that twice -- the State has offered twice for Ms. Brandt to come view the State's file. And the first occasion was out in the hallway, and Ms. Brandt asked the State to send her the open file policy for the State's office. And I wrote her an email on November 2nd -- we don't call it a policy, we call it a privilege. And setting forth in that email what our policy is, what our privilege is. And since that email, I had not heard from Ms. Brandt until I got a subpoena on Monday regarding the State's file. So the file has been open to her for quite some time.

So the State asks that you deny the Motion for Discovery and the continuance of an evidentiary hearing.

MS. BRANDT: Your Honor, may I respond to that?

THE COURT: Yes, ma'am.

MS. BRANDT: First of all, when they talk about how I didn't do anything and I knew December 7 was the hearing and so forth, I essentially was prevented from doing anything in the prior month. It is the State of Texas who set four execution settings in my client's cases. It was just over the top and really out of the ordinary for something like this to happen.

The Dallas District Attorney's Office set the Bobby Lee Hines case in June. I had asked -- or eventually what had happened is because of DNA testing that had been done, the Dallas District Attorney's Office had to withdraw the motion for execution.

In August, I had Mr. John Valentine, who was up for execution for the third time, I had again gone to the District Attorney's Office -- this case is out of Amarillo -- and asked them to delay because we had an issue pending before the U.S. Supreme Court. That was the Martinez issue. The issue is whether ineffective assistance of State habeas counsel is cause to excuse procedural default. I had also gone to the judge and written the judge asking him if he would wait. And instead, the State of Texas insisted on setting the execution of Mr. Valentine for, I think it was June 20th. For the second time, the United States Supreme Court stayed Mr. Valentine's execution and the case is currently pending before the Supreme Court.

In August and September, the Dallas District Attorney's Office set the execution for Mr. Bobby Harris. And in October -- and once again, I asked Lisa Smith to delay the execution. They set the execution date for Bobby Harris in October. And so essentially, I was going from back-to-back executions where I was not able to address this sort of thing, not because of any fault of my own but because of the rapidity with which these executions were set.

With respect to the 6th Amendment right to counsel, we are asserting that the media interviews are, in fact, at a critical stage in the proceedings. The -- for the very reason that we are also asking for discovery. They become a critical stage in the proceeding when law enforcement is facilitating, encouraging or soliciting the media to conduct these interviews.

What happens is -- if, for example, a defense attorney, a capital defense attorney is successful in having a suppression of the confession, these media interviews end up being fallback insurance where the Dallas District Attorney's Office or the D.A.'s office and then get the confession introduced. And then the government comes back and says, well, you can't challenge that because this is the media, this isn't State action. So essentially, it is used as insurance to help the State in that. These are critical stages in the proceedings. The media interviews are critical stages in the proceedings.

With respect to her saying that these underlying issues are not cognizable in habeas, what I had raised in claim three is that trial counsel was ineffective in the way they were handling the challenges to these media interviews. Essentially, they didn't do the necessary due diligence with respect to fact investigation or with respect to their legal theories.

And as I said, Rothgery was decided on June 23rd, the very day Mr. Broadnax was being interviewed.

33

And so that case law from the United States Supreme Court was there when they were put on notice that Texas was really out of step with all of these jurisdictions. And given the fact it is well known between the experienced capital bar that at one time Dallas County was appointing counsel. The magistrate would call at the very time -- right after the arraignment and say, if you want the case, you must get down here.

With respect to viewing the State files, I want to put the other piece in there. I initially had gone to the State asking to view their policies. And what Amy Murphy told me --

THE COURT: Y'all don't talk to each other, talk to me.

MS. BRANDT: -- was -- what had happened is that policy -- the open file policy is constantly changing. When I initially went, what I had to do was open all of my files to the Dallas District Attorney. They have done some changes in the course of this litigation. They have changed their policy some ways. But before I can end up seeing their files, what I have to do is open up my files to them. So they're going to pick out and sort out work product privilege, attorney privilege.

Essentially, I will end up in the same

34

situation I was before when I needed to do a Motion for Discovery, which is I get offense reports, you know, police reports, arrest records, and really nothing that gets to the meat of what it is that I need to see. But yet, the way their contacts are drafted or their requests are drafted, I have to in turn have to open my file to them and give them everything because I have alleged an ineffective assistance of counsel claim. So strategically, the defense is put at a disadvantage where we have to give them all of our stuff, but we get virtually nothing from them.

