# TAMES Barcode Cover Sheet



953fcf108cfe43c79f9bec7af3eec26f

**Case Number:** WR-81,573-01

**Style:** Broadnax, James Garfield

**Event Date:** 5/30/2014

**Event Details:** Unassigned/This Court/RR RECEIVED/11.071/

**Filename:** WR-81,573-01 RR RECEIVED 11.071 5-30-2014--vol. 3 of 4 vols

**Document Description:** RECORD

**Document Remarks:** chronological index

**Document(s):**

**Generated By:** bhooper

**Generated On:** 7/22/2014 8:48:59 AM



SCANNED
APR 05 2016

43

REPORTER'S RECORD

TRIAL COURT CAUSE NO. WR08-24667-Y

| | | |
|---|---|---|
| STATE OF TEXAS | * | IN THE CRIMINAL |
| VS. | * | DISTRICT COURT 7 |
| JAMES BROADNAX | * | DALLAS COUNTY, TEXAS |

------------------------------

WRIT HEARING

DECEMBER 7, 2012

VOLUME 3 OF 4 VOLUMES

------------------------------

On the 7th day of December, 2012, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Judge Michael Snipes, Judge presiding, held in Dallas County, Texas;

Proceedings reported by machine shorthand.

---

**APPEARANCES**

FOR THE STATE:

CRIMINAL DISTRICT ATTORNEY

MS. AMY MURPHY

MS. KUBALAK

133 N. RIVERFRONT

DALLAS, TX 75207

(214) 653-3600

FOR THE DEFENDANT:

MS. LYDIA BRANDT

ATTORNEY AT LAW

DALLAS, TX 75206

---

**CHRONOLOGICAL INDEX**

| | PAGE | VOLUME |
|---|---|---|
| MOTION ON MEDIA INTERVIEWS | 6 | 3 |

DX CX RD RC RD RC

| | | VOLUME |
|---|---|---|
| CLIFF JENKINS | 7 | 3 |
| WITNESSES SWORN ---------------------------- 7 | | 3 |

MOTION TO QUASH:

| | | VOLUME |
|---|---|---|
| CATHERINE BERNHARDT | 22 47 49 | 3 |
| BROOKE BUSBEE | 51 65 69 | 3 |
| DWIGHT STEWART | 70 86 | 3 |
| KARO JOHNSON | 88 108 110 | 3 |
| DOUG PARKS | 113 124 127 128 129 | 3 |
| BRAD LOLLAR | 130 156 163 | 3 |
| JOHN EDENS | 165 | 3 |

RECEIVED IN
COURT OF CRIMINAL APPEALS

MAY 30 2014

Abel Acosta, Clerk

---

**ALPHABETICAL INDEX**

DX CX RD RC RD RC VOLUME

| | | VOLUME |
|---|---|---|
| CATHERINE BERNHARDT | 22 47 49 | 3 |
| JOHN EDENS | 165 | 3 |
| BROOKE BUSBEE | 51 65 69 | 3 |
| CLIFF JENKINS | 7 | 3 |
| KARO JOHNSON | 88 108 110 | 3 |
| BRAD LOLLAR | 130 156 163 | 3 |
| DOUG PARKS | 113 124 127 128 129 | 3 |

5

EXHIBIT INDEX

| NO. | DESCRIPTION | ADMTD. | VOLUME |
|-----|-------------|--------|--------|
| Dx-3 | law | 29rpo | 3 |
| Dx-4 | procedures | 30rpo | 3 |
| Dx-7 | law | 34rpo | 3 |
| Dx-8 | documents | 36rpo | 3 |
| Dx-9 | opinion | 39rpo | 3 |
| Dx-10 | law | 40rpo | 3 |
| Dx-11 | media report | 45rpo | 3 |
| Dx-15 | billing records | 130rpo | 3 |
| Dx-23 | various documents | 146rpo | 3 |

6

P R O C E E D I N G S

December 7, 2012

THE COURT: This is the State of Texas versus James Broadnax. This is Cause Number WR08-24667. A continuation of a writ hearing that began yesterday.

Ms. Brandt, did you get a copy of my order with the rulings from yesterday's proceedings?

MS. BRANDT: I did, Your Honor.

THE COURT: And you did as well?

MS. MURPHY: Yes, sir.

THE COURT: Any questions about any of that from either side?

MS. MURPHY: No, Your Honor.

MS. BRANDT: No, Your Honor.

THE COURT: And then I received a filing entitled Objections to Motions to Quash Subpoena that was filed by Jackson, Walker pertaining to Rebecca Lopez, et cetera. I take it that is moot in light of my ruling yesterday; is that right, Ms. Murphy?

MS. MURPHY: Yes, Your Honor.

THE COURT: You agree with that, Ms. Brandt?

MS. BRANDT: No, Your Honor, I don't. We would like to be able to make a record about our attempts with the subpoena because the request that we

7

made in our motion was only to depose them, it wasn't to call them at the hearing. So our Motion for Discovery didn't go to the actual testimony of the trial or at the hearing.

THE COURT: Okay. Well, do you want to do that now or what?

MS. BRANDT: If we could, please. I would like to call Clifton Jenkins, please.

(Witness sworn.)

THE COURT: Lower your hand. Respond to questions by Ms. Brandt.

Ms. Brandt, whenever you're ready.

CLIFTON JENKINS, was called as a witness and testified as follows:

DIRECT EXAMINATION

BY MS. BRANDT:

Q. Could you please state your name for the record?

A. Cliff Jenkins.

Q. And Mr. Jenkins, what is your role in this particular litigation?

A. I was appointed facts investigator on the case.

Q. And as part of your duties as a fact investigator, were you asked to go talk to the media?

A. Yes.

Q. And could you please tell us who it is that you

8

attempted to contact? Let me back up a second. Let's start out with 2011. Did you attempt to contact the media back in 2011?

A. Yes.

Q. And could you tell me the channels that you went to talk to, please?

A. Channel 4, Channel 8, Channel 5, Channel 11.

Q. And what was their role in Mr. Broadnax's trial that you went to talk to them? What had they done that caused --

A. Well, basically, interviewed the defendant before the attorneys interviewed the defendant.

Q. And as a result, those tapes were put into the trial; is that correct?

A. That's correct.

Q. And so back in 2011 when you went to talk to WFAA Channel 8, would you tell us what happened?

A. 2011?

Q. 2011.

A. Channel 8?

Q. Channel 8.

A. I went to the radio station and they denied me access into the building, and so I went over to the Belo Corporation, which is the attorneys for Channel 8, and I saw one -- actually two attorneys, talked with one and

explained the situation while I was there. And they said we don't really don't care to give you that information, and by law we don't have to.

Q. Okay. And they specifically stated there were laws to protect them from giving out that information?

A. Correct.

Q. And they were asserting 1st Amendment privilege?

A. Yes.

Q. And is it true that what you were being asked to investigate was how the media initially learned the whereabouts of Mr. Broadnax?

A. Yes.

Q. At the various points. The Texarkana police, the --

A. Garland.

Q. Garland police, the Garland jail and then the Dallas Sheriff's Office; is that correct?

A. That's correct.

Q. So each of those. Now, that continued on -- that investigation continued on to the other channels. So could you tell us what happened when you went to KDFW Fox 4 in 2011 prior to the filing of the State's habeas application?

A. I was denied access into the building.

Q. Okay. And what happened then? Did they tell you to talk to an assignments editor?

A. They suggested I talk with the assignments editor, that's correct.

Q. And what happened?

A. Actually, I need my notes for that.

Q. Did he state to you that he didn't care to speak with you?

A. Yes.

Q. Okay. And you had also asked him the same questions about the initial contacts between the media and the various arms of law enforcement?

A. Yes.

Q. Okay. So it was very specific to this case?

A. Yes.

Q. All right. You then went to Channel 5. That was also prior to the filing of the State's application. When you were at Channel 5, did they talk to you?

A. I again would need my notes.

Q. I'm sorry?

A. I would need my notes --

THE COURT: Have you got your notes up there? You can look at those all you want.

MS. BRANDT: Your Honor, could I provide him with the affidavit that he filed?

THE COURT: Yeah.

Q. (By Ms. Brandt) Let me show you the affidavit you filed as part of the writ application to help you refresh your memory.

A. All right.

Q. This part here.

A. All right.

Q. So going back to Fox 4, did you speak with someone at Fox 4?

A. Yes.

Q. And could you please tell us what transpired?

A. I talked with Fox 4 and I left my cell phone number and told them I needed to get into contact with the reporters, and they never called me back.

Q. Okay. And you were going to ask them the same questions that were specific to Mr. Broadnax?

A. Correct.

Q. That we just discussed?

A. Yes.

Q. And did you go to Channel 5?

A. Yes.

Q. And did you attempt to contact them?

A. Yes.

Q. And you also were going to ask them questions that were specific to the interaction of the media and the various law enforcement that were just identified; is that correct?

A. Yes.

Q. Could you please tell us what happened.

A. They gave several ways of contacting or tracing the movements of the defendant from the time he is arrested until the time he showed up over here.

Q. Did they specifically identify the contacts of the media and Mr. Broadnax?

A. No, they didn't.

Q. Did you specifically ask for that?

A. Yes. I was trying to find out who the person was that had given them the information, and they couldn't do that. They didn't know who it was.

Q. Okay. And then did you contact WTVT, Channel 11?

A. Yes.

Q. And could you please tell me what happened when you tried to contact them?

A. I talked with their person down there and they gave their modus for tracking the defendant or a defendant that is arrested until he got in jail.

Q. Did you specifically ask for information on the interaction between the media and law enforcement with respect to Mr. Broadnax's case?

A. Well, they said that they had called the law enforcement, you know, they called like for Garland --

15

Q. I'm sorry. I can't hear you. I'm having a hard time hearing you.

A. They would contact law enforcement themselves.

Q. And would they tell you who it is that they contacted with Mr. Broadnax?

A. No.

Q. Did they invoke any kind of privilege?

A. No. Did they invoke any kind of privilege?

Q. Yes. Did they -- were they willing to tell you who it is --

A. No, they wouldn't give that person up if they knew.

Q. Okay. So let's move to just this past week. Did you try again to speak with the individuals at Channel 5 and also at Channel 11?

A. Yes.

Q. Okay. And what happened -- do you recall who you talked to at Channel 5? Was that Steven Wright?

A. That was Ellen Goldberg, I believe, I was trying to contact at Channel 5.

Q. I'm talking about talking to the assignments editor.

A. Didn't talk to the assignment editor at that time. We're talking about what your -- this 2011 still?

Q. No. I'm talking about just recently in the past

subpoena for today?

A. Correct.

Q. Okay. And so were you able to serve the subpoena?

A. No.

Q. Okay. How about Channel 11, Steven Pickett, could you tell us, did you attempt to serve him with a subpoena?

A. Yes.

Q. And could you tell us what happened?

A. I went to Channel 11, and it is also in the Arlington, Fort Worth area. I talked to a person up there that would help me out, and she said that we don't accept subpoenas for the reporters.

And I asked her, Well, who would accept that. And she said they had their attorneys in New York. And so she says -- she wanted to give me a fax number and I said I would rather go through your fax machine -- or your email service, it would be a lot more efficient, and maybe they would know who I was. So she agreed to meet me up there and she said, I'm not accepting this, I'm not signing for it.

Q. So Channel 11 would not accept service either?

A. They accepted it to relay it to the attorneys in New York, yes.

14

couple of weeks.

A. No.

Q. You went back --

A. Channel 5 has one telephone number that goes into their office in Arlington, Fort Worth, their station up there. And I asked for Ellen Goldberg. They patched me in -- allegedly into her phone. I left a message for her.

Q. What message did you leave?

A. That -- who I was, identified myself and I needed some information and told her to call me immediately. And I never received anything from her in two days. So I went to Channel 5 at the Arlington, Fort Worth station and I met with the receptionist and I asked for a private number to Goldberg. She didn't have it. She had one number that you reach everybody and they patch you in from there.

So I said is she -- will she be coming around here? They were vague on that, when she would show up. They said we haven't seen her for awhile. I said do they have a Dallas location, and they gave me a street on McKinney, 3100, and Suite 800, and I went over there and couldn't find it, it wasn't there, physically there.

Q. And the purpose of that to serve her with a

16

Q. But you couldn't get personal service on Mr. Pickett; is that correct?

A. No, I could not.

Q. Okay. And how about Channel 4, Fox 4, Greg Millett -- let's start with Greg Millett. Did you attempt to serve him with a subpoena for today?

A. Yes. I made numerous telephone calls to Channel 4. And you get Clarice Tinsley on every call you make. She transfers you around. I never talked to a human being that could answer questions.

So I went down to Channel 4, and the security let me come in this time instead of, you know, coming out and meeting me. And they said, Well, what is your business, and I said I need to talk with Rabb and --

Q. Well, we're talking about Greg Millett right now?

A. Millett. And so he went through his employee sheet here and said he was no longer there.

Q. Greg Millett was no longer there?

A. No longer there.

Q. Okay. And you also while you were there, you tried to serve Shawn Rabb to appear at the hearing today?

A. Yes. Shawn Rabb was on the property at that time and he made a call up to him and I had my subpoena laid

19

right out in front of the security guard stating my business. He stated my business, why I was there, and he told me that Mr. Rabb doesn't care to accept that today.

Q. Okay. And how about Channel 8 for Carlos Rosales and Rebecca Lopez?

A. Channel 8, let's see. Let me review this.

Q. Yes, sir.

A. Okay. I went over to Channel 8, which it's a lock-out over there.

Q. When you say a lock-out, what does that mean?

A. You can't get in the station. Since 9/11, they have very strict security rules on who enters the building and who leaves the building.

They have six security guards on duty. So I had -- they're controlled by Bela -- Belo, their attorneys, and I dealt with Sandy -- I forget what her last name was.

So anyway, I called her and said, what is your protocol on receiving subpoenas. And she says, Belo itself accepts them at their office. So I met with the -- with Sandy and she accepted the subpoena for the two people we had service on.

Q. Okay. But you never were able to personally serve Carlos Rosales, right?

18

A. No.

Q. And you were not able to serve Rebecca Lopez either?

A. No.

Q. And do you have copies of the subpoenas there that you attempted to serve?

A. What I have right here are the actual subpoenas that need to go in the file in the court. And I have copies which are scattered. I need to put them together.

MS. BRANDT: Your Honor, if we could, could we mark this and introduce it as an exhibit to attempt to introduce this, please?

MS. MURPHY: Your Honor --

THE COURT: Yes, ma'am.

MS. MURPHY: -- we were scheduled to conduct a hearing on the writ allegations, not the Motion to Quash. Can we continue this for another time?

MS. BRANDT: Judge, I'm almost finished.

THE COURT: I just -- I was going to ask if you could expedite this.

MS. BRANDT: Yeah, I understand.

THE COURT: She is right.

Q. (By Ms. Brandt) These are --

A. That is official court documents. Those are

subpoenas, or copy of the original subpoenas that were served, they're a copy of that and they're stamped by the district clerk's office. There is seven of them.

(Defense Exhibit 2 marked for identification)

MS. BRANDT: And we have admitted -- Judge, if I could make a proffer?

THE COURT: Go ahead.

MS. BRANDT: Since we obviously don't have the testimony, we haven't had an opportunity to talk to these individuals since they wouldn't make themselves available to us to talk to us because they asserted statutory and 1st Amendment privileges.

However, we believe and would hope to prove that if we were able to get both these individuals, as well as the documentation that they produced, that we would be able to show that there was State action on the part of the media, that in some way law enforcement facilitated, solicited or somehow encouraged the media to produce these videotapes that were then used by the State of Texas.

That is all I have.

THE COURT: You got any questions for him?

MS. MURPHY: No questions, Your Honor.

THE COURT: Thank you, Mr. Jenkins.

20

Now as to the writ hearing. Ms. Brandt, you're going to call a variety of witnesses, right?

MS. BRANDT: Yes, sir.

THE COURT: Okay. And so that I can understand what they're testifying about, what is your objective on these witnesses?

MS. BRANDT: My objective, Your Honor, is to show that prior to the enactment of the Texas Fair Defense act that became effective 2002, Dallas County had recognized and implemented both the procedural and substantive 6th Amendment right of the defendant to have counsel appointed at the time of arraignment.

When this amendment came in on or about that time, Dallas County changed its procedures. And as a result, there was a gap between the arraignment and the actual appointment of counsel.

We have challenged the constitutionality of the statute. And what we need to show is that counsel was ineffective. We have to prove what it is that counsel could have shown had they raised the claim. And that is the reason I'm putting in all of this information.

In that gap, what we are arguing is that these media interviews were at a critical stage in the proceedings. And again we go back to our issue about

the solicitation, facilitation and encouragement of law enforcement that was made at a critical stage of the proceedings, and that Mr. Broadnax was deprived of counsel at the very time that he was both entitled to a 6th Amendment right to counsel, and he had no one there to advise him. And that's what these particular --

And the other thing you had also asked me is whether or not it was peculiar to this Court, and the answer is no. And these various attorneys can talk about their experiences in the other courts here in Dallas County.

THE COURT: Okay. You may call your first witness.

MS. BRANDT: Could we swear them in and invoke the Rule?

THE COURT: Do you wish to be heard on this at all?

MS. MURPHY: The State was able to get Dr. Edens and Dwight Stewart here to testify today. And those are the experts that provided affidavits and writ applications, and Mr. Stewart has to catch a flight back at 4:00.

THE COURT: Okay. I understand. All your witnesses.

MS. BRANDT: Could we have the witnesses come to the front, please. Mr. Parks, Ms. Lollar, Ms. Bernhardt, Karo Johnson, Ms. Busbee.

(Witnesses sworn)

THE COURT: Lower your hands. We'll start with Ms. Bernhardt. Just state your name for the record.

THE WITNESS: Catherine Bernhardt.

THE WITNESS: Brooke Busbee.

THE WITNESS: Doug Parks.

THE WITNESS: Brad Lollar.

THE WITNESS: William E. Karo Johnson.

