IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JAMES GARFIELD BROADNAX, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | No. 3:15cv01758-N-BF |
| | § | ***CAPITAL CASE*** |
| LORIE DAVIS, Director, | § | ECF |
| Texas Department of Criminal | § | |
| Justice, Correctional Institutions | § | |
| Division, | § | |
| Respondent. | § | |

## RESPONDENT'S ANSWER WITH BRIEF IN SUPPORT

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

ADRIENNE MCFARLAND
Deputy Attorney General for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

GEORGE A. D'HEMECOURT*
Assistant Attorney General
State Bar No. 24082888

\* Counsel of Record

P. O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 936-1400
(512) 936-1280 (Facsimile)

*Counsel for Respondent*

## TABLE OF CONTENTS

BROADNAX'S ALLEGATIONS ............................................................... 2

STATEMENT OF THE CASE.................................................................5

STATEMENT OF FACTS........................................................................6

I.    Facts Relating to Guilt/Innocence.....................................................6

II.   Facts Relating to Punishment........................................................ 7

      A.  The State's future dangerousness evidence ............................. 7

      B.  The defense's case in mitigation..................................................11

ARGUMENT .........................................................................................14

I.    Broadax Is Not Entitled to Relief on His Claims Related to the
      Admission of Statements Made During His Media Interviews.
      (Claims 1–6). ...................................................................................... 20

      A.  Relevant facts.................................................................................. 21

      B.  State court proceedings.................................................................22

      C.  Broadnax's claim that the media interviews violated his
          Fifth Amendment protection against self-incrimination is
          procedurally barred and meritless (Claim 1). ......................... 23

          1.  The claim is procedurally barred. ......................................... 24

          2.  Alternatively, Broadnax's Fifth Amendment claim lacks
              merit. ...................................................................................... 28

          3.  Alternatively,   the   state   court   reasonably   rejected
              Broadnax's Sixth Amendment claim..................................... 34

      D.  Broadax's claim that his Sixth Amendment rights were
          violated because he was denied access to counsel during a
          critical stage of his proceedings is procedurally barred and
          meritless. (Claim 2). ..................................................................... 36

          1.  The claim is procedurally barred. ......................................... 36

          2.  The state court reasonably determined that the media
              interviews did not constitute a "critical stage" of the
              proceedings............................................................................. 40

E. Broadnax's claim that the Texas Fair Defense Act is unconstitutional on its face is procedurally barred and lacks merit (claim 3). ........................................................ 45

    1. The claim is procedurally barred. .......................................... 45

    2. Alternatively, the state court reasonably rejected Broadnax's argument that the Texas Fair Defense Act violates the constitution. ........................................................ 47

F. Broadnax's claim that his confession was involuntarily coerced is procedurally barred and lacks merit (Claim 4). . 49

    1. The claim is procedurally barred. .......................................... 49

    2. Alternatively, the state court reasonably rejected Broadnax's involuntary confession claim. ........................... 51

G. Broadnax's claim that the trial court erred by failing to hold a *Jackson v. Denno* hearing is procedurally barred and lacks merit (Claim 5). ........................................................... 55

H. Broadnax's claim that his trial counsel was ineffective for failing to present the expert testimony of pharmacologist, Dr. John Roache, concerning his capacity to consent is procedurally barred and lacks merit (Claim 6). ..................... 56

II. The CCA Reasonably Rejected Broadnax's Claim that the Trial Court Erred in Denying His *Batson* Challenges (Claim 7). ........ 61

A. Broadnax's new evidence is *Pinholster*-barred. ..................... 63

B. Alternatively, Broadnax's new evidence fails to show that the State's strikes were racially motivated. ............................ 63

C. All *Batson*-challenged venirepersons were struck for race neutral reasons. ........................................................................ 70

    1. Shaven McCraney. ................................................................ 78

    2. Mattie Vation. ...................................................................... 79

    3. Angelita Rivera. .................................................................... 82

    4. Curtis Riser. .......................................................................... 84

    5. Agwana Long. ........................................................................ 86

6.  Betty Jackson. ..............................................................88

7.  Dedrick Morrison. ........................................................89

III.  The State Court Reasonably Denied Broadnax's Claim that Reseating Juror Patterson Was an Improper Remedy for a *Batson* Violation (Claim 8). ................................................91

A.  The claim was raised and denied in state court. ....................91

B.  The CCA reasonably determined that there was no *Batson* violation. ..................................................................92

C.  Alternatively, the CCA reasonably determined that, even if there was a *Batson* violation as to Juror Patterson, the remedy of reseating him was constitutionally adequate. ....95

IV.  Broadnax's Claim That Trial Counsel Was Ineffective for Failing to Object to the Trial Court's Remedy for the *Batson* Violation Is Procedurally Barred; Alternatively, the Claim Lacks Merit (Claim 9). ..........................................................97

V.  The State Court Reasonably Rejected Broadnax's Claim that the Trial Court Erred in Denying his Challenges for Cause (Claim 10). .................................................................99

A.  Broadnax's assertions as to panel members who did not sit on the jury fail to allege constitutional violations and lack merit. ...........................................................................102

B.  The state court reasonably denied Broadnax's claim that the trial court erred by not striking Juror John Vessels for cause based on his inability to give examples of mitigating circumstances. ...............................................................104

C.  Broadnax's claims that the trial court erred by not striking Vessels for cause based on his answers on the Juror questionnaire are procedurally barred and lack merit. .....105

VI.  Broadnax's Claim that the Trial Court Erred by Admitting Evidence Obtained During the Search of His Prison Cell Is Not Cognizable on Federal Habeas Review and Was Reasonably Rejected By the State Court (Claim 11). ..........................109

A. The claim is barred pursuant to *Stone v. Powell* and is therefore not cognizable on federal habeas review.............109

B. Alternatively, the CCA reasonably determined that the search did not violate the Fourth Amendment......................111

C. Alternatively, any error did not have a substantial and injurious effect on the verdict. ................................................114

VII. Broadnax's Claim that the Trial Court Erred by Admitting Dr. Price's Testimony Concerning Psychopathy is Procedurally Barred and Lacks Merit (Claim 12)................................................115

A. Relevant facts.........................................................................115

B. Broadnax's fundamental fairness claim is procedurally barred, foreclosed by precedent, and lacks merit................116

1. The claim is procedurally barred. .........................................116

2. Alternatively, the claim is foreclosed by Supreme Court and Fifth Circuit precedent....................................................118

3. Alternatively, the claim lacks merit. ..................................119

C. The state court reasonably rejected Broadnax's *Giglio* claim as to Dr. Price. ..................................................................124

VIII. Broadnax's Claim That His Trial Counsel Was Ineffective in Handling Dr. Price's Testimony Is, In Part, Procedurally Barred and Lacks Merit (Claim 13)...............................................127

A. Broadnax's claim that counsel was deficient for failing to retain and call an expert to test him and testify that he is not as psychopath is procedurally barred and lacks merit. ..........................................................................................128

B. The state court reasonably denied Broadnax's claim that his counsel was ineffective for failing to call an expert to testify about PCL-R testing. .......................................................131

C. Broadnax fails to show prejudice..............................................133

IX. Broadnax's Claim that Appellate Counsel Was Ineffective for Failing to Challenge the Admissibility of Dr. Price's Testimony Is Procedurally Barred and Lacks Merit (Claim 14)..................134

X.      Broadnax's Claim that He Is Actually Innocent of the Death Penalty Because New Evidence Indicates that He Is Not a Psychopath Is Not Cognizable on Federal Habeas Review and Lacks Merit (Claim 15). ...................................................................... 137

XI.     The State Court Reasonably Rejected Broadnax's Claim that His Due Process Rights Were Violated by the Admission of False and Misleading Gang Expert Testimony (Claim 16). ....... 139

XII.    Broadnax's Claim that the Trial Court Erred by Qualifying Detective Nelson as an Expert Is Procedurally Barred For Lack of a Contemporaneous Trial Objection and Lacks Merit (Claim 17)................................................................................... 145

XIII.   Broadnax's Claim that the Trial Court Violated His First Amendment Rights by Allowing Gang Affiliation Evidence Is Procedurally Barred And Lacks Merit (Claim 18)...................... 148

XIV.    The State Court Reasonably Rejected Broadnax's Claim that His Trial Counsel Was Ineffective in Handling Detective Nelson's Testimony (Claim 19). ...................................... 152

XV.     Broadnax's Claim that He Was Prosecuted on the Basis of His Race in Violation of the Equal Protection Clause Is Procedurally Barred and Lacks Merit (Claim 20). ..................... 155

        A.  The claim is procedurally barred.............................................. 156

        B.  The claim lacks merit. ............................................................ 157

XVI.    The State Court Reasonably Rejected Broadnax's Claim that the Jury Instructions Improperly Allocate the Burden of Proof for the Mitigation Special Issue (Claim 21)................................. 159

XVII.   The State Court Reasonably Rejected Broadnax's Claim that the Jury Instructions Failed to Define Vague Terms in the Special Issues (Claim 22). ............................................................... 160

XVIII.  The State Court Reasonably Rejected Broadnax's Challenge to the "10/12 Rule." (Claim 23) ....................................... 161

XIX.    The State Court Reasonably Rejected Broadnax's Claim that the Trial Court Erred by Failing to Instruct the Jury to

Individually Consider the Mitigation Evidence Presented (Claim 24)............................................................................... 163

XX.  The State Court Reasonably Denied Broadnax's Claim that the Death Penalty is Unconstitutional (Claim 25)............................ 164

XXI. Broadnax is Not Entitled to an Evidentiary Hearing or Discovery. ................................................................................ 165

CONCLUSION ............................................................................... 171

CERTIFICATE OF SERVICE ................................................................ 172

## ANSWER

Petitioner James Garfield Broadnax was convicted of and received the death penalty for the murder of Stephen Swan in the course of committing a robbery. He now challenges that presumptively valid conviction and sentence in this Court pursuant to 28 U.S.C. §§ 2241 and 2254. Broadnax seeks habeas relief. However, some of his claims are procedurally barred because they were not properly raised in state court, and he has failed to show that any of his claims have merit or that he is entitled to further factual development. Accordingly, the Director respectfully requests that Broadnax's petition for writ of habeas corpus be denied with prejudice.

## BROADNAX'S ALLEGATIONS

The Director understands Broadnax to assert the following claims in support of federal habeas relief:

1. He was denied his Fifth Amendment protection against self-incrimination when he was compelled to provide interviews to media outlets while in State custody without being read *Miranda*[1] rights. Petition at 17–25.

2. He was denied his Sixth Amendment right to counsel during a critical stage of his trial when media interviews were conducted absent counsel. Petition at 36–45.

3. The Texas Fair Defense Act is unconstitutional because it violates the Sixth Amendment by unreasonably delaying the appointment of counsel. Petition at 45–50.

---

[1]    *Miranda v. Arizona*, 384 U.S. 436 (1966).

4.    His statements to the media were involuntarily coerced. Petition at 25–33.

5.    The trial court erred by failing to hold a *Jackson v. Denno*[2] hearing prior to the admission of his confessions. Petition at 30–31.

6.    His trial counsel was constitutionally ineffective for failing to present Dr. John Roache's testimony about his capacity to consent. Petition at 33–34.

7.    The trial court erred in denying *Batson*[3] challenges to the State's peremptory strikes of the following venirepersons (Petition at 50–70):

    a.    Shaven McCraney,
    b.    Mattie Vation,
    c.    Angelita Rivera,
    d.    Curtis Riser,
    e.    Agwana Long,
    f.    Betty Jackson,
    g.    Dedrick Morrison.

8.    The trial court's reseating of a single African-American juror was not a sufficient remedy for a *Batson* violation. Petition at 70–74.

9.    Trial counsel was ineffective during jury selection for failing to object to the trial court's remedy for the *Batson* violation. Petition at 84–90.

10.    The trial court erred in denying Broadnax's challenges for cause to jurors who were unwilling to consider mitigating evidence. Petition at 74–84.

11.    The trial court erred by admitting evidence obtained during the search of Broadnax's prison cell in violation of the Fourth Amendment. Petition at 90–97.

---

[2]    378 U.S. 368 (1964).

[3]    *Batson v. Kentucky*, 476 U.S. 79 (1986).

~ 3 ~

12. The trial court erred by admitting Dr. Price's testimony concerning psychopathy. Petition at 97–114.

13. Trial counsel was ineffective in handling Dr. Price's testimony concerning psychopathy. Petition at 109–10.

14. Appellate counsel was ineffective for failing to challenge the admissibility of Dr. Price's testimony. Petition at 110–11.

15. Broadnax is actually innocent of the death penalty because new evidence indicates that he is not a psychopath. Petition at 112–14.

16. Broadnax's due process rights were violated by the admission of false and misleading gang expert testimony. Petition at 114–119.

17. The trial court erred by qualifying Detective Nelson as an expert on gang affiliation. Petition at 119–20.

18. The trial court violated Broadnax's First Amendment rights by admitting gang affiliation evidence. Petition at 120–24.

19. Trial counsel was ineffective in their handling of Detective Nelson's gang expert testimony. Petition at 124–26.

20. Broadnax was persecuted on the basis of his race by the imposition of the death penalty. Petition at 127–32.

21. The jury instructions improperly allocated the burden of proof for the mitigation special issue. Petition at 133–37.

22. The jury instructions failed to define vague terms in the Texas special issues. Petition at 137–39.

23. The requirement of ten "No" votes on the special issues violated Broadax's due process rights. Petition 139–41.

24. The trial court erred by failing to instruct the jury to individually consider the mitigation evidence presented. Petition at 141–45.

25.   The death penalty is unconstitutional because it violates the Eighth Amendment and because of its unreliable application. Petition at 146–50.

## STATEMENT OF THE CASE

Broadnax was convicted of capital murder in a judgment entered on August 21, 2009. 3 Clerk's Record (CR) 698–99. Pursuant to the jury's answers to the special issues on future dangerousness and mitigation, the trial court sentenced Broadnax to death. *Id*. The Texas Court of Criminal Appeals (CCA) affirmed Broadnax's conviction on direct appeal. *Broadnax v. State*, No. AP-76,207, 2011 WL 6225399 (Tex. Crim. App. Dec. 14, 2011), cert. denied, *Broadnax v. Texas*, 133 S. Ct. 103 (2012).

Broadnax filed a state application for writ of habeas corpus, raising eight claims. State Habeas Clerk's Record (SHCR) 2–92. After holding an evidentiary hearing, the trial court entered findings of fact and conclusions of law recommending that relief be denied. SHCR 224–56. The CCA issued an order adopting the trial court's findings and conclusions and denying habeas relief. *Ex parte Broadnax*, No. WR-81,573-01, 2015 WL 2452758, at *1 (Tex. Crim. App. May 20, 2015), cert. denied, *Broadnax v. Texas*, 136 S. Ct. 77 (2015). This amended federal petition follows.

**STATEMENT OF FACTS**

## I.      Facts Relating to Guilt/Innocence

On direct appeal, the CCA provided the following summary of the evidence of Broadnax's capital crime:

> A man riding his bicycle home from work saw the bodies of Stephen Swan and Matthew Butler in the street outside their recording studio in Garland shortly after 1:00 a.m. on June 19, 2008. The man alerted Garland firefighters at a nearby fire station. Upon arriving at the scene, the firefighters quickly determined that both Swan and Butler were recently deceased. At [Broadnax]'s trial, the medical examiner testified that Swan had suffered an intermediate-range gunshot wound to the head, in addition to a gunshot wound to the left chest.
>
> Later that day, [Broadnax] and his cousin, Demarius Cummings, arrived at the Southeast Dallas apartment where [Broadnax] had been staying with family members. While there, [Broadnax] boasted of "hit[ting] a lick"—street slang for committing a robbery—and displayed Swan's driver's license. [Broadnax] and Cummings left the apartment in Swan's Ford Crown Victoria, after telling those present that they planned to sell the vehicle. Fifteen minutes after [Broadnax] and Cummings left, [Broadnax]'s aunt's friend who had been present in the apartment saw news reports of the double homicide. She realized that [Broadnax] and Cummings were likely involved, and she called the Garland Police.
>
> That evening, police officers in Texarkana (which is about 150 miles from Garland) saw Swan's car in a high-crime area. After a check of the license plates returned information for a Cadillac, rather than a Ford, officers pulled the vehicle over. [Broadnax] gave the officers his name, and after they learned that there were warrants for [Broadnax]'s arrest, the officers placed [Broadnax] in custody. The arresting officer testified that [Broadnax] did not appear to be intoxicated when he was pulled over.

~ 6 ~

After being returned to Dallas, [Broadnax] gave multiple interviews to television broadcasters in the Dallas area. These interviews became the crux of the State's case at trial. In them, [Broadnax] confessed to murdering and robbing Swan and Butler, and he provided explicit details of the crimes. He said that he and Cummings had traveled to Garland that day with the specific intent of committing a robbery. [Broadnax] said that while Cummings had participated in the robberies, [Broadnax], alone, had murdered the victims. [Broadnax] told reporters that he had no remorse for his actions, and that he hoped a jury would sentence him to death.

At trial, the defense conceded that [Broadnax] had shot Swan and Butler, but argued that [Broadnax] was under the influence of marijuana and PCP at the time of the murders. The defense further posited that [Broadnax] was still intoxicated at the time of his multiple television interviews and confessions four days after his arrest. Several of the State's witnesses were skeptical of [Broadnax]'s theory. In addition to the arresting officer's testimony that [Broadnax] was lucid at the time of his arrest, the reporters who interviewed him described [Broadnax] as intelligent and rational. The jail nurse, too, testified that [Broadnax] did not appear to be under the influence of alcohol or drugs.

*Broadnax v. State*, 2011 WL 6225399, at *1.

## II.   Facts Relating to Punishment

### A.   The State's future dangerousness evidence

As an initial matter, the jury was presented with significant evidence at guilt/innocence that demonstrated that Broadnax is a future danger. In response to Broadnax's direct appeal claim that the evidence of future dangerousness was insuffient, the CCA recounted:

Here, [Broadnax] confessed to murdering two defenseless men in order to steal their car so he could return

home. [Broadnax] described to reporters how he shot each man a second time after their initial wounds failed to kill them immediately. Then, when [Broadnax] was sure the victims had expired, he rifled through their pockets. The probability of [Broadnax]'s future dangerousness also can be inferred from evidence showing a lack of remorse. In the same television interviews discussed above, [Broadnax] coldly and calmly walked reporters through the murders. When asked if he had anything to say to the victims' families, [Broadnax] responded, "Fuck 'em." To the specific question by the interviewer, "Do you have any remorse, none whatsoever?" [Broadnax] only shook his head.

Finally, in one of the interviews [Broadnax] discussed the probability that he would commit criminal acts of violence that would constitute a continuing threat to society:

Reporter: What do you think's going to happen to you now?

[Broadnax]: Whatever they throw at me. Hopefully the death penalty.

Reporter: Hopefully?

[Broadnax]: Yea. 'Cuz they give me life I'ma' kill somebody else. Straight up. I'm telling you right now. I can't do no motherfuckin' life. I'ma' go crazy.

Reporter: So you want the death penalty?

[Broadnax]: They better. Pick one [[Broadnax] holds up each arm, presumably referencing the lethal injection method of execution]. Or you gon' have some more bodies.

Reporter: Oh, in here you're gonna kill someone?

~ 8 ~

[Broadnax]:        Nah. Whichever penitentiary they send me to. They better put me on death row. Tell you just like I'ma' tell the judge.

*Broadnax v. State*, 2011 WL 6225399, at \*17.

In addition to the details of the brutal murder and Broadnax's statements in his media interviews, the State also played several phone calls made by Broadnax while he was in jail. In the calls, Broadnax bragged about fighting with jail staff and other inmates, demonstrated a complete lack of remorse for the murders, threatened further violence against other inmates, and admitted that he was not intoxicated at the time of the media interviews. 48 RR 96–98; 52 RR 195–99; 203–07; State's Exhibit (SX) 544; SX 545; SX 552; SX 592.

The State also presented evidence that while in jail, Broadnax fought with a member of the jail's Special Response Team, Schesser Kirvin, who was conducting a routine search of Broadnax's cell; as a result, Broadnax had to be restrained. 48 RR 131, 138–51. Broadnax was also involved in two separate fights with inmates. 48 RR 177–80. The State provided pictures of the injuries sustained by one of the inmates after he had been in a fight with Broadnax. 48 RR 183–84; SX 474–75.

The jury also learned that jail authorities discovered an individual razorblade and other contraband during a shakedown search of Broadnax's prison cell. 49 RR 43–47, 55–56. Further, the State offered expert testimony

from a member of the Dallas Police Department's Gang Unit, Detective Barrett Nelson, who reviewed the media tapes of Broadnax's phone calls and items found in Broadnax's cell. *Id.* at 77–83. Detective Nelson testified that he was able to determine Broadnax was a member of the Gangster Disciples, a criminal street gang whose members commit murder and aggravated robberies. *Id.* at 83–125.

The State also called multiple rebuttal witnesses. Dr. Jack Randall Price testified about Broadnax's expert's testimony on antisocial personality disorder. 52 RR 238–259. He explained the character traits of psychopathic individuals, but did not deliver any specific testimony about Broadnax. *Id.* He also testified that there is no effective treatment for psychopathy. *Id.* at 258.

Finally, the State elicited testimony from the victims' families. Theresa Butler, the mother of Matthew Butler, testified about her only son. 48 RR 28–39. She explained that he was a musician and had opened a recording studio in 2005. *Id.* at 31. She testified that music was his life until he had two children with his wife. *Id.* at 32. She recalled, "I talked to Matthew every day, sometimes multiple times a day, and we were very close." *Id.* at 35. Jean Swan, the mother of victim Stephen Swan, testified that her son loved his country and worked for several volunteer organizations. *Id.* at 65. She explained that he had just recovered from cancer and that her family was crushed. *Id.* at 65–67. Stephen's brother, Matthew, testified that Stephen was his best friend and

like a father-figure to him. 52 RR 267–69. Stephen's sister, Deborah, testified that Stephen had always wanted to join the military. *Id.* at 279. She explained that he had been talking to military recruiters about joining the Army, but was then diagnosed with Hodgkin's Lymphoma. *Id.* at 279–280. She testified that after this diagnosis, Stephen fought to take good care of himself, and had been declared in remission shortly before his death. *Id.* at 280.

### B.    The defense's case in mitigation

Broadnax presented expert testimony on brain development and the effects of PCP use on the human brain. According to Dr. Cheryl Silver, Broadnax's brain would not have been fully developed at the time of the offenses because he was only nineteen years old. 50 RR 45. Dr. Frank Lane, a jail physician who treated Broadnax, testified that Broadnax explained to him that he was having hallucinations, was paranoid, and did not remember talking to the media. *Id.* at 77–82, 86. Broadnax also told him that he had used PCP at the time of the offense. Dr. Lane thus concluded that Broadnax was most likely suffering from mood and perceptual disturbances due to prior PCP use. *Id.* at 88–89.

According to Dr. Lane, PCP can be stored in the fat cells of the brain and its effects can reoccur for some time after use of the drug. *Id.* After a follow-up interview several months later, Dr. Lane explained that Broadnax's drug-induced psychosis symptoms had subsided but that he was suffering from post-

~ 11 ~

traumatic stress disorder and he displayed signs of having antisocial personality disorder. *Id*. at 97–99. In addition, addiction expert Dr. John Roache testified that based on his review of the arrest video, the media interviews, and Broadnax's medical records, he believed that Broadnax was still under the effects of PCP at the time he gave the interviews to the media. *Id*. at 171–72; 175–76; 200–01.

Broadnax also called Tre'Vaun Miller, who testified that he had fought with Broadnax during a recreation time. *Id*. at 280–81. According to Miller, in response to his complaints about being in jail, Broadnax told him to "chill and give it up to God." *Id*. at 284–85, 287. Angered by this advice, Miller assaulted Broadnax who only hit him back in self-defense. *Id*. at 286.

Much of Broadnax's evidence at punishment focused on testimony from his family about his difficult his childhood. Most notably, his mother's cousin, Clara Holyfield, testified that Broadnax was sweet when he was a child and respectful of his elders. 50 RR 227–37. She recalled that Broadnax's mother was once arrested for abusing one of her daughters. *Id*. at 237. Teresa Thompson, Broadnax's aunt, explained that he had to live in a lot of different places because his mother moved around when he was young. *Id*. at 248–50. She testified that Broadnax's mother was "kind of unstable" and that "she wasn't the best mother." *Id*. at 258.

~ 12 ~

Broadnax's mother, Audrey Kelley, testified that Broadnax's father was violent and abusive towards her, but not towards her children. *Id*. at 304. There were times when Broadnax would attempt to intercede to stop his father from abusing her. *Id*. at 43–46. She explained that when she tried to leave Broadnax's father, he ran her car off the road while her children were in it. *Id*. at 306. She also recounted that she went to prison for six months for writing hot checks when Broadnax was twelve or thirteen. 51 RR 44. She testified that Broadnax lived for brief periods with different relatives. Id. at 43–45. 70–71, 100. She also explained that other men she had relationships with had been abusive to her and to her daughter. *Id*. at 51–52, 71.

Further, Kevon Eason, Broadnax's cousin, testified that when Broadnax was sent to live with his great aunt, she treated him poorly. *Id*. at 236–37. Jackie Aaron, another relative of Broadnax, confirmed that Broadnax's mother often "dropped him off" with different relatives, and that his great aunt would hit him with her hands and throw things at him.  260–61, 265–68. Juanita Mayes also testified that Broadnax's mother would hit and abuse him and that "he took some licks." 52 RR 42–43. Broadnax's sister, NiQuia Winn testified that she was abused by her great aunt and her mother, and recalled an incident when her mother broke her arm. *Id*. at 103–04.

## ARGUMENT

Confined pursuant to a presumptively valid state court judgment, Broadnax is entitled to relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Thus, any claims he raises that are based solely on alleged violations of state law should be denied as a matter of law.

Habeas relief is also inappropriate for claims that are either unexhausted and procedurally defaulted or claims that are exhausted yet were dismissed in a successive state habeas application and, thus, are also procedurally defaulted. Indeed, under the AEDPA, a federal habeas petition shall not be granted unless:

    (A)   the applicant has exhausted the remedies available in the courts of the State; or

    (B)   (i)    there is an absence of available State corrective process; or

            (ii)   circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1). Moreover, a writ may be denied on the merits, notwithstanding any failure to exhaust available state court remedies. 28 U.S.C. § 2254(b)(2).

Regarding exhausted claims that were adjudicated on the merits, federal habeas relief cannot be granted unless that adjudication:

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d). The Supreme Court has explained that a state court decision is "contrary to" clearly established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or confronts facts that are "materially indistinguishable" from relevant Supreme Court precedent but reaches an opposite result.[4] (*Terry*) *Williams*, 529 U.S. at 405-06.

A "run-of-the-mill" state court decision applying the correct Supreme Court rule to the facts of a particular case is to be reviewed under the "unreasonable application" clause. *Id.* at 406. To this end, a state court unreasonably applies Supreme Court precedent *only if* it correctly identifies the governing precedent but unreasonably applies it to the facts of the particular case. *Id.* at 407–09. And as the Court recently described this

---

[4]     "Clearly established Federal law" refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (citing (*Terry*) *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). "In other words, 'clearly established federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court reaches its decision." *Id.* at 71–72 (citing (*Terry*) *Williams*, 529 U.S. at 405, 413, and *Bell v. Cone*, 535 U.S. 685, 698 (2002)).

deferential standard, in order to determine if the state court made an unreasonable application, a federal court "must determine what arguments or theories supported or … *could have supported*, the state court's decision; and then it must ask *whether it is possible fairminded jurists could disagree* that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (emphasis added). Indeed, this is the "only question that matters under § 2254(d)(1)." *Id*.

Thus, "a state court's only decision that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the state court's decision. *Id*. (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2002)); *see also Woodford v. Visciotti*, 537 U.S. 19, 27 (2002) (federal habeas relief is only merited where the state court decision is both incorrect *and* objectively unreasonable, "whether or not [this Court] would reach the same conclusion"). Moreover, "evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway the courts have in reaching outcomes in case-by-case determinations." *Alvarado*, 541 U.S. at 644. This is particularly true when reviewing a state court's application of *Strickland v. Washington*,[5] that when

---

[5]      466 U.S. 668 (1984).

~ 16 ~

analyzed in conjunction with § 2254(d) creates a difficult and "doubly" deferential assumption in favor of the state court denial. *Richter*, 562 U.S. at 105.

Under this standard, even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. *Id* at 102–03.

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops just short of imposing a complete bar on federal litigation of claims already rejected in state court. It preserves the authority to issue the writ in cases where there is *no possibility fairminded jurists could disagree* that the state court's decision conflicts with [the Supreme] Court's precedents. It goes no farther. [28 U.S.C. §] 2254(d) reflects the view that habeas corpus is a "guard against *extreme malfunctions* in the state court criminal justice systems, *not a substitute for ordinary error correction through appeal*."

*Id*. (emphasis added, internal citations omitted).