Let me also state that I -- as part of the due diligence investigation that I have done, I have been told that the Dallas County jailers have encouraged defendants to talk to the media because the Dallas jailers are the ones who actually take these media request letters to the defendants. They sign or witness the defendant saying, yes, I agree or, no, I don't. And I have been told that in at least one case the jailer has encouraged the defendant to talk to the media. So we do have a basis for what it is that we're doing. We just keep getting blocked.

I didn't address this particular part. When I had tried to interview and go down to talk to these various defendants, because they were represented by

35

counsel I was required first to contact their counsel. And I repeatedly got, no, you are not allowed to talk to my counsel (sic) because there they're in ongoing litigation or I need to protect my client's rights.

The attorneys would not even be there with me except in one case, Seth Kretzer, and he said he was not available to do it until after December 7th because he had a federal writ and he just didn't have time to do this. So once again, we have an obstacle in our midst because the attorneys who represent the defendants are saying, no, I want to protect the rights of my clients and I won't let you talk with them.

THE COURT: Do you have any response?

MS. MURPHY: No.

THE COURT: All right. So right now what I'm doing is making a decision on your discovery request?

MS. BRANDT: Yes, sir. And my continuance is not -- we have agreed to have the hearing December 7th. I have subpoenaed the reporters. I don't know if they're going to show up or not, but I do know that with respect to some of the other discovery -- as I said, if the discovery and Brady motions are fruitful, we are asking you to allow us a reasonable amount of time -- I believe I put down down there March 18th, 2013, to have

36

all of that completed. And then at that point in time if what we come up with is additional proof because that's what the discovery revealed and that's what the Brady material shows, then we can come back and report to you and say, Judge, we found something, we would like to have an additional day or two for hearing, or in the alternative we will come back and say, Judge, it doesn't look it's a go.

THE COURT: What about the State's motion to quash your subpoena? Am I ruling on that, too?

MS. BRANDT: I assume they want to present it.

MS. SMITH: I think the motion pretty much speaks for itself. It lists a number of reasons it is not disclosable at this time. If you would like us to give argument on any particular point, I'm happy to do so, but I think it speaks for itself.

THE COURT: I tend to agree, but I think it would be the better part of valor for me to hear something from you.

MS. SMITH: Sure.

I think, as Ms. Murphy said earlier, we received the subpoena in our office -- I think one of our investigators got it on Friday. Ms. Murphy received it on Monday. I filed a response on Tuesday of this

37

week.

Basically, our arguments kind of fall into a couple of areas. One of them is this is clearly asking for work product. And it is never -- our current position on information we disclose from our files is we turn over Brady and we turn over anything that's not otherwise privileged. This material in our office is communications. Communications with other state agencies is clearly privileged. It is clearly work product. In conjunction with the work product privilege, we assert attorney-client privilege.

Secondarily, the subpoena doesn't comply with certain statutory requirements. Those are enumerated in the motion as well. It doesn't comply with the discovery statute, assuming that statute is applicable -- that the Court would find that applicable.

The subpoena and application has to meet certain requirements, most importantly materiality requirement. There has been no showing -- there has been no allegation or showing the information she is requesting is material to the issues that this Court has designated to be litigated in this writ proceeding. And absent some showing of that kind, she is not entitled to the documents under our statutes.

THE COURT: Response?

38

MS. BRANDT: I believe, Your Honor, that the materiality issue has been satisfied. Our position is that the media interviews are at a critical stage in the proceedings. That these particular documents, emails, letters, faxes, evidence of telephone messages, all that will go to show state action by the media and it goes back to our issue that it is their -- that law enforcement is facilitating, encouraging, or soliciting the media on their behalf so these media interviews can be introduced at trial and used against the defendant. So, in fact, these are very material.

THE COURT: Do I have to rule on these right at this moment in order to proceed with the rest of the hearing?

MS. BRANDT: I don't believe so, Judge,

MS. MURPHY: No.

THE COURT: I'm going to take all of this under advisement, and I will have an answer for y'all later today. Okay. I thought that we were laying sort of like a preview for what we're doing tomorrow.

MS. MURPHY: That's what the State would like to do.

THE COURT: Why don't you go ahead and start doing it.

MS. MURPHY: One of the emails, I suggest

39

that we start with Brad and Doug as trials attorneys who have been accused of ineffectiveness, and the State be allowed a chance to cross-examine Edens and Stewart, the two experts who were issued affidavits claiming that B.K. Nelson and Dr. Price gave perjured testimony.

And, quiet honestly, the State thinks that there is only four relevant witnesses to the entire application, and those are the only four. If we could do those tomorrow, the two -- if we could handle those four tomorrow, any other proceedings will become irrelevant.

The accusations are the ineffectiveness of Brad and Doug and the claims of perjury against B.K. Nelson and Dr. Price. So the State represents that we only need those four witnesses.