THE COURT: And the Rule is invoked. Who is your first witness?

MS. BRANDT: My first witness is Catherine Bernhardt, please.

THE COURT: Ma'am, if you'll take the stand.

MS. MURPHY: Your Honor, does the Rule apply to the experts, too?

THE COURT: Yes.

MS. MURPHY: Were they sworn in?

THE COURT: No. They don't have to be sworn in for the Rule to apply.

CATHERINE BERNHARDT, was called as a witness and testified as follows:

DIRECT EXAMINATION

BY MS. BRANDT:

Q. Could you state your name for the record, please.

A. Catherine Bernhardt.

Q. And Ms. Bernhardt, would you tell me what your occupation is.

A. I'm an attorney.

Q. Do you have a particular specialty?

A. Criminal defense.

Q. And could you tell us when you graduated from law school?

A. I graduated from the University of Texas in 1987.

Q. And when were you licensed to practice law?

A. In November of 1987.

Q. Okay. And could you tell us what your work history is, please?

A. I went to work for the Staff Attorney's Office for the Criminal District Courts of Dallas County in December of 1987. I was employed there until April of 1990, at which time I went to work for the Public Defender's Office in Dallas County. And I was an attorney in the Public Defender's Office until September of 2002 when I left and went into private practice.

Q. And I assume that private practice is criminal defense?

A. It is a hundred percent criminal defense and criminal appellate work.

Q. And do you represent defendants who are charged with capital crimes?

A. I do.

Q. And you've been doing that from the time you started private practice until today; is that correct?

A. Well, actually I started representing -- I tried my first death penalty case when I was in the public defender's office in 1999.

Q. Okay. So you have continuously represented capital defendants since that time?

A. Yes.

Q. Okay. And are you board certified?

A. I am.

Q. Could you please tell us about those certifications?

A. I'm board certified in criminal law, I want to say '96. And then I was board certified in criminal appellate law in 2011.

Q. Okay. Could you tell us, please, the appointment procedures here in Dallas County when you were working for the Public Defender's Office, and specifically with respect to capital defendants because that is what the issue is on the table today?

A. When I represented capital defendants in the

25

Public Defender's Office, I was assigned to Judge Gerry Meier's court, the 291st District Court. That was a probably a unique situation because Judge Meier only used public defenders. There were no private court appointments unless there was some kind of conflict of interest.

So if a capital case was assigned to that court, we knew it went to our office. And as the senior attorney in there at the time, it was my case. So as soon as I knew what court it was assigned to, I knew that it was my case.

Q. And so what was the result of you knowing that it was your case? What did you do?

A. As soon as I knew that it was my case, I would make efforts to go visit the defendant.

Q. Can you tell us what the mental state is of your various capital defendants, based on your experience?

A. Just generally, based on my experience, I would say that most capital murder defendants have some sort of mental health deficit, either, you know, low functioning or mental illness of some nature.

Q. And even today you see that --

A. I think it is rare that you have a high functioning capital murder defendant.

Q. Okay. And so during the time that you were

26

working in the public defender's office, you went to visit them immediately upon -- right after the arraignment; is that true?

A. Well, as soon as I possibly could.

Q. And what was the time lapse?

A. I really couldn't say specifically.

Q. But it was pretty immediate?

A. As soon as I knew, I would make an effort to get over to the jail.

Q. Okay. When you went into private practice, had things changed to the procedure -- do you know how -- the private bar who was getting appointed to capital cases during that timeframe, do you know the appointment procedure for them?

A. You mean prior to 2002?

Q. Yes.

A. I can't really say I have personal knowledge, just my understanding is that they would get calls from the magistrate when they got appointed.

Q. Okay. And when you left the public defender's office, and I guess that was on or after 2002, did you see a change in the -- or did you see any delay between arraignment and the request for counsel and the actual appointment of counsel?

A. Typically, yes.

27

Q. And could you give us what your experience was in about the 2002 timeframe?

A. After I went into private practice, you mean?

Q. Yes, un huh. And again, this is specifically limited to capital defendants?

A. Yeah. To the best of my recollection, there would typically be a day or two, sometimes more, between arraignment and appointment of counsel.

Q. Okay. Are you familiar with the statute that deals with appointment of counsel that came into effect in 2002?

A. I am.

Q. Are you able to speak to that or do you need the statute?

A. I would probably need to look at the statute. I don't have it memorized.

MS. BRANDT: Your Honor, may I approach the witness?

THE COURT: Yes, ma'am.

Q. (By Ms. Brandt) Could you identify what that is, please?

A. I'm looking at a copy of Article 1.051 from the Texas Code of Criminal Procedure, I believe.

Q. And could you look specifically at subsection C. And if you would, could you read into the record that

28

last sentence, please?

A. The one that begins in a county?

Q. Yes.

A. In a county with a population of 25 -- 250,000 or more, the court or the court's designee shall appoint counsel as required by this subsection as soon as possible, but not later than the end of the first working day after the date on which the court or the court's designee receives the defendant's request for appointment of counsel.

Q. And is Dallas County a county with a population 250,000 or more?

A. I believe it is.

Q. Okay. If you continue on a couple more pages, there is another document behind it. Are you able to identify what that document is, please.

A. The document behind it appears to be a copy of Senate Bill 7.

Q. And these are -- what does it say up at the top? 2001 what?

A. 2001 Texas Session Law Service, Chapter 906, Senate Bill 7, Vernon's.

Q. And if you go to the last page on that, could you please -- and this -- would you agree that this is where the change in the law happened to put in that one

**29**

working day rule?

A. Yes.

Q. Okay. And if you could look at the last page on that, when did that become effective?

A. Effective January 1st, 20 -- 2002.

MS. BRANDT: Your Honor, I would like to put a copy of this into the record.

THE COURT: Okay. That's granted.

MS. BRANDT: Number 3.

(Defense Exhibit Number 3 admitted for record purposes)

Q. (By Ms. Brandt) Are you familiar with the policies and procedures in Dallas County with respect to the appointment of counsel and how it changed over the years?

A. By and large, I guess.

Q. Okay. Would you be able to tell us in your own words what the time period was for appointment in May of 2007, or do you need to refresh your memory?

A. I probably need to refresh my memory.

MS. BRANDT: Your Honor, may I approach?

THE COURT: Yes, ma'am. You only have to ask one time per witness.

MS. BRANDT: I'm sorry, I didn't hear you.

THE COURT: One time per witness when you

**30**

approach.

MS. BRANDT: I have got a substantial number of documents. I don't know what to do, so I want --

THE COURT: All I'm saying is, you don't have to ask but one time.

MS. BRANDT: Okay. I'm sorry. Thank you. I didn't understand.

Q. (By Ms. Brandt) Could you please identify this document?

A. This document appears to be a copy of Dallas County procedures for appointment of counsel in death penalty cases that's amended May 20, 2007.

Q. And could you please take a look at the provision that says appointment of counsel. Could you read into the record, please, when counsel shall be appointed?

A. You're talking on the first page?

Q. Yes.

A. It says, The presiding judge of the district court in which a capital case is filed shall appoint two attorneys, at least one of which is from the list of qualified attorneys approved by the local selection committee to represent an indigent defendant. Attorneys shall be appointed as soon as practicable after charges are filed unless the State gives notice in writing that the State will not seek the death penalty.

**31**

MS. BRANDT: Your Honor, could we admit that exhibit, please?

THE COURT: Record exhibit, yes, ma'am.

(Defense Exhibit Number 4 admitted for record purposes)

Q. (By Ms. Brandt) And then let me show you this other document, please. Could you identify this document?

A. This appears to be a copy of the Dallas County indigent defense plan for the appointment of defense counsel in felony cases revised January 2009.

Q. Let me back up a second. I didn't ask you to identify the signature on the May 20th, the Dallas County procedures for appointment in May 2007. Could you tell us who signed that?

A. That was signed by presiding Judge John Cruezot on May 7 (sic) of 2007.

Q. May 7th or May 4th?

A. May 4th, I'm sorry.

Q. And you recognize Judge Cruezot's signature?

A. I do.

Q. Okay. And going back to this revised January 2009 defense plan for Dallas County, if we take a look on the second page, Section 4, what's the heading on Section 4?

**32**

A. Appointment of counsel.

Q. And could you read into the record 4.3?

A. 4.3 states that counsel shall be appointed for eligible defendants within one working day of the Court's receipt of a request for appointed counsel.

Q. Okay. So by January of 2007, we had the same type of language being implemented in Dallas County as in the statute; is that correct?

A. I believe so.

Q. Okay. And could you identify this particular policy and procedure?

A. The one you just handed me, the first page appears to be an email from Joe Lowy -- I'm not sure if I'm pronouncing that correctly -- to you, Lydia Brandt.

Q. And if you turn two pages over, does this appear to be the electronic signature of Judge Lowy?

A. On which page?

Q. I think you go two more -- two more pages.

A. I'm not really sure which page I'm supposed to be looking at here.

Q. Could you read the part that reads Submit plan for approval?

A. Submit plan for approval. The current plan was submitted for approval by Dana Nixon 10-24-2011, 3:49.

Q. And if you go down to the next box where it says

33

approval of plan, it says county approval, approval date. What county is written there?

A. Dallas.

Q. And who was the approver?

A. I believe Martin Lowy.

Q. And the approval date?

A. 10-28-11.

Q. Okay. And if we then go into the actual policies and procedures themselves, can you tell us what the name of this plan is?

A. Dallas District Court's Plan.

Q. And if we go to -- you turn one -- two, three, four, five -- the fifth section there, it says Section 4.

A. Prompt appointment of counsel.

Q. Yeah. And could you read just the heading of that?

A. Prompt appointment of counsel.

Q. And what follows after that in bold?

A. 10-23-11.

Q. Section 4?

A. Section 4, prompt appointment of counsel.

Q. Okay. And let's take a look at 4.1. Could you read that into the record, please?

A. When an eligible defendant requests appointment

34

of trial counsel and submits the required documents, the request and any required documentation shall be transmitted to the court within 24 hours of the request for appointment of counsel being made.

Q. By 2007, you were in private practice representing capital defendants?

A. Yes.

Q. And do you have any independent recollection with respect to some of those defendants, or do you need to refresh my memory?

A. I would need to refresh my memory.

(Defense Exhibit 7 marked for identification and admitted for record purposes.)

THE COURT REPORTER: That will be Number 7, Judge, that she just handed me.

Q. (By Ms. Brandt) Could we take a look at the first document that you have got. Could you identify that for us, please?

A. The first sheet of the document you handed me is an arraignment sheet for a client of mine by the name of Teresa Renee Price.

Q. And could you please tell us when she was arraigned?

A. She was arraigned on June 25th of 2012 at 9:47 p.m.

35

Q. Are there additional documents appended to that?

A. There are.

Q. Could you please identify what those documents are.

A. The second document is entitled instructions relating to preliminary initial appearance for the same client in the same case.

Q. And who does that show that the original appearance was before? Does it identify a judge?

A. Well, it says that all felony charges associated with this arrest are assigned and shall be filed in Robert Burns' court, Criminal District Court Number 1.

Q. Okay. And what is the next document with respect to Teresa Price?

A. The next document is election of counsel.

Q. And what date did she elect counsel? Does it say that?

A. There's not actually a date on this document. There's a signature but there's no date off to the side.

Q. Would the election of counsel be done at the same time of the arraignment?

A. That would be my understanding.

Q. Okay. And do you have another document there with respect to your appointment?

A. There's another document that is an email that

36

was sent to me appointing me to her case.

Q. And could you please tell me when you were appointed?

A. The email was sent January 30th, 2012, at 10:05 a.m.

Q. And so what is the delay between arraignment or request of counsel and actual appointment?

A. Well, arraignment occurred on January 25th at 9:47 p.m. and I was appointed January 30th at 10:05 a.m.

Q. Was it January 15th or January 25th was the arraignment, I'm sorry?

A. January 25th is what this shows.

Q. And so what was the time lapse?

A. That's five days.

Q. About five days. And what is next one that you have there for your client?

A. These all actually appear to be Teresa Price's documents.

MS. BRANDT: Okay. Could we mark the next one, please?

THE COURT REPORTER: Should I put admitted on all of these, Judge, for record purposes?

THE COURT: Yes.

(Defense Exhibit Number 8 marked for identification and admitted for record

37

purposes.)

Q. (By Ms. Brandt) And could you identify the first document?

A. The next document is the arraignment sheet for Mark Anthony Spears.

Q. And what was the date he was arraigned?

A. He was arraigned April 25th, 2012 at 2:53 a.m.

Q. And the next document after that?

A. Is the instructions relating to preliminary initial appearance.

Q. And who was that before?

A. Again, Robert Burns.

Q. And what court is Judge Burns in?

A. Criminal District Court Number 1.

Q. And what court are we in right now?

A. Criminal District Court Number 7.

Q. Okay. And could you tell us what the next document is?

A. And then the next sheet is the email appointing me, which was sent out on February 28th, 2012, at 3:32 p.m.

Q. And so was there a delay in appointment?

A. From the 25th to the 28th.

Q. Okay. So we had delays in appointment being happening in courts other than CDC 7?

38

A. Correct.

Q. Were these capital cases?

A. They were initially filed as such. Teresa Price's case ended up being indicted for murder, but she was arraigned on a capital murder charge. And Mark Anthony Spears is indicted for capital murder.

Q. Okay. Were they -- did the media interview these individuals?

A. They did not.

Q. They did not. Why is it still -- would you say that these delays between the arraignment and then the actual appointment of counsel are significant and material?

A. I would say they were.

Q. And why is that?

A. Because that's a critical stage of the proceeding. And I believe as soon as they request counsel, it should be as soon as practical that counsel gets appointed.

Q. And so is it your professional opinion that the 6th Amendment right to counsel would attach at that point in time and they are also entitled to have counsel at that point in time and not just a mere request?

A. I would say yes.

Q. Okay.

39

(Defense Exhibit Number 9 marked for identification and admitted for record purposes.)

Q. (By Ms. Brandt) Could I ask you to identify what the document that is in front of you?

A. This document is an arraignment sheet for Brandon Jarod Fulwood.

Q. Okay. And could you tell us what the date of arraignment was?

A. He was arraigned November 11th, 2012 at 2:48 a.m.

Q. And what is the document after that?

A. The document after that is his election for counsel.

Q. Okay. And what's the date on that?

A. The date of that is November 11th, 2012.

Q. And did he request counsel?

A. He did.

Q. And the date after that, or I'm sorry, the document after that.

A. Document after that is instructions relating to preliminary initial appearance.

Q. And who was that case sent to?

A. Don Adams, Criminal District Court Number 2.

Q. Okay. And what's the document that follows?

A. The document that follows appears to be

40

appointment of counsel.

Q. And the document after that?

A. And the document after that is the email that was sent to me on --

Q. And when were you appointed?

A. On November 13, 2012 at 12:53 p.m.

Q. And again, we have a time gap there between request for counsel and the actual appointment?

A. From November 11th to November 13th.

Q. Okay. Was Mr. Fulwood interviewed by the media?

A. He was not.

MS. MURPHY: Your Honor, the State is going to object to any more testimony regarding the arraignment and appointment of counsel of any defendants that did not get media interviews because the issue before this Court is whether or not the media interviews were, in fact, critical stages.

MS. BRANDT: Your Honor, I have got a right to show that there's a delay. We're challenging the 6th Amendment right to counsel at the time that they requested counsel.

THE COURT: I will allow it, but try not to repeat yourself, Ms. Brandt.

(Defense Exhibit Number 10 marked for identification and admitted for record

purposes.)

Q. (By Ms. Brandt) And let me show you this. Could you identify this, please?

A. This is an arraignment sheet for Chloe Menager.

Q. And what is the date of arraignment?

A. Date of arraignment, September 7, 2012 at 12:33 a.m.

Q. And what's the document after that?

A. The document after that is the election of counsel.

Q. And when is that dated?

A. September 7th, 2012.

Q. And was there a request for counsel?

A. There was.

Q. And she signed it?

A. Yes.

Q. And what is the next sheet after that?

A. The next sheet after that is the instructions relating to preliminary initial appearance.

Q. And could you tell us who that case was shown it was being assigned to?

A. Don Adams, Criminal District Court Number 2.

Q. What is Don Adams' position right now?

A. I believe he is the -- I'm not sure what you would -- the presiding judge.

THE COURT: He is.

A. I believe that is the title.

Q. (By Ms. Brandt) Okay. What is the document that follows?

A. The document that follows is appointment of counsel for indigent defendant.

Q. And does that show that you were appointed?

A. It does.

Q. And on the document after that?

A. Is the email I received appointing me.

Q. And when were you appointed?

A. September 7th, 2012 at 4:11 p.m.

Q. Was Ms. Menager interviewed by the media?

A. She was.

Q. It looks like the arraignment shows September 7 of 2012 and your appointment was September 7, 2012?

A. Correct.

Q. Would you tell us what happened in that interim?

A. She was arraigned at 12:30 a.m. or 12:33 a.m. in the morning. And it's my understanding -- I don't know exactly what time, but prior to my appointment, the morning of September 7th she was interviewed by numerous representatives of the media.

Q. And did she, in fact, give interviews?

A. She did.

Q. Can you tell us based on your professional opinion and observation what her mental state is?

A. Um --

Q. Was she mentally impaired?

MS. MURPHY: Your Honor, objection. Ms. Bernhardt is not a mental health expert.

MS. BRANDT: I'm sorry, I didn't hear the objection.

MS. MURPHY: Ms. Bernhardt is not a mental health expert.

MS. BRANDT: But, Your Honor, she does have an obligation to go out and evaluate this and she can take a look herself. She has done enough of this type of litigation --

THE COURT: Overruled.

Q. (By Ms. Brandt)

A. At this point in time, I would not like to comment on her mental state. I believe that is attorney/client privilege at this point.

Q. Okay. Let me ask you this question. If she was mentally impaired, was it crucial for you to get appointed at the time that you could -- why was prior appointment so crucial to you?