Further, it is a state court's "ultimate decision" that is to be tested for unreasonableness," "not every jot of its reasoning." *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001); *see also Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (holding that a federal court's "focus on the 'unreasonable application' test under [§] 2254(d) should be on the ultimate legal conclusion the state court reached and not on whether the state court considered and discussed every angle of the evidence"); *Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002) ("[W]e review on the state court's decision, not its reasoning or written opinion[.]"). And a state court's decision need not expressly cite any

federal law or *even be aware of* applicable Supreme Court precedent in order to be entitled to deference. *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003); *Early v. Packer*, 537 U.S. 3, 8 (2002) (state court decision must be upheld so long as the result does not contradict Supreme Court precedent). A state court's decision also need not specifically address the federal constitutional claim. *See Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013) ("When a state court rejects a federal claim without expressly addressing the claim, a federal court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted.").

If the Supreme Court has not "broken sufficient legal ground to establish [a] . . . constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar" under either the "contrary to" or "unreasonable application" standards. (*Terry*) *Williams*, 529 U.S. at 381; *see also Lopez v. Smith*, 135 S. Ct. 1, 4 (2014) (explaining that circuit "precedent cannot refine or sharpen a general principle of Supreme Court jurisprudence into a specific rule that this Court has not announced[]") (internal quotation marks and citation omitted); *Marshall v. Rodgers*, 133 S. Ct. 2446, 1450–451 (2013) ("Although an appellate panel may, in accordance with its usual law-of-the-circuit procedures, look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established Supreme Court precedent, . . . , it may not canvass

~ 18 ~

circuit decisions to determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to this Court, be accepted as correct." (citations omitted)).  Stated differently,

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there *was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

*Richter*, 562 U.S. at 103 (emphasis added). And a federal court must be wary of circumstances where it must "extend a [legal] rationale" of the Supreme Court "before it can apply it to the facts at hand" because such a process suggests the proposed rule is not "clearly established." *Alvarado*, 541 U.S. 666; *see also White v. Woodall*, 134 S. Ct. 1697, 1706 (2014) (explaining that § 2254(d) "provides a remedy for instances in which a state court unreasonably *applies* [the] Court's precedent; it does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error.").

Regarding questions of fact, federal courts must presume correct the factual findings of the state courts unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. §2254(e)(1). "This presumption not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state

court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).

Additionally, except for the narrow exceptions contained in § 2254(e)(2), the evidence on which a petitioner would challenge a state court finding must have been presented to the state court. *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011) (explaining that § 2254(d)(1) "refers, in the past tense, to a state court adjudication that 'resulted in' a decision that was contrary to, or 'involved' an unreasonable application of, [clearly] established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at the time, i.e., the record before the state court."). Further, because a federal habeas court is also prohibited from granting relief unless a decision was based on an "unreasonable determination of the facts in light of the evidence *presented in the state court proceeding*," it follows that demonstrating the incorrectness of a state court finding of fact based on evidence not presented to the state court would be of no use to a habeas petitioner. 28 U.S.C. § 2254(d)(2) (emphasis added).

I.    **Broadax Is Not Entitled to Relief on His Claims Related to the Admission of Statements Made During His Media Interviews. (Claims 1–6).**

Broadnax raises various claims asserting that the admission of media interviews that were conducted while he was in prison awaiting trial violated

his constitutional rights. The manner in which these issues were raised in state court and how those state court claims correspond with his current claims is complicated, and there are multiple reasons why each claim fails. However, ultimately, all of the claims must be denied for the simple reason that the state court, both on direct appeal and state habeas, reasonably determined that the media reporters were not agents of the State.

## A.   Relevant facts

During trial, the State played recordings of Broadnax's interviews with reporters from multiple local media outlets conducted while he was in custody. 45 RR 117, 270–71; 46 RR 216, 219; SX 18, 403–07. Broadnax agreed to, and participated in, the interviews after he initially appeared before the magistrate on July 21, 2008, and before he was appointed counsel on July 24th, 2008. 3 (State Habeas Reporter's Record) SHRR 136–39 (state habeas testimony of Brad Lollar). In the interviews, Broadnax confessed to shooting the victims, rifling through their pockets, and stealing their cars; he also stated that he had no remorse for the killings. SX 18, 403–07.

Prior to trial, Broadnax moved to suppress the recordings on the grounds that they violated multiple constitutional and state statutory rights. 43 RR 102–15. The trial court held a hearing on the motion to suppress at which all of the reporters testified that they were not employed by law enforcement, that their respective stations had initiated the interviews by sending interview

~ 21 ~

request forms that were signed by Broadnax, and that no law enforcement officer had asked them to conduct the interviews.[6] 43 RR 5, 7, 10, 36–37; 40–64; 66, 84–85; 88–89. The trial court denied the motion to suppress.

### B.    State court proceedings

Broadnax raised claims challenging the admission of his media interviews both on direct appeal and in his state habeas application. On direct appeal, Broadnax argued that because the media reporters were acting as de facto agents of the state, they violated his Sixth Amendment right to counsel and Articles 38.22 and 38.23 of the Texas Code of Criminal Procedure when they interviewed him outside the presence of counsel. Appellant's Brief at 86–92 (Issue 27). The CCA rejected this claim finding that the media reporters were not de facto agents of the State. *Broadnax v. State*, 2011 WL 6225399, at *10.

---

[6]    Copies of some of the signed interview request forms were admitted during the state habeas hearing. 4 SHRR at Exhibit B. These forms were therefore before the court on state habeas review, but not direct appeal.

In his state habeas application, Broadnax raised four separate claims relating to the admission of the interviews. First, he argued that the Texas Fair Defense Act and the procedures for appointment employed in this case violated his Sixth Amendment right to counsel because they did not ensure that he was appointed counsel during his media interviews, which was a "critical stage" of his proceedings; second, he argued that his equal protection rights were violated because he was not appointed counsel at the same time as his co-defendant; third, he argued that his constitutional rights were violated because he did not voluntarily consent to the media interviews; finally, he argued that his counsel provided ineffective assistance by failing to properly challenge the admissibility of the media interviews on Sixth Amendment grounds. 1 State Habeas Clerk's Record (SHCR) at 30–53. The state habeas court determined that some of these claims were procedurally barred, and that they all lacked merit. 3 SHCR 226–33 (¶¶ 6–68).

### C.    Broadnax's claim that the media interviews violated his Fifth Amendment protection against self-incrimination is procedurally barred and meritless (Claim 1).

Broadnax contends that his Fifth Amendment protection against compelled self-incrimination was violated by the media interviews. Petition at 17–25. This claim is procedurally barred and, alternatively, lacks merit.

### 1.   The claim is procedurally barred.

In his petition, Broadnax argues that he unambiguously raised his Fifth Amendment claim on direct appeal. Petition at 24–25. The record establishes otherwise.[7] Instead, Broadnax argued that because the media reporters were acting as de facto agents of the state, they violated his Sixth Amendment right to counsel, and Articles 38.22 and 38.23 of the Texas Code of Criminal Procedure when they interviewed him outside the presence of counsel. Appellant's Brief at 86–92 (Issue 27). In raising this claim, Broadnax relied on *Massiah v. United States*,[8] which held that the State commits a Sixth Amendment violation if, through use of its agents, it "deliberately elicits" incriminating information from a defendant without access to an attorney after the defendant's right to counsel has attached. *Id*. In his direct appeal brief,

---

[7]     While Broadnax understandably does not mention it for purpose of exhaustion in relation to this claim, he did nominally raise a Fifth Amendment claim in his state habeas application. However, the state habeas Fifth Amendment claim alleges that the state did not appoint an attorney quickly enough and does not in any way correspond his current Fifth Amendment claim, which is based on *Miranda*. 1 SHCR at 30–41. Moreover, even if it did, the state court applied a procedural bar to the claim: "Broadnax's allegation that the media interviews violated his constitutional rights to procedural and substantive due process could have been but was not presented on appeal. Therefore this claim is procedurally barred." 3 SHCR 227 (¶ 11). Accordingly, even if Broadnax's current Fifth Amendment claim were raised on state habeas, it would still be defaulted on federal habeas.

[8]     377 U.S. 201 (1964).

Broadnax explained, "the issue is whether the reporter became an agent of the state." *Id.* at 91.

The CCA rejected this claim finding that because there was no legal support for Broadnax's contention that the media reporters were de facto agents of the State and because "all four interviewers testified that they had no such agreement with law enforcement personnel, and [Broadnax] points to no evidence of any agreement," Broadnax could not show a constitutional violation. *Broadnax v. State*, 2011 WL 6225399, at *10. In making this determination on Broadnax's Sixth Amendment claim, the state court appropriately relied on its own precedent from *Escamilla v. State*, which likewise addressed a Sixth Amendment claim and applied the "deliberate elicitation" test from *Massiah* and other Supreme Court Sixth Amendment

jurisprudence.[9] *Id.* (citing *Escamilla v. State*, 143 S.W.3d 814, 824 (Tex. Crim. App. 2004); *see, e.g., Massiah*, 377 U.S. at 204.

Accordingly, it is clear from the record that Broadnax did not raise, and the CCA did not address, a claim alleging a Fifth Amendment violation; thus, his current claim is unexhausted.[10] *Rodriguez v. McKaskle*, 724 F.2d 463, 466 (5th Cir. 1984) (explaining that to have exhausted his state remedies, a habeas petitioner must have fairly presented the substance of his claims to the state courts) (citing *Vela v. Estelle*, 708 F.2d 954, 958 (5th Cir. 1983)); *Whitehead v.*

---

[9]     The Director notes that in the present case and in *Escamilla*, the CCA referred to *Miranda*, a Fifth Amendment case, in addressing Sixth Amendment and state law statutory claims. *Broadnax v. State*, 2011 WL 6225399, at *10 ("Specifically, [Broadnax] argues that these reporters were *de facto* agents of the State, and, as such, were required to properly *Mirandize* [Broadnax] in compliance with the United States Constitution and the Texas Code of Criminal Procedure."); *Escamilla*, 143 S.W.3d at 824. Referencing *Miranda* rights in response to a Sixth Amendment claim is not inappropriate as the Supreme Court has held that whether or not a defendant has been *Mirandized* is relevant to whether or not a defendant's Sixth Amendment rights have been waived. *See, e.g.*, *Montejo v. Louisiana*, 556 U.S. 778, 787–99 (2009) (even after attachment of Sixth Amendment rights, defendant can waive right to an attorney during custodial interrogation); *Kansas v. Ventris*, 556 U.S. 586, 595 (2009) (opinion explaining that no *Miranda* warnings were given in its analysis of a *Massiah* claim). Further, the CCA's citation to *Miranda* may have only related to Broadnax's state court claim that the media interviews violated his statutory rights under Texas Code Criminal Procedure Article 38.22, which essentially requires compliance with *Miranda*. In any event, the CCA's citation to *Miranda* in this case does not convert its analysis of a Sixth Amendment issue into a holding on a Fifth Amendment issue.

[10]     The Director notes that in its initial response to Broadnax's state habeas application, the State incorrectly argued that "the trial court's ruling on the admissibility of the media interviews was solely on Fifth Amendment grounds . . . . 2 SHCR 149. However, the state habeas court disagreed, properly finding that on direct appeal, the CCA "rejected [Broadnax's Sixth Amendment claim that the reporters were acting as agents of the State during the interviews." 3 SHCR 227 (¶ 14).

*Johnson*, 157 F.3d 384, 387 (5th Cir. 1998) ("A federal court claim must be the 'substantial equivalent' of one presented to the state courts if it is to satisfy the 'fairly presented' requirement.") (citing *Picard v. Connor*, 404 U.S. 270, 275–78 (1971)). Here, the CCA did not have an opportunity address Broadnax's current Fifth Amendment argument—or any of the law upon which he now relies—because the claim was not presented in state court.

Moreover, the normal rule that a state court must explicitly apply a procedural bar to preclude federal review does not apply to those cases where a petitioner has failed to exhaust his state court remedies, and the state court to which he would be required to present his unexhausted claims would now find those claims to be procedurally barred. *Coleman v. Thompson*, 501 U.S. 722, 735 n.1. (1991). In such cases, the federal procedural default doctrine precludes federal habeas corpus review. *Id*. Here, the CCA would find Broadnax's Fifth Amendment claim to be procedurally barred under the Texas abuse-of-the-writ doctrine. *See Nobles v. Johnson*, 127 F.3d 409, 423 (5th Cir. 1997) (finding an unexhausted claim, which would be barred by the Texas abuse-of-the-writ doctrine if raised in a successive state habeas petition, to be procedurally barred). Because Broadnax has failed to argue, much less establish, cause and prejudice or a miscarriage of justice, this claim is procedurally barred. *See Coleman*, 501 U.S. at 749–50 (explaining that the federal procedural default doctrine precludes federal habeas corpus review

unless the petitioner establishes cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrates that failure to consider the claim will result in a fundamental miscarriage of justice).

### 2. Alternatively, Broadnax's Fifth Amendment claim lacks merit.

If this Court determines that Broadnax's Fifth Amendment claim was raised on direct appeal, it was reasonably rejected by the CCA. [11] As an initial matter, Broadnax's complaints related to the alleged "police" interrogations after he had been charged implicate the Sixth not the Fifth Amendment. *See Patterson v. Illinois*, 487 U.S. 285, 293 (1988) (addressing a post-charging interrogation by police as a potential Sixth Amendment violation); *see also Montejo v. Louisiana*, 556 U.S. 778, 787–99 (2009) (same, even in consideration of whether a *Miranda* waiver was appropriate). This is likely the reason that the claim was raised and addressed as a Sixth Amendment claim in state court. For this reason alone, Broadnax's Fifth Amendment claim fails.

---

[11]   Given that Broadnax has not alleged and cannot establish cause or prejudice for the default of his Fifth Amendment claim, this Court could only reach the issue upon a finding that it was raised and rejected in state court. Accordingly, the AEDPA standard of review would apply to the state court's decision. Importantly, as explained further below, if anything, the Supreme Court and Fifth Circuit have more strictly required state involvement for Fifth Amendment claims, in fact only holding that Fifth Amendment warnings need be given by official State employees or courts. It thus follows that, while the Supreme Court has never applied *Massiah* to Fifth Amendment claims, the CCA's determination that under Sixth Amendmendment jurisprudence, the reporters were not state agents is dispositive of Broadnax's Fifth Amendment claim. *See below*, Section I(A)(3),

But more importantly, to the extent the Fifth Amendment is implicated, Broadnax entirely fails to show that any interrogation was made "by the authorities" as required under *Miranda*. 384 U.S. at 478 ("when an individual is taken into custody or otherwise deprived of his freedom *by the authorities* in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized.") (emphasis added); *see Dickerson v. United States*, 530 U.S. 428, 435, (2000) (explaining that *Miranda* "laid down 'concrete constitutional guidelines *for law enforcement agencies* and courts to follow'") (emphasis added). Instead, he agreed to interviews with the media. Recognizing this fact, Broadnax appears to entirely rest his *Miranda* claim on an assertion that these interviews were conducted "in coordination with the

Dallas County Sheriff's Office.[12] Petition at 18.   However, in response to Broadnax's claim that his rights under state law and the Sixth Amendment were violated, the CCA expressly, and appropriately, found that the reporters had no agreements with the State and were not acting at the behest of the State when they interviewed Broadnax.[13]   *Broadnax v. State*, 2011 WL 6225399, at *10. Necessarily, the media had to coordinate with officials at the

---

[12]   Broadnax contends that the test to ascertain whether a private party functioned as an instrument of the State for Fourth Amendment purposes from *United States v. Blocker* should be applied to his Fifth Amendment claim. 104 F.3d 720, 726 (5th Cir. 1997) (establishing a two-pronged test to ascertain whether a private party functioned as an "instrument or agent" of the State for Fourth Amendment purposes:"(1) whether the Government knew or acquiesced in the intrusive conduct; and (2) whether the private party intended to assist law enforcement efforts or to further his own ends"). However, Broadnax provides no legal support whatsoever for his proposition that this test should apply to a Fifth Amendment claim. Rather, as explained above, the Supreme Court has only applied Fifth Amendment requirements to law enforcement and courts. *See Miranda*, 384 U.S. at 478; *Dickerson*, 530 U.S. at 435. Indeed, the use of *Blocker* in the Fifth Amendment context or in these circumstances is not possible as the first prong of the test, asking whether the state knew or acquiesced in the intrusive conduct, cannot be applied. Whereas in a Fourth Amendment case the private party has allegedly engaged in intrusive conduct by obtaining private information from the defendant; here media interviews cannot be considered constitutionally "intrusive conduct." *Blocker*, 104 F.3d at 726 (explaining that there was no Fourth Amendment violation, even if the private party was acting as an agent of the state because the private party did not "intrude upon a reasonable expectation of privacy").

In addition, *Blocker* is a Fifth Circuit case and therefore is not the measure of the reasonableness of the state court's decision in this case. Finally, even if *Blocker* applied, these circumstances fail to satisfy it. In particular, Broadnax cannot show that the media reporters were intending to assist the State. *Id.* at 725.

[13]   Broadnax also refers to evidence that was submitted on state habeas review in support of this claim. Petition at 20–22. However, he asserts he exhausted this claim on direct appeal. Because this evidence was not presented to the state court in connection to this claim, this Court may not consider it. *Pinholster*, 563 U.S. at 181–82. In any event, none of the state habeas evidence contradicts the suppression hearing testimony or shows that the reporters were acting as agents of the state.

sheriff's department in order to have access to Broadnax in prison. 43 RR 9–10, 41, 65–66, 87–89 (interviewers testified that fax requests were sent to Dallas County Sherriff's Office Public Information Officer Kim Leach and that they spoke with Leach when they arrived at the prison); 47 RR 121–48 (Kim Leach's testimony related to her role in facilitating the media requests and scheduling the interviews). However, Broadnax fails to show any State action beyond this coordination, the transportation of Broadnax, and the provision of security during the interviews. 47 RR 160–66 (Dallas County Sherriff's Department Mental Health Service Officer Christie Hicklen's testimony that Dallas County personnel transported Broadnax and provided security during the interviews). Instead, all of the reporters expressly testified that the interviews were initiated by their respective media outlets on their own accord and that they were under no agreement with the State. 43 RR 5, 7, 10, 36–37; 40–64; 66, 84–85; 87–89.

Nonetheless, Broadnax contends that the Supreme Court case *Mathis v. United States*[14] supports his position. Petition at 19, 23. However, *Mathis* is entirely inapposite. In *Mathis,* a United States IRS agent elicited incriminating statements from an inmate serving time in a state jail on a state conviction. 391 U.S. at 2–3. The information was then used to convict the inmate for a federal crime in a United States District Court. *Id.* The Supreme Court determined that the defendant's Fifth Amendment rights were violated because the IRS agent, who the Court explained was a "government agent," did not read him his *Miranda* rights.[15] *Id.* at 2–6. The Fifth Circuit has expressly declined to extend the *Mathis* holding to individuals not serving in a law-enforcement capacity. *See Powell v. Quarterman,* 536 F.3d 325, 343 (5th Cir. 2008); *see also Burton v. Thaler*, 863 F. Supp. 2d 639, 656 (S.D. Tex. 2012) (discussing *Powell*). As explained in detail above, here, unlike in *Mathis*, the media reporters were not state agents.

Likewise, contrary to his assertions, *Estelle v. Smith*[16] provides no support for Broadnax's claim. Petition at 19, 23. In *Smith*, the Supreme Court

---

[14]    391 U.S. 1 (1968).

[15]    *Mathis* implicated the Fifth Amendment not the Sixth Amendment because the defendant was not charged with the federal offense when he was interrogated by the IRS agent. *Id.* at 2–4.

[16]    451 U.S. 454 (1981).

held that a defendant's Fifth Amendment rights were violated when a defendant was administered an un-*Mirandized*, court-ordered psychiatric examination that was admitted by the State at punishment to prove that the defendant was a future danger. 451 U.S. at 466–69. In this regard, the Court held, "A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding."[17] *Id.* at 468. The Supreme Court has only applied its holding in *Smith* to the "distinct circumstances" of that case and has "never extended [its] Fifth Amendment holding beyond its particular facts." *Penry v. Johnson,* 532 U.S. 782, 795 (2001). The present case differs dramatically from *Smith* because in *Smith* the defendant was *ordered* by the trial court to submit to the evaluation, and, likewise, the psychiatrist was directed by the court to conduct the exam; whereas here, Broadnax's interviews were not court-ordered, and the media reporters were not acting at the behest of the court or the prosecution.

---

[17]    Notably, in *Smith*, the Supreme Court, determined that a Fifth Amendment violation occurred even though the defendant had already been charged. 451 U.S. at 466–69. This is likely due the fact that the psychiatric evaluation was actually court ordered—as opposed to a police interrogation which implicates a Sixth Amendment violation—and the defendant had no choice whether or not to participate. In addition, the Court issued its holding in *Smith* in 1981, well before case-law establishing that a post-charging interrogation implicates the Sixth Amendment. *See, e.g., Patterson*, 487 U.S. at 293.

In sum, even if his claim were not procedurally barred and the Fifth Amendment were implicated, Broadnax fails to show a violation because he cannot establish that the media reporters were agents of the state. For the foregoing reasons, his Fifth Amendment claim must be denied.

### 3.   Alternatively, the state court reasonably rejected Broadnax's Sixth Amendment claim.

To the extent Broadnax's Fifth Amendment claim could be re-characterized as a Sixth Amendment claim, as it was raised in state court, it was reasonably denied by the CCA.[18] As explained above, on direct appeal, Broadnax argued that his Sixth Amendment rights were violated when the media, allegedly acting on behalf of the State, conducted uncounseled interviews. Appellant's Brief at 89–92. In this regard, Broadnax properly framed the question: "the issue is whether the reporter[s] became [agents] of the state." *Id*. at 91. The CCA reasonably, and properly, determined that they did not. *Broadnax v. State*, 2011 WL 6225399, at *10.

Once the Sixth Amendment has attached, the government may not "deliberately elicit" incriminating statements from the defendant without the presence of his attorney. *See United States v. Henry*, 447 U.S. 264, 270 (1980)

---

[18]   The Director contends that it is clear from Broadnax's petition that he did not raise a Sixth Amendment claim that corresponds to his direct appeal argument, but addresses the reasonableness of the state court's ruling on this issue out of an abundance of caution.

(outlining the deliberate-elicitation standard). Under *Massiah,* the Sixth Amendment is implicated when an undercover officer or unidentified informant acting at the behest of the State questions the defendant. *See United States v. Fields*, 761 F.3d 443, 478 (5th Cir. 2014) (citing *United States v. Cutno*, 431 Fed. Appx. 275, 280 (5th Cir. 2011)). "A *Massiah* violation has three elements: (1) the Sixth Amendment right to counsel has attached; (2) the individual seeking information from the defendant is a government agent acting without the defendant's counsel being present; and (3) that agent 'deliberately elicit[s]' incriminating statements from the defendant." *Henderson v. Quarterman*, 460 F.3d 654, 664 (5th Cir. 2006). The Fifth Circuit holds that one is considered an agent of the government for *Massiah* purposes where one "(1) was promised, reasonably led to believe, or actually received a benefit in exchange for soliciting information from the defendant; and (2) acted pursuant to instructions from the State, or otherwise submitted to the State's control." *Creel v. Johnson*, 162 F.3d 385, 393–94 (5th Cir. 1998).

The primary concern of *Massiah* is the "secret interrogation by investigatory techniques that are the equivalent of direct police interrogation." *Kuhlman v. Wilson,* 477 U.S. 436, 459 (1986). But "the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached." *Maine v. Moulton*, 474 U.S. 159, 176 (1985).

Here, the record establishes that the reporters interviewed Broadnax as part of their role as members of the media. Each reporter expressly testified that their respective outlets initiated the interviews on their own behalf and that they had no agreement with the State. 43 RR 5, 7, 10, 36–37; 40–64; 66, 84–85; 87–89. Broadnax entirely fails to show either that the reporters received any benefit from, or that they were acting under the control of, the State. *See Creel*, 162 F.3d at 393–94. For these reasons, the CCA reasonably determined that the reporters were not state agents, and therefore, that the State had not violated Broadnax's Sixth Amendment rights.

> **D.   Broadax's claim that his Sixth Amendment rights were violated because he was denied access to counsel during a critical stage of his proceedings is procedurally barred and meritless. (Claim 2).**

Broadnax contends that his Sixth Amendment right to counsel was violated because he was not provided with counsel at or before his media interviews, which he asserts constituted a critical stage of his trial. Petition at 36–44. This claim is procedurally barred and lacks merit.

### 1.   The claim is procedurally barred.

In his state habeas application, Broadnax alleged that his Sixth Amendment rights were violated because the Texas Fair Defense Act,  both facially and as applied by the Dallas County procedures for appointment of counsel in his case, did not ensure that he was appointed an attorney at a

critical stage of his trial. 1 SHCR 30–41. In response to this claim, the state habeas court held, "[Broadnax] could have but did not previously assert at trial or on appeal that the Texas Fair Defense Act and the Dallas County Procedures for the Appointment of Counsel in Death Penalty Cases are unconstitutional. Therefore, these claims are procedurally barred." 3 SHCR 226 (¶ 9). Indeed, the state habeas court determined that these claims were procedurally barred for two separate reasons: (1) because Broadnax failed raise the argument at trial, and (2) because he could have, but did not, raise the issue on direct appeal. *Id.*

In his petition, Broadnax contends that his current "critical stage" Sixth Amendment violation claim is exhausted because he, "unambiguously advanced the claim that he was denied his Sixth Amendment right to counsel at trial, and on direct appeal before the [CCA]." Petition at 44 (citations omitted). As explained in detail above, Broadnax did raise a claim on direct appeal that his Sixth Amendment rights were violated because the media defendants, acting as agents of the state, deliberately elicited incriminating information from him. *See above*, Section IA. However, the record flatly refutes the assertion that he argued that he was denied counsel at a critical stage of his trial on direct appeal; instead, that claim was raised in his state habeas

~ 37 ~

application, and the state habeas court determined that it was procedurally barred because it should have been raised at trial or on direct appeal.[19]

In his federal petition, Broadnax delineates two separate arguments: (1) that his Sixth Amendment rights were violated because he was deprived of counsel at a critical stage of his trial, which he contends was raised on direct appeal; and (2) that the Texas Fair Defense act is unconstitutional, which he admits was raised and procedurally barred on state habeas review.[20] Petition at 48. However, these arguments were raised together as one assertion in his

---

[19]     In support of his contention that he raised this claim on direct appeal, Broadnax points to the state habeas court's findings that the CCA, on direct appeal, rejected his "Sixth Amendment claim that the reporters were acting as agents of the State during the interviews[,]" and that he was "procedurally barred from relitigating the issue of State agency on habeas and, thus, his Sixth Amendment claim should be dismissed." Petition at 44 n. 19 (citing 3 SHCR 227 (¶¶ 14–15)). In context, it is clear that the state habeas court held that the CCA's determination on State agency— which he was barred from relitigating—was dispositive of his Sixth Amendment critical stage argument, not that he had actually raised a critical stage argument on direct appeal. Indeed, when the Court addressed the merits of the critical stage argument in the alternative, it explained, "Because the reporters were not acting as agents of the State during their interviews, the interviews were not critical stages." 3 SCHR 228 (¶ 24).

[20]     Broadnax argues that his procedural default of the challenge to the Texas Fair Defense act is excused. The Director addresses that argument in the following section. *See* Section I(E)(1).

state habeas application.[21] SHCR 30–41. And as explained above, the state habeas court applied two adequate and independent state procedural bars. *See Styron v. Johnson*, 262 F.3d 438, 453–54 (5th Cir. 2001) (explaining the Texas contemporaneous objection rule is an adequate and independent state ground that bars federal habeas review); *Aguilar v. Dretke,* 428 F.3d 526, 535 (5th Cir. 2005) (recognizing application Texas's procedural default rule concerning the requirements that record claims must be raised on direct appeal as a bar to federal habeas review). Federal habeas review of a claim is procedurally barred if the last state court to consider the claim "clearly and expressly" based its denial of relief on an "independent and adequate" state procedural rule. *Glover v. Cain,* 128 F.3d 900, 902, (5th Cir. 1997). Because Broadnax fails to show

---

[21]    There is no indication whatsoever from Broadnax's state habeas application that the critical stage argument and the challenge to the Fair Defense Act are separate claims. Even the titles of the sections and issues listed in the table of contents make clear that the two arguments are indistinguishable. Section B(3) states, "Both on its face and as applied the Texas Fair Defense Act, and the Dallas County Procedures implementing it, violated Mr. Broadnax's substantive 6th and 14th amendment Right to Counsel and due process of law . . .". 1 SHCR 4. Subsection (b) under section (B)(3) is "Media Interviews A 'Critical Stage'." *Id*.

cause and prejudice for his default, the claim is likewise barred on federal habeas review.[22] *See Coleman*, 501 U.S. at 749–50.

### 2. The state court reasonably determined that the media interviews did not constitute a "critical stage" of the proceedings.