MS. BRANDT: Your Honor, I object. We have the burden of proof, and it's up to me to decide who it is that I call to make that case. It isn't the State who has got the right to tell the defense who to present, when to present it and the order in which to present it.

I somewhere have got it laid out what it is that I want to do. I'm working on that diligently. I know the order of presentation of my witnesses. The exhibits that goes to those witnesses. I mean, this is

40

my obligation. This is not their case and they don't have the right to tell me how to present my case.

THE COURT: Okay.

MS. MURPHY: Can I respond, Your Honor?

THE COURT: If you will quit being mean to each other.

MS. MURPHY: I'm sorry.

THE COURT: Both sides, you-all quit being mean to each other.

You can respond.

MS. MURPHY: Counsel is correct, the State doesn't direct the hearing, but neither does Ms. Brandt. The Court's proceedings, the Court is the factfinder and so the Court can direct the matters under the subject.

THE COURT: I'm going let you call whoever you want to and see where we go. We'll start with those four mentioned.

MS. BRANDT: If I choose to call some, all or any of them.

THE COURT: Right. What else do we need to do today?

MS. MURPHY: Can I just clarify that she intends to call the witnesses she listed in the initial email and then all the subsequent emails until yesterday?

41

THE COURT: Is that right?

MS. BRANDT: Your Honor, I will decide who to call.

THE COURT: We don't do the deal we tell witnesses they've got to come down here because they get respected too.

MS. BRANDT: No. I have got five witnesses that I will call tomorrow. I did issue subpoenas for the reporters. I anticipate that the reporters or their legal counsel is going to quash -- to file motions to quash the --

THE COURT: What witnesses do you want to be down here tomorrow?

MS. BRANDT: I want Doug Parks, Brad Lollar, Brooke Busbee.

THE COURT: Let me write these down.

MS. BRANDT: There is Karo Johnson, Catherine Bernhardt.

THE COURT: All right.

MS. BRANDT: That's it. As I said, I issued subpoenas for the reporters, but I'm anticipating that their counsel is going to file a bunch of motions to quash.

THE COURT: So you don't want B.K. Nelson down here tomorrow?

42

MS. BRANDT: No.

THE COURT: You got any problem with that?

MS. MURPHY: Actually, I do, because I thought in our email exchange she had indicated that the two experts, Stewart and Edens, would be here.

THE COURT: I seem to recall that. What about them?

MS. BRANDT: I made a strategic choice not to call them.

MS. MURPHY: Then the State will call them.

MS. BRANDT: Then you're going to have to issue subpoenas.

THE COURT: Y'all quit talking to each other.

MS. BRANDT: I'm sorry, Judge.

THE COURT: I'm not going to tell you again. I don't put up with that.

So can you handle that?

MS. MURPHY: Yes, Your Honor.

THE COURT: Anything else? What time we starting tomorrow?

MR. MURPHY: 9 o'clock.

THE COURT: Anything else from the State?

MS. MURPHY: No, Your Honor.

THE COURT: From the defense?

43

MS. BRANDT: Yes, Your Honor. Defense attorneys have a habit of wandering off, you know, call me, because you got other witnesses. I need to go back to my office. I don't want to be the bad guy, so I was wondering if you would let the attorneys know they may need to stick around other than run back to their offices so we don't have a giant gap.

THE COURT: Mr. Lollar, make sure all of your colleagues know that if they're going to wander around, give them the cell phones.

MR. LOLLAR: Okay.

THE COURT: Thank you, Mr. Lollar.

Anything else from the State?

MS. MURPHY: No.

THE COURT: Anything from the defense?

MS. BRANDT: No.

THE COURT: I will have a written decision on the the other matters within an hour or two.

(Proceedings adjourned.)

44

THE STATE OF TEXAS )
COUNTY OF DALLAS    )

I, SHARON HAZLEWOOD, Official Court Reporter in and for the Criminal District Court 7 of Dallas County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND this the 20th day of September, 2013.

Sharon Hazlewood
Texas CSR 628
Expiration Date: 12/31/14
Official Court Reporter
Criminal District Court 7
Dallas, Texas 75207
(972) 739-3906

THE STATE OF TEXAS    )
COUNTY OF DALLAS      )

I, SHARON HAZLEWOOD, Official Court Reporter in and for the Criminal District Court 7 of Dallas County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND this the 10th day of September, 2013.

                    /s/Sharon Hazlewood
                    Texas CSR 628
                    Expiration Date: 12/31/14
                    Official Court Reporter
                    Criminal District Court 7
                    Dallas, Texas  75207
                    (972) 739-3906