A. I think any time in a capital murder case, immediate appointment is the preference. And I would again say generally that most capital murder defendants are not high-functioning mentally.

Q. And what would you have done had you been appointed prior to her being interviewed?

A. If I been appointed prior to the media interviews, I would have advised her not to speak to anyone.

Q. Would you have been proactive with respect to stopping or preventing her to be interviewed?

A. As much as possible.

Q. What would you have done?

A. Not only would I have advised her not to speak to anyone, I would have sent a letter to the jail saying to not let her be interviewed.

Q. And when sent a letter to the jail, does the jail -- when we're talking about the jail, we're talking about the jail that's run by the Dallas County Sheriff's Department?

A. Correct.

Q. And it's also known as the Lew Sterrett Justice Center?

A. Correct.

Q. And when they get a letter like that, what happens? Do they honor it?

A. It has been my experience when that happens that

-- you know, I don't know whether it's my advice to the client not to speak or the letter to the jail, but I haven't had anybody interviewed in that situation.

(Defense Exhibit Number 11 marked for identification and admitted for record purposes.)

Q. (By Ms. Brandt) Could you identify what that is?

A. That appears to be one of the media reports.

Q. And what is the date on that?

A. September 7th.

MS. MURPHY: Your Honor, can the State be provided with a copy?

MS. BRANDT: Sure. I'm sorry. I made four copies for everybody.

Q. (By Ms. Brandt) And where there's this white box would have been the video that was actually on the internet?

A. That would be my understanding.

Q. Okay. And what was the timing with respect to these being on the internet and your appointment?

A. I don't really know how to answer that. I was not aware of the case or aware of her existence until 4:11 p.m. when I got the email. Shortly after that, I received a phone call from another attorney saying, did you know your new client is doing interviews.

Q. And who was that attorney?

A. That was David Bilbow.

Q. Okay. And by that time, was there anything you could do to stop it?

A. No.

Q. What did you after that?

A. Well, after that, I immediately went down to the jail.

Q. Had you been -- and what did you do there?

A. Visited with my client.

Q. Is Ms. Menager's case an example of how and why there's a substantial delay that can harm a defendant?

A. I would say yes.

Q. In your experience, does the State of Texas get ahold of these media interviews?

A. Yes.

Q. And what do they do with them?

A. If they are incriminating, they invariably end up being used at trial.

Q. And what's the harm that happens to the defendant?

A. It depends on the particular interview, but a lot of them are very damaging.

Q. Why do you say that? What happens on these interviews?

A. In a lot of cases there are inculpatory statements by the defendant.

Q. So they've got admissions of guilt on there?

A. Absolutely.

Q. And how about with to -- do they get asked what the punishment should be?

A. Sometimes.

Q. And does that affect also the punishment phase of the trial?

A. It can.

Q. Is it your professional opinion the media interviews that take place in the gap between the request for counsel by the client and the actual appointment affect the legal proceedings?

A. Yes.

Q. Do you believe that law enforcement is exploiting this gap to benefit the State of Texas?

A. I would say yes.

MS. BRANDT: No further questions.

THE COURT: Cross-examination?

CROSS-EXAMINATION

BY MS. MURPHY:

Q. Ms. Bernhardt, you represented Charles Payne, didn't you?

A. On his direct appeal.

Q. And Mr. Payne gave a media interview, didn't he?

A. He did.

Q. And was that interview while he was being arrested?

A. I was not his attorney at the time so I don't really have any personal knowledge of that. I didn't get appointed until after he was convicted.

Q. Based on your understanding, do you know what was in his media interview? Do you have any knowledge?

A. No, I don't. I don't believe his ended up being used at trial.

Q. And wouldn't you agree that just like the right to testify, a defendant can choose to go against your advice and still give interviews to the media?

A. They can, but in that situation when you're talking about the right to testify, I have had a chance to advise them. In these media situations, these are occurring before the attorney ever meets the client.

Q. Even if you go in and you advise your client?

A. Sure. They don't have to follow my advice.

Q. You testified when you have been appointed, you go go the jail and stop the interviews, correct?

A. I don't know that I've had a situation where I got to the jail while the interviews were ongoing.

Q. But if someone has given a media interview

49

before, or even if they haven't given an interview, once they're appointed, you send a letter to the DSO's -- talk to the DSO's and say no media contact?

A. In most situations, particularly since 2002, by the time I get appointed, media interviews have already happened if they're going to happen.

Q. But you mentioned in your earlier testimony that you advise your client not to testify or not to give media interviews?

A. Correct.

Q. And tell the DSO's not to allow interviews?

A. I can't say I do that in every case.

Q. But you have done it?

A. I have done it.

Q. And do the DSO's seem to honor that agreement?

A. To the best of my knowledge.

MS. MURPHY: No further questions.

THE COURT? Any redirect?

REDIRECT EXAMINATION

BY MS. BRANDT:

Q. Ms. Bernhardt, just because some clients don't necessarily follow your advice, that doesn't mean -- some clients do in fact follow your advice?

A. Yes.

Q. And with respect to those individuals that are

---

50

impaired, that is the very place that the fiduciary relationship is most important, isn't it?

A. I would say so.

Q. Because they are unable to really exercise their rights because they don't have full capacity?

A. I would say so.

Q. Okay. And when you talked about sending a letter honoring -- or having the DSO or the Dallas County Sheriff's Department, so that we're clear on the record, a lot of times those letters are sent after the fact because the interview has already happened?

A. Well, when the interviews have already happened, I usually don't bother with the letter. I mean that --

Q. Because you can't unring the bell; is that true?

A. No -- yes.

MS. BRANDT: Your Honor, I have no further questions.

THE COURT: Anything else, ma'am?

MS. MURPHY: No, Your Honor.

THE COURT: May the witness be permanently excused?

MS. MURPHY: Yes, Your Honor.

MS. BRANDT: Yes, sir.

THE COURT: Thank you, ma'am.

I apologize if I kept you from making money.

---

51

What further says the defense?

MS. BRANDT: I'm sorry?

THE COURT: Call your next witness.

MS. BRANDT: My next witness is Karo Johnson.

THE COURT: Okay.

MS. BRANDT: My next witness is Brooke Busbee.

(Off-the-record discussion)

BROOKE BUSBEE,

was called as a witness and testified as follows:

DIRECT EXAMINATION

BY MS. BRANDT:

Q. Would you state your name for the record, please?

A. Brooke Busbee.

Q. And Ms. Busbee, what do you do for a living?

A. I am a criminal defense attorney.

Q. And when did you graduate from law school?

A. In '79.

Q. And how long have you been doing capital defense?

A. Since about '80 -- I mean -- yeah, 1989.

Q. And are you board certified?

A. I am.

Q. And do you practice here in the Dallas County courts?

---

52

A. Exclusively, and federal.

Q. Could you tell us, please, before January 2nd of 2002 -- you are in private practice; is that correct?

A. Yes, ma'am.

Q. And during all of this time, you were not working for the public defender?

A. No.

Q. So essentially we could call you something like a private public defender because you have your own office?

A. Right. On some cases.

Q. Prior to January 2nd, 2002, you indicated that you represented defendants accused of capital crimes. Could you explain the procedure used in Dallas County where you were notified of the appointment?

A. I'm not real sure about the 80's, but in the '90s, the procedure was that the -- whoever was on duty, the magistrate that was on duty at Lew Sterrett, was instructed to call from a list of lawyers.

When they had somebody to arraign on a capital murder charge, they were instructed to get one of those lawyers on the phone to inform them that they should come down and assist that person.

Q. And what if you got a phone call at 10 o'clock at night?

53

A. Well, it's my recollection you're supposed to go.

Q. And so about how long -- at the arraignment, that is when the defendant invoked his right to counsel; is that correct?

A. You know, I don't know what the process was from the magistrate's point of view. I'm just assuming that -- I mean -- but it was our understanding that at the time someone was brought before them and charged with capital murder, they were instructed to notify a lawyer on the list.

Q. Okay. You didn't have to go down at 10:00, you weren't required just because you got a call to take the appointment? You could decline it?

A. Oh yeah, certainly. But that was before caller ID so maybe I'd answer the phone. But, yeah, I mean they would keep calling, I'm assuming, until they found somebody who was willing to assist that person.

Q. And when you're talking about assist that person, you're talking about going down within 30 minutes to an hour?

A. Yes, that's how I recall it, that, you know, you needed to go down and talk to them right away. I mean, that's certainly how I took it.

Q. Did you have a client -- well, let me back up.

The capital defendants, in your experience

54

that you represented, could you describe their mental state? I mean, are you representing high-functioning individuals who are capital defendants?

A. Some maybe were high functioning, most of them not.

Q. And could you describe what the problem was with those who were not?

A. Well, I've had a couple of capital murderers in the past few years who had schizophrenia. I've had one at least that was mentally retarded, maybe another one. I have had sociopaths. I can say that as well but --

Q. Did you have those who had -- well, mental illness, of course, is schizophrenia?

A. Yes. Yes.

Q. Did you have some who were laboring under youth, they were very young?

A. Yes.

Q. Could you tell us about one in particular?

A. That, of course, was back when they called us at night. That was Hector Fernandez.

Q. And when you say they called you at night, we're talking about the immediate procedures where the magistrate called?

A. Right. Somebody -- it was not somebody I knew. A lot of times they had civil lawyers sitting back then,

55

and so --

Q. To do the appointments?

A. Yeah, to do the arraignments. And this man called me and said that I was appointed to represent a young man, and he said something about him being a juvenile, which kind of -- he probably wasn't really supposed to call me, but --

Q. Was this juvenile accused of capital murder?

A. Yes, he was accused of a couple of capital murders. And so I went down there to talk to him. But they had taken him back to the police station. So I went down to the police station because it dawned on me that although I don't do any juvenile law that you have to arraign a juvenile before you can take a written statement from them.

And so I went down there and caught them in the sallyport and stopped them from taking a statement from him. So it was good for him that I showed up in about -- showed up, you know, within the time period to assist. Not so good from their standpoint.

Q. When you talk about their standpoint, you're talking about the State of Texas?

A. Yes, ma'am.

Q. And so would you -- could you give us your opinion about the advisability or inadvisability of this

56

delay? Does it have a substantial and material harm to the client if there is a delay?

A. Sure. I think it does.

Q. Okay. And had there been a delay in Hector Fernandez's case, would there have been substantial and material harm to him?

A. Definitely.

Q. Okay. Let me ask you a question. Some of your clients have given media interviews; is that true?

A. Yes.

Q. And have they given media interviews in between this gap between arraignment and appointment of counsel?

A. Yes.

Q. And what do your clients tell you that the jailers said to them?

A. I've been told on more than one occasion that they --

MS. MURPHY: Objection. Hearsay.

THE COURT: It is not for the truth of the matter asserted.

A. Anyway, my clients have told me they have been encouraged by the jailers to sign to talk to the press.

Q. (By Ms. Brandt) When you talk the jailers, who specifically in Dallas County are we talking about? Are we talking about the Dallas County Sheriff's Office when

57

you say jailers?

A. Yes.

Q. Okay. So that the record is clear.

A. Yes.

Q. Detention officers, I'm assuming, who takes care of people in the jail. Okay. And can you identify specifically who those are, do you remember?

A. I remember being told this, and I remember that it was one client -- and it was a client that was in the medical ward, which is the third floor of the west tower, but I'm not really sure who told me. It could have been Licho Escamilla or it could have been this other guy I had actually out of this court, Santiago Lara. But I remember that --

Q. Could you spell that, please, for us.

A. S-a-n-t-i-a-g-o, L-a-r-a. I just don't remember which of those people told me that.

Q. And these interviews happened after the change in procedure in Dallas County; is that right?

A. These interviews would have happened after 2002.

Q. Okay. You mentioned Licho Escamilla. I think that's a -- a December of 2002 case. I don't know when the law went into effect, but I'm pretty sure --

THE COURT REPORTER: How do you spell his first name?

58

THE WITNESS: L-i-c-h-o.

Q. (By Ms. Brandt) It could also have happened a little bit before the enactment, right?

A. What was the date of the enactment?

Q. The date of the enactment was January 2nd, 2002.

A. It was a 2002 case. It happened in the late winter, like mid-December or late November so the Act was in place at that time.

Q. (By Ms. Brandt) This was a pretrial suppression hearing, was it not?

A. Yes.

Q. And could you tell us about what happened?

A. Well, this was a case out of the 203rd and Lana McDaniel was the presiding judge, and I was in a jury trial in her court when she was assigned -- I'm making an assumption there -- I was in a jury trial in her court, and at a break she asked me if I would represent Licho Escamilla who had been charged with capital murder.

And she gave me time at lunch to go over and talk to him. He had been up in the court, but they sent him back. And when I went to talk to him, I met -- was it Bud Gillette, or whoever it was -- whoever was called in this case -- Bud Gillette --

Q. And Bud Gillette is whom?

59

A. I guess he is a local newscaster. And the television crew and everything else leaving the holdover that my defendant was in. And they had already conducted an interview with him in the interim apparently.

Q. And this particular transcript was one in which you were challenging the admission of the reporter's videotape?

A. Yes, ma'am.

Q. Okay. And was there a conversation, to the best of your recollection, between the police officer and the reporter? And I call your attention --

MS. MURPHY: Could you tell me a page?

MS. BRANDT: 16 through 20.

A. I know I was supposed to read this, but I didn't really have time. Yes.

Q. (By Mr. Brandt) And do you recall in there -- on pages 40 and 41 --

A. Yes, ma'am.

Q. -- do you recall that --

A. Oh, yes. The conversation he had with Sergeant DeCourte?

Q. Yes.

A. I do remember that now.

Q. Looking at pages 16 through 20 and then 40 and

60

41.

A. Uh-huh. Yes. Right. I remember that. Right.

Q. Could you please tell us a little bit about that.

A. Well, of course, the interview was very prejudicial to the defendant and it was going to do a lot of harm in the punishment phase -- or well, the guilt or innocence or punishment phase of the trial.

Q. It was or it did?

A. Oh, it did.

Q. Okay.

A. It was allowed in. And I don't think at the time that we had any real hope that we would be able to keep it out, but we thought we needed to definitely try to do so.

Q. Did it appear that -- do you recall that the police officer made a statement that the defendant would not talk to them?

A. Right. It is -- well, it is as it is reflected in the report.

Q. In the record?

A. In the record.

Q. Do you have other defendants that there were delays between arraignment and their request for counsel and then your actual appointment?

A. Yes. At your request, I went through -- I have

had my cases on a computer program since 1998. So it was surprisingly difficult to pull up what capital cases I've been appointed on out of the Forvus system, but I looked through my cases and I found six cases where there had been a significant delay and then --

Q. Could you list each of those for the record so that we know what they are, the name of the defendant and if you have the case number.

A. These are not necessarily in chronological order. This case number is F11-61285. The defendant's last name is G-a-l-a-v-i-z.

Q. And what was the delay?

A. Well, she was arraigned on -- I have trouble finding this. She was arraigned on the 26th of October, and I was appointed on the 3rd of November.

Q. Of what year?

A. Of 2011.

Q. Was this a capital case?

A. It was a capital case, and it was covered by the First 48. So there been a significant amount of media coverage already.

Q. And -- do you have another --

A. Yes. I just want to confirm with my notes that they comported with the notes here.

Q. Sure.

A. This other one would be Francisco Martinez. The case number is F07-33618. He was arraigned on the 31st of May of 2007, and I was appointed on the 4th day of June, 2007.

Q. Was there media coverage in that?

A. Newspaper coverage, but not very much.

Q. Okay. This was also a capital case?

A. These were all capital cases that --

Q. That you're listing?

A. Yes.

Q. And the next one?

A. And the next one is one out of this court that the gentleman's name was Santiago Lara, F07-51820. He was arraigned on 5 -- May 1st of 2007. The computer shows that I was appointed on May 7th of 2007. And I'm going to look here and compare that with my notes to make sure that my notes comport with that. I show myself appointed 5-8, but that could be that -- I will go with the 5-7 date.

There was a woman by the name of Amelia Guerrero, and I was app --

Q. What was the case number?

A. F10-13206. And she was arrested -- arraigned, I should say, on -- let me back up -- this is the client that I could not get an arraignment date on her. I have

got an arrest date. She was not arrested by Dallas Police Department. I want to say it was Carrollton. She was arrested on the 25th day of March of 2010, and I was appointed on the 30th day of March, 2010. This had significant media coverage because it was a nanny who had allegedly killed one of her charges.

Q. Had she spoken to the media? Was she interviewed between arraignment and appointment?

A. She was interviewed by -- I think by CPS. I don't recall if she had been interviewed by the media.

Q. What would have happened if you had been appointed?

A. I would have not allowed her to give any interviews to anybody.

Q. Okay. Certainly.

A. Case Number F07-59596. The defendant's name is Adrian Lopez. He was arraigned on 30th day of November of 2007, and I was appointed on the 4th day of December, 2007.

Q. 4th day of what?

A. December.

Q. December 2007?

A. Yes, ma'am.

And then the other one that I could find was a Raul Salazar, Case Number F08-53019. He was arraigned on the 19th of March, 2008, and I was appointed on the 24th day of March, 2008. And that comports with my records as well.

Q. Do you know if there was any media interviews that he gave?

A. I don't even remember what this guy's case was, so probably not.

Q. But you do recall there was a gap?

A. That's what my records show.

Q. Do you know Brad Lollar?

A. I do.

Q. And do you know Doug Parks?

A. I do.

Q. And had they wanted to talk to you about problems with this gap, would you have been available to them to talk to them?

A. Sure. I'm sure -- I suppose it's common knowledge that there's a little delay more so than the ordinary defendants because of the way that they parcel out the death penalty cases -- or the capital murder cases.

Q. Could you explain to us how it is done after 2002?

A. I don't really -- I -- it's my understanding that the presiding judge or a judge assigned to take -- there

65

is one judge assigned to distribute these type of cases. They go to that court first and that judge looks to see who has too many or too few and distributes them that way. And once it gets to the court it will be ultimately assigned to, that judge will assign a lawyer. So there is something of a lag time.