Broadnax appeared before a magistrate on July 21, 2008. 4 SHRR 22, 23. He was appointed counsel, Brad Lollar, on the morning of July 24, 2008, within three days of his initial appearance before the magistrate. 3 SHRR 136–39; Tex. Code Crim. Proc. Ann. art. 1.051(c). In the interim, Broadnax agreed to, and participated in, the four interviews with local media outlets. Broadnax's Sixth Amendment claim rests entirely on his assertion that his media interviews, and the brief period between his appearance before the magistrate and those interviews, constituted a critical stage of his trial, during which he was deprived of counsel by the Texas Fair Defense act and its application by Dallas County.

---

[22]    Curiously, Broadnax also asserts that this Court "should review this claim *de novo* because the Texas Court of Criminal Appeals did not actually rule on whether Mr. Broadnax's Sixth Amendment rights were violated." Petition at 45. However, the CCA expressly ruled on the merits of the version of Broadnax's Sixth Amendment claim raised on direct appeal, *Broadnax v. State*, 2011 WL 6225399, at *10, and the state habeas court alternatively ruled on merits of the version of his Sixth Amendment claim raised in his state habeas application. 3 SHCR 227–29 (¶¶ 16–29). These determinations are entitled to AEDPA deference. *See Busby v. Dretke,* 359 F.3d 708, 721 n.14 (5th Cir. 2004) (affording deference to merits finding when state court "invoked a procedural bar as an alternative basis to deny relief").

An accused is guaranteed his right to counsel during all critical stages of his trial; "[t]he cases have defined critical stages as proceedings between an individual and agents of the State, whether 'formal or informal, in court or out,' that amount to 'trial-like confrontations,' at which counsel would help the accused 'in coping with legal problems or . . . meeting his adversary[.]'" *Rothgery v. Gillespie Cnty., Tex.*, 554 U.S. 191, 212 n. 16. (2008) (citations omitted); *see also United States v. Wade*, 388 U.S. 218, 226 (1967) ("the accused is guaranteed that he need not stand alone *against the State* at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial" (emphasis added)); *United States v. Ash*, 413 U.S. 300, 314, (1973) (counsel may be required in trial-like situations where counsel is "needed to render 'Assistance' in counterbalancing any 'overreaching' by the prosecution").

Here, the state court reasonably determined that the interviews were not a critical stage of Broadnax's proceedings. Broadnax cites no legal authority for his contention that media interviews conducted within days of an initial appearance are a critical stage of a trial. Given the Supreme Court's consistent definition of a critical stage as a "trial-like" confrontation with the State, the state habeas court properly found that Broadnax's critical stage argument fails because the media reporters were not state agents. 3 SHCR 228 (¶23).

Nonetheless, Broadnax argues that the Supreme Court cases *Rothgery v. Gillespie County*, *Powell v. Alabama,*[23] and *Laffler v. Cooper*[24] support his position. In *Rothgery*, the Supreme Court held that a defendant's right to counsel attaches at the initial appearance before the court, whether it be formal or informal, and therefore that counsel must be appointed within a reasonable time of the initial appearance. 554 U.S. at 197. The Court explained that "[o]nce attachment occurs . . . counsel must be appointed within a reasonable time after attachment to allow for adequate representation at any critical stage before trial, as well as at trial itself." *Id.* at 212. However, the Court reaffirmed the definition of a critical stage as a trial-like confrontation with the State. *Id.* 212 n. 16.

Indeed, *Rothgery*'s holding did not primarily relate to or change what constitutes a critical stage; instead, the Court ruled that the county was improperly determining when the right to counsel attaches.[25] *Rothgery*, 554 U.S. at 212 ("The County thus makes an analytical mistake in its assumption

---

[23]     287 U.S. 45 (1932).

[24]     132 S. Ct. 1376 (2012).

[25]     The Fifth Circuit was also applying the wrong rule as it had held that the right did not attach at an initial appearance before a magistrate "if prosecutors are unaware of and uninvolved in the arrest and appearance." *Rothgery v. Gillespie County, Tex.*, 491 F.3d 293, 294 (5th Cir. 2007).

that attachment necessarily requires the occurrence or imminence of a critical stage."). In fact the court specifically concluded:

> Our holding is narrow. We do not decide whether the 6–month delay in appointment of counsel resulted in prejudice to Rothgery's Sixth Amendment rights, and have no occasion to consider what standards should apply in deciding this. We merely reaffirm what we have held before and what an overwhelming majority of American jurisdictions understand in practice: a criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel.

*Id.* at 213. Here, there is no dispute that Broadnax's Sixth Amendment right attached when he appeared before the magistrate. However, as Broadnax cannot show that, after attachment, he was deprived of counsel at a trial-like confrontation with the State, *Rothgery* provides no support for his claim that his Sixth Amendment rights were violated.

In *Powell*, the Supreme Court determined that the defendants were deprived of their right to counsel and a fair trial when counsel was not appointed until the morning of trial in a capital case. 287 U.S. at 56. Indeed, the Court was specifically concerned with the defendant's preparation for trial, not media interviews days after arraignment. As such, *Powell* does not support Broadnax's claim.

In *Laffler*, the Supreme Court determined that plea bargaining negotiations with the State at which trial counsel deficiently advised the

defendant to reject plea offers constituted a "critical stage" of a trial. 566 U.S. at 165. Once again, the Court held that the defendant required effective counsel for a confrontation with the State that the Court expressly reasoned was "part of the whole course of a criminal proceeding." *Id*. Here, the media interviews were neither a confrontation with the State nor part of a criminal proceeding.

In addition, Broadnax cites case law indicating that a "carnival-like" atmosphere and improper outside influences can be prejudicial at trial. Petition at 39 (citing *Rideau* v. *Louisiana*, 373 U.S. 723, 725–27 (1963), and *Sheppard* v. *Maxwell*, 384 U.S. 333, 353–58 (1966)). However, Broadnax fails to cite any law supporting a proposition that these factors render a media interview a critical stage of a trial.

Ultimately, the question before this Court extends no further than assessing the reasonableness of the state court's determination that the media interviews were not a critical stage of Broadnax's trial. In this regard the Supreme Court's opinion in *Woods v. Donald* is instructive as it demonstrates the strictness of the requirement that clearly-established law compel a conclusion that a proceeding is a critical stage. 135 S. Ct. 1372, 1378 (2015). In a unanimous opinion in *Woods*, the Court held that the state court reasonably determined that a defendant was not abandoned when his counsel was not present during the testimony of a co-defendant because the Court had never

determined that the testimony of a co-defendant represents a critical stage of a trial. The Court specifically explained:

> Because we consider this case only in the narrow context of federal habeas review, we "expres[s] no view on the merits of the underlying Sixth Amendment principle." All that matters here, and all that should have mattered to the Sixth Circuit, is that we have not held that *Cronic* applies to the circumstances presented in this case. For that reason, federal habeas relief based upon *Cronic* is unavailable.

*Id*. at 1378 (*quoting Marshall,* 133 S. Ct. at 1451. Here, like in *Woods*, as there is no Supreme Court precedent holding that a media interview is a critical stage of a trial, federal habeas relief is unavailable. Accordingly, even if it were not procedurally barred, Broadnax's claim must be denied.

### E. Broadnax's claim that the Texas Fair Defense Act is unconstitutional on its face is procedurally barred and lacks merit (claim 3).

Broadnax contends that the Texas Fair Defense Act is unconstitutional because it deprives defendants of the appointment of counsel within a reasonable time of initial appearance. Petition at 45–49. This claim is procedurally barred and lacks merit.

### 1. The claim is procedurally barred.

As explained above, in his state habeas application, Broadnax's claim that the Texas Fair Defense Act is unconstitutional was indistinguishable from his claim that he was deprived of counsel during a critical stage of his trial; for the same reasons listed above, the claim is procedurally barred on federal

habeas review. *See above*, Section I(D) (citing 3 SHCR 226 (¶ 9) (holding that the claim was procedurally barred because it was not raised at trial, and could have been, but was not, raised on direct appeal)). Broadnax admits that the state court applied procedural bars to this claim, but contends that his default is excused under the *Martinez/Trevino* exception.

Under *Martinez v. Ryan*, "inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 132 S. Ct. 1309, 1315 (2012). *Martinez*'s "narrow exception" applies to Texas's postconviction system. *Trevino v. Thaler*, 133 S. Ct. 1911, 1921 (2013). "[T]o succeed in establishing cause, the [inmate] must show (1) that his claim of ineffective assistance of counsel at trial is substantial—i.e., has some merit—and (2) that habeas counsel was ineffective in failing to present those claims in his first state habeas proceeding." *Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013). To prove a claim "substantial," a "prisoner must demonstrate that the claim has some merit." *Id*. An "insubstantial" ineffective assistance of trial counsel (IATC) claim, by contrast, is one that "does not have any merit" or is "wholly without factual support." *Id*. at 1319.

Here, as an initial matter, *Martinez/Trevino* has no impact on claims that do not allege IATC. *Davila v. Davis,* No. 16-6219, 2017 WL 2722418, at *4 (U.S. June 26, 2017); *Vasquez v. Stephens,* 597 Fed. Appx. 775, 778 (5th Cir. 2015);

*Reed v. Stephens*, 739 F.3d 753, 778 n.16 (5th Cir. 2014). Therefore, it cannot excuse the default of Broadnax's challenge to the constitutionality of a state statute.

Moreover, even if Broadnax can be understood to allege a separate claim of IATC for failing to raise a constitutional challenge at trial, his *Martinez/Trevino* allegation fails. Indeed, the reasoning of the state habeas court rejecting the constitutional challenge to the statute —which was adopted by the CCA—shows his claim of deficient performance and prejudice are insubstantial. *See Martinez*, 132 S. Ct. 1309, 1315 *Strickland*, 466 U.S. 668 at 684–690. For the foregoing reasons, *Martinez/Trevino* does not excuse the default of Broadnax's challenge to the Texas Fair Defense Act; therefore it is procedurally barred and must be dismissed.

> **2.    Alternatively, the state court reasonably rejected Broadnax's argument that the Texas Fair Defense Act violates the constitution.**

A facial challenge to the constitutionality of a statute is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Under the Texas Fair Defense Act, courts must appoint counsel on behalf of indigent defendants who request such assistance "if adversarial judicial proceedings have been initiated against the defendant . . . not later than (1) the end of the third working day after the date

on which the court or the courts' designee receives the defendant's request for appointment of counsel, if the defendant is arrested in a county with a population of less than 250,000; or (2) the end of the first working day after" receipt of a defendant's request in more populous counties. Tex. Code Crim. Proc. Ann. art. 1.051(c). Broadnax's facial challenge is linked to his previous claim that he was deprived counsel during a critical stage of his trial. As explained above, he has essentially divided his facial and as applied challenge to the statute into two separate claims. Indeed, in order to be successful in this challenge, Broadnax would need to show that the statute, on its face, deprives defendants in Texas of their right to counsel during a critical stage of trial.

In this regard, Broadnax relies on *Rothgery* for the proposition that the statute is unconstitutional on its face because counsel may not be appointed until three days after initial appearance. Petition at 46–49. As explained above, *Rothgery* held that counsel must be appointed within a reasonable time after a defendant's initial appearance to allow for adequate representation at any critical stage before trial, as well as at trial itself.   554 U.S. at 212. *Rothgery* merely disapproved of one county's practice of waiting to appoint counsel until *after* a critical stage occurs, which was based on its mistaken belief that the right to counsel did not attach at an informal initial appearance. *Id*. at 212–13. Here, Broadnax entirely fails to show that the Texas Fair Defense Act is unreasonable or that, in all of its applications, it deprives

~ 48 ~

defendants of counsel at any trial-like confrontations with that State. *See Id.* at 212, n. 16; *Wade*, 388 U.S. at 226; *Salerno*, 481 U.S. at 745. Accordingly, the state court reasonably rejected Broadnax's facial challenge to the Texas fair Defense Act.[26] 3 SHCR 227–28 (¶¶16–29). Therefore, even if it were not procedurally defaulted, this court must deny his claim.

### F. Broadnax's claim that his confession was involuntarily coerced is procedurally barred and lacks merit (Claim 4).

Broadnax contends that his confessions made in his media interviews should not have been admitted because they were involuntary. Petition at 25–33. This claim is procedurally barred and lacks merit.

### 1. The claim is procedurally barred.

Broadnax contends that he raised his claim that his confessions to the media were involuntarily coerced on direct appeal. Petition at 35. The record flatly refutes that assertion. As explained in detail above, on direct appeal, Broadnax only challenged the admissibility of his confession on the grounds that it violated Texas Code of Criminal Procedure Articles 38.22 and 38.23 and

---

[26]     Broadnax contends that this Court "should review this claim *de novo* because the state habeas tribunal did not actually rule on the constitutionality of the Texas Fair Defense Act." Petition at 49. However, after it ruled that it was procedurally barred, the state habeas court alternatively rejected the claim on the merits. 3 SHCR 227–29 (¶¶ 16–20). That determination is entitled to AEDPA deference. *See Busby,* 359 F.3d at 721 n.14 .

the Sixth Amendment because the media reporters were agents of the State. Appellant's Brief at 89–92.

Curiously, Broadnax cites a state habeas finding indicating that he could not relitigate issues related to his Sixth Amendment claim to support an assertion that the court "did not permit Mr. Broadnax to re-litigate [his involuntary confession] claim on collateral review because it had already been presented on direct appeal." *Compare* Petition at 35 n. 8 *with* 3 SHCR 227 (¶ 15) ("[Broadnax] is procedurally barred from relitigating the issue of State agency on habeas and thus his Sixth Amendment claim should be dismissed.").

Instead, in response to his claim that his consent to the media interviews was involuntary, the state habeas court determined that Broadnax "could have *but did not* raise on direct appeal the allegation that his consent to the interviews was unknowing and involuntary. Thus it is procedurally barred." 3 SHCR 233 (¶ 64) (emphasis added). Because an adequate and independent procedural rule was applied in state court, the claim is procedurally barred on federal habeas review.[27] *See Aguilar,* 428 F.3d at 535. Broadnax fails to argue

---

[27]   The Director explains below that, under Supreme Court precedent, Broadnax's federal habeas involuntary confession claim is functionally the same as his state habeas involuntary consent claim. *See* Section I(F)(2). To the extent, this Court might hold that it is a separate claim, it is procedurally barred because Broadnax did not raise the claim in state court, and the state court would now refuse to rule on its merits. *See Coleman*, 501 U.S. at 735 n.1; *Nobles*, 127 F.3d at 423.

cause or prejudice for his procedural default; accordingly, this claim must be dismissed under the federal procedural default doctrine. *Id.*

### 2. Alternatively, the state court reasonably rejected Broadnax's involuntary confession claim.

An accused is deprived of due process if his conviction rests wholly or partially on an involuntary confession. *Sims v. Georgia*, 385 U.S. 538, 543–44 (1967). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). The voluntariness of a confession is a mixed question of law and fact. *Evans v. McCotter*, 790 F.2d 1232, 1235 n.1 (5th Cir. 1986). A state court's factual findings upon which a finding of voluntariness is based are entitled to a presumption of correctness. *Id.* A voluntariness inquiry examines whether defendant's will was overborne. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26 (1973).

On federal habeas, Broadnax appears to claim that his confession itself was involuntary, an allegation of a Fourteenth Amendment violation, which is technically different than his state law claim that his consent to the interview was involuntary, which appears to implicate the voluntariness of his consent to waive his Fifth Amendment *Miranda* right. However, the Supreme Court has explained that the two claims are functionally the same. *Connelly*, 479 U.S.

at 169–70 ("There is obviously no reason to require more in the way of a 'voluntariness' inquiry in the *Miranda* waiver context than in the Fourteenth Amendment confession context. The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion."); *Dickerson v. United States*, 530 U.S. 428, 435 (2000) (explaining that "[o]ver time, our cases recognized two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment" without articulating a distinction between the two analyses).

Accordingly, the Director contends that the state court's alternative merits adjudication on the involuntary consent claim is entitled to AEDPA deference in relation to his involuntary confession claim.[28] *See Busby,* 359 F.3d at 721 n.14. The state habeas court specifically found that Broadnax's allegation in this regard was not cognizable and that he failed to show that his consent to the media interviews was unknowing or involuntary. 3 SHCR 233 (¶¶ 63, 66).

---

[28]   While there was no law cited to support the claim, the Director construes Broadnax's state habeas involuntary consent to the media interviews claim as a claim that Broadnax did not voluntarily waive his *Miranda* rights. 1 SHCR 51–52. However, in the event this Court determines that no "involuntary consent to waive *Miranda* rights" or "involuntary confession claim" was raised at all in state court, and the claim somehow overcomes the procedural bar, Broadnax would be entitled to a de novo review. Given that the interviews were not police interrogations and there was no coercive state conduct, Broadnax's claim fails even under a de novo review.

Indeed, here, Broadnax's claim attempts to fit a square peg in a round hole. To establish that a confession is involuntary, the Supreme Court has required defendants to prove that state agents coerced a confession during a police interrogation. *Connelly*, 479 U.S. at 167. However, Broadnax confessed during media interviews. As explained previously, the media reporters were not agents of the State, and Broadnax fails to cite any law indicating that the admission of a confession provided to a non-state actor is subject to voluntariness requirements. As such, the state court reasonably determined that this claim fails to state a claim of a constitutional violation.  3 SHCR 233 (¶ 63).

Further, even if the claim did implicate due process, Broadnax fails to provide any evidence that his confession was the product of police coercion. In this regard, the State's action in allowing the media to interview Broadnax in prison did not constitute coercive conduct sufficient to show that his "will was overborne." *See Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26 (1973). Moreover, Broadnax's assertion that he was "suffering from substance-induced psychosis" does not show that his confession was constitutionally involuntary. Petition at 28. The Supreme Court has explicitly held that a suspect's mental state is only relevant to the voluntariness of a confession when police exploit it with coercive tactics. *Connelly*, 479 U.S. at 165. While Broadnax points to testimony from two specialists that indicated that he may have been

~ 53 ~

experiencing delusions and acting paranoid due to drug use,[29] Broadnax fails to allege that the State, or even the reporters, took advantage of any mental impairment, other than by questioning him and allowing him to tell his story. Petition at 28 (citing 47 RR 31–35, 79–80); *See Connelly*, 479 U.S. at 167; *Schneckloth*, 412 U.S. at 225–26. In addition, to the extent Broadnax can be construed to argue that he did not voluntarily waive his *Miranda* rights or that the State failed to prove voluntariness in this regard, as explained above, his *Miranda* rights, and the State's burden to prove waiver, did not attach to interviews with non-state actors, and Broadnax fails to present any evidence of police coercion. *See* Section I(A)(2). For the foregoing reasons, even if it were not procedurally barred, this claim must be denied.

---

[29] The Director notes that testimony from multiple witnesses established that when Broadnax gave the interviews, he was of sound mind. 46 RR 231 (testimony of reporter Shawn Rabb); 47 RR 160–66 (testimony of Dallas County Sherriff's Department Mental Health Service Officer Christie Hicklen). To the extent it is relevant, this certainly provides evidence that Broadnax was not suffering from any significant mental impairment when he participated in the interview. Broadnax cites *United States* v. *Elrod*, 441 F.2d 353, 356 (5th Cir. 1971), for his contention that his demeanor and outward manifestations are irrelevant to the voluntariness inquiry. However, *Elrod* considered a defendant's capacity to consent to sign a waiver allowing the search of his property. *Id.* at 356. Whereas here, Broadnax had to show that his will was overborne by police coercion. The testimony of individuals that were present at the interviews is clearly relevant to that inquiry.

G.      **Broadnax's claim that the trial court erred by failing to hold a *Jackson v. Denno* hearing is procedurally barred and lacks merit (Claim 5).**

Broadnax contends that the trial court erred by not holding a hearing on the voluntariness of his confession. Petition at 30–31. As an initial matter, because Broadnax did not raise this claim on direct appeal or in any of his state habeas applications, and the state court would now refuse to rule on its merits, the claim is procedurally barred from federal habeas review. *See Coleman*, 501 U.S. 722, 735 n. 1; *Nobles*, 127 F.3d at 423. Broadnax fails to argue cause or prejudice for his procedural default; accordingly, this claim should be dismissed as procedurally barred. *Id.* at 749–50.

In any event, the claim lacks merit. A defendant objecting to the admission of a confession is entitled to a fair hearing in which both the underlying factual issues and the voluntariness of his confession are actually and reliably determined. *Jackson*, 378 U.S. at 377. "When the evidence clearly reflects a question of the voluntariness of a confession, the trial court must raise the issue on its own motion." *United States* v. *Guanespen-Portillo*, 514 F.3d 393, 399 (5th Cir. 2008).

Here, the trial court rejected Broadnax's assertion that his consent to the media interviews was involuntary because he could not show that the reporters were agents of the State. 41 RR 111 ("The question has to be by law enforcement officers or by agents of law enforcement."). Broadnax fails to cite

~ 55 ~

any law indicating that a court is required to hold a *Jackson* hearing to determine if a confession to non-state actors is voluntary. Moreover, here the evidence did not raise an issue of voluntariness because there was no coercive conduct by the State. *See Connelly*, 479 U.S. at 167.  Accordingly, even if the claim were not procedurally barred, it must be denied.

### H. Broadnax's claim that his trial counsel was ineffective for failing to present the expert testimony of pharmacologist, Dr. John Roache, concerning his capacity to consent is procedurally barred and lacks merit (Claim 6).

Broadnax contends that his trial counsel was constitutionally ineffective for failing to offer testimony at his suppression hearing or at the guilt/innocence stage of his trial from pharmacologist Dr. John Roache. Petition at 33–35. As an initial matter, Broadnax did not raise this claim on direct appeal or in his state habeas application, and the state court would now refuse to rule on its merits. Therefore, the claim is procedurally barred from federal habeas review. *See Coleman*, 501 U.S. 722, 735 n. 1; *Nobles*, 127 F.3d at 423. Broadnax fails to argue cause or prejudice; accordingly, this claim should be dismissed under the federal procedural default doctrine.[30] *Id*. at 749–50.

---

[30]   In the event Broadnax may claim that his default is excused under the *Martinez/Trevino* exception, the claim would fail. For the reasons stated above, Broadnax cannot show a substantial likelihood of success on the merits of his unexhausted IATC claim or that his state habeas counsel was ineffective for failing to raise the IATC claim. *Martinez*, 132 S. Ct. 1309, 1315; *Trevino*, 133 S. Ct. at 1921.

In any event, the claim lacks merit. The Sixth Amendment, together with the Due Process Clause, guarantee a defendant both the right to a fair trial and the right to effective assistance of counsel at that trial. *Strickland*, 466 U.S. at 684–86. A defendant's claim that he was denied constitutionally effective assistance requires him to affirmatively prove both that (1) counsel rendered deficient performance, and (2) his actions resulted in actual prejudice. *Id.* at 687–88, 690. Importantly, failure to prove either deficient performance or resultant prejudice will defeat an ineffective assistance of counsel claim, making it unnecessary to examine the other prong. *Id.* at 687.

In order to demonstrate deficient performance, Broadnax must show that in light of the circumstances as they appeared at the time of the conduct, "counsel's representation fell below an objective standard of reasonableness," i.e., "prevailing professional norms." *Id.* at 689–90; *see also Richter*, 562 U.S. at 105. The Supreme Court has admonished that judicial scrutiny of counsel's performance "must be highly deferential," with every effort made to avoid "the distorting effect of hindsight."[31] *Strickland*, 466 U.S. 689–90; *see also Richter*, 562 U.S. at 105 ("It is 'all too tempting' to 'second–guess counsel's assistance

---

[31]   "Representation of a capital defendant calls for a variety of skills. Some involve technical proficiency connected with the science of law. Other demands relate to the art of advocacy. The proper exercise of judgment with respect to the tactical and strategic choices that must be made in the conduct of a defense cannot be neatly plotted in advance by appellate courts." *Stanley v. Zant*, 697 F.2d 955, 970 & n.12 (11th Cir. 1983).

after conviction or adverse sentence.'") (citations omitted); *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight.") (citations omitted). Accordingly, there is a "strong presumption" that the alleged deficiency "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. If there is *any* "reasonable argument that counsel satisfied *Strickland*'s deferential standard," the state court's denial will be upheld. *Richter*, 562 U.S. at 105.

This reasonableness standard applies also to counsel's investigation. Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. *Strickland*, 466 U.S. at 690–91. Counsel must make reasonable investigations or make a reasonable decision that makes particular investigations unnecessary. *Id*. at 691. A particular decision not to investigate must be assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. *Id*. at 691.

Finally, even if deficient performance can be established, Broadnax must still affirmatively prove prejudice that is "so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. This

requires him to show a reasonable probability that but for counsel's deficiencies, the result of the proceeding would have been different." *Id*. at 694. A "reasonable probability" is one sufficient to undermine confidence in the outcome. *Id*. And as explained by the Supreme Court: The question in conducting *Strickland*'s prejudice analysis "is *not* whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel [had] acted differently." *Richter*, 562 U.S. at 111 (emphasis added and citations omitted). Rather, "[t]he likelihood of a different result must be substantial, not just conceivable." *Id*. at 112 (citation omitted).

Here, Broadnax contends that his trial counsel was ineffective for failing to call Dr. Roache to offer "expert testimony to show that Mr. Broadnax's drug-induced psychosis rendered his statements to the media involuntary." Petition at 33. He contends that by explaining the effect of the drug PCP on Broadnax, "Dr. Roache's testimony likely would have negated a finding that Mr. Broadnax's so-called 'confession' was freely and voluntarily given." Petition at 34. However, counsel was not ineffective for failing to call Dr. Roache in this regard, and Broadnax was not prejudiced, because as explained above, there is no voluntariness requirement for confessions made to non-state actors. Moreover, because "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary,'" and here there is no evidence of

~ 59 ~

coercive conduct, Dr. Roache's testimony about the effects of PCP could not have rendered Broadnax's confession involuntary. *See Connelly*, 479 U.S. at 167.

Broadnax also contends that reasonably competent counsel would have called Dr. Roache to testify about his capacity to consent at guilt/innocence and would have asked Dr. Roache questions at punishment about his capacity to consent to the media interviews. Petition at 33. As an initial matter, counsel *did* seek to admit Dr. Roache's testimony at guilt/innocence, but the trial court denied their efforts. 42 RR 42 ("[T]he Court will deny the Defense the opportunity to put either Dr. Platt or Dr. Roache on in the case in chief or guilt or innocence"). Further, Broadnax entirely fails to explain how testimony concerning his capacity to consent to interviews would have affected the jury's verdict or sentence. *See Schlang v. Heard*, 691 F.2d 796, 799 (5th Cir. 1982), (explaining that"[m]ere conclusory statements do not raise a constitutional issue in a habeas case"). He therefore fails to show deficient performance or prejudice in this regard. For the foregoing, reasons even if it were not procedurally barred, Broadnax's IATC claim related to Dr. Roache must be denied.

II.   **The CCA Reasonably Rejected Broadnax's Claim that the Trial Court Erred in Denying His *Batson* Challenges (Claim 7).**

Broadnax asserts that the State's peremptory strikes were exercised in a racially discriminatory manner. Petition at 50–74. However, the state court reasonably denied this claim on direct appeal.

Claims of race-based use of peremptory strikes are governed by the three-step test enunciated in *Batson. See Rice v. Collins*, 546 U.S. 333, 973 (2006). A defendant must first make out a prima facie case that race motivated the challenged strikes. *Batson*, 476 U.S. at 96–97. If such a showing is made, the prosecutor must then provide race neutral explanations for the strikes in question. *Id*. at 97–98. "The second step of this process does not demand an explanation that is persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 767–68 (1995) (per curiam). "[S]o long as the reason is not inherently discriminatory, it suffices." *Rice*, 546 U.S. at 974. Finally, the trial court must weigh the evidence and determine whether the race neutral explanation is credible or whether it is merely pretext for purposeful discrimination. *Batson*, 476 U.S. at 98. The final step "largely will turn on evaluation of credibility." *Id*. at 98 n.21.

In turn, "[c]redibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in

~ 61 ~

accepted trial strategy." *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003) (*Miller-El I*). In short, the trial court considers the relevant circumstances bearing upon racial animosity. *Miller-El v. Dretke*, 545 U.S. 231, 239 (2005) (*Miller-El II*). But "the best evidence often will be the demeanor of the attorney who exercises the challenge." *Hernandez v. New York*, 500 U.S. 352, 365 (1991) (plurality opinion).

A trial court's denial of a *Batson* claim "is entitled to 'great deference' and 'must be sustained unless clearly erroneous.'" *Felkner v Jackson*, 131 S. Ct. 1305, 1307 (2011) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008)). That, however, "is the standard on direct review," but AEDPA imposes an even higher standard of review which "'demands that state-court decisions be given the benefit of the doubt.'" *Id.* (quoting *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010)). "Therefore, the federal court's role is to 'determine whether the trial court's determination of the prosecutor's neutrality with respect to race was objectively unreasonable and has been rebutted by clear and convincing evidence to the contrary.'" *Hoffman v. Cain*, 752 F.3d 430, 448–49 (5th Cir. 2014) (quoting *Murphy v. Dretke*, 416 F.3d 427, 432 (5th Cir. 2005)).