Q. And the one working day referred to in the statute doesn't begin to run until it gets to that ultimate assigned judge; is that true?

A. That's an interpretation I'm not qualified to make.

Q. So if Brad Lollar or Doug Parks wanted to call you to testify as to your experience with respect to the gap, you would have been able -- you would have been willing to testify?

A. I would have.

Q. And you would have been willing to testify also to what your experience was in getting these capital appointments prior to these changes in the law?

A. Yes.

MS. BRANDT: Okay. I have no further questions.

THE COURT: Cross-examination?

CROSS-EXAMINATION

BY MS. MURPHY:

66

Q. Ms. Busbee, you said you represented Licho Escamilla?

A. Yes.

Q. And that at trial your objection was that the -- the reporter had spoken to a police officer prior to the reporter giving the interview with Mr. Escamilla?

A. I think it -- it will say who it was. I think our theory was he was acting as a state agent of some kind.

Q. And do you recall if your objection was 6th Amendment?

A. I think I testified. I think Wayne Huff was the one that was making the objection. I don't remember, but it will be reflected in here.

Q. Do you remember what the Court of Criminal Appeals said about the issue in its Opinion?

A. I'm sure they said that that was not so. No, I don't recall --

Q. You don't recall?

A --what was said. But I'm sure you have it there.

Q. Have you had what you would determine intelligent capital defendants? Not all capital defendants have some mental deficiency?

A. Sure. I certainly have.

Q. And you brought up Hernandez, a juvenile?

67

A. Fernandez.

Q. Fernandez?

A. Yes.

Q. Would you agree that he had a legal -- there is actually statute that says he gets legal counsel prior to making any statements?

A. I don't know anything about juvenile law. I think that he has to be arraigned before he can give a statement. I don't know if he has counsel -- I always thought what happened in that case was the magistrate not knowing how things worked, didn't understand that he wasn't supposed to appoint him an attorney. That -- but I don't know that that was a fact, and that was 1993 or '4, so I mean, we're long past that statute.

Q. Do you have any reason to believe that Doug and Brad were not aware of this gap?

A. You know, I'm sure they can tell you what they knew and what they didn't know.

Q. And you don't know what they knew and you don't know what their strategy was in the case?

A. No. I don't even remember discussing this case with them, although we're real good friends and we do -- and we tried a case together since then, the three of us so I just don't know anything about this particular one.

Q. And prior to 2002, was there a written or formal

68

procedure for appointment?

A. Something came in effect in the mid-'90s and Judge McDowell was the presiding judge then, and he actually appointed me to some board that was supposed to decide who could -- what the qualifications were going to be or who qualified.

All I remember is that we met one time, and I don't remember what else ever happened on that. There was something in place prior to this Act, I just don't -- I don't remember anything about it.

Q. And you are not saying that media interviews did not occur prior to 2002?

A. Oh, no. I mean, they did occur. But one thing I wanted to tell you, but I got into the habit the minute I got appointed on something that had any kind of media attention, I would have my secretary fax a letter to the jail and to the police department to say that he did not want any media interviews and trying to stop it if it could because sometimes it apparently had an effect, but sometimes, you know, obviously if they have already interviewed them, it's too late.

Q. But did you speak to your client before saying no media interviews?

A. Well, after my experience with Licho, I just stopped them and then -- because that was like a

69

ten-minute too late thing. I sent it to stop them. Now, if they wanted to talk to him after I talked to him, there'd be nothing I could do about it.

But because the media gets there before I do, if I -- my policy was and would be to try everything I could -- it doesn't really have any effect -- the sheriff's department doesn't have to do what I ask them to do. It's just something to see if I could make them -- you know, pause them from letting the media talk to my client before I got a chance to talk to them.

MS. MURPHY: No further questions.

MS. BRANDT: I do have one other question.

REDIRECT EXAMINATION

BY MS. BRANDT:

Q. Just because a client is high-functioning, do you still believe they need counsel at the time of appointment without this gap?

A. No, I think anybody -- no matter how intelligent they are, they don't understand the system. And even if -- they're scared. They're frightened. So, yeah, you need counsel, no matter who you are. You need counsel if you're a lawyer.

MS. BRANDT: I have no further questions.

MS. MURPHY: Nothing further.

THE WITNESS: May I be excused, Your Honor?

70

THE COURT: Yes, ma'am.

THE WITNESS: I'll be available.

THE COURT: I want to go out of order here and call that doctor that has got the flight.

(Brief recess)

THE COURT: Sir, please stand, face me and raise your right hand. Good morning.

THE WITNESS: Good morning.

THE COURT: How are you?

THE WITNESS: Good.

(Witness sworn.)

THE COURT: Lower your hand. Take your seat on the witness stand. Respond to questions of Ms. Murphy.

Ms. Murphy, whenever you're ready.

DWIGHT STEWART,

was called as a witness and testified as follows:

DIRECT EXAMINATION

BY MS. KUBALAK:

Q. Good morning, Mr. Stewart.

A. Good morning.

Q. Please state your name for the record.

A. Dwight Stewart.

Q. Thank you for being here today on such short notice. Mr. Stewart, did you provide an affidavit in

71

this case for defense counsel?

A. Yes, I did.

MS. KUBALAK: May I approach the witness, Your Honor?

THE COURT: Yes, ma'am, and as necessary.

Q. (By MS. KUBALAK) Mr. Stewart, I'm showing you what was attached to the writ application as Exhibit 25. Do you recognize that as your affidavit?

A. Yes, ma'am, I do.

Q. Mr. Stewart, what is your current occupation?

A. I'm an education specialist with the Texas School Safety Center.

Q. And is it part of your job to be testifying in cases such as this? Is that part of your job responsibilities?

A. No, it's not.

Q. So is your employer aware that you're testifying here today in this case?

A. No, they're not.

Q. And is your employer aware that you provided an affidavit in this case?

A. No, they're not.

Q. When did you prepare that affidavit? Was it during working hours?

A. No, it was on my own time.

72

Q. In your affidavit, you state that you are a nationally certified gang awareness trainer; is that correct?

A. That's correct.

Q. And where did you receive that certification?

A. I received it from the National Gang Crime Research Center out of Chicago.

Q. Can you describe the purpose of that organization?

A. The purpose of it is to train individuals to conduct gang trainings, also provide information on certain gangs. They have a certain track that you take to become certified in that specific area. You're able to go out and interview gang members from Cabrini Greens to Hilton. It's a neighborhood in Chicago. You work after hours to gain your certification.

Q. That's what I was going to ask you. What are the requirements to obtain certification?

A. The requirements is that you have to take a certain number of hours, a certain numbers of classes, you know, to get your certification.

Q. Is there any sort of exam requirement or anything like that?

A. No, no exam.

Q. Are you aware if -- the National Gang Crime

73

Center in Chicago, do they maintain a database on gang experts that can be accessed by defense attorneys?

A. I have no idea.

Q. Would you agree that you're primarily a researcher and educator?

A. Yes, I would agree with that.

Q. In other words, you're not -- are you a member of law enforcement?

A. As a member of law enforcement, no.

Q. How much personal interaction do you have with gang members?

A. I have had a great deal of interaction. I've worked for the Texas Youth Commission. I've worked for the Texas Department of Criminal Justice as a supervision officer. I have worked for Comal County Juvenile Probation Department as an ISP officer. I've worked in San Patricio County as a superintendent running the juvenile detention center down there.

I have also ran bootcamps for CCI, Community Corrections, Incorporated, which is located in Hays County. I've worked at the Juvenile Justice Academy in San Antonio. I also work between communities and schools. And so I've been -- you know, I've been at this for awhile.

Q. And primarily, your contact with gang members,

74

that occurs in Texas, would you say?

A. Yes.

Q. Mr. Stewart, are you being paid to testify here today?

A. Am I being paid by the State?

Q. No, sir, by the defense.

A. By the defense, yes, ma'am.

Q. How much are you being paid?

A. I can't recall. I think it's $150 an hour or something like that.

Q. And were you paid to provide your affidavit?

A. No.

Q. All right. Let me talk a little bit about your affidavit. In it, you allege that Detective Barrett Keith Nelson gave false and misleading testimony at Mr. Broadnax's trial concerning Mr. Broadnax's membership in the Gangster Disciples; is that correct?

A. Yes.

Q. And you state that one of the reasons the testimony was false and misleading is because Mr. Broadnax, you say, does not meet the criteria for gang membership set out in Chapter 61 of the Texas Code of Criminal Procedure; is that correct?

A. That's correct.

Q. Mr. Nelson (sic), are you an attorney?

75

A. Mr. Stewart.

Q. I'm sorry. Mr. Stewart, are you an attorney?

A. No.

Q. Are you aware that Chapter 61 deals with law enforcement responsibility for creating data bases for gang activity?

A. Yes.

Q. Are you aware it does not govern the admissibility of gang membership testimony at trial?

A. No, I wasn't aware.

Q. And are you aware that the Texas Court of Criminal Appeals has already held in this case that the gang membership testimony was properly admitted at trial?

A. No, I wasn't.

Q. You also say that Detective Nelson's testimony was false and misleading because the Gangster Disciples is not a recognized Dallas criminal street gang; is that correct?

A. That is not correct. The Gangster Disciples are a recognized gang here in Dallas.

Q. So you're not saying, therefore, that there are no Gang Disciples in Dallas County, Texas; is that correct?

A. That's correct.

76

Q. I would like to show you Page 1 of your affidavit.

A. Yeah, I have seen that.

Q. Would you please read for me --

A. Yes, I have seen it.

Q. When it starts with "however".

A. However, as more fully discussed below, the Gangster Disciples and Folk Nation is not recognized as a Dallas criminal street gang.

Q. Would you agree with me that the Gangster Disciples is one of the largest criminal street gangs in the United States?

A. Yes.

Q. If I said there's between 50,000 and 100,000 members, would you disagree with that?

A. No, I wouldn't disagree with it.

Q. And how many personal contacts have you had with Gangster Disciples?

A. I had the opportunity to interview several Gangster Disciples in Chicago Cabrini Greens during the National Crime Research -- I mean the National Gang Crime Research Conference. I had the opportunity to sit down and interview a few of them and bring some to Texas to -- for our conference.

Q. And in your affidavit, you state that you

77

primarily specialize in gangs, K-12, Chinese gangs, military gangs and national gangs, so not the Gangster Disciples, correct?

A. The Gangster Disciples, they can be a K through 12 clique. I mean, you know, they vary in different -- if they're in the military definitely.

Q. So where do you obtain most of your information pertaining to the Gangster Disciples?

A. A lot of my information comes from Chicago. Some of my information comes from, you know, officers that I have worked with as far as doing presentations for.

I also have the Gangster Disciples manuscript Bible that I have researched. I have their rules and regulations. I have all their signs and symbols and so forth.

Q. Mr. Stewart, you state that Mr. Broadnax is not listed in any Dallas gang database?

A. To my knowledge, he is not.

Q. Did you check the Dallas gang database?

A. No, I did not.

Q. And it is your testimony that you do not have access to the Dallas database?

A. Yes.

Q. Do you know how long Mr. Broadnax had been living

78

in Dallas prior to these murders?

A. No, I don't.

Q. So would it surprise you to learn that he had only been in Dallas for a matter of weeks?

A. Would it surprise me? I guess it does surprise me.

Q. So you were not aware he had been living in Michigan prior to coming to Dallas?

A. No, I did not.

Q. And that prior to living in Michigan, he had been in Georgia.

A. No.

Q. Did you know that?

A. No.

Q. How many dealings have you had with the Gangster Disciples in Michigan and Georgia?

A. I've had none.

Q. So you can't testify to what presence the Gangster Disciples has in those states?

A. No.

Q. Wouldn't you agree with me that checking whether this defendant was in a Dallas gang database would not really be worthwhile if he was not a resident of Dallas?

A. State that question again, please.

Q. Let me state it another way. If the defendant

79

had only been in Dallas for a short period of time prior to the murders -- and we're talking about less than two months -- you wouldn't necessarily expect him to appear in the Dallas gang database?

A. I agree.

Q. And are you aware that Detective Nelson consulted with gang officers in Chicago prior to entering his opinion in this case?

A. No, I'm not aware.

Q. You also state in your affidavit that Detective Nelson's references to Folk and Folk Nation, that was part of why his testimony was false and misleading because Folk and Folk Nation have no current meaning; is that correct?

I'm showing you Page 3 of your affidavit. If you would read, starting with Broadnax's --

A. Where?

Q. Right here (indicating).

A. Broadnax's reference to Folk or the Folk Nation has no current meaning. The term -- is that what you want me to read?

Q. Yeah.

A. Okay. The term relates to an affiliation dating back some 30 years ago before Broadnax's birth, which is no longer valid.

80

Q. Mr. Stewart, as part of your responsibilities with the Texas School Safety Center, do you give presentations to various groups on gangs?

A. Yes, I do.

Q. Do you sometimes utilize Powerpoint for those presentations and slides?

A. Yes.

(State's Exhibit 1 marked for identification)

Q. And I will refer you to Page 7, and ask you to read what the last slide on the page says.

A. On Page 7, the last slide you have a six-pointed star, the 2 6 nation with the pitchforks pointing up. You have the heart with wings, standing for the love of our nation, with the wings standing for expansion. You have the rabbit with the bent left ear. You have pitchforks pointing up, and you have -- the Number 6 is with the dice. You have the devil's tail also.

Q. And what is the title of that?

A. And you have the horns. That is for wisdom.

Q. What is the title of that slide?

A. The title of that slide is Folk Nation.

Q. And do you recognize this as a presentation that you gave?

A. Yes.

Q. And your name is, in fact, on the front?

A. Yes.

Q. On the first part. And what is the date at the top?

A. 6-6-2012.

Q. And you would agree with me some of these symbols, such as the pitchfork, the six-pointed star, GD and the heart with wings, those were introduced as evidence in this case as part of Mr. Broadnax's writings and drawings?

A. I wasn't aware.

MS. KUBALAK: Your Honor, we would offer State's Exhibit 1 into evidence.

THE COURT: Any objection?

MS. BRANDT: No, Your Honor.

THE COURT: Okay. That is admitted.

(State's Exhibit Number 1 admitted into evidence for record purposes only)

Q. (By Ms. Kubalak) Isn't it true that much of this presentation deals with identifying gang members through their various signals and symbols and writings?

A. Yes.

Q. You also state in your affidavit that Mr. Broadnax was merely a gangster wannabe and that all of these signs and symbols and lyrics and self-admissions don't mean that he was actually a member of the Gangster Disciples; is that correct?

A. Yes, the -- I would say that a lot of the time -- you know, many times that gang members, they -- you know, they pretend to be gang members but, you know, don't have the signs and symbols to state that they are gang members. And like I said, I just found out that these were the drawings.

Q. So you were not aware of the gang evidence that was admitted at trial and that Detective Nelson relied upon to render his opinion?

A. No, I wasn't.

Q. But you still are -- in your affidavit you allege that Detective Nelson gave false and misleading testimony, correct?

A. Through the testimony that I saw, through his testimony. I never seen the drawings or -- I have never seen the drawings.

Q. So you did not review any of the evidence in this case? You did not read the record?

A. No. Just through his testimony. That is what I saw.

Q. And you were aware in his testimony that he was asked to look at several exhibits?

A. No.

Q. Would you agree with me, Mr. Stewart, that there is also a fine line between a gangster wannabe or gangster gonnabe?

A. Yes, I agree with you.

Q. And that many gangs consider wannabes gonnabes?

A. Yes.

Q. Would you also agree with me that for the jury hearing this evidence in the punishment phase, it might not have mattered whether he was actually a card-carrying member of the Gangster Disciples or he just aspired to be?

A. Say that again.

Q. Would you agree with me that for a jury hearing this evidence during Detective Nelson's testimony in the punishment phase, it wouldn't much matter that Mr. Broadnax was not a verifiable member of the Gangster Disciples and he merely aspired to be?

A. I can't answer that.

Q. Would you agree with me that the fact that Mr. Broadnax identifies with, obviously has some respect for and aspires to be part of the Gangster Disciples says something about his character and propensity for violence?

MS. BRANDT: Objection, Your Honor. This assumes facts not in evidence.

THE COURT: Overruled. I'll allow it.

A. I can't answer that either.

Q. (By Ms. Kubalak) Are you aware that Mr. Broadnax's brother is a Gangster Disciple?

A. No.

Q. Would you agree with me that Mr. Broadnax seems to know a good amount about the Gangster Disciples?

MS. BRANDT: Objection, Your Honor. The witness was asked to opine on the testimony of B.K. Nelson. He wasn't asked to opine specifically with respect as to whether he was a member or not. The question that was presented in the affidavit is whether or not prosecution created an entirely false and misleading impression based on the various indicia that B.K. Nelson was testifying to.

THE COURT: Overruled. I will allow it.

If you know. You may not know the answer to that question. Why don't you ask him again.

Q. (By Ms. Kubalak) Isn't it true that Mr. Broadnax seems to know a good amount about the Gangster Disciples?

A. I don't know.

Q. Because you haven't seen the evidence that was presented at trial as far as items recovered from his cell?

A. That is correct.

85

Q. And you weren't aware that a large amount of writings and drawings were recovered from two notebooks that were in his possession?

A. That's correct.

Q. Were you aware that he, during a media interview, when talking about the murder weapon, said that he wrapped his life around it because I'm a Folk?

A. I have seen the interview and I heard the word Folk. But I did see the interview.

Q. Do you not consider that to be a self-admission of membership in the Folk Nation?

A. The Folk Nation isn't an organization. It's an affiliation. So I can't answer that question.

Q. Mr. Stewart, you protracted several statements that you made in your affidavit and you admit that you did not see the evidence that formed the basis for Detective Nelson's testimony?

A. Yes.

Q. Do you still stand by the statements and allegations you made in your statement in this case?

A. If I haven't seen the evidence then it is hard for me to make a judgment either way.

Q. Finally, in your affidavit, which you cannot stand by at this point, you say that due to the popularity of gangster rap most young black men like

86

Mr. Broadnax are well-versed in some verbal and non-verbal gang language; is that correct?