### A.   Broadnax's new evidence is *Pinholster*-barred.

Broadnax raised an entirely record-based challenge to the trial court's denial of his *Batson* challenges on direct appeal. He did not raise a *Batson* claim on state habeas review. Broadnax has now attached extra-record supplemental documents, including prosecutors' notes and emails, to his federal habeas petition as exhibits; however, he has given no explanation for his failure to provide these documents in state court. ECF No. 52, Exhibits A– F. When § 2254(d) applies, review "is limited to the record that was before the state court." *Pinholster*, 563 U.S. at 181. Because the state court did not consider these documents, this Court may not either. *Id*. at 182–83. ("It would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonable applied federal law to facts not before the state court.").

### B.   Alternatively, Broadnax's new evidence fails to show that the State's strikes were racially motivated.

Broadnax has attached the following supplemental documents to his federal habeas petition: (1) a list of qualified jurors indicating each juror's gender, race, and the number of an answer choice selected on their juror questionnaire; the African-American jurors' names are in bold, Exhibit A; (2) notes prepared by a prosecutor detailing reasons for exercising peremptory strikes, Exhibit B; (3) a page of pictures of the venire panel with the letter "X" marked through multiple jurors' pictures, Exhibit C; (4) handwritten notes

taken by prosecutors, Exhibit D; and (5) juror questionnaires marked with notes from prosecutors, Exhibits E, F. ECF No. 52.

Initially, Broadnax argues that the list of jurors with only the African–American jurors in bold is proof of discriminatory intent. However, this list appears to have been created to aid the State in its response to the *Batson* challenges; it does not show that African-American jurors were treated differently than jurors of other races. *See United States v. Barnette*, 644 F.3d 192, 211 (4th Cir. 2011) (accepting that prosecutors' notations of race and gender on cover of juror questionnaires were for "quick access to information about each juror and also helped them deal with any potential *Batson* challenges").

Indeed, the email to which this list was attached strongly supports a conclusion that it was created in preparation for a second *Batson* hearing held *after* the jury had been selected. In this regard, the same documents that were provided to Broadnax by the Dallas District Attorney's Office during his federal habeas investigation were also provided to the Director. Respondent's Exhibit A. The copy of the list that was given to the Director was attached to an email, which the Director has attached to this response as Respondent's Exhibit B.[32]

---

[32]   As explained above, this list is barred from consideration by this Court. *Pinholster*, 563 U.S. at 181. However, in the event this Court might consider the list, it is important that the complete document and context is provided.

~ 64 ~

The email, dated July 22, 2008, was sent from Gordon Hikel, an assistant district attorney that took part in questioning during voir dire, to Andrea Handley, who also took part in voir dire, and Lisa Smith, who drafted the brief in response to the *Batson* challenges, which was filed on July 27, 2008. *Id.*; 3 CR 558 (brief signed by Lisa Smith). Importantly, the jury was selected, and the State made all of its peremptory strikes, by July 20, 2008. 38 RR. The email explained that there were two spreadsheets attached related to African-American jurors, the second of which "has the names of African American jurors on the 'qualified pool' of 47." Respondent's Exhibit A. Lisa Smith's brief to the court compared answers given by African-American venire panel members during voir dire to answers given by non-African-American venire panel members. The fact that this list was created *after* the state had exercised its strikes and was sent from a trial prosecutor who was at voir dire to another prosecutor that briefed the *Batson* challenge issue demonstrates that the list was created in preparation for the State's response brief and the subsequent *Batson* hearing.

And even if the list were prepared prior to the State's peremptory strikes, such evidence does not show that the challenges were racially motivated. Indeed, while there are two Supreme Court cases that have found the State's notations in its file related to race relevant to a *Batson* analysis, those cases are vastly different than the present case. First, in a case where the Court held

~ 65 ~

that the State committed a *Batson* violation, *Miller-El II*, the Court noted that the State "marked the race of each juror on their juror card." 545 U.S. at 264. The Court gave no indication that this fact was of any importance to its decision. Rather, it focused on five critical factors that lead to its ultimate determination that the strikes were based on racial discrimination: (1) that a side-by side comparison revealed that the "State's proffered reasons for striking black panelists" often applied to "otherwise-similar nonblack [panelists] who [were] permitted to serve," *id.* at 241–49; (2) that the State often mischaracterized the testimony of African-American jurors and did not remain consistent such that its explanations "reeked of afterthought," *id.*; (3) that the State engaged in consistent disparate questioning of African-American and white jurors during voir dire, *id.* at 255–63; (4) that the State exercised a jury shuffle in an effort to ensure that less African-American jurors were on the panel, *id.* at 253–54; and (5) that there was evidence presented to the state court that the district attorney's office had a "specific policy of systematically excluding blacks from the jury" derived from a twenty year old manual on jury selection advice. *Id.* at 263–66.

As explained further below, Broadnax has provided no evidence during any stage of the proceedings of a policy of excluding minorities; he has not alleged disparate questioning; the State did not exercise a shuffle; and the

record conclusively demonstrates that minority venire panelists were treated the same as all other venirepersons. *See below*, Section II(C).

Second, in *Foster v. Chatman*, another case in which the Supreme Court recently found a *Batson* violation, the Court characterized the fact that the prosecutor's file was filled with references to race as "arresting."[33] 136 S. Ct. 1737, 1755 (2016). However, in *Foster*, the Court had also found that the prosecution's race neutral reasons "had no grounding in fact," contained multiple misrepresentations, relied on a false predicate, and shifted over time. *Id*. at 1748–54. Further, and perhaps most importantly, like in *Miller-El*, the Court found that the prosecution accepted white jurors with the same traits that it found unacceptable in African-American prospective jurors. *Id*. Here, as explained further below, the record fully supports the State's legitimate race neutral reason for exercising its strikes against the *Batson*-challenged jurors. *See below*, Section II(C). The email to which Respondent's Exhibit A was attached and the fact that the State's race neutral reasons for its peremptory strikes were consistent, credible, and supported by the record, demonstrate that the list fails to provide any evidence of discriminatory intent.

---

[33]   Notably, to the extent this Court reviews the newly-submitted notes to consider the reasonableness of the state court's denial of the *Batson* challenge, *Foster* does not provide the appropriate standard because it was decided after the CCA's decision. AEDPA requires this Court to determine whether the state court's decision was unreasonable under then-existing Supreme Court precedent. *See* § 2254(d). The reasonableness of the decision is not measured by Supreme Court cases decided after the Court of Criminal Appeals made its decision.

Broadnax's Exhibit B contains the prosecution's notes explaining its reasons for using peremptory challenges. ECF No. 52-2. These notes belie any assertion that the strikes were racially motivated. Indeed, the notes provide detailed reasons for the strikes and indicate that the State struck all of the venirepersons, minority and non-minority, who provided answers indicating that they were not in favor of the death penalty or would likely be prevented from imposing the death penalty under the facts of this case. These notes are proof that the State's race neutral reasons for its strikes were consistent and well-documented. Indeed, they serve the exact opposite function of the prosecutor's notes in *Foster*: they in fact confirm that the State's race neutral reasons for exercising its strikes were genuine. *See Foster*, 136 S. Ct. at 1749 (explaining that the State's race neutral reasons were contradicted and proven false by the notes in its file).

Broadnax's Exhibit C is a compilation of prospective juror's photographs prepared by the State. ECF No. 52-3. In his petition, Broadnax asserts that the State marked "each African-American juror (and only those jurors) with a large, red 'X.'" Petition at 54. A quick review of the document proves that allegation entirely false. Exhibit C. There are red "Xs" marking out multiple white jurors' pictures as well as African-American jurors. Accordingly, in the event the Court considers this barred exhibit, it wholly fails in showing any discriminatory intent.

~ 68 ~

Finally, the notes on the juror questionnaires provide no indication that the prosecution's strikes were racially motivated. Broadnax Exhibit D (ECF Nos. 52-4, 52-5), Exhibit E (ECF No. 52-6), Exhibit F (ECF No. 52-7). First, Broadnax contends that the State exercised a peremptory strike against Shaven McCraney, but there was a note in its file stating that answers on venireperson McCraney's questionnaire were "very good for [the State's] case." Exhibit D at 32. However, the fact that there were answers that a prosecutor found beneficial does not show that the State ever thought venireperson McCraney was an acceptable juror; indeed this one comment does not negate the other negative comments listed on the same page cited by Broadnax; more importantly, it does not in any way discredit the State's race neutral reasons, explained further below, for striking venireperson McCraney—most notably that she did not believe the death penalty ought ever be invoked. In a footnote, Broadnax makes similar unavailing references to notes related to venirepersons Patterson and Morrison. Petition at 57 n. 23. If anything, these notes demonstrate that the State did not discount these panel members simply because of their race and was actively considering the substance of their answers. It does not show that the State's ultimate conclusion that these venirepersons were not acceptable based on their views about the death penalty, among other race neutral reasons, was a pretext. *See below*, Section

~ 69 ~

II(C). Accordingly, even if the Court considers these notes that were not provided to the state court, they fail to prove discriminatory intent.

### C.   All *Batson*-challenged venirepersons were struck for race neutral reasons.

Broadnax asserts that the trial court erred in denying his *Batson* challenges because the prosecution's race neutral reasons were pretextual and "did not accord with the evidence." Petition at 51.  As such, especially on federal habeas review, Broadnax must rebut the trial court's decision to accept the prosecutor's multiple race neutral reasons with "clear and convincing evidence to the contrary.'" *See Hoffman*, 752 F.3d 430, 448–49. Here, Broadnax provides no such evidence. Rather, the record entirely supports the trial court's determinations and, in turn, the reasonableness CCA's denial of Broadnax's claim on direct appeal.

Here, while the State articulated multiple race neutral bases for striking the *Batson*-challenged venirepersons, it is most notable that every *Batson*-challenged panel member expressly indicated that he or she was not in favor of the death penalty, that the death penalty ought never be invoked, or that he or she would be "automatically prevented" from imposing the death penalty if the defendant were on drugs at the time the crime was committed. As the prosecutor explained at the *Batson* hearing, the State struck every juror

that gave these answers.[34] Opposition to the death penalty is a race neutral explanation. *See Hoffman*, 752 F.3d at 449 (accepting hesitancy to impose a death sentence as race neutral). So too is a venireperson's vacillation on whether he or she could impose a death sentence. *Id.*; *Garcia v. Stephens*, 793 F.3d 513, 529 (5th Cir. 2015) ("We have upheld peremptory strikes as race neutral on the basis of a prospective juror's hesitation, even where the juror ultimately indicated he could vote to impose death.").

There were two questions on the first page of the juror questionnaire that made each panel member's stance on the death penalty very clear. The first was the question was very simple: "Are you in favor of the death penalty?" *See, e.g.*, 55–57 RR (Juror Questionnaire p. 1). *Batson*-challenged venirepersons Vation, Rivera, Riser, Jackson, and Morrison answered "No." 55 RR (Vation Questionnaire p. 1), (Rivera Questionnaire p. 1), (Riser Questionnaire p. 1); 57 RR (Jackson Questionnaire p. 1), (Morrison Questionnaire p. 1).

Next, the questionnaire asked venirepersons to circle a response to the following question: "With reference to the death penalty, which of the following statements best represents your feelings?" Answer choice number "3" read:

---

[34]   It is worth mentioning that even defense counsel recognized, "No juror will sit on this jury that is opposed to the death penalty." 31 RR 67. Indeed, the State would certainly not be expected to forgo striking a venireperson who is not in favor of the death penalty in a case where the death penalty is sought.

"Although I do not believe that the death penalty ever ought to be invoked, as long as the law provides for it, I could assess it under the proper set of circumstances." 55–57 RR (Juror Questionnaire p. 1). *Batson*-challenged venirepersons McCraney, Riser, and Morrison circled answer choice "3". 55 RR (McCraney Juror Questionnaire p. 1), (Riser Questionnaire p.1); 57 RR (Morrison Questionnaire p. 2). In sum, every *Batson*-challenged venireperson who was excluded from the jury, except Agwana Long, indicated on the first page of the juror questionnaire that they were either not in favor of the death penalty or that they believed that the death penalty ought never be invoked.[35] Every venireperson that did so was struck by the State.[36] Accordingly, the CCA

---

[35] As explained further below, the State also exercised a strike on Juror Patterson, who is African-American; however, Juror Patterson was eventually included as part of the jury. Patterson's circumstances are addressed in further detail below. *See below*, Section III. But in short, to the extent that the Patterson's strike is relevant to the State's strikes exercised against the excluded venirepersons, he was struck by the state primarily because (1) during voir dire, he expressly stated that he did not believe in the death penalty, and (2) he was the foreman on two juries, one of which returned a not guilty verdict. *Id.*

[36] Sue McCormick, Johnny Sanford, and Carl Jackson were all struck by the State because they chose answer choice "3". 55 RR (Sue McCormick Questionnaire p. 1). 55 RR (Johnny Sanford Questionnaire p. 1); (Carl Jackson Questionnaire p. 1). In his petition, Broadnax generally contends, "Three other white jurors—Alex Folz, Jerome Williams, and William Kreighbaum—all voiced opinions that questioned the imposition of the death penalty, and all were accepted by the State." Petition at 64, 68. However, Broadnax does not explain what those opinions were. *See Hines v. Texas*, 129 F. App'x 100, 101–02 (5th Cir. 2005) (denying a *Batson* claim because it was, in part, conclusory). Indeed, the record demonstrates that none of these jurors listed himself as a "3" or stated that he was not in favor of the death penalty. 55 RR (Williams Questionnaire), (Folz Questionnaire p. 1); 57 RR (Kreighbaum Questionnaire p. 1).

reasonably found that Broadnax "has not demonstrated that the prosecutor's stated reason was a pretext for discrimination." *Broadnax v. State*, 2011 WL 6225399, at *3.

Regarding venireperson Long, the State explained that it exercised a strike against her because, among other reasons detailed below, she answered that she would be "automatically prevented" from imposing the death penalty if the defendant were on drugs when the crime was committed. 38 RR 47. On page six of the questionnaire, venirepersons were asked, "Would a person's use of drugs or alcohol at the time of the offense automatically prevent you from assessing the death penalty if you found him guilty of capital murder?" 55–57 RR (Juror Questionnaires p. 6). Venireperson Long answered "yes," and in the space provided for an answer she stated, "I believe drugs alter a person['s] way of thinking." 57 RR (Long Questionnaire p. 6.).[37] Venireperson Long confirmed this answer during voir dire. 30 RR 66. In his petition, Broadnax entirely mischaracterizes the explanation for the State's strike of venireperson Long by claiming that it was merely because "she believed that intoxication was a mitigating circumstance." Petition at 65. To the contrary, at the *Batson* hearing, the prosecutor stated that the State was exercising a strike because

---

[37]   As explained below, *Batson*-challenged venireperson Mattie Vation also answered yes to this question. 55 RR (Vation Questionnaire p. 1).

venireperson Long answered that she would be automatically prevented from assessing the death penalty. 38 RR 47.

Here, given that the State was aware that the jury would hear evidence alleging that Broadnax was on drugs when he committed the murders, it was critical that it strike jurors that would be unable to assess a death sentence in those circumstances.[38] Broadnax fails to point to any other juror accepted by the State who would have been automatically prevented from imposing the death penalty if the defendant were under the influence of drugs. Broadnax contends that Juror Stinson, a white juror who was not struck by the state, also "specifically stated that he could consider voluntary intoxication to be a mitigating factor." Petition at 66. However, Juror Stinson answered that voluntary intoxication would *not* automatically prevent him from imposing the death penalty. 57 RR (Stinson Questionnaire p. 6). Broadnax also attempted to compare Stinson to Long on direct appeal, Appellant's Brief at 32, but the claim was properly rejected by the CCA: "Venire Member Long said that a defendant's voluntary intoxication would preclude her from assessing the death penalty. Contrary to [Broadnax's] assertions, such a definitive position

---

[38]   As the State explained during jury selection, "this hits squarely on the defensive theory of intoxication and what they seem to be heavily voir diring with on each panel member." 38 RR 74.

was not taken by a fellow venire member whom the State did not strike." *Broadnax v. State*, 2011 WL 6225399, at *3.

Here, Broadnax relies entirely on conclusory and unsupported claims that the State's race neutral reasons served as a pretext for racial animus. To the contrary, what is clear is that the State struck all of the jurors who were not in favor of the death penalty, who believed the death penalty ought not be invoked, or who could not impose the death penalty if the defendant were under the influence of drugs; this indeed included all of the minority jurors on the panel. *See Hoffman*, 752 F.3d at 449; *Miller-El II*, 545 U.S. at 248.

Broadnax primarily rests his comparative analysis on an argument that the State's reference to some of the *Batson*-challenged venirepersons' demeanor for nervousness was pretext for discrimination. Petition at 51, 55, 56, 57, 60, 62, 63, 69. While it is well-established that demeanor is an appropriate race neutral reason for exercising a peremptory challenge, *see United States v. Thompson*, 735 F.3d 291, 297 n.14 (5th Cir. 2013), Broadnax argues that, here, the explanations constituted pretext because the trial court never expressly found the State's assertions regarding the demeanor of individual venirepersons credible. Petition at 55.

Indeed, the Supreme Court in *Snyder* refused to accept a venireperson's nervous demeanor as the sole race neutral reason for a peremptory strike when the only other reason offered by the State was proven false by the record. *See*

~ 75 ~

552 U.S. at 479 (explaining that "we cannot presume that the trial judge credited the prosecutor's assertion that Mr. Brooks was nervous"). However, the Supreme Court has subsequently expressly limited that holding. In *Thaler v. Haynes*, the Court ruled that there is no clearly established federal law "that a demeanor-based explanation for a peremptory challenge must be rejected unless the judge personally observed and recalls the relevant aspect of the prospective juror's demeanor." 559 U.S. 43, 47 (2010) (per curiam). The Court explained its holding in *Snyder* as follows: "We concluded that the record refuted the explanation that was not based on demeanor and, in light of the particular circumstances of the case, we held that the peremptory challenge could not be sustained on the demeanor-based ground, which might not have figured in the trial judge's unexplained ruling . . . these observations do not suggest that, in the absence of a personal recollection of the juror's demeanor, the judge could not have accepted the prosecutor's explanation." *Id.* at 48–49.

Here, as explained below, the State articulated multiple race neutral reasons that are supported by the record. The trial court's lack of a specific credibility finding on the prosecutor's assertions about the *Batson*-challenged venirepersons' demeanor provides no indication that these explanations were

a pretext; nor does it negate the other well-supported, record-based, reasons articulated by the State.[39] *See id.*

Further, many of the features of successful *Batson* challenges are not present here. The State did not exercise a jury shuffle—the defense did (Supp. 1 CR 96; 4 RR 10)—and there no allegation, much less any indication in the record, that the State engaged in "trickery" in asking its questions or that there were any instances of disparate questioning. *See Miller-El II*, 545 U.S. at 261–63. Finally, there was no objective evidence demonstrating that the Dallas DA's office had a policy of excluding members of any minority from juries.[40] *Id.* at 263–64. *See Fields v. Thaler*, 588 F.3d 270, 281 (5th Cir. 2009) (noting the absence of the circumstantial evidence of racial animus found in *Miller-El II*).

---

[39]   The Director also notes that, as detailed further below, the State's assertions about demeanor were much more specific and demonstrably rooted in the record than those of the prosecutor in *Snyder*. For example, Juror McCraney specifically stated that she was nervous and uncomfortable with sitting in the same room as appellant because she knew the decision she would have to make. 10 RR 18.

[40]   As explained above, in *Miller-El II*, the Supreme Court found that there was evidence presented to the state court that the Dallas County district attorney's office had a "specific policy of systematically excluding blacks from the jury" derived from a twenty year old manual on jury selection advice. 545 U.S. at 263–66. Here, Broadnax attempts to tie his case to *Miller-El*. Petition at 72 ("This conduct occurred in a jurisdiction that has already been found to have a history of purposeful discrimination when selecting jurors in capital cases."). However, in *Miller-El* the court relied on a "body of evidence" that had been presented to the state court related to the policies of the district attorney's office at the time of and in the years leading up to the defendant's jury selection hearing in 1986. *Id.* at 263–64. In this case, there was absolutely no such evidence presented related to current policies and procedures of the Dallas County district attorney's office. And the record establishes that the State relied on an extensive list of race neutral reasons for exercising its peremptory strikes against the *Batson*-challenged jurors.

Ultimately, and most importantly, it is the comparative juror analysis that proves the absence of any discriminatory intent. The Supreme Court has only found *Batson* violations when the State's race neutral reasons are discredited because they are proven entirely false by the record or when the prosecution accepted white jurors with the same traits that it found unacceptable in minority venirepersons. Here, the record conclusively demonstrates that the State struck jurors of any race who were not in favor of the death penalty or who may have been prevented from imposing the death penalty in this case. Accordingly, in light of the record and Supreme Court precedent, the State court reasonably rejected Broadnax's *Batson* claim.

### 1. Shaven McCraney.

At the *Batson* hearing, the State explained that it had exercised a peremptory challenge against Shaven McCraney primarily because she listed herself as a "3," was otherwise very weak on the death penalty in her questionnaire and at voir dire, could not look at Broadnax during voir dire, and was a single woman who wanted to mentor young men who did not have father figure. 38 RR 10–11. The record supports the State's explanations.

After checking the box indicating that she was in favor of the death penalty, venireperson McCraney qualified her choice, "I check yes, but really I'm unsure. It depends on [the] situation I guess." *Id.* She also stated that she would only be able to assess the death penalty if there were several other

~ 78 ~

people making the decision with her. 10 RR 23–24. Moreover, when the prosecutor asked her to look at Broadnax, she stated that it made her nervous to look at him because, in her words, "It's a little bit uncomfortable for me to be sitting in the same room with someone that I have to make that type of a decision." *Id*. at 18.

Nonetheless, Broadnax contends that the State's proffered reasons for striking venireperson McCraney were pretextual. Broadnax ignores venireperson McCraney's selection of answer choice "3" and her statements that expressed weakness on the death penalty, and instead concentrates on the State's assertions related to her nervous demeanor. However, as explained above this is an acceptable race neutral basis for striking a juror, and Supreme Court case law refutes the assertion that the lack of an express credibility finding renders this demeanor-related reason pretextual. *See Haynes*, 559 U.S. at 47. Accordingly, the trial court and the CCA reasonably determined that this peremptory strike was not the product of racial discrimination. *Broadnax v. State*, 2011 WL 6225399, at *3.

### 2.    Mattie Vation.

At the *Batson* hearing, the State explained that it exercised a peremptory challenge against Mattie Vation mainly due to her views on the death penalty. 38 RR 14–17. The State also explained that it's strike was based on the following: her answer on the juror questionnaire that the use of drugs

~ 79 ~

or alcohol at the time of the offense would automatically prevent her from imposing the death penalty; she had a sister that had struggled with drug addiction; she had a brother and nephew in prison; she had engaged in what the State considered jury nullification during prior jury service; when she heard about the crime on the news, she felt compassion for the men who killed the victims; she had many spelling and grammar errors on her questionnaire; she appeared anxious to get on the jury.[41] *Id*. The record supports the State's explanations.

On the juror questionnaire, venireperson Vation answered that she was not in favor of the death penalty. And underneath the question she wrote, "I believe in 2nd chances. Too many [have] died innocent I believe I have to think of my love[d] ones." 55 RR (Vation Questionnaire, p. 1). During voir dire, venireperson Vation confirmed her answer and explained that she had problems with the death penalty because of all of the recent DNA exonerations. 11 RR 120–21. She also stated on her juror questionnaire that voluntary intoxication would automatically prevent her from assessing the death

---

[41]    In circumstances where the prosecutor asserts multiple race neutral bases for its strike, it is particularly important to note that even if Broadnax could show that the State accepted a white juror that shared one or some traits with the *Batson*-challenged venireperson, it does not establish that the strike was racially motivated. *See Hoffman*, 752 F.3d at 449 ("It is not clear from the record that the trial judge solely relied on that one race neutral reason, and we give AEDPA deference to fact-findings made by a state appellate court.")

penalty, although she attempted to change this answer during voir dire. 55 RR (Vation Questionnaire p. 6); 11 RR 134–35; *see Miller-El II*, 545 U.S. at 248 (noting that peremptorily striking a venireperson for inconsistent answers can be a race neutral reason). As explained previously, given that there was evidence of Broadnax's drug-use, this inconsistency was highly relevant to the State. Further, venireperson Vation stated that she had previously served on a jury in a DWI case and that she was able to convince the other members of the jury to acquit. *Id*. at 144. Finally, venireperson Vation also admitted to seeing stories about Broadnax on the news and to having compassion for "the one that did it." *Id*. at 128.

Broadnax contends that the State "mischaracterized" venireperson Vation's juror questionnaire and feelings on the death penalty, such that its explanation was, "at its core, false." Petition at 58–59. This allegation is itself demonstrably false. Broadnax explains that the State asserted that it struck anyone that was "classified as a 3 on the scale, or who have stated that [they] are not in favor of the death penalty . . ." 38 RR 14. Then, he appears to complain that this statement was somehow false because venireperson Vation circled answer choice "2." However, Broadnax entirely ignores the second half of the State's disjunctive explanation. Because venireperon Vation expressly stated on the juror questionnaire that she was not in favor of the death penalty, the State accurately explained that she fell into the category of panel members

~ 81 ~

it was striking because of their answers on page one. In fact, the State specifically stated that it was striking venireperson Vation because she stated she was not in favor of the death penalty; it even read her written answer to the trial court. 38 RR 15. At no point did the State misrepresent her position.

Based on the fact that venireperson Vation was not in favor the death penalty, combined with the State's other race neutral explanations that were supported by the record, the CCA reasonably determined that her strike was not the product of racial discrimination. *Broadnax v. State,* 2011 WL 6225399, at *3.

### 3.    Angelita Rivera.

The State explained that it exercised a peremptory challenge against venireperson Rivera primarily because she was not in favor of the death penalty; listed rehabilitation as a primary goal of punishment; stated that in deciding punishment, she would want to know if the defendant had availed himself of available resources, but was unable to articulate what such resources were; would require the State to prove that Broadnax had been violent in the past to show future dangerousness; had a relative that was murdered by another relative; and did not believe that the criminal justice system protected the rights of the accused. 38 RR 22–24.

The record supports the State's explanations. Rivera answered that she was not in favor of the death penalty on the juror questionnaire. 55 RR (Rivera

Questionnaire p. 1). During voir dire, although Rivera stated that she knew that the law allowed the death penalty and that she could follow the law, she repeatedly admitted that she had religious and moral convictions against the death penalty, which was consistent with her answer on the questionnaire. 13 RR 175–77, 180; 55 RR (Rivera Questionnaire p. 1). Furthermore, Rivera admitted she was hesitant in her answers about the death penalty and, "The hesitation is that someone can participate in putting somebody to death is just kind of, those words just kind of—you know, kind of slap you." 13 RR 187. In addition, on her questionnaire, Rivera ranked "rehabilitation" as the primary objective of punishment. 55 RR (Rivera Questionnaire p. 8). During voir dire, Rivera affirmatively stated that she has witnessed people change and that she believes the judicial system provides rehabilitation, but not all inmates accept the help. 13 RR 177–79. She also stated that she believed that the death penalty should only be imposed if a person commits "[r]epeated, repeated, repeated, murders." 13 RR 188.

In his petition, Broadnax admits that Rivera checked "no" when asked if she was in favor of the death penalty, but points out that in the space provided she wrote that "don't think this is the answer to all cases; but could be the only solution with all the proper evidence I could be decided to take this action." 55 RR 197. Despite this qualification, Rivera chose that she was not in favor of the death penalty, and the State struck all jurors who answered this way.

~ 83 ~

Moreover, Broadnax fails to account for the strong religious conviction venireperson Rivera expressed towards the death penalty, her steadfast belief in rehabilitation, and her limitations on future dangerousness. Instead, he again relies on the legally flawed assertion that any of the State's reasons that relied on demeanor could not be accepted. Petition at 62–63; *see Haynes*, 559 U.S. at 47.

Based on the fact that she was not in favor of the death penalty, combined with multiple other race neutral reasons provided by the State, the CCA reasonably determined that the strike against venireperson Rivera was not racially motivated. *Broadnax v. State*, 2011 WL 6225399, at *3.

### 4.    Curtis Riser.

At the *Batson* hearing, the State explained that it exercised a peremptory challenge against Curtis Riser primarily because he was not in favor of the death penalty, listed himself as a "3," ranked himself as a "1" in support of the death penalty, stated he believed that the death penalty was imposed too often, believed that voluntary intoxication should be considered, has a cousin in prison for murder, believed that the lack of a father-figure would be mitigating, and indicated that he saw his son in Broadnax. 38 RR 27–29. The record supports the State's explanations.

As discussed above, venireperson Riser identified himself as a "3" on his questionnaire. 55 RR (Riser Questionnaire, p. 1). Moreover, in his

questionnaire, Riser stated that he was not in favor of the death penalty because there have been too many innocent people convicted and listed himself as a "1" on the 10-point scale indicating support-level for the death penalty (1 being the lowest level of support, and 10 being the highest level of support).  55 RR Riser Questionnaire, pp. 1, 4).