A. That is correct, yes.

Q. Isn't it also true, Mr. Stewart, that most young black men don't go out and commit double murder, double homicide?

A. Say that again.

Q. Isn't it correct that most young black men don't go out and commit double homicide?

A. Yes, that's correct.

Q. Are you aware what Mr. Broadnax did in this case, what he confessed to doing?

A. Yes. I have seen it.

Q. So you would agree with me that if Mr. Broadnax is indeed a merely wannabe gangster, he is not like most other wannabes in that he doesn't merely talk the talk, he walks the walk too; isn't that correct?

MS. BRANDT: Well, objection, Your Honor. I don't know that we drew any kind of connection here, and she is putting facts not in evidence that this was a gang-related killing. There's no evidence in the record whatsoever to support that.

THE COURT: I appreciate that. It's overruled.

MS. KUBALAK: Your Honor, I pass the

87

witness.

THE COURT: Cross-examination.

MS. BRANDT: I'm sorry?

THE COURT: Cross-examination.

MS. BRANDT: Yeah.

CROSS-EXAMINATION

BY MS. BRANDT:

Q. Mr. Stewart, you said that you were paid by the defense to be here. Who was it that called you to come testify today? Was it the defense?

A. No, it was the State.

Q. Okay. And who paid your way here? Who got you the flight to come here?

A. Oh, the state.

Q. Okay. So the defense isn't the one who paid you to come testify today?

A. Oh, okay. Then --

Q. Is that correct?

A. That's correct.

Q. All right. And with respect to documented areas, could you tell us whether or not there are Gangster Disciples in Texarkana?

A. To my knowledge, in Texarkana, there is no Gangster Disciples there to my knowledge.

A. Yes.

88

Q. And are you aware that Mr. Broadnax spent a substantial portion of his life in Texarkana?

A. Yes.

Q. Okay. Would you -- never mind.

MS. BRANDT: No further questions.

MS. KUBALAK: Nothing further, Your Honor.

THE COURT: May the witness be permanently excused?

MS. BRANDT: Yes.

MS. KUBALAK: Yes.

THE COURT: Okay. You are excused. You may step down.

Back to your witnesses, ma'am.

MS. BRANDT: Thank you, Judge.

We would like to be able to call Karo Johnson.

Mr. Johnson, let me remind you that you are still under oath. If you would take your seat on the witness stand.

Whenever you're ready.

WILLIAM E. KARO JOHNSON,

was called as a witness and testified as follows:

DIRECT EXAMINATION

BY MS. BRANDT:

Q. Could you state your name for the record, please?

89

A. William E. Karo Johnson.

Q. Mr. Johnson, what do you do for a living?

A. I'm a criminal defense attorney licensed in 1976. My practice is exclusively criminal defense.

Q. And do you represent defendants who are accused of capital crimes?

A. I do occasionally. That's a yes.

Q. And how far back does that go? When did you start representing defendants accused of death penalty crimes?

A. My first death case was in 1994.

Q. Let me back up one second. Are you board certified?

A. I'm not.

Q. Could you describe the procedures here in Dallas County for appointment of counsel in death penalty cases prior to 2002, primarily in the 1990s?

A. Well, I won't tell you that I know the date that it changed specifically, but I know when I first started being asked to take clients that were charged with capital crimes, I would get a call.

Q. And that was starting at least in 1994?

A. It was 1994 or before that because all the calls that I get, they wouldn't necessarily seek death. This was on people that were being brought in and being

90

charged with capital murder.

And back when I first started doing it, any time, day or night, I would get a phone call from a Dallas County magistrate saying that they wanted to know if I could come down and speak to somebody who had just been brought in charged with capital murder.

Q. And he had been arraigned and was asking for counsel at that time, right?

A. That is correct.

Q. Were you allowed -- You would get a call, you said day or night. I mean, if they called you at 11 o'clock at night, could you say, yeah, Judge, I want the appointment, but you know what, I will come back tomorrow at 8:00. It's 11 o'clock at night and I'm tired and I want to go back to sleep?

A. Well, I never asked that. I never thought about that. I would always just come down there immediately. They would still be in central intake.

Q. Okay. Describe that, please.

A. Well, back then, you would come down, you would go to the information booth when you first walked into Lew Sterrett. They would give you a badge to go into the -- what is called central intake, which is the first doors that you go in on the hallway down into the jail. They're glass doors. There's a couple of interview

91

rooms inside that little area.

You would go into one of those booths and then they would bring that person into that booth so that you could talk to them.

Now, the object at that point, from my perspective, was to, number one, make them aware that I was their attorney. I would tell them who I am, what my background is.

Q. I'm sorry, I'm having a hard time hearing you. It is old ears.

A. Okay. I would basically introduce myself, tell them my background and tell them I've been appointed to represent them on this case and explained to them that everything we talked about was attorney-client information. Gave them a very short little bit of information about what their situation was.

But the primary issue in my mind was to make sure that they understood that they should keep their mouth shut, that they shouldn't talk to anybody except me or somebody working with me or for me, working for them.

Q. And why was that so important?

A. Well, because I knew that they would possibly want to talk to other people and that that information could be used against them. And I wanted to explain to

92

them that the people in the jail were not their friends. And that most people would only want to talk to them to take advantage of what they told them, not to try to help them.

And that their case was the most serious case they could ever be charged with and that this was a very critical time in the representation and it was very important for them to listen to me and do what I asked them.

Q. Based on your long history and experience doing capital defense, could you talk about the mental state of the capital defendants that you see? Do you see them as mentally impaired or --

A. Well, they're all different.

Q. Well, could you describe some of what you have seen over the years with respect to the mental states? Have you had individuals who are mentally retarded?

A. Well, I have had several that I thought had probably marginal intelligence. I have had some that I thought were extremely intelligent. So I mean it's going to -- it runs the gamut.

Q. And have you had some that were mentally ill?

A. Well, I have represented people who are mentally ill, but not necessarily charged with capital murder.

Q. But you have had capital murder defendants who

93

had mental illness?

A. They certainly have some mental health issues.

Q. Okay. And do you believe in your professional opinion that it is important to have an attorney there from the get-go without any kind of gap in time that they ask for counsel that they ought to be given counsel at that time?

A. That is certainly my feeling. Most of these people when you talk to them, they're -- whether they're mentally challenged or highly intelligent, they're in an excited state and they're kind of in a -- basically the fog of war, in a sense.

They certainly need somebody to kind of help them understand what their situation is. And I think it is extremely important that they have some counsel to kind of talk to them about the ramifications of some of the things that they could do right at the beginning of the early stages of the charges and investigation.

Q. And without an attorney there, who are they left with to advise them?

A. I don't know.

Q. I mean, perhaps other individuals in jail?

A. Well, you know, typically, the only people they're going to have contact with in that situation is going to be law enforcement or other people that are

94

incarcerated with them.

Q. Okay. Let's fast forward to what's happening today. You said you didn't know the actual date of the change in the procedures in Dallas County?

A. Correct.

Q. Okay. But there was a change that you became aware of?

A. Yeah. Through my practice, I became aware of it, yes.

Q. And could you describe the procedures here in Dallas County? If you have knowledge of several different ways of appointing counsel over the years, could you describe the first change that you saw?

A. Well, I can tell what the change in my experience has been. Now I do not get calls from the magistrate typically. Now I get a phone call on these cases from a court coordinator when the case has been assigned to their court.

And typically, that would be at some period after the person has already been in custody for maybe a day or two while there's some period of time that goes by for them to decide which court this particular capital case is going to be assigned to.

Q. And has that particular individual, the defendant, have they already been arraigned and

95

requested counsel?

A. Yes, it turns out that's the case.

Q. So the gap that you're talking about starts out with them requesting counsel and then there's this gap between your appointment?

A. That has been my experience in the last, probably, I guess, seven or eight years, at least.

Q. Okay. And what is the downside of that gap based on your experience representing capital defendants?

A. Well, most recently the downside is that I have had clients that get interviewed by the media before I get over there and talk to them about not giving any statements.

Q. Do you have a recollection of a current case that that happened?

A. I have one recently, an individual whose name is Franklin Davis.

Q. And could you tell us what happened in the case?

A. Well, the day I got appointed to represent him, I went over to the jail to see him. I think it was about two hours later, because I was getting some other attorneys to go over with me that had also been appointed.

When we got to the jail to get our credentials to go in to visit him, we were asked by the

96

person taking our credentials to give us our passes if we were sure we wanted to go up because it was a media circus at the time.

Q. So they were trying to wave you away?

A. Well, they were suggesting that I might not want to go up there because I might want to wait.

Q. And so who were these people? Were they the deputies from the Dallas County Sheriff's Office?

A. This was the individual that was actually in charge of the room where you give them your bar card and your driver's license and they give you the little name tag.

Q. Who does that person work for?

A. The Dallas Sheriff's Office. He is one of the deputies for the Dallas County Sheriff's Office.

Q. Okay.

A. And I said no, we want to go up there now. And when we got up there to where they had Mr. Franklin, there was already a TV crew in the attorney visitation room doing an interview with him. And I went in and suggested that the interview was over and ran them off. But it turned out that he had already given multiple interviews prior to that to different media outlets.

Q. So by that time, you could not unring the bell?

A. Exactly.

97

Q. And what do you anticipate could happen with respect to those media interviews?

A. Well, I anticipate they're going to be used as evidence against him in his trial.

Q. And what happens when that gets into evidence? What harm is there?

A. Well, it is harmful in multiple parts of the trial regarding the different issues. I mean, they -- typically, all of these interviews they start off by asking the person if, in fact, they're guilty, which obviously goes to the guilt/innocence aspect.

Q. What about confession?

A. Well, it is basically tantamount to a confession. That's what they're asking them to confess to.

Q. What happens if you were successful in challenging a confession that was obtained by law enforcement and getting that suppressed? What's the effect of the media interview that gets into the trial?

A. Well, I don't know that I will have an effective challenge to the media interviews that I would have with the law enforcement because you're not under the same restrictions as law enforcement as far as the safeguards that are in place under the constitution and the law as far as somebody giving a statement to the police.

Now, I did -- after my experience with

98

Franklin Davis, I did try to find out how this happened because I was very offended by it. So I got Carmen Castro, who is the -- some type of a public relations officer for the Dallas County Sheriff's Office, and she faxed me over the interview requests that were sent to my client.

MS. BRANDT: Let me approach. I'm sorry if I'm not supposed to ask.

A. And she explained to me that she would get requests from different media agencies, and that once she got those requests she would send over the request to the person in jail, which in this case was Franklin Davis.

(Defense Exhibit 13 marked for identification.)

Q. (By Ms. Brandt) Let me show you a copy of these. Could you identify what these are, please?

A. These are the interview requests given to my client, Franklin Davis, by one of the Dallas County Sheriff's personnel. And he was asked to sign them if he wanted to do these interviews.

Q. Okay. What I would like to do is call your attention to the language that is in these various media requests.

A. Okay. Basically, they all say more or less the

99

same thing, and that is that we're just going to give you an opportunity to tell your side of the story.

Q. Well, let me also -- let's take a look, for example, on the second page. It says CW33 News at 9:00. Looking at the second page, that's a media request, right?

A. Yes, ma'am.

Q. Could you read that into the record, please?

A. Well, it is from CW33 News at 9:00.

Q. I want the -- after Mr. Davis --

A. I'm sorry, after Mr. Davis?

Q. Yeah.

A. Mr. Davis, CW33 News would like to request an interview with you. We would like to offer you the opportunity to tell your side of the story regarding the capital murder charge you are facing. Thank you. Dan Branch. It is signed by the editor of the 33 News.

Q. Okay. And let's go to Channel, it says 11, I think it says KTXA 21, which is the page after.

A. Okay.

Q. Could you read that into the record also, please?

A. Yes. This one is from 11 and 21 and --

Q. Read the actual --

A. The body of the letter is KTVT -- CBS 11 News requests the opportunity for a brief interview. We feel

100

you deserve the chance to speak about the charges against you. There are questions about the accuracy of the allegations that we would like to give you the chance to address.

If you are interested, please sign below so that the Sheriff's Department can notify us as soon as they receive your response. You may call directly at 214-739-1199 if you so choose.

Q. And could you then turn to News 8 WFAA. It is two pages later.

A. Yep.

Q. Could you read that into the record, please?

A. To Mr. Davis. News 8 WFAA TV would like to request an interview with you regarding the capital murder charges that have been filed against you in relation to the death of Shania Gray. We would like to give you an opportunity to tell your story.

If you are interested, please sign below so the sheriff's department can notify us as soon as they receive your response. Thank you for your consideration. Steve Young, assignments editor, News 8 WFAA TV.

Q. Can you turn to the next page, Fox 4. Read the second paragraph. It starts "If you" --

A. Okay. If you are willing to talk with --

101

Q. I'm sorry. Go back -- read the first paragraph.

A. Okay. Let's just put Mr. -- Dear Mr. Davis. KDFW TV Fox 4 would like to have the opportunity to talk with you about your current situation. It would also allow you to tell your side of what happened and any other details you would like to share.

If you're willing to talk to one of our reporters, please let the Dallas County Sheriff's Department know of your willingness as soon as they deliver this letter. Thank you for your consideration and we would appreciate your response as soon as possible.

Q. Let's go to the last one, the Dallas Morning News. If you would read the body of that.

A. Dear Mr. Davis. I'm a reporter with the Dallas Morning News. I'm writing about Shania Gray's death. I would like to give you the opportunity to tell us what happened with Shania and the capital murder charge filed against you.

We would like to give you an opportunity to tell your side of the story. If you're interested, please sign below so the Sheriff's Department can notify us as soon as they receive your response.

Q. Thank you.

MS. BRANDT: I'd like to have this marked,

102

please.

(Defendant's Exhibit Number 14 marked for identification)

Q. (By Ms. Brandt) Could you identify the first page, please? Where is that coming from?

A. Well, it is an Affidavit of Records.

Q. From what department?

A. Dallas Sheriff's Office. An affidavit of Elizabeth Lutton, L-u-t-t-o-n.

Q. Let's turn to the second page, please. Do you see at the bottom there a familiar name?

A. Carmen Castro.

Q. Yes.

A. Yes.

Q. Is she the same person who was -- that you contacted in the Franklin Davis case?

A. Yeah, I assume it is.

Q. And what's the title of this document?

A. This is an inmate interview request form, a request from the media.

Q. Okay. And this looks like the policies and procedures that the Dallas Sheriff's Office puts out?

A. Yeah. That, and it looks like it is basically a template for them.

Q. I'm looking at the first page, not the second

103

page yet. The first page, it says inmate interview request form. That looks like their procedure, right?

A. Yeah. It tells you about how to go about doing it.

Q. Okay. And then let's look at the second page where you started to identify it as a template.

A. Oh, yep. This basically is a template. This basically is the same thing that they send. It just tells you exactly how to do it.

Q. So this is a document that is drafted by the Dallas Sheriff's Office, is that correct, for the media?

A. It certainly appears to be.

Q. And could you read in there -- just read the info can be found by visiting, I mean --

A. Okay. Well, this thing is a media -- it basically tells you to put your media logo on this request form.

Q. And we saw the media logos in the Franklin Davis documentation that we just looked at; is that right?

A. Yes, ma'am.

Q. So would you say it looks like a media logo, they were following this template?

A. Yeah. I mean, it looks like that it is basically telling you how to make these requests.

Q. Okay.

104

A. And it tells you how to put the name in there and it tells you how to put the book-in number and their location and then it tells you how to find all the information online.

Q. Okay.

A. And then it basically tells you what to put in your request.

Q. Okay. And could you read this sample that starts Dear Mr. Smith?

A. Dear Mr. Smith. Channel, question mark.

Q. And what does that -- channel question mark, what are they supposed to fill in there?

A. Obviously, what channel or what media source this is.

Q. And did they do that in the Franklin Davis letters?

A. Yes.

Q. Okay. Go ahead.

A. Channel question mark, requests an interview with you regarding the charges that have been filed against you. We would like to give you an opportunity to tell your side of the story.

Q. Let's stop a moment right there. Could you read that second line again?

A. We would like to give you an opportunity to tell

105

your side of the story.

Q. And is that a line that looks like it is verbatim from the Franklin case letters?

A. It's my recollection it's in all of them, that very line.

Q. Okay. Continue on reading from the pattern.

A. If you are interested, please sign below so the sheriff's department can notify us as soon as they receive your response.

Q. Okay. And so the part saying -- telling the Sheriff's Department to notify us as soon as you sign your response, is that also contained in the letters that the media sent?

A. I believe so.

Q. Okay. And would you say this template ensures quick access since the information that is being used really is making sure that the media has dotted all the t's -- dotted all the i's and crossed all the t's.

A. It appears that's exactly what it is designed for.

Q. Okay. So what we've got is the Dallas Sheriff's Department that really is facilitating quick access to the defendant?

A. Yes. And if I may, one of my problems with this is that this is actually coming from law enforcement and

106

there is absolutely no Miranda type warnings in any of these letters to these defendants to suggest to them that this could be used against them.

Q. The Dallas Sheriff's Department, if we can put it in the shorthand, the jailers, they're the ones who take a defendant up to the courtroom for arraignment; is that true?

A. It's my understanding that's how it happens.

Q. Okay. And the magistrate judge -- when the magistrate judge is arraigning these particular defendants, part of that arraignment is to advise the defendant sitting there, including the capital defendants, that they have a right to an attorney; is that true?

A. That's true.

Q. Okay. So the Dallas Sheriff's Department or the jailers are aware they not only should know, but in fact they do know because they're sitting in the room that these capital defendants have been advised of their right to counsel.

A. Their right to counsel and their right regarding statements are supposed to be made to them.

Q. When you say statements, what are you talking about? Could you elaborate for the record?

A. Well, I mean, basically the code says that the

107

magistrates are supposed to tell them about several rules. And the code says it is all supposed to be recorded and preserved, all of these admonitions from the magistrates. And there's a list of things that they're supposed to tell them.