On his questionnaire, while he stated that he would not be automatically prevented from imposing the death penalty, Riser also explained that he believed voluntary intoxication should be considered as mitigating because a person "usually wouldn't commit the offense otherwise."  55 RR (Riser Questionnaire, p. 6).  Riser further stated during voir dire that he could see his son in every black man that was in the courtroom, including the defendant, that his brother was once in prison for murder, and that he believed inmates would be less likely to commit acts of violence because they are kept "under control." 33 RR 249–50, 277–90.

In his petition, Broadnax concentrates on venireperson Riser's belief in rehabilitation. Petition at 64. However, venireperson Riser stated on his juror questionnaire that he was not in favor of the death penalty, listed himself as a "3," and characterized himself as "1" out of "10" on a scale of his support for the death penalty. No accepted jurors gave these answers. For these reasons, along with the other, well-supported, race neutral explanations provided by the

State, the CCA reasonably rejected the *Batson* challenge to venireperson Riser. *Broadnax v. State*, 2011 WL 6225399, at \*3.

### 5.    Agwana Long.

The State explained that it exercised a peremptory challenge against Agwana Long primarily because she would automatically be prevented from imposing the death penalty if the defendant was on drugs, expressed mixed feelings regarding the death penalty, thought that life without parole was the better punishment option, believed that prison was a controlled environment, expressed a limited view of future dangerousness, did not believe that a co-defendant should receive the same punishment as a shooter, and had been on probation for theft.  38 RR 45–49. The record supports the State's explanations.

In her juror questionnaire, Long answered that she would be automatically prevented from imposing the death penalty if the defendant were on drugs when he committed the crime. 57 RR (Long Questionnaire p.1). Long confirmed that answer during voir dire, explaining that in the case of voluntary intoxication, "I do think you are responsible for your actions, but I do also think it plays your—it [alters] your thought process. . . I don't think you're at full potential with your thought process." 30 RR at 66. Indeed, as explained above, the State had a significant interest in striking jurors who would be prevented from imposing the death penalty if the defendant was on drugs at the time of the crime. As explained above, Broadnax's assertion that

an accepted juror provided a comparable answer to Long is inaccurate. *See above*, Section II(C).

The State's other explanations are also supported by the record. At voir dire, Long confirmed her statement on her questionnaire that she had mixed feelings about the death penalty. 30 RR 31–32 ("I have mixed feelings according to if I'm against it or for it."); 57 RR (Long Questionnaire p. 1). She explained that she was against the death penalty in some cases, but was in favor of it in cases involving children and the elderly "because they are defenseless more so . . . ." *Id.* 31–35. Neither victim in this case was a child or an elderly person. In addition, in her questionnaire, Long stated that she thought a lifetime in prison was the equivalent to the death penalty and that she was "strongly in favor" of life without parole because she believed it would force the defendant to think about the crime and "deal with it." 57 RR (Long Questionnaire p. 5). Long confirmed these beliefs during voir dire. 30 RR 41, 54–56.

Long stated that she thought that prison was a controlled environment where violence was less likely to occur. 30 RR 50. In addition, at one point during voir dire, Long appeared to be under the impression that the State was required to prove that a defendant would commit the same offense in order to prove he was a future danger. 30 RR 50–51. Moreover, Long expressed that she did not believe she could assess the same sentence to a non-shooter as the

shooter. 30 RR 58. Based on the fact that Juror Long may likely have been "automatically prevented" from imposing the death penalty in this case, combined with the State's other race neutral explanations, the CCA reasonably determined that her strike was not the product of racial discrimination. *Broadnax v. State*, 2011 WL 6225399, at *3.

### 6.    Betty Jackson.

At the *Batson* hearing, the State explained that it exercised a peremptory challenge against Betty Jackson primarily because she was not in favor of the death penalty, selected answer choice "3," and because she would only assess the death penalty in cases that involved the sexual assault or murder of a child. 38 RR 70.

The record supports the State's explanations. Venireperson Jackson answered that she was not in favor of the death penalty and wrote, "I believe in life in prison without any chance of parole." 57 RR (Jackson Questionnaire p. 1). Venireperson Jackson also identified herself as a "3." *Id.* In addition, on her questionnaire, she stated that cases involving rape and murder should carry with it the possibility of the death penalty regardless of the person's past." *Id.* (Jackson Questionnaire p. 4). During voir dire, when asked if a situation where a person sexually assaults and murders a child was the only exception where she would consider the death penalty as a verdict, she replied, "right." 34 RR 25. Then she was asked, "In all other situations life in prison . .

. that's going to be the verdict that's rendered in that particular case for you?" *Id.* at 25–26. She answered, "That's correct." *Id.* at 26. In his petition, Broadnax characterized the State's explanation that she would only consider the death penalty in cases of sexual assault of a child as, "mere speculation." Petition at 67. The record demonstrates otherwise. In any event, given her views on the death penalty, along with the other race neutral explanations offered by the State, the CCA reasonably denied the *Batson* challenge to venireperson Jackson. *Broadnax v. State*, 2011 WL 6225399, at *3.

### 7.    Dedrick Morrison.

The prosecution explained that it exercised a peremptory challenge against Dedrick Morrison primarily because he was not in favor of the death penalty; he strongly believed that one could change while in prison; he believed that some people that commit crimes while on drugs might not remember what they did; he recently had a cousin that was killed by a police officer; and he indicated that age was an important factor in a person's ability to change. 38 RR 72, 77. The record supports these explanations.

Morrison answered that he is not in favor of the death penalty on the juror questionnaire, and wrote underneath the question, "You never know what caused the individual to perform whatever act they did. Every individual will change in the essence of time." 57 RR (Morrison Questionnaire p. 1). During voir dire, venireperson Morrison reiterated that all people will change

over the course of time. 34 RR 118–19. In addition, he indicated on his questionnaire that he believed that some individuals who commit crimes while intoxicated do not realize what they have done until they sober up; consequently, he considered evidence of intoxication to be mitigating. 57 RR (Morrison Questionnaire p. 6). While Broadnax points out that William Stinson, who was not challenged by the State, also indicated that he agreed that intoxication should be considered mitigating, venireperson Stinson did not give the detailed answer that individuals may not realize what crimes they committed while on drugs. 57 RR (Stinson Questionnaire p.1)

Moreover, during voir dire, venireperson Morrison spoke at length about his cousin who had been killed by an Austin police officer. 34 RR 93–94. He explained that the killing was believed to have been intentional and sparked riots in Austin. *Id.* at 96–97. Likely as a consequence, he expressed distrust for law enforcement; in his questionnaire, venireperson Morrison stated that he believed that police officers would try to "cover themselves when they have done the wrong things." *Id.* at 108.

Finally, venireperson Morrison stated that he had a good mentor that kept him off of the streets. *Id.* at 129–31. He further stated that his calling was to teach kids and keep them off of the streets. *Id.* at 153, 161–62. He also explained that he believed people who commit crimes at young ages can change. *Id.* 154–55.

Given his answer that he is not in favor of the death penalty, along with the other race neutral explanations offered by the State, the CCA reasonably denied the *Batson* challenge to venireperson Morrison. *Broadnax v. State*, 2011 WL 6225399, at *3.

### III.   The State Court Reasonably Denied Broadnax's Claim that Reseating Juror Patterson Was an Improper Remedy for a *Batson* Violation (Claim 8).

Broadnax contends that the trial court erred by reseating Juror Patterson, without selecting an entire new jury, after it determined that a *Batson* violation occurred. Petition at 70–71. This claim was reasonably rejected by the state court.

#### A.   The claim was raised and denied in state court.

In his petition, Broadnax asserts that this claim was not raised in state court. However, on direct appeal, Broadnax expressly argued that the trial court erred by "reinstating Juror Patterson after sustaining the Defense's *Batson* claim." Appellant's Brief at 42. The CCA accordingly recognized Broadnax as raising this claim and addressed it, even splitting the discussion of this claim into a separate section of its opinion. *Broadnax v. State*, 2011 WL

6225399, at *4. Accordingly, this claim was exhausted, and the CCA's denial of it is entitled to AEDPA deference.[42]

## B.      The CCA reasonably determined that there was no *Batson* violation.

Here, the trial court initially denied Broadnax's *Batson* challenge to Juror Patterson. 38 RR 68. However, the judge presiding during the initial *Batson* challenge to Juror Patterson was not the same judge who eventually sat at trial. *Id.* at 68 (indicating Judge Biard denied the *Batson* challenge); 42 RR 1 (Judge Snipes presided at trial and at the second *Batson* hearing). And based on his concerns over the fact that all of the African-American jurors had been struck, the judge who presided at trial ordered a second *Batson* hearing to reconsider the ruling on Juror Patterson. 42 RR 6. After the hearing, the trial court held the following:

> The problem in this case is, again, as I have said, one could conclude if I grant a *Batson* challenge that [the prosecutor]'s reasons for challenge were contextual [*sic*], that being false.  That's —if I was a subjective finder of the intent of [the prosecutor] or his team, I would not conclude that . . . I'm going to grant the *Batson* challenge and I'm going to do so because of the fact that there are no African-American jurors on this jury and there was a disproportionate number of African-Americans who were struck.

---

[42]      In the event this Court determines that the claim was not raised, *Martinez/Trevino* only applies to IATC claims. *See Davila*, 2017 WL 2722418, at *4; *Vasquez*, 597 Fed. Appx. at 778; *Reed*, 739 F.3d at 778 n.16. Accordingly, contrary to Broadnax's assertions, this exception cannot excuse the procedural default of his claim that the trial court erred by reseating Juror Patterson. Accordingly, because to the extent this claim was not previously raised in state court, it would now be barred from review if Broadnax returned to state court, the claim must be considered barred on federal habeas review. *See* Coleman, 501 U.S. 722, 735 n.1.

> This is not to be considered in any way as some sort of negative context on any lawyers in this case. It's because I simply have to look at the factors that are contained in the *Miller-El* and I make my decisions based on that.

42 RR 35. The trial court restored juror Patterson to the jury. *Id.*

In response to Broadnax's direct appeal claim that the trial court erred by reseating Juror Patterson to remedy a *Batson* violation, the CCA simply found that the trial court erred by finding that there was a *Batson* violation at all. *Broadnax*, 2011 WL 6225399, at *4. It explained, "Here, the trial court explicitly stated that it did not find the State's peremptory strike of Patterson to be racially motivated. The trial court's grant of the defense's *Batson* motion, then, does not invalidate the entire jury selection." *Id.* Indeed, the trial court made express findings crediting the State's race neutral reasons and even reassured those involved in the proceedings that there had been no racial animus. This does not amount to a finding that a *Batson* violation occurred.

The record supports the trial court's findings in this regard. The State explained, in response to defense counsel's *Batson* challenge, that it requested a transcript of Juror Patterson's voir dire examination so it could seriously consider him but, "that ultimately what it comes down to is Mr. Patterson does not believe in the death penalty." 38 RR 53. The State explained that "this comes directly from the transcript," and even attempted to provide a copy of the transcript to the presiding judge. *Id.*

Indeed, Juror Patterson interrupted defense counsel during voir dire so that he could express his feelings on the death penalty. 31 RR 67. He stated "I don't believe that I am in favor of the death penalty. . . I don't believe that I am in favor of abortion, but each is the law, and I accept each of them." *Id*. Moreover, the State explained that Juror Patterson had sat as the foreman on two juries, one that found the defendant not guilty. 38 RR 57. Further, the State explained that it was concerned that Patterson had asked a question about jury nullification without even being asked about it. *Id*. The State concluded:

> What would be not race neutral, Judge, is for me to let this jur[or] on simply because he is African American, and that would be – it's not the thought behind *Batson*, but the notion of leaving him on just because he's African American. [Were] he [not] African American, he would be struck every day all day, I think is completely race neutral, and Mr. Patterson is not a believer in the death penalty.

38 RR 65–66.

Here, given that Juror Patterson did not believe in the death penalty and that he was the foreman of a jury that found a defendant not guilty, the trial court reasonably credited the State's race neutral reasons, and the CCA reasonably determined that no *Batson* violation occurred. *Broadnax v. State*, 2011 WL 6225399, at *3. Because there was no *Batson* violation, as corollary, Broadnax's claim that the remedy for the *Batson* violation was inadequate must also fail.

C.  **Alternatively, the CCA reasonably determined that, even if there was a *Batson* violation as to Juror Patterson, the remedy of reseating him was constitutionally adequate.**

Even if a *Batson* violation occurred, the reseating of Juror Patterson was not constitutional error under clearly established federal law. In this regard the CCA alternatively held:

> Moreover, even if the State's peremptory challenge of Patterson had been racially motivated, it would be but one factor in the determination of whether the entire jury selection was invalid. It would not, as [Broadnax] contends, automatically indicate that all other peremptory strikes were racially motivated. Thus, because neither comparative-juror-analysis on the other seven *Batson* challenges nor the granted *Batson* challenge for Patterson weighs in favor of a finding that the trial court's rulings were clearly erroneous, [Broadnax's *Batson* challenges], are overruled.

*Broadnax v. State*, 2011 WL 6225399, at *4. The Supreme Court in *Batson* explained, "We express no view on whether it is more appropriate in a particular case, upon a finding of discrimination . . . for the trial court to discharge the venire and select a new jury from a panel not previously associated with the case . . . or to disallow the discriminatory challenges and resume selection with the improperly challenged jurors reinstated on the venire." 476 U.S. at 99 n. 24.

And, in Texas, reinstating an excluded veniremember is an appropriate remedy for a *Batson* violation. *State ex rel. Curry v. Bowman*, 885 S.W.2d 421, 425 (Tex. Crim. App. 1993) (holding that a decision to reinstate *Batson*-

challenged veniremembers to the jury was appropriate); *Degar v. State*, 482

S.W.3d 588, 590 (Tex. App.—Houston [1st Dist.] 2015); *Peetz v. State,* 180

S.W.3d 755, 760 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ("When a court

finds a *Batson* violation, it may fashion an appropriate remedy according to its

discretion."); *Boones v. State,* 170 S.W.3d 653, 657 (Tex. App.—Texarkana

2005, no pet.) (recognizing *Bowman* as holding that a decision to reinstate

excluded venire members was an acceptable remedy); *Craig v. State,* 82 S.W.3d

451, 453 n. 1 (Tex. App.—Austin 2002, pet. ref'd) (recognizing that "a trial court

is authorized to remedy a *Batson* error by reinstating the excluded venire

member to the trial jury").[43]

Broadnax cites cases from other jurisdictions that have held otherwise.

Petition at 71 (citing *State* v. *McCollum*, 433 S.E.2d 144, 159 (N.C. 1993);

*Minniefield* v. *State*, 539 N.E.2d 464, 466 (Ind. 1989)). However, these cases do

not establish that the Texas approach violates clearly established federal law

as required by AEDPA. In addition, the creation of a rule that a *Batson*

---

[43]    In *Hayes v. Thaler*, the Fifth Circuit addressed a case where the trial court determined that one *Batson* violation occurred but denied other *Batson* challenges. 361 Fed. Appx. 563, 574 (5th Cir. 2010). The court explained that "[a]ny sense that the state trial judge implicitly found the prosecutor to be generally credible" was undermined by the trial court's previous finding that a *Batson* violation occurred. *Id.* at 574 n. 10. To any extent Broadnax might attempt to rely on that reasoning, it is not implicated here, as the trial court expressly credited the State's race neutral reasons for striking Juror Patterson.

violation requires a state trial court to dismiss the entire jury would violate federal habeas non-retroactivity principles under *Teague v. Lane*.[44] *See Goeke v. Branch*, 514 U.S. 115, 118 (1995) (explaining that under *Teague*, "[t]he question is 'whether a state court considering [the defendant's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution'"). Accordingly, even if Broadnax could show that a *Batson* violation occurred as to Juror Patterson, the CCA reasonably determined that his constitutional rights were not violated by the remedy. For the foregoing reasons, his claim must be denied.

## IV.   Broadnax's Claim That Trial Counsel Was Ineffective for Failing to Object to the Trial Court's Remedy for the *Batson* Violation Is Procedurally Barred; Alternatively, the Claim Lacks Merit (Claim 9).

In his petition, Broadnax admits that this claim was not raised in state court, but contends that his default is excused by his state habeas counsel's ineffective assistance under the *Martinez/Trevino* exception. Petition at 89–90. As explained above, under *Martinez*, "to succeed in establishing cause, the [inmate] must show (1) that his claim of ineffective assistance of counsel at trial is substantial—i.e., has some merit—and (2) that habeas counsel was

---

44      489 U.S. 288 (1989).

ineffective in failing to present those claims in his first state habeas proceeding." *Garza*, 738 F.3d at 676. For the reasons addressed below, Broadnax's IATC claim is insubstantial, and state habeas counsel was not ineffective for declining to raise it. Accordingly, the claim is procedurally defaulted. *See Martinez*, 132 S. Ct. 1318.

Alternatively, the claim lacks merit. Here, Broadnax contends that trial counsel was ineffective for failing to object to the trial court's failure to dismiss the entire jury after it determined that a *Batson* violation occurred. Petition at 85–89. However, counsel's failure to raise frivolous objections does not constitute deficient performance. *See Green v. Johnson,* 160 F.3d 1029, 1037 (5th Cir. 1998). And as explained above, the trial court did not find that the State's strike of juror Patterson was racially motivated and had already denied Broadnax's other *Batson* challenges. There is no indication whatsoever that the trial court would have disqualified the entire jury had trial counsel essentially re-raised the *Batson* objections to the other jurors. In addition, as explained above, Texas law establishes that the trial court's remedy would have been proper *even if* it had determined that the State's strike of Patterson was racially motivated. *Bowman*, 885 S.W.2d at 425; *Degar*, 482 S.W.3d at 590; *Peetz,* 180 S.W.3d at 760; *Boones,* 170 S.W.3d at 657; *Craig,* 82 S.W.3d at 453 n. 1.

Indeed, the CCA's eventual ruling that the trial court actually erred by reseating Juror Patterson confirms that the trial court would have egregiously erred by striking the entire panel.[45] Trial counsel provided exemplary representation by having Juror Patterson restored to the jury despite the fact that the trial court found that the State's race neutral reasons for striking him were credible. Given that the CCA ultimately determined that there was no *Batson* violation, the trial court had already denied Broadnax's other *Batson* objections, and Texas law supports the remedy applied even if there had been a *Batson* violation, Broadnax fails to raise a substantial claim of either deficient performance or resulting prejudice. *See Strickland*, 466 U.S. 668 at 684–690. Accordingly, even if the claim was not defaulted, it must be denied as meritless.

## V. The State Court Reasonably Rejected Broadnax's Claim that the Trial Court Erred in Denying his Challenges for Cause (Claim 10).

Broadnax contends that the trial court erred by denying his challenges for cause during jury selection, which resulted in Broadnax being "left with a jury that was unable to consider mitigation evidence that [he] was later able to present." Petition at 74. This claim was reasonably denied by the state court.

---

[45] Importantly, trial counsel's failure to object did not prevent the CCA from considering whether the remedy was appropriate. *See Broadnax v. State*, 2011 WL 6225399, at *4. As such, Broadnax also cannot show prejudice because the highest state court did rule on the issue he claims should have been raised by trial counsel.

In *Ross v. Oklahoma*, the Supreme Court expressly held that "peremptory challenges are not of constitutional dimension." 487 U.S. 81, 88 (1988). "[R]ather they are one means to achieve the constitutionally required end of an impartial jury." *United States v. Martinez-Salazar*, 528 U.S. 304, 307 (2000). Therefore, even if the trial court errs in denying a challenge for cause, a defendant is "not deprived of any rule-based or constitutional right" unless he can show that one of the jurors who convicted him was biased. *Id.* As such, if a defendant cures error by exercising a peremptory strike on the challenged juror, he cannot assert that the trial court violated his constitutional rights. *Id.* Ultimately, "[s]o long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." *Ross*, 487 U.S. at 88.

The Sixth Amendment, made applicable to the states through the Due Process Clause of the Fourteenth Amendment, guarantees that an accused shall enjoy the right to a trial by an impartial jury. *Parker v. Gladden*, 385 U.S. 363, 364 (1966). Further, a federal court must initially presume that a jury was impartial. *United States v. Ruggiero*, 56 F.3d 647, 652 (5th Cir. 1995); *De La Rosa v. Texas*, 743 F.2d 299, 306 (5th Cir. 1984). The court will not readily presume that a juror is biased. *Willie v. Maggio*, 737 F.2d 1372, 1379 (5th Cir. 1984).

The bias of a juror may be actual or implied. *Solis v. Cockrell*, 342 F.3d 392, 395 (5th Cir. 2003). Only extreme situations would justify a finding of imputed bias. *Id.* at 396. "In evaluating claims of juror partiality, we must consider whether the jurors in a given case had 'such fixed opinions that they could not judge impartially the guilt of the defendant.'" *Chavez v. Cockrell*, 310 F.3d 805, 811 (5th Cir. 2002) (citing *Patton v. Yount*, 467 U.S. 1025, 1035 (1984)). In demonstrating actual bias, "admission or factual proof" of bias must be presented. *United States v. Bishop*, 264 F.3d 535, 554 (5th Cir. 2001); *Yount*, 467 U.S. at 1036 ("Rather it is plainly [a question] of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed."). As such, a presumption of correctness applies in federal habeas, *Yount*, 467 U.S. at 1038, to the already deferential review afforded the trial court's finding of no bias. *See Skilling v. United States*, 561 U.S. 358, 396 (2010) ("In reviewing [juror-bias claims], the deference due to district courts is at its pinnacle.").

As correctly explained in Broadnax's petition, the "Eighth Amendment requires that the jury be able to consider and give effect to a capital defendant's mitigating evidence." *Tennard v. Dretke*, 542 U.S. 274, 285 (2004) (citation omitted). Here, Broadnax's specific assertion that the venirepersons statements during voir dire rendered them unable to give effect to mitigating

evidence relies on *Eddings v. Oklahoma.* 455 U.S. 104 (1982). In *Eddings*, the Supreme Court reversed a death sentence when a trial judge expressly stated that he, as a matter of law, could not consider a young man's background as mitigation evidence. *Id.* at 114. The Court held, "Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence." *Id.* (emphasis added). The Court clarified, "The sentencer, and the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration." *Id.* at 114–15. The Court explained that because the judge refused to consider the defendant's upbringings as a matter of law, he violated the defendant's constitutional rights. *Id.* It held, "In this instance, it was as if the trial judge had instructed a jury to disregard the mitigating evidence Eddings proffered on his behalf." *Id.* at 114.

> ### A. Broadnax's assertions as to panel members who did not sit on the jury fail to allege constitutional violations and lack merit.

As an initial matter, Broadnax complains of the trial court's denial of his challenges to multiple veniremembers who were not a part of the jury, and he argues that the errors all "individually and cumulatively entitle [him] to habeas corpus relief." Petition at 74. However, as explained above, a complaint

that the trial court improperly denied a challenge for cause to a venireperson who was not seated on the jury does not allege the violation of a constitutional right. *See Ross*, 487 U.S. at 88; *Martinez-Salazar*, 528 U.S. at 307. As such, his contentions regarding veniremembers who were not part of the jury fail to allege constitutional violations and are irrelevant to his federal habeas claim.

Alternatively, the state court reasonably determined that these venirepersons were not biased. Broadnax's sole complaint about these venirepersons is that they indicated that they would be unable to consider mitigating evidence. However, the CCA properly explained:

> Each of these fifteen . . . said that they could listen to the mitigating evidence and answer the special issues in accord with the law and the facts. There is no requirement that venire members be able to think of sufficiently mitigating circumstances on their own, or that they find any particular circumstance to be sufficiently mitigating. We do not find [Broadnax]'s allegation of mitigation-impairment for any of these fifteen venire members to be evidence of a bias against the law.

*Broadnax v. State*, 2011 WL 6225399, at *5 (citations omitted). Indeed, to the extent it is relevant to the constitutional analysis, the CCA's determination that these venire members were not prevented, as a matter of law, from considering mitigation evidence was reasonable under clearly established federal law.

~ 103 ~

**B.** **The state court reasonably denied Broadnax's claim that the trial court erred by not striking Juror John Vessels for cause based on his inability to give examples of mitigating circumstances.**

The record does not support Broadnax's claim that juror John Vessels—the only member of the jury who was challenged for cause by the defense—was unable to consider mitigation evidence. Petition at 76–77. Broadnax contends that the trial court committed constitutional error by denying his challenge for cause to Vessels because he "was unable to follow the law and would not give effect to mitigating circumstances." *Id*. The record proves otherwise.

Juror Vessels expressly stated that even if he found Broadnax guilty of capital murder, he could answer the mitigation special issue with an open mind, and that mitigating circumstances would allow him to answer "yes" on the issue. 35 RR 56. *See Chavez*, 310 F.3d at 811 ("In evaluating claims of juror partiality, we must consider whether the jurors in a given case had 'such fixed opinions that they could not judge impartially the guilt of the defendant.'"); *see also Coleman v. State*, 881 S.W.2d 344, 352 (Tex. Crim. App. 1994) (holding that the trial court did not err in denying a challenge for cause for an inability to consider mitigating evidence where the record showed that the prospective juror could listen to the evidence with an open mind).

Despite these unequivocal affirmations, Broadnax claims that Juror Vessels was biased because, during an exchange with defense counsel at voir

dire, he was unable to give examples of mitigation evidence off the top of his head. 35 RR 80. The CCA denied this claim on direct appeal, holding, "There is no requirement that venire members be able to think of sufficiently mitigating circumstances on their own, or that they find any particular circumstance to be sufficiently mitigating." *Broadnax v. State*, 2011 WL 6225399, at \*5. Indeed, Juror Vessels's inability to conjure up potential hypotheticals did not render him unable to follow the law or consider mitigating evidence. The CCA's denial of this claim was therefore objectively reasonably.

### C.   Broadnax's claims that the trial court erred by not striking Vessels for cause based on his answers on the Juror questionnaire are procedurally barred and lack merit.

Broadnax also contends that two answers provided by Juror Vessels on his juror questionnaire indicated that he could not give effect to mitigation evidence. Petition at 77. Specifically, Broadnax refers to  the fact that Juror Vessels explained that he did not agree with Texas law that voluntary intoxication may be considered at punishment and answered "no" when asked if  genetics, circumstances of birth, upbringing and environment should be considered when determining the proper punishment for someone convicted of a crime. 57 RR (Vessels Questionnaire pp. 6, 8). However, Broadnax did not raise these assertions to the state court on direct appeal; instead, he argued only that Juror Vessels's answers on voir dire showed that he would

automatically answer yes to the future dangerousness special issue—an argument he has not renewed on federal habeas review—and that he could not give examples of specific mitigating circumstances off the top of his head. Appellant's Brief at 77. He did not present any argument concerning Juror Vessels's questionnaire answers related to voluntary intoxication or a defendant's upbringing, and the CCA accordingly did not have the opportunity to address this issue. Thus, because the CCA would now refuse to hear this claim, it is procedurally defaulted.[46]

In any event, these answers did not indicate that Juror Vessels would not consider mitigation evidence or that he was precluded as a matter of law from considering any evidence. Notably, counsel did not probe these questions with Juror Vessels during voir dire. Indeed, under Texas law, counsel would not have been permitted to ask them. *See Raby v. State*, 970 S.W.2d 1, 3 (Tex. Crim. App. 1998) (voir dire questions asking a juror to commit whether they consider any specific kind of evidence mitigating are improper commitment questions). And under express Fifth Circuit precedent, "the law is clear that a

---

[46]    Notably, Broadnax's trial counsel also did not challenge Vessels for cause on this basis. Instead, trial counsel only argued that Vessels should be excluded because: "He told us if he finds the defendant guilty of capital murder he's going to answer Special Issue No. 1 yes and can't think of anything that is going to mitigate against the death penalty in answer to Special Issue No. 3. We feel the juror is not qualified." 35 RR 80; *see also* 38 RR 80–81 (renewed challenge for cause). Thus, the procedural bar is particularly relevant here because the trial court did not have an opportunity to rule on this argument, and the appellate court, in turn, did not have the opportunity to apply state law preservation requirements. *See* Tex. R. App. P. 33.1.

defendant in a capital case is not entitled to challenge prospective jurors for cause simply because they might view the evidence the defendant offers in mitigation of a death sentence as an aggravating rather than a mitigating factor." *Dorsey v. Quarterman*, 494 F.3d 527, 533 (5th Cir. 2007).