Q. Okay. Did you have any other comments with respect to these procedures?

MS. MURPHY: Objection, Your Honor. There's no question.

THE COURT: Sustained.

Q. (By Ms. Brandt) Mr. Davis -- Mr. Johnson, in your opinion, are these media interviews critical in these proceedings?

A. Absolutely.

Q. And let me back up one second. There's a provision in the current statute that talks about one working day.

A. I'm aware of that.

Q. Could you elaborate on what one working day means? Is that one day, or what does a working day mean?

A. My understanding is it is one business day.

Q. So does one working day include Saturday, Sunday or holidays?

A. That is not my understanding.

108

Q. That one working day, is that the first time that it's sent to a court coordinator or does it have to be assigned to a court before one working day is triggered?

A. Well, the way I read it, it sounds like that the courts do not have to assign an attorney to these people at least for a day after they have been arraigned, one full working day. And unfortunately, that seems like it possibly gives a chance for things to happen before the lawyer gets to talk to them.

Q. And, in fact, it did happen in Franklin Davis?

A. It did happen in Franklin Davis.

Q. Okay. And is it your testimony that these gaps are substantial and material in the prejudice that they work for a capital defendant?

A. They can be and they have been.

MS. BRANDT: I have no further questions.

THE COURT: Cross-examination.

CROSS-EXAMINATION

BY MS. MURPHY:

Q. Mr. Johnson, even if you were appointed immediately, he was arraigned and you're appointed immediately, you still cannot prevent a media interview from happening, can you?

MS. BRANDT: Objection, Your Honor. This is irrelevant. We're talking about the gap between request

109

for counsel and the actual appointment. So what happens after an attorney is appointed is not what is at issue here.

THE COURT: Thank you, ma'am. Overruled.

A. You know, I can't tell you specifically that I can, but I know that I could try.

Q. (By Ms. Murphy) And how would you try?

A. Well, number one, I would tell my client not to give the interviews. And number two, I would try to ask the sheriff's office not to allow my client to give interviews.

And also I could come to the court and try to get a motion filed asking the court to order that the sheriff's department not give interviews of my client in the critical stage that he's at.

Q. So your advice to your client would be do not talk to the media, right?

A. Correct.

Q. And you would also seek to prevent the media from even attempting to contact your client?

A. Correct.

Q. Looking at the media requests in Franklin Davis.

A. Yes, ma'am.

Q. On the Telemundo, which I think is the second request.

110

A. Yes, ma'am.

Q. Your client declined the interview, correct? He declined the interview?

A. He did. He doesn't speak Spanish.

Q. And he agreed to Univision, didn't he?

A. He did.

Q. And the Channel 5 request, the ones that starts I'm Mike Conner.

A. Okay.

Q. It advises him he has the right to decline, the second to the last line?

A. Okay. Tell me which media this is. Which media is it?

Q. It's the one that has media -- it is Channel 5. Mike Conner.

A. Okay. Go ahead.

Q. And it says in the media request that he has the right to decline?

A. Yes.

Q. And you don't know why the Dallas Sheriff's Office has a form and procedure they give to media? You don't know why they have that, do you?

A. I don't know why.

MS. MURPHY: No further questions.

THE COURT: Anything else?

111

MS. BRANDT: Yeah.

REDIRECT EXAMINATION

BY MS. BRANDT:

Q. Mr. Johnson, when we're looking at that Channel 5 where it says you have the right to decline, what does the rest of that statement say there?

A. Well, it goes on to say that it may also be to your advantage to have people learn about your situation.

Q. So this really is a statement that is prompting a defendant to sign?

A. Well, not only that, but it is asking the Sheriff's Department to facilitate this.

Q. And it is your personal opinion that this pattern form that is being used to provide quick access, certainly, if they weren't providing the information, they're going to be blocked by the Sheriff's Department; is that correct?

A. Well, let me start by answering the first part of your question. I think that the actions speak for themselves. I don't think that it is just my opinion. I think that it's fact that that's what they're doing.

And it definitely creates a problem for me in representing my clients. What they do is they more or less -- there is three prongs to what they're asking

112

these folks and that is, more or less tell us if you did it. In other words, just --

Q. You're talking about the media?

A. --tantamount to a confession.

Q. You're talking about the media?

A. I'm talking about the media.

Q. Okay.

A. And in all these interviews that I have watched that he has done, that is what they ask. Then the next thing they ask them is, you know, how do you feel about it?

So in other words, that goes to remorse, which is certainly an important question as far as punishment. And then the next thing is they ask what do you think should happen to you, which is the tantamount question in these cases.

So I mean, basically, it is the whole enchilada as far as trying these cases. I mean they basically are infringing on the right of the judge and the jury as far as what's going to happen. So the harm is almost -- I mean, there's nothing you can do.

Q. So essentially it is rendering counsel ineffective throughout the entire trial, defense of a defendant?

A. It is about as close as you can get.

113    115

MS. BRANDT: Thank you. I have no further questions.

MS. MURPHY: Nothing further.

THE COURT: May the witness be permanently excused?

MS. BRANDT: Yes.

MS. MURPHY: Yes.

THE COURT: You are permanently excused. You may step down.

Call your next witness.

MS. BRANDT: I would like to call Doug Parks.

(Off-the-record discussion.)

THE COURT: Mr. Parks, if you'll take a seat on the witness stand. You are reminded that you are still under oath.

THE WITNESS: Thank you, Your Honor.

THE COURT: I realize what you're doing, Ms. Brandt, but try not to repeating --

MS. BRFANDT: I'm having a hard time hearing you.

THE COURT: I realize what you're doing, and I understand that, but try not to be cumulative on all the --

MS. BRANDT: Okay.

Q. Okay.

A. I know when I first started doing this work, appointments were made on an individual basis by judges. And they would reach out to whomever they wished to appoint to the case. Then there came a time, and I'm guessing it is going to be the late '80s or early '90s, when a new process was put in place whereby the magistrates were given a list of approved attorneys for capital work.

And when they arraigned a capital murder defendant, they then called someone from that list until they got a person to agree to come to the jail right then and speak with the defendant.

Q. And that could be 11 o'clock at night, right?

A. Oh, sure, anytime of the night.

Q. And if you got a call at 11 o'clock at night, did you tell the judge, I will take the appointment, but I will come tomorrow morning?

A. No. You were expected to come right then.

Q. And if you chose not to go right then, what happened?

A. Well, they would call someone else on the list.

Q. And that changed after 2002?

A. At some point after 2002.

Q. Could you explain what the one working day rule

114    116

DOUG PARKS,

was called as a witness and testified as follows:

DIRECT EXAMINATION

BY MS. BRANDT:

Q. Could you state your name for the record, please?

A. Doug Parks.

Q. And, Mr. Parks, what do you do for a living?

A. I'm an attorney.

Q. And do you have a particular area that you work in?

A. I do altogether criminal defense work.

Q. How long have you been doing criminal defense work?

A. I was licensed in 1970, and I began to be pretty active in criminal defense work in about 1972.

Q. And do you do capital defense?

A. Most of my work is capital defense.

Q. And when did you start doing capital defense?

A. The late '70s.

Q. Can you tell us how the appointments were prior to 2002 for capital defendants?

A. Well, it worked different ways at different times.

Q. How about in the 1990's?

A. I'm not real good at dates, Ms. Brandt.

is in the current statute?

A. The statute says what it says. As I understand it, I understand it, it means that once you are appointed and accept an appointment, you have one working day to see your client.

Q. But I'm talking about the one working day for the appointment of counsel.

A. Well, I suppose that would be after a person has been booked into jail -- arraigned and booked into jail and the Court to which the case has been assigned has been notified that that person is in their court, they have one working day to appoint an attorney. I think that's what it means.

Q. Okay. Tell me a little bit about your background and credentials. Are you board certified?

A. I am. I just got my recertification for another five years -- I should live so long -- this past week. I've been certified since 1977.

Q. You've been certified since -- okay. Are you on any particular committees with respect to capital appointments?

A. I am. I am the criminal defense lawyer member of the committee for the First Administrative District that approves the applications of other lawyers to be on the list of lawyers who can be appointed to first chair

117

capital cases and second chair.

Q. Okay. And have you done capital trials?

A. Yes.

Q. And have you done capital direct appeals?

A. Yes.

Q. And have you done capital state habeas, like the procedures that we're in now?

A. Yes.

Q. And have you done federal habeas procedures?

A. Not -- only in -- only with other attorneys. I have not had the primary responsibility of doing a federal writ itself.

Q. Okay. You are aware of what is necessary in order to preserve an objection so that whatever the claim is can move from state court into federal court; is that true?

A. Yes, it has to be federalized.

Q. Could you explain what that means, that it has to be federalized?

A. Well, your objection has got to rest in some way on the constitution of the United States.

Q. Okay. So if the attorney says something like, I was appointed the day after media interviews, is that sufficient to preserve an objection that will then move into federal court?

118

A. Well, I'm not sure of the context of him having said that. Was that in a court hearing?

Q. Let's just assume that is all he said. "I was appointed the day after the media interviews, Judge." It's just an argument --

A. Oh, in trial?

Q. Right.

A. Oh, okay.

Q. I mean, we've got the facts laid out there.

A. Probably not.

Q. Okay. And we do have the facts laid out in that kind of a statement. So you said that you don't believe that that is sufficient to preserve the objection to get to federal court.

A. Well --

Q. What's missing?

A. Well, I'm not sure what the objection is other than just telling the Court that I wasn't appointed until the day after. Is that in conjunction with trying to suppress videotapes or --

Q. Let's assume it is.

A. Probably not.

Q. And why is that?

A. Well, there was no reference to the Constitution.

Q. And what would an attorney have needed to have

119

done?

MS. MURPHY: Objection, Your Honor. Relevance.

THE COURT: What is the relevance of this?

MS. BRANDT: It is going to the issue of ineffective assistance of counsel, Judge.

THE COURT: Go ahead. Let's cut to the chase.

A. Well, to federalize it, to make the argument, I would suppose one would generally invoke the 6th Amendment.

Q. (By Ms. Brandt) Okay. Let's talk about the roles in the defense of Mr. Broadnax. Could you tell me what was the trial team as far as the attorneys?

A. Brad Lollar was first chair. I was second chair. Keri Mallon was third chair.

Q. And was there a way in which the duties were allotted? I mean, did you have certain responsibilities that maybe Mallon didn't have or that Lollar had that you didn't have?

A. My recollection is that Keri really didn't have a particularly active role in the trial of the case. I think she did some voir dire. She may have put some of our punishment witnesses on. I don't recall.

THE COURT: She did.

120

A. And then she was a great help to us outside the trial process. I was available to do whatever Mr. Lollar asked me to do. I was certainly active in jury selection.

I think -- and I cross-examined some witnesses. I may have put some witnesses on. I have not reviewed the record, Ms. Brandt, prior to my testimony. And frankly, I don't remember exactly what I did.

Q. (By Ms. Brandt) Who was responsible for doing the direct and cross-examination with respect to the reporters, Channel 4, 5, and 7 and all of that?

A. My recollection is that Brad did that.

Q. And have you done any independent fact investigation at his direction?

A. Personally, no, I have not.

Q. And have you talked to any of the Dallas capital defenders here about their experiences with the media interviewing their clients before they got appointed?

A. Not that I recall. I don't believe I did.

Q. Have you done any research about problems with the 6th Amendment and delays in appointment? I'm talking about all of this with respect to your actions on or about the time that you were representing Mr. Broadnax. So this would have been in preparation

121

for trial or during the trial.

A. Well, I know that Brad and I talked about the issue. I know that we --

Q. What did you say? What were the conversations?

A. Well, I don't remember the conversations precisely, Ms. Brandt. I remember that we talked about the issues. We talked about what we thought we might be able to do to keep the videotapes out.

Q. And what was that?

A. Well, that was to try to show that there was some state action involved in getting the media up to the jail in such a timely fashion for them and to get the videotapes and see if we can get them suppressed.

Q. And had you been able to talk to the reporters prior to the suppression hearing?

A. I did not attempt to talk to the reporters.

Q. Why is that?

A. Because Brad was handling that part of it.

Q. Okay. And did you attempt to talk to the jailers who brought the media requests to Mr. Broadnax?

A. I did not personally.

Q. Did anybody else?

A. I don't know.

Q. Okay. Did you attempt to talk to any of the law enforcement, such as the Garland police or the Garland

122

jailers?

A. I did not.

Q. And how about any of the jailers at the Dallas Sheriff's Office?

A. I did not.

Q. Okay. And again, why was that? Because it was not your job?

A. I wasn't asked to do that.

Q. Okay. Are you aware there are 43 jurisdictions that appoint counsel before, at or just after initial appearance?

A. No.

Q. And I guess I should say were you aware of that at the time of preparing for Mr. Broadnax's case?

A. No.

Q. And at the time of preparing for Mr. Broadnax's case, were you aware that Texas was not one of these 43 jurisdictions?

A. No.

Q. At the time of Mr. Broadnax's case, were you aware that it's the ABA's position that counsel should be appointed certainly no later than the accused's initial appearance before a judicial officer?

A. I probably was, but I don't recall specifically whether I was or not.

123

Q. Okay. Did you -- Rothgery, R-o-t-h-g-e-r-y, which is 128 Supreme Court 257, was decided on June 23rd of 2008, the same day that Mr. Broadnax was interviewed by the media. At the time that you were preparing for Mr. Broadnax's case, did you review Rothgery?

A. I don't recall one way or the other. I have no specific recollection of having done that. I have since then.

Q. Okay. You weren't assigned to do legal research with respect to this issue; is that correct, because this was Brad Lollar's?

A. Well, you know, it's not always as black and white as you make it out to be.

MS. BRANDT: I object to that. I'm asking a question as to, you know, was that your assignment, was that part of your role?

A. Part of my role, Ms. Brandt, in these cases as second chair is generally the responsibility -- whether it is with Brad or someone else, is the responsibility for doing research.

Q. (By Ms. Brandt) I'm sorry, the responsibility for --

A. For doing research. Because Brad does not do appeals. I do.

Q. Okay. So did you do the research?

124

A. No, not that I recall.

Q. And why didn't you do the research when --

A. Because I thought it was probably fruitless. I -- well, I'm going to stop right there.

Q. Okay.

MS. BRANDT: I don't have any other questions.

THE COURT: Cross-examination?

CROSS-EXAMINATION

BY MS. MURPHY:

Q. Mr. Parks, you said that you primarily do appellate and post-conviction work; is that correct?

A. No.

Q. No?

A. I primarily do trial work, but I do some appellate work.

Q. But even when you're in trial --

A. Generally, it's my responsibility to do the, quote, bookwork.

THE COURT: I was wondering when you were going to say that. That's what I regard you as.

Q. (By Ms. Murphy) And as the book lawyer, you deal with constitutional issues, don't you?

A. Yes.

Q. And in this case, the trial court made a

determination that there was no state action involving the media interviews; is that correct?

A. That's correct.

Q. Would you agree that the bulk of your argument and theory at trial was that Broadnax was intoxicated or high at the time of the interviews and offense?

A. Yes.

Q. Would you agree that all constitutional violations would require state action?

A. I believe that they do.

Q. Would you agree that criminal defendants can use media interviews to deny committing the offense?

A. Sure.

Q. And, in fact, Mr. Broadnax did deny in the beginning committing the offense; do you recall?

A. I don't really recall.

Q. Do you recall the Steven Pickett, Channel 11 interview?

A. Yeah, that's right. I believe I recall that.

Q. And in the beginning, Mr. Broadnax claimed that he doesn't know why he is in jail?

A. Yes.

Q. And are you aware of what the allegations are in the writ application?

A. Yes.

---

Q. So you're aware that one of the allegations is that you did not cross-examine Dr. Price?

A. Yes.

Q. I'm showing you what is Volume 52 of the reporters's record. If you could flip through, starting at 259 to 263.

A. Okay.

Q. Is that your cross-examination of Dr. Price?

A. Yes.

Q. And you cross-examined him on whether or not psychopathy is found in the DSM IV.

A. Right.

Q. And whether or not the closest thing to psychopathy in the DSM IV is anti-social personality disorder?

A. Yes.

Q. And that people can have some of the traits on the PCLR but not be a psychopath?

A. Right.

Q. And some of the traits in the PCLR can be due to immaturity?

A. Yes.

Q. Do you recall objecting to the admission of Dr. Price's testimony?

A. Not specifically. But I will take your word for

---

it.

Q. Okay. And do you recall the judge said he would allow you liberal cross-examination of Dr. Price?

A. I think that's correct, yes.

Q. And do you recall whether or not any of the reporters were willing to come down and testify at all in this?

A. I think we did hear from reporters. I think Shawn Rabb testified.

Q. Right. But do you recall whether or not they filed motions to quash the subpoenas and tried to stop from having to come down and testify? Do you recall?

A. I don't remember.

MS. MURPHY: No further questions.

THE COURT: Redirect?

REDIRECT EXAMINATION

BY MS. BRANDT:

Q. Was the theory with respect to the media that the media were acting as state agents?

A. It was, because we believed at the time, and I still believe, that the only way we get any relief in that regard was to show actions -- state actions.

Q. And those kinds of burdens of proof are difficult; is that true?

A. Yes, they are.

---

Q. And had you explored any other alternative theories prior to selecting this one?

A. Not that I recall.

Q. And why is that?

A. Because I don't know that there are any alternative theories.

Q. Had you thought of or had you considered challenging the Constitutionality of the Texas Fair Defense Act because of this one working day provision that was creating a gap?

A. No.

Q. Had y'all discussed it amongst yourselves?

A. Not that I recall.

Q. And do you know why not? Did it just not come up?

A. Well, if we -- the problem that I see with what we had there is that without state action, unconstitutionality of the statute is emperical as applied to the client and the facts of this case.

Q. Well, you weren't aware that Texas was in the minority with respect to a delay in appointment of counsel; is that true? You hadn't read Rothgery in 2008?