Juror Vessels's answers revealed that, without being instructed on the special issues of Texas capital sentencing law, he did not agree with Texas laws about voluntary intoxication and that, as a general matter, he did not believe a person's upbringing should be considered when determining punishment. These answers, at most, indicated that he simply did not afford much weight to a specific kind of evidence at punishment, not that he would refuse to

consider the evidence when answering the special issues.[47] *Id*. This falls far short of showing that Juror Vessels was precluded as a matter of law from considering mitigation evidence. *See Eddings*, 455 U.S. at 114 ("In this instance, it was as if the trial judge had instructed a jury to disregard the mitigating evidence Eddings proffered on his behalf."). Perhaps more importantly, to any extent Juror Vessels's answers on his questionnaire could be construed to represent a "bias," he was clearly rehabilitated when he

---

[47]    Broadnax cites the Fifth Circuit case *Soria* v. *Johnson*, 207 F.3d 232, 245 (5th Cir. 2000), in support of his position. Petition at 75, 82. In *Soria*, the trial court denied a defendant's challenge for cause to a venireperson who stated that youthfulness would not have any effect on his answers to the special issues. 207 F.3d at 245 n. 14. The Fifth Circuit reasoned that "it appears that [the venireperson's] views were such that he should have been excused for cause," but ultimately determined that there was no constitutional error because the venireperson was not selected for the jury. *Id*. As an initial, matter the Fifth Circuit's statement that "it appears" that the challenge for cause should have been granted, does not support a conclusion that clearly established law compelled the state court to rule as such. Moreover, the present circumstances are clearly distinguishable from *Soria* as (1) Juror Vessels's opinions were given on a juror questionnaire and did not indicate that he would not consider any evidence in consideration of the death penalty special issues; and (2) Juror Vessels subsequently expressly stated that he would keep an open mind and would follow the law after it was explained to him at voir dire.

Moreover, the Fifth Circuit seems to have subsequently departed from this dicta in *Soria*. In *Dorsey*, the petitioner raised a similar claim that the trial court improperly denied challenges for cause to venirepersons who "said they would not consider youth as a mitigating factor." 494 F.3d at 533. While the Fifth Circuit held that this claim was procedurally barred and failed to raise a constitutional issue because the venirepersons were peremptorily challenged, it also reasoned, "As to the merits, the law is clear that a defendant in a capital case is not entitled to challenge prospective jurors for cause simply because they might view the evidence the defendant offers in mitigation of a death sentence as an aggravating rather than a mitigating factor." *Id*.

indicated, after the law was explained to him during voir dire, that he would be able to keep an open mind on, and answer yes to, the mitigation special issue. *See Dorsey*, 494 F.3d at 533 (finding that the state court reasonably denied a challenge for cause when the venireperson initially answered that he would automatically assess the death penalty after a guilty verdict, but, after the law was explained to him, agreed he could follow the law and require that the State meet its burden of proof). Accordingly, Broadnax fails to show that Juror Vessels had "such fixed opinions that [he] could not judge impartially" when answering the mitigation special issue. *See Chavez*, 310 F.3d at 811. As such, even if this claim were not procedurally barred, it must be denied.

## VI. Broadnax's Claim that the Trial Court Erred by Admitting Evidence Obtained During the Search of His Prison Cell Is Not Cognizable on Federal Habeas Review and Was Reasonably Rejected By the State Court (Claim 11).

Broadnax contends that the admission of evidence discovered during a shakedown search of his shell violated his Fourth Amendment right to privacy. Petition at 90–97. This claim is not cognizable on federal habeas review and lacks merit.

### A. The claim is barred pursuant to *Stone v. Powell* and is therefore not cognizable on federal habeas review.

Where a state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on that claim. *Stone v. Powell*, 428 U.S. 465, 494 (1976).

The Fifth Circuit has since interpreted an "opportunity for full and fair litigation" to mean just that: "an opportunity." *Janecka v. Cockrell*, 301 F.3d 316, 320–21 (5th Cir. 2002) (citing *Caver v. Alabama*, 577 F.2d 1188, 1192 (5th Cir. 1978)). The mere allegation that the state court erred in its determination of the Fourth Amendment issue does not suffice to circumvent *Stone*. *See Sonnier v. Maggio*, 720 F.2d 401, 409 (5th Cir.1983). *Stone* forecloses review absent allegations that the processes provided by a state are routinely or systematically applied in such a way as to prevent the actual litigation of Fourth Amendment claims on their merits. *Moreno v. Dretke*, 450 F.3d 158, 167 (5th Cir. 2006).

Here, Broadnax had an opportunity to raise his Fourth Amendment claim through a motion to suppress the contents of the cell search and through his direct appeal to the CCA. 49 RR 3–35; *Broadnax v. State*, 2011 WL 6225399, at *10. Nonetheless, Broadnax contends that he did not have a full and fair chance to litigate his claim because the trial court and CCA relied on an application of the "incorrect law" instead of a full and fair hearing on the facts. Petition at 96 (citing *Gamble* v. *Oklahoma*, 583 F.2d 1161, 1165 (10th Cir. 1978). To the contrary, as explained further below, the trial court and CCA relied on prior CCA precedent that in turn relied on appropriate United States Supreme Court jurisprudence. *See below*, Section VI(B). Even if this was not a proper interpretation of the law, the Fifth Circuit has explicitly held that *Stone*

must still apply. *Swicegood v. Alabama,* 577 F.2d 1322, 1324 (5th Cir.1978) ("If the term 'fair hearing' means that the state court must correctly apply federal constitutional law, *Stone* becomes a nullity."); *Balentine v. Quarterman*, 324 Fed. Appx. 304, 307 (5th Cir. 2009) ("We find no evidence of "willful" rejection of controlling precedent by the Texas court. At most, there might have been a misapplying of federal constitutional law. That does not suffice."). Accordingly, Broadnax's Fourth Amendment claim is barred by *Stone* and is therefore not cognizable on federal habeas review.

### B.   Alternatively, the CCA reasonably determined that the search did not violate the Fourth Amendment.

In denying Broadnax's claim, the CCA relied on its prior precedent holding "that a shakedown search of a pretrial detainee's cell does not violate the Fourth Amendment or due process." *Broadnax v. State*, 2011 WL 6225399, at \*10. Indeed the Supreme Court has held that a prisoner does not have a reasonable expectation of privacy in a prison cell.*"Hudson v. Palmer*, 468 U.S. 517, 527–30. (1984).

In his petition, Broadnax contends that *Hudson* stands for the proposition that "a convicted prisoner's rights to privacy are sometimes outweighed by the security concerns of penal institutions." Petition at 92. To the contrary, the Court held that a "prisoner's expectation *always* yields to what must be considered the paramount interest of institutional security."

*Hudson*, 468 U.S. at 528 (emphasis added). As such, the Supreme Court did not hold that a prison is required to show a security interest that allows it to conduct a search; rather, it expressly determined that a prisoner "does not have a reasonable expectation of privacy enabling him to invoke the protections of the Fourth Amendment . . . ." *Id*. at 530. The Supreme Court has not distinguished between prisoners and pre-trial detainees in regards to the privacy interest in a cell, and, in fact, even prior to *Hudson*, it explained that "[i]t may well be argued that a person confined in a detention facility has no reasonable expectation of privacy with respect to his room or cell and that therefore the Fourth Amendment provides no protection for such a person." *Bell v. Wolfish*, 441 U.S. 520, 556–57 (1979). And, ultimately, it concluded that assuming that such a right exists, a room search rule did not violate that right. *Id*.; *see also Block v. Rutherford*, 468 U.S. 576, 590 (1984) (following *Wolfish*'s precedent)

Nonetheless, Broadnax contends that the state court's decision was unreasonable because the Supreme Court has never held that a cell search intended solely to bolster the prosecution's case against a pre-trial detainee complies with the Fourth Amendment and because the Second Circuit has held that such a search is a violation of a detainee's privacy rights. Petition at 91–93; *United States* v. *Cohen*, 796 F.2d 20, 23 (2d Cir. 1986). Ignoring the fact that the assertion that a detainee has a privacy right in this context seems to

directly contradict the outright blanket rejection of the existence of such a right in *Hudson*, Broadnax certainly fails to show that clearly established federal law compels this conclusion as required by AEDPA.[48]

Moreover, to the extent this Court would consider creating such a rule, its retroactive application would be *Teague*-barred. Under *Teague*, "[t]he question is 'whether a state court considering [the defendant's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution.'" *Goeke*, 514 U.S. at 118. Here, the Supreme Court has never held that a pre-trial detainee, as opposed to normal prisoner, has an expectation of privacy in his cell; accordingly, such a holding would represent a new rule in violation of *Teague*. For the foregoing reasons, even if the claim were cognizable, it must be denied.

---

[48]    Further, in the event the court deems it relevant, Broadnax fails to show that the cell search was intended solely to bolster the state's case against him; instead, as explained by the CCA, the record reflects simply that the "District Attorney's investigator requested that an *already-planned* shakedown be rescheduled for earlier in the day, when he could attend and take photographs." *Broadnax v. State*, 2011 WL 6225399, at *10 (emphasis added); 49 RR 16 ("since the Sherriff's Office conducts regular shakedowns anyway, we wanted one of our people there to assist them in— in a sense that they would stand by and take photographs of anything in the cell that was something of value").

## C.  Alternatively, any error did not have a substantial and injurious effect on the verdict.

In *Brecht v. Abrahamson*, the Supreme Court held that a federal court may grant habeas relief based on trial error only when that error "'had substantial and injurious effect or influence in determining the jury's verdict.'" 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also Fry v. Pliler*, 551 U.S. 112, 121 (2007) (explaining that the *Brecht* standard applies regardless of whether the state court recognized the constitutional error or reviewed it for harmless-error). Under this standard, a constitutional trial error is not so harmful as to entitle a defendant to habeas relief unless there is more than a mere reasonable possibility that it contributed to the verdict. *See e.g. Penry*, 532 U.S. at 795–96. Indeed, given the brutal nature of crime committed, his lack of remorse, his statements that he would commit multiple murders if not given the death penalty, and the evidence presented of his violent behavior in prison, Broadnax cannot show that the admission of evidence obtained during the search had a substantial and injurious effect on the jury's verdict. See *Brecht*, 507 U.S. 619, 637. For the foregoing reasons, even it were cognizable, Broadnax's Fourth Amendment claim must be denied.

**VII. Broadnax's Claim that the Trial Court Erred by Admitting Dr. Price's Testimony Concerning Psychopathy is Procedurally Barred and Lacks Merit (Claim 12).**

Broadnax contends that his due process rights were violated by the admission of Dr. Jack Randall Price's testimony relating to psychopathy. Petition at 97–114. In this regard, Broadnax actually asserts two separate claims: (1) that this testimony was irrelevant such that it rendered his trial fundamentally unfair; and (2) that the admission of the testimony constituted the knowing presentation of false evidence by the State in violation of *Giglio* v. *United States*, 405 U.S. 150, 154 (1972). The former is procedurally barred and lacks merit; the latter was reasonably rejected by the state court.

**A.    Relevant facts**

At the punishment phase of his trial, Broadnax elicited the testimony of Dr. Frank Lane, a jail psychiatrist who treated Broadnax. 50 RR 78–80. Dr. Lane testified that in his opinion, while in prison, Broadnax "had substance-induced psychosis, anxiety, versus malingering mental illness, [and] antisocial personality traits." *Id*. at 88. Towards the end of his testimony, Dr. Lane stated that there was a "possibility [Broadnax] also had antisocial personality disorder." *Id*. at 99. He explained that "a personality disorder is a more entrenched derangement of the personality that can't be diagnosed until the age of 18 or older, and it is an enduring pattern of behavior. And it occurs not simply after exposure to a drug, or, say, in response to a medical condition like

a brain tumor or hormone imbalance or something of that nature." *Id*. Dr. Lane explained that he could not diagnose Broadnax with the disorder because he was not aware of Broadnax's history prior to the age of 15. *Id*. at 100.

The trial court allowed the State to call Dr. Price to rebut Dr. Lane's testimony. 52 RR 230. Dr. Price first explained that he is a licensed clinical and forensic psychologist. *Id*. 239–40. He subsequently detailed the traits of a psychopathic personality. *Id*. at 249–57. He also testified that psychopathy is a "persistent condition" and that "there is no effective treatment." *Id*. at 258. On cross-examination, Dr. Price admitted that these characteristics are not listed in the DSM-IV but that the most similar diagnosis in the DSM is antisocial personality disorder. *Id*. at 259. He explained that between 80 and 85 percent of people in prison have antisocial personality disorder and "probably only 15 to 25 percent of people in prison would meet the characteristics of the traits of a psychopath." *Id*. at 261. Dr. Price agreed with defense counsel's statement that people can have the traits of psychopathic personality but "can outgrow some of these kinds of things." *Id*. at 263.

### B. Broadnax's fundamental fairness claim is procedurally barred, foreclosed by precedent, and lacks merit.

#### 1. The claim is procedurally barred.

As an initial matter, the state court determined that Broadnax's state law evidentiary claim was procedurally barred because he did not raise the

claim on direct appeal.[49] 3 SHCR 249 (¶¶ 196–199). Accordingly, because the state court applied an adequate and independent procedural rule, the claim is likewise procedurally barred on federal habeas review. *See Aguilar,* 428 F.3d at 535.

In his petition, Broadnax contends that the claim is not defaulted because the state habeas court alternatively denied his claim on the merits. Petition at 108. However, this argument is foreclosed by Fifth Circuit precedent. *Corwin v. Johnson*, 150 F.3d 467, 473 (5th Cir. 1998) ("It is clear in this Circuit that alternative rulings do not operate to vitiate the validity of a procedural bar that constitutes the primary holding.") In addition, Broadnax contends that his default was excused by trial counsel ineffectiveness under *Martinez/Trevino*; however, as explained previously, *Martinez* does not apply

---

[49]     In his state habeas application, Broadnax argued that the State presented false and misleading testimony through Dr. Price. 1 SHCR 89–95. However, in this argument, Broadnax did reference his trial counsel's objections based on the Texas Rules of Evidence. As explained above, in its findings of fact, the state habeas court found the challenges to evidentiary rules to be procedurally barred, "to the extent they were raised"; and it alternatively found they were meritless "even if construed as a constitutional claim." 3 SHCR 249 (¶¶ 196, 200). As such it appears that the state court construed and addressed Broadnax's state habeas claim as challenging the admissibility of the evidence under Texas Rules of Evidence Rule 702, even in a constitutional posture. Accordingly, the Director contends that the state procedural bar rule and AEDPA deference should apply to this claim. Alternatively, this Court could hold that the claim was not raised at all in state court and that it is procedurally defaulted because it would now be procedurally barred by the CCA. *See Coleman*, 501 U.S. 722, 735 n.1; *Nobles*, 127 F.3d at 423.

to trial court error claims. *Davila*, 2017 WL 2722418, at \*4; *Vasquez*, 597 Fed. Appx. at 778; *Reed*, 739 F.3d at 778 n.16. Moreover, the default could not possibly be excused by ineffective assistance because the record establishes that trial counsel did in fact object to the admissibility of Dr. Price's testimony. 52 RR 227–28. Accordingly, Broadnax's fundamental fairness due process claim is procedurally defaulted on federal habeas review.

### 2. Alternatively, the claim is foreclosed by Supreme Court and Fifth Circuit precedent.

Broadnax contends that the admission of Dr. Price's expert testimony violated *Daubert*, and its state court counterpart *Kelly*, because (1) the testimony did not "fit the facts of the case," and (2) the testimony relied on unreliable science. Petition at 100–06 (citing *Daubert* v. *Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993) and *Kelly* v. *State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992) (en banc)). However, this claim challenging the admissibility of the State's future dangerousness testimony is foreclosed by Supreme Court and Fifth Circuit precedent.

In *Barefoot v. Estelle* the Supreme Court held that the introduction of expert testimony of future dangerousness does not violate the Constitution. 463 U.S. 880, 896–903 (1983); *see also United States v. Scheffer*, 523 U.S. 303, 334 (1998) (Stevens, J., dissenting) ("There is no legal requirement that expert testimony must satisfy a particular degree of reliability to be admissible.

Expert testimony about a defendant's 'future dangerousness' to determine his eligibility for the death penalty, even if wrong 'most of the time,' is routinely admitted."). Indeed, in the federal habeas review of state convictions context, the Fifth Circuit has expressly held that "*Daubert* does not apply to the standards governing the admissibility of expert evidence at a capital sentencing hearing." *Williams v. Stephens*, 761 F.3d 561, 571 (5th Cir. 2014). Further, the Fifth Circuit has even acknowledged that this claim that a State's expert on future dangerousness fails to meet *Daubert* requirements is "squarely foreclosed." *Rivas v. Thaler*, 432 F. App'x 395, 404 (5th Cir. 2011). Even in federal death penalty cases, *Daubert* does not apply to sentencing proceedings. *See United States v. Fields*, 483 F.3d 313, 341–43 (5th Cir. 2007). While Broadnax frames his claim as a state law fundamental fairness claim, he expressly relies entirely on a *Daubert* analysis. As such, even if it were not procedurally barred, his claim must be denied.

### 3.    Alternatively, the claim lacks merit.

The state court reasonably denied Broadnax's "fundamental fairness" claim. 3 SHCR 249 (¶ 200). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). Evidentiary rulings of a state court do not warrant federal habeas corpus relief unless the errors are so extreme that they constitute a denial of fundamental

~ 119 ~

fairness under the Due Process Clause. *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998).

Only those errors that violate "those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' and which define 'the community's sense of fair play and decency,'" will render a trial fundamentally unfair. *Id.* at 353 (citing *United States v. Lovasco*, 493 U.S. 783, 790 (1977)); *see also Menzies v. Procunier*, 743 F.2d 281, 288 (5th Cir. 1984) ("An unfair trial has been characterized as one that has been 'largely robbed of dignity due a rational process'") (quoting *Houston v. Estelle*, 569 F.2d 372, 383 (5th Cir. 1978)). Habeas relief is warranted only when an erroneous admission played a crucial, critical, and highly significant role in the trial. *Skillern v. Estelle*, 720 F.2d 839, 852 (5th Cir. 1983).

To warrant relief, the trial court error must do more than merely affect the verdict; it must render the trial as a whole fundamentally unfair. *Bailey v. Procunier*, 744 F.2d 1166, 1168 (5th Cir. 1984); *Nelson v. Estelle*, 642 F.2d 903, 907 (5th Cir. 1981). The test applied to determine whether an error by the trial court rendered the trial fundamentally unfair is if there is a reasonable probability that the verdict would be different had the trial been conducted properly. *See Rogers v. Lynaugh*, 848 F.2d 606, 609 (5th Cir. 1988).

First, Broadnax contends that the testimony was irrelevant because it did not "fit the facts of the case." Petition at 102. In this regard, he relies on

Texas law that requires courts to admit only "sufficiently reliable and relevant" evidence. *Kelly*, 824 S.W.2d at 572 (en banc) (adopting *Daubert*, 509 U.S. at 591). Broadnax correctly points out that expert testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *E.I. du Pont de Nemours & Co.* v. *Robinson*, 923 S.W.2d 549, 555–56 (Tex. 1995). In this regard, "[e]vidence that has no relationship to any of the issues in the case is irrelevant" and is inadmissible under Texas law. *Id.*

Here, defense counsel elicited testimony from Dr. Lane about Broadnax's drug-induced psychosis at that time of the murder, presumably both to mitigate his responsibility for the crimes and to suggest that he might not be a future danger. 50 RR 97 ("It seemed that his psychotic symptoms had improved, but the toxic exposure was probably fading . . ."). However, Dr. Lane also testified that Broadnax displayed traits of a person with antisocial personality disorder, which he explained is a "more entrenched derangement of personality" and is indicative of a "more enduring pattern of behavior." *Id.* at 99. Dr. Lane did not describe specific traits of a person with antisocial personality disorder and testified that he was unable to diagnose Broadnax because he did not have enough information. *Id.* at 99–100.

The State sought to admit Dr. Price's testimony in order to fill in details related Dr. Lane's vague testimony about antisocial personality disorder. This was an attempt to rebut any suggestion that Broadnax's behavior was solely

~ 121 ~

the result of drug-use, but instead, potentially a product of a "more entrenched derangement of personality" that Dr. Lane explicitly testified Broadnax showed signs of having. In this regard, Dr. Price's more specific testimony regarding the traits that Dr. Lane referenced certainly "fit the facts of the case."

Broadnax is incorrect in asserting that Dr. Price's testimony was irrelevant because he had not tested Broadnax. *See Barefoot*, 463 U.S. at 903 ("Expert testimony, whether in the form of an opinion based on hypothetical questions or otherwise, is commonly admitted as evidence where it might help the factfinder do its assigned job.") And Broadnax's contention that Dr. Price's testimony was irrelevant as a rebuttal because Dr. Lane testified about antisocial personality disorder not psychopathy is also unavailing. Dr. Price explained that antisocial personality is similar to psychopathy but less common. Indeed, Dr. Price testified about traits of a similar disease that the jury easily could have made a fact determination that Broadnax possessed; the fact that he opined about a disease that is less common did not render his testimony irrelevant. Ultimately, Broadnax fails to show that this testimony "had no relationship to any of the issues in the case." *Robinson*, 923 S.W.2d 549, 555–56. But more importantly, he cannot establish that its admission rendered his trial as whole fundamentally unfair. *See Little*, 162 F.3d at 862.

Next, Broadnax argues that Dr. Price's testimony had no scientific basis such that it should not have been admitted under Texas law. In this regard he argues that the tests are unreliable under *Daubert*. Petition at 104–06; *see Daubert*, 509 U.S. at 591. In support, Broadnax cites the affidavit of forensic psychologist Dr. John Edens and scholarly material he has attached that he claims establish that the Psychopathy Checklist Revised (PCL-R) scale relied on by Dr. Price is unreliable. Petition at 105–06 (citing 2 SHCR 121–25 (Edens Affidavit)). He also references an evidentiary ruling by a district court in the Northern District of Indiana in which the court did not allow PCL-R testing to be done by the government in a federal criminal trial. *United States* v. *Taylor*, 320 F. Supp. 2d 790, 794 (N.D. Ind. 2004).[50]

However, PCL-R tests have been accepted by multiple federal courts— most notably the Fourth Circuit has explicitly determined that a trial court did not abuse its discretion by deciding that PCL-R was admissible to show a defendant is a psychopath for purpose of proving future dangerousness. *United States v. Barnette,* 211 F.3d 803, 821–22 (4th Cir. 2000); *see also United States v. Mitchell*, 706 F. Supp.2d 1148, 1217–18 (D. Utah 2010); *United States v. Williams*, 731 F. Supp. 2d 1012, 1024 (D. Hawaii 2010) (determining that

---

[50]   In *Taylor*, there is no indication that the government provided any testimony from a licensed doctor when it sought to permission to have testing done. *See* 320 F. Supp. 2d at 794.

testimony concerning PCL-R tests exceeded the scope of rebuttal to mental health defense at guilt-innocence but not calling their reliability into question.) Given that federal courts have sanctioned the use of these tests, and a credentialed psychologist provided the testimony, Broadnax cannot show that the state court's evidentiary ruling allowing the admission of testimony related to PCL-R tests was unreasonable in light of Supreme Court precedent, much less that it rendered his trial fundamentally unfair.

### C.   The state court reasonably rejected Broadnax's *Giglio* claim as to Dr. Price.

Broadnax also claims that the use of Dr. Price's testimony constituted the State's knowing presentation of false evidence in violation of his due process rights. This claim was reasonably rejected by the CCA.

The State denies a criminal defendant due process when it knowingly uses false evidence at trial or allows untrue testimony to go uncorrected. *See Giglio*, 405 U.S. at 153; *see also Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir. 1996). "To establish a due process violation based on the government's use of false or misleading testimony, the defendant must show (1) that the witness's testimony was actually false, (2) that the testimony was material, and (3) that the prosecution knew the witness's testimony was false." *Fuller*, 114 F.3d 491, 496 (5th Cir. 1997) (citing *Giglio*, 405 U.S. at 153–54). In adjudicating a *Giglio* claim, the "any reasonable likelihood" standard has been applied to determine

materiality. 405 U.S. at 153–54; *see also Strickler v. Greene*, 527 U.S. 263, 299, (1999) ("We have treated "reasonable likelihood" as synonymous with "reasonable possibility" and thus have equated materiality in the perjured-testimony cases with a showing that suppression of the evidence was not harmless beyond a reasonable doubt.").

As explained above, in response to the testimony of Broadnax's own expert regarding his potential anti-social personality disorder, Dr. Price, a credentialed psychologist, testified to inform the jury about the traits of psychopathic personality; he did not state that Broadnax was a psychopath or provide any testimony about Broadnax. 52 RR 249–57. Broadnax fails to point to any specific evidence he deems false, but rather explains that he can now proffer evidence indicating that the characteristic trait tests described by Dr. Price are unreliable. This claim therefore does not even allege the knowing

presentation of evidence that is actually false.[51] *See Clark v. Johnson*, 202 F.3d 760, 766–67 (5th Cir. 2000) (explaining that mere differences of opinion between expert witnesses do not, standing alone, establish that either expert furnished false, misleading, or perjured testimony); *Boyle v. Johnson*, 93 F.3d 180, 186–87 (5th Cir. 1996) (same). Moreover, as explained above, the testimony regarding the PCL-R tests was sponsored by a credentialed psychologist, and federal courts have accepted such testimony in similar contexts.

As explained by the state habeas court, by presenting Dr. Edens's affidavit and testimony on state habeas review, "[a]t most, [Broadnax] has shown a difference of opinion between two qualified experts. If Dr. Edens had testified at [Broadnax]'s trial, it would simply have been a battle of the

---

[51]     The state habeas court, in part, determined that Broadnax's false presentation of evidence claim might have alleged an Eighth Amendment violation. SHCR at 249 (¶ 201). In response, the court found that the Eighth Amendment "is not implicated by the State's use of false or misleading testimony." *Id*. In his petition, Broadnax does contend, as part of his due process claim, that there "is a special need for reliability in the determination that death his appropriate punishment in capital cases." Petition at 106 (citing *Johnson* v. *Mississippi*, 486 U.S. 578, 584 (1988)). The Director does not construe this as a separate claim from Broadnax's *Giglio* claim; however, to the extent that it is, the claim was reasonably denied by the state court. Indeed, presentation of false evidence is not an Eighth Amendment claim, and to the extent that it could be considered one, as explained above, Dr. Price's testimony was not false. *See Fuller*, 114 F.3d at 497 ("Because Fuller has not adequately shown Dr. Erdmann's testimony to be false or material, Fuller's Eighth Amendment claim must fail.")

experts." SHCR at 253 (¶ 229).[52]  It thus reasonably concluded that Dr. Price did not give false, misleading, or perjured testimony and that Broadnax's due process rights were not violated. *Id.* (¶¶ 230, 231).

Finally, Broadnax fails to show that the State knew of any "false" testimony. *See Giglio*, 405 U.S. at 153–54. Nor, given the substantial punishment evidence presented by the State, can he show that there is a reasonable likelihood of a different outcome had Dr. Price's testimony been excluded. *Id.* For the foregoing reasons, this claim must be denied.

## VIII. Broadnax's Claim That His Trial Counsel Was Ineffective in Handling Dr. Price's Testimony Is, In Part, Procedurally Barred and Lacks Merit (Claim 13).

Broadnax contends that trial counsel was constitutionally ineffective for (1) failing to retain "an expert to actually examine Mr. Broadnax and testify he is *not* a psychopath," and (2) failing to call an expert to testify about the shortcomings of the PCL-R as a scientific predictor of future dangerousness. Petition at 110. This claim is, in part, procedurally barred and entirely lacks merit.

---

[52]  Notably, the state court not only found that Broadnax's claim failed to establish a due process violation under *Giglio*, but also that he could not establish a violation under the lower standard applicable under Texas law, which does not require that the state's presentation of false evidence be knowing. SHCR at 250 (¶ 205) (citing *Ex parte Ghahremani*, 332 S.W.3d 470, 478 (Tex. Crim. App. 2011)).

**A.      Broadnax's claim that counsel was deficient for failing to retain and call an expert to test him and testify that he is not as psychopath is procedurally barred and lacks merit.**

As an initial matter, Broadnax's claim that he should have retained an expert to test him and testify that he is not psychopath is procedurally barred. This claim was not raised in state court, *see* 1 SHCR 96–101, and the CCA would now refuse to rule on its merits. Accordingly, the federal procedural default doctrine applies. *Coleman*, 501 U.S. at 735 n.1.

In any event, the claim lacks merit. As explained above, "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The Supreme Court, however, has observed that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91. A particular decision not to investigate further "must be directly assessed for reasonableness in all the circumstances," and a heavy measure of deference is given to counsel's strategic decisions. *Id.* at 691. Relatedly, for uncalled witnesses, an inmate must name the witness, prove the witness's availability, allege what the witness would have testified to, and explain how such

testimony would have been beneficial. *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).

In support his claim, Broadnax relies on an affidavit provided for the first time on federal habeas review indicating that Dr. Stephen A. Throne conducted a PCL-R assessment of Broadnax and is of the opinion that he is not a psychopath. ECF No. 30 at 8–13.[53] However, Dr. Thorne's affidavit is barred from this Court's review because it was not before the state court. *See Pinholster*, 563 U.S. at 181. In any event, Broadnax's claim that trial counsel should have called Dr. Thorne lacks merit.