A. That's true.

MS. BRANDT: Okay. I have no further

129

questions.

THE COURT: Anything else?

RECROSS-EXAMINATION

BY MS. MURPHY:

Q. Mr. Parks, you made a strategic decision based on your extensive experience to make the challenge to the media interviews that you made, correct?

A. Yes.

MS. MURPHY: No further questions.

REDIRECT EXAMINATION

BY MS. BRANDT:

Q. Mr. Parks, had you explored any other theories? Had you done any due diligence at that stage into any other theories before you made that decision?

A. Well --

Q. Yes or no. It's a yes or no question. Had you done any due diligence into any other theories before you made that decision?

A. I'm not -- I don't think that that's a question I can answer yes or no.

Q. And why is that?

A. If you're asking me whether I had read the case that you referred to at that time, the answer to that question is no. But, you know, I've been doing this a long time.

130

MS. BRANDT: Thank you, Mr. Parks. You have answered my question.

MS. MURPHY: No further questions.

THE COURT: Do you want to elaborate on that? I will let you. You don't have to.

THE WITNESS: I will pass, Judge.

THE COURT: Okay. Have a good day.

THE WITNESS: Bye.

THE COURT: What further says the Defense?

MS. BRANDT: I'm sorry, Judge.

THE COURT: Call your next witness.

MS. BRANDT: Brad Lollar.

(Off-the-record discussion.)

THE COURT: Ms. Brandt, you wanted to put something on the record?

MS. BRANDT: Yes, Your Honor. I forgot to introduce these as an exhibit. They are Mr. Parks' billing records. Can I bring them in now?

THE COURT: Yes. What's that going to be, Haze?

THE COURT REPORTER: 15, if we just put them all together.

(Defense Exhibit Number 15 marked for identification, and admitted for record purposes.)

131

THE COURT: You may cross-examine Mr. Lollar whenever you're ready.

BRAD LOLLAR, was called as a witness and testified as follows:

DIRECT EXAMINATION

BY MS. BRANDT:

Q. Mr. Lollar, would you state your name for the record, please?

A. My name is Brad Lollar.

Q. Could you tell us what you do for a living?

A. I'm sorry?

Q. Could you tell us what you do for a living?

A. I'm an attorney.

Q. Do you have a particular area that you practice in?

A. Criminal defense.

Q. And how long have you been doing that?

A. 35 years.

Q. I'm sorry?

A. 35 years.

Q. 35 years. And could you give us a work history --

A. Sure.

Q. -- so we have some idea of what you did?

A. Graduated from SMU Law School in 1977. Went to

132

work for the Dallas District Attorney's Office until 1982. Went into private practice until 2005. Was appointed chief public defender from 2005 to 2008. Returned to private practice in 2008. And that's where I'm at now.

Q. Okay. And could you tell us what occupation your wife held and for how long?

A. Yes. My wife just -- my wife is also an attorney. For the last seven years, she has been a Dallas County magistrate and just retired here about a month ago.

Q. And she would have been one of the judges who would have been doing the arraignments; is that correct?

A. Yes.

Q. Okay. Could you tell us -- from the time that an individual is booked in the Dallas County Jail, could you run us through that procedure until the point at which they sign a request for counsel?

A. Well, the defendant is brought in by a police agency, law enforcement agency into the jail. They go through the book-in process.

Q. And who runs that jail here in Dallas County?

A. I'm sorry?

Q. And who runs the jail here in Dallas County?

A. The sheriff.

133

Q. The Dallas County Sheriff's Department?

A. Yes, ma'am.

Q. And just for shorthand, can we refer to those employees that deal with the defendant as the jailers so we're not using the Dallas County Sheriff?

A. Sure.

Q. Okay. So go ahead.

A. Well, the defendant is brought in. They're placed in a room with another -- with a group of people while the police officer is preparing their paperwork, their initial paperwork on the case. That paperwork is then taken to a supervising sergeant who either approves it or disapproves it or makes suggestions. Once the paperwork is completed, then the paperwork and the defendant are brought before the magistrate.

Q. And who brings them before the magistrate?

A. The jailers.

Q. And do the jailers stay in the courtroom with the defendant?

A. Yes.

Q. Yes. So both the defendant and the jailers are in the same room and the magistrate is there. And then what happens?

A. Well, it's a courtroom. And the magistrate will arraign the defendant. Tell them what they're charged

134

with, set their bonds, tell them their rights and have them -- then have their clerks hand the paperwork to the jailers to deliver to the defendants, the affidavits of indigency and whether they're requesting counsel.

The --

Q. So the jailers are actually taking them to the defendant?

A. Yes.

Q. Okay.

A. And then the defendants will fill them out.

Q. And who do they fill them out in front of?

A. The jailers.

Q. Okay. Where do they get the pen from?

A. The jailer.

Q. Okay.

A. They can't have a pen so the jailer has to stand there with them while they fill out the paperwork.

Q. Okay. Go ahead.

A. So the paperwork is taken back from the defendant, along with the pen. They take that to the magistrate's clerks and then that is delivered to the magistrate. And that paperwork --

Q. When you're talking about they, you're talking about the jailers bringing this paperwork from the defendant that they witnessed the signature on to the

135

magistrate's clerks; is that correct?

A. Yes.

Q. So would you agree that the Dallas County jailers knew or should have known that the capital defendant had invoked his rights to counsel?

A. Well, it is done right in front of them, yes, and they're delivering the paperwork.

Q. Okay.

A. And then that paperwork is forwarded on to the district courts.

Q. Okay. The judge has asked us not to be cumulative so let me jump down here and let's talk about the actual assignment of the case and your ultimate appointment with respect to Mr. Broadnax. Could you talk or tell us how you got appointed from what -- what the system was in Dallas County for the appointment of you and how that system worked in Dallas County in 2008, and specifically with respect to Mr. Broadnax, what happened to his case?

A. Sure. I was contacted by Sharon Johnson, the court coordinator in this court, Criminal District Court Number 7, about 9:00, 9:30 in the morning, Tuesday, June 24th. And I think I came to see Sharon. I don't know whether Sharon told me or whether Judge Snipes told me that I was going to be appointed to represent

136

Mr. Broadnax.

I recall that that was sometime around 9:30 that Tuesday morning. And I borrowed somebody's computer, and I don't know whose, whether it was Sharon's or somebody else, and I typed out a letter to the Sheriff's Department that I was going to deliver to them saying that Mr. Broadnax -- well, saying that I did not want Mr. Broadnax interviewed by any further media or law enforcement.

Q. And why were you typing out that letter?

A. Well, that is something I always do on high profile cases, certainly Mr. Broadnax's cases. He had already talked to the press and I had seen those the day before, but I didn't want that going on anymore.

Q. Okay. Let me show you these, please. If you could identify that, please? I'm specifically looking on the second page, down at the bottom. Does it show when Mr. Broadnax was booked in?

A. This document reflects that he was booked in on June the 21st, 2008 at 2:51 a.m. And what you showed me here are book-in documents from the Dallas County Jail.

Q. Okay. And can you please identify -- let's start with the first page, on 17.

A. The first page is an arraignment sheet. This is a document produced by Dallas County and by the

137

magistrates.

Q. And what does it show -- when was Mr. Broadnax arraigned?

A. This shows that Mr. Broadnax appeared before Judge Jonathan Vickery, who is a part-time Dallas County magistrate and works on the weekends, on June 21st, 2008, at 5:45 in the morning.

Q. Okay. And what's the next document that is here?

A. The next document is the defendant's affidavit of indigence. It is in regard to James Gardield (sic) Broadnax. That's a typo, it's Garfield.

And it shows on June the 21st, 2008, that he had been advised by the court of his right to representation by counsel. He certified that he was unable to employ counsel and requested the Court to appoint counsel for him.

Q. What does it look like Mr. Broadnax -- where did Mr. Broadnax -- what court are we in right now?

A. This reflects --

Q. What court are we in right now?

A. Oh, we're in Criminal District Court Number 7.

Q. Okay. And what court does this document show Mr. Broadnax's case being in?

A. It showed assignment to Criminal District Court Number 1.

138

Q. And at the bottom there, who was appointed as his counsel?

A. I was.

Q. Let's go on to the next page. What is the next page?

A. That is entitled Instructions Relating to Preliminary Initial Appearance for Mr. Broadnax in this case, or the case he was charged with at the time. And shows that his bond was set at a million dollars by Judge Burns.

Q. And even though this was in Criminal District Court Number 1, did Judge Burns appoint you in this case?

A. No, I was appointed by this Court.

Q. By this Court?

A. Yes.

Q. Okay. Could you take a look at this document? There were -- well, let me back up. There was some discrepancy with respect to your billing records; is that correct? You had written on some of them that you had been appointed 6-23; is that correct?

A. Well, I think what I put that on was a paper I prepared basically for the press explaining my relationship with the case at that point and what I had learned.

139

Q. No. I'm talking about was it an error for you to have written on your billing records that you had been appointed --

A. June the 23rd?

Q. -- June 23rd?

A. Yes, that is an error, if that's what it reflects, because I was appointed on June 24th.

Q. So let me show you, for example, here, this is a quick one that I got. It shows 6-23 when you were appointed. Were you appointed on June 23rd?

A. No, I was appointed on June 24th.

Q. So that was an error -- if any of these billing records reflect 6-23, that was incorrect?

A. Right.

Q. So let's go back to Number 18, this jail log. When does it show you first went to visit your client?

A. June 24th, 10:15 a.m.

Q. And is that how you remembered that --

A. Yes.

Q. -- this was the day you were appointed?

A. Yes.

Q. And why is that?

A. Well, because I had seen several -- I don't know if I had seen all, but I'd seen several of the interviews that Mr. Broadnax gave to the media which had

140

occurred on Monday, the 23rd.

Q. Okay.

A. And it was after that that I was appointed the next morning, and that is when I prepared the letter requesting that Mr. Broadnax not be seen by any media or law enforcement, and took that and delivered it to jail personnel, in particular Vicki Duran, who is a deputy sheriff in the jail. Gave it to her, and then went up to see Mr. Broadnax. And this shows that I saw him on the 24th at 10:15 a.m.

Q. Let's take a look. Do you recognize these documents?

A. Yes.

Q. Okay. And could you identify for us first -- what's the first document that is here after the affidavit from the Dallas Sheriff's Office?

A. This is a request from WFAA, Channel 8, to Mr. Broadnax, from an assignments editor at WFAA, Carlos Rosales, asking if they could come interview him.

Q. Okay. And could you look at the next one?

A. The next one is the same type of letter from Fox 4.

Q. And could you read into the record, please, the body of that particular letter?

A. The second one?

141

Q. Yes.

A. KDFW Fox 4 would like to request an interview with you regarding the charges filed against you. We hope by speaking with you you will be given this opportunity to tell your side of the story. If you're interested in talking with KDFW TV Fox 4, please notify the Dallas County's Department as soon as they deliver this letter.

Q. Okay. Was there -- let's take a look at both of these letters. The ones that actually were signed, that have the signatures on them. The first one that we have which was WFAA TV, do we have a date on here where the letter was faxed to -- let's back up a second. Do we know who Kim Leach is?

A. Kim Leach was at the time the public relations officer for the Dallas Police Department.

Q. Who has replaced her now, do you know?

A. I don't know what her name is.

Q. Was it Carmen Castro maybe?

A. Yes, I think that's right.

Q. Okay. So let's take a look at the fax heading on the top of this letter from WFAA TV.

A. It reflects the fax was sent from WFAA News on June 20th, 2008 at 7:30. Doesn't say whether it is a.m. or p.m.

142

Q. And when did you say Mr. Broadnax was booked into the jail?

A. He was not booked into the jail until Saturday morning, the 21st.

Q. So we had the media already -- well, you tell me. Did you have the media already contacting the Dallas Sheriff's Office before Mr. Broadnax was even arrested -- or transferred in?

A. Yes.

Q. And let's take a look at the Fox 4 media request. What was the date of that media request?

A. It shows a date of June 20th, 2008.

Q. And that was also before Mr. Broadnax was in the Dallas County Jail?

A. Yes.

Q. Uh, could you -- did Kim Leach talk about -- do you recall if Kim Leach -- were there other media letters? There are only two here.

A. Yes.

Q. Were there other media requests?

A. Yes, there was. Ms. Leach discussed them in a pretrial hearing we had in this case in this court, and then she also testified in front of the jury in this case. And she testified that she received these type of letters, similar letters, from all four different

143

agencies.

Q. Do you recall this? If you want to take a look at what the front of it is, the very first page.

A. Yes.

Q. Could you tell us what that is, please?

A. This is something --

Q. What does it say?

A. Media relations.

Q. No, what is --

A. Defense Exhibit 10.

A. Yes.

Q. Is that a defense exhibit that you put into the trial?

A. Yes.

Q. And tell us what this is that we're looking at?

A. Well, I would have gotten this off of the Dallas County Sheriff's Office web page, and I printed it out and we talked with Ms. Leach about this particular document.

Q. And on this particular document that is identified as Defendant's Exhibit 10A, what was so special about what was in this that it caused you to talk with her?

A. Well, what I wanted to point out was the -- what I wanted to question Ms. Leach about is what is

144

reflected here on the sheriff's web page in regard to media relations that interviews may be denied based upon jail staffing, emergency conditions or the inmate's physical or mental condition at the time of the request.

Q. And why was that particular provision so important?

A. Because we had --

Q. Go ahead.

A. We had determined from the medical records which we obtained from the jail that about two hours before the media was allowed to see Mr. Broadnax that he had been seen by a jail psychiatrist and by jail psychological assessor, and that they had determined Mr. Broadnax was psychotic due to polysubstance abuse.

They believed he was psychotic due to his PCP usage. They had ordered him kept in closed behavioral observation where he had been from the moment he hit the jail. And that had all happened within a couple of hours of the time that Ms. Leach permitted the various media representatives to interview James. And in the documents you have already showed me, James is being held in the West Tower in 3PO5. 3PO5 is a psych ward for the jail.

Q. So we know at the time that he was being asked to consent to these media interviews, he was going through

145

a psychotic rage --

A. Yes.

Q. -- based on the mental health records?

A. Yes.

Q. Okay.

MS. BRANDT: Your Honor, I would like to state on the record there have been problems with the reporter's record. We have some missing records. My understanding is that the district attorney doesn't have the record that I'm missing also, which was identified as Defense Exhibit Number 8.

It was in the pretrial hearing that was held on June -- or excuse me, July 27, 2009. And so what I would like to be able to do is to see if he could identify this and we could substitute in this particular document since I don't have it, and I think the prosecution said they don't have it.

THE COURT: Any objection from the State?

MS. MURPHY: No objection, Your Honor.

THE COURT: Go ahead, Ms. Brandt. I'm not aware of any problem with the record.

THE COURT REPORTER: I wasn't either.

THE COURT: Were you, Haze?

THE COURT REPORTER: Not until this morning when she mentioned it to me.

146

Q. (By Ms. Brandt) Could you identify what we're looking at? I don't know if you can read that. It says --

A. It's a part of the reporter's record from the James Broadnax pretrial hearing on July the 27th, 2009.

Q. If you turn to Page 4 of that, could you look down where it says Defense Exhibit Number 8?

A. Yes.

Q. And do you see an entry there?

A. Report of J. Cook, letter to Sheriff Valdez.

A. Yes.

Q. And did you offer this Defense Exhibit 8?

A. Yes.

Q. And was it admitted?

A. Yes.

Q. Could you identify these documents? Are these the documents you introduced at that hearing?

A. They appear to be the same.

MS. BRANDT: Your Honor, could we admit these into evidence?

THE COURT: Any objection?

MS. MURPHY: No objection.

THE COURT: They're admitted.

(Exhibit Number 23 admitted into evidence for record purposes only)

147

Q. (By Ms. Brandt) Could you tell me -- you called Janet Cook; is that correct?

A. Yes.

Q. And could you tell me why you called Janet Cook to testify at that hearing?

A. I knew Janet. Janet is also a criminal defense lawyer. She had been appointed to represent, I believe a capital murder defendant. And she had gone to the jail --

Q. Who was the capital murder defendant?

A. Charles Patrick Payne.

Q. Okay. And so what had happened?

A. Well, there's a book-in procedure you go through to get up to see your client who is in the jail towers. She and her investigator, Christian Smith, had gone over to see him, this letter says, on Tuesday, January 13th, 2009, about noon.

And when they had arrived, they gave our credentials and we were told it would be a minute. And according to this letter that she wrote to Sheriff Valdez, after a couple of minutes, someone from the Dallas Sheriff's Office media department arrived with a reporter and cameraman from Fox 4 News and the sheriff's employee walked into the booth, looked at our paperwork along with the officers on duty in the booth, and they

148

looked at us, and she goes on to describe how she and her investigator were kept downstairs while the sheriff's department took the Fox 4 reporter and cameraman up to what -- what turned out to be was to interview her client that she was waiting there to see.

Q. So is it fair that based on her experience it was the Dallas Sheriff's Office that was delaying access to the client?

A. That's what Ms. Cook was complaining to the sheriff about.

Q. So it appears that the media were given superior access because the Dallas Sheriff's Office was facilitating that, right?

A. In her case, sure.

Q. Do you believe that the policy that you had put in, the media relations policy because Mr. Broadnax was going through a psychotic rage at the time of the media interviews --

A. We consulted experts about that and presented expert testimony in the trial at the time that we see him on those media interviews, he was, in fact, in a psychotic rage.

Q. You believe it was a violation of the Dallas Sheriff's Office to give them access?

A. She testified that had she known that

149

Mr. Broadnax was in closed behavioral observation, she would not have allowed the media to interview him.

Q. So why did the media get the interviews?

A. She apparently didn't realize he was in closed behavioral observation. She had only been working in the sheriff's office for about a month at that time, as I recall.