Defense counsel Brad Lollar testified at the state habeas hearing that the trial team had retained a mental health expert, Dr. Gilda Kessner, who attended the punishment phase of trial and was prepared to testify. 3 SHRR 157–58. Lollar explained that none of the doctors who testified at guilt/innocence or punishment stated that Broadnax "was either a psychopath or antisocial." Id. at 158. He recalled that the defense team had a discussion about whether or not to call Dr. Kessner. *Id.* at 159. Lollar reiterated that Dr. Price did *not* testify that Broadnax was either a psychopath or antisocial and explained,

> [W]hat was important to me that—*and I have had it done many times in the past* where even if the State psychiatrist has not

---

[53]   Dr. Thorne's affidavit can be found in the original appendix filed by Broadnax after he filed his original petition. ECF No. 30 (original appendix).

personally interviewed the defendant, they could certainly give a diagnosis based on a hypothetical that had the exact same characteristics as a defendant does in a particular case. So I was afraid if we called Dr. Kessner to dispute, I guess, the Harris Psychopathy checklist that Dr. Price had gone through, that the State would be able to take advantage of that situation with her on the stand and make her go through a hypothetical situation listing all the characteristics that James Broadnax had. And I was afraid they were going to take my psychiatrist, my psychologist, and turn them into a State's witness.

*Id*. at 159–60 (emphasis added).

Dr. Thorne's affidavit merely confirms the significant risk trial counsel sought to avoid. In his affidavit, Dr. Thorne stated: "Though I do not *believe* Mr. Broadnax is a psychopath, I do note that review of the collateral records made available suggests he had, at times prior to his trial in relation to the instant offense, displayed some of the traits/characteristics commonly associated with psychopathy." ECF No. 30 at 11 (emphasis added). Indeed, had Broadnax called an expert to the stand, even Dr. Thorne, to testify that he was not a psychopath, that expert would have been subject to thorough cross-examination on these traits Broadnax had in common with psychopaths. Dr. Thorne's admission that Broadnax displayed psychopathic traits constitutes much more damaging evidence than Dr. Price provided, as Dr. Price did not testify that Broadnax displayed any psychopathic traits. Moreover, as noted by Lollar in his statement, neither Dr. Price nor Dr. Lane testified that Broadnax had antisocial personality disorder; had defense counsel been able to retain an

expert to testify that Broadnax was not a psychopath, they also would have risked the possibility that the same expert would have delivered more testimony that Broadnax displayed traits consistent with antisocial personality disorder. As Dr. Lane had already testified that antisocial personality disorder was an "entrenched" disease, this testimony could have been significantly harmful. 50 RR 99.

In addition, had defense counsel sought to delay the trial so that they could have Broadnax tested for psychopathy, it would have given the State the opportunity to do the same with its own expert, and could have risked rebuttal testimony much more damaging than Dr. Price's generic testimony about the traits of a psychopath. Given the circumstances, counsel's decision to use their expert to help them vigorously cross examine Dr. Price about his rather benign general testimony constituted strong advocacy; and it was certainly a reasonable choice not to call an expert that could have invited significantly more damaging testimony. *See Strickland*, 466 U.S. at 691.

> **B.    The state court reasonably denied Broadnax's claim that his counsel was ineffective for failing to call an expert to testify about PCL-R testing.**

Broadnax also contends that trial counsel should have called an expert to testify about the "shortcomings" of PCL-R as a predictor for future dangerousness. Petition at 110. In this regard, Broadnax suggests that counsel

should have called Dr. Edens to testify. *Id.* Broadnax raised this claim in his state habeas application, and it was reasonably rejected.

As explained extensively above, counsel Brad Lollar testified that the trial team had retained an expert that was ready to testify, but based on his previous trial experiences and the fact that no doctor had testified that Broadnax had any psychopathic traits, he believed that calling his expert risked eliciting significantly more damaging testimony. *See above*, Subsection (A); 3 SHRR 159–60. While Dr. Edens states in his affidavit that he could have testified regarding his opinion as to the shortcomings of PCL-R tests, like with Dr. Thorne, he also would have been cross-examined on Broadnax's traits that tend to show he was a psychopath or had antisocial personality disorder. 2 SHCR 121–25 (Edens Affidavit). In any event, especially in light of the fact that Dr. Price did not state that Broadnax was a psychopath, counsels' reasoned decision to avoid risking harmful testimony was constitutionally sound trial strategy.

Moreover, the state habeas court expressly relied on counsel's reasoning during the state habeas hearing in making a fact-finding that, had they called an expert, counsel risked the possibility that the expert would admit that under a hypothetical, [Broadnax] was a psychopath." 3 SHCR 255 (¶247). And the court ultimately found that trial counsel was not ineffective for failing to call a mental health expert. *Id.* (¶ 252). For the reasons discussed above, this

~ 132 ~

determination was objectively reasonable. *See Richter*, 562 U.S. at 105. (explaining that the standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so.") Accordingly, Broadnax's claim must be denied.

## C.    Broadnax fails to show prejudice.

Further, Broadnax cannot show that he was prejudiced as a result of any of counsel's decisions related to Dr. Price's testimony. 3 SHCR 255 (¶254) ("there is no reasonable probability that, but for the alleged deficiency, the result of the proceeding would have been different"). When evaluating prejudice, a reviewing court must "consider all the relevant evidence that the jury would have had before it if [the inmate] had pursued a different path— not just the . . . evidence [the inmate] could have presented, but also the . . . evidence that almost certainly would have come in with it." *Wong v. Belmontes*, 558 U.S. 15, 20 (2009). Here, given that an expert called to testify likely would have admitted that Broadnax possessed psychopathic traits, which would have been the first instance of such testimony, Broadnax fails to show a reasonable probability of a different outcome. *Strickland*, 466 U.S. at 694.

In addition, given the brutal nature of the crime committed, his lack of remorse, his statements that he would kill again if not given the death penalty, and the evidence of his violent behavior in prison, including prison phone calls where he bragged about the behavior, Broadnax cannot show that he was

~ 133 ~

prejudiced even if he could have called an expert to successfully rebut Dr. Price's general testimony about the traits of psychopath. *Id*. For the foregoing reasons, even if this claim were not procedurally defaulted, it must be denied.

## IX.   Broadnax's Claim that Appellate Counsel Was Ineffective for Failing to Challenge the Admissibility of Dr. Price's Testimony Is Procedurally Barred and Lacks Merit (Claim 14).

Broadnax contends that his appellate counsel was ineffective for failing to raise claims (1) that the trial court erred by admitting Dr. Price's testimony because it was irrelevant under Rules 410, 403, and 702 of the Texas Rules of Evidence; and (2) that Dr. Price's testimony violated his due process rights. Petition at 110–11. As an initial matter, Broadnax did not raise this claim in state court. Because the CCA would now refuse to rule on the merits of the claim and because Broadnax fails to allege cause and prejudice for the default, it is procedurally barred on federal habeas review.[54] *See Coleman*, 501 U.S. 722, 735 n.1. Alternatively, the claim lacks merit.

To succeed on an ineffective assistance of appellate counsel claim, a petitioner must satisfy the same *Strickland* two-pronged test discussed above. *Smith v. Robbins*, 528 U.S. 259, 286 (2000). To demonstrate deficiency he must

---

[54]   To any extent Broadnax might argue that his default is excused under *Martinez/Trevino*, that exception does not apply to claims of ineffective assistance of *trial* counsel. *Davila*, 2017 WL 2722418, at *4; *Vasquez*, 597 Fed. Appx. at 778; *Reed*, 739 F.3d at 778 n.16. In any event, as explained above, Broadnax's ineffective assistance of appellate counsel claim is not substantial, and state habeas counsel was not deficient for failing to raise it.

show that "counsel unreasonably failed to discover [and raise] nonfrivolous issues." *Smith*, 528 U.S. at 286. Appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select among them in order to maximize the likelihood of success on appeal." *Id*. at 765 (citing *Jones v. Barnes,* 463 U.S. 745 (1983)). It is possible that an ineffectiveness claim may be "based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent." *Id*. (citing *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)). As to the second prong, to prove prejudice, a petitioner must show that but for counsel's deficient performance, "he would have prevailed on appeal." *Smith*, 528 U.S. at 286.

First, Broadnax refers to his previous briefing on the relevancy and reliability of Dr. Price's testimony which entirely relied on *Daubert*. Petition at 111 (citing Parts III.B.2-iii). But the Fifth Circuit has explicitly held that *Daubert* does not apply to capital sentencing and has likewise consistently summarily denied claims alleging ineffective assistance of counsel for failure raise issues related to the reliability and relevancy of expert testimony on the future dangerousness special issue. *See Williams v. Stephens*, 761 F.3d 561, 571 (5th Cir. 2014) ("This court, moreover, has held that *Daubert* does not apply to the standards governing the admissibility of expert evidence at a capital sentencing hearing, and has rejected the notion that trial counsel is deficient for not challenging the continued validity of *Barefoot*.") (citations

~ 135 ~

omitted)); *Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002) ("[P]recedent from the Supreme Court, Fifth Circuit, and Texas Court of Criminal Appeals unanimously support the conclusion that an objection to Dr. Grigson's testimony would have been frivolous. Johnson's argument about the inadmissibility of Grigson's testimony is foreclosed by *Barefoot v. Estelle,* where the Supreme Court rejected the view that this type of evidence is inadmissible."). As explained previously, notwithstanding Broadnax's citations to the Texas Rules of Evidence, his claim challenges the relevancy and reliability of expert testimony on the future dangerousness special issue and consistently relies on *Daubert* and its progeny. As such, his ineffective assistance of appellate counsel claim in this regard is foreclosed by Fifth Circuit precedent.

Second, as explained in detail above, the evidence would not have been excluded under any evidentiary rule because Dr. Price's testimony was relevant. *See above*, Section VII(B)(3).

Third, and finally, Broadnax cannot show that appellate counsel would have been able to show that the admission of this evidence was harmful under either Texas law harmless error standard. Tex. R. App. P. 44.2(a) (for constitutional error, requiring that judgment be reversed unless the error did not contribute to conviction or punishment beyond a reasonable doubt), 44.2(b) ("Any other error, defect, irregularity, or variance that does not affect

~ 136 ~

substantial rights must be disregarded."). As explained above, any evidence that indicated that he may have been a psychopath was double edged and may have actually benefited him. And given the nature of the crime committed, Broadnax's lack of remorse, and the evidence presented of Broadnax's violent behavior in prison, including prison phone calls where he bragged about the behavior, Broadnax cannot show that he was harmed by Dr. Price's general testimony about the traits of psychopath. For the foregoing reasons, even if this claim were not procedurally defaulted, it must be denied.

**X.     Broadnax's Claim that He Is Actually Innocent of the Death Penalty Because New Evidence Indicates that He Is Not a Psychopath Is Not Cognizable on Federal Habeas Review and Lacks Merit (Claim 15).**

Broadnax contends that he is actually innocent of the death penalty because he has presented new evidence showing that he is not a psychopath. Petition at 112–14.  As an initial matter, Broadnax appears to admit at the outset of his claim that "actual innocence" is merely gateway claim to excuse a procedural default. *Id*. at 112 (citing *Sawyer* v. *Whitley*, 505 U.S. 333, 339 (1992)). Nonetheless, at the end of this claim he asserts, "Mr. Broadnax is entitled to habeas corpus relief." *Id*. at 114. However, under clear Supreme Court precedent, an independent claim of actual innocence is not cognizable. *Herrera v. Collins*, 506 U.S. 390, 400 (1993) (explaining that claims of actual innocence do not state a basis for federal habeas corpus relief, absent an

independent constitutional violation). For this reason alone, Broadnax is not entitled to the relief he appears to seek.

In any event, Broadnax does not provide any evidence showing that he is actually innocent of the death penalty. A prisoner is actually innocent of the death penalty only if he can "show by clear and convincing evidence that but for constitutional error at his sentencing hearing, no reasonable juror would have found him eligible for the death penalty under [state] law." *Sawyer*, 505 U.S. at 350. In *Rocha v Thaler*, the Fifth Circuit held that *Sawyer* "'expressly rejected the argument that a constitutional error that impacts only the jury's *discretion* whether to *impose* a death sentence upon a defendant who is unquestionably *eligible* for it under state law can be considered sufficiently fundamental as to excuse the failure to raise it timely in prior state and federal proceedings.'" 626 F.3d 815, 823 (5th Cir. 2010) (emphasis in original) (citing *Haynes v. Quarterman,* 526 F.3d 189, 197 (5th Cir. 2008). The Fifth Circuit further explained, "[t]he quality of the mitigation evidence the petitioner would have introduced at sentencing has no bearing on his claim of actual innocence of the death penalty" because "[e]vidence that might have persuaded the jury to decline to impose the death penalty is irrelevant under *Sawyer*. The only question is whether the petitioner was eligible for the death penalty." 626 F.3d at 825–26. It logically follows that Broadnax's proposed evidence that simply might have rebutted some of the State's evidence of future dangerousness is

also irrelevant under *Sawyer* as it fails to even suggest that Broadnax was ineligible for the death penalty. At most, this evidence "impacts only the jury's *discretion* whether to *impose* a death sentence." *See id*. at 823. Accordingly, even if it were cognizable, Broadnax's "actual innocence" claim lacks merit and must be denied.

## XI.    The State Court Reasonably Rejected Broadnax's Claim that His Due Process Rights Were Violated by the Admission of False and Misleading Gang Expert Testimony (Claim 16).

Broadnax contends that his due process rights were violated because the state knowingly admitted the "false and misleading" testimony of Detective Barret Keith Nelson. Petition at 114–119. In making this claim, Broadnax again relies on *Giglio*, which requires him to show (1) that the witness's testimony was actually false, (2) that the testimony was material, and (3) that the prosecution knew the witness's testimony was false. *Fuller*, 114 F.3d at 496 (citing *Giglio*, 405 U.S. at 153–54). Broadnax raised this claim in his state habeas application, which the state habeas court rejected after delivering detailed findings of fact and conclusions of law. SHCR at 239–245 (¶¶ 123–162).

During Broadnax's punishment hearing, Detective Nelson, a member of the Dallas Police Department's Gang Unit, testified that after a review Broadnax's prison records, he concluded that Broadnax was a self-admitted member of the Gangster Disciples. 49 RR 94–95, 101. As the state habeas court

explained, Detective Nelson's opinion was based on (1) Broadnax's repeated use of the word "Folk" in his writings and in one of the media interviews; (2) Broadnax's use of a pitchfork hand-signal during one of the media interviews; (3) Broadnax's reference to wrapping his flag around his pistol during one of the media interviews; (4) Broadnax's repeated use of the pitchfork in his drawings; (5) Broadnax's reference to his mother's boyfriend as an OG74, and his statement he's "a member of that organization,"; (6) Broadnax's use of the six-pointed star of David in his artwork; (7) Broadnax's sign of allegiance to the founder of the Black Gangster Disciples in his writings; and (8) Broadnax's use of wings in his artwork. *See* SHCR at 241 (¶ 135) (citing 49 RR 84–103).

As an initial matter, and most importantly, Broadnax entirely fails to show that Detective Nelson's testimony was actually false. To the contrary, Detective Nelson's testimony was supported by the record and by specific articulable facts. Most notably, Broadnax admitted to being in a gang during his taped interviews, in a prison phone call, and in his writings. *Id.* Nonetheless, Broadnax bases his assertion that the testimony was false on (1) an affidavit completed by a newly retained expert that was not included in the state court record, (2) the punishment hearing testimony of Broadnax's sister NiQuia Wynn, and (3) general complaints about Detective Nelson's research methods.

~ 140 ~

As an initial matter, because it was not presented to the state court, this Court may not consider the affidavit of Broadnax's newly retained gang expert Lisa Taylor-Austin.[55] *See Pinholster*, 563 U.S. at 181. In any event, the affidavit does not establish that detective Nelson's testimony was actually false. ECF No. 30 at 25 (original appendix). Taylor-Austin admits that Broadnax "was interested in gangs and used gang language and imagery in his artistic work," but states that in her opinion, "any boasts about gang membership were mere bravado or fantasy, and that Mr. Broadnax was not involved in any gang activity." *Id.* at 26. Taylor-Austin's opinion that Broadnax merely had a "tendency to claim the Gangster Disciples as part of his identity, to emulate his brother, and to project fantasy" is based largely on information suggesting Broadnax engaged in actions she deemed inconsistent with gang membership, like his sister's testimony that he spent time with rival gang members. *Id.* at 25–31. Taylor-Austin's opinion that Broadnax was not in a gang despite his obvious outward manifestations of gang-membership is entirely speculative. But more importantly, it at best simply represents a competing expert interpretation, which fails to show a due process violation.

---

[55]    Broadnax used a different expert, Dwight Stewart, to support his state habeas application. As explained further below, Stewart provided an affidavit alleging that Detective Nelson's testimony was false; however, he essentially fully recanted during his state habeas hearing testimony. 3 SHRR at 72–84; SHCR at 244 (¶ 155). Stewart's unsuccessful testimony provides even more support for the reasonableness of the state court's denial of Broadnax's *Giglio* claim.

*See Clark*, 202 F.3d at 766–67 (explaining that mere differences of opinion between expert witnesses do not, standing alone, establish that either expert furnished false, misleading, or perjured testimony); *Boyle*, 93 F.3d at 186–87 (same).

Nor does NiQuia Wynn's testimony provide any indication that Detective Nelson's testimony was actually false. Wynn, who is Broadnax's sister, testified that she knew their brother, Aaron, was a member of the Gangster Disciples. 52 RR at 110. And with regard to Broadnax, she explained, "He had said—I heard him talk about the gangs and stuff before, but his actions in certain things that he did doesn't—doesn't say to me that he was actually in a gang." *Id.* at 110. She further stated that Broadnax wanted to be like their brother Aaron. Id. at 111. She also testified that Broadnax would hang out with a man named Mario who was in a gang that was a rival of the gangster disciples. *Id.* at 111–12. If anything, Wynn's testimony confirms that Broadnax exhibited signs of being in a gang. And her opinion that she did not personally believe he was a member a gang does not render Detective Nelson's testimony actually false. To the extent there was a contradiction in testimony, it was for the jury determine the reliability and credibility of the witnesses.

Further, Broadnax contends that Detective Nelsons' "sparse investigation falls far short of the standards typically followed by an investigator in a gang unit" and asserts that his opinion was based solely on

~ 142 ~

information provided on a website. Petition at 116. At best, Broadnax alleges that portions of Detective Nelson's testimony were unreliable because his research could have been more thorough; this fails to state to state claim of, much less establish, a *Giglio* violation. *See Fuller*, 114 F.3d at 496 ("Fuller has shown nothing about Dr. Erdmann's opinion to be actually false; he has only challenged the methods by which Erdmann reached those conclusions."). Nonetheless, his complaints are not supported by the record. During his testimony, Detective Nelson explained that he had been a gang-enforcement officer in an exclusive unit of the Dallas Police Department for twelve years, that he is a member of the Texas Gang Investigator Association, and that he attends conferences every year. 49 RR 79–80. As explained above, he based his opinion on Broadnax's admissions that he was in a gang and on multiple indications from his writing and interviews, including the use of gang signs and symbols. Ignoring the bulk of this evidence and testimony, Broadnax quibbles with two statements made by Detective Nelson.

First, he complains of Detective Nelson's testimony that "MOB," which Broadnax had tattooed on him and used in his writing, has two different meanings. Petition at 117–18. Detective Nelson explained that in Broadnax's case, he believed it "stands for money over bitches" not the use of the term which refers to a member of the "Blood" family. 49 RR 111–12. Detective Nelson thus explained that, even though the Blood family is a rival of the

~ 143 ~

Gangster Disciples, the use of "MOB" was not inconsistent with Broadnax being a member of the Gangster Disciples. *Id.* This testimony is not actually false; nor does it render Detective Nelson's entire opinion as to Broadnax actually false.

Broadnax also refers to Detective Nelson's testimony that his comment that he was thinking of joining the military was an indication of membership in the Gangster Disciples. Petition at 118. However, this was only a factor that viewed in light of other much more significant evidence, helped lead Detective Nelson to the conclusion that Broadnax was in a gang. It was certainly not a statement that was actually false.

Furthermore, Broadnax entirely fails to establish that the State had knowledge of any "false" testimony as required by *Giglio*. *See* 405 U.S. at 153–54. Finally, even if Broadnax could show that the state knowingly presented false testimony, he fails to establish that the testimony was material. In adjudicating a *Giglio* claim, the "reasonable likelihood" standard has been applied to determine materiality. *See id.* Given the nature of the double-murder, Broadnax's repeated expressions that were played for the jury of his lack of remorse for the crime, and his numerous prison fights, there is not a reasonable likelihood of a different outcome had Detective Nelson's testimony been excluded. For the foregoing reasons, the state court reasonably rejected this claim, and it must be denied.

**XII. Broadnax's Claim that the Trial Court Erred by Qualifying Detective Nelson as an Expert Is Procedurally Barred For Lack of a Contemporaneous Trial Objection and Lacks Merit (Claim 17).**

Broadnax also contends that the trial court's qualification of Nelson as an expert violated his due process rights by rendering his trial fundamentally unfair. Petition at 119–20. This claim is procedurally barred and lacks merit.

First, on direct appeal, the CCA held, "[Broadnax] did not object to Detective Nelson's testimony on this basis at trial. [Broadnax] has therefore failed to preserve this argument, and it will not be considered." *Broadnax v. State*, 2011 WL 6225399, at *14 (citing Tex. R. App. P. 33.1). Because the denial of this claim was based upon the contemporaneous objection bar, an adequate and independent state procedural rule, and because Broadnax has failed to allege cause or prejudice relating to his default, it is procedurally barred on federal habeas review. *See Styron*, 262 F.3d at 453–54.

Alternatively, as explained above, the claim is foreclosed by Fifth Circuit precedent. Once again, while Broadnax frames the claim as a state law evidentiary and due process fundamental fairness issue, the claim challenges the reliability of a State's expert on future dangerousness and relies on application of Texas Rule of Evidence Rule 702 and therefore on a *Daubert* analysis. *See Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 720 (Tex. 1998) (explaining that *Daubert* construed Rule 702 of the Federal Rules

of Evidence which is identical to its Texas counterpart). As explained in detail above, the Supreme Court and the Fifth Circuit have expressly held that *Daubert* does not apply to capital sentencing. *See above* Section VII(b)(2); *Barefoot*, U.S. at 896–903; *Williams*, 761 F.3d at 571.

Moreover, Broadnax cannot show that the admission of Nelson as an expert violated Texas evidentiary rules such that it rendered his trial fundamentally unfair. Indeed, Broadnax cannot even establish that the admission of Nelson's testimony violated Texas law. The CCA has explained that when addressing fields of study that are based primarily upon experience and training as opposed to the scientific method, "[t]he appropriate questions are: (1) whether the field of expertise is a legitimate one; (2) whether the subject matter of the expert's testimony is within the scope of that field; and (3) whether the expert's testimony properly relies upon and/or utilizes the principles involved in the field." *Nenno v. State,* 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas,* 4 S.W.3d 720, 727 (Tex. Crim. App. 1999). Whether an expert possesses the required qualifications rests largely in the trial court's discretion; absent a clear abuse of that discretion, the trial court's decision to admit or exclude testimony will not be disturbed. *Id.*

Broadnax contends that Nelson was not qualified because he lacked specialized knowledge or experience with the Gangster Disciples and only

~ 146 ~

based his knowledge on internet research. Petition at 119. However, during his testimony, Detective Nelson explained that he had been a gang-enforcement officer in an exclusive unit of the Dallas Police Department for twelve years, that he is a member of the Texas Gang Investigator Association, and that he attends conferences every year. 49 RR 79–80. He testified that the unit comprises only thirty-five out of the approximately 3,000 officers in Dallas County and that they usually have "30 or 40 people apply for one spot." *Id*. at 79. He explained that there is a thorough review of each officer's credentials before they are accepted in the unit and stated, "They want the best of the best in the gang unit." *Id*.

Based on this specialized knowledge, he was qualified to testify as an expert under Texas law. *See Nenno,* 970 S.W.2d at 561; *see also Garza v. State*, No. 75,477, 2008 WL 5049910, at *10 (Tex. Crim. App. Nov. 26, 2008) (unpublished) (holding that a Texas Department of Criminal Justice Security Threat Group office was qualified to testify as a gang expert). And Broadnax's assertion that Detective Nelson's lack of prior experience with the specific gang he testified about rendered him unqualified to testify as a gang expert is entirely unsupported. More importantly, he fails to show that the admission of Detective Nelson's testimony denied him a fundamentally fair trial. *Little*, 162 F.3d at 862. Indeed, given the substantial evidence presented by the State at punishment, Broadnax cannot demonstrate that the outcome of the trial would

~ 147 ~

have been affected had Detective Nelson's testimony been excluded. *See Brecht*, 507 U.S. at 637; *Rogers*, 848 F.2d at 609. For the foregoing reasons, even if it were not procedurally barred, his claim must be denied.

### XIII. Broadnax's Claim that the Trial Court Violated His First Amendment Rights by Allowing Gang Affiliation Evidence Is Procedurally Barred And Lacks Merit (Claim 18).

Broadnax contends that his First Amendment rights were violated by the admission of Detective Nelson's testimony about his affiliation with the Gangster Disciples, and his drawings, lyrics, and spoken-word poetry supporting that testimony. Petition at 120–24. Indeed, as Broadnax explains in his petition, he raised a claim that his First Amendment rights were violated in his state habeas application. 1 SHCR 76–77. The state habeas court ruled on the claim, referring to, citing, and adopting the reasoning from the CCA's opinion on the relevancy of Dr. Nelson's testimony on direct appeal. 3 SHCR 246 (¶ 171 (citing the direct appeal opinion in finding that "the complained of

evidence was relevant"). [56] Referencing the Supreme Court case *Dawson v. Deleware*,[57] the state habeas court determined that Broadnax's First Amendment rights were not violated. *Id*. at 245–46 (¶¶165–68, 171–74).

In *Dawson*, the Supreme Court held that gang affiliation testimony violated a defendant's First Amendment rights when the government provided no evidence that the gang had committed any unlawful or violent acts and therefore failed to show that "the evidence might serve a legitimate purpose in showing that a defendant represents a future danger to society." 503 U.S. 159, 166 (1992). In *Dawson*, the government proffered evidence showing that the defendant was a member of the Aryan Brotherhood prison gang, but the parties agreed that the only evidence related to the Aryan Brotherhood that could be submitted to the jury was the following stipulation: "The Aryan Brotherhood refers to a white racist prison gang that began in the 1960's in

---

[56]   To the extent Broadnax challenged the relevancy of the evidence and testimony, the state habeas court procedurally barred this claim as raised and rejected on direct appeal. 3 SHCR 246 (¶¶ 168–170). The Director contends that the court denied the merits of the First Amendment claim without applying a procedural bar. *Id*. (¶¶ 172–74). To any extent, this Court might determine that the state habeas court procedurally barred Broadnax's First Amendment claim as raised and rejected on direct appeal, it still unequivocally ruled on Broadnax's First Amendment claim, at least in the alternative. That determination, whether it was the primary or an alternative basis, is entitled to AEDPA deference. *See Busby,* 359 F.3d at 721 n.14 (affording deference to merits finding when state court "invoked a procedural bar as an alternative basis to deny relief"). The Director does not believe that a federal procedural bar applies to this claim.

[57]   503 U.S. 159 (1992).

California in response to other gangs of racial minorities. Separate gangs calling themselves the Aryan Brotherhood now exist in many state prisons including Delaware." *Id*. at 162. The court concluded "that the narrowness of the stipulation left the Aryan Brotherhood evidence totally without relevance to Dawson's sentencing proceeding." *Id*. at 165. Therefore, it held that the evidence was solely related to Dawson's personal beliefs and violated his First Amendment rights. *Id*. at 165–167.

However, the Court also explained that, prior to the agreed stipulation, the prosecution claimed that it had an expert that would show that the Aryan Brotherhood is "associated with drugs and violent escape attempts at prisons, and advocates the murder of fellow inmates." *Id*. at 165. The Court opined that if that testimony had been presented, "we would have a much different case." *Id*. at 165. Subsequently, in *Fuller v. Johnson*, the Fifth Circuit held that the admission of gang affiliation evidence, specifically evidence showing that defendant was a member of the Aryan Brotherhood, is constitutionally permissible when the State introduced evidence that the defendant was "a member of a gang that had committed unlawful or violent acts, including homicides, multiple stabbings, drug dealing, and aggravated assaults."114 F.3d 491, 498 (5th Cir. 1997).

Here, as the CCA recounted, after detailing the substantial evidence of Broadnax's affiliation with the Gangster disciples,

~ 150 ~

> Detective Nelson then described the activities and reputation of the gang itself, testifying that the Gangster Disciples were "impressive" in their organization, and explaining that "they're teaching their younger generation how to be a gang member." Detective Nelson further testified that the gang was heavily involved in criminal enterprises in order to fund their organization; specifically, he testified that they "turned to violence, selling drugs, robberies and murders."