Q. Was someone in the Dallas Sheriff's Office responsibile for making that determination?

A. They have to be, because it happened.

Q. So one of the jailers there made a determination to have Mr. Broadnax brought for the media interviews?

A. Yes.

Q. Okay. Could you talk about the roles in the defense of the various attorneys in this case?

A. I was lead counsel. Mr. Parks was my first assistant and Keri Mallon was our third counsel.

Q. And who was responsible for the challenges to the media interviews?

A. Me.

(Off-the-record discussion.)

Q. (By Ms. Brandt) Okay. Let's take -- so you were the one who was involved in the media issue?

A. Well, we all were. I was lead counsel so I was responsible.

151

Q. And what happened in that -- what alternative had you discussed or strategized if that procedure wasn't going to work? Had you done alternative theories?

A. Well, we had, of course, what the reporters themselves said about how they got into the jail. And I thought the procedure was pretty clear from the reporters and from Kim Leach.

Q. Had you talked to the reporters before you put them on the stand?

A. No, they wouldn't talk to us before.

Q. So the first time you were learning what the reporters were going to say was on the stand?

A. Yes.

Q. Had you tried to talk to the assignment editors who sent the reporters over?

A. I don't know that I did, but I think someone on our team tried to, but they wouldn't talk to us.

Q. They wouldn't talk to you?

A. No.

Q. Did you find out who the reporter on the beat was that made the contact or got the first information that there was this offense that Mr. Broadnax had been accused of? Did you try to locate that person?

A. I'm sorry, which person?

Q. The person -- the reporter on the beat who would

150

Q. Okay. And had you delegated to anybody else to say, for example, go talk to the jailers and find out whether or not any of these -- what these jailers have to say about the media interviews?

A. I do not recall having done that.

Q. You don't recall or you did not do that?

A. I don't recall whether I did or not.

Q. Okay. Let's take a look at the Fox 4 television media request.

A. Uh-huh. The first one or the second one?

Q. Well, both of them -- or I'm sorry, the one that was signed.

A. Okay.

Q. And the one that -- was there an officer here that apparently signed their name to it?

A. It shows -- signature appears to be Spradling, Number 5795.

Q. Let's take a look at the one from WFAA Channel 8.

A. Also appears to be DSO Spradling 5795.

Q. And did you talk to this jailer?

A. I don't believe we did.

Q. Okay. And why not?

A. I just thought that the procedure that we wanted to show to the jury and to the judge was satisfied with calling Kim Leach.

152

have been the first person who learns about an offense.

A. Well, now, the offense had occurred on the 19th, the morning of the 19th of June. And are you talking about a beat reporter for the Morning News or --

Q. Any of the media, any first contact.

A. I don't think we tried to talk to them before the morning of the 24th, no.

Q. So had you tried to talk to any of the -- for want of a better word -- the beat reporter who had the first contact with the officers from Texarkana who arrested Mr. Broadnax?

A. No.

Q. How about the jailers in Garland?

A. No.

Q. How about -- well, you said you didn't talk to Spradling. Why did you not talk to any of them?

A. Because, as I explained, I think the procedure we were trying to show was shown by the testimony of the reporters and by Ms. Leach.

Q. It turns out it wasn't. Did you have any alternative theories to raise or had you investigated --

A. Well, we raised the suggestions that whether they knew it or not, the media were being used to gain evidence that the police agencies couldn't gain. I mean, James didn't talk to the police agencies when

given the opportunity.

He did talk to the media representatives when given the opportunity. And that was facilitated by the Sheriff's Department. And they're law enforcement.

And it was of note to us that in all of these interviews there are deputy sheriffs in the room on James' side hearing what he says to the media. So it appeared to me to be state action.

Q. But state action, if it didn't pan out -- let me back up a second. Were you aware in 2008, either prior to the time of trial when you were preparing for the trial or during the trial itself when you were raising these issues, were you aware that 43 jurisdictions had appointed counsel at, before or immediately on -- at the first appearance?

A. I think that is the the general rule is that they are appointed counsel as soon as can be given to them after their initial appearance.

Q. Did you have knowledge of that?

A. Yes.

Q. In 2008?

A. Yes.

Q. Did you know Texas was a minority position?

A. Yes.

Q. How did you know that in 2008?

A. I knew that our rules were not as strict in that regard, that there was some leeway in our laws to allow for appointment at the first convenience rather than the first necessity.

Q. Had you done any legal research into this issue?

A. Yes.

Q. When did you do that research?

A. Back at the time.

Q. Could you take a look at your billing records and show me where you did that research?

A. Well, I did a lot of legal research. So I don't know whether I can find a particular day where I reflected that I researched that.

Q. Did you challenge the constitutionality of the Texas Fair Defense Act?

A. No.

Q. Why not?

A. We thought the primary position that we would take is to try to show that the Sheriff's Department was facilitating these interviews with the defendants, that it's occurring before the time we're appointed.

And that as a result of the devastating impact, I would say, that James' interviews had on his case, we tried to show to this Court that the media were, in fact, knowingly or unknowingly, assisting law enforcement, and that the sheriff's office was facilitating the interviews with that in mind.

Q. What did you do to raise the issue in -- under a legal theory or a constitutional law violation about this gap between appointment and request for counsel?

A. We made sure it was included in the record and we argued to Judge Snipes at the pretrial hearing and again at trial.

Q. Did you specifically raise a 6th and 14th Amendment violation?

A. Yes.

Q. Could you tell us where in the record it is?

A. Ms. Murphy has got it.

Q. Reporter Records, Volume 43, Pages 105, 106.

MS. MURPHY: Judge, can I give this to Mr. Lollar?

Q. (By Ms. Brandt) Did you challenge the constitutionality of the Texas Fair Defense Act?

A. No.

Q. Why not?

A. Well, we thought by making our 6th Amendment objection, 6th and 14th Amendment objection, we felt that the Court certainly understood what we were talking about. It talks about appointment of counsel.

Q. Well, doesn't an attorney have an obligation to put the Court on notice of what that objection is?

A. Well, yes, and I think we did that during the pretrial hearings, our objection, which I thought we made very clear to everybody, I hope we did, was that the lawyers were not being appointed quickly enough to cut off media access and interviews of high profile defendants in the Dallas County Jail, and the system set it up that way.

Q. And did you put the Judge on notice that Rothgery had been decided on June 13th, 2008, the date that Mr. --

A. I don't know if I told him that or not.

MS. BRANDT: All right. I have no further questions.

THE COURT: Anything?

CROSS-EXAMINATION

BY MS. MURPHY:

Q. What was the name of your mental health expert in this case?

A. I'm sorry?

Q. What was the name of your mental health expert in this case?

A. Well, now we called several. We called Jason Varghese, V-a-r-g-h-e-s-e, who is the psych assessor at the jail. We called Dr. Jaida Mersmadal, who was the

157

psychiatrist who saw him on the morning of June the 23rd. Both of them saw him, both Jason and Jaida Mersmadal saw him on the morning of June the 23rd.

We called Dr. Lane, who is another jail psychiatrist who treated James over the course of the next year while he was in jail for basically withdrawal from psychosis induced by PCP intoxication.

We called Dr. Roache, who was a drug expert from the University of Texas San Antonio Health Center, who is a professor there. And that's all the people I believe that we called.

Q. Did you call Dr. Silver?

A. Pardon me?

Q. Did you call Dr. Silver?

A. Well, we did call Dr. Silver. Now, her expertise -- she is a professor at U.T. Southwestern -- and her expertise is on brain development. And she talked about the immature brain of a 19 year old, which is the age that James was at the time of the commission of these offenses.

Q. And did you have a Gilda Kessner?

A. We did. Dr. Kessner is a psychologist. We had her retained and she actually sat through the testimony of Dr. Price, who was called by the State in rebuttal in punishment.

158

Q. And did Dr. Kessner assist you in your cross-examination of Dr. Price?

A. I'm sorry?

Q. Would Dr. Kessner have assisted you in your cross-examination of Dr. Price,

A. Well, yes. I mean, we had consulted with Dr. Kessner before. And we also had another psychologist, Dr. Antoinette McGarrahan, who had been retained by us.

Q. And why didn't you call Dr. Kessner or someone similar to Dr. Kessner in rebuttal of Dr. Price's direct testimony?

A. Well, Jason Varghese, Jaida Mersmadol, Dr. Lane, Dr. Roache, and most importantly Dr. Price, called by the State, would never -- did not ever say in their testimony that James Broadnax was either a psychopath or was antisocial.

The way that the -- Mr. Alex, the prosecutor presented the testimony of Randall Price was that -- in rebuttal, he just put him up here on this witness stand and asked Randall Price to list for the jury the items found in the Harris psychopathy checklist.

Specifically, Mr. Alex did not ask him whether James Broadnax was either a psychopath under the Harris Psychopath checklist or ASPD.

Now, we, Doug and I and our third counsel,

159

Ms. Mallon, discussed at the end of Price's testimony whether we were going to call Kessner who had sat through Price's testimony here in the courtroom. She was prepared to testify, had we called her to testify.

The danger that we saw in doing that -- and recall that I had specifically asked Dr. Price in cross-examination of him, are you saying that James Broadnax is antisocial? No, I'm not saying that. Are you saying he is a psychopath? No, I'm not saying that. Have you ever seen or interviewed James Broadnax? No.

And what was important to me that -- and I have had it done many times in the past where even if the State psychiatrist has not personally interviewed the defendant, they could certainly give a diagnosis based on a hypothetical that had the exact same characteristics as a defendant does in a particular case.

So I was afraid if we called Dr. Kessner to dispute, I guess, the Harris Psychopathy checklist that Dr. Price had gone through, that the State would be able to take advantage of that situation with her on the stand and make her go through a hypothetical situation listing all the characteristics that James Broadnax had.

And I was afraid they were going to take my psychiatrist, my psychologist, and turn them into a

160

State's witness. So we chose not to call her specifically in light of the fact that we had objected to Dr. Price's testimony being irrelevant since he wasn't going to say that James was a psychopath or ASPD.

We objected to that in pretrial. We objected to it during trial. The Court admitted it. Nothing I could do about that, but it was over our objection.

Q. And you brought up the inability to diagnose Mr. Broadnax as a psychopath in your closing argument?

A. Certainly. I told the jury that Mr. Alex had become Dr. Alex. And I told the jurors that Mr. Alex was inviting them to become Doctor Jurors and fill in the blanks when their own expert refused to do it.

Q. And are you aware that the defense objected to B.K. Nelson's testimony under the 1st and 14th Amendments?

A. Yes.

Q. And where did the -- I say B.K. you know I'm talking about Detective Nelson?

A. I'm sorry?

Q. When I say B.K., you know who I'm talking about?

A. B.K., yes, uh-huh.

Q. Would it have been futile to object to his testimony under Chapter 61 of the Code of Criminal

161

Procedure?

A. Yes, it had nothing to do with what he was being called to testify about.

Q. And did you make a strategic decision not to cross-examine?

A. Yes, we did.

Q. And what was your strategy?

A. Well, B.K. Nelson was called by the State. He is a gang expert for the Dallas Police Department, and he testified basically, in his opinion, that James was a member or a wannabe member of the GD's, Gangster Disciples.

We, having the same information that the State had already shown the jury, which is the combination of one of the media interviews where James said that he was a member of the Folk Nation and he wrapped his flag around his gun.

They had presented a telephone call that James had made from the jail where he is talking to his mother's boyfriend, and he is talking about being a member of the GD's and asking the boyfriend if it wasn't true that he had also been a member of that back in his younger age.

We had all of the journals that were found with James in the car in Texarkana which were introduced

162

that contained all sorts of references to GD's and contained the pitchfork, the three-tined pitchforks and the six-pointed star of David, all sort of writings about that organization in his journals. The State had presented testimony from the -- well, from his jail cell where there's all sorts of six-pointed stars and pitchforks drawn on his jail cell.

We felt that in light of that, that there was little use in trying to convince the jury that he was not at least a wannabe gang member in GD's, if not a full-fledged member. Also, part of the testimony provided by our witnesses, the witnesses we called in punishment, including the sister, she testified that James' older brother, Aaron, was a GD and James was a wannabe GD.

Okay? So we felt that it would be useless and futile and would irritate the Judge and irritate the jury if we tried to convince the jury that he really wasn't, in light of all of this evidence.

Now, the main thing about all of that is this: We did not feel this offense had anything to do with James being either in or out of a gang. This was two guys, two cousins who went out to hit a lick. It had nothing to do -- it was not a gang initiation. It was not an order from a gang member. It wasn't an order

163

to, you know, elevate the gang in any way.

We felt that whether James was a member of GD or not was irrelevant really to the evidence in this case. And those were the arguments we made to Judge Snipes that the testimony of B.K. Nelson was irrelevant to this case.

Q. And did you make a strategic decision not to call any gangs experts of your own?

A. Yes. For all those same reasons.

MS. MURPHY: Pass the witness.

THE COURT: Anything else?

MS. BRANDT: Yes, I do.

REDIRECT EXAMINATION

BY MS. BRANDT:

Q. You were aware that in the 1990's, counsel had been appointed or was being appointed at the same time that they were requesting counsel?

A. Yes, I was one of those counsel who was frequently called on the weekends by the magistrates at Sterrett.

Q. How long did that go on?

A. It seems to me about ten years. It seems to me it happened in the decade of the '90s.

Q. And then that changed as a result of the amendment to the Texas Fair Defense Act?

164

A. It did.

Q. And did you put the Judge on notice about that change? Did you tell the Judge that?

A. Did I tell Judge Snipes that the law had changed --

Q. Did you make that argument when you were talking about the delay in appointment of counsel?

A. I don't recall if we did or not.

Q. Had you thought about doing that?

A. I don't recall.

Q. And would you agree there's a systemic problem here in Dallas County that is arising as a result of that gap?

A. Absolutely.

Q. And did you put Judge Snipes on notice of that gap?

A. Yes, I mean, we talked about the gap.

Q. In this specific case, right?

A. Yes.

Q. But you didn't talk about the gap or bring in other attorneys to show that there was this gap that was causing this problem?

A. No.

Q. Why not?

A. I think our point was trying to show the Court

165

that the sheriff's office again was facilitating the interviews with the defendants prior to the time of getting appointed, and that was our main point.

Q. But it is true you hadn't thought about it back in 2008; is that true?

A. Yes, I guess.

MS. BRANDT: I have no further questions.

THE COURT: Anything else?

MS. MURPHY: No questions.

THE COURT: You're permanently excused, sir.

There's one more witness, correct? Take that witness up at 2:15. We are in recess until then.

(Brief recess.)

JOHN EDENS,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. Murphy:

Q. Can you state your name for the record, please?

A. John Edens, E-d-e-n-s.

Q. And did you provide an affidavit in this case?

A. Yes.

Q. For the record, that is Exhibit 26 that was attached to the defendant's writ application. Did you get paid to do that affidavit?

A. I did.

166

Q. How much did you get paid?

A. Like $350 an hour. I don't know actually how many hours I put into it. It would be in a billing statement somewhere. I don't recall. Sorry.

Q. And have you given affidavits similar to this in post-conviction proceedings?

A. Post-conviction? In a variety of death penalty cases. I assume, yes, some of them would be post-conviction.

Q. And are they all similar to the affidavits that you provided in this case?

A. Depending on the issues being addressed. Most of the time I'm asked to talk about the relevance of the Harris (phonetic) Psychopathy checklist. So there are a consistent set of issues that I have concerns about in relation to it being used. There is issues as to what types of information is provided as allegedly violence risk factors in these types of cases. So there are a certain set of issues that usually get addressed there.

This one was also focusing a bit more on antisocial personality disorders specifically. But yes, most of these affidavits do address similar type of issues because I keep getting asked to testify about the same research, so yes.

Q. And in your affidavit, you indicated that you

167

only reviewed portions of the record in this case, correct?

A. Right.

Q. And were those portions given to you by defense counsel, Lydia Brandt?

A. Yes. I believe.

Q. Were you aware that the defense called several mental health experts at trial?

A. I don't recall that specifically, no.

Q. And were you aware that Dr. Price and indeed no one at the trial diagnosed Mr. Broadnax with psychopathy?

A. I am aware from reading the trial transcript when I initially prepared the affidavit that no one specifically described him as being psychopathic, but that it was being introduced into the case for some reason.

Q. Were you aware that the defense had a mental health expert that was prepared to rebut Dr. Price's testimony?

A. I don't believe I was aware of that because I believe I said in the affidavit that one should have been called, so...

Q. So you don't know why the defense counsel -- you don't know why defense counsel chose not to call that

168

witness, correct?

A. I don't.

MS. MURPHY: No further questions.

MS. BRANDT: I have no questions.

THE COURT: May the witness be permanently excused?

MS. BRANDT: Yes.

MS. MURPHY: Yes.

THE COURT: All right. You're permanently excused, sir. Thank you for your testimony.

What further says the State?

MS. MURPHY: Nothing more, Your Honor.

THE COURT: Anything else, ma'am?

MS. BRANDT: No, Your Honor.

THE COURT: Okay. What's the timeline for y'all giving me proposed findings of facts and conclusions of law?

MS. BRANDT: Your Honor, could I ask to make it as accurate as I can get it, could we get the -- a copy of the reporter's record for yesterday and also today, and then perhaps give us three weeks after that in order to do the findings of fact so I will have a chance to look at what was presented here?

THE COURT: Any objection to that?

MS. MURPHY: No. I think the statute

provides for us to have 30 days after the reporter's record is completed to submit those.

THE COURT:  Anything else from the State?

MS. MURPHY:  No, Your Honor.

THE COURT:  From the defense?

MS. BRANDT:  No.

(Proceedings adjourned).

---

THE STATE OF TEXAS    )
COUNTY OF DALLAS       )

I, SHARON HAZLEWOOD, Official Court Reporter in and for the Criminal District Court 7 of Dallas County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record will be paid by Dallas County.

WITNESS MY OFFICIAL HAND this the 5th day of September, 2013.

/s/Sharon Hazlewood
Texas CSR 628
Expiration Date: 12/31/14
Official Court Reporter
Criminal District Court 7
Dallas, Texas  75207
(972) 739-3906