*Broadnax v. State*, 2011 WL 6225399, at *15. When asked what kind of things the Gangster Disciples do, Detective Nelson responded, "[s]ell narcotics, murders, agg robberies, yes." 49 RR 92. He later testified that "robbing, killing and selling dope" are consistent with the Gangster Disciples way of making money. 49 RR 108.   Detective Nelson's testimony, unlike the evidence in *Dawson*, described violent acts committed by its members and a culture where those violent tendencies are passed on to younger generations.[58] His testimony is in fact almost identical to the evidence that did not offend the First Amendment in *Fuller*.   114 F.3d 491, 498 (5th Cir. 1997); *see also Tamez v. Dir., TDCJ-CID*, 550 F. Supp. 2d 639, 645 (E.D. Tex. 2008) (admission of evidence of petitioner's membership in the Latin Kings was constitutionally permissible because the petitioner admitted to being a member, and the Latin

---

[58]   This evidence also differs dramatically from the evidence presented in the district court case cited by Broadnax, *Diaz v. Dretke*, No. M-04-225, 2005 WL 2264966, at *12 (S.D. Tex. Aug. 19, 2005). The court in *Diaz* explained that the state "presented no evidence that the Pistoleros advocated or participated in violence or other criminal activity, aside from general testimony that gang members (not limited to Pistoleros) were housed with other members of the same gang to avoid gang-related violence." *Id.*

Kings' activities included homicides, extortion, and drug trafficking). As such, the state court reasonably denied Broadnax's First Amendment claim.

Further, even if he could establish a First Amendment violation, given the significant evidence presented by the State at punishment, Broadnax cannot demonstrate that Detective Nelson's testimony "'had substantial and injurious effect or influence in determining the jury's verdict.'" *See Brecht*, 507 U.S. at 637. For the foregoing reasons, this claim must be denied.

## XIV. The State Court Reasonably Rejected Broadnax's Claim that His Trial Counsel Was Ineffective in Handling Detective Nelson's Testimony (Claim 19).

Broadnax contends that his trial counsel was ineffective for failing to effectively cross-examine Detective Nelson or call an expert to rebut his testimony. Petition at 124–26. This claim was reasonably rejected by the state court.

In its findings of fact the state habeas court summarized:

At the hearing conducted on [Broadnax]'s application for writ of habeas corpus Brad Lollar testified that he made a strategic decision to downplay evidence of [Broadnax]'s gang membership because there was no evidence that the murders were gang-related.

Mr. Lollar made a strategic decision not to call a gang expert. Instead he decided to call family members such as [Broadnax]'s sister to testify that [Broadnax] was not a member of the gang but was merely a wannabe who had learned about the Gangster Disciples from his older brother.

> Mr. Lollar testified that [Broadnax] had self-admitted membership in the gang and that it would be difficult to present a credible case that [Broadnax]'s use of gang symbolism was meaningless. He believed that if he attempted to argue that the symbolism was meaningless he would lose credibility with the jury.

3 SHCR 246 (¶¶ 182–84) (citing 3 SHRR 161–62).

Further, Broadnax attached an affidavit to his state habeas application from his previous gang expert Dwight Stewart, which stated that Detective Nelson gave false and misleading testimony, that the Gangster Disciples are not a recognized street gang in Dallas, and that Broadnax was only a "gangsta wanna-be." 2 SHCR at 111–20. However, Stewart's testimony fell apart during the state writ hearing. 3 SHRR at 72–84. As the state habeas court explained, he "disavowed his entire affidavit accusing Detective Nelson of giving false and misleading testimony and agreed with much of Nelsons trial testimony." 3 SHCR at 244 (¶ 155).

Based on the testimony provided at the hearing, the state habeas court concluded that, "[Broadnax] fails to rebut the presumption that his trial counsel's response to the State's offer of evidence of his gang membership constituted reasonable trial strategy. He also fails to demonstrate that counsel's response was deficient and that he was prejudiced by any alleged deficiency." *Id.* at 248 (¶ 189).

Here, as an initial matter, most of Broadnax's assertions in support of this claim rely on the affidavit of his newly-retained gang expert Lisa Taylor-

Austin. As explained previously, this Court may not consider this affidavit because it was not before the state court. *See Pinholster*, 563 U.S. at 181.

Regardless, Broadnax fails to show that counsel's decision not to cross-examine Detective Nelson or call a gang expert was unreasonable. Indeed, counsel properly pointed out that there was no evidence linking the murders to gang activity; thus, counsel reasonably sought to avoid amplifying the evidence of gang affiliation that the jury may not have given much weight absent any more attention. 3 SHRR 161–62. Further, counsel also properly recalled that the objective evidence in fact proved that Broadnax either was a member of a gang or wanted to act like he was. *Id*. Certainly, calling an expert to testify that Broadnax was not in a gang even though his actions indicated otherwise would have risked counsels' credibility with the jury. In this regard, Dwight Stewart's unsuccessful state habeas testimony confirms the significant risk counsel would have undertaken by calling an expert. Ultimately, counsel chose to elicit testimony from Broadnax's sister that she did not believe he was in gang instead of cross-examining Nelson or calling an expert to rebut his testimony that was well supported by objective facts; this reflected a sound trial strategy. Accordingly, the state court reasonably concluded that counsel was not deficient in this regard. 3 SHCR 248 (¶ 189); *see Strickland*, 466 U.S. at 691.

In any event, Broadnax entirely fails to show prejudice from counsel's inability or failure to show that he was not in a gang. Here, in the best case scenario for Broadnax, counsel could have elicited testimony that indicated that Broadnax just wanted to be in a violent gang, but that he was not an actual member. Accordingly, even if counsel had successfully rebutted Detective Nelson's testimony, either through cross-examination or with a retained expert, it would not likely have significantly altered the jury's opinion of Broadnax. Moreover, cross-examining Detective Nelson and calling an expert would have undermined counsel's strategy to downplay the importance of the testimony. *See Wong*, 558 U.S. at 20. Finally, given the brutal nature of the crime committed, his lack of remorse, his statements that he would kill again if not given the death penalty, and the evidence presented of his violent behavior in prison, Broadnax cannot show that he was prejudiced by any failure of his counsel to challenge or rebut Detective Nelson's testimony. 3 SHCR 248 (¶ 189); *see Strickland*, 466 U.S. at 694. For the foregoing reasons, Broadnax's claim must be denied.

## XV. Broadnax's Claim that He Was Prosecuted on the Basis of His Race in Violation of the Equal Protection Clause Is Procedurally Barred and Lacks Merit (Claim 20).

Broadnax contends that Dallas County sought the death penalty against him because of his race. Petition at 127–31. This claim is procedurally barred and lacks merit.

### A.   The claim is procedurally barred.

Broadnax admits that he has not previously advanced this claim, but asserts that his procedural default is excused because his claim would be dismissed as an abuse-of-the-writ upon return to state court. Petition at 132–33; Tex. Code Crim. Proc. Ann. art. 11.071 § 5(a). In this regard Broadnax correctly points out that "[a]n exception [to the exhaustion requirement] is made only if there is no opportunity to obtain redress in state court or if the corrective process is so clearly deficient as to render futile any effort to obtain relief." *Duckworth* v. *Serrano*, 454 U.S. 1, 3 (1981). However, under unequivoqual Fifth Circuit precedent, the Texas abuse-of-the-writ doctrine constitutes an adequate and independent state procedural rule that bars federal habeas relief. *Fuller v. Johnson*, 158 F.3d 903, 906 (5th Cir. 1998) (Texas's abuse-of-the-writ doctrine is regularly and strictly applied); *see also Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995) (per curiam) (dismissal is independent and adequate state bar). The application of an adequate and independent state procedural bar does not represent a situation where there is no opportunity to obtain redress; nor is it a deficiency in a state corrective

process.[59] *See Nobles*, 127 F.3d at 423 (finding an unexhausted claim, which would be barred by the Texas abuse-of-the-writ doctrine if raised in a successive state habeas petition, to be procedurally barred). Instead, precisely because his claim would be dismissed pursuant to an adequate state procedural rule if he now raised it in state court, it is subject to federal procedural default and must be dismissed. *See Coleman*, 501 U.S. 722, 735 n.1; *Nobles*, 127 F.3d at 423.

## B.    The claim lacks merit.

Broadnax's claim relies entirely on statistics related to the application of the death penalty in Dallas County and one case in Dallas County where the death penalty was not sought against a white defendant. Petition at 129–31. Broadnax also has provided a study conducted by Professor Jonathan

---

[59]    Broadnax cites *Ex parte Campbell*, 226 S.W.3d 418, 424 (Tex. Crim. App. 2007), for the proposition that the CCA has applied the Texas abuse-of-the-writ statute to claims where the factual predicate was unavailable. Petition at 133. *Campbell* explained that in order satisfy the portion of the Texas abuse-of-the-writ statute at issue: "1) the factual or legal basis for an applicant's current claims must have been unavailable as to all of his previous applications; and 2) the specific facts alleged, if established, would constitute a constitutional violation that would likely require relief from either the conviction or sentence." 226 S.W.3d at 424 (citing Tex. Code Crim. Proc. Ann. art. 11.071 § 5(a)). In *Campbell*, the CCA relied on the second basis for its dismissal of the defendant's claim. *Id*. The Fifth Circuit has held, at least in some circumstances, that if the CCA relies on the second basis, the decision is entitled to AEDPA deference as a merits adjudication. *Rocha*, 626 F.3d at 833–34 ("If the [T]CCA determines that the claim was unavailable but that the application does not make a prima facie showing of merit, a federal court can review that determination under the deferential standards of AEDPA."). In any event, the requirement that an applicant make a prima facie showing of a constitutional violation does not represent a deficiency in the state's corrective procedure that could excuse Broadnax's default.

Sorensen. *Id.*; ECF 30 at 120–25. However, Professor Sorenson's study was not before the state court; therefore, this Court may not consider it. *See Pinholster*, 563 U.S. at 181. The news articles cited by Broadnax in support of this claim are likewise barred from consideration. *Id.*

In any event, Supreme Court precedent forecloses this claim. A defendant claiming an equal protection violation in a death penalty case must prove that the prosecutor acted with a discriminatory purpose *in that particular case*. *McCleskey v. Kemp,* 481 U.S. 279, 292–93 (1987); *see also White v. Thaler*, 522 Fed. Appx. 226, 235 (5th Cir. 2013) (explaining that a defendant could not prevail in an equal protection claim challenging the imposition of the death penalty because he could not show evidence of racial discrimination in his particular case). Indeed, the Court in *McCleskey* considered very similar evidence and rejected the idea that statistics or studies provide proof of discriminatory intent in a particular case. 481 U.S. at 294. Further, Broadnax's reference to a case where the prosecutor did not seek the death penalty against a white defendant is similarly unavailing because it fails to show discriminatory intent in his case. *Id.* Accordingly, even if it were not procedurally barred, Broadnax's claim must be denied.

**XVI.      The State Court Reasonably Rejected Broadnax's Claim that the Jury Instructions Improperly Allocate the Burden of Proof for the Mitigation Special Issue (Claim 21).**

Broadnax contends that his Sixth Amendment and Fourteenth Amendment rights were violated because the trial court's jury instruction did not require the jury to apply a beyond a reasonable doubt standard to the mitigation special issue. Petition at 133–37 (citing *Apprendi* v. *New Jersey*, 530 U.S. 466, 494 (2000)).  Fifth Circuit case law forecloses this claim.

The Fifth Circuit has held that *Apprendi* does not control the pleading and proof requirements for the mitigation issue because it is not an aggravating factor that increases punishment beyond the prescribed statutory maximum authorized by the jury's verdict. *Scheanette v. Quarterman*, 482 F.3d 815, 828 (5th Cir. 2007); *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir. 2005). In this regard, the Fifth Circuit has explained that "[n]o Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof." *Rowell*, 398 F.3d at 378; *see also Allen v. Stephens*, 805 F.3d 617, 628 (5th Cir. 2015) ("[T]he jury's consideration of aggravating circumstances in connection with the mitigation special issue is not governed by *Apprendi* and *Ring*."). The Fifth Circuit has also found such claims to be barred by *Teague*. *See Rowell*, 398 F.3d at 378–79. Accordingly, the state court's rejection of Broadnax's claim was not objectively unreasonable, and his

claim is barred by non-retroactivity principles. *Broadnax v. State*, 2011 WL 6225399, at \*20.

**XVII. The State Court Reasonably Rejected Broadnax's Claim that the Jury Instructions Failed to Define Vague Terms in the Special Issues (Claim 22).**

Broadnax argues that he was denied due process of law because the Texas death-penalty "special issues are unconstitutionally vague and fail to meaningfully narrow the class of death-eligible defendants." Petition at 137–39. Specifically, Broadnax complains of the trial court's failure to define the terms "probability," "criminal acts of violence," and "continuing threat to society." *Id*.

However, the Fifth Circuit has consistently approved the use of these terms without definition over objections that they are unconstitutionally vague as used in these sentencing instructions. *Turner v. Quarterman*, 481 F.3d 292, 299-300 (5th Cir. 2007) (holding terms "probability," "criminal acts of violence," and "continuing threat to society" not unconstitutionally vague); *Leal v. Dretke*, 428 F.3d 543, 553 (5th Cir. 2005) (holding that terms "probability," "criminal acts of violence," and "continuing threat to society" needed no definition); *Hughes*, 191 F.3d 615 (upholding use of term "probability"); *Woods v. Johnson*, 75 F.3d 1017, 1033-34 (5th Cir. 1996) (overruling complaint that Texas' punishment special issues are unconstitutionally vague); *James v. Collins*, 987 F.2d 1116, 1120 (5th Cir. 1993) (upholding use of terms "deliberately,"

"probability", "criminal acts of violence," and "continuing threat to society" as having a "common-sense core of meaning that criminal juries should be capable of understanding"); *Nethery v. Collins*, 993 F.2d 1154, 1162 (5th Cir. 1993) (upholding use of terms "deliberately," "probability," and "society" without definition); *Thompson v. Lynaugh*, 821 F.2d 1054, 1060 (5th Cir. 1987) (upholding use of term "deliberately" as its "common meaning is sufficiently clear to allow the jury to decide the special issues on punishment"); *Milton v. Procunier*, 744 F.2d 1091, 1095–96 (5th Cir. 1984) (upholding the terms "deliberately," "probability," and "criminal acts of violence" as having "plain meaning of sufficient content" to warrant their inclusion in sentencing instructions).

Broadnax's argument that the state court's adjudication of this claim was unreasonable is plainly contradicted by Fifth Circuit precedent. *Broadnax v. State*, 2011 WL 6225399, at *20. Accordingly, this Court should deny federal habeas relief on this claim.

## XVIII.   The State Court Reasonably Rejected Broadnax's Challenge to the "10/12 Rule." (Claim 23)

Broadnax argues that the requirement of ten "No" votes on the special issues violates his due process rights. Petition 139–41. Under what is commonly referred to as the "10/12 Rule," Texas law stipulates that the jury charge in a capital case explain: (1) that at least 10 jurors must agree before

~ 161 ~

they may answer "No" to the future dangerousness and the anti-parties issues and answer "Yes" to the mitigation special issue, and (2) that all 12 jurors must agree before answering "Yes" to the future dangerousness and anti-parties issues and "No" to the mitigation special issue. Tex. Code Crim. Proc. art. 37.071, § 2(d)(2) & (f)(2). Texas law prohibits informing jurors of the effect of the jury's failure to agree on a special issue, *id*. § 2(a).

The Fifth Circuit has repeatedly rejected challenges to the "10/12 Rule." *See Sprouse v. Stephens,* 748 F.3d, 609, 623 (2014); *Blue v. Thaler,* 665 F.3d 647, 669–70 (2011); *Druery v. Thaler* 647 F.3d 535, 542–45 (5th Cir. 2011); *Miller v. Johnson,* 200 F.3d 274, 288-89 (5th Cir. 2000); *Jacobs v. Scott,* 31 F.3d 1319, 1328–29 (1994). Moreover, The Fifth Circuit has additionally held that challenges to the "10/12 Rule" are barred by *Teague.  See Blue,* 665 F.3d at 670 (to the extent "10/12 Rule" challenge urges adoption of new rule, it is barred under *Teague*); *Hughes v. Dretke,* 412 F.3d 582, 593-94 (5th Cir. 2005) (rejecting Eighth Amendment challenge to "10/12 Rule" as *Teague*-barred); *Alexander v. Johnson,* 211 F.3d 895, 897 (5th Cir. 2000) (argument that "10/12 Rule" created false need for unanimity *Teague*-barred).

Indeed, Broadnax's primary argument—that the rule leads reasonable jurors to believe that they have no ability to give effect to mitigating evidence— has failed multiple times in this circuit. Petition at 141. *See e.g., Alexander,* 211 F.3d at 897 n.5 ("[T]he Fifth Circuit has expressly rejected the contention

~ 162 ~

that Texas's 10-12 Rule prevents jurors from considering mitigating circumstances."); *Jacobs,* 31 F.3d at 1328–29 (rejecting an Eighth Amendment challenge to "10/12 Rule" because under Texas system all jurors can take into account mitigating circumstance and one juror cannot preclude entire jury from considering mitigating circumstance). Accordingly, the state court's rejection of Broadnax's claim was not objectively unreasonable, and his claim is barred by non-retroactivity principles. *Broadnax v. State,* 2011 WL 6225399, at *20.

### XIX.  The State Court Reasonably Rejected Broadnax's Claim that the Trial Court Erred by Failing to Instruct the Jury to Individually Consider the Mitigation Evidence Presented (Claim 24).

Broadnax contends that the trial court erred by failing to specifically instruct the jurors to consider mitigation evidence individually. Petition at 141–45. This claim is again foreclosed by Fifth Circuit precedent. Broadnax's claim relies on *Mills v. Maryland*, in which the Supreme Court rejected a state death penalty scheme in which jurors likely believed that they were required to agree unanimously on the existence of a specific mitigating circumstance. 486 U.S. at 384. The Supreme Court has since explained that "*Mills* requires that each juror be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death." *McKoy v. North Carolina,* 494 U.S. 433, 442–43 (1990).

However, The Fifth Circuit has expressly held that "*Mills* is not applicable to the capital sentencing scheme in Texas." *Miller*, 200 F.3d 274, 288; *see Hughes*, 412 F.3d at 594; *Jacobs,* 31 F.3d at 1328–29 (explaining that under Texas system all jurors can take into account mitigating circumstance and one juror cannot preclude entire jury from considering mitigating circumstance); *Druery* 647 F.3d at 543. The Fifth Circuit has further held that the non-retroactivity rule from *Teague* bars extension of *Mills* to invalidate the Texas scheme. *See e.g.*, *Druery*, 647 F.3d at 543; *Hughes*, 412 F.3d at 594. Because the Fifth Circuit has held that the Texas mitigation instructions allow the jury to properly consider mitigation evidence, and *Teague* prevents it from holding otherwise, it follows that no additional instruction from the trial court was required, and that Broadnax's claim is likewise *Teague*-barred. Accordingly, the state court's rejection of this claim was reasonable, and Broadnax's claim must be denied. *See Broadnax v. State*, 2011 WL 6225399, at *20.

## XX.  The State Court Reasonably Denied Broadnax's Claim that the Death Penalty is Unconstitutional (Claim 25).

Broadnax argues that the death penalty is unconstitutional because (1) it constitutes cruel and unusual punishment and (2) because it is applied in an arbitrary, capricious, and unreliable manner. Petition 146–50. In his unreliable application claim, Broadnax does not present any specific challenge

to the application of the death penalty in Texas or in his case, but instead provides general facts and statistics related to the imposition of the death penalty in multiple different states. *Id.* at 148–50. Both of these assertions constitute facial challenges to the death penalty as employed in the United States; they are thus foreclosed under Supreme Court precedent. For decades, the Supreme Court has found capital punishment, and the Texas capital punishment scheme, to be facially constitutional. *See, e.g., Johnson v. Texas*, 509 U.S. 350, 367–68 (1993); *Jurek v. Texas*, 428 U.S. 262, 270–72 (1976); *see also Glossip v. Gross*, 135 S. Ct. 2726, 2732, (2015) (explaining that "it is settled that capital punishment is constitutional"). In other words, the Court is "bound by Supreme Court precedent which forecloses any argument that the death penalty violates the Constitution under all circumstance[s]." *United States v. Jones*, 132 F.3d 232, 242 (5th Cir. 1998). As such, Broadnax cannot show the CCA was unreasonable in denying his challenge to the constitutionality of the death penalty. *Broadnax v. State*, 2011 WL 6225399, at \*20.

## XXI.     Broadnax is Not Entitled to an Evidentiary Hearing or Discovery.

Broadnax requests an evidentiary hearing "to develop the record" of his discriminatory prosecution claim, Petition at 133, and in relation to his claims alleging that the trial court's remedy of reseating Juror Patterson was improper and that trial counsel was ineffective for failing to object to that

remedy, Petition at 74, 111. Moreover, he generally requests an evidentiary hearing in his prayer for relief. *Id.* at 152.

Where a habeas petitioner has failed to fully develop the factual bases of his claims in state court, he is precluded from further factual development in federal court unless (1) his claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise of due diligence; *and* (2) he establishes by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found him guilty. 28 U.S.C. § 2254(e)(2). A failure to meet this standard of "diligence" will bar a federal evidentiary hearing in the absence of a convincing claim of actual innocence that can only be established by newly discovered evidence. (*Michael*) *Williams v. Taylor*, 529 U.S. 420, 436 (2000); *Beazley v. Johnson*, 242 F.3d 248, 272–73 (5th Cir. 2001). For example, a petitioner's failure to present controverted, previously unresolved factual issues to the state court is sufficient to constitute "failure" under the plain meaning of § 2254(e)(2). (*Michael*) *Williams*, 529 U.S. at 433; *Beazley*, 242 F.3d at 273.

Moreover, even if a petitioner can meet the foregoing standard, it is within this Court's discretion to deny a hearing if sufficient facts exist to make an informed decision on the merits. *See Schriro v. Landrigan*, 550 U.S. 465, 474–75 (2007) ("It follows that if the record refutes applicant's factual allegations or otherwise precludes habeas relief, a district court is not required

~ 166 ~

to hold an evidentiary hearing."); *see also Clark*, 227 F.3d at 284–85; *Hall v. Quarterman*, 534 F.3d 365, 368 (5th Cir. 2008). Even where no factual findings have been made by any state court, a district court does not abuse its discretion in refusing to grant an evidentiary hearing if there are sufficient facts before it to make an informed decision regarding the merits of a claim. *McDonald v. Johnson*, 139 F.3d 1056, 1060 (5th Cir. 1998) ("The district court had sufficient facts before it to make an informed decision on the merits . . . and, accordingly, did not abuse its discretion in refusing to hold an evidentiary hearing."). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Landrigan*, 550 U.S. at 474–75. In order to be entitled to a hearing, a petitioner must show that there is a factual dispute that if determined in his favor would entitle him to relief. *Murphy v. Johnson*, 205 F.3d 809, 816 (5th Cir. 2000). A general assertion that a constitutional violation occurred but an evidentiary hearing is required to develop the claim, "is tantamount to an impermissible fishing expedition." *Id*.

Broadnax is not entitled to an evidentiary hearing on any of his claims. First, he cannot show that the factual predicate for any claims was not available when he filed his state habeas application. *See* 28 U.S.C. § 2254(e)(2). Specifically, his discriminatory prosecution claim was available to him, and could have been raised, in state court. *Id*. And his trial court error and

ineffective assistance of counsel claims regarding the reseating of Juror Patterson are entirely related to decisions made by counsel and the trial court prior to trial; thus, he is not entitled to an evidentiary hearing for either of those claims. *Id.*

Further, this Court should not grant an evidentiary hearing for any claims that are procedurally barred. *See Woods v. Whitley,* 933 F.2d 321, 323 (5th Cir.1991) (holding that "[n]o evidentiary hearing is required" if a prisoner is unable to satisfy the cause and prejudice standard for overcoming a procedural bar); *see also United States v. Reedy*, 393 Fed. Appx. 246, 247 (5th Cir. 2010) (same). And, as explained above, for claims that were previously adjudicated by the CCA, the federal habeas record is "limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 131 S. Ct. at 1398. And new "evidence introduced in federal court has no bearing on § 2254(d)(1) review." *Id.* at 1400; *see also Champ v. Zavaras*, No. 10-1308, 2011 WL 2411002, at *10 (10th Cir. June 16, 2011) (not designated for publication) ("Mr. Champ's requests to expand the record and to hold an evidentiary hearing to further develop the record aim to place new evidence before the federal court that was not a part of the state-court record. Under [*Pinholster*], this is no longer permitted."). Finally, Broadnax fails to show that any evidence would indicate that but for any constitutional error, no reasonable fact finder would have found him guilty, or that there are

~ 168 ~

insufficient facts before this Court to address the merits of his claims. *See* 28 U.S.C. § 2254(e)(2); *Landrigan*, 550 U.S. at 474–75.

In addition, Broadnax requests discovery for his discriminatory prosecution claim and generally in his prayer for relief.[60] Petition at 127–31, 152. A federal habeas petitioner is entitled to discovery only where he can show good cause. *See* Rule 6(a) of the Rules Governing Section 2254 Cases. Although the rule does not define "good cause," it was written to comply with *Harris v. Nelson*, 394 U.S. 286 (1969). *See* Advisory Committee Notes to Rule 6. Therefore, this Court must provide discovery only where the petitioner gives it reason to believe that if the facts alleged are developed fully, he will be able to show that he is confined illegally and entitled to relief. *Harris*, 394 U.S. at 300. He must make his showing with allegations that are specific. *See id.*; *see also Bracy v. Gramley*, 520 U.S. 899, 905 (1997); *Perillo*, 79 F.3d at 445.

A petitioner also cannot show "good cause" for discovery where the claim is defaulted or where the federal court cannot reach the claim's merits. *See Rucker v. Norris*, 563 F.3d 766, 771 (8th Cir. 2009); *Williams v. Bagley*, 380 F.3d 932, 957 (6th Cir. 2004) (holding that district court denied request for

---

[60]    Notably, the Dallas County District Attorney's office did permit Broadnax's federal habeas counsel to review their records, as is demonstrated by the documents included in his most recent appendix. ECF 52; *see also* Respondent's Exhibit A. Even if these documents could be reviewed by this Court, they would not help Broadnax succeed on the merits of any of his claims. *See above*, Section II(B).

production properly because the claim was defaulted); *Thompson v. Stephens*, 2014 WL 2765666, at \*2 (S.D. Tex. June 18, 2014) (unpublished) ("A petitioner cannot show good cause if a federal court cannot reach the merits of the disputed claims."); *cf. Fuller v. Johnson*, 114 F.3d at 502 (finding no abuse of discretion where district court denied funding for expert in habeas proceedings where the claim is defaulted). ). And as explained above, "Section 2254(e)(2) . . . governs when a district court may consider evidence not presented to the state courts." *Shelton v. Quarterman*, 294 F. App'x 859, 868 (5th Cir. 2008). Consequently, new evidence cannot be considered if the petitioner "failed to develop the factual basis of a claim in State court proceedings." § 2254(e)(2).

Here, this Court should not grant discovery on any of Broadnax's claims that are procedurally barred. *Rucker*, 563 F.3d at 771; *Williams v.*, 380 F.3d at 957 ; *Thompson*, 2014 WL 2765666, at \*2; *cf. Fuller*, 114 F.3d at 502. Moreover, Broadnax would be prevented from expanding the record with any newly discovered evidence because he cannot show that any of his claims could not have been developed in state court. *See* § 2254(e)(2); *Pinholster*, 131 S. Ct. at 1398. Therefore, Broadnax fails to show good cause for discovery, and this Court must deny his request.

## CONCLUSION

For the foregoing reasons—and considering the totality of the record—the Director respectfully requests that this Court deny Broadnax's petition for federal habeas relief, deny his requests for an evidentiary hearing and discovery, and deny a Certificate of Appealability.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

ADRIENNE MCFARLAND
Deputy Attorney General for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

s/ George A. d'Hemecourt
GEORGE A. D'HEMECOURT*
* Counsel of Record                      Assistant Attorney General
State Bar No. 24082888
Southern Id. No. 2533916

P. O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 936-1400
(512) 936-1280 (Facsimile)

ATTORNEYS FOR RESPONDENT

~ 171 ~

## CERTIFICATE OF SERVICE

I hereby certify that, June 26, 2017, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system. The electronic case filing system sent a "Notice of Electronic Filing" to lead counsel, who has consented in writing to accept this Notice as service of this document by electronic means:

Daniel J Leffell
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
212-373-3000
dleffell@paulweiss.com

Adam Ross Mandelsberg
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
212-373-3000
AMandelsberg@paulweiss.com

Camille M. Knight
Burleson, Pate & Gibson
900 Jackson Street, Suite 330
Dallas, TX 75202
214-871-4900
Fax: 214-871-7543
cknight@bp-g.com

Jordana Lauren Haviv
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10128
212-373-3597

Fax: 212-492-0597
JHaviv@paulweiss.com

Livia Fine
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
212-373-3000
LFINE@paulweiss.com

Steven Herzog
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
212-373-3317
Fax: 212-492-0317
sherzog@paulweiss.com

s/ George A. d'Hemecourt
GEORGE A. D'HEMECOURT*
Assistant Attorney General