IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

JAMES GARFIELD BROADNAX,  §
                          §
            Petitioner,   §
                          §
v.                        §            Civil Action No. 3:15-CV-1758-N
                          §
LORIE DAVIS, Director,    §
                          §
            Respondent.   §

## MEMORANDUM OPINION AND ORDER

Petitioner James Garfield Broadnax filed this federal habeas corpus action pursuant 28 U.S.C. § 2254 challenging his August 2009 Dallas County conviction for capital murder and sentence of death. For the reasons discussed below, Broadnax is not entitled to federal habeas corpus relief or a Certificate of Appealability from this Court.

## I. BACKGROUND

### A. The Offense and Aftermath

During the early morning hours of June 19, 2008, Broadnax and his cousin Demarius Cummings fatally shot and robbed Stephen Swan and Matthew Butler in the parking lot of Butler's recording studio in downtown Garland. There is no genuine dispute about these facts. Within days of his arrest, Broadnax gave a series of recorded interviews with four Dallas area television stations during which he confessed in graphic terms to fatally shooting Swan and Butler, robbing them, and driving away from the crime scene in Swan's vehicle.[1] During one of his television

---

[1] Three of Broadnax's videotaped interviews were admitted into evidence and played in open court during the guilt-innocence phase of Broadnax's capital murder trial.

interviews, all of which were later broadcast, Broadnax informed his interviewer that he hoped to receive the death penalty and insisted that, if he did not receive the death penalty, he would kill again.

## B. Indictment

On September 15, 2008, a Dallas County grand jury indicted Broadnax on a single count of capital murder, to wit, intentionally causing the death of Stephen Swan by shooting Swan with a firearm, a deadly weapon, in the course of committing and attempting to commit Swan's robbery.[2]

## C. Guilt – Innocence Phase of Trial

The guilt-innocence phase of Broadnax's capital murder trial commenced on August 10, 2009.[3] The prosecution called three of the television reporters who interviewed Broadnax and played recordings of their interviews with Broadnax, as well as presented a host of other witnesses who (a) established Swan's cause of death, (b) linked Broadnax and Cummings to Swan's vehicle (the one in which they were traveling at the time of their arrest) and a set of tools belonging to Swan which Cummings and Broadnax pawned the day of the murders, and (c) linked Broadnax and Cummings to a handgun later determined to be the murder weapon. The defense presented a series of witnesses through whom it attempted to show that Broadnax was intoxicated on PCP and marijuana at the time of his offense and was suffering from the long-lasting effects of his PCP ingestion, including experiencing psychotic delusions, at the time he gave his televised interviews.

---

[2] Multiple copies of Broadnax's indictment appear among the voluminous state court records submitted by Respondent. One copy appears among the state court records from Broadnax's state trial court proceeding at Clerk's Record, Vol. 1 of 3, at 1-2 [38-4 ECF at 5-6 of 219].

[3] See Appendix I below for a synopsis of the testimony and other evidence admitted during the guilt-innocence phase of Broadnax's capital murder trial.

The jury returned its verdict on August 12, 2009, finding Broadnax guilty of capital murder.[4]

### D. Punishment Phase of Trial

The punishment phase of Broadnax's capital murder trial commenced on August 13, 2009.[5] The prosecution presented (1) victim impact testimony from Butler's mother and Swan's mother, (2) testimony concerning the results of Butler's autopsy, (3) the custodian of Dallas County Jail inmate telephone records, (4) a pair of investigators for the Dallas County District Attorney's Office, (5) a Dallas County Jail Special Response Team officer who helped supervise a shakedown of Broadnax's cell during which Broadnax became agitated and had to be restrained physically, (6) a Dallas County Jail detention officer who broke up a fight between Broadnax and another inmate in the jail's recreational area, (7) a Dallas County Jail detention officer who witnessed Broadnax strike a different inmate in an unprovoked assault only weeks before the start of Broadnax's capital murder trial and the inmate Broadnax assaulted, (8) a member of the Dallas Police Department's gang unit, who identified various symbols and phrases Broadnax employed in his drawings and writings as indicating Broadnax's gang membership,[6] and (9) the assistant Warden of a Texas Department of Criminal Justice ("TDCJ") unit, who explained the TDCJ's

---

[4] 47 S.F. Trial at 203 [41-21 ECF at 59 of 60]. Broadnax's guilt-innocence phase verdict form appears at Clerk's Record, Vol. 3 of 3, at 635 [38-8 ECF at 98 of 256].

[5] See Appendix II below for a synopsis of the testimony and other evidence admitted during the punishment phase of Broadnax's capital murder trial.

[6] Both during his state habeas corpus proceeding and in his federal habeas corpus proceeding, Broadnax has argued in conclusory fashion that Officer Nelson's trial testimony was factually inaccurate. The only disagreement with Officer Nelson's trial testimony identified with specificity in Broadnax's pleadings in this Court, however, is with Nelson's opinion that Broadnax was a "member" of the Gangster Disciples. Broadnax presented the state habeas court, and presents this Court, with no evidence showing any of the *factual* information to which Nelson testified regarding the history, criminal activities, or symbols of the Gangster Disciples was in any manner inaccurate.

system for classifying prisoners, the TDCJ's prison disciplinary procedures, and other aspects of prison life in Texas.[7]

Broadnax's defense team called (1) a research psychologist who testified regarding the processes of brain development in humans, (2) a psychiatrist who treated Broadnax at the Dallas County Jail and diagnosed Broadnax with substance abuse-induced psychosis, (3) a professor and researcher in clinical pharmacology who opined that Broadnax was under the influence of marijuana and PCP at the time of his offense and during his interviews several days later, (4) a cousin of Broadnax's mother, who testified to Broadnax's good character as a child, (5) a trio of Broadnax's maternal aunts, concerning Broadnax's abusive childhood, (6) Broadnax's mother, who testified extensively regarding her own difficulties growing up, Broadnax's family background, her many unstable relationships with men, and Broadnax's extremely unstable, difficult, childhood, (7) Broadnax's brother-in-law, who testified regarding Broadnax's good character traits and responsible behavior as a baby sitter, (8) two of Broadnax's cousins, who testified to Broadnax's good character, (9) the Dallas County Jail inmate with whom Broadnax fought in the recreational area, who testified he started the fight between them because he felt Broadnax had disrespected him, (10) two persons who knew Broadnax's family, who testified via deposition about the difficult challenges Broadnax faced growing up, (11) Broadnax's sister, who testified about Broadnax's unstable abusive childhood, her own experiences growing up with their abusive mother, and Broadnax's difficult teenage years, and (12) one of Broadnax's mother's ex-

---

[7] As explained in a previous Order, the hard copy version of Volume 49 of the S.F. Trial and the electronically filed version of that same volume, found at 41-23 ECF both cut off at page 160 [41-23 ECF at 198 of 198]. A complete version of Warden Nelson's testimony does appear, however, on a CD-ROM marked "Volume 1-54 & Supp. Volumes" that was submitted to this Court by Respondent along with similarly formatted copies of the audio and video recordings filed in this cause. This Court has printed a hard copy of pages 161-255 from Volume 49 S.F. Trial and included it with the rest of Volume 49 among the hard copy of the state court record in this cause.

husbands, who testified that he ended their relationship and threw Broadnax's mother out of his house after she beat Broadnax so badly his back was bloody.

After the defense rested at the punishment phase of trial, in rebuttal the prosecution (1) introduced Broadnax's Dallas County Jail commissary account records and a series of recordings of telephone calls Broadnax made from the Dallas County Jail on the same day the jury returned its verdict at the guilt-innocence phase of trial, (2) presented the testimony of a forensic psychologist, who read a list of the characteristics of a psychopathic personality, explained in layman's terms what each of the terms in the list meant, but also admitted that he had not interviewed Broadnax and expressly declined to offer an opinion as to whether Broadnax possessed any of the traits of a psychopathic personality he identified and defined for the jury,[8] and (3) presented more victim impact testimony from Swan's younger sister and brother.

On August 20, 2009, the jury returned its punishment phase verdict, answering the Texas capital sentencing scheme's future dangerousness special issue affirmatively and the mitigation special issue negatively.[9] After excusing the jury, the trial court pronounced sentence, imposing the death penalty.[10]

---

[8] While Broadnax argues Dr. Price's rebuttal testimony was prejudicial and should not have been admitted into evidence, he fails to note that Dr. Price's testimony regarding the character traits of a "psychopathic personality" did not differ significantly from the list of character traits contained in the DSM-IV-TR's definition of Antisocial Personality Disorder admitted into evidence (as State Exhibit no. 581) during the cross-examination of defense expert Dr. Lane. Testimony of Dr. Frank Lane, 50 S.F. Trial at 147-48 [41-24 ECF at 48 of 90].

[9] 54 S.F. Trial at 4-5 [40-3 ECF at 5-6 of 10]. Broadnax's punishment phase verdict form appears at Clerk's Record, Vol. 3 of 3, at 650-51 [38-8 ECF at 113-14 of 256].

[10] 54 S.F. Trial at 6-7 [40-3 ECF at 7-8 of 10].

### E. Direct Appeal

Broadnax appealed his conviction and sentence.[11]  The Texas Court of Criminal Appeals affirmed Broadnax's conviction and sentence.  *Broadnax v. State*, AP-76,207, 2011 WL 6225399 (Tex. Crim. App. Dec. 14, 2011), *cert. denied*, 568 U.S. 828 (2012).

### F. State Habeas Corpus Proceeding

Broadnax subsequently filed an application for state habeas corpus relief.[12]  The state trial court held an evidentiary hearing in Broadnax's state habeas corpus proceeding on December 7,

---

[11] Attorney John Tatum filed Broadnax's Appellant's Brief on February 9, 2011, asserting fifty-six points of error.  A complete copy of Broadnax's Appellant's Brief appears at 42-7 ECF at 1-152 of 152.  In his first seven points of error, Broadnax argued the state trial court erred in overruling his *Batson* challenges to the prosecution's exercise of peremptory strikes against seven different members of the jury venire.  In his eighth through twenty-third points of error, Broadnax argued the state trial court erroneously denied his challenges for cause to specific members of the jury venire.  In his twenty-fourth and twenty-fifth points of error, Broadnax argued his petit jury was biased and prejudiced against him.  In his twenty-sixth through thirty-third and thirty-fifth points of error, Broadnax argued the state trial court committed a variety of erroneous evidentiary rulings, including (1) excluding his proffered evidence of diminished capacity, (2) admitting his interviews with television reporters, (3) admitting a variety of graphic autopsy and crime scene photographs, and (4) admitting expert testimony concerning Broadnax's alleged gang affiliation. In his thirty-fourth, thirty-seventh, and fortieth points of error, Broadnax argued there was legally insufficient evidence (1) establishing he was guilty of capital murder, (2) supporting the jury's affirmative finding of future dangerousness, and (3) supporting the trial court's imposition of court costs as part of its Judgment.  In his thirty-sixth point of error, Broadnax argued the trial court erred in denying his requested limiting jury instruction regarding evidence of gang affiliation.  In his thirty-eighth and thirty-ninth points of error, Broadnax argued the trial court erred in imposing court costs as part of its Judgment. In his forty-first through fifty-fourth points of error, Broadnax asserted a wide range of challenges to the constitutionality of the Texas capital sentencing special issues, including challenges to the alleged vagueness of the terms included therein, the open-ended discretion exercised by his sentencing jury in answering the mitigation special issue, the lack of meaningful state appellate review for the jury's answers to the special issues, as well as the trial court's refusal to impose an express "beyond a reasonable doubt" burden of proof on the prosecution in connection with the mitigation special issue.  In his final two points of error, Broadnax argued the trial court erred in refusing to quash the indictment for due process violations under both state and federal constitutional principles.

[12] Attorney Lydia M.V. Brandt filed Broadnax's state habeas corpus application on December 20, 2011, asserting eight grounds for relief.  An apparently corrupted copy of Broadnax's state habeas corpus application (containing shifts in font size and style) appears at 42-1 ECF at 6-106 of 258.  As grounds for relief in his state habeas application, Broadnax argued (1)

2012 and heard testimony from (1) a trio of Dallas area criminal defense attorneys regarding their experiences with media requests to interview their own clients at the Dallas County Jail and their belief the Dallas County Sheriff's Department encouraged jail inmates to talk to the media, (2) Broadnax's trial defense team's court-appointed investigator regarding his unsuccessful efforts prior to trial to interview and serve subpoenas on the members of the media who interviewed Broadnax, (3) an educational specialist and gang awareness trainer who represented himself as a gang expert, (4) two of Broadnax's three criminal defense attorneys from his capital murder trial, who testified concerning their strategic decision-making, and (5) a professor of psychology at Texas A&M University who opined that the list of psychopathic personality characteristics which Dr. Price introduced to the jury and the definition of Antisocial Personality Disorder introduced during the cross-examination of Dr. Lane were both scientifically invalid as predictors of future violence in prison.[13]

On September 17, 2014, the state habeas trial court issued its findings of fact and conclusions of law and recommendation that state habeas corpus relief be denied, concluding in pertinent part that (1) the reporters who interviewed Broadnax prior to trial were not acting as

---

his interviews by the media violated his rights under the Fifth, Sixth, and Fourteenth Amendments, (2) his trial counsel rendered ineffective assistance in violation of the Sixth Amendment by (a) failing to adequately investigate and present evidence showing his media interviews violated constitutional principles, (b) failing to object to the admission of gang affiliation expert testimony and failing to cross-examine the prosecution's gang expert, (c) opening the door to the admission of expert testimony concerning antisocial personality disorder during the direct testimony of Dr. Lane, and (d) failing to cross-examine and rebut prosecution witness Dr. Price concerning his characterizations of a psychopathic personality, (3) the prosecution knowingly introduced false and misleading expert testimony regarding Broadnax's gang affiliation, (4) the admission of evidence of Broadnax's gang affiliation violated his First Amendment rights, and (5) the trial court admitted false and misleading testimony regarding Broadnax's antisocial personality disorder.

[13] *See* Appendix III below for a synopsis of the testimony and other evidence admitted during the evidentiary hearing held in Broadnax's state habeas corpus proceeding.

agents of the State, (2) there was no showing the testimony of either B.K. Nelson or Dr. Price was factually inaccurate or otherwise false, (3) Chapter 61 of the Texas Code of Criminal Procedure does not deal with the admissibility of evidence of gang membership, (4) the evidence of Broadnax's fascination with the Gangster Disciples was overwhelming, and (5) attorney Lollar furnished credible testimony regarding the defense team's strategic reasons for not challenging the punishment phase trial testimony of Dr. Price and Detective Nelson.[14]  On May 20, 2015, the Texas Court of Criminal Appeals denied Broadnax's state habeas corpus application in an unpublished order adopting the trial court's findings and conclusions.  *Ex parte James Garfield Broadnax*, WR-81,573-01, 2015 WL 2452758 (Tex. Crim. App. May 20, 2015), *cert. denied*, 136 S. Ct. 77 (2015).[15]

### G. Proceedings in this Court

Broadnax filed his original petition for federal habeas corpus relief on May 18, 2016 [ECF no. 29].  On November 18, 2016, Broadnax filed his first amended federal habeas corpus petition, asserting a variety of claims of ineffective assistance by his state trial and appellate counsel, claims of alleged *Batson* violations and other allegedly erroneous rulings by the state trial court during jury selection, and a host of other claims, including assertions of erroneous evidentiary rulings, alleged errors in his punishment phase jury charge, a plethora of challenges to the Texas capital sentencing special issues, and an Eighth Amendment challenge to death penalty [ECF no. 48].  Respondent filed her answer on June 26, 2017 [ECF no. 63].  Broadnax filed his reply brief on October 4, 2017 [ECF no. 69].

---

[14] The state trial court's Order issued September 17, 2014 containing its findings and conclusions appears at 42-6 ECF at 39-72 of 163.

[15] A copy of the Texas Court of Criminal Appeals' *per curiam* order denying Broadnax's state habeas corpus application appears at 42-8 ECF at 3-4 of 4.

## II. STANDARD OF REVIEW

Because Broadnax filed his federal habeas corpus action after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), this Court's review of Broadnax's claims for federal habeas corpus relief is governed by AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792 (2001). Under the AEDPA standard of review, this Court cannot grant Broadnax federal habeas corpus relief in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. Section 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown v. Payton*, 544 U.S. at 141, 125 S.Ct. at 1438; *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) ("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"). A state court's failure to cite Supreme Court authority does not, per se, establish the state court's decision is "contrary to" clearly established federal law:

"the state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell v. Esparza*, 540 U.S. at 16.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown v. Payton*, 544 U.S. at 141; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) ("A federal habeas court can only set aside a state-court decision as 'an unreasonable application of . . . clearly established Federal law,' § 2254(d)(1), if the state court's application of that law is 'objectively unreasonable.'"); *Wiggins v. Smith*, 539 U.S. at 520-21. The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."); *Wiggins v. Smith*, 539 U.S. at 520; *Price v. Vincent*, 538 U.S. 634, 641 (2003) ("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner"). "Under the Antiterrorism and Effective Death Penalty Act, a state prisoner seeking a writ of habeas corpus from a federal court 'must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Bobby v. Dixon*, 565 U.S. 23, 24 (2011) (quoting *Harrington v. Richter,* 562 U.S. 86, 101(2011)).

Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

AEDPA also significantly restricts the scope of federal habeas review of state court fact findings. Section 2254(d)(2) of Title 28, United States Code, provides federal habeas relief may not be granted on any claim that was adjudicated on the merits in the state courts unless the state court's adjudication of the claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Wood v. Allen*, 558 U.S. 290, 301(2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."); *Williams v. Taylor*, 529 U.S. at 410 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."). Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), on habeas review, this does not suffice to supersede the trial court's factual determination. *Wood v. Allen*, 558 U.S. at 301; *Rice v. Collins*, 546 U.S. 333, 341-42 (2006).

In addition, section 2254(e)(1) provides a federal habeas petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro v. Landrigan*, 550 U.S. at 473-74 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice v. Collins*, 546 U.S. 333, 338-39 (2006) ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of

rebutting the presumption by 'clear and convincing evidence.'"); *Miller-El v. Dretke,* 545 U.S. 231, 240 (2005) ("[W]e presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'"); 28 U.S.C. §2254(e)(1). It remains unclear at this juncture whether section 2254(e)(1) applies in every case presenting a challenge to a state court's factual findings under section 2254(d)(2). *See Wood v. Allen*, 558 U.S. at 300-01 (choosing not to resolve the issue of section 2254(e)(1)'s possible application to all challenges to a state court's factual findings); *Rice v. Collins*, 546 U.S. at 339 (likewise refusing to resolve the Circuit split regarding the application of Section 2254(e)(1)).

The deference to which state-court factual findings are entitled under AEDPA does not imply an abandonment or abdication of federal judicial review. *See Miller-El v. Dretke*, 545 U.S. at 240 (the standard is "demanding but not insatiable"); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief.").

Finally, in this Circuit, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision. *See Evans v. Davis*, 875 F.3d 210, 216-17 (5th Cir. 2017) (section 2254(d) directs federal habeas courts to review only a state court's ultimate decision and not the written opinion explaining that decision and requires the federal court to consider all the arguments and theories that could have supported the state court's decision), *cert. denied*, 139 S. Ct. 78 (2018); *Woodfox v. Cain*, 609 F.3d 774, 789 (5th Cir. 2010) ("[W]e review for objective reasonableness the state court's ultimate legal decision, not necessarily the state court's opinion and legal reasoning for its ultimate decision."); *Maldonado v. Thaler*, 625 F.3d

229, 239 (5th Cir. 2010) (federal habeas review of a state court's adjudication involves review only of a state court's decision, not the written opinion explaining the decision), *cert. denied*, 565 U.S. 829 (2011).

### III. CONSTITUTIONALITY OF THE DEATH PENALTY

In his final claim for federal habeas relief in his amended petition, Broadnax argues that the death penalty is in all cases an unconstitutional violation of the Eighth Amendment's prohibition against cruel and unusual punishments.[16]   In support of this claim, Broadnax cites to the Supreme Court's holdings in three cases appealed directly to that court from the highest appellate courts of Louisiana, Missouri, and Virginia.  *See Kennedy v. Louisiana*, 554 U.S. 407, 446-47 (2008) (holding the Eighth Amendment prohibits imposition of the death penalty for rape of a child where the crime did not result, and was not intended to result, in the death of the victim); *Roper v. Simmons*, 543 U.S. 551, 578 (2005) (holding the execution of individuals who were under eighteen years of age at the time of their capital crimes is prohibited by the Eighth and Fourteenth Amendments); *Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (holding executions of mentally retarded criminals are cruel and unusual punishments prohibited by the Eighth Amendment). Therein lies the rub for Broadnax: not any of those cases were federal habeas corpus proceedings subject to the constraints imposed by AEDPA.  As explained above, AEDPA greatly limits the

---

[16] ECF no. 48 at 146-51.  In his forty-first through fifty-sixth points of error in his Appellant's Brief, Broadnax fairly presented the Texas Court of Criminal Appeals with numerous constitutional arguments challenging the Texas capital sentencing scheme, including specific challenges to various aspects of the Texas capital sentencing special issues, the manner in which burdens of proof are imposed (or not imposed) in those special issues, and (in his forty-first, forty-seventh, and forty-eighth points of error) the overall constitutionality of imposing the ultimate form of criminal punishment.  Broadnax's Appellant's Brief at 111-24 [42-7 ECF at 138-51 of 152].  The Texas Court of Criminal Appeals rejected all of these federal constitutional attacks upon the Texas capital sentencing scheme on the merits.  *Broadnax v. State*, 2011 WL 6225399, at *18-*20.

ability of this Court to grant federal habeas corpus relief when a state court has acted in a manner consistent with clearly established federal law, as set forth in the precedents of the Supreme Court. The Supreme Court recently reaffirmed the constitutional vitality of capital punishment. *See Bucklew v. Precythe*, 139 S. Ct. 1112, 1122 (2019) ("The Constitution allows capital punishment."). Because the Supreme Court has never declared the death penalty unconstitutional per se, the rejection on the merits of Broadnax's Eighth Amendment challenge to his sentence by the Texas Court of Criminal Appeals in the course of Broadnax's direct appeal was wholly consistent with clearly established federal law and does not furnish a basis for federal habeas corpus relief.

Likewise, because they were direct appeal cases accepted for certiorari review by the Supreme Court from state appellate courts, none of the three Supreme Court opinions relied upon by Broadnax in his federal habeas corpus petition were limited by the Supreme Court's long-standing nonretroactivity doctrine announced in *Teague v. Lane*, 489 U.S. 288 (1989), which forecloses adoption of the new principles of federal constitutional criminal procedure in federal habeas corpus proceedings. Under the holding in *Teague*, federal courts are generally barred from applying new constitutional rules of criminal procedure retroactively on collateral review. *Caspari v. Bohlen*, 510 U.S. 383, 389-90 (1994). A "new rule" for *Teague* purposes is one which was not dictated by precedent existing at the time the defendant's conviction became final. *See O'Dell v. Netherland*, 521 U.S. 151, 156 (1997) (holding a "new rule" either "breaks new ground," "imposes a new obligation on the States or the Federal Government," or was not "dictated by precedent existing at the time the defendant's conviction became final"). Under this doctrine, unless reasonable jurists hearing the defendant's claim at the time his conviction became final would have

felt compelled by existing precedent to rule in his favor, a federal habeas court is barred from doing so on collateral review. *Id.*

The holding in *Teague* is applied in three steps: first, the court must determine when the petitioner's conviction became final; second, the court must survey the legal landscape as it then existed and determine whether a state court considering the petitioner's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution; and third, if the rule advocated by the petitioner is a new rule, the court must determine whether the rule falls within one of the two narrow exceptions to the nonretroactivity principle. *Caspari v. Bohlen*, 510 U.S. at 390.

The only two exceptions to the *Teague* nonretroactivity doctrine are reserved for (1) new rules forbidding criminal punishment of certain primary conduct and rules prohibiting a certain category of punishment for a class of defendants because of their status or offense and (2) "watershed" rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding, i.e., a small core of rules requiring observance of those procedures that are implicit in the concept of ordered liberty. *O'Dell v. Netherland*, 521 U.S. at 157. Broadnax's proposed new rule barring the imposition of the death penalty in all criminal cases satisfies neither of these two exceptions. A conviction becomes final for *Teague* purposes when either the United States Supreme Court denies a certiorari petition on the defendant's direct appeal or the time period for filing a certiorari petition expires. *Caspari v. Bohlen*, 510 U.S. at 390. Broadnax's conviction became final for *Teague* purposes no later than October 1, 2012, i.e., the date the United States Supreme Court denied Broadnax's petition for writ of certiorari following the Texas Court of Criminal Appeals' affirmation of his conviction and sentence. *See Beard v. Banks*, 542 U.S. 406, 411-12 (2004) (recognizing a state criminal conviction ordinarily becomes final for *Teague*

purposes when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for writ of certiorari has elapsed or a timely filed petition for certiorari has been denied); *Caspari v. Bohlen*, 510 U.S. at 390 ("A state conviction and sentence become final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied.")

*Teague* remains applicable after the passage of AEDPA. *See Horn v. Banks*, 536 U.S. 266, 268-72 (2002) (applying *Teague* in an AEDPA context); *Robertson v. Cockrell*, 325 F.3d 243, 255 (5th Cir. 2003) (recognizing the continued vitality of the *Teague* nonretroactivity doctrine under AEDPA). As of the date Broadnax's conviction and sentence became final for *Teague* purposes no federal court had ever held a Texas criminal defendant was entitled to have his capital sentence vacated on Eighth Amendment grounds because the sentence of death is in all cases "cruel or unusual" under Eighth Amendment principles. Thus, under *Teague*, Broadnax's final claim does not warrant federal habeas corpus relief under even a de novo standard of review.

## IV. CHALLENGES TO TEXAS CAPITAL SENTENCING SCHEME & JURY CHARGE

Broadnax challenges four aspects of the Texas capital sentencing scheme, specifically, (1) the absence of a burden of proof in the mitigation special issue, (2) the presence of allegedly vague terms in both of the two capital sentencing special issues submitted in his trial, (3) the validity of the Texas twelve/ten rule, and (4) the trial court's failure to instruct his capital sentencing jury that

it was required to consider all mitigating evidence individually.[17] For the reasons discussed below, all of these arguments lack arguable merit.[18]

### A. Absence of a Burden of Proof in the Mitigation Special Issue

Neither the Supreme Court's opinion in *Apprendi* nor any of the Supreme Court's subsequent opinions construing its holding in *Apprendi* (including the holdings in *Hurst, Ring,* and *Alleyne* cited by Broadnax), mandate imposition of a burden of proof on the prosecution with regard to the Texas capital sentencing scheme's mitigation special issue. *Kansas v. Carr*, 136 S. Ct. 633, 642 (2016); *Allen v. Stephens*, 805 F.3d 617, 626-28 (5th Cir. 2015). In fact, the Supreme

---

[17] ECF no. 48 at 133-45. As explained in note 13, Broadnax presented variations on these same complaints in his forty-first through fifty-sixth points of error in his Appellant's Brief and the Texas Court of Criminal Appeals rejected each of these arguments on the merits.

[18] Rule 11 of the Federal Rules of Civil Procedure provides in pertinent part that an attorney filing a litigation document (including a federal habeas corpus petition) certifies that the document (1) is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation and (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law. *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 528 (5th Cir. 2016). As is explained at length below, Broadnax's complaints about the absence of a burden of proof in the Texas capital sentencing scheme's mitigation special issue and the constitutionality of the Texas twelve/ten rule have been consistently rejected by the Fifth Circuit for decades, followed by consistent denials of certiorari review of those same decisions by the Supreme Court. Despite the long lines of Fifth Circuit case law rejecting the legal arguments underlying Broadnax's challenges to the Texas capital sentencing scheme, Broadnax has made no good faith effort in this cause to distinguish any of the relevant Fifth Circuit case law rejecting his legal arguments, much less offer a nonfrivolous justification for extending, modifying, or reversing existing law or for establishing new law. In the context of a federal habeas corpus proceeding, any argument for the establishment of "new law" must necessarily address the twin concerns of (1) the extremely narrow standard of review mandated by AEDPA and (2) the nonretroactivity doctrine announced in *Teague*. It is in this particular regard that Broadnax's challenges to the Texas capital sentencing scheme are deficient under Rule 11. While this Court will not impose sanctions pursuant to Rule 11 in this case, counsel in this cause and all federal habeas counsel are admonished to avoid asserting claims before this Court which have routinely been rejected by the Fifth Circuit without also furnishing this Court some nonfrivolous legal argument for "for extending, modifying, or reversing existing law or for establishing new law" which recognizes the reality of the limitations imposed upon this Court by both AEDPA and *Teague*.

Court has expressly recognized the lack of efficacy in selection phase jury instructions addressing mitigating evidence:

> [W]e doubt whether it is even possible to apply a standard of proof to the mitigating-factor determination (the so-called "selection phase" of a capital-sentencing proceeding). It is possible to do so for the aggravating-factor determination (the so-called "eligibility phase"), because that is a purely factual determination. The facts justifying death set forth in the Kansas statute either did or did not exist—and one can require the finding that they did exist to be made beyond a reasonable doubt. Whether mitigation exists, however, is largely a judgment call (or perhaps a value call); what one juror might consider mitigating another might not. And of course the ultimate question whether mitigating circumstances outweigh aggravating circumstances is mostly a question of mercy—the quality of which, as we know, is not strained. It would mean nothing, we think, to tell the jury that the defendants must deserve mercy beyond a reasonable doubt; or must more-likely-than-not deserve it. It *would* be possible, of course, to instruct the jury that *the facts establishing* mitigating circumstances need only be proved by a preponderance, leaving the judgment whether those facts are indeed mitigating, and whether they outweigh the aggravators, to the jury's discretion without a standard of proof. If we were to hold that the Constitution requires the mitigating-factor determination to be divided into its factual component and its judgmental component, and the former to be accorded a burden-of-proof instruction, we doubt whether that would produce anything but jury confusion. In the last analysis, jurors will accord mercy if they deem it appropriate, and withhold mercy if they do not, which is what our case law is designed to achieve.

*Kansas v. Carr*, 136 S. Ct. at 642.

Furthermore, the Fifth Circuit has repeatedly rejected the arguments underlying Broadnax's call for imposing a burden of proof on the mitigation special issue. *See, e.g., Blue v. Thaler*, 665 F.3d 647, 668 (5th Cir. 2011) ("No Supreme Court or Circuit precedent constitutionally requires that Texas' mitigation special issue be assigned a burden of proof."); *Druery v. Thaler*, 647 F.3d 535, 546 (5th Cir. 2011) ("In *Avila v. Quarterman*, this court rejected a petitioner's argument 'that allowing a sentence of death without a jury finding beyond a reasonable doubt that there were no mitigating circumstances sufficient to warrant a sentence of life imprisonment violated his Sixth and Fourteenth Amendment right to due process and a fair

trial.' 560 F.3d 299, 315 (5th Cir.2009). Other decisions have likewise rejected the argument that failure to instruct the jury that the State has the burden of proof beyond a reasonable doubt on the mitigation issue is unconstitutional."); *Coleman v. Quarterman*, 456 F.3d 537, 542 (5th Cir. 2006) ("'[N]o Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof.'" (quoting *Rowell v. Dretke,* 398 F.3d 370, 378 (5th Cir. 2005)). Broadnax makes no good faith effort to distinguish any of the foregoing Supreme Court or Fifth Circuit authorities.

The Texas Court of Criminal Appeals' rejection on the merits during Broadnax's direct appeal of his complaint about the absence of a burden of proof in the mitigation special issue was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Broadnax's trial and direct appeal. This Court therefore denies relief on this claim.

### B. Allegedly Vague Terms in the Texas Capital Sentencing Special Issues

Likewise, the Fifth Circuit has repeatedly rejected challenges to the terms in the Texas capital sentencing special issues identified by Broadnax as allegedly unconstitutionally vague. *See, e.g.*, *Sprouse v. Stephens*, 748 F.3d 609, 622-23 (5th Cir. 2014) (denying Certificate of Appealability ("CoA") on complaints about the lack of definitions of "probability," "criminal acts of violence," and "continuing threat to society" in a Texas capital sentencing jury charge); *Paredes v. Quarterman*, 574 F.3d 281, 294 (5th Cir. 2009) (holding the terms "probability," "criminal acts of violence," and "continuing threat to society" "have a plain meaning of sufficient content that the discretion left to the jury is no more than that inherent in the jury system itself"); *Turner v. Quarterman*, 481 F.3d 292, 299-300 (5th Cir. 2007) (rejecting claims that the terms "probability,"

"criminal acts of violence," and "continuing threat to society" were so vague as to preclude a capital sentencing jury's consideration of mitigating evidence); *Leal v. Dretke*, 428 F.3d 543, 552-53 (5th Cir. 2005) (listing numerous Fifth Circuit opinions rejecting complaints about the failure of Texas courts to define the terms "probability," "criminal acts of violence," and "continuing threat to society").  Thus, all of the key terms in his punishment phase jury charge about which Broadnax complains have a common understanding in the sense that they ultimately mean what the jury says by their final verdict they mean and do not require further definition.  *James v. Collins*, 987 F.2d 1116, 1120 (5th Cir. 1993); *Milton v. Procunier*, 744 F.2d 1091, 1096 (5th Cir. 1984).  Broadnax's constitutional complaints about the trial court's failure to define the terms "probability," "criminal acts of violence," and "continuing threat to society" have repeatedly been rejected by the Fifth Circuit and are frivolous.

The constitutional standard for evaluating the propriety of a capital sentencing jury charge is set forth in *Boyde v. California*, 494 U.S. 370, 380 (1990), where the Supreme Court held the test for determining whether jury instructions satisfy the Constitution is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Johnson v. Texas,* 509 U.S. 350, 367-368 (1993).  Broadnax identifies no potentially mitigating evidence before the jury at the punishment phase of his trial which he contends the jury was unable to properly consider in answering one or more of the Texas capital sentencing special issues because of the lack of definitions of the terms "personal moral culpability," "moral blameworthiness," or "mitigating circumstances."  *See Beazley v. Johnson*, 242 F.3d 248, 259-60 (5th Cir. 2001) (holding the Texas capital sentencing scheme's statutory definition of "mitigating evidence" as that which renders the defendant less morally blameworthy did not preclude consideration of any aspect of the defendant's character or

record or any of the circumstances of the offense the defendant proffers as a basis for a sentence less than death). Likewise, the Fifth Circuit has repeatedly rejected arguments that the Texas capital sentencing scheme's definition of "mitigation" is too narrow. *See, e.g., Sprouse v. Stephens*, 748 F.3d at 622-23 (denying a CoA on this same issue); *Blue v. Thaler*, 665 F.3d 647, 665-66 (5th Cir. 2011) (Article 37.071 does not unconstitutionally preclude the jury from considering as a mitigating factor any aspect of a defendant's character or record and any of the circumstances of the offense the defendant proffers as a basis for a life sentence); *Beazley v. Johnson*, 242 F.3d at 260 ("The definition of mitigating evidence does *not* limit the evidence considered under the third special issue (whether mitigating circumstances warrant a life, rather than a death, sentence). '[V]irtually *any* mitigating evidence is capable of being viewed as having some bearing on the defendant's 'moral culpability' apart from its relevance to the particular concerns embodied in the Texas special issues'."). Broadnax's complaints about the lack of definitions of key terms and alleged vagueness in the Texas capital sentencing special issues and his punishment phase jury charge are frivolous.

The Texas Court of Criminal Appeals' rejection on the merits during Broadnax's direct appeal of his complaints about the lack of definitions of key terms in the special issues in his punishment phase jury charge was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Broadnax's trial and direct appeal. This Court therefore denies relief on this claim.

## C. Challenge to the Texas Twelve/Ten Rule

The Fifth Circuit has also repeatedly rejected the same arguments underlying Broadnax's challenge to the Texas capital sentencing scheme's requirement of jury unanimity for a verdict favorable to the prosecution but only ten votes for a verdict favorable to the defense on the capital sentencing special issues. *See, e.g., Blue v. Thaler*, 665 F.3d at 669-70 (rejecting an Eighth Amendment challenge to the Texas twelve/ten rule); *Alexander v. Johnson*, 211 F.3d 895, 897 (5th Cir. 2000) (specifically rejecting both Fourteenth and Eighth Amendment challenges to the Texas twelve/ten rule in the course of affirming this Court's rejection of claims virtually identical to those raised by Broadnax); *Miller v. Johnson*, 200 F.3d 274, 288-89 (5th Cir. 2000) (holding *Mills* inapplicable to a Texas capital sentencing proceeding); *Woods v. Johnson*, 75 F.3d 1017, 1036 (5th Cir. 1988) (holding the same); *Hughes v. Johnson*, 191 F.3d 607, 628-29 (5th Cir. 1999) (holding both *Mills* and *McKoy* inapplicable to the Texas capital sentencing scheme); *Jacobs v. Scott*, 31 F.3d 1319, 1328-29 (5th Cir. 1994) ("Under the Texas system, all jurors can take into account any mitigating circumstance. One juror cannot preclude the entire jury from considering a mitigating circumstance. Thus, *Mills* is inapplicable."). Because the Texas capital sentencing scheme is vastly different from those employed in Maryland and North Carolina, Broadnax's reliance on the Supreme Court's opinions in *McKoy* and *Mills* is misplaced. *Alexander v. Johnson*, 211 F.3d at 897; *Miller v. Johnson*, 200 F.3d at 288-89; *Woods v. Johnson*, 75 F.3d at 1036; *Jacobs v. Scott*, 31 F.3d at 1328-29. Broadnax's challenge to the Texas twelve/ten rule is frivolous.

The Texas Court of Criminal Appeals' rejection on the merits during Broadnax's direct appeal of his complaints about the Texas twelve/ten rule was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination

of the facts in light of the evidence presented in Broadnax's trial and direct appeal. This Court therefore denies relief on this claim.

### D. Individualized Consideration of Mitigating Evidence

The fundamental problem with Broadnax's complaint about the trial court's failure to instruct the jury at the punishment phase of trial that jurors were required to consider mitigating evidence individually is that Broadnax never requested the state trial court give such an instruction.[19] Moreover, Broadnax does not identify any Supreme Court precedent mandating the type of punishment phase jury instruction which he now complains his state trial court failed to issue *sua sponte*. Regardless whether this Court may deem Broadnax's requested instruction advisable, in the absence of any clearly established Supreme Court precedent mandating the giving of such an instruction or declaring the absence of such an instruction constitutional error, the Texas Court of Criminal Appeals' rejection on the merits of this complaint during Broadnax's direct appeal is not objectionable under AEDPA's narrow standard of review. For the same reasons discussed in section IV.C. above, Broadnax's reliance upon the Supreme Court's opinions in *Mills*

---

[19] Broadnax identifies no written request for such an instruction among the more than twelve thousand pages of state court records. This Court's independent review of the record likewise reveals no such formal written request. This Court's independent review of the multiple conferences at trial during which the parties and trial judge discussed the punishment phase jury instructions likewise reveals no specific request for such a jury instruction by defense counsel. *See* 50 S.F. Trial at 309-14 [41-24 ECF at 88-90 of 90]; 52 S.F. Trial at 292-95 [40-1 ECF at 82 of 83].

During the latter of these punishment phase jury charge conferences, Broadnax's attorney made vague references to "motions" the defense had previously filed. The only defense motions addressing the punishment phase jury charge this Court has been able to locate (without the assistance of counsel for either party) in the record appear in Volume 1 of 2 of the Clerk's Supplemental Record at 281-88 & 295-306 [38-12 ECF at 285-88, 290-92, & 299-310 of 311]. While Broadnax's trial counsel did request a number of specific jury instructions be included in the punishment phase jury charge, none of the instructions requested in these motions asked the state trial court to instruct the jury to give "individual" consideration to mitigating evidence in the same manner Broadnax now complains the state trial court failed to instruct the jury. Thus, this aspect of Broadnax's federal habeas corpus petition complains about a missing punishment phase jury instruction which Broadnax never requested.

and *McKoy* is misplaced. Respondent also correctly points out the "new rule" advocated by Broadnax in this claim is foreclosed by the nonretroactivity doctrine of *Teague*.

Furthermore, even when viewed under a de novo standard, this complaint about Broadnax's punishment phase jury charge does not warrant federal habeas relief. As explained above, the Supreme Court has established the constitutional standard for evaluating the propriety of a jury instruction at the punishment phase of a capital murder trial is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. at 380. The Supreme Court has consistently applied this standard to evaluate challenges to punishment-phase jury instructions. *See Weeks v. Angelone*, 528 U.S. 225, 226 (2000) (emphasizing the *Boyde* test requires a showing of a reasonable likelihood, as opposed to a mere possibility, the jury construed the jury instructions to preclude its consideration of relevant mitigating evidence); *Jones v. United States*, 527 U.S. 373, 390 & n.9 (1999) (holding the same); *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (holding the same); *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998) (holding the same); *Johnson v. Texas*, 509 U.S. 350, 367 (1993) (holding *Boyde* requires a showing of a reasonable likelihood the jury interpreted the jury instructions so as to preclude it from considering relevant mitigating evidence). This "reasonable likelihood" standard does not require that a capital murder defendant prove the jury "more likely than not" interpreted the challenged instruction in an impermissible way; however, he must demonstrate more than "only a possibility" of an impermissible interpretation. *Johnson v. Texas*, 509 U.S. at 367; *Boyde v. California*, 494 U.S. at 380.

This Court must analyze the challenged language included in the jury charge within the context of the overall jury charge. *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973). "In evaluating

the instructions, we do not engage in a technical parsing of this language of the instructions, but instead approach the instructions in the same way that the jury would--with a 'commonsense understanding of the instructions in the light of all that has taken place at the trial.'" *Johnson v. Texas*, 509 U.S. at 368; *Boyde v. California*, 494 U.S. at 381. Nothing in Broadnax's punishment-phase jury charge can reasonably be construed as foreclosing the consideration by the jury of any of the extensive, potentially mitigating, evidence actually presented during his capital murder trial. Simply put, Broadnax identifies no potentially mitigating evidence properly before his jury to which his jury was unable to adequately give effect because of the lack of a jury instruction mandating the "individualized" consideration he did not request at trial but now demands.

Finally, improper jury instructions in state criminal trial do not generally form the basis for federal habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991); *Galvan v. Cockrell*, 293 F.3d 760, 764-65 (5th Cir. 2002). The fact that a jury instruction was incorrect under state law is not a basis for federal habeas relief. *Gilmore v. Taylor*, 508 U.S. 333, 342 (1993); *Estelle v. McGuire*, 502 U.S. at 71; *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1988). Rather, the question is whether the allegedly ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *Estelle v. McGuire*, 502 U.S. at 72; *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Cupp v. Naughten*, 414 U.S. at 147; *Johnson v. Puckett*, 176 F.3d 809, 824 (5th Cir. 1999) ("as a federal habeas court, our question is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process, not merely whether the instruction is undesirable, erroneous, or even universally condemned."). "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of law." *Henderson v. Kibbe*, 431 U.S. at 155.

The relevant inquiry is whether the failure to give an instruction by itself so infected the

entire trial that the resulting conviction violates due process. *Cupp v. Naughten*, 414 U.S. at 147; *Galvan v. Cockrell*, 293 F.3d at 764-65. A federal court may reverse a state court criminal conviction based upon erroneous jury instructions only when the instructions in question render the entire trial fundamentally unfair. *Henderson v. Kibbe*, 431 U.S. at 154; *Cupp v. Naughten*, 414 U.S. at 147; *Mayabb v. Johnson*, 168 F.3d 863, 867 (5th Cir. 1999). Moreover, there is a strong presumption that errors in jury instructions are subject to harmless error analysis. *Galvan v. Cockrell*, 293 F.3d at 765 (recognizing under *Brecht v. Abrahamson*, 507 U.S. 619, 623-24 (1993), the test for harmless error in federal court is "whether the error had a substantial and injurious effect or influence in determining the jury's verdict"). Having independently reviewed the entirety of Broadnax's punishment phase jury charge, this Court concludes after de novo review that any error in the failure of the state trial court to instruct Broadnax's punishment phase jury to give mitigating evidence "individual" consideration did not render the punishment phase of Broadnax's capital murder trial fundamentally unfair and did not have a substantial and injurious effect or influence on the outcome of the jury's punishment phase verdict as required by *Brecht*. Thus, regardless of the standard of review employed, this complaint about Broadnax's punishment phase jury charge does not warrant federal habeas relief.

The Texas Court of Criminal Appeals' rejection on the merits during Broadnax's direct appeal of his complaint about the absence of a punishment phase jury instruction mandating individualized consideration of mitigating evidence was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Broadnax's trial and direct appeal. This Court therefore denies relief on this claim.

# V. SELECTIVE PROSECIUTION

Broadnax presents an unexhausted complaint that he was selectively prosecuted on the basis of race.[20] Selective prosecution claims are disfavored because they (1) call for the imposition of judicial review upon the usually unfettered discretion exercised by the executive authority responsible for prosecuting criminal offenses and (2) necessarily begin with a presumption of good faith and constitutional compliance by prosecutors. *United States v. Armstrong*, 517 U.S. 456, 463-64 (2006); *Reno v. American-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 489 (1999); *In re United States*, 397 F.3d 274, 284 (5th Cir. 2005). In the ordinary case, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *United States v. Armstrong*, 517 U.S. at 464 (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)); *In re United States*, 397 F.3d at 284.

Nonetheless, a prosecutor's discretion is subject to constitutional constraints, including equal protection principles. *United States v. Armstrong*, 517 U.S. at 464; *In re United States*, 397 F.3d at 284. That is, the decision to prosecute may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification. *United States v. Armstrong*, 517 U.S. at 464. To

---

[20] ECF no. 48 at 127-33. Title 28 U.S.C. § 2254(b)(1) prohibits a federal district court from granting habeas corpus relief based upon an unexhausted claim (except in circumstances inapplicable to Broadnax's selective prosecution claim). Section 2254(b)(2), however, permits a federal district court to deny relief on the merits notwithstanding a petitioner's failure to exhaust available state remedies. Because Broadnax chose not to present his selective prosecution claim to the state courts during either his direct appeal or state habeas corpus proceeding, this Court's review of that claim is necessarily de novo. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) (holding de novo review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (holding de novo review of the prejudice prong of *Strickland* required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (holding the same).

dispel the presumption that a prosecutor has not violated equal protection principles, a defendant must present clear evidence showing that the prosecutor's decisions had both a discriminatory effect and a discriminatory motive or purpose. *United States v. Armstrong*, 517 U.S. at 465; *In re United States*, 397 F.3d at 284. To establish discriminatory effect in a race case, a defendant must show that similarly situated individuals of a different race were not prosecuted. *United States v. Armstrong*, 517 U.S. at 465; *In re United States*, 397 F.3d at 284.

Despite the statistical case and new evidence presented by Broadnax in this Court for the very first time, Broadnax has failed to identify a single individual of another race who was "similarly situated" to him in one critical regard: Broadnax gave multiple interviews following his arrest in which he not only confessed to his capital offense in graphic and precise detail with a cold and calculating demeanor but also repeatedly denied that he felt any remorse for his crimes, repeatedly used crude and offensive language when asked what he had to say to the families of his victims, insisted that he would not serve a sentence of life without parole, and demanded to receive the death penalty, even going so far during one interview as to threaten to kill again if he did not receive a sentence of death.[21] This Court is aware of criminal defendants who have given media interviews prior to trial in which they confessed to committing a capital offense.[22] But Broadnax has identified no one else, and this Court is unaware of any other criminal defendant in the history of Dallas County criminal prosecutions, who has ever given multiple pretrial interviews denying he felt any remorse for his victims and their families, demanding to receive the death penalty, and

---

[21] *See* Appendix I.

[22] *See, e.g., Gonzales v. Stephens*, 2014 WL 496876, at *2 n.6 (W.D. Tex. Jan. 15, 2014) (recounting the fact the defendant gave a televised pretrial interview in which he confessed that his victim had begged for her life just before he shot her, which interview was played for the jury during the defendant's subsequent capital murder trial), *CoA denied*, 606 F. App'x 767 (5th Cir. Apr. 10, 2015).

28

threatening to kill again unless he received a death sentence. In every sense of the term, Broadnax put himself in a class by himself. His cold, antisocial, behavior on camera makes him *sui generis*.[23] There is no one else of any race "similarly situated" to Broadnax for equal protection purposes. Thus, Broadnax has failed to allege any facts showing that a criminal defendant of another race who was genuinely "similarly situated" to Broadnax was not prosecuted for capital murder or that Dallas County prosecutors brought a capital murder prosecution against but did not seek the death sentence for such a nonexistent offender. For that reason, under a de novo standard of review, Broadnax's race-based selective prosecution claims fails.

## VI. ADMISSION OF EXPERT TESTIMONY REGARDING GANG MEMBERSHIP

### A. The Complaints

Broadnax argues the state trial court erroneously admitted the testimony of Dallas Police Officer Barrett Nelson regarding the meaning of various symbols contained on the walls of Broadnax's cell and throughout the spiral notebooks found among Broadnax's belongings in the trunk of Swan's stolen vehicle, as well as his expert opinion that Broadnax was either a Gangster Disciple member or potential member.[24] In addition to arguing that the state trial court erred in

---

[23] Insofar as Broadnax continues to assert that he was suffering from a substance-abuse-induced psychosis during his recorded interviews, that assertion is belied by (1) even a cursory review of the actual video recordings of his interviews (i.e., State Exhibit nos. 403-07), during which Broadnax is clearly alert and oriented, fully responsive (albeit crudely) to the questions asked, and displays an appropriate affect throughout the interviews, including at the dramatic moment one reporter read the arrest warrant affidavit to Broadnax for the first time and Broadnax became aware that a member of his own family had turned him in and (2) Broadnax's subsequent telephone calls from the jail months after his arrest (when Broadnax knew he was being recorded) during which he crudely denied that he felt any remorse for his crimes, stated that he would refuse to accept a term of life without parole, and denied that he was intoxicated at the time of his offense or interviews (State Exhibit nos. 560, 567, 569, & 592 (particularly the conversation beginning at 21:15:01 PM on August 12, 2009, the same date the jury returned its guilty verdict)).

[24] ECF no. 48 at 114-24. Officer Nelson's trial testimony is summarized in Appendix II. Broadnax's accompanying complaint that his trial counsel failed to cross-examine or rebut Nelson's testimony regarding Broadnax's gang membership will be discussed below in connection

admitting Officer Nelson's testimony, under both state evidentiary rules and federal due process principles, Broadnax also argues Officer Nelson's testimony was false or misleading, the prosecution used this false or misleading testimony to secure Broadnax's capital sentence, and Nelson's testimony regarding gang membership violated Broadnax's First Amendment right to freedom of association.

### B. Due Process Claim

Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also presented. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (holding complaints regarding the admission of evidence under California law did not present grounds for federal habeas relief absent a showing that admission of the evidence in question violated due process); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (recognizing that federal

---

with Broadnax's other assertions of ineffective assistance. Broadnax fairly presented a much more abbreviated version of his due process claim as his thirty-fifth point of error on direct appeal at pages 103-04 of his Appellant's Brief [42-7 ECF at 130-31 of 152]. The Texas Court of Criminal Appeals held Officer Nelson's punishment phase testimony (as to the history and criminal activities of the Gangster Disciples, as well as the meaning of various symbols found among Broadnax's writings, and his opinion that Broadnax was a member of the Gangster Disciples) was both relevant and probative and, therefore, admissible under applicable state evidentiary principles. *Broadnax v. State*, 2011 WL 6225399, at *14-*16. The Texas Court of Criminal Appeals also explained the significance of Officer Nelson's testimony:

> Detective Nelson testified that a great deal of evidence indicated the appellant was a member of the Gangster Disciples of the Folk Nation network of gangs: 1) The appellant made statements and hand signals self-identifying himself as a member. 2) The appellant had several tattoos indicating membership in the gang. 3) Notebooks found in the appellant's possession at the time of arrest contained numerous drawings linking the appellant to the gang. 4) Drawings on the walls of the appellant's cell linked the appellant to the gang. Detective Nelson then described the activities and reputation of the gang itself, testifying that the Gangster Disciples were "impressive" in their organization, and explaining "they're teaching their younger generation how to be a gang member." Detective Nelson further testified that the gang was heavily involved in criminal enterprises in order to fund their organization; specifically, he testified that they "turned to violence, selling drugs, robberies and murders."

*Id.*, 2011 WL 6225399, at *15.

habeas relief will not issue for errors of state law); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) (holding a federal court may not issue the writ on the basis of a perceived error of state law). In the course of reviewing state criminal convictions in federal habeas corpus proceedings, a federal court does *not* sit as a super-state appellate court. *Estelle v. McGuire*, 502 U.S. at 67-68; *Lewis v. Jeffers*, 497 U.S. at 780; *Pulley v. Harris*, 465 U.S. at 41.

> When a federal district court reviews a state prisoner's habeas petition pursuant to 28 U.S.C. § 2254 it must decide whether the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." The court does not review a judgment, but the lawfulness of the petitioner's custody *simpliciter*.

*Coleman v. Thompson*, 501 U.S. 722, 730 (1991).

Insofar as Broadnax argues his state trial court erroneously accepted Nelson as an expert witness and improperly allowed Nelson to express an opinion regarding Broadnax's gang membership, Broadnax's complaints turn initially on interpretations of state evidentiary rules. The Texas Court of Criminal Appeals' conclusion in the course of Broadnax's direct appeal that Detective Nelson's testimony was admissible under applicable state evidentiary rules is binding upon this Court in this federal habeas corpus proceeding. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Garza v. Stephens*, 738 F.3d 669, 677 (5th Cir. 2013) (holding a Texas habeas court's interpretation of evidentiary rules was binding in a federal habeas case); *Paredes v. Quarterman*, 574 F.3d 281, 291 (5th Cir. 2009) (a state court's interpretation of state law binds a federal court sitting in habeas corpus).

A federal court may grant habeas relief based on an erroneous state court evidentiary ruling only if the ruling violates a specific federal constitutional right or is so egregious it renders the petitioner's trial fundamentally unfair. *Payne v. Tennessee*, 501 U.S. 808, 825 (1991); *Darden v.*

*Wainwright*, 477 U.S. 168, 179-83 (1986); *Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007); *Brown v. Dretke*, 419 F.3d 365, 376 (5th Cir. 2005). Thus, the question before this Court is not whether the state trial court properly applied state evidentiary rules but, rather, whether Broadnax's federal constitutional rights were violated by the state trial court's rulings on evidentiary matters. *See Bigby v. Dretke*, 402 F.3d 551, 563 (5th Cir. 2005) (holding federal habeas review of a state court's evidentiary ruling focuses exclusively on whether the ruling violated the federal Constitution).

> Due process is implicated only for rulings "of such a magnitude" or "so egregious" that they "render the trial fundamentally unfair." It offers no authority to federal habeas courts to review the mine run of evidentiary rulings of state trial courts. Relief will be warranted only when the challenged evidence "played a crucial, critical, and highly significant role in the trial."
> The due process inquiry must consider the significance of the challenged evidence "in the context of the entire trial." We have held that the Due Process Clause does not afford relief where the challenged evidence was not the principal focus at trial and the errors were not "'so pronounced and persistent that it permeates the entire atmosphere of the trial.'" This is a high hurdle, even without AEDPA's added level of deference.

*Gonzales v. Thaler,* 643 F.3d 425, 430-31 (5th Cir. 2011) (footnotes omitted).

The admission of Detective Nelson's testimony regarding the symbols employed by the Gangster Disciples (and found throughout Broadnax's drawings) did not render the punishment phase of Broadnax's capital murder trial fundamentally unfair. Broadnax has identified nothing factually inaccurate about Detective Nelson's recitation of the history, reputation, or symbols of the Gangster Disciples as an organization. While Broadnax does take issue with Detective Nelson's expert opinion that Broadnax's drawings incorporating numerous Gangster Disciples symbols, use of the phrase "Folk Nation," references to the leader of the Gangster Disciples, and a hand gesture Broadnax gave during a televised interview suggest Broadnax is a member of the Gangster Disciples, even if that opinion was incorrect, it was far from an unreasonable inference

based on the evidence then before the trial court. Moreover, even if Broadnax was not an official, card-carrying, member of the Gangster Disciples, as Detective Nelson's testimony and Broadnax's own correspondence, drawings, and rap lyrics made very clear, Broadnax was most certainly fascinated with the Gangster Disciples.

Moreover, Broadnax's sister testified that Broadnax's older brother is a member of the Gangster Disciples. During a recorded telephone conversation with his mother's boyfriend that was admitted into evidence and played for the jury (State Exhibit no. 570) Broadnax identified himself as being associated with the Gangster Disciples. The only direct evidence Broadnax offered at trial disputing his membership in the Gangster Disciples consisted of his own sister's testimony (hardly an unbiased witness) stating that she believed Broadnax was merely a Gangster Disciple "wannabe" because Broadnax associated with another person (Mario) whom she believed to be a "wannabe" in a rival gang. Under these circumstances, even if Detective Nelson's conclusion that Broadnax was a "member" of the Gangster Disciples were proven to have been incorrect, the admission of Detective Nelson's testimony as a whole did not render the punishment phase of Broadnax's capital murder trial fundamentally unfair. Officer Nelson's explanations regarding the association of various symbols found throughout Broadnax's notebooks and on Broadnax's cell walls (including pitchforks, winged figures, and six-pointed stars) with the Gangster Disciples quite possibly prevented the jury from drawing an erroneous (and potentially even more disadvantageous) inference that those symbols were satanic in nature.

The Texas Court of Criminal Appeals' rejection on the merits during Broadnax's direct appeal of Broadnax's Due Process complaints about the admission of Nelson's trial testimony was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based

on an unreasonable determination of the facts in light of the evidence presented in Broadnax's trial and direct appeal. This Court therefore denies relief on this claim.

## C. First Amendment Claim

As he argued in his fifth claim for state habeas corpus relief, Broadnax again argues that the admission of Officer Nelson's testimony regarding his gang membership violated Broadnax's First Amendment rights.[25] Broadnax's reliance upon the Supreme Court's opinion in *Dawson v. Delaware*, 503 U.S. 159 (1992), in support of his First Amendment claim is misplaced. As Respondent accurately argues, in *Dawson*, the Supreme Court held that evidence showing a criminal defendant was associated with the Aryan Brotherhood, unaccompanied by evidence

---

[25] Broadnax's First Amendment Claim in his state habeas corpus application appears at pages 66-67 of that document, a copy of which appears at 42-1 ECF at 80-81 of 258. As explained in Appendix III, the expert who furnished an affidavit supporting Broadnax's state habeas corpus application (in which he opined that Officer Nelson had erroneously concluded Broadnax was a member of the Gangster Disciples) admitted during the evidentiary hearing held in Broadnax's state habeas corpus proceeding that he had not seen any of the evidence relied upon by Officer Nelson in reaching his conclusion, admitted that he knew virtually none of the facts relied upon by Officer Nelson, admitted he was unaware that Chapter 61 of the Texas Code of Criminal Procedure (cited in his affidavit) did not govern the admissibility of evidence in Texas courts, and all but recanted substantial portions of the information contained in his affidavit. The state habeas trial court (1) concluded Chapter 61 of the Texas Code of Criminal Procedure did not govern the admissibility of evidence in Texas courts, (2) found Broadnax's gang expert admitted during his testimony that (a) the Gangster Disciples were a recognized street gang in Dallas, (b) he was unaware that Broadnax was not from Dallas but from Michigan and Georgia, (c) he could not testify to the presence of the Gangster Disciples in either of those two States, (d) he was unaware that Nelson consulted with gang officers in Chicago in researching Broadnax's gang affiliation, and (e) he did not know Broadnax's older brother was a member of the Gangster Disciples, (3) found Broadnax's gang expert's affidavit was not credible or reliable, (4) found Broadnax had failed to show that "any part of Detective Nelson's testimony was false or misleading," (5) found Nelson was a credible witness, (6) found Nelson's testimony was true and accurate, and (7) concluded the admission of Nelson's testimony had not violated Broadnax's due process or Eighth Amendment rights. State Habeas Trial Court's Findings of Fact and Conclusions of Law, issued September 17, 2014 (henceforth "State Habeas Trial Court's Findings & Conclusions"), at 15-22 [42-6 ECF at 53-60 of 163]. The Texas Court of Criminal Appeals expressly adopted all of the trial court's findings and conclusions when it denied Broadnax's state habeas corpus application. *Ex parte Broadnax*, WR-81,573-01, 2015 WL 2452758 (Tex. Crim. App. May 20, 2015) [42-8 ECF at 3-4 of 4].

showing the Aryan Brotherhood had committed unlawful or violent acts or endorsed such acts, was not relevant at the punishment phase of a capital trial to prove any aggravating circumstance or disprove any mitigating circumstance. *Dawson v. Delaware*, 503 U.S. at 166-67. The Supreme Court made clear, however, that the prosecution can easily cure this constitutional defect by introducing evidence beyond that of a defendant's association with a particular organization, i.e*.,* evidence showing the organization of which the defendant was a member had committed unlawful or violent acts or endorses such acts: "A defendant's membership in an organization that endorses the killing of any identifiable group, for example, might be relevant to a jury's inquiry into whether the defendant will be dangerous in the future." *Id.* at 166.

Officer Nelson's punishment phase testimony does not embody the defect identified in *Dawson*. Officer Nelson testified without contradiction that the Gangster Disciples was a long-standing, highly organized, violent, criminal street gang that engaged in drug dealing, robberies, and murders to raise money for its organization. Broadnax's own sister admitted the Gangster Disciples was a ruthless street gang. The Supreme Court made clear in *Dawson* that the Constitution does not erect a per se barrier to the admission of evidence concerning beliefs and associations at sentencing. *Id.* at 161. Under such circumstances, admission of Detective Nelson's punishment phase testimony did not violate Broadnax's First Amendment rights. *See Fuller v. Johnson*, 114 F.3d 491, 498 (5th Cir. 1997) (holding evidence showing the defendant was a member of the Aryan Brotherhood was admissible at the punishment phase of a capital murder trial to prove future dangerousness when accompanied by evidence showing the gang had committed unlawful or violent acts, including homicides, multiple stabbings, drug dealing, and aggravated assaults).

The state habeas court's rejection on the merits of Broadnax's First Amendment claim was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Broadnax's state habeas corpus proceeding. This Court therefore denies this claim for relief.

### D. Giglio/Napue *Claim*

As he did in his fourth claim in his state habeas corpus application, Broadnax argues the prosecution improperly used false and misleading evidence, in the form of Officer Nelson's "erroneous" expert opinion that Broadnax was a member of the Gangster Disciples, to secure a death sentence.[26] A state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected. *Giglio v. United States*, 405 U.S. 150, 153-54 (1972); *Napue v. Illinois*, 360 U.S. 264, 269-70 (1959). To succeed in showing a due process violation from the use of allegedly perjured testimony, a defendant has the burden of establishing that (1) the witness in question actually gave false testimony, (2) the falsity was material in that there was a reasonable likelihood that it affected the judgment of the jury, and (3) the prosecution used the testimony in question *knowing* that it was false. *Giglio v. United States*, 405 U.S. at 153-54; *Canales v. Stephens*, 765 F.3d 551, 573 (5th Cir. 2014) (a conviction obtained through false evidence known to be such by representatives of the State violates a defendant's constitutional rights); *Kinsel v. Cain*, 647 F.3d 265, 271 (5th Cir. 2011) ("The Supreme Court has

---

[26] Broadnax's "false or misleading" evidence argument appears in his state habeas corpus application at pages 61-65 [42-1 ECF at 65-69 of 258]. As explained in note 25, the state habeas trial court heard testimony from Broadnax's gang expert but concluded there was nothing inaccurate, false, or misleading about Nelson's trial testimony, and recommended this claim be denied on the merits. This is precisely what the Texas Court of Criminal Appeals did when it adopted the trial court's findings, conclusions, and recommendation.

held that the Due Process Clause is violated when the government knowingly uses perjured testimony to obtain a conviction."); *Reed v. Quarterman*, 504 F.3d 465, 473 (5th Cir. 2007).

The state habeas court's factual finding that Nelson's trial testimony was in all respects accurate and credible (not false or misleading) is a factual determination entitled to deference by this federal habeas court pursuant to 28 U.S.C. § 2254(e)(1). *See Schriro v. Landrigan*, 550 U.S. at 473-74 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice v. Collins*, 546 U.S. at 338-39 ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller-El v. Dretke*, 545 U.S. at 240 ("[W]e presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'"). The record before the state habeas court was bereft of any evidence establishing that Nelson furnished any false or misleading testimony to the jury regarding the nature of the Gangster Disciples, its history, symbols, or criminal nature. Broadnax presented the state habeas court with no evidence showing that Nelson's inference from Broadnax's use of a gang hand sign, references to "Folk Nation," penchant for drawing symbols utilized by the Gangster Disciples, telephonic profession that he was associated with that organization, and apparent knowledge of the history and details of the organization of the Gangster Disciples that Broadnax was either a member or "wannabe" gang member was anything other than objectively reasonable.

The fact Broadnax's state habeas counsel found an expert willing to express a divergent opinion about Broadnax's gang membership (albeit without apparently examining the same evidence as Nelson) does not establish that Nelson's expert opinion was false or misleading. *See Clark v. Johnson*, 202 F.3d 760, 766-67 (5th Cir. 2000) (holding that a disagreement between

experts regarding the conclusions to be drawn from the physical evidence was insufficient to overcome the presumption of correctness afforded a state habeas court's factual finding that an expert trial witness had not testified falsely at trial or otherwise misled the jury). As was true with the forensic pathologist in *Clark*, whose expert opinions were fully supported by the physical evidence in that case, the evidence supporting Nelson's expert opinion that Broadnax was a gang member (or at least that Broadnax seemed in Nelson's opinion to possess an intimate knowledge of the Gangster Disciples) was evident from Broadnax's own writings and drawings. More importantly, Broadnax presented the state habeas court with no specific factual allegations, much less any evidence, showing the prosecution *knowingly* employed false or misleading evidence to secure Broadnax's death sentence.

Insofar as Broadnax attempts to overcome the state habeas court's factual findings through the presentation of new affidavits and other evidence not presented to the state habeas court, his efforts are in vain. Because the state habeas court denied Broadnax's *Giglio/Napue* claim on the merits, this Court is precluded from considering any new or additional evidence in the course of reviewing this same claim. *See Cullen v. Pinholster*, 563 U. S. 170, 181-82 (2011):

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time *i.e.,* the record before the state court.

Thus, this Court may not consider any of the new evidence Broadnax has attached to his federal habeas corpus petition in resolving Broadnax's *Giglio/Napue* claim.[27] Because the state habeas

---

[27] Insofar as Broadnax argues in conclusory fashion that the Supreme Court's holdings in *Martinez v. Ryan,* 556 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), allow him to re-litigate with new evidence his *Giglio/Napue* claim (premised solely upon a naked assertion that

court found Officer Nelson's trial testimony to be factually accurate and not false or misleading, and those factual determinations are fully supported by the evidentiary record before the state habeas court, the state habeas court's rejection on the merits of Broadnax's *Giglio/Napue* claim was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in his state habeas corpus proceeding. This Court therefore denies this claim for relief.

---

his state habeas counsel rendered ineffective assistance during his state habeas corpus proceeding), Broadnax misconstrues the holdings in those two Supreme Court opinions. The Supreme Court's holding in *Martinez v. Ryan* furnishes a narrow avenue for circumventing a procedural default. It requires a showing that the performance of a federal habeas petitioner's state habeas counsel was so deficient as to preclude state court merits review of a meritorious claim of ineffective assistance by trial counsel, thus permitting a federal habeas court to undertake a merits review of the otherwise procedurally defaulted complaint of ineffective assistance by state trial counsel. *See In re Edwards*, 865 F.3d 197, 207-08 (5th Cir.), *cert. denied*, 137 S. Ct. 909 (2017) (To show cause for procedural default under *Martinez* and *Trevino*, "the petitioner must show (1) that his claim of ineffective assistance of counsel at trial is 'substantial' (i.e., 'has some merit'); and (2) that his habeas counsel was ineffective for failing to present those claims in his first state habeas application." (quoting *Beatty v. Stephens*, 759 F.3d 455, 465-66 (5th Cir. 2014)); *Prystash v. Davis*, 854 F.3d 830, 836 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 649 (2018) (holding the Supreme Court's rulings in *Martinez* and *Trevino* created a narrow exception to the general rules of procedural default that applies only to a claim of ineffective assistance by state trial counsel).

The Supreme Court has expressly declined to extend the holdings in *Martinez v. Ryan* and *Trevino v. Thaler* beyond the context of procedurally defaulted complaints of ineffective assistance by state trial counsel. *See Davila v. Davis*, 137 S. Ct. 2058, 2065-66 (2017) (declining to extend the holdings in *Martinez* and *Trevino* to a complaint of ineffective assistance by state appellate counsel and declaring that doing so would constitute an improper overruling of its prior opinion in *Coleman v. Thompson*); *Busby v. Davis*, 892 F.3d 735, 755-56 (5th Cir. 2018) (citing *Davila* and declining to extend the holdings in *Martinez/Thaler* beyond the context of procedurally defaulted claims of ineffective assistance by state trial counsel). The holdings in *Martinez* and *Trevino* do not furnish a vehicle for obtaining de novo federal habeas review of substantive constitutional claims which a federal habeas corpus petitioner litigated unsuccessfully in a state habeas corpus proceeding but now wishes to re-litigate using new evidence and different counsel.

## VII. ADMISSION OF DR. PRICE'S TESTIMONY REGARDING PSYCHOPATHY

As he argued in his seventh ground for state habeas corpus relief, Broadnax argues the admission of Dr. Price's punishment phase rebuttal testimony regarding the factors mental health professionals examine to make a diagnosis of psychopathic personality violated his due process rights because (1) that testimony was irrelevant to Broadnax, (2) the checklist from which Dr. Price read during his testimony is a highly unreliable predictor of future dangerousness, and (3) Broadnax has subsequently been diagnosed by a different mental health professional as not possessing a psychopathic personality.[28]  Initially, Broadnax's reliance upon the Supreme Court's holding in *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993), is unpersuasive.  The Fifth Circuit has repeatedly held that *Daubert* does not control the admission of expert mental health testimony regarding future dangerousness offered at the punishment phase of a capital murder trial. *See, e.g., Williams v. Stephens*, 761 F.3d 561, 571 (5th Cir. 2014) ("*Daubert* does not apply to the standards governing the admissibility of expert evidence at a capital sentencing hearing"); *United States v. Fields*, 483 F.3d 313, 341-43 (5th Cir. 2007) (explaining the Supreme Court's opinion in *Barefoot v. Estelle*, 463 U.S. 880 (1983), rejected as "contrary to our cases," the argument that psychiatric testimony regarding future dangerousness was constitutionally inadmissible at the punishment phase of a capital murder trial and, therefore, holding *Daubert* inapplicable to the admission of such testimony).

---

[28] ECF no. 48 at 97-109.  Dr. Price's punishment phase rebuttal testimony is summarized in Appendix II.  As explained in Appendix III, Professor John Edens furnished the state habeas court with an affidavit and testimony challenging the efficacy of Dr. Price's trial testimony regarding psychopathy.  Despite Dr. Edens' opinions, the state habeas trial court found Dr. Price's trial testimony was neither false, misleading, nor perjured, and concluded the admission of Dr. Price's testimony did not render the punishment phase of Broadnax's capital murder trial fundamentally unfair.  State Habeas Trial Court's Findings & Conclusions, at 25-30 [42-6 ECF at 63-68 of 163].  The Texas Court of Criminal Appeals adopted those findings and conclusions when it denied Broadnax's state habeas corpus application.

Insofar as Broadnax argues that the admission of Dr. Price's testimony violated due process principles, Broadnax's arguments are likewise unpersuasive. The expert testimony of Dr. Lane (regarding the DSM-IV-TR's criteria for a diagnosis of ASPD) and Dr. Price (regarding the traits of a psychopathic personality) did not render the punishment phase of Broadnax's capital murder trial fundamentally unfair. Neither of those two experts linked ASPD or psychopathy to Broadnax. Despite Broadnax's suggestions to the contrary in his federal habeas corpus petition, Dr. Lane never testified that Broadnax had ASPD. Instead, Dr. Lane admitted during his cross-examination only that his notes indicated that, at one point during his treatment of Broadnax he wanted to attempt to rule out ASPD as a possible diagnosis but he was unable to make any further evaluation of a possible ASPD diagnosis because he lacked accurate information concerning Broadnax's behavior prior to age fifteen. Thus, there was no testimony during Broadnax's trial from Dr. Lane or anyone else establishing that Broadnax had ever been diagnosed with ASPD. Likewise, Dr. Price took great pains to explain during his rebuttal testimony that he had not interviewed Broadnax and was not testifying that Broadnax possessed any of the traits of a psychopathic personality. Dr. Price also admitted on cross-examination that the term "psychopath" was not a diagnosis appearing in the DSM-IV-TR.

Furthermore, as explained in Appendix II, Broadnax's trial counsel put on one of the most comprehensive and compelling cases in mitigation this Court has ever seen in a Texas capital murder trial. But ultimately it was not enough. The reason Broadnax's jury answered the two capital sentencing special issues in a manner favorable to the prosecution, in all reasonable likelihood, had nothing to do with the trial testimony of either Dr. Lane, Dr. Price, or any other mental health professional.

Rather, at the start of its deliberations at the punishment phase of trial, Broadnax's jury had before it compelling, overwhelming, evidence establishing that (1) Broadnax had described his capital offense in highly detailed, albeit crude, and graphic terms during his videotaped interviews (thus belying his trial counsels' arguments that Broadnax was intoxicated, under the influence of drugs, or otherwise suffering from a mental impairment at the time of his offense), (2) Broadnax felt no remorse for fatally shooting two strangers multiple times at close range (in his own words, to make sure they were dead) without warning and then robbing them, (3) in the months following his arrest, Broadnax had never retracted or withdrawn any of the crude, highly offensive, hateful statements he had made during his interviews about the families of his victims but, instead, had continued to make crude, dismissive, comments whenever asked during telephone conversations about his victims or their families, (4) the day the jury returned its guilty verdict at the guilt-innocence phase of trial, Broadnax remained unrepentant and remorseless, telling a female acquaintance in a series of telephone conversations that stretched late into the night that he felt certain he would prevail on appeal, and (5) perhaps most tellingly, Broadnax had never retracted or withdrawn his demand to receive a death sentence or his threat to kill again if the jury failed to impose a sentence of death.

Given the foregoing evidence, as well as the massive amount of double-edged punishment phase testimony from Broadnax's family and friends establishing that Broadnax (1) suffered a physically abusive and emotionally abusive childhood, (2) grew up in an environment bereft of stability and positive role models, and (3) was battered by a physically abusive, emotionally and physically distant, mother and tortured by an emotionally and physically abusive, racist, grandmother, Broadnax's jury could easily have concluded that, as the product of such an negative environment (even disregarding Broadnax's demonstrated willingness to brutally murder

individuals he did not know, his lack of remorse, his demand to be executed, and his threat to kill again unless he was sentenced to death), the evidence before it mandated an affirmative answer to the future dangerousness special issue and a negative answer to the mitigation special issue. *See Brown v. Thaler*, 684 F.3d 482, 499 (5th Cir. 2012) (explaining that mitigating evidence is "double-edged" when it might permit an inference that the defendant is not as morally culpable for his behavior but also might suggest that, as the product of his environment, he is likely to continue to be dangerous in the future); *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002) ("Although the evidence of Ladd's inadequate supervision as a child might permit an inference that he is not as morally culpable for his behavior, it also might suggest Ladd, as a product of his environment, is likely to continue to be dangerous in the future.").

This Court alternatively concludes after independent, de novo review of the entire record from Broadnax's capital murder trial, including careful scrutiny of Broadnax's videotaped interviews and audiotaped telephone calls, that any error in the admission of Dr. Price's rebuttal testimony did not exceed that of harmless error under the standard of *Brecht v. Abrahamson*.

For the foregoing reasons, the state habeas court's rejection on the merits of Broadnax's due process complaints about the admission of Dr. Price's testimony was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Broadnax's state habeas corpus proceeding. This Court therefore denies this claim for relief.

## VIII. ADMISSION OF ITEMS DISCOVERED IN JAIL CELL SEARCH

Broadnax's Fourth and Fourteenth Amendment federal habeas corpus claims addressing the evidence admitted during his trial showing the contents of his jail cell (including photographs

of drawings on his cell walls, titles of books found inside his cell, and some of his writings collected during the search)[29] are foreclosed by the Supreme Court's holding in *Stone v. Powell*, 428 U.S. 465, 489-95 (1976), which provides that complaints about alleged Fourth Amendment violations (made actionable against the States through the Fourteenth Amendment) are not cognizable in federal habeas corpus proceedings if the defendant was afforded a full and fair opportunity to litigate those claims on direct appeal. *See Stone v. Powell*, 428 U.S. at 494 ("we conclude that where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced during his trial."); *Bridgers v. Dretke*, 431 F.3d 853, 861 (5th Cir. 2005) (holding federal habeas petitioner who was afforded a full and fair opportunity to litigate his Fourth Amendment claim in state court was barred from seeking federal habeas relief by the holding in *Stone*).

Broadnax was afforded a full and fair opportunity to fully litigate the validity of the search of his cell during his state trial court proceeding and had an opportunity to challenge on direct appeal the state trial court's ruling admitting the evidence in question. Broadnax took full advantage of his opportunity, raising a complaint about the validity of the search of his jail cell in a pretrial motion and then again in his twenty-eighth point of error on direct appeal.[30] The Texas Court of Criminal Appeals rejected Broadnax's illegal search claim on the merits. *Broadnax v. State*, AP-76,207, 2011 WL 6225399, at *10.[31]

---

[29] ECF no. 48 at 90-97.

[30] Brief for Appellant at 92-93 [42-7 ECF at 11841-42].

[31] For the reasons discussed in note 27, Broadnax cannot rely upon the Supreme Court's holdings in *Martinez v. Ryan* and *Trevino v. Thaler* to re-litigate substantive constitutional claims in this court which he fully litigated in the state courts.

Furthermore, having reviewed the entire record from Broadnax's capital murder trial, this Court concludes that any arguable error in the admission of the contents of Broadnax's jail cell was harmless under the standard set forth in *Brecht v. Abrahamson*. The drawings and writings found inside Broadnax's jail cell (reflected in State Exhibit nos. 456-83 & 495-99) which Officer Nelson linked to the Gangster Disciples were duplicative of the numerous Gangster Disciples symbols, images, and rap lyrics found in the two spiral notebooks (one red and one black) found among Broadnax's personal property in the trunk of Swan's vehicle at the time of Broadnax's arrest that were introduced into evidence in a pretrial hearing as State Exhibit nos. 14 and 15 and at trial as State Exhibit nos. 131-I and 131-J.[32] Thus, the photographs of the walls and contents of Broadnax's jail cell represented additional evidence in the prosecution's compelling mountain of evidence establishing Broadnax's fascination with the culture and symbols of a violent criminal street gang. Admission of the largely redundant photographs of items in Broadnax's jail cell, even if erroneous, did not have a substantial and injurious effect or influence in determining the jury's punishment phase verdict.

## IX. DENIAL OF DEFENSE'S CHALLENGES FOR CAUSE

### A. The Proper Scope of the Claim

Broadnax complains that the state trial court erroneously denied the defense's challenges for cause to more than a dozen members of the jury venire.[33] Respondent correctly points out,

---

[32] The contents of Broadnax's red and black notebooks appear among the state court records in this cause at 40-7 ECF at 62-111 of 111 (State Exhibit no. 14), 40-8 ECF at 1-27 of 95 (State Exhibit no. 15), 40-11 ECF at 62-110 of 120 (State Exhibit no. 131-I), and 40-11 ECF at 111-20 of 120 & 40-12 ECF at 1-26 of 89 (State Exhibit no. 131-J).

[33] ECF no. 48 at 74-84. Broadnax urged many of these same arguments as his eighth through twenty-fifth points of error on direct appeal. Appellant's Brief at 43-83 [42-7 ECF at 70-110 of 152]. The Texas Court of Criminal Appeals rejected Broadnax's direct appeal complaints on the merits. *Broadnax v. State*, AP-76,207, 2011 WL 6225399, at *4-*9.

however, that insofar as Broadnax complains about the state trial court's failure to grant defense challenges for cause made against venire members against whom Broadnax later exercised peremptory challenges, Broadnax's complaints are *non sequitur*. *See Ross v. Oklahoma*, 487 U.S. 81, 88 (1988) ("So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated."). If a criminal defendant exercises a peremptory challenge to exclude an allegedly biased venire member from service on the jury, no constitutional violation occurs. *See United States v. Martinez-Salazar*, 528 U.S. 304, 307 (2000) ("[I]f the defendant elects to cure such error by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat, he has not been deprived of any rule-based or constitutional right."). Thus, this Court's focus is limited to examining the propriety of the state trial court's ruling on Broadnax's challenge for cause to the only member of the jury venire Broadnax identifies as biased who ultimately served on Broadnax's petit jury, i.e., qualified juror no. 43, J_ V_ (listed in the original jury venire as potential juror no. 1345).[34]

### B. Defense Voir Dire Examination of Qualified Juror No. 43 & Outcome on Appeal

The relevant portions of Broadnax's trial counsel's voir dire examination of qualified juror no. 43 are as follows:

> Q.      Now, here's where we get into our problems.  A juror can go into this and know that by the way he votes on these issues is going to determine whether or not a person gets life or death.
> A.      Right.

---

[34] Broadnax complained about the state trial court's failure to grant his challenge for cause to this particular member of the jury venire in his twenty-second point of error on direct appeal. Appellant's Brief at 76-78 [42-7 ECF at 103-05 of 152].  The juror questionnaire answers given by qualified juror number 43, J_ V_ (venire member number 1345) appear at 61-3 ECF at 235-53 of 349.  The voir dire examination of this same juror appears at 35 S.F. Trial at 5-82 [41-9 ECF at 5-25 of 57].  This Court will identify individual jurors and jury venire members by their initials and juror numbers only.

Q.     Okay. And if we have a juror who tells us, Yes, I think that both life without parole and death are both very serious punishments and are satisfactory punishments and I can honestly look at these issues to let them guide me on how I vote on these issues to get to the end.

A.     Right.

Q.     Okay. That's one thing. But, [name omitted], and this is where I'm concerned because what you've told us here in your questionnaire quite plainly is that you have a bias against life without parole, is that right?

A.     I don't know if I have a bias against it. I don't know if it is not more cruel than the death penalty.

Q.     Well, let me go through some of your answers that you gave us in your questionnaire. Here on Page 2 you tell us the best argument for the death penalty is, Willful taking of another person's life should be the forfeiture of the assailant's life -- should result in the forfeiture of the assailant's life.

A.     Okay.

Q.     Is that what you thought?

A.     Yes.

Q.     And I assume, obviously, that you told us the truth when you made the answers to your questionnaire.

A.     Yes.

Q.     And that is how you felt. When we go over here to Page 4 we ask you, For what crimes do you think the death penalty should be available in Texas and you said, first-degree murder or murder in the commission of a felony.

A.     Okay.

Q.     If we go over to Page 5 we ask you, Do you think spending a lifetime in prison is equivalent to the death penalty? And you said, No. We asked you, Which of the following accurately states your general belief regarding a sentence of life without the possibility of parole? And you told us you were strongly opposed to that.

A.     Right.

Q.     And in explaining your response you said, I believe that lifetime incarceration is both a financial burden on society and morally the criminal deprived another person of their life and should not be allowed to suffer for years in a cell.

A.     Right.

Q.     And then we ask you, For what purpose, if any, do you believe life without the possibility serves? And your answer was nothing. And then the next one, What purposes, if any, do you believe the death penalty serves? And you said, It ends the actions someone may repeat if unused.

If the death penalty is not used, they may repeat their willful taking of another person's life, is that what you meant there?

A.     Yes, sir.

Q.     Okay. So tell me where I'm wrong.

A.     Okay. I will.

Q.     Basically, it seems to me like you told us that you'd consider if you got the ability to answer these questions in such a way that a person gets death or

47

life without parole, you would favor giving them death because it would be a financial burden on the taxpayers to keep them alive for life, it is morally wrong to give them life – and you're afraid they may repeat their actions if you don't give them death.

A.    Okay.

Q.    Is that fair?

A.    Yes. I guess.

Q.    See, that's where I'm having a problem.

A.    Okay.

Q.    I'm not mad at you.  Believe me.

A.    I know.

Q.    We're just trying to pick twelve people who can be fair to both sides.

A.    I completely understand.

Q.    Please understand, I'm not mad at you or criticizing you for having your opinions.

A.    Right.

Q.    Ain't nobody going to try to change your opinions, but this is a process where we try to pick people who can be fair to both sides.

A.    Okay, sure.

Q.    And if we have a juror – a potential juror that tells us, I'm against life without parole and particularly for a person that I have found has willfully caused the death of another person and has done that during the course of committing a robbery and if that's what you're telling me, fine, we'll go on to the next juror.

[*Prosecutorial Objection Overruled – Colloquy Omitted*]

Q.    Tell me where you stand.

A.    Well, honestly, yes, there are kind of my opinions.  It's, like, I don't think the death penalty should be used for just anything less than murder and things like that that are going on.  I guess the statement – I think lifetime incarceration is a horrid thing.  That's, like, who would want to be locked up for absolutely the rest of their life and never get out?  But I do think that I would judge this case honestly and fairly.  I mean, there are my opinions, but it doesn't mean that I couldn't make the judgment.  I didn't know about these special issues and how the situation worked.  I mean, I think I can take the evidence and honestly judge it.

Q.    Do you think you could vote in such a way that the defendant would get life without parole even if you personally dislike a person getting life without parole?

A.    Yes.  It is the law and I want to follow the same rules.[35]

\*\*\*

Q.    Okay.  Now, some people tell us, [name omitted], well, wait a minute, if the State has proven to me already beyond a reasonable doubt and they've

---

[35] Voir Dire Examination of Qualified Juror No. 43, J_ V_, 35 S.F. Trial at 67-72 [41-9 ECF at 20-22 of 57].

48

proven to all of the other jurors beyond a reasonable doubt that the person on trial is the type of person who would harm [sic] themselves with a loaded gun, go out and willingly do a robbery and during the course of doing that robbery form -- be able to have the ability to form the intention of causing the victim's death and doing whatever it took to accomplish that death, okay?

A.     Okay.

Q.     Then that is the type of person who, to me, is always going to be the type of person that's going to be likely to commit criminal acts of violence in the future.  How do you feel about that?

A.     That's a tough one.

Q.     In other words, I'm saying to some jurors – and jurors have told us this, you know, if you show me that he is the type of person that would do a capital murder, that is the type of person that I believe is likely to commit criminal acts of violence in the future, even if you put him in the penitentiary.

[*Prosecutorial Objection Overruled – Colloquy Omitted*]

A.     So basically you're asking me, do I think that if they can commit the crime once that's a guarantee they would do it again?

Q.     (By. Mr. Lollar)  Not guaranteed.  That's not what the question asks.  Is there a probability?

A.     A probability that they would do it again and if I think that's a true statement?

Q.     Yes.

A.     Yes.

Q.     So if I'm understanding you, if the State proves the case beyond a reasonable doubt, you're going to answer Special issue No. 1 "yes" because you think that's the type of person who probably would commit criminal acts of violence?

A.     It would be a consideration.  I thought she had to bring on more evidence –

Q.     She doesn't have to bring on more --

MS. HANDLEY:  I'd like the juror to finish his response, Your Honor.

THE COURT:     Sustained.

A.     I thought in the punishment phase she had to present more evidence of the perpetrator, whatever you call it.  The defendant, I'm sorry, the defendant's personality and everything else and had another background that may or may not indicate that the --

Q.     Well, the fact of the matter is, the State is not required to put on a bit more evidence in the punishment phase.

A.     Okay.

Q.     They don't have to do anything.  They can rely upon the facts of the case that have been shown in the first part of the trial.

[*Prosecutorial Objection Overruled – Colloquy Omitted*]

Q.     (By Mr. Lollar)  Where were we?  I was explaining that the State is not required to put on more evidence in the second part of the trial.

A.     Okay.

Q.     They can stand up and rest and just rely upon the evidence in the first part of the trial.  They can if they want to, but they're not required to.

THE COURT:  They still have to prove the answer to that is "yes" beyond a reasonable doubt.  And do you understand this?

[Qualified Juror no. 43]:  Yes.

Q.     (By. Mr. Lollar)  Let me skip over Special Issue No. 2 there for a minute, that's pretty self-explanatory, and go on to Special Issue No. 3.

Now Special Issue No. 3 allows a jury who has basically assessed a death penalty to back off of that and change that to a life sentence.

A.     Yes.

Q.     Do you understand that?

A.     Right.

Q.     Let me tell you where a jury would be at the time they get to Special issue No. 3.  Number one, that jury will have necessarily found that the person on trial is an intentional murderer who committed the act of intentional murder during the course of a robbery and they will have concluded, beyond a reasonable doubt, that the State has successfully proven to them not only that, but also that the person would be likely to commit criminal acts of violence in the future against other inmates and guards and wardens and teachers and priests and whatever [sic] else might be at the penitentiary and they have persuaded the jury of that beyond a reasonable doubt, okay?

So here you are as a juror who at that point, now, is convinced beyond a reasonable doubt that the defendant is an intentional murderer, a robber who is likely to commit criminal acts of violence to the people around him at the penitentiary.

A.     Okay.

Q.     So then you get Special Issue No. 3 and it allows a jury to back off of that death sentence and change that to life.  Frankly, people have told us that, Well, wait a minute, if you've already convinced me that he's an intentional murderer, a robber and he's likely to commit criminal acts of violence around the people – on the people around him down at the penitentiary, then there ain't going to be nothing.  There is no mitigating circumstance that can be shown to me that's going to make me want to back off a death sentence at that point and change that to a life sentence.  Because if I do that, I'm basically allowing future violence to be played out on the people in the penitentiary by the defendant and that ain't never going to happen with me.

A.     Okay.

Q.     How do you feel about that?

A.     Well, you know, I'm kind of like in this place.  It is, like, everything is black and white, yes or no.  You're saying that I've made all of these decisions, so that's going to be my decision and that during the course of the trial I may not hear or understand something that may bring other issues that are mitigating factors that I might consider changing my mind under Special issue No. 3.  I can't predict it, but I'm not saying that I'm so hard that this is my answer and this is always going to be my answer and this is never going to change and nothing else can ever affect me.

Q.      Okay.  As you sit here today, can you think of some things that you might consider to be a sufficient mitigating circumstance to change a death sentence to a life sentence or an intentional murder that you believe (Inaudible)?

[*Prosecutorial Objection Overruled – Colloquy Omitted*]

THE COURT:  Let me say this:  You don't have to say anything, but if something comes to your mind, you might tell Mr. Lollar that.  You're not required to say here what you would consider a sufficient mitigating circumstance, but if you're thinking of some things you'd like to think about, you can say that.

A.      I can't think of anything off the top of my head.[36]

Immediately after this latter series of exchanges, the defense challenged this member of the jury venire because: "He told us if he finds the defendant guilty of capital murder he's going to answer Special Issue No. 1, 'yes' and can't think of anything that is going to mitigate against the death penalty in answer to Special issue No. 3.  We feel the juror is not qualified."[37]  The trial court immediately denied the challenge for cause.

Broadnax complained on direct appeal that the venire member's voir dire answers revealed (1) he was unable to identify exactly what particular mitigating evidence he would need to hear to answer the mitigation special issue in a manner favorable to defense and (2) he would "automatically" answer the future dangerousness special issue affirmatively based upon a finding the defendant was guilty of a capital offense.[38]  The Texas Court of Criminal Appeals concluded the entire record from this venire member's voir dire examination revealed him to be a vacillating juror on the subject of whether he would automatically answer the future dangerousness special issue affirmatively or could, instead, render his verdict based on the evidence and deferred to the trial court's conclusion the venire member was qualified to serve.  *Broadnax v. State*, AP-76,207,

---

[36] Voir Dire Examination of Qualified Juror No. 43, J_ V_, 35 S.F. Trial at 74-80 [41-9 ECF at 23-24 of 57].

[37] 35 S.F. Trial at 80-81 [41-9 ECF at 9435-36].

[38] Appellant's Brief at 77 [42-7 ECF at 11826].

2011 WL 6225399, at *8.  The state appellate court also concluded there was no requirement that venire members be able to think of sufficiently mitigating circumstances on their own or that they find any particular circumstances sufficiently mitigating.  *Broadnax v. State*, AP-76,207, 2011 WL 6225399, at *5.

### C. Clearly Established Federal Law

In *Adams v. Texas*, 448 U.S. 38 (1980), the Supreme Court emphasized the limitations its previous holding in *Witherspoon v. Illinois*, 391 U.S. 510 (1968), imposed on the ability of the State to exclude members of a jury venire from service on a capital sentencing jury:

> a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court.

*Adams v. Texas*, 448 U.S. at 45.  The Supreme Court emphasized in *Adams* that the State could, consistent with *Witherspoon*, exclude prospective jurors whose views on capital punishment are such as to make them unable to follow the law or obey their oaths; but excluding jurors on broader grounds based on their opinions concerning the death penalty is impermissible.  *Id.* at 44-48.

In *Wainwright v. Witt*, 469 U.S. 412 (1985), the Supreme Court further clarified its holdings in *Witherspoon* and *Adams*, holding the proper inquiry when faced with a venire member who expresses personal, conscientious, or religious views on capital punishment is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  *Wainwright v. Witt*, 469 U.S. at 424.  The Supreme Court also emphasized that considerable deference is to be given the trial court's first-hand evaluation of the potential juror's demeanor and that no particular magical incantation or word choice need necessarily be followed in interrogating the potential juror in this regard.  *Id.* at 430-35.

More recently, the Supreme Court has identified the following "principles of relevance" from its *Witherspoon-Witt* line of opinions:

> First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause. Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes. Third, to balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible. Fourth, in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts.

*Uttecht v. Brown*, 551 U.S. 1, 9 (2007) (citations omitted). In *Uttecht*, the Supreme Court admonished reviewing courts to defer to the trial court's resolution of questions of bias arising from a potential juror's conflicting voir dire answers because the trial court had the opportunity to observe the demeanor of the potential juror. *Id.* at 20 ("where, as here there is a lengthy questioning of a prospective juror and the trial court has supervised a diligent and thoughtful *voir dire*, the trial court has broad discretion."). "Courts reviewing claims of *Witherspoon-Witt* error, however, especially federal courts considering habeas petitions, owe deference to the trial court, which is in a superior position to determine the demeanor and qualifications of a potential juror." *Id.* at 22. Moreover, judicial determinations of whether a potential juror possesses disqualifying bias is a question of fact to which a federal habeas court is required to give deference. *Skilling v. United States,* 561 U.S. 358, 396 (2010); *Wainwright v. Witt*, 469 U.S. at 423-24; *Patton v. Yount*, 467 U.S. 1025, 1036-38 (1984).

### D. Synthesis

The Eighth Amendment requires that the jury be able to consider and give effect to a capital defendant's mitigating evidence. *Tennard v. Dretke*, 542 U.S. 274, 285 (2004); *Boyde v.*

*California*, 404 U.S. at 377-78. The law is clear, however, that a defendant in a capital case is not entitled to challenge prospective jurors for cause simply because they might view the evidence the defendant offers in mitigation as aggravating, rather than mitigating, in nature. *See Johnson v. Texas*, 509 U.S. 350, 368 (1993) ("the fact that a juror might view the evidence of youth as aggravating, as opposed to mitigating, does not mean that the rule in *Lockett* is violated."); *Dorsey v. Quarterman*, 494 F.3d 527, 533 (5th Cir. 2007) (holding the fact several members of the jury venire did not consider the defendant's youth to be a mitigating factor did not furnish a basis for a challenge for cause); *Soria v. Johnson*, 207 F.3d 232, 244 (5th Cir. 2000) (holding defendant was not entitled to challenge venire members for cause because they viewed as a double-edged sword evidence (of youth) the defendant might proffer in mitigation).

In his federal habeas corpus petition, Broadnax complains for the very first time that this venire member gave answers on his juror questionnaire refusing to accept as "mitigating" potential evidence of voluntary intoxication at the time of the capital offense and evidence regarding the defendant's genetic and psychosocial background. As explained in Section VII, evidence Broadnax came from an unstable, disadvantaged family background and suffered severe abuse as a child is inherently double-edged in nature. The fact that qualified juror no. 43 gave an answer on page 8 of his questionnaire suggesting that he did not view "genetics, circumstances of birth, upbringing and environment" as relevant in "determining the proper punishment of someone convicted of a crime" "except in cases of actual organic brain disfunction [sic]"[39] did not render him subject to a proper challenge for cause. *Dorsey v. Quarterman*, 494 F.3d at 533; *Soria v. Johnson*, 207 F.3d at 244. The same is true for Broadnax's complaint that this juror answered "no" on page 6 of his juror questionnaire to "The law in Texas provides that evidence of

---

[39] 61-3 ECF at 243 of 349.

intoxication may be considered in mitigation of punishment. Do you agree with this law?" This juror not only answered "no" but wrote as follows: "Most actions made under intoxication are just suppressed aspects of the personality, hence could have been committed anyway."[40] The fact this juror did not appear to view evidence of voluntary intoxication at the time of a criminal offense as "mitigating" in nature did not render him subject to a challenge for cause. *Dorsey*, 494 F.3d at 533; *Soria v. Johnson*, 207 F.3d at 244; *see also Boyle v. Johnson*, 93 F.3d 180, 187-88 (5th Cir. 1996) (recognizing evidence of a defendant's drug and alcohol abuse has a double-edged quality). The failure of this venire member to adopt a "mitigating" view of proposed evidence of voluntary intoxication at the time of a criminal offense and his apparently dim view of the mitigating value of other, equally double-edged, background evidence did not render him subject to a proper challenge for cause. Thus, Broadnax's unexhausted complaints of disqualifying bias arising from the venire member's questionnaire answers regarding voluntary intoxication, genetics, and the circumstances of the defendant's birth, upbringing, and environment do not furnish a basis for federal habeas corpus relief.

Viewed objectively, the venire member's voir dire examination makes clear that his questionnaire answers, given prior to his receiving any instructions regarding the Texas capital sentencing Special Issues, should not be construed as reflecting an unwillingness on his part to consider all the evidence before the jury or to follow the law. On the contrary, this Court concludes the venire member's voir dire examination reveals an individual who was anything but substantially impaired in his or her ability to impose the death penalty under the state-law framework. The venire member gave no indication whatsoever during his voir dire examination that he was unable to put aside any personal views he might possess and decide Broadnax's case,

---

[40] 61-3 ECF at 241 of 349.

including giving answers to the Texas capital sentencing Special Issues, based solely upon the law and the evidence presented at trial. This Court finds no evidentiary basis in the record for a rational belief this venire member was constitutionally unqualified to serve on Broadnax's capital jury under the Supreme Court's *Witherspoon-Uttecht* line of opinions.

Furthermore, the state trial judge who overruled Broadnax's challenge for cause to this venire member had the opportunity to view the venire member's demeanor first hand. Broadnax has failed to present this Court with any clear and convincing evidence showing the state trial court's factual determination the venire member was unbiased was erroneous. Under such circumstances, this Court is required to defer to the state trial court's factual determination, including its implicit credibility findings. *Skilling v. United States,* 561 U.S. at 396; *Wainwright v. Witt*, 469 U.S. at 423-24; *Patton v. Yount*, 467 U.S. at 1036-38. "The factual question whether the juror is biased and whether his answers can be believed are questions for the trial court." *Dorsey v. Quarterman*, 494 F.3d at 55 (citing *Wainwright v. Witt*, 469 U.S. at 423-24).

Having reviewed the entirety of the venire member's juror questionnaire answers and voir dire examination, this Court concludes the Texas Court of Criminal Appeals' rejection on the merits of Broadnax's twenty-second point of error on direct appeal was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in his trial and direct appeal. This Court therefore denies this claim for relief.

# X. ADMISSION OF MEDIA INTERVIEWS – FIFTH & SIXTH AMENDMENT CLAIMS

As he did both on direct appeal and in his state habeas corpus application, Broadnax argues

the trial court's admission of his videotaped interviews by multiple television reporters violated

his Fifth and Sixth Amendment rights.[41]

---

[41] ECF no. 48 at 17-33 & 36-45. The parties spend considerable energy and effort arguing whether either or both of Broadnax's claims are procedurally defaulted. It is unnecessary for this Court to resolve that issue because, as explained below, all of Broadnax's complaints about the admission of his videotaped interviews lack arguable merit. The Supreme Court has made clear that federal habeas courts may deny writs of habeas corpus by engaging in de novo review when it is unclear whether AEDPA deference applies because a federal habeas petitioner will not be entitled to a writ of habeas corpus if his claim is rejected on de novo review. *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010). The Supreme Court has declined to address an issue of procedural default and chosen, instead, to resolve a claim on the merits, holding that an application for habeas corpus may be denied on the merits notwithstanding a petitioner's failure to exhaust in state court. *See Bell v. Cone*, 543 U. S. 447, 451 n.3 (2005) (citing section 2254(b)(2)). "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." *Rhines v. Weber*, 544 U. S. 269, 277 (2005) (quoting 28 U.S.C. § 2254(b)(2)). Writing for four Justices of the United States Supreme Court, Justice Alito explained the rationale underlying a federal habeas court's decision to eschew analysis of a factually and legally convoluted procedural default question in favor of simply addressing the lack of merit in a particular claim as follows:

> In the absence of any legal obligation to consider a preliminary nonmerits issue, a court may choose in some circumstances to bypass the preliminary issue and rest its decision on the merits. *See, e.g.*, 28 U.S.C. § 2254(b)(2) (federal habeas court may reject claim on merits without reaching question of exhaustion). Among other things, the court may believe that the merits question is easier, and the court may think that the parties and the public are more likely to be satisfied that justice has been done if the decision is based on the merits instead of what may be viewed as a legal technicality.

*Smith v. Texas*, 550 U. S. 297, 324 (2007) (Justice Alito, with Chief Justice Roberts and Justices Scalia and Thomas, dissenting). A Supreme Court majority employed this very approach in *Lambrix v. Singletary*, 520 U. S. 518, 520 (1997), where the Supreme Court held "[w]e do not mean to suggest that the procedural-bar issue must be resolved first; only that it ordinarily should be. Judicial economy might counsel giving the *Teague* question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."

## A. State Court Disposition

**1. Trial Court Ruling on Motion to Suppress & Jury Verdict.** -- Broadnax filed a pretrial motion arguing his statements to the media made following his arrest should be suppressed because (1) their admission violated the Fifth Amendment principles announced in *Miranda v. Arizona*, 384 U.S. 436 (1966), because he did not receive warnings before each interview as mandated by that decision, (2) his statements during the interviews were involuntary, i.e., they were the products of inducements and coercion by the Dallas County Sheriff's Department, and (3) his statements were taken in violation of Broadnax's Sixth Amendment right to counsel.[42]  On July 27 and August 4, 2009, the trial court held an evidentiary hearing on Broadnax's motion to suppress.

More specifically, on July 27, 2009, the trial court heard testimony from the Dallas County Sheriff's Department's media relations official who testified (1) she is the contact person when the media wishes to interview a jail inmate, (2) she received numerous requests to interview Broadnax, (3) she never encouraged or asked any member of the media to interview Broadnax, (3) she identified a series of documents recording the media interview requests for Broadnax and Cummings, all of which were signed June 20, a day before Broadnax arrived at the Dallas County Jail, (4) she arranged for interviews of Broadnax and Cummings on June 23, (5) she received a request on June 24 from Broadnax's attorney Brad Lollar and thereafter declined all media requests to interview Broadnax, (6) prior to June 24, she had received no request from any attorney to not allow media interviews of Broadnax, (7) after a jail inmate signs a consent form agreeing to an interview, she routinely contacts the media who requested the interview and make arrangements to facilitate the interview, (8) Broadnax consented in writing to interviews by four television

---

[42] Broadnax's Motion to Suppress, Clerk's Record, Supplemental Volume 1 of 2, at 200-03 [38-12 ECF at 205-07 of 311].  Broadnax's pretrial motion to suppress clearly embodied both Fifth and Sixth Amendment claims.

stations and possibly one member of the print media, (9) she had to arrange for staggered interviews because Broadnax and Cummings gave their respective interviews simultaneously in different locations within the jail, (10) she stayed near the location of the Broadnax's interviews while another official handled Cummings' interviews, (11) while she allowed each television reporter a thirty-minute time slot with Broadnax, most of the interviews concluded after about fifteen minutes, (12) she has never taken part in a police interrogation, (13) Broadnax was fairly cooperative during his interviews although he did appear aloof at points, (14) nothing about Broadnax's interviews appeared to be involuntary, (15) no money was offered to induce his interviews, (16) it was clear to her that Broadnax wanted to talk to the media, (17) nothing that took place after the interviews suggested to her they had been involuntary, (18) she was unaware at the time of Broadnax's interviews that he had been placed in closed behavioral observation, referred for a psychiatric evaluation, or that he had been examined by jail medical staff for complaints of auditory hallucinations, (19) she had never seen Broadnax's medical records until the day of the suppression hearing, (20) she was unaware Broadnax had requested appointment of counsel or filed an affidavit of indigence shortly after he arrived at the jail in Dallas, and (21) nothing in Broadnax's medical records indicated he had any psychological problems. Testimony of Kimberly Leach, 41 S.F. Trial at 7-63 [41-15 ECF at 6-19 of 45].[43]

Also on July 27, the state trial court heard testimony from the Dallas County Jail detention officer who escorted Broadnax to his June 23 interviews, who testified (1) Broadnax's demeanor during his transport was "okay" and she had no reason to second guess removing him from his cell

---

[43] Please note that pages 52-55 of Ms. Leach's testimony during the pretrial hearing are missing from both the hard copy and electronic copies of Volume 41 of the S.F. Trial filed by Respondent. However, a complete version of Volume 41 appears on the CD-ROM submitted by Respondent labeled "Volumes 1-54 & Supp. Volumes" included among the state court record.

to take him to his interviews, (2) she escorted Broadnax by herself without assistance and had no fear for her own safety, (3) Broadnax did not appear to be psychotic, was not talking to himself or drooling, (4) Broadnax did not refuse to go to his visits, (5) she asked Broadnax before each of his interviews if he was okay doing them and he said he was, and (6) Broadnax was placed on suicide watch starting at two PM on June 23, after he gave his interviews. Testimony of Christie Hicklen, 41 S.F. Trial at 65-79 [41-15 ECF at 20-23 of 45].

Finally, on July 27, the state trial court also heard testimony from a defense expert – a former law enforcement officer with a doctorate in education who testified (1) he had worked with the Texas Engineering Extension Service to help standardize field sobriety tests, (2) he teaches at the undergraduate and graduate levels in drug recognition, (3) he had reviewed Broadnax's medical records and videotaped interviews, (3) based upon Broadnax's appearance and combative behavior, he believed Broadnax was under the influence of "wet" at the time of his interviews, (4) he found support for his conclusion in (a) Broadnax's medical records, which indicate a diagnosis of polysubstance abuse induced psychosis, (b) Broadnax's elevated temperature, pulse, and blood pressure upon admission to the Dallas County Jail, (c) Broadnax's complaints of hallucinations on the morning of June 23, and (d) the fact Broadnax was subsequently treated with anti-psychotic medications, (5) he was not a medical doctor and is not qualified to give a medical opinion, (6) he was unaware Broadnax had been arrested on June 19 and not brought to the Dallas County Jail until June 21, (7) in his opinion, after two days of not smoking pot, Broadnax's body would still be metabolizing the drug but it would not be psychoactive, (8) PCP is a powerful drug that can be both a depressant and a stimulant, (9) he cannot say with a hundred percent certainty that Broadnax was under the influence at the time of his interviews, (10) his opinion was based in part on Broadnax's statement that he saw colors or flashes of light at the time of his offenses, which was

consistent with drug abuse, (11) he had never interviewed Broadnax, and (12) he had witnessed people on PCP during his years as a police officer but had not been involved in any scientific studies of the effects of PCP abuse. Testimony of Dr. Lance Pratt, 41 S.F. Trial at 91-106 [41-15 ECF at 26-30 of 45].

On August 4, 2009, the state trial court heard testimony from the four television reporters who interviewed Broadnax on June 23, 2008.[44] More specifically (1) a journalist from KDFW, Fox 4, testified that (a) his station filed a request to interview Broadnax, (b) he had no contact with law enforcement before his interview with Broadnax, (c) the only person from law enforcement with whom he spoke was Kim Leach, (d) he had no conversations with Ms. Leach regarding Broadnax's invoking his *Miranda* rights, (e) he was informed Broadnax had signed a written consent to be interviewed, (f) he made no promises or threats to induce Broadnax's interview and was aware of no such threats or inducements, (g) he and his cameraman did nothing to overcome Broadnax's free will, (h) he saw no one at the jail or with the Sheriff's Department do anything to get Broadnax to talk with him, (i) Ms. Leach took them upstairs when they arrived at the jail, and (j) Broadnax received no *Miranda* warnings or warnings about the consequences of talking with the media in his presence (Testimony of Shawn Rabb, 43 S.F. Trial at 4-34 [41-17 ECF at 6-36 of 134]); (2) a journalist from WFAA channel 8 testified that (a) she had never worked in law enforcement, (b) the unedited original video of her interview with Broadnax had been recorded over since June 23, 2008 but the edited version was accurate, (c) she had no contact with law enforcement before interviewing Broadnax, (d) she did speak with Kim Leach prior to interviewing Broadnax to set up the interview, (e) she did nothing to overcome Broadnax's free

---

[44] Please note that, for unknown reasons, wherever the word "is" should appear throughout the transcription of the hearing held August 4, 2009, the word that appears in the transcript is "earns."

will, (f) she offered Broadnax nothing and made no threats to induce his interview, (g) no one threatened or bribed Broadnax to induce his interview, (h) Broadnax wanted to talk with her, (i) her assignment editors arranged Broadnax's interview, (j) Broadnax's appearance during the interview was scruffy and his demeanor was somewhat cavalier and callous, i.e., he denied feeling any remorse and didn't seem to care what he had done to his victims, and (k) when she asked him whether he really meant it when he said he was ready to receive a lethal injection, Broadnax held up his arms and said "pick an arm." (Testimony of Rebecca Lopez, 43 S.F. Trial at 36-60 [41-17 ECF at 38-62 of 134]); (3) the first journalist to interview Broadnax on June 23 testified that (a) he was assigned that duty by his assignment editor, (b) no one did anything to overcome Broadnax's free will, (c) he did not ask Broadnax if he had a lawyer because he is a reporter, not a police officer, (d) he was unaware whether Broadnax had been *Mirandized* prior to the interview, (e) he interviewed Cummings before he interviewed Broadnax, and (f) initially, Broadnax was calm and cordial but later made statements that were against his own interest (Testimony of Steven Antonio Pickett, 42 S.F. Trial at 62-79, 81 [41-17 ECF at 64-81, 83 of 134]); and (4) the last television journalist who interviewed Broadnax testified (a) she had never worked for law enforcement, (b) the video-recording of her interview she gave to the prosecution was accurate, (c) prior to interviewing Broadnax, she had no discussion with anyone in law enforcement regarding her interview with Broadnax, (d) she was not involved in any communication in which law enforcement encouraged her to interview Broadnax, (e) her assignments editor put in the request to interview Broadnax, (f) no offers or threats were made to induce Broadnax's interview, and (g) nothing was done to overcome Broadnax's free will, (h) Broadnax was not *Mirandized* in her presence (Testimony of Ellen Goldberg, 43 S.F. Trial at 82-99 [41-17 ECF at 83-101 of 134]).

At the conclusion of that hearing, the state trial court denied Broadnax's motion to suppress, concluding (1) there was no evidence in the record whatsoever showing any of the reporters who interviewed Broadnax had acted as agents of the State (expressly stating it was not even a close question) and (2) Broadnax's interviews by the television reporters did not constitute custodial interrogations for purposes of the Fifth and Sixth Amendments. 43 S.F. Trial at 112-13 [41-17 ECF at 114-15 of 134].

During the guilt-innocence phase of trial, three of the television reporters who interviewed Broadnax reiterated their testimony at the pretrial hearing on Broadnax's motion to suppress, i.e., they testified (1) they were not in any way associated with law enforcement, (2) they were not acting at the direction or behest of law enforcement when they interviewed Broadnax, and (3) their interviews of Broadnax had been arranged by their superiors at their stations.[45] They also testified, without contradiction, that none of them witnessed anything during their time with Broadnax suggesting his cooperation with them during their interviews was in any way involuntary.[46] As part of the defense's evidence at the guilt-innocence phase of trial, Broadnax presented testimony showing (1) he was examined the same morning he gave his interviews by Dallas County Jail

---

[45] *See* Appendix I.

[46] Testimony of Steven Antonio Pickett, 45 S.F. Trial at 123-30 [41-19 ECF at 41-42 of 84] (emphasizing that nothing before, during, or after the interview suggested Broadnax's participation had been involuntary and that he saw no signs Broadnax was intoxicated, unresponsive, unintelligent, or irrational throughout the interview); Testimony of Ellen Goldberg, 45 S.F. Trial at 275-76 [41-19 ECF at 79 of 84] (no threats or offers were made to induce Broadnax's interview with her); and Testimony of Shawn Rabb, 46 S.F. Trial at 234, 249 [41-20 ECF at 101, 105 of 107] (emphasizing Broadnax rationally answered all of his questions and he saw nothing indicating Broadnax was intoxicated).

medical staff who diagnosed him as suffering from a psychosis possibly related to substance abuse and (2) after his interviews he was placed on suicide watch.[47]

The state trial court instructed the jury at the guilt-innocence phase of Broadnax's trial that it could not consider the evidence of Broadnax's interviews to the reporters who testified at trial if the jury (1) had a reasonable doubt as to whether a reporter was acting as an agent of law enforcement and failed to give Broadnax his constitutionally mandated warnings or (2) concluded Broadnax was so impaired as to be unable to freely and voluntarily give his statements to the reporter.[48] At the punishment phase of trial, Broadnax presented additional expert testimony

_____

[47] More specifically, a Dallas County Jail psychiatrist who (1) observed Broadnax was alert and oriented, guarded, disrespectful, angry, goal-directed, displayed normal psychomotor skills, and displayed congruent thought processes, (2) concluded Broadnax's complaints of auditory hallucinations indicated paranoid delusions, (3) diagnosed Broadnax with polysubstance dependence and bronchial asthma, (4) assessed Broadnax as functioning at the seventieth percentile, (5) concluded Broadnax was not responding to internal stimuli, and (6) concluded there was nothing indicating Broadnax needed immediate help or prescription medications. Testimony of Dr. Haideh Mirmesdagh, 47 S.F. Trial at 69-117 [41-21 ECF at 26-38 of 60]. For a more thorough summary of Dr. Mirmesdagh's trial testimony, *see* Appendix I, which also includes summaries of the trial testimony of defense witnesses (1) Jason Varghese, a licensed psychological assessor who, like Dr. Mirmesdagh, saw Broadnax on the morning of June 23, 2008 prior to Broadnax's interviews by television and print reporters, and (2) Kimberly Leach, the Dallas County Sheriff's Department's public relations officer who arranged, and handled the logistics for, the Broadnax's interviews. In rebuttal, the prosecution presented deposition testimony from the jail employee who accompanied Broadnax to his interviews and who testified (1) she was not concerned for her safety as she escorted Broadnax to his interviews, (2) she asked Broadnax before each interview if he wanted to do it and he said he did, and (3) she saw no indication Broadnax was behaving in a psychotic manner. Testimony of Christie Hicklen, 47 S.F. Trial at 158-73 [41-21 ECF at 48-52 of 60]. For a more detailed summary of Officer Hicklen's trial testimony, see Appendix I.

[48] Broadnax's guilt-innocence phase jury charge included the following instructions:
You are instructed that under our law a confession of a defendant made while the defendant was in jail or other place of confinement or in the custody of an officer shall be admissible in evidence if it appears that the same was freely and voluntarily made, without compulsion or persuasion. However, before a statement made orally to law enforcement or persons acting as agents of law enforcement may be considered voluntary, it must be shown beyond a reasonable doubt that, prior to making such statement, the accused was warned by the person to whom the statement was made, or by a magistrate, that: 1) he has the right to remain silent

suggesting Broadnax was suffering from the effects of PCP abuse at the time he gave his interviews.[49]

    *2. **Direct Appeal***. -- As his twenty-seventh point of error on direct appeal, Broadnax argued the trial court erred in admitting his televised interviews because (1) there was no evidence Broadnax had given valid consent to waive his constitutional rights (presumably a reference to his Fifth Amendment rights) and (2) the Sixth Amendment renders inadmissible statements deliberately elicited without an express waiver of the right to counsel.[50]  The Texas Court of Criminal Appeals denied the claim on the merits, pointing out Broadnax had failed to identify any

---

    and not make any statement, 2) that anything said by the defendant will be used against him at trial or in court, 3) that he has the right to terminate the questioning at any time during the interview or questioning, and 4) that he is entitled to the services of an attorney, his own, or, if he is unable to employ one, a court-appointed attorney, to advise him prior to and during any questioning or interrogation.

    So, if you find from the evidence, or if you have a reasonable doubt thereof, that at the time the defendant gave any statement on June 23, 2008, to a reporter, Steve Pickett, Ellen Goldberg, or Shaun Rabb, the reporter was acting as an agent of law enforcement and failed to give the defendant the above warning, you shall disregard any such statement and not consider such statement for any purpose nor any evidence obtained as a result thereof.

    Moreover, if you find from the evidence, or you have a reasonable doubt thereof, that at the time of the defendant's statement to the reporters on June 23, 2008, the defendant was under the influence of PCP, marijuana, formaldehyde, or any combination thereof to such an extent as to be reduced to a condition of mental impairment such as to render his statement not wholly voluntary, then such statement would not be freely and voluntarily made, and in such case you will wholly disregard the statement referred to and not consider it for any purpose nor any evidence obtained as a result of such statement.

    You are instructed that you may only consider evidence of voluntary intoxication or testimony of witnesses Jason Varghese or Dr. Haideh Mirmesdagh to the extent it relates to the voluntariness of the defendant's statements to the various television reporters that previously testified in this case.

Clerk's Record, Volume 3 of 3, at 626-27 [38-8 ECF at 1256-57].

[49] *See* Appendix II.

[50] Appellant's Brief at 86-92 [42-7 ECF at 113-19 of 152].

evidence in the record showing any of the television reporters who interviewed Broadnax were agents of the State, i.e., there was no evidence of an agreement between the reporters and law enforcement personnel at the time of Broadnax's interviews. *Broadnax v. State*, AP-76,207, 2011 WL 6225399, at *10.

***3. State Habeas Corpus Proceeding.* --** Broadnax re-urged his Fifth and Sixth Amendment challenges to the admission of his highly incriminating and aggravating television interviews in his first and second grounds for state habeas relief.[51]  The state habeas trial court concluded the claims were procedurally barred from re-litigation in state habeas because they had already been rejected on the merits on direct appeal but nonetheless went on to hold, alternatively, that the claims lacked merit because (1) the reporters who interviewed Broadnax were not acting as agents of the State, (2) the media interviews, therefore, did not constitute a "critical stage" of the criminal proceeding against Broadnax (which it defined as "a proceeding between an individual and an agent of the State"), (3) the media interviews did not involve any State action, (4) Broadnax failed to establish by a preponderance of the evidence that his consent to the media interviews was unknowing and involuntary, and (5) while counsel can advise a client not to speak with the media, the ultimate decision belongs to the client.[52]  The Texas Court of Criminal Appeals adopted those findings and conclusions when it denied Broadnax's state habeas corpus application.

### C. Synthesis

***1. Fifth Amendment Claims.* --** Given the evidence presented at the hearing on Broadnax's motion to suppress his media interview, the state trial court's factual finding that the reporters were not agents of the State is unassailable.  Broadnax has presented this Court with no clear and

---

[51] State Habeas Corpus Application at 5-53 [42-1 ECF at 19-57 of 258].

[52] State Habeas Court's Findings & Conclusions at 3-15 [42-6 ECF at 11600-12].

convincing evidence establishing the contrary. A criminal defendant's post-arrest statements to a private individual who is not acting as an agent of the State are not rendered inadmissible simply because the individual in question failed to properly give the defendant *Miranda* warnings. *See Powell v. Quarterman*, 536 F.3d 325, 343-44 (5th Cir. 2008) (holding criminal defendant's Fifth Amendment rights were not violated where emergency room physician who treated defendant following arrest testified regarding statements the defendant made to him when police brought the defendant in for treatment). Reporter Pickett said it best when he replied to a question during the pretrial hearing on Broadnax's motion to suppress about his failure to give Broadnax *Miranda* warnings by pointing out the obvious – he was a reporter, not a police officer. Testimony of Steven Antonio Pickett, 43 S.F. Trial at 71 [41-17 ECF at 73 of 134]. Broadnax's Fifth Amendment claim lacks arguable merit.

Broadnax's complaint that his consent to give interviews (and confess) to the television reporters was involuntary is also without arguable merit. Due process precludes admission of a confession where a defendant's will is overborne by the circumstances of the interrogation. *Schneckloth v. Bustamante*, 412 U.S. 218, 226 (1973). Custodial police interrogation entails inherently compelling pressures and coercive aspects. *J.D.B. v. North Carolina*, 564 U.S. 261, 268-70 (2011); *Dickerson v. United States*, 530 U.S. 428, 435 (2000) ("police interrogation, by its very nature, isolates and pressures the individual"); *Miranda v. Arizona*, 384 U.S. at 439 (holding the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements and heightens the risk that an individual will not be accorded his privilege against self-incrimination). Absent coercive police conduct causally related to a defendant's confession, however, there is no basis for concluding that any state actor has deprived a criminal defendant of due process of law. *Colorado v. Connelly*, 479 U.S. 157, 164 (1986). A defendant's mental

condition, by itself and apart from its relation to official coercion, does not dispose of the inquiry into constitutional voluntariness. *Id.* There is simply no evidence in the record establishing that any *state agent* applied any coercive device, tactic, or maneuver to compel Broadnax to consent against his will to be interviewed by any of the reporters on June 23, 2008.

Broadnax's persistent protests throughout his state trial, appellate, and habeas corpus proceedings that he was suffering from a psychosis so severe he was unable to give a voluntary confession to his television interviewers is belied by even a cursory review of the videotapes of those very interviews (i.e., State Exhibit nos. 403-07). If a picture is worth a thousand words, Broadnax's videotaped interviews were worth multiple sets of encyclopedia in terms of permitting his jury to intelligently evaluate Broadnax's culpability and lack of remorse for his crimes. In his interviews, Broadnax gave multiple, detailed, almost clinical accounts of how he approached two people he had never met before, engaged them in casual conversation, asked for a cigarette, and, when one of the men reached to get one, Broadnax withdraw his handgun and, without first making a demand for money or car keys, shot the first victim in the chest. Broadnax then described, albeit at times in crude terms, how his first victim responded to the first shot and how his second victim reacted physically when Broadnax shot him the first time. Broadnax casually explained how he proceeded to shoot both victims again in the head to make sure they were dead. Broadnax also described how, after they robbed both victims, he casually wiped the blood off his gun as Cummings drove them away from the crime scene in Swan's vehicle.[53] There is no evidence in

---

[53] Furthermore, Broadnax's visible demeanor through his interviews by Pickett, Goldberg, and Rabb likewise belies any suggestion that Broadnax was experiencing a psychotic episode, much less unable to fully comprehend what was going on in the interview room on the morning of June 23. Broadnax was clearly alert and responsive to the reporters' questions, and clearly understood the ramifications of the words read to him by Pickett from the arrest warrant affidavit, which indicated that a member of Broadnax's own family had turned Broadnax and Cummings into authorities, and clearly understood that his protests of innocence during the first portion of his

the record establishing that any of the reporters who interviewed Broadnax on June 23, 2008 were acting as agents of the State, much less that they or anyone else applied coercive methods to induce Broadnax's interviews on that date.

Moreover, the jury's guilty verdict necessarily rejected, beyond a reasonable doubt, Broadnax's contention that he was so impaired as to be unable to give a free and voluntary statement to the reporters. Broadnax's own expert witness, Dr. Lane, testified that a person suffering from a "psychosis" suffers from an inability to integrate information and use it properly. Testimony of Dr. Frank Lane, 50 S.F. Trial at 90 [41-24 ECF at 34 of 90]. This Court's review of Broadnax's videotaped statements to the three reporters amply demonstrates, beyond any room for debate by jurists of reason, that on the morning of June 23, 2008, Broadnax was fully capable of integrating the information he was given by Pickett and the other reporters and responding to same, albeit at times crudely, in a perfectly rational and logical manner. Broadnax's alertness and quick change in demeanor when confronted with evidence of his guilt during his interview by Pickett, in particular, demonstrate the factual inaccuracy of Broadnax's "psychosis" and impairment contentions. That Broadnax displayed no remorse for his criminal actions during his videotaped interviews does not, standing alone, reveal that he was so impaired as to be unable to give a voluntary statement. Even months after his arrest, in his telephone conversations with family and friends, Broadnax continued to display absolutely no remorse for his offenses and no empathy for his victims or their families.

---

interview with Pickett held no credibility. Broadnax did not persist in protesting his innocence after he heard Pickett read the words of Broadnax's arrest warrant and clearly understood, in a dramatic heartbeat, that a member of his own family had turned against him and furnished police with highly incriminating evidence. In fact, from that point forward in his interviews, Broadnax's words and demeanor demonstrate that he fully understood his situation, i.e., that he would likely face a capital sentencing proceeding at some point in his future.

*2. Sixth Amendment Claims.* -- For similar reasons, Broadnax's Sixth Amendment claims also lack arguable merit.  In view of the state trial court's and state appellate court's factual finding that the reporters who interviewed Broadnax were not acting as agents of the State, Broadnax's reliance on the Supreme Court's holding in *Massiah v. United States*, 377 U.S. 201 (1964), is misplaced.  *Massiah* stands for the rule that, when the Sixth Amendment's right to counsel has attached, *a government agent* may not seek information from a criminal defendant outside the presence of the defendant's counsel.  *See Thompson v. Davis*, 916 F.3d 444, 454 (5th Cir. 2019) ("To bring a *Massiah* claim, the claimant must establish that his Sixth Amendment right to counsel had attached when *a government agent* sought information from the defendant without his counsel's presence, and deliberately elicited incriminating statements from the defendants." (emphasis added)); *United States v. Bates*, 850 F.3d 807, 810 (5th Cir. 2017) (holding that a defendant asserting a *Massiah* claim must establish, in part, that an individual seeking incriminating statements from the defendant was a government agent acting without the defendant's counsel being present).

In this Circuit, the test for determining if an informant was a government agent has two prongs: whether the informant (1) was promised, reasonably led to believe, or actually received a benefit in exchange for soliciting information from the defendant and (2) acted pursuant to instructions from the state or otherwise submitted to the State's control.  *United States v. Bates*, 850 F.3d at 810; *Creel v. Johnson*, 162 F.3d 385, 393 (5th Cir. 1998).  Broadnax has identified no evidence in the record from trial or his direct appeal satisfying either of these two requirements.  This Court's independent review of the entirety of Broadnax's pretrial and trial record likewise discloses no such evidence.  The same is true for the evidentiary record from Broadnax's state habeas corpus proceeding.

The fact that the reporters who interviewed Broadnax had to follow procedures established by the Dallas County Sheriff's Department to request and obtain their interviews with Broadnax does not establish that they "submitted to the State's control" in connection with those interviews or that they "received a benefit" in exchange for soliciting information from Broadnax, as those terms have been utilized in the context of *Massiah* jurisprudence. To hold otherwise would transform *every* media interview conducted with an individual under custodial detention into a custodial interrogation by a *de facto* state agent. This Court is precluded from adopting such a new rule in the context of this federal habeas corpus proceeding by the principle announced in *Teague.* Broadnax's complaint that he was not appointed counsel immediately upon his making of a request for appointment of counsel and filing an affidavit of indigence likewise does not furnish a basis for federal habeas corpus relief.[54]

---

[54] Broadnax also argues in his first amended federal habeas corpus petition that the Texas Fair Defense Act is unconstitutional under the Supreme Court's holding in *Rothgery v. Gillespie Cnty., Tex.*, 554 U.S. 191 (2008). ECF no. 48, at 45-49. Rothgery was arrested as a felon in possession of a firearm based upon false information that he had previously been convicted of a felony. He was taken promptly before a magistrate for an article 15.17 hearing. The magistrate described the facts supporting the arrest, informed Rothgery of the charge against him, determined there was probable cause for the arrest, and set bail at $5.000. Rothgery was released after posting a surety bond, which required him to make personal appearance in any subsequent proceedings relative to the charge against him. Rothgery had no money for an attorney and made several requests, both oral and written, for appointed counsel, which went unheeded. Approximately six months later, Rothgery was indicted by a grand jury for unlawful possession of a firearm by a felon, rearrested the next day, and held by virtue of an order which increased his bond to $15,000. He remained in jail for three weeks, until he was finally assigned an attorney who promptly obtained a bail reduction (to gain Rothergy's release from custody) and assembled the paperwork confirming that Rothgery had never been convicted of a felony. When Rothgery's counsel relayed the information to the prosecution, the district attorney's motion to dismiss was granted. Rothgery subsequently brought an action under 42 U.S.C. § 1983, seeking monetary damages and claiming that if the County had provided an attorney within a reasonable time after Rothgery's article 15.17 hearing, he would not have been rearrested or held in jail for three weeks months later. Rothgery attacked as unconstitutional the County's unwritten policy of denying appointed counsel to indigent defendants out on bond prior to entry of an information or return of an indictment. The Supreme Court reversed the lower court decisions in favor of the County, holding Rothgery's Sixth Amendment right to counsel attached at the time of his Article 15.17 hearing and the County was

obligated to furnish Rothgery with appointed counsel within a reasonable time once a request for assistance was made. *Rothgery*, 554 U.S. at 198-205. The Supreme Court expressly rejected the County's proffered justification for its policy, i.e., that the absence of a prosecutor at the Article 15.17 hearing somehow meant that formal criminal proceedings had not been commenced against Rothgery. *Id.* at 205-13. The Supreme Court emphasized the narrow nature of its holding: "a criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel." *Id.* at 213. Neither the language nor the facts in *Rothgery* supports the principle that a criminal defendant has a constitutional right to the appointment of legal counsel contemporaneously with his assertion of indigence and request for legal assistance.

None of the opinions upon which the Supreme Court relied in *Rothgery* declared that a criminal defendant is entitled to the appointment of counsel *contemporaneously* with the filing of a request for appointment of counsel. On the contrary, the Supreme Court's opinion in *Rothgery* focused on the instant at which the right to counsel attached, not the moment at which an attorney was required to be physically present with the defendant. *Id.* at 198: "The issue is whether Texas's article 15.17 hearing marks that point, with the *consequent state obligation to appoint counsel within a reasonable time* once a request for assistance is made." (emphasis added). Nothing in *Rothgery* suggests that a Texas county is constitutionally obligated to furnish appointed counsel to an indigent defendant within a shorter time period (about two working days) after the defendant is arraigned (in this case in the early morning hours of a Saturday) than was true in Broadnax's case. Likewise, none of the opinions addressing Sixth Amendment issues upon which the Supreme Court relied in *Rothgery* compel the new constitutional rule urged by Broadnax, i.e., that an indigent criminal defendant is entitled to the instantaneous appointment of counsel upon the filing of a request for legal assistance and indigence. Furthermore, none of those earlier Supreme Court opinions addressed the situation in this case, i.e., Broadnax's incriminating interviews were obtained by independent members of the media. For example, in *Brewer v. Williams*, 430 U.S. 387 (1977), a criminal defendant turned himself into authorities after conferring with an attorney. Williams was arrested on a charge of abduction, booked into jail, and given *Miranda* warnings. Police officers agreed with Williams's attorney to transport Williams and not to question Williams during a lengthy car drive. Williams was then arraigned on an outstanding arrest warrant. During the subsequent car drive, however, one of the law enforcement officers escorting him asked Williams a number of questions about where the victim's body might be located and informed Williams that if the victim's body could be located it would be possible to give her a Christian burial. Williams then led the detectives escorting him to a gas station where he had left the victim's shoes, then to a rest area where he had left a blanket. Searches of both locations proved fruitless. Williams then directed the detectives to the location where the body was located. He was subsequently indicted and convicted of murder. The Supreme Court overturned the conviction in a federal habeas corpus proceeding, holding the detective's questions to Williams during their car ride violated the rule in *Massiah*. *Brewer v. Williams*, 430 U.S. at 400-01. Likewise, the Supreme Court's holding in *Michigan v. Jackson*, 475 U.S. 625 (1986), is also distinguishable from Broadnax's case. In that case, the Supreme Court reaffirmed the rule that *government* efforts to elicit information from an accused following arraignment in the absence of the accused's attorney violated the Sixth Amendment. *See Michigan v. Jackson*, 475 U.S. at 636 ("[I]f police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to

**3. Conclusions.** -- The Texas Court of Criminal Appeals' rejection on direct appeal of the merits of Broadnax's Fifth and Sixth Amendment claims was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in his trial and direct appeal. Likewise, given its unassailable factual finding that the reporters were not acting as state agents when they interviewed Broadnax, the Texas Court of Criminal Appeals' alternative rejections on the merits of Broadnax's Fifth and Sixth Amendment claims in the course of his state habeas corpus proceeding were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in his state habeas corpus proceeding. Finally, even under de novo review, Broadnax's Fifth and Sixth Amendment claims, including his claims that his statements to the reporters were involuntary and that the Texas Fair Defense Act is unconstitutional, do not warrant federal habeas corpus relief.

## XI. *BATSON* CLAIMS

Broadnax argues his constitutional equal protection rights were violated when the state trial court overruled his *Batson* challenges to the prosecution's use of peremptory strikes against minority members of the jury venire and when the trial court *sua sponte* reinstated a single black

---

counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid."). These and the other Sixth Amendment cases relied upon by the Supreme Court in *Rothgery* dealt with police interrogations of criminal defendants following arrest and arraignment or its equivalent. None of those opinions recognized an unqualified constitutional right to the instantaneous appointment of counsel for an indigent criminal defendant upon the filing of an affidavit of indigence and request for legal assistance. *Teague* prevents this Court from recognizing such a new rule in the context of this federal habeas corpus proceeding. Thus, after de novo review, Broadnax's arguments that the Texas Fair Defense Act is unconstitutional do not furnish a basis for federal habeas corpus relief.

venire member on the jury panel instead of striking the entire jury and beginning jury selection from scratch with an entirely new venire.[55]

## A. State Court Disposition of Batson Challenges at Trial

The parties conducted general and individual voir dire examination of the jury venire over several weeks under the supervision of several different judges.  On July 20, 2009, the parties exercised their peremptory strikes.[56]  Broadnax's trial counsel made a number of *Batson* objections to the prosecution's exercise of its peremptory strikes.[57]  A judge other than the one who presided at trial heard Broadnax's trial counsel's *Batson* challenges, listened to the prosecution's explanations for its use of peremptory challenges against the venire members in question, and denied each of Broadnax's *Batson* challenges.

Broadnax's trial counsel raised a *Batson* objection to the prosecution's striking of qualified juror no. 6, S_ M_ (original juror no. 165), a black female.  38 S.F. Trial at 9 [41-12 ECF at 9 of 86].  The prosecution announced it had elected to eliminate from the panel both (1) any members of the jury venire who either had stated on the first page of their juror questionnaire that they did not believe in the death penalty (i.e., that they choose options three, four, or five from a series of options that included (1) "I believe that the death penalty is appropriate in all murder cases"; (2)

---

[55] ECF no. 48 at 50-74.

[56] The verbatim transcription of the hearing held July 20, 2009 appears in 38 S.F. Trial at 6-85 [41-12 ECF at 6-85 of 86].

[57] More specifically, Broadnax's trial counsel objected on equal protection grounds to the prosecution's exercise of peremptory strikes against eight members of the jury venire: qualified juror no. 6, S_ M_ (originally juror no. 165) – a black female; qualified juror no. 9, M_ V_ (original juror no. 131) – a black female; qualified juror no. 11, A_ R_ (original juror no. 208) – an hispanic female; qualified juror no. 12, C_ R_ (original juror no. 222) – a black male; qualified juror no. 36, A_ L_ (original juror no. 868) – a black female; qualified juror no. 37, R_ P_ (original juror no. 930) – a black male; qualified juror no. 40, B_ J_ (original juror no. 139) – a black female; and qualified juror no. 41, D_ M_ (original juror no. 1062) – a black male.

"I believe that the death penalty is appropriate in some murder cases, and I could return a verdict in a proper case which assessed the death penalty"; (3) Although I do not believe that the death penalty ever ought to be invoked, as long as the law provides for it, I could assess it under the proper set of circumstances"; (4) I believe that the death penalty is appropriate in some murder cases, but I could never return a verdict which assessed the death penalty"; and (5) "I could never, under any circumstances, return a verdict which assessed the death penalty") and (2) any members of the jury venire who indicated during their individual voir dire examination that they were not in favor of the death penalty ("we have elected to strike all jurors who are listed as a 3 or who have stated that they are not in favor of the death penalty"). 38 S.F. Trial at 10 [41-12 ECF at 10 of 86]. The prosecution then explained that it exercised a peremptory challenge against qualified juror 6, S_ M_ because (1) she chose option three above on the first page of her juror questionnaire, (2) she also stated on the first page of her juror questionnaire that, while she had checked "yes" in response to a question asking whether she was in favor of the death penalty, she was "really unsure," (3) she is a single woman with no children who mentors young adult men without a father figure – a situation similar to Broadnax's background, (4) she appeared nervous and was unwilling to make eye contact with Broadnax during her voir dire examination, and (5) she testified during her voir dire examination that she believed she would have difficulty voting to impose the death penalty without the assistance and support of other jurors. 38 S.F. Trial at 9-12 [41-12 ECF at 9-12 of 86]. Broadnax's trial counsel argued these were "subjective explanations and a pretext for racial discrimination but the presiding judge denied the challenge. 38 S.F. Trial at 12-13 [41-12 ECF at 9598-99].

Broadnax's trial counsel raised a *Batson* objection to the prosecution's striking of qualified juror no. 9, M_ V_(original juror no. 131), a black female. 38 S.F. Trial at 14 [41-12 ECF at 14

of 86].  The prosecution explained this venire member (1) answered on the first page of her juror questionnaire that she was not in favor of the death penalty, (2) indicated she had been influenced by innocent people sentenced to death, (3) had a daughter with a drug addiction, (4) indicated on page six of her juror questionnaire that a person's use of drugs or alcohol at the time of an offense would automatically prevent her from assessing the death penalty if she found him guilty of capital murder, (5) testified during her voir dire examination that she had previously served on a jury that acquitted a DWI defendant because he was old and needed his license, and (6) had multiple relatives who have served time in the penitentiary.  38 S.F. Trial at 14-18 [41-12 ECF at 14-18 of 86].  Broadnax's trial counsel once again argued these reasons were merely pretext and suggested that many of the members of the qualified jury venire possessed characteristics of compassion or had relatives in the penitentiary as did this potential juror.  38 S.F. Trial at 18-19 [41-12 ECF at 18-19 of 86].  The presiding judge denied the *Batson* challenge.  38 S.F. Trial at 19 [41-12 ECF at 19 of 86].

Broadnax's trial counsel raised a *Batson* challenge when the prosecution used a peremptory strike against qualified juror no. 11, A_ R_(original juror no. 208), an Hispanic female.  38 S.F. Trial at 21 [41-12 ECF at 21 of 86].  The prosecution responded by explaining that this venire member (1) on page one of her juror questionnaire, stated she was not in favor of the death penalty, (2) on page two of her questionnaire, stated she had moral, religious, or personal beliefs that would prevent her from returning a verdict that would result in the execution of another human being, (3) on page two of her questionnaire wrote that the best argument for the death penalty was "in a case where you have a psycho killer" it was a solution, (4) was involved in the ministry, (5) testified during voir dire that she did not know if she could punish someone if they had not been in trouble before and wanted to see proof of increasingly violent crimes, and (6) had a relative who was

murdered by another relative. 38 S.F. Trial at 21-24 [41-12 ECF at 21-24 of 86]. Broadnax's trial counsel argued the foregoing reasons were pretext and did not support a finding that this juror would necessarily be favorable to the defense but the presiding judge denied the challenge. 38 S.F. Trial at 24-26 [41-12 ECF at 24-26 of 86].

Broadnax's trial counsel raised a *Batson* challenge to the prosecution's peremptory strike of qualified juror no. 12, C_ R_(original juror no. 222), a black male. 38 S.F. Trial at 26 [41-12 ECF at 26 of 86]. The prosecution then explained that (1) this juror indicated on page one of his juror questionnaire that he is not in favor of the death penalty and chose option three from the list described above, (2) on page four of his questionnaire listed himself as a "1" on a scale of one to ten asking how strongly he believed in the death penalty (with "1" being the lowest score), (3) on page six of his questionnaire and during his voir dire examination, this juror indicated that he believed drugs and alcohol alter the mind (which the prosecution expected to be a major defense contention at trial), (4) has a cousin in prison for murder, (5) emphasized that he has two good parents, and (6) has a son about the same age as the defendant and said during voir dire that he saw his son in this room." 38 S.F. Trial at 26-29 [41-12 ECF at 26-29 of 86]. Broadnax's trial counsel argued it was illogical for the prosecution to strike a potential juror because he had two good parents and relatives in prison but the presiding judge denied the challenge. 38 S.F. Trial at 29-30 [41-12 ECF at 29-30 of 86].

Broadnax's trial counsel raised a *Batson* challenge to the prosecution's peremptory strike of qualified juror no. 36, A_ L_(original juror no. 868), a black female. 38 S.F. Trial at 44 [41-12 ECF at 44 of 86]. The prosecution then explained that this juror (1) stated on page one of her questionnaire that she had mixed feelings about the death penalty, (2) seemed in her questionnaire answers to want to limit the scope of the death penalty to cases of torture or death of a child or the

elderly, (3) indicated in her questionnaire answers she was strongly in favor of life without parole, (4) indicated on page six of her questionnaire that she believed drugs alter a person's ways of thinking and acting, (5) indicated she did not believe a non-shooter should get the same punishment as a shooter, (6) had been placed on probation for theft by check, and (7) appeared to have displayed a different, more receptive demeanor during voir dire examination by Broadnax's trial counsel. 38 S.F. Trial at 44-49 [41-12 ECF at 9630-35]. Broadnax's counsel argued the court should disregard the prosecution's observations about the juror's allegedly shifting demeanor during voir dire (in part because the voir dire examinations had not been videotaped) and suggested the prosecution's arguments were pretext but the presiding judge denied the challenge. 38 S.F. Trial at 50-51 [41-12 ECF at 50-51 of 86].

Broadnax's trial counsel raised a *Batson* challenge to the prosecution's peremptory challenge to qualified juror no. 37, R_ P_(original juror no. 930), a black male. 38 S.F. Trial at 51 [41-12 ECF at 51 of 86]. The prosecution explained that this potential juror (1) gave voir dire answers to the defense's questions indicating he does not believe in the death penalty and placed it in the same category as abortion, (2) had served as the foreperson of a jury that acquitted a defendant in a murder trial, (3) had a very narrow view of a crime of violence, believing a physical assault was not a crime of violence – seemed to insist that the use of a weapon was required for it to be a "crime of violence," (4) on his own raised the issue of jury nullification during his voir dire examination in the context of a discussion of the mitigation special issue, and (5) suggested during his voir dire examination that if a person's background included growing up in a crime-infested neighborhood, with no parental supervision, and had been involved with a gang, but had no history of criminal activity, that might furnish a basis for an affirmative answer to the mitigation special issue. 38 S.F. Trial at 53-66 [41-12 ECF at 53-66 of 86]. Broadnax's trial counsel argued this

juror was eminently qualified and was the best member of the jury venire but the presiding judge denied the challenge. 39 S.F. Trial at 51-53, 66-68 [41-12 ECF at 51-53, 66-68 of 86].

Broadnax's trial counsel raised a *Batson* challenge to the prosecution's peremptory challenge to qualified juror no. 40, B_ J_(original juror no. 1391), a black female. 38 S.F. Trial at 69 [41-12 ECF at 69 of 86]. The prosecution explained that this potential juror (1) stated on page one of her juror questionnaire that she was not in favor of the death penalty and chose option three from among the options described above, (2) on page four of her questionnaire listed herself as a "2" on a scale of one to ten in terms of her support for the use of the death penalty, (3) indicated that she could only give the death penalty in cases of sexual assault or rape/murder of a child, and (4) only changed her position on that when questioned by the court. 38 S.F. Trial at 70 [41-12 ECF at 70 of 86]. Broadnax's trial counsel argued the prosecution's reasons were pretext but the presiding judge denied the challenge. 38 S.F. Trial at 70-71 [41-12 ECF at 70-71 of 86].

Broadnax's trial counsel raised a *Batson* challenge to the prosecution's peremptory challenge to qualified juror no. 41, D_ M_(original juror no. 1062), a black male. 38 S.F. Trial at 71 [41-12 ECF at 71 of 86]. The prosecution explained that this juror (1) indicated on page one of his juror questionnaire that he was not in favor of the death penalty, (2) stated during his voir dire testimony his belief that people in prison can change, (3) on page two of his questionnaire stated that he believed that use of drugs was an argument against the death penalty, (4) on pages four and six of his questionnaire gave answers that suggested he believed intoxication was clearly a mitigating factor to a criminal offense, (5) during his voir dire examination indicated that he has a strong interest in helping kids, (6) had a cousin who was killed as a teenager by a police officer, and (7) believed that people change after age eighteen. 38 S.F. Trial at 72-77 [41-12 ECF at 9658-63]. Broadnax's trial counsel argued the prosecution's peremptory strikes reflected a continued

policy of striking all black members of the jury venire from capital murder trials but the presiding judge denied the challenge. 38 S.F. Trial at 77-79 [41-12 ECF at 9663-65].

On July 27, 2009, Broadnax filed a motion asking the trial court to either restore qualified juror no. 37, R_ P_ (original juror no. 930), to the jury or, in the alternative, strike the entire panel and begin jury selection anew.[58] The prosecution filed a brief in response.[59] On July 30, 2009, the judge who presided at trial heard oral argument on the motion and received documentary evidence.

At the start of that hearing, the trial judge noted that while he recognized the juror whom Broadnax had asked to be reinstated had served as the foreperson of a jury that had acquitted a murder defendant and the same venire member had raised the issue of jury nullification *sua sponte* but the judge nonetheless expressed concern that the prosecution had peremptorily struck every black member of the jury venire and invited the prosecution to address the comparative juror analysis contained in Broadnax's motion. 42 S.F. Trial at 5-7 [41-16 ECF at 6 of 24].

The prosecution then argued that (1) the venire member in question had given the prosecution no concerns in his questionnaire answers or during the prosecution's voir dire questioning but, during voir dire examination by the defense, this venire member had interrupted defense counsel to explain that he was not in favor of the death penalty and wished to rectify any misimpression in that regard which his questionnaire answers might have created, (2) no one else on the jury had given such an answer during their voir dire examination, (3) this venire member also responded to an open-ended question from defense counsel regarding mitigating evidence

---

[58] Defendant's Brief in Support of *Batson* Motion, Clerk's Record, Volume 3 of 3, at 542-49 [38-8 ECF at 5-12 of 256].

[59] State's Response to *Batson* Challenge, Clerk's Record, Volume 3 of 3, at 550-58 [38-8 ECF at 13-21 of 256].

sufficient to justify a life sentence by reciting a laundry list of factors which appeared to dovetail with the defense's trial strategy for Broadnax's trial, (4) this venire member raised the issue of jury nullification on his own during questioning from defense counsel, and (5) this venire member had served as the foreperson of a jury that acquitted a murder defendant. 42 S.F. Trial at 7-16 [41-16 ECF at 6-8 of 24].

Broadnax's trial counsel then argued (1) because voir dire examination had not been videotaped, the prosecution could not rely on the demeanor of venire members to justify a peremptory strike, (2) another member of the jury whom the prosecution did not strike [qualified juror no. 10, A_ F_ (original juror no. 227)] had served on a jury that acquitted a criminal defendant, (3) the venire member in question raised the issue of jury nullification when questioned about special issue no. 3, which defense counsel had explained was added to the Texas capital sentencing scheme in response to Supreme Court's rulings, (4) on page one of his juror questionnaire, the venire member in question clearly answered that he was in favor of the death penalty and could follow the law, (5) another member of the jury whom the prosecution did not strike [qualified juror no. 15, K_ M_ (original juror no. 272)] had given answers similar to the venire member in question indicating personal reservations about the death penalty but a willingness to follow the law, (6) six other members of the jury venire who expressed reservations about the death penalty were not stricken by the prosecution, and (7) based on a comparative analysis, the defense believed the prosecution's striking of the venire member in question was racially motivated. 42 S.F. Trial at 19-28 [41-16 ECF at 9-11 of 24].

The prosecution responded with arguments that (1) the venire member in question had been the foreperson of a jury that acquitted a murder defendant not merely a member of a jury that acquitted in a DWI case, (2) contrary to his questionnaire answers, the venire member in question

volunteered during voir dire examination that was not in favor of the death penalty and did so in unmistakable terms, (3) the female venire member identified by the defense as having vacillated in terms of her feelings about the death penalty had given a very pro-prosecution response to a question about mitigating evidence.  42 S.F. Trial at 28-32 [41-16 ECF at 11-12 of 24].

The trial judge then declared that he could not conclude the prosecution had subjectively presented pretextual reasons for striking the venire member in question but explained he was going to restore the venire member to the jury nonetheless.  42 S.F. Trial at 33-35 [41-16 ECF at 13 of 24].  The ensuing problem of excess jurors became moot several days later when another member of the jury was excused for medical reasons.  45 S.F. Trial at 19-22 [41-19 ECF at 15 of 84].

Without making any specific factual findings regarding the prosecution's intent to discriminate on the basis of race, the trial judge concluded that restoring the venire member in question to the jury was the proper course.[60]  More specifically, the trial judge declared as follows:

> The problem in this case is, again, as I have said, one could conclude if I grant a Batson challenge that Mr. Alex's reasons for challenge were contextual [sic], that being false.  That's – If I was [sic] a subjective finder of the intent of Mr. Alex of his team, I would not conclude that.  But I'm not in the business of ming [sic] subjective decisions, so I have to look at the criteria that's set out in the Miller-El case and the logic contained in Greer.  It states the factors that are to be applied, it doesn't state which one weighs more than the other or anything of that sort.
>
> I'm going to grant the Batson challenge and I'm going to do so because of the fact that there are no African-Americans jurors on this jury and there was a disproportionate number of African-Americans who were struck.  This is not to be considered in any way as some sort of negative context on any lawyers in this case.  It's because I simply have to look at the factors that are contained in the Miller-El and I made my decision based on that.[61]

---

[60] The transcription from the July 30 hearing on Broadnax's *Batson* motion appears at 42 S.F. Trial at 5-36 [41-16 ECF at 6-13 of 24].  For unknown reasons, throughout this part of the trial transcript, the word "making" appears as "ming," the word "taken" appears as "ten," and the word "take" appears as "te."

[61] 42 S.F. Trial at 34-35 [41-16 ECF at 13 of 24].

## B. State Court Disposition on Direct Appeal

In his first seven points of error on direct appeal, Broadnax argued the trial court erred in denying his *Batson* challenges to the six other black venire members and one hispanic venire member peremptorily struck by the prosecution.[62] The Texas Court of Criminal Appeals overruled all seven points of error on the merits. *Broadnax v. State*, AP-76,207, 2011 WL 6225399, at *2-*4.

## C. Clearly Established Federal Law

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the United States Supreme Court extended the equal protection principle barring the purposeful exclusion of Blacks from criminal jury service to the prosecution's use of peremptory challenges during petit jury selection. *See Batson v. Kentucky*, 476 U.S. at 89 ("the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant."). *Batson* provides a three-step process for a trial court to use in adjudicating a claim that a peremptory challenge was based on race: first, the defendant must make out a *prima facie* case of discriminatory jury selection by the totality of the relevant facts concerning a prosecutor's conduct during the defendant's own trial; second, once the defendant makes the *prima facie* showing, the burden shifts to the State to come forward with a race-neutral explanation for challenging jurors within the arguably targeted class; finally, the trial court must determine if the defendant established purposeful discrimination by the prosecution. *Foster v. Chatman*, 136 S. Ct. 1737, 1747 (2016); *Snyder v. Louisiana*, 552 U. S.

---

[62] Appellant's Brief at 24-42 [42-7 ECF at 51-69 of 152].

472, 476-77 (2008); *Miller-El v. Dretke*, 545 U. S. 231, 239 (2005); *Batson v. Kentucky*, 476 U. S. at 94-98.[63]

### D. Synthesis

A trial judge's findings in connection with a *Batson* challenge turn primarily upon an evaluation of the prosecutor's credibility and are entitled to deference. *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015) ("The opponent of the strike bears the burden of persuasion regarding racial motivation and a trial court finding regarding the credibility of an attorney's explanation of the ground for a peremptory challenge is entitled to 'great deference.'"); *Felker v. Jackson*, 562 U.S. 594, 598 (2011) (holding the same); *Batson v. Kentucky*, 476 U.S. at 98 n.21 (holding the same).

---

[63] Broadnax has recently filed a pleading calling this Court's attention to the Supreme Court's opinion in *Flowers v. Mississippi*, 139 S. Ct. 2228 (2019). ECF no. 72. Broadnax argues in that pleading that the Supreme Court's decision in *Flowers* controls the disposition of his own *Batson* claims. For several reasons, this is not the case. First, *Flowers* was an appeal from the Supreme Court of Mississippi and not a federal habeas corpus proceeding governed by AEDPA principles. Thus, *Flowers* does not represent "clearly established" federal law for purposes of this Court's AEDPA review of the Texas Court of Criminal Appeals' 2011 opinion on direct appeal rejecting Broadnax's *Batson* claims. Second, many of the factual arguments contained in Broadnax's latest pleading are inaccurate. Specifically, the reasons stated on the record during Broadnax's jury selection by the prosecution for its peremptory strikes are set forth in detail in this opinion - along with record citations. Broadnax's counsels' efforts in his latest pleading to misrepresent the reasons stated by the prosecution for its strikes of particular members of the jury venire come perilously close to a violation of Rule 11 and will not be countenanced in the future. This Court's AEDPA review of Broadnax's *Batson* claims must necessarily focus on the actual reasons the prosecution gave on the record for its use of peremptory challenges, not the reasons asserted by his federal habeas counsel which find no support in the record. Third, *Flowers* is not the landmark shift in Supreme Court jurisprudence suggested by Broadnax. It is, instead, a straight-forward application of the same principles that have guided the Supreme Court's *Batson* jurisprudence for several decades. Finally, unlike the situation in *Flowers*, Broadnax does not identify a series of prior trials in which Dallas County prosecutors were found by state appellate courts to have violated the principles of *Batson* in order to secure Broadnax's conviction on the same charge for which he was convicted in 2009.

Under the AEDPA, even more deference must be shown.  *Davis v. Ayala*, 135 S. Ct. at 2199-2200.[64]

Having independently examined the voir dire testimony and juror questionnaire answers given by each of these venire members, this Court finds the questionnaire answers and voir dire testimony given by these seven venire members fully supported the race-neutral reasons given by the prosecution for peremptorily striking each of them.  The prosecution stated on the record at both of the *Batson* hearings held in Broadnax's case that it had determined to peremptorily strike any venire member who indicated in their juror questionnaire answers or their voir dire testimony that they were not in favor of the death penalty.

There were two questions on the first page of the juror questionnaire relevant to this issue.  The first asked simply "Are you in favor of the death penalty?"  Five of the venire members whom the prosecution peremptorily struck and for whom Broadnax's trial counsel made *Batson* challenges checked "No" in response to that question:  qualified juror no. 9, M_ V_ (original juror

---

[64] Broadnax also argues the trial court improperly relied upon the prosecution's references to the demeanor of venire members during voir dire examination in rejecting Broadnax's *Batson* challenges.  Broadnax argues that the trial judges who ultimately ruled on his *Batson* challenges on July 20 and July 30, 2009 did not personally supervise the entirety of the voir dire examination and, therefore, could not make credibility determinations regarding the accuracy of the prosecution's descriptions of the venire members' demeanor.  There is no clearly established federal law requiring that a judge have personally observed a venire member's demeanor during voir dire in order to make credibility findings on that subject.  *See Thaler v. Haynes*, 559 U.S. 43, 48 (2010) ("[W]here the explanation for a peremptory challenge is based on a prospective juror's demeanor, the judge should take into account, among other things, any observations of the juror that the judge was able to make during *voir dire*.  But *Batson* plainly did not go further and hold that a demeanor-based explanation must be rejected if the judge did not observe or cannot recall the juror's demeanor.").  Out of an abundance of caution, however, this Court has undertaken to review the efficacy of the prosecution's proffered rationale for each of its peremptory strikes in question by focusing on only the reasons given that can be objectively verified through review of the relevant juror questionnaires and voir dire examination.  Thus, Broadnax's complaint that the state trial court did not make any express credibility findings based upon the demeanor of a particular venire member is moot.

no. 131)[65]; qualified juror no. 11, A_ R_ (original juror no. 208)[66]; qualified juror no. 12, C_ R_ (original juror no. 222)[67]; qualified juror no. 40, B_ J_ (original juror no. 1391)[68]; and qualified juror no. 41, D_ M_ (original juror no. 1062).[69]

---

[65] Qualified juror no. 9, M_ V_ (original juror no. 131) stated on page one of her juror questionnaire that she was not in favor of the death penalty. [61-1 ECF at 159 of 291]. She also hand-wrote "I believe in 2nd chances. Too many has [sic] died innocent I believe I have to think of my love [sic] ones." *Id.* In explaining the reasons for the prosecution's use of a peremptory strike against this venire member, the prosecutor not only pointed out the venire member's questionnaire answer but also accurately pointed out that, during her voir dire examination, this same venire member testified that she had previously served on a jury that acquitted a DWI defendant because he was old and she believed he needed his license and she believed she had played a pivotal role in convincing her fellow jurors to acquit. Voir Dire Examination of M_ V_, 11 S.F. Trial at 144 [39-10 ECF at 145 of 185].

[66] Qualified juror no. 11, A_ R_ (original juror no. 208) stated on page one of her juror questionnaire that she was not in favor of the death penalty and on page two stated that she had "moral, religious or personal beliefs that would prevent her from returning a verdict which would result in the execution of another human being." [61-1 ECF at 197-98 of 291]. She also hand-wrote on page two "taking a life for a life is not what I believe is the solution to the problem. Life sentence maybe." [61-1 ECF at 198 of 291] The prosecution called those answers to the trial court's attention, as well as pointed out this venire member was studying for the ministry and expressed strong personal views which could interfere with her ability to render a pro-prosecution verdict at the punishment phase of a capital murder trial, both points amply demonstrated in her voir dire examination. Voir dire examination of A_ R_, 13 S.F. Trial at 176-89 [39-11 ECF at 176-89 of 310].

[67] Qualified juror no. 12, C_ R_ (original juror no. 222) stated on page one of his juror questionnaire that he was not in favor of the death penalty, hand wrote "There have been too many people convicted of a crime, that we later, found were innocent," and chose option three in response to a question asking him about his feelings on the death penalty: "Although I do not believe that the death penalty ever ought to be invoked, as long as the law provides for it, I could assess it under the proper set of circumstances." [61-1 ECF at 216 of 291]. On page four of his questionnaire, the same venire member listed himself as a "1" – the lowest point - on a scale asking for his belief in the death penalty. [61-1 ECF at 219 of 291]. The prosecution pointed out these answers, as well as accurately pointed out the fact this same venire member had stated during voir dire examination that he had a son about the same age as the defendant and that he felt his son was in the courtroom. Voir Dire Examination of C_ R_, 13 S.F. Trial at 249 [39-11 ECF at 249 of 310] ("You know, my son is a black boy, and I see him in this room.").

[68] Qualified juror no. 40, B_ J_ (original juror no. 1391) stated on page one of her juror questionnaire that she was not in favor of the death penalty, hand wrote "I believe in life in prison without any chance of parole," and also chose option three in response to the next question on the same page. [61-3 ECF at 179 of 349]. On page four of her questionnaire she rated herself a "2"

A second question on page one of the juror questionnaire asked the venire members to self-identify from a list of five pre-printed options their views of the death penalty. Option three stated "Although I do not believe that the death penalty ever ought to be invoked, as long as the law provides for it, I could assess it under the proper set of circumstances." Two of the relevant venire members chose this option: Qualified juror no. 12, C_ R_ (original juror no. 222)[70] and qualified juror no. 6, S_ M_ (original juror no. 165).[71] Finally, qualified juror no. 36, A_ L_ (original juror

_____

on the one-to-ten scale of belief in the death penalty, the next-to-lowest point on the scale. [61-3 ECF at 182 of 349]. The prosecution accurately pointed out the foregoing answers as well as pointing out that, during her voir dire examination, this venire member not only reaffirmed her personal belief in the efficacy of life without parole as a more severe sentence than a sentence of death but also indicated she could not impose the death penalty except in the case of a sexual assault and murder of a child and seemed to change her mind on those subjects only when questioned by the trial court directly. Voir Dire Examination of B_ J_, 34 S.F. Trial at 23-26, 47-50, 73-75 [41-8 ECF at 23-26, 47-50, 73-75 of 259].

[69] Qualified juror no. 41, D_ M_ (original juror no. 1062) stated on page one of his questionnaire that he was not in favor of the death penalty and stated on pages two, four, and six that he believed intoxication at the time of a criminal offense was mitigating in nature. [61-3 ECF at 198-99, 201, 203 of 349]. The prosecution pointed out those answers, as well as accurately reminded the judge that this venire member had testified he had a cousin about Broadnax's age who was recently killed by a police officer and repeatedly stated during his voir dire examination that he believed people in prison could change. Voir Dire Examination of D_ M_, 34 S.F. Trial at 93-104, 118-20, 154-55 [41-8 ECF at 93-104, 118-20, 154-55 of 259].

[70] 61-1 ECF at 216 of 291.

[71] Qualified juror no. 6, S_ M_ (original juror no. 165) chose option three in response to the second question asking about her feelings on the death penalty, thus indicating that she was not in favor of the death penalty. [61-1 ECF at 102 of 291]. While this venire member had checked "Yes" in answer to the previous question asking whether she was in favor of the death penalty, she hand wrote "I check yes, but really I'm unsure. It depends on situation I guess." *Id.* During her voir dire examination, this venire member (1) admitted she was nervous and was uncomfortable being in the same room as someone she was being asked to judge (Voir Dire Examination of S_ M_, 10 S.F. Trial at 18-20 [39-9 ECF at 9 of 66]) and (2) admitted she would have difficulty voting in favor of the death penalty without the support of other jurors (*Id.*, 10 S.F. Trial at 23-25 [39-9 ECF at 10-11 of 66]). The prosecution pointed out the foregoing answers as justifications for its use of a peremptory strike against this venire member.

no. 868) gave a number of questionnaire answers the prosecution identified as both problematic and justifying its race-neutral peremptory strike against her.[72]

While none of the respective venire members' questionnaire answers or voir dire testimony in question may have risen to the level of a basis for a challenge for cause, they all constituted racially neutral, objectively verifiable, record-based, reasons for a prosecutorial peremptory strike. The state trial court's rejections of Broadnax's *Batson* challenges to the prosecution's peremptory strikes of these seven venire members were fully supported by the evidence before that court. Broadnax has failed to present this Court with clear and convincing evidence showing the state trial court's implicit credibility findings (regarding the prosecution's race-neutral reasons for its peremptory strikes against these venire members) were erroneous.[73] The Texas Court of Criminal

---

[72] On page one of her juror questionnaire this venire member checked "Yes" in response to the first question asking whether she was in favor of the death penalty but then hand wrote "I have mixed feelings about the death penalty, but I lean more toward yes. I feel that their [sic] are certain crimes that are so cold hearted could be a situation where the death penalty is a [sic] accurate punishment." [61-3 ECF at 103 of 349]. On page 2 of her questionnaire, she wrote in response to a question asking for the "best argument for the death penalty" as follows: "When you brutally kill, and torture someone and have no regard for human life." [61-3 ECF at 104 of 349]. On page 4 of her questionnaire in response to a question asking for what crimes she thought the death penalty should be available, she wrote: "When you murder and [sic] helpless child or elderly person some on [sic] that cannot defend themselves." [61-3 ECF at 106 of 349]. On page 5 of her questionnaire, she circled the option indicating she was "strongly in favor" of life without parole and, when asked to explain her answer, hand wrote as follows: "I believe you have to [sic] time to think about what you did and deal with it, and the death penalty is a quick fix. I think it is a greater punishment in life w/ parole." [61-3 ECF at 107 of 349]. When asked on the same page what purposes she believed life without parole serves, she wrote by hand: "Make you suffer and deal with the crime." *Id.* On page six of her questionnaire she checked a box indicating a person's use or drugs or alcohol at the time of the offense would automatically prevent her from assessing the death penalty and hand-wrote "I believe drugs alter a person [sic] way of thinking and acting." [61-3 ECF at 108 of 349]. The prosecution called these answers to the trial judge's attention as justifications for its peremptory strike, as well as accurately pointed out this venire member had self-reported that she received deferred adjudication in 1999 in a bad check case. [61-3 ECF at 110 of 349].

[73] For the first time, Broadnax has presented this Court with a document allegedly prepared by the Dallas County District Attorney's Office in advance of the exercise of peremptory challenges showing the race and gender of all members of the qualified jury venire and

highlighting the remaining black members of the jury venire. Broadnax argues this document constitutes evidence of racial animus on the part of the prosecution. There are multiple problems with Broadnax's argument. First, as correctly pointed out by Respondent, the Supreme Court's clear holding in *Cullen v. Pinholster*, 563 U.S. 170, 185 (2011) ("If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court.") bars this Court from considering new evidence that was not properly before the Texas Court of Criminal Appeals when it rejected Broadnax's *Batson* claims on direct appeal. "Similarly, § 2254(d)(2) expressly limits review to the state court record." *Halprin v. Davis*, 911 F.3d 247, 255 (5th Cir. 2018). Under AEDPA, Broadnax's new documents are not properly before this Court in this habeas corpus proceeding.

Second, and in this case even more significantly, the documentation now presented by Broadnax does nothing more than indicate that the Dallas County District Attorney's Office made a point of memorializing the ethnicity and gender of the remaining members of the jury venire prior to the exercise of its peremptory challenges. Having twice been criticized by the United States Supreme Court for its exercise of racially discriminatory peremptory strikes in *Miller-El v. Dretke*, 545 U.S. 231 (2005), and *Miller-El v. Cockrell*, 537 U.S. 322 (2003), it would have been professionally irresponsible for the Dallas County District Attorney's Office (in 2009) to have failed to identify the members of the remaining jury venire who were members of a protected class and against whom it might have been preparing to exercise a peremptory challenge. Such an endeavor would necessarily have first required the prosecution to identify all remaining members of the jury venire who were members of a protected class. No sinister motive can be inferred rationally simply because the prosecution noted the race and gender of every remaining member of the jury venire or highlighted those for whom that office would need to be prepared to offer sound, race-neutral, reasons in the event the prosecution chose to exercise a peremptory strike against such an individual and the defense raised a *Batson* objection.

Finally, Broadnax also argues the prosecution failed to exercise peremptory strikes against several white venire members who gave at least some answers on their juror questionnaires that were similar to the questionnaire answers given by minority venire members against whom the prosecution did exercise peremptory strikes. Given the extensive length and detail in the juror questionnaires, any similarity between some answers given by venire members against whom the prosecution exercised peremptory strikes and the answers of venire members against whom the prosecution did not exercise peremptory strikes is hardly surprising – or conclusive of anything. More specifically, at various points in his amended petition, Broadnax identifies (1) qualified juror no. 1, J_ W_ (original juror no. 6), whose juror questionnaire appears at 61-1 ECF at 7-24 of 291 and whose voir dire examination appears at 7 S.F. Trial at 9-92 [39-6 ECF at 10-92 of 215]; (2) qualified juror no. 7, E_ C_ (original juror no. 134), whose juror questionnaire appears at 61-1 ECF at 121-38 of 291 and whose voir dire examination appears at 10 S.F. Trial at 84-161 [39-9 ECF at 25-45 of 66]; (3) qualified juror no. 10, A_ F_ (original juror no. 227), whose juror questionnaire appears at 61-1 ECF at 178-95 of 291 and whose voir dire examination appears at 13 S.F. Trial at 66-150 [39-11 ECF at 66-150 of 310]; (4) qualified juror no. 15, K_ M_ (original juror no. 272), whose juror questionnaire appears at 61-1 ECF at 273-90 of 291 and whose voir dire examination appears as 14 S.F. Trial at 195-280 [39-13 ECF at 195-280 of 300]; (5) qualified juror no. 25, K_ M_ (original juror no. 626), whose juror questionnaire appears at 61-2 ECF at 178-95 of 293 and whose voir dire examination appears at 22 S.F. Trial at 147-235 [39-21 ECF at 40-60 of 61]; (6) qualified juror no. 33, W_ S_ (original juror no. 684), whose juror questionnaire

Appeals' subsequent rejection on the merits of Broadnax's *Batson* claims on direct appeal was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in his trial and direct appeal. Broadnax's *Batson* claims do not warrant federal habeas corpus relief.

### E. Failure to Strike the Entire Jury Venire After Granting One Batson Challenge

Broadnax also argues the state trial court should have dismissed the entire jury panel after granting Broadnax's motion to reinstate qualified juror no. 37, R_ P_ (original juror no. 930) and begun jury selection anew.[74] The Texas Court of Criminal Appeals rejected this argument on direct appeal, concluding the state trial court erroneously granted the *Batson* challenge involving this venire member, finding the trial court's stated justification for reinstating this juror did not amount to a finding of racial animus in connection with the peremptory striking of this potential juror. *Broadnax v. State*, AP-76,207, 2011 WL 6225399, at *4 (holding that even if there was a valid finding of a racially-motivated strike against this potential juror, that finding would not automatically establish all other peremptory strikes were racially motivated).

---

appears at 61-3 ECF at 46-63 of 349 and whose voir dire examination appears at 27 S.F. Trial at 96-175 [41-1 ECF at 96-175 of 176]; (7) qualified juror no. 38, W_ K_ (original juror no. 874), whose juror questionnaire appears at 61-3 ECF at 141-58 of 349 and whose voir dire examination appears at 32 S.F. Trial at 5-81 [41-6 ECF at 5-81 of 96]; (8) qualified juror no. 44, E_ B_ (original juror no. 1313), whose juror questionnaire appears at 61-3 ECF at 255-72 of 349 and whose voir dire examination appears at 35 S.F. Trial at 120-91 [41-9 ECF at 34-52 of 57]. Unlike the venire members against whom the prosecution exercised peremptory strikes, however, none of these venire members gave any questionnaire or voir dire answers indicating they were opposed to the death penalty or that they believed a term of life imprisonment without the possibility of parole was a significantly more harsh sentence than a sentence of death. For equal protection purposes, none of these venire members were similarly situated with the venire members against whom the prosecution exercised challenged strikes.

[74] 48 ECF at 70-74.

While Broadnax cites to authorities from other state jurisdictions holding that reinstatement of an improperly stricken venire member is not an adequate remedy for a *Batson* violation, he cites no clearly established Supreme Court legal authority holding that dismissal of an entire jury panel is required whenever a trial court determines there has been a single *Batson* violation. This Court's independent research has likewise revealed no such clearly established Supreme Court authority. The Texas Court of Criminal Appeals' rejection on the merits of this additional *Batson* claim on direct appeal was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Broadnax's trial and direct appeal. Furthermore, Respondent correctly argues that the new rule advocated by Broadnax in this federal habeas corpus proceeding is foreclosed by the nonretroactivity doctrine of *Teague.*

## XII. INEFFECTIVE ASSISTANCE BY TRIAL COUNSEL

### A. *Overview of the Complaints*

Scattered throughout his first amended federal habeas corpus petition, Broadnax raises a host of conclusory complaints about the performance of his state trial counsel. More specifically, he complains that his trial counsel (1) failed to call Dr. Roache to testify at the guilt-innocence phase of Broadnax's trial regarding Broadnax's lack of capacity to consent to his media interviews,[75] (2) failed to properly object to the prosecution's use of peremptory strikes against minority members of the jury venire,[76] (3) failed to rebut the trial testimony of Dr. Price regarding

---

[75] 48 ECF at 33-55.

[76] 48 ECF at 84-90.

the traits of a psychopathic personality,[77] and (4) failed to cross-examine Officer Nelson regarding evidence of Broadnax's gang membership and the characteristics of the Gangster Disciples.[78]

### B. State Court Disposition

In his state habeas corpus application, Broadnax presented complaints that his trial counsel rendered ineffective assistance by (1) failing to investigate and present the facts surrounding the appointment of Broadnax's lead trial counsel and Broadnax's media interviews, (2) failing to (a) object to testimony by, and cross-examine, the prosecution's gang expert (Officer Nelson) and (b) call a rebuttal expert, (3) opening the door to the admission of testimony regarding Antisocial Personality Disorder ("ASPD") by calling Dr. Lane to testify, and (4) failing to cross-examine Dr. Price.[79] The state habeas trial court made extensive findings of fact and conclusions of law and recommended the Texas Court of Criminal Appeals reject all of Broadnax's ineffective assistance claims.[80] The Texas Court of Criminal Appeals adopted the foregoing findings and conclusions when it denied Broadnax's state habeas corpus application on the merits.

---

[77] 48 ECF at 109-12.

[78] 48 ECF at 124-27.

[79] Broadnax's State Habeas Corpus Application, at 54-60, 68-75, 86-90 [42-1 ECF at 58-64, 82-88, 100-04 of 258].

[80] The state habeas trial court (1) found Broadnax's trial counsel made a sound and reasonable strategic decision regarding which legal arguments to raise and pursue in challenging the admissibility of the media interviews, State Habeas Court's Findings & Conclusions at 12 [42-6 ECF at 50 of 163], (2) found Broadnax's trial counsel did object to the admission of the media interviews on Fifth and Sixth Amendment grounds but did not challenge the constitutionality of the Texas Fair Defense Act because their position was that the Sheriff's Department was active in facilitating the interviews, *Id.*, at 13 [42-6 ECF at 51 of 163], (3) found Broadnax had failed to rebut the presumption that his trial counsels' decisions regarding the challenges to raise against the admission of the media interviews constituted reasonable trial strategy, *Id.* at 14 [42-6 ECF at 52 of 163], (4) concluded the efforts of Broadnax's trial counsel to exclude the media interviews did not fall below an objective standard of reasonableness, *Id.*, (5) concluded there was no reasonable probability that, had his trial counsel raised additional constitutional challenges to the media interviews, the result of Broadnax's trial would have been different, *Id.* at 15 [42-6 ECF at

### C. Clearly Established Federal Law

The constitutional standard for determining whether a criminal defendant has been denied

the effective assistance of *trial* counsel, as guaranteed by the Sixth Amendment, was announced

by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This

---

53 of 163], (6) found Officer Nelson's testimony was true and accurate, not false or misleading, *Id.* at 22 [42-6 ECF at 60 of 163], (7) found Broadnax's trial counsel made a strategic decision not to call its own gang expert because (a) there was no evidence Broadnax's gang membership was related to the murder, (b) Broadnax had self-admitted to gang membership, and (c) it would be difficult to present a credible case that Broadnax's use of gang symbols was meaningless, *Id.* at 24 [42-6 ECF at 62 of 163], (8) found it would have been futile to object to Officer Nelson's testimony under Chapter 61 of the Texas Code of Criminal Procedure, *Id.* at 25 [42-6 ECF at 63 of 163], (9) concluded Broadnax's complaints about Officer Nelson's testimony (a) failed overcome the presumption that counsels' actions constituted reasonable trial strategy and (b) failed to show Broadnax was prejudiced by any alleged deficiency in his trial counsel's conduct vis-a-vis Officer Nelson's testimony, *Id.*, (10) found Broadnax failed to establish that Dr. Price's trial testimony was false, misleading, or perjured, *Id.* at 30 [42-6 ECF at 68 of 163], (11) found Broadnax's trial counsel effectively cross-examined Dr. Price, eliciting testimony that (a) psychopathy is not listed in the DSM-IV, (b) the closest thing to psychopathy in the DSM-IV is a personality disorder, (c) people who have the traits of psychopathy may not be a psychopath, and (d) some of the traits of a psychopath are consistent with those of an immature person, *Id.* at 31 [42-6 ECF at 69 of 163], (12) found Broadnax's trial counsel did object to the admission of Dr. Price's testimony, *Id.*, (13) found Broadnax's trial counsel argued it was not possible for the jury to determine if Broadnax were a psychopath because it lacked relevant historical information, *Id.*, (14) found Broadnax's defense team chose not to call its own mental health experts to rebut Dr. Price because (a) calling another expert might have opened the door to cross-examination which suggested Broadnax was a psychopath and (b) neither Dr. Price nor any other person who testified at trial stated that Broadnax definitely was a psychopath, *Id.* at 32 [42-6 ECF at 70 of 163], and (15) concluded (a) Broadnax's complaints about his trial counsel's failure to call another mental health expert failed to overcome the presumption that his trial counsel exercised reasonable trial strategy and (b) there was no reasonable probability that, but for the alleged deficiency in his trial counsel's conduct vis-a-vis the testimony of Dr. Lane and Dr. Price the result of Broadnax's trial would have been different, *Id.*

requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland*, i.e., establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Williams v. Taylor*, 529 U.S. 362, 390-91 (2000). In so doing, a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U.S. at 687-91. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith*, 539 U.S. at 523 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009); *Strickland v. Washington*, 466 U.S. at 688-89. Under the well-settled *Strickland* standard, the Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Strickland v. Washington*, 466 U.S. at 690.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith*, 539 U.S. at 534; *Strickland v.*

*Washington*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Strickland v. Washington*, 466 U.S. at 694.

In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test (such as those complaints the state courts summarily dismissed under the Texas writ-abuse statute or which the petitioner failed to fairly present to the state courts), this Court's review of the un-adjudicated prong is de novo. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) (holding de novo review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U. S. 374, 390 (2005) (holding de novo review of the prejudice prong of *Strickland* required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U. S. at 534 (holding the same).

Under AEDPA's deferential standard of review, claims of ineffective assistance adjudicated on the merits by a state court are entitled to a doubly deferential form of federal habeas review. AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow,* 571 U.S. 12, 19 (2013). Under section 2254(d)(1), "'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *White v. Wheeler,* 136 S. Ct. 456, 460 (2015) (quoting *White v. Woodall,* 572 U.S. 415, 419-20 (2014)); *Harrington v. Richter,* 562 U. S. 86, 103 (2011).

The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether

95

defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."

*Harrington v. Richter*, 562 U. S. at 101 (citations omitted).

### D. Failure to Call Dr. Roache to Testify Re Broadnax's Consent to be Interviewed

Respondent correctly notes that while Broadnax presented a multi-faceted challenge during his state habeas corpus proceeding to his trial counsels' handling of the admissibility of Broadnax's media interviews, Broadnax has never fairly presented any state court with his new complaint that his trial counsel should have called Dr. Roache to testify that Broadnax was not competent to consent to his media interviews. This Court will, therefore, undertake de novo review.

As explained in detail in Section X above, however, because the state trial court and state appellate courts found the television reporters who interviewed Broadnax were not acting as state agents, there was no constitutional impediment to the admission of Broadnax's interviews. As explained in subsection X.C.1. above, Broadnax's contention that his consent to be interviewed was involuntary is also without arguable merit. Even if Dr. Roache (who is a pharmacologist, not a psychologist or psychiatrist) had testified at the pretrial hearing on the admissibility of Broadnax's media interviews (or at the guilt-innocence phase of trial) that he believed Broadnax was suffering from the debilitating effects of a PCP-induced psychosis at the time Broadnax gave

his media interviews, Dr. Roache gave no testimony suggesting there had been any coercive police action to induce Broadnax's media interviews.[81]  Thus, under applicable clearly established federal law, Dr. Roache's punishment-phase trial testimony would not have served as a legal barrier to the admission of Broadnax's media interviews.  At best, Dr. Roache's punishment phase testimony would have added to the testimony of Dr. Mirmesdagh and Mr. Varghese that Broadnax voiced a variety of complaints, including entirely subjective complaints of hallucinations and anxiety, on the morning of his interviews.  Significantly, Dr. Mirmesdagh (who is a psychiatrist) concluded Broadnax was alert and oriented and did not prescribe any medication for Broadnax that morning after examining him.[82]  Moreover, as explained in subsection X.C.1., the opinions of Broadnax's mental health experts regarding Broadnax's alleged psychosis at the time he gave his interviews must be evaluated in the context of the videotapes of those interviews, during which Broadnax displayed full alertness and responsiveness to questions, a range of emotions, and the ability to repeatedly furnish a vividly detailed account of his execution of two strangers on the night in question, when he and his cousin had gone out to "hit a lick."  The jury had the opportunity to see for itself that Broadnax was plainly alert, responsive, coherent, and logical (albeit crude and remorseless most of the time) throughout his interviews.

Having independently reviewed the entire record from Broadnax's trial, direct appeal, and state habeas corpus proceeding, this Court concludes after de novo review that (1) the failure of Broadnax's trial counsel to call Dr. Roache to testify at the pretrial hearing on the admissibility of Broadnax's media interviews or at the guilt-innocence phase of trial did not cause the performance of his trial counsel to fall below an objective level of reasonableness and (2) there is no reasonable

---

[81] *See* Appendix I.

[82] *See* Appendix I.

probability that, but for the failure of Broadnax's trial counsel to call Dr. Roache to testify at either the pretrial suppression hearing or the guilt-innocence phase of Broadnax's trial, the outcome of either phase of Broadnax's capital murder trial would have been any different. This complaint fails to satisfy either prong of the *Strickland* standard and does not warrant federal habeas relief.

### E. Failure to Properly Object to **Batson** *Violations and Move for a New Jury Venire*

As was true of Broadnax's first complaint of ineffective assistance, Broadnax's complaints that that his trial counsel failed to (a) properly raise and preserve his *Batson* challenges and (b) object to the trial court's failure to strike the entire jury panel after granting one of Broadnax's *Batson* challenges were not fairly presented to the state courts during Broadnax's state habeas corpus proceeding. This Court will undertake de novo review.

As explained in detail in Section XI above, Broadnax's trial counsel raised timely *Batson* challenges to the prosecution's use of eight peremptory strikes against various venire members. The Texas Court of Criminal Appeals addressed all of those challenges on direct appeal, found the state trial court had correctly rejected seven of the Broadnax's *Batson* challenges, and held the state trial court erroneously ruled in Broadnax's favor on the eighth such challenge. Likewise, as discussed in Section XI, Broadnax's complaints about the denial of his *Batson* challenges and the trial court's failure to strike the entire jury panel after it granted one of Broadnax's *Batson* challenges and reinstated one of the stricken jurors are refuted by the record and without arguable legal merit. Broadnax failed to identify any white jurors against whom the prosecution failed to exercise a peremptory strike who were genuinely similarly situated in terms of their questionnaire answers and voir dire testimony to those whom the prosecution struck peremptorily.[83] The prosecution peremptorily struck seven venire members who indicated in their questionnaire

---

[83] *See* note 70.

answers or their voir dire testimony that they did not favor the death penalty and one venire member who indicated she strongly believed that a term of life imprisonment without the possibility of parole was a harsher sentence than the death penalty. The state appellate court held on direct appeal that the trial court had not erred in failing to dismiss the entire jury panel and begin jury selection anew after granting a single *Batson* challenge. No clearly established Texas or federal law requires such an outcome.

Under such circumstances, this Court concludes after de novo review that (1) the conduct of Broadnax's trial counsel in connection with both Broadnax's *Batson* challenges (including the state trial court's granting of one such challenge) did not cause the performance of Broadnax's trial counsel to fall below an objective level of reasonableness and (2) there is no reasonable probability that, had Broadnax's trial counsel objected more strenuously or persistently to the trial court's failure to begin the entire jury selection process anew after granting a single *Batson* challenge, the outcome of either phase of Broadnax's capital murder trial (or Broadnax's direct appeal) would have been any different. The state appellate court addressed and rejected on the merits Broadnax's complaint that the trial court failed to begin jury selection anew after granting a single *Batson* challenge. Thus, the conduct of Broadnax's *trial* counsel did not prevent Broadnax from obtaining a ruling on the merits of this complaint from the state appellate court. This Court independently concludes there is no reasonable likelihood that different or more emphatic objections by Broadnax's trial counsel with regard to Broadnax's *Batson* challenges would have resulted in a different result at trial or on direct appeal. This unexhausted ineffective assistance

claim fails to satisfy either prong of the *Strickland* standard and does not warrant federal habeas relief.[84]

## F. Failure to Rebut Dr. Price's Testimony

As explained in Section VII above, the scope of Dr. Price's rebuttal testimony was narrow (he testified to the characteristics of a psychopathic personality without ever stating that Broadnax actually possessed any of those traits). As explained in Appendix III below, Broadnax's lead and second chair trial counsel testified at length at the evidentiary hearing in Broadnax's state habeas corpus proceeding that they made a deliberate decision not to call a mental health expert to rebut Dr. Price's trial testimony because (1) they believed it might open the door to harmful hypothetical testimony on cross-examination by the prosecution, (2) none of the prosecution's mental health experts had testified Broadnax either was a psychopath or had ASPD, and (3) they felt they had obtained favorable admissions from Dr. Price on cross-examination. The state habeas trial court reasonably found this testimony credible.[85] The state habeas court also reasonably concluded this complaint failed to satisfy either prong of the *Strickland* test. Broadnax has presented this Court with no clear and convincing evidence showing the state habeas court's findings or conclusions on

---

[84] Insofar as Broadnax argues that he is entitled to federal habeas corpus relief based upon his state habeas counsel's alleged failure to adequately litigate a claim during the course of Broadnax's state habeas corpus proceeding, Broadnax misconstrues the holdings in the Supreme Court's opinions in *Martinez v. Ryan* and *Trevino v. Thaler*. *See* note 27 (explaining that those two opinions authorize relief from a finding of procedural default for an omitted claim of ineffective assistance by state *trial* counsel but do not furnish a basis for a free-standing claim of federal habeas relief and do not authorize a federal habeas court to entertain de novo review of a claim that was fully litigated in the state court but with a new set of evidence). Insofar as Broadnax seeks to present new evidence supporting this ineffective assistance claim which he failed to present during his state habeas corpus proceeding, his efforts are precluded by the Supreme Court's holding in *Cullen v. Pinsholster*. *See also* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").

[85] *See* note 80.

this claim were objectively unreasonable. This Court's independent review of the record compels a finding that the strategic decision-making of Broadnax's trial counsel on this point was objectively reasonable. Furthermore, given the narrow focus of Dr. Price's rebuttal testimony, this Court independently concludes there is no reasonable probability that, but for the failure of Broadnax's trial counsel to rebut Dr. Price's testimony, the outcome of the punishment phase of Broadnax's capital murder trial would have been any different.

Under the doubly deferential standard of review applicable under *Harrington v. Richter*, the Texas Court of Criminal Appeals' rejection on the merits of this ineffective assistance claim during the course of Broadnax's state habeas corpus proceeding was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in his state habeas corpus proceeding. The Court therefore denies this claim for relief.

### G. Failure to Cross-Examine/Rebut Expert Gang Testimony

As explained at length in Appendix III, Broadnax's trial counsel explained during their testimony in Broadnax's state habeas corpus proceeding that they decided not to challenge Officer Nelson's testimony regarding Broadnax's gang membership because (1) there was no evidence Broadnax's gang membership was related to the murder, (2) Broadnax had self-admitted to gang membership, and (3) it would be difficult to present a credible case that Broadnax's use of gang symbols was meaningless. The state habeas trial court reasonably found this testimony credible.[86] This Court independently concludes Broadnax's trial counsels' decision-making on this point was objectively reasonable. The state habeas court also reasonably found there was nothing false or

---

[86] State Habeas Court's Findings & Conclusions at 24 [42-6 ECF at 62 of 163].

misleading about Officer Nelson's testimony, a conclusion which this Court shares after review of the entirety of the trial record. Broadnax's trial counsel did introduce testimony from Broadnax's sister that she believed Broadnax was only a gang "wannabe," as opposed to a full-fledged gang member like their older brother. Broadnax's red and black spiral notebooks contained numerous drawings and rap lyrics which reflected Broadnax's fascination with gang culture in general and the Gangster Disciples in particular. This Court concludes that, under such circumstances, the state habeas court reasonably concluded Broadnax's complaints about his trial counsels' failure to cross-examine or rebut Officer Nelson's expert testimony failed to satisfy either prong of the *Strickland* test.

Under the doubly deferential standard of review applicable under the Supreme Court's holding in *Harrington v. Richter*, the Texas Court of Criminal Appeals' rejection on the merits of this ineffective assistance claim was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Broadnax's state habeas corpus proceeding. The Court therefore denies this claim for relief.

### XIII. INEFFECTIVE ASSISTANCE BY STATE APPELLATE COUNSEL

#### A. The Claim

Broadnax also argues that his state appellate counsel rendered ineffective assistance by failing to challenge the admission of Dr. Price's testimony on direct appeal.[87]

---

[87] 48 ECF at 108-12.

### B. Clearly Established Federal Law

The same two-pronged standard for evaluating ineffective assistance claims against trial counsel announced in *Strickland* applies to complaints about the performance of counsel on appeal. *See Smith v. Robbins*, 528 U. S. 259, 285 (2000) (holding a petitioner arguing ineffective assistance by his appellate counsel must establish both his appellate counsel's performance was objectively unreasonable and there is a reasonable probability that, but for appellate counsel's objectively unreasonable conduct, the petitioner would have prevailed on appeal). Thus, the standard for evaluating the performance of counsel on appeal requires inquiry into whether appellate counsel's performance was deficient, i.e., whether appellate counsel's conduct was objectively unreasonable under then-current legal standards, and whether appellate counsel's allegedly deficient performance "prejudiced" the petitioner, i.e., whether there is a reasonable probability that, but for appellate counsel's deficient performance, the outcome of the petitioner's appeal would have been different. *Smith v. Robbins*, 528 U. S. at 285. Appellate counsel who files a merits brief need not and should not raise every nonfrivolous claim but, rather, may select from among them in order to maximize the likelihood of success on appeal. *Smith v. Robbins*, 528 U. S. at 288; *Jones v. Barnes*, 463 U. S. 745, 751 (1983). The process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail is the hallmark of effective appellate advocacy. *Smith v. Murray*, 477 U. S. 527, 536 (1986); *Jones v. Barnes*, 463 U. S. at 751-52.

Where, as in Broadnax's case, appellate counsel presented, briefed, and argued, albeit unsuccessfully, one or more nonfrivolous grounds for relief on appeal and did not seek to withdraw from representation without filing an adequate *Anders* brief, the defendant must satisfy *both* prongs of the *Strickland* test in connection with his claims of ineffective assistance by his appellate counsel. *See Roe v. Flores-Ortega*, 528 U. S. 470, 477, 482 (2000) (holding the dual prongs of

*Strickland* apply to complaints of ineffective appellate counsel and recognizing, in cases involving "attorney error," the defendant must show prejudice); *Smith v. Robbins*, 528 U.S. at 287-89 (holding petitioner who argued his appellate counsel rendered ineffective assistance by failing to file a merits brief must satisfy both prongs of *Strickland*).

## C. Synthesis

Broadnax failed to present fairly his complaint of ineffective assistance by his state appellate counsel to the state courts. The Court will review it de novo.

For the reasons discussed in Section VII above, Broadnax's constitutional complaints about the admission of Dr. Price's testimony lack arguable merit. *See Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002) (rejecting the argument underlying Broadnax's complaint about Dr. Price's testimony that *Daubert* altered the rule in *Barefoot* authorizing mental health expert opinion testimony regarding future dangerousness). Broadnax's state appellate counsel did not render ineffective assistance by failing to assert a meritless constitutional challenge to the admission of Dr. Price's testimony. *See Davila v. Davis*, 137 S. Ct. at 2067 (declining to raise a claim on appeal is not deficient performance unless that claim was plainly stronger than those actually presented to the appellate court); *Smith v. Robbins*, 528 U.S. at 288 (to prove ineffective assistance on appeal for failure to raise a claim in a merits brief, a petitioner must show that a particular omitted nonfrivolous issue was clearly stronger than issues that appellate counsel did present); *Medellin v. Dretke*, 371 F.43d 270, 279 (5th Cir. 2004) (failure of appellate counsel to raise a meritless *Batson* claim on direct appeal was not ineffective assistance). For the same reasons identified in Section VII, Broadnax's constitutional complaint about the admission of Dr. Price's rebuttal punishment phase testimony was not a plainly stronger argument than the claims Broadnax's state appellate counsel actually raised on direct appeal. Broadnax's points of error on

direct appeal complaining of alleged *Batson* violations, while ultimately without merit, were clearly stronger than his newly proffered complaint about the admission of Dr. Price's rebuttal testimony.

Dr. Price emphasized on direct examination that he was not making a mental health evaluation of Broadnax and admitted on cross-examination that (1) psychopathy is not listed in the DSM-IV, (2) the closest thing to psychopathy in the DSM-IV is a personality disorder, (3) people who have the traits of psychopathy may not be a psychopath, and (4) some of the traits of a psychopath are consistent with those of an immature person. Broadnax's state appellate counsel could reasonably have believed that a complaint on direct appeal about the admission of Dr. Price's rebuttal testimony would not withstand applicable state harmless error analysis. *See Taylor v. State*, 268 S.W.3d 571, 592 (Tex. Crim. App. 2008) (explaining that, under Texas law, errors not of a constitutional dimension that do not affect the substantial rights of the defendant must be disregarded); *Neal v. State*, 256 S.W.3d 264, 284 (Tex. Crim. App. 2008) ("The error was not harmless if there is a reasonable likelihood that it materially affected the jury's deliberations.").

By the time of the punishment phase of Broadnax's capital murder trial, the jury had already found Broadnax guilty beyond a reasonable doubt of Swan's brutal murder in the course of a robbery. Broadnax's videotaped confessions to multiple television reporters and his audiotaped telephone conversations had been admitted into evidence and established beyond any doubt his lack of sincere contrition and genuine remorse for his crimes. Under such circumstances, even if erroneous under state law, the admission of Dr. Price's rebuttal testimony at the punishment phase of trial did not, in all reasonable likelihood, constitute reversible error under state law or rise above the level of harmless error under the *Brecht* standard. Therefore, this Court concludes there is no reasonable probability that, but for the failure of Broadnax's state appellate counsel to

challenge the admission of Dr. Price's punishment phase rebuttal trial testimony on direct appeal, the outcome of Broadnax's direct appeal would have been any different. This claim satisfies neither prong of the *Strickland* standard. The Court therefore denies this claim for relief.

## XIV. FREE-STANDING ACTUAL INNOCENCE CLAIM

Broadnax argues he has now presented new evidence showing that he is not a psychopath and, therefore, he is entitled to federal habeas corpus relief because he is "actually innocent" of the death penalty.[88] The Fifth Circuit does not, however, recognize federal habeas claims based on freestanding assertions of actual innocence. *Floyd v. Vannoy*, 894 F.3d 143, 155 (5th Cir. 2018), *cert. denied*, 139 S. Ct. 573 (2018); *Coleman v. Thaler*, 716 F.3d 895, 908 (5th Cir. 2013) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." (quoting *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000)); *Reed v. Stephens*, 739 F.3d 753, 766 (5th Cir. 2014) ("actual innocence is not an independently cognizable federal habeas claim" (quoting *Foster v. Quarterman*, 466 F.3d 359, 367 (5th Cir. 2006)). As explained above, Broadnax has failed to establish that a constitutional violation took place during his capital murder trial. Therefore, his assertion that he has new evidence showing that he is not a psychopath does not furnish an independent basis for federal habeas corpus relief.

Analysis of the lone Supreme Court opinion cited by Broadnax in support of his actual innocence claim further supports this conclusion. In *Sawyer v. Whitley*, 505 U.S. 333 (1992), the

---

[88] ECF no. 48 at 112-14. Broadnax's "new evidence" consists of the opinions of a new mental health expert that Broadnax does not satisfy the vast majority of the criteria for psychopathy, as listed by Dr. Price during his rebuttal testimony at the punishment phase of trial. This purported "new evidence" is indistinguishable from the affidavit and testimony which Dr. Edens gave during Broadnax's state habeas corpus proceeding summarized in Appendix III.

Supreme Court addressed the issue of "the standard for determining whether a petitioner bringing a successive, abusive, or defaulted federal habeas claim has shown he is 'actually innocent' of the death penalty to which he has been sentenced so that the court may reach the merits of the claim." *Sawyer*, 505 U.S. at 335.  The Supreme Court held "to show 'actual innocence' one must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under applicable state law.'"  *Id.*, 505 U.S. at 226.  The Supreme Court emphasized that a mere showing of the existence of additional or new mitigating evidence did not, per se, satisfy the foregoing standard: "the 'actual innocence' requirement must focus on those elements that render a defendant eligible for the death penalty, and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error."  *Id.*, 505 U.S. at 347.  At no point in *Sawyer* did the Supreme Court suggest that satisfying the standard set forth in that decision would entitle a federal habeas corpus petitioner to relief from a sentence of death.

Furthermore, Broadnax's proffered "new evidence" that he is not a psychopath does not even begin to approach the "actual innocence" test set forth in *Sawyer*.  Broadnax's jury did not answer the Texas capital sentencing special issue addressing future dangerousness affirmatively or the mitigation special issue negatively because of any of the mental health testimony offered during Broadnax's trial.  Dr. Price's punishment phase testimony listing the factors mental health professionals consider before diagnosing an individual as a psychopathic personality was not tied to Broadnax.  On the contrary, Dr. Price took great pains during his testimony to make clear he was not suggesting Broadnax possessed any of the traits of a psychopathic personality.  Thus, despite Broadnax's assertions in his federal habeas petition to the contrary, no one offered any testimony at Broadnax's trial establishing that Broadnax is a psychopathic personality.

Likewise, despite Broadnax's complaints in his federal habeas corpus petition, Dr. Lane never testified that Broadnax displays ASPD. Dr. Lane admitted during his cross-examination only that his notes indicated that, at one point during his treatment of Broadnax he wanted to attempt to rule out ASPD as a possible diagnosis but he was unable to make any further evaluation of a possible ASPD diagnosis because he lacked accurate information concerning Broadnax's behavior prior to age fifteen. Thus, there was no testimony during Broadnax's trial from Dr. Lane or anyone else establishing that Broadnax had ever been diagnosed with ASPD. The Court therefore, denies this claim for relief.

## XV. REQUEST FOR AN EVIDENTIARY HEARING

Broadnax requests an evidentiary hearing.[89] Insofar as Broadnax's claims in this federal habeas corpus proceeding were disposed of on the merits during the course of Broadnax's direct appeal or state habeas corpus proceeding, Broadnax is not entitled to a federal evidentiary hearing to develop new evidence attacking the state appellate or state habeas court's resolution of Broadnax's claims. Under AEDPA, the proper place for development of the facts supporting a federal habeas claim is the state court. *See Harrington v. Richter*, 562 U. S. at 103 ("Section 2254(d) thus complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding."); *Hernandez v. Johnson*, 108 F.3d 554, 558 n.4 (5th Cir. 1997) (holding AEDPA clearly places the burden on a federal habeas petitioner to raise and litigate as fully as possible his federal claims in state court). Where a petitioner's claims have been rejected on the merits, further factual development in federal court is effectively precluded by virtue of the Supreme Court's holding in *Cullen v. Pinholster*, 563 U. S. at 181-82:

---

[89] 48 ECF at 152.

We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time *i.e.,* the record before the state court.

Thus, Broadnax is not entitled to a federal evidentiary hearing on any of his claims which were rejected on the merits by the state courts, either on direct appeal or during his state habeas corpus proceeding.[90]

With regard to the new factual allegations and new legal arguments Broadnax failed to fairly present to the state courts, and for which this Court has undertaken de novo review, Broadnax

---

[90] For the reasons explained in note 27, Broadnax is not entitled to an evidentiary hearing in this Court for the purposes of developing and presenting new facts or new evidence supporting claims which he fully litigated on direct appeal or in his state habeas corpus proceeding. The Supreme Court's opinions in *Martinez v. Ryan* and *Trevino v. Thaler* dealt with situations in which a state habeas counsel utterly failed to assert a claim of ineffective assistance by trial counsel during the course of a state habeas corpus proceeding, thus resulting in a procedural default on that omitted claim. Neither of those cases dealt with a situation in which an ineffective assistance claim (or any other complaint) was fully litigated in a state post-conviction proceeding and the federal habeas petitioner sought to re-litigate the claim with new or additional evidence in federal court. Thus, Broadnax's new complaints in this Court that his state habeas counsel should have presented new or additional evidence during his state habeas corpus proceeding (or done a better job arguing Broadnax's state habeas claims) do not fall within the narrow scope of the holdings in *Martinez/Trevino*.

There is no clearly established federal law holding that a federal habeas corpus petitioner is entitled to an evidentiary hearing based on an assertion that his state habeas counsel could have done a better job litigating a particular claim that was resolved *on the merits* in a state post-conviction proceeding. On the contrary, the Supreme Court's holding in *Cullen v. Pinholster* implicitly rejects such a rule. Such a rule would also contravene the Congressional intent underlying AEDPA, which was, in part, to promote the principle of federalism. *See Gonzalez v. Thaler*, 565 U.S. 134, 144 (2012) (recognizing Congress' intent in adopting AEDPA was to eliminate delays in the federal habeas review process); *Williams v. Taylor*, 529 U.S. 420, 436 (2000) (recognizing Congress intended AEDPA to further the principles of comity, finality, and federalism); *Caldwell v. Dretke*, 429 F.3d 521, 528 (5th Cir. 2005) (recognizing Congress's stated intent in adopting AEDPA was to "curb the abuse of the statutory writ of habeas corpus" and "address problems of unnecessary delay.").

is likewise not entitled to an evidentiary hearing. In the course of conducting de novo review, this Court has assumed the factual accuracy of all the specific facts alleged by Broadnax in support of his unexhausted claims for relief. Even when the truth of all of Broadnax's new factual allegations supporting his unexhausted claims is assumed, his unexhausted claims do not warrant federal habeas relief. *See Schriro v. Landrigan*, 550 U. S. 465, 474 (2007) ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."). Thus, Broadnax is not entitled to an evidentiary hearing with regard to any of his unexhausted claims.

## XVI. CERTIFICATE OF APPEALABILITY

Under AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under section 2254, the petitioner must obtain a Certificate of Appealability ("CoA"). *Miller-El v. Johnson*, 537 U.S. 322, 335-36 (2003); 28 U.S.C. § 2253(c) (2). Likewise, under AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted. *See Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10 (5th Cir. 2002) (holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997) (holding the scope of appellate review of denial of a habeas petition limited to the issues on which CoA has been granted). In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted. *Crutcher v. Cockrell*, 301 F.3d at 658 n.10; 28 U.S.C. §2253(c) (3).

A CoA will not be granted unless a petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Miller-El v. Johnson*, 537 U.S. at 336; *Slack v. McDaniel*, 529 U.S. 473, 483 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893

(1983). To make such a showing, the petitioner need *not* show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard v. Dretke*, 542 U.S. at 282; *Miller-El v. Johnson*, 537 U.S. at 336. This Court is required to issue or deny a CoA when it enters a final Order such as this one adverse to a federal habeas petitioner. *Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts.*

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Johnson*, 537 U.S. at 338 (*quoting Slack v. McDaniel*, 529 U.S. at 484). In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its procedural ruling. *See Slack v. McDaniel*, 529 U.S. at 484 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct). This Court did not dispose of any of Broadnax's federal habeas corpus claims on procedural grounds.

In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor. *Avila v. Quarterman*, 560 F.3d 299, 304 (5th Cir. 2009); *Bridgers v. Dretke*, 431 F.3d 853, 861 (5th Cir. 2005). Nonetheless, a CoA is not automatically granted in every death penalty habeas case. *See Miller-El v. Cockrell*, 537 U.S. at 337 ("It follows that issuance of a COA must not be *pro forma* or a matter of course."). The deferential standard of review applied to claims of ineffective assistance adjudicated on the merits in the state courts has particular bite in evaluating the appealability of ineffective assistance claims—the Supreme Court requires that federal courts "use a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow,* 571 U.S. at 15.

Reasonable minds could not disagree with this Court's conclusions that (1) all of Broadnax's complaints about the performance of his trial counsel and state appellate counsel fail to satisfy both prongs of the *Strickland* standard, (2) his state appellate court reasonably concluded Broadnax's *Batson* claims were without merit, (3) Broadnax's challenges to the Texas capital sentencing scheme and his punishment phase jury charge are all foreclosed by well-settled Fifth Circuit precedent, (4) Broadnax's complaints about the trial court's admission of Officer Nelson's and Dr. Price's expert testimony lack arguable merit, (5) because he has identified no other capital murderer who has ever given televised interviews in which he demanded to receive a death sentence, Broadnax's selective prosecution claim lacks arguable merit, (6) Broadnax's challenge to the constitutionality of the death penalty is foreclosed by the holding in *Teague v. Lane,* (7) Broadnax's complaint about the search of his jail cell is foreclosed by the holding in *Stone v. Powell*, (8) the state trial and appellate courts reasonably rejected Broadnax's challenge for cause to qualified juror no. 43, (9) Broadnax's challenges to the admission of his media interviews are foreclosed by the state court's reasonable factual finding that the television reporters were not

acting as state agents and by the jury's implicit factual determination at the guilt-innocence phase that Broadnax was sufficiently mentally competent to give his interviews, (10) Broadnax's free-standing actual innocence claim does not furnish a basis for federal habeas relief, and (11) Broadnax is not entitled to an evidentiary hearing in this Court.

Accordingly, it is hereby ORDERED that:

1.      All relief requested in Broadnax's first amended petition and reply brief (ECF nos. 48 & 69) is **DENIED.**

2.      Broadnax's request for an evidentiary hearing is **DENIED.**

3.      Broadnax is **DENIED** a Certificate of Appealability on all his claims.

4.      All other pending motions are **DISMISSED AS MOOT**.

Signed this 23rd day of July, 2019.

**DAVID C. GODBEY**
**UNITED STATES DISTRICT JUDGE**

# APPENDICES

## I. SYNOPSIS OF EVIDENCE FROM GUILT/INNOCENCE PHASE

In the first of the interviews Broadnax gave to television reporters on June 23, 2008, Broadnax met with Channel 11 reporter Steven Antonio Pickett. Copies of Broadnax's interview by Pickett appear among the records from Broadnax's trial as DVD's marked as State Exhibit nos. 403 & 404. Exhibit 404 contains subtitles. Initially during the Pickett interview, Broadnax defiantly denied any knowledge of, or involvement in, the murders. After Pickett read Broadnax information from the affidavit included in Broadnax's arrest warrant, however, Broadnax's entire demeanor changed radically. Broadnax confessed that he and his cousin Cummings had traveled to downtown Dallas looking to "hit a lick," decided to take a train to downtown Garland instead, and searched for a victim to rob. When the victims exited a recording studio late at night, Broadnax described how he approached them in the parking lot, talked briefly, and then asked for a cigarette. Broadnax then described how, when one of the victims reached to get a cigarette, Broadnax shot the first victim, then shot the driver of the vehicle. Broadnax then described how he subsequently shot each of his victims in the head because they were both still moving. Broadnax said he and Cummings rifled through their victims' pockets, obtained the car keys, and fled the scene in their victims' Crown Victoria, with Cummings driving. Broadnax made it clear he was the one who had the gun and fired all of the shots that night. While Broadnax claimed at one point during his Pickett interview that he "blanked out" during the shooting, his highly detailed account of exactly how he approached and shot both of his victims (and his detailed accounts of exactly how they each responded to the shots) belie any assertion that Broadnax was unaware or not otherwise in full control of his actions. In response to a question by Pickett about what he would say to the widow of one of his victims, Broadnax replied "I laugh in her face." Broadnax later responded to

questions by Pickett about his future by glumly saying "I ain't got no reason to live" and "my life was [expletive deleted] up since I was born." Pickett testified that he had not spoken with law enforcement before he interviewed Broadnax, no one from law enforcement had asked him to do the interview, and he had never worked for law enforcement. Statement of Facts from Broadnax's Trial (henceforth "S.F. Trial"), testimony of Steven Antonio Pickett, Volume 45, at 120-21 [41-19 ECF at 10050]. Pickett also testified that Broadnax never expressed any remorse for his crimes, showed no signs of intoxication during the interview, and gave answers that appeared to Pickett to be both rational and fully responsive to Pickett's questions. *Id.*, 45 S.F. Trial at 128-30 [41-19 ECF at 42 of 84]. On cross-examination, Pickett admitted that during the interview (1) Pickett encouraged Broadnax to tell the truth by saying "if you tell me the truth, your life will be spared," (2) Broadnax claimed to have been "smoking blunts" the night of the offense, and (3) Broadnax asserted at various times that he "blanked out" as the robbery began, "everything went colors," and "I went Psycho." *Id.*, 45 S.F. Trial at 142-44 [41-19 ECF at 45-46 of 84]. On redirect, Pickett testified Broadnax said he did not have a conscience and did not appear to be having any problems during the interview remembering the events on the night of the shootings. *Id.*, 45 S.F. Trial, at 148-49 [41-19 ECF 47 of 84].

A copy of the interview subsequently obtained by Channel 5 reporter Ellen Goldberg later the same day appears among the state court record as State Exhibit no. 405 (with subtitles), which was played in open court. During the Goldberg interview, Broadnax once again described in great detail exactly how he approached his victims in the parking lot, asked for a cigarette, and when one of the victims reached for a cigarette, Broadnax shot him, shot the other victim, and then shot both victims again in the head to make sure they were both dead. Broadnax emphasized that while Cummings went through the pockets of their victims, it was Broadnax who had pulled the trigger.

While Broadnax displayed a defiant demeanor throughout most of his interview, he did admit near the end of his time with Goldberg "I wish I wouldn't have had the pistol on me." Goldberg testified in part that she made no threats or offers to induce Broadnax to consent to be interviewed, she was aware of no such threats or offers, no one had asked her to get a confession from Broadnax, and she had never worked for law enforcement. Testimony of Ellen Goldberg, 45 S.F. Trial at 274-76 [41-19 ECF at 78-79 of 84].

The interview conducted the same date by Channel 4 reporter Shaun Rabb appears among the state court as State Exhibit nos. 406 & 407 (407 has subtitles). During this interview, Broadnax once again stated that he "blanked out" during the robbery but then described in great detail how his victims reacted when he first shot them and how he shot them in the head to make sure they were both dead. During Rabb's interview, Broadnax briefly appeared to break down emotionally, hanging up the phone and walking out of the interview room when Rabb asked him to tell him what was going through his head. But Broadnax immediately returned and confessed "I kinda regret what I did" and responded to Rabb's question about what his life had been like with "Hell." Broadnax's defiant demeanor quickly returned, however, and he informed Rabb "I don't want life." Broadnax also informed Rabb that if given the chance, he would tell his victims' families "[expletive deleted] 'em, straight up." Broadnax also told Rabb "I got no family. You see who snitched on me" and "weed don't make you blank out." Rabb testified that no one suggested or asked him to get a statement from Broadnax. He had never worked for law enforcement or in law enforcement, and he did not act under any authority or color of law when he interviewed Broadnax. Testimony of Shaun Rabb, 46 S.F. Trial at 221-22 [41-20 ECF at 98 of 107].

During his interview by Goldberg (contained on State Exhibit no. 405), when asked by Goldberg if he felt any remorse over what he had done, Broadnax silently shook his head from

side to side.  When asked by Goldberg what he thought would happen to him, Broadnax replied "Hopefully, the death penalty."  Broadnax followed that comment by explaining that if they did not give him the death penalty, he would kill again, declaring there would be more bodies if he did not receive the death penalty.  When Goldberg asked him what he had to say to the families of his victims, Broadnax replied "[expletive deleted] his family too.  Both of them."  After Broadnax briefly confessed that he regretted that he had his pistol with him the night of the murders, Goldberg again sought to elicit some expression of remorse but Broadnax once more repeated his earlier crude comments about his victims' families, saying "[expletive deleted] them and their families."

Broadnax's crude, dismissive comments about his victim's families were consistent throughout his other interviews.  During his interview by Pickett (contained in State Exhibit nos. 403 & 404), Broadnax replied to a question about what he would tell the widow of one of his victims with "I laugh in her face."  During his interview by Rabb (contained on State exhibit nos. 406 & 407), Broadnax made a similarly vulgar reply when Rabb asked what he would say to his victims' families.

In addition to the television reporters, the prosecution called (1) Swan's father, who identified a photograph of the vehicle which Broadnax was driving and in which Cummings and another young male were passengers at the time they were stopped in Texarkana, Texas the day after the murders as his son's vehicle (Testimony of Craig Anthony Swan, 45 S.F. Trial at 105, 108 [41-19 ECF at 36-37 of 84]); (2) a nurse at the Dallas County Jail, who testified that Broadnax (a) informed her he had last drank beer on June 1 and last used marijuana on June 18 prior to his arrest, (b) did not appear to be under the influence of alcohol or drugs when she screened him on June 21, and (c) was placed in closed behavioral observation and referred for a psychological

evaluation because of the severity of the charges against him, i.e., the high profile nature of the case against him (Testimony of Deborah Ann Busby, 45 S.F. Trial at 163-69 [41-19 ECF at 51-52 of 84]); (3) an acquaintance of Broadnax's aunt, who testified that the day after the double murder/robbery (a) she saw Broadnax and Cummings at Broadnax's aunt's residence driving a Crown Victoria vehicle, (b) Broadnax and Cummings said they had "hit a lick," which she construed as meaning they had committed a robbery, (c) Broadnax was carrying a pistol, (d) Cummings looked scared but Broadnax appeared "bold," (e) Broadnax appeared to be the leader of the two, (f) she saw Stephen Swan's identification, (g) she saw various items in the trunk of the Crown Victoria, (h) Broadnax and Cummings said they planned to sell the vehicle, (i) later that same day she saw Stephen Swan's picture on the television and realized Broadnax and Cummings had robbed and murdered Swan, and (j) she telephoned police to report what she had seen and heard and was interviewed later that day (Testimony of Evelyn Barg, 45 S.F. Trial at 208-29 [41-19 ECF at 61-67 of 84]); (4) a Texarkana police officer who stopped the Crown Victoria vehicle which Broadnax was driving on June 19 because that vehicle was in a high crime area and bore a set of license plates that did not match the make or model of that vehicle, who testified that (a) Broadnax said he had no driver's license but gave consent for a search of the vehicle, (b) a call back reported the vehicle had been involved in a double homicide and that there were outstanding warrants on all three occupants of the vehicle, (c) a concealed handgun license owned by Stephen Swan was found in the vehicle during an inventory search, and (d) throughout the traffic stop and ensuing arrest, Broadnax was calm and collected and showed no sign of intoxication (Testimony of Jeff Johnston, 45 S.F. Trial at 235-67 [41-19 ECF at 69-77 of 84]); (5) the Dallas County medical examiner who performed the autopsy on Stephen Swan, who testified that (a) Swan died as a result of multiple gunshot wounds to the head and chest, (b) there was no natural disease

apparent, (c) Swan suffered one intermediate range (i.e., twelve-to-eighteen inches from the skin) gunshot wound to the right temporal area which entered above the right eye and exited the base of the skull on the left side just in front of the ear, (d) this entrance wound showed signs of stippling, (e) this gunshot wound caused severe immediate and devastating traumatic brain injury as well as brain contusion, subarachnoid hemorrhage, and multiple fractures of the base of the skull, (f) Swan also suffered a gunshot wound to the chest of indeterminate range (because clothing masked any stippling) which entered the left chest, hit the upper lobe of the left lung and exited through the lower lobe of the left lung through the ninth rib and lodged in back muscle, (g) she was able to recover this bullet, and (h) the chest wound would have been devastating but not as immediately fatal as the head wound (Testimony of Dr. Amy Gruszecki, 46 S.F. Trial at 12-36 [41-20 ECF at 45-51 of 107]); (6) a Garland police officer, who testified he recovered (a) the handgun that turned out to be the murder weapon after Cummings directed law enforcement officers to the precise location of that weapon under a mattress in a bedroom inside a specific apartment and (b) a set of tools belonging to Swan that Cummings and Broadnax pawned on June 19 (Testimony of Clint McNear, 46 S.F. Trial at 37-59 [41-20 ECF at 52-57 of 107]); (7) a Garland forensic investigator who photographed and processed the crime scene where the bodies were discovered, as well as the Crown Victoria vehicle and the clothing of all three occupants of the Crown Victoria, who identified (a) photographs of various items recovered at the crime scene, including spent shell casings and bullets, (b) photographs of blood spatter on the vehicle, and (c) various items of clothing found inside the vehicle (Testimony of Isabel Giannone, 46 S.F. Trial at 61-161 [41-20 ECF at 58-83 of 107]); (8) a forensic firearms examiner, who testified the 9 mm Browning short semi-automatic pistol recovered by law enforcement officers was the same weapon that fired the shell casings recovered at the crime scene and the bullets recovered during the autopsies of Swan

and Butler (Testimony of Susan Allen, 46 S.F. Trial at 162-83 [41-20 ECF at 83-88 of 107]); (9)

a forensic scientist with the Texas Department of Public Safety, who testified that (a) DNA

recovered from the left side of the handgun was consistent with Swan's DNA, (b) blood found on

a pair of Nike tennis shoes belonging to Broadnax was consistent with Butler's blood, and (c)

DNA obtained from a swab of the handgun's trigger was consistent with both Broadnax and

Cummings (Testimony of James Nichols, 46 S.F. Trial at 184-208, 41-20 ECF at 88-94 of 107]);

and (10) the Dallas County Jail detention officer who escorted Broadnax to his interviews on the

morning of June 28, 2008, who testified via deposition that (1) Broadnax's demeanor during his

transport was not combative, (2) Broadnax was not talking to himself or drooling, (3) she had

received training in mental health issues, (4) there was no indication Broadnax was behaving in a

psychotic manner, (5) Broadnax did not say he did not want to go to his interviews, and (6) she

asked him before each interview if he wanted to do it and he said he did (Testimony of Christie

Hicklen, 47 S.F. Trial at 158-73 [41-21 ECF at 48-52 of 60].

The defense called (1) a licensed psychological professional counselor who evaluated

Broadnax on the morning of June 23, i.e., the day of Broadnax's interviews, who testified (a) he

performed a mental health screening and suicide risk assessment, (b) Broadnax reported he was

suffering from auditory hallucinations but not any directing him to take action, (c) Broadnax's

primary symptoms were irritability and anger, (d) Broadnax reported that he believed he had been

set up, (e) Broadnax reported that had last used weed, i.e., smoked "wet blunts," two or three days

before, (f) Broadnax's affect was dramatic and he displayed severe agitation, (g) he referred

Broadnax for a psychiatric evaluation, (h) he again saw Broadnax on June 24 and at that time he

placed Broadnax on suicide protection protocol, which required the removal of Broadnax's

clothing and observation every fifteen minutes, because Broadnax was guarded, irritable, and

angry, and because of Broadnax's statements to the media the day before that he was not going to prison for life, (i) he did not note any indication of mental illness, (j) Broadnax had no problems responding to him and was capable of speaking voluntarily, and (k) he was not confident in the accuracy of the information Broadnax related to him (Testimony of Jason Varghese, 47 S.F. Trial at 17-67 [41-21 ECF at 13-25 of 60]); (2) a psychiatrist who also evaluated Broadnax on the morning of June 23, who testified that (a) Broadnax informed her he was high at the time he arrived at the Dallas County Jail, (b) Broadnax was alert and oriented and denied depression or anxiety, (c) Broadnax was guarded, disrespectful, irritable, and angry, (d) his speech was normal and goal directed, his thought processes were congruent, (e) Broadnax gave a history of smoking pot daily since age twelve but last used on June 21 [despite the fact he had been in custody since June 19], (f) her notes indicated she felt she needed further study to rule out malingering and Antisocial Personality Disorder, (g) she evaluated Broadnax as functioning in the seventieth percentile, (h) she concluded to keep Broadnax in close behavioral observation for safety reasons and did not prescribe any medications at that time, (i) while Broadnax claimed to experience auditory hallucinations, she saw nothing that indicated Broadnax needed immediate help, (j) Broadnax did not appear to be responding to any internal stimuli, (k) Broadnax asked to see a "psych lawyer," (l) there was no objective evidence Broadnax was hearing voices, (m) an evaluation performed by another jail employee on June 24 concluded Broadnax was manipulative, inappropriate, impatient, and irritable, (n) after his June 24 evaluation, Broadnax was taken off of suicide prevention protocol and given Ibuprofen for a bad molar, (o) Broadnax told his evaluator on June 24 "nothing is wrong with me," and requested transfer to the general jail population (Testimony of Dr. Haideh Mirmesdagh, 47 S.F. Trial at 69-119 [41-21 ECF at 26-38 of 60]); and (3) the Dallas County Sheriff's Department's public information officer, who testified (a) jail policy allows inmates to

agree to be interviewed in writing, (b) she has no role in deciding whether a particular inmate has a right to speak with the media, (c) she received multiple interview requests from members of the media to speak with Broadnax, (d) she was unaware Broadnax had been seen by mental health professionals during his stay at the jail, (e) she forwarded the media interview requests to the jail for them to be presented to Broadnax, (f) she went to the jail the day of Broadnax's interviews because both Broadnax and Cummings had agreed to multiple interviews and those interviews would be taking place simultaneously, (g) when she received a letter from Broadnax's court-appointed attorney requesting that Broadnax not be interviewed further, she thereafter allowed no more interviews of Broadnax, (h) she does not believe she had the authority to deny an inmate access to the media, and (i) at no time did she act out of a desire to get Broadnax to confess, and (j) she never saw anything to suggest Broadnax's will had been overcome (Testimony of Kimberly Leach, 47 S.F. Trial at 121-48 [41-21 ECF at 38-46 of 60]).

In rebuttal, the prosecution called a Dallas County Jail detention officer who escorted Broadnax to his interviews on June 23, who testified (1) during her transport of Broadnax to the interview area, Broadnax's demeanor was not combative and she did not feel the need to request assistance, (2) Broadnax was not talking to himself, drooling, or otherwise showing any signs he was psychotic, (3) Broadnax never indicated he did not want to give his interviews, (4) she never felt any concern for her safety while transporting Broadnax, (5) when she asked Broadnax before each interview if he wanted to be interviewed, he said he did. Testimony of Christie Hicklin, 47 S.F. Trial at 158-73 [41-21 ECF at 48-52 of 60]. Prior to both parties resting at the guilt-innocence phase of trial, they stipulated on the record that Broadnax was placed on suicide prevention protocol after he gave his interviews. 47 S.F. Trial at 173 [41-21 ECF at 52 of 60].

## II. SYNOPSIS OF EVIDENCE FROM PUNISHMENT PHASE

At the punishment phase of Broadnax's capital murder trial, Butler's mother testified in part that (1) her son was married and had two very young children, (2) Swan and her son were good friends, (3) Swan often helped her son after hours at her son's recording studio, and (4) the last song recorded on her son's recording machines when her family went to the studio after the murders was a song written by Swan titled "We All Die Before Our Time."  Testimony of Theresa Butler, 48 S.F. Trial at 28-37 [41-22 ECF at 19-22 of 78].  Swan's mother testified in part that (1) Stephen was her oldest child, (2) at a young age Stephen learned to play a variety of musical instruments and self-trained his voice, (3) he had battled cancer and only recently been diagnosed in remission, (4) Stephen often volunteered to help Matt Butler at his recording studio, and (5) Stephen's death had been devastating to their family and his friends.  Testimony of Jean Swan, 48 S.F. Trial at 62-66 [41-22 ECF at 28-29 of 78].

The medical examiner who performed Butler's autopsy testified that (1) Butler died as a result of multiple gunshot wounds, (2) one of those gunshot wounds, which showed evidence of stippling, entered Butler in the left side of his face, went through the mandible, through the back of the tongue, and exited the left side of his face near the jawline, (3) a second gunshot wound entered the right side of Butler's torso near the right nipple and may have been associated with a gunshot wound to Butler's arm, (4) another gunshot wound passed through Butler's arm and re-entered Butler's body on the right side of his chest near the armpit, (5) this bullet passed through Butler's arm, entered the right side of the chest, passed through the right lung in a downward trajectory, and went through the liver and into the abdomen, where it was recovered fairly low in the body near the first lumbar vertebrae, (6) another gunshot wound entered Butler in the right side of his back, passed through a rib, through the middle of the chest, perforating a couple of large

blood vessels near the heart, traveling in a back-to-front, right-to-left trajectory, (7) yet another gunshot wound entered and exited Butler's left shoulder, and (8) he was able to recover two bullets from Butler's body during autopsy. Testimony of Tracy Dyer, 48 S.F. Trial at 39-61 [41-22 ECF at 22-28 of 78].

The president and chief operating officer of Value Added Communications testified that (1) his company had contracted to furnish inmate telephone system at the Dallas County Jail during the time Broadnax was an inmate there, (2) all inmate telephone calls were made with a personal identification number and the receiving party had to accept a call from the jail, (3) other than "legal calls," all calls from the jail were recorded, and (4) State Exhibit no. 425 was a call log of Broadnax's calls beginning on September 15, 2008. Testimony of Mark Turner, 48 S.F. Trial at 72-86 [41-22 ECF at 30-34 of 78].

One investigator from the Dallas County District Attorney's Office (1) identified State Exhibit nos. 571 and 572 as a complete set of the recordings of all of Broadnax's telephone calls; (2) identified State Exhibit nos. 544 through 558 as recordings of individual telephone calls made by Broadnax; (3) identified Broadnax's voice on State Exhibit no. 544 in a conversation between Broadnax and his sister on January 26, 2009 during which, in response to a question from his sister regarding the family of his victims, Broadnax responded "[expletive deleted] the family!"; and (4) identified Broadnax's voice on a January 9, 2009 telephone call in which Broadnax explained that he had been involved in a fight with a Special Response Team at the jail during a shakedown of his cell. Testimony of David Barger, 48 S.F. Trial at 86-113 [41-22 ECF at 34-41 of 78].

A different investigator (1) testified he went to the jail on June 19, 2009 to photograph the contents of Broadnax's cell during a shakedown, (2) identified numerous photographs of the contents of Broadnax's cell, including numerous books, as well as numerous drawings on the walls

of Broadnax's cell, (3) testified it was not unusual to photograph the inside of a prisoner's cell during a shakedown in high profile cases, (4) testified that during the shakedown, jail officials discovered Broadnax had a blade from a disassembled razor hidden inside his cell, (5) testified that among the more than forty books observed inside Broadnax's cell were copies of Sun Tzu's *The Art of War* and other books titled *The Art of Seduction* and *The 48 Laws of Power*, (6) in addition to the razor blade, other contraband items found inside Broadnax's cell included a loose pill hidden under a magazine and a pornographic photograph hidden inside a Bible, and (7) the contents of Broadnax's cell included a story written apparently by Broadnax in which he described "hitting a lick" and multiple drawings of six-pointed stars and pitchforks and images resembling those on Tarot cards. Testimony of Darrell Doty, 49 S.F. Trial at 35-73 [41-23 ECF at 73-111 of 198].

State Exhibit no. 565 is a recording of a very brief portion of a telephone conversation on January 12, 2009 in which Broadnax asks his mother to obtain and send to him copies of *The Art of War* and *The Art of Seduction*.

A Dallas County Jail Special Response Team officer testified that (1) all jail cells at the Dallas County Jail are routinely shaken down, i.e., searched for weapons and contraband, two to three times each week, (2) she supervised a shakedown of Broadnax's cell on July 23, 2008, (3) Broadnax exited his cell when directed to do so but refused her directives to face the wall in the hallway and keep his hands on the wall, (4) Broadnax spoke aggressively to her, (5) eventually, Broadnax had to be taken down by multiple officers, (5) Broadnax was then taken to the nurse for evaluation, and (6) while being transported to the nurse and after arriving at the infirmary, Broadnax remained noncompliant, cursing and refusing to answer the nurse's questions. Testimony of Schesser Rachel Kirvan, 48 S.F. Trial at 130-68 [41-22 ECF at 45-54].

A Dallas County Jail detention officer testified that (1) on January 21, 2009 he broke up a fight between Broadnax and another inmate named Trevann Miller in the jail's gym, (2) he did not see how the fight began, (3) once he and other detention officers managed to separate Broadnax and inmate Miller, Broadnax was still trying to get to Miller, (4) both inmates received fifteen-day restrictions as a result of the fight, (5) State Exhibit nos. 574-75 were photographs that accurately depicted inmate Miller's facial injuries after the fight and State Exhibit no. 576 was a photograph that accurately depicted Broadnax's lack of injuries after the fight, and (6) State Exhibits nos. 562 and 563 were recordings of telephone conversations in which Broadnax discussed his fight with inmate Miller.  Testimony of Morris Contreras, 48 S.F. Trial at 173-97 [41-22 ECF at 56-62 of 78].

State Exhibit no. 562 contains recordings of three very brief snippets of conversation from January 22, 2009 between Broadnax and his mother.  In pertinent part, Broadnax explained during those three brief segments of conversation that (1) his hand was swollen from a fight he had the previous day with another inmate after he struck the inmate in the mouth, (2) he had written more rap songs, and (3) he joked that it was possible to smoke inside the jail but only if you didn't get caught.  State Exhibit no. 563 contains a brief conversation from January 21, 2009 in which Broadnax describes in detail how he fought with another inmate because he felt the other inmate had disrespected him the day before and that when they reached the gym that day, the two men simply began fighting.

A Dallas County Jail detention officer testified that (1) on May 13, 2009 while he was escorting Broadnax and another inmate to court, Broadnax suddenly and without warning turned around and struck the other inmate who was walking single file directly behind Broadnax, (2) Broadnax attempted to punch the other inmate in the face, (3) the other inmate, Matthew Utley,

was much shorter than Broadnax and ducked when he saw Broadnax's fist approaching, (4) Broadnax struck Utley in the arm with sufficient force that, had the blow landed on Utley's face, it could have knocked Utley out, (5) the assault was unprovoked as far as he could tell, (6) Broadnax never said why he decided to strike Utley, and (7) after the assault, Broadnax told him that he should have allowed Broadnax to strike Utley again. Testimony of Marcos Gutierrez, 48 S.F. Trial at 198-215 [41-22 ECF at 62-66 of 78].

The inmate whom Broadnax assaulted in May 2009 testified that (1) he was in jail in May 2009 for a variety of charges, including domestic violence, felony injury to a child, and felony retaliation, (2) he later received deferred adjudication on all his charges, (3) trash talking was common in the jail, especially late at night, (4) Broadnax and another inmate named D'Angelo often yelled at one another all night long, (5) Broadnax and other inmates often picked on him because of his small stature, (6) Broadnax beat him up a lot – almost every day, (7) he did not know why Broadnax was angry with him but Broadnax had attempted to get him to give up his prescription medications, which he refused to do, (8) he often did not go to recreation because he did not want Broadnax shaking him down for his medications and it was too violent at recreation, (9) he never gave Broadnax any of his pills, (10) inside the jail inmates often used strings they pulled off their bedding to pass items from one cell to another, (11) on the day Broadnax assaulted him, he saw the punch coming and was able to move enough to avoid getting hit in the face, (12) Broadnax struck him in the arm, (13) he did not strike back but just stepped back after Broadnax struck him, (13) he denied hitting or kicking Broadnax or saying anything to antagonize Broadnax, (14) he had been in the general population but was beaten several times and that was why he preferred to be in a single cell, (15) Broadnax behaved like a bully, trash talking and making threats, using a lot of fighting words, (16) he denies ever calling anyone a racial epithet, taunting

anyone inside the jail, or calling anyone a "young mutt," (17) Broadnax was the meanest, "baddest" person in their area of the jail, (18) Broadnax bragged about taking money from others in the free world, (19) Broadnax said that he would not leave the jail alive, (20) Broadnax spoke as if he were a member of a gang, often saying the day he joined his gang was his "B day, and (21) Broadnax often said that eventually he would get to Utley.  Testimony of Matthew Utley, 48 S.F. Trial at 216-57 [41-22 ECF at 66-77 of 78].

A member of the Dallas Police Department's gang unit testified that (1) he had received on-the-job training in street gangs, attended conferences and classes concerning gang activity, and was a member of the Texas Gang Investigators Association, (2) his job was to gather intelligence on gang activity, (3) doing research into gangs often includes using information posed by the gangs themselves on Internet web sites, (4) he had watched the videos of Broadnax's media interviews, listened to Broadnax's telephone conversations, reviewed the documents found in the vehicle in which Broadnax was arrested and the documents and drawing taken from Broadnax's jail cell, to determine whether Broadnax was associated with a gang, (5) during one of his televised interviews, Broadnax declared that he was "folk" and threw up a hand gestures of a pitchfork, which he believed were indications of gang membership, (6) he believed Broadnax's recurring use of the term "Folks" during conversations and interviews was a reference to the "Folk Nation," a loose allegiance of gangs operating between Chicago and Shreveport, which included the "Gangster Disciples" and most of the "Crips," (7) members of these gangs often refer to themselves as "folk," (8) the Gangster Disciples were a gang founded in Chicago, (9) members of the Gangster Disciples used an upward directed pitchfork hand signal and a six-pointed star as ways of identifying themselves, (10) the Gangster Disciples often used the letters "G" and "D" and the numbers "7" and "4" in their writings, including when they tagged property, (11) the use of "7"

and "4" was because those were the numbers of the letters "G' and "D" in the alphabet, (12) in one of Broadnax's telephone conversations, Broadnax used the term "OG74" which was a reference to an "Original Gangster," i.e., an "old school" or longtime member of the Gangster Disciples, (13) during the same telephone conversation, Broadnax admitted that he was a member of "that organization," (14) the Gangster Disciples sell narcotics, commit murders, and commit aggravated robberies to fund their organization, (15) while the Gangster Disciples had once walked with the Reverend Jesse Jackson and helped to lead protests in Chicago, more recently, the group had turned to criminal activity to fund itself, (16) the founder and chairman of the Gangster Disciples was Larry Hoover, to whom Broadnax referred in one of his jail writings as "King Hoover," (17) in a letter Broadnax received from someone in Flint, Michigan, he identified the phrase "Gangstas make the world go round," (18) when tagging property, the Gangster Disciples often put wings on the figures they create, much like the Broadnax's addition of wings to a heart and a bikini-clad female found in Broadnax's jailhouse drawings, (19) two spiral notebooks found in the trunk of the victim's car among Broadnax's suitcases contained numerous drawings depicting pitchforks, six-pointed stars, winged creatures, "GD74," and the use of the words "Folk Nation," (20) Broadnax's notebooks also included multiple sets of rap lyrics that referred to the "Folk Nation" and discussed committing murders, robberies, and drug dealing, (21) Broadnax's drawings reflect a "pretty good knowledge" of Gangster Disciple symbols and imagery, (22) in addition to mentioning criminal activity, Broadnax's raps and other writings include multiple references to leaving no witnesses alive, i.e., references to "body bags" and "slaughter everyone so there is no trial," (23) the term "flipping a gram," used in Broadnax's writings was most likely a reference to drug dealing, and (24) both of Broadnax's notebooks bear indicia of gang mentality. Testimony of Barrett Nelson, 49 S.F. Trial at 77-133 [41-23 ECF at 115-71 of 198].

An assistant warden who had worked at the TDCJ's Polunsky Unit testified regarding the TDCJ prisoner classification system, TDCJ's disciplinary procedures, the manner in which TDCJ handles gang members who are in prison, the general layout and management of TDCJ's death row facilities, and the general layout and management of TDCJ's facilities for inmates who are not on death row. Testimony of Melody Nelson, 49 S.F. Trial at 140-255 [only a portion of this testimony, i.e., pages 140-60, appears at 41-23 ECF at 178-98 of 198].

The defense called a psychologist specializing in clinical neuropsychology who (1) used visual aids in the form of a diagram of a human neuron to describe the two main processes in brain development: pruning and myelination; (2) explained that "pruning," the process through which the billions of neurons in the human brain are trimmed to help the brain distinguish between less effective behaviors and more effective behaviors, is not complete until about age 22; (3) explained myelination is the process whereby fatty sheath wrap around axons of every neuron to help insulate the electrochemical reactions that occur at synapses in much the same way as insulation protects electrical wiring; (4) explained the brain of a nineteen-year-old does not function the same as an adult brain; (5) explained the brain's prefrontal cortex in the frontal lobes controls executive functioning; (6) explained the amygdala in the temporal lobes, i.e., the seat of memory and emotions, develop faster in adolescence that the rest of the temporal lobes, which is why adolescents are more reactive emotionally than adults; and (7) explained adolescents react more emotionally, i.e., react more to stress, than to logic, and are more emotionally volatile. Testimony of Dr. Cheryl Silver. 50 S.F. Trial at 22-76 [41-24 ECF at 17-30 of 90]. On cross-examination, Dr. Silver acknowledged that (1) she knew nothing about Broadnax's maturity or level of sophistication, (2) she could say nothing about Broadnax's propensity for violence, and (3) she

could not say that persons aged eighteen-to-twenty-one are too young to be held accountable for a crime. *Id.*, 50 S.F. Trial at 53-72 [41-24 ECF at 24-29 of 90].

A psychiatrist who examined Broadnax at the Dallas County Jail testified for the defense that (1) he had treated Broadnax since July 2008, (2) on July 11, 2008 Broadnax submitted a medical request asking to see a psychiatrist, in which he complained of insomnia, visual hallucinations, auditory hallucinations, and paranoia, (3) Broadnax claimed to see blood on the walls of his cell and to hear voices, (4) Broadnax's mental health records showed that he had been seen on June 23 by Dr. Mirmesdagh and at that time gave no history of mental illness, (5) there were multiple reports in Broadnax's medical records in which he denied any mental illness, (6) Broadnax claimed that he was on "whack," possibly embalming fluid, at the time he gave his interviews by television reporters, of which he claimed to have no memory, (7) when seen in July 2008, Broadnax was alert, oriented, but drowsy, with blunted affect, guarded, depressed mood, agitated, suspicious, and fearful, but did not appear to be responding to internal stimuli, (8) Broadnax stated that he had to talk to his attorney because he had to use the insanity defense, (9) his diagnosis was that Broadnax was suffering from substance-induced psychosis, i.e., a visual and perceptual disturbance resulting from PCP and marijuana abuse, (10) he prescribed Trazodone (an antidepressant and sedative), Benadryl (an antihistamine), Bupropion (an antidepressant and stimulant), Clonazepam (an antianxiety medication), and Risperdal (an antipsychotic), (11) PCP or "phenylcyclidine" is a unique and dangerous drug that was outlawed in the 1950's after patients using it as a surgical sedative reported side-effects similar to schizophrenia, (12) medical notes from October 6, 2008 indicate Broadnax complained of auditory and tactile hallucinations and requested an increase in his medications, (13) schizoaffective disorder is an overlapping of a mood disorder (such as depression) with a thought disorder (such as hallucinations), (14) by November

4, 2008, Broadnax's psychotic symptoms had improved as the toxic effects of whatever drugs Broadnax had taken were likely fading, (15) he diagnosed Broadnax with post-traumatic stress disorder ("PTSD") but could not rule out the possibility of antisocial personality disorder ("ASPD") because he had no information on Broadnax's life prior to age fifteen, (16) a very high percentage of people in jail are diagnosed with ASPD, (17) when examined on November 4, 2008, Broadnax displayed a blunt affect, depression, and dysphoria, was fearful, displayed a concrete thought process, no hallucinations or delusions but did show the effects of an oral cavity infection and PTSD-like symptoms, (18) when seen on November 6, 2008, Broadnax was diagnosed with major depressive disorder, generalized anxiety, and schizoaffective disorder, (19) when seen on February 18, 2009, Broadnax was diagnosed with insomnia and anxiety, stated that he was reading the Jason Bourne novels, and appeared alert, oriented, and more positive and hopeful, with no hallucinations, normal motor activity, but still some anxiety over his legal problems, (20) because of Broadnax's continued depression/mood disorder and continued display of some PTSD symptoms, on February 14, 2009, two new anti-depressants, Doxepin and Mirtazepine were added to Broadnax's prescription list, and (21) Broadnax voiced no significant problems during a June 16, 2009 follow-up examinations, at which time Wellbutrin was discontinued in lieu of Zoloft. Testimony of Dr. Frank Lane, 50 S.F. Trial at 77-170 [41-24 ECF at 30-54 of 90].

On cross-examination, Dr. Lane (1) admitted that all of Broadnax's mental health symptoms were self-reported, (2) agreed that Broadnax had submitted numerous sick call slips during his time at the Dallas County Jail stating that he was fine and wanted out of suicide protection protocol, (3) agreed there was no evidence establishing that Broadnax had ever reacted to internal stimuli during his stay at the jail, (4) read into the record the definition and characteristics of ASPD from edition IV-TR of the Diagnostic and Statistical Manual of the

American Psychiatric Association (which was admitted into evidence as State Exhibit no. 582), and admitted that he never actually diagnosed Broadnax with schizoaffective disorder. *Id.*, 50 S.F. Trial at 114-62 [41-24 ECF at 40-52 of 90]. During Dr. Lane's cross-examination, the prosecution played for the jury a series of recordings of Broadnax's telephone conversations. In the January 22, 2009 recording, portions of which were admitted and played for the jury in open court as State Exhibit no. 562, Broadnax informed his mother that (1) he had injured his hand in a fight the day before, (2) he had written some more raps, and (3) you can smoke inside the jail as long as you don't get caught doing it. In the March 25, 2009 recording, admitted as State Exhibit nos. 550 & 560, Broadnax discussed an electrical fire inside the jail, discussed his then-on-going plea bargain negotiations, and advised that he had rejected and would not accept a plea offer of life without parole. In a recording made April 1, 2009 admitted into evidence as State Exhibit nos. 549 & 559 (excerpts only), Broadnax (1) jokingly stated that he had received a plea offer of a 25-year sentence with the possibility of parole, (2) explained that one of his mother's ex-husbands had attempted to rape his sister, (3) explained his mother had gone to jail for writing hot checks, and (4) explained that he had not seen his younger brother Michael since Michael was three months old. In the recording excerpts admitted as State Exhibit no. 559, Broadnax (1) can be heard stating that his aunt Alice Gatewood would get what was coming to her, (2) stating that his sister had been raped, and (3) threatening to put a slug in someone.

A professor and researcher in clinical pharmacology at the University of Texas Health Science Center in San Antonio testified for the defense that (1) the "wet blunt" Broadnax stated he smoked the night of the murders was most likely a mixture of marijuana with PCP and formaldehyde, (2) this opinion was consistent with Dr. Lane's diagnosis of substance abuse-induced psychosis, (3) PCP was originally used as an anesthetic but was taken off the market after

patients reported post-surgical reactions including hallucinations and psychotic behavior, (4) PCP is still used experimentally to induce schizophrenia and psychotic behavior in animals and increases aggression and hostility, (5) his opinion is also supported by the fact that, in one of his television interviews, Broadnax claimed he "blanked out" and saw colors during the murders, (6) a variety of genetic and environmental factors influence drug abuse, (7) drug abuse retards brain development and causes changes in brain chemistry, and (8) while Broadnax was not intoxicated at the time of the offense, Broadnax was under the influence of a drug-induced psychosis. Testimony of Dr. John Roache, 50 S.F. Trial at 171-220 [41-24 ECF at 54-66 of 90].

On cross-examination, Dr. Roache (1) admitted he had not interviewed Broadnax or any members of Broadnax's family and had not reviewed any of Broadnax's school records before reaching his opinion, (2) he was not a psychiatrist but a clinical pharmacologist, (3) he believed that while Broadnax was not intoxicated at the time of his interviews, Broadnax was still under the influence of PCP at that time, (4) there have been reports of the effects of PCP being apparent even days after use of the drug, (5) there is no literature in the medical community linking PCP use with violence, (6) he had no access to any of the recordings of Broadnax's jail telephone calls, (7) during one of his interviews, Broadnax described how he asked a victim for a cigarette before he fatally shot him while the man was reaching for a cigarette, and (8) Broadnax did not show any signs of intoxication during his initial post-arrest interview by the Garland Police Department and did not confess during that interview. *Id.*, 50 S.F. Trial at 192-216 [41-24 ECF at 59-65 of 90].

A cousin of Broadnax's mother, a resident of Hope, Arkansas, testified that (1) Broadnax's mother was raised by their maternal aunt (Betty Eason), (2) she had known Broadnax his whole life but only seen him occasionally, (3) Broadnax has an older brother named Aaron, two older sisters, and a younger brother named Michael, (4) Broadnax's sisters were raised by their father in

Michigan, (5) Broadnax's younger brother lives with his father, (6) she saw Broadnax when he was young and his mother moved back to Texarkana and then again at age ten, (7) Broadnax's mother was arrested for writing hot checks, which is when his sisters moved to Michigan to live with their father, (8) she had little contact with Broadnax when he was a child, and (9) his mother treated Broadnax's sisters well. Testimony of Clara Holyfield, 50 S.F. Trial at 221-39 [41-24 ECF at 66-71 of 90].

A sister of Broadnax's mother testified that (1) she first saw Broadnax at age two months at her father's funeral when Broadnax's mother was married to James Broadnax, (2) at that time, Broadnax's mother was in the Army and stationed in California, (3) Broadnax's mother moved to Hope, Arkansas when Broadnax was three or four years old, (4) Broadnax's relationship with his mother was "okay," (5) Broadnax's mother moved around quite a bit, (6) Broadnax lived with her when he was in third grade and was not a problem child, was respectful, (7) at that time., Broadnax's mother had remarried and moved, (8) Broadnax grew up in a lot of places and lived with her on four different occasions, the last time when he was in eleventh grade, (9) she always treated Broadnax like a son, (10) when Broadnax was thirteen or fourteen, his mother married a nice man who lived in Arkadelphia, named Darryl Maxwell, (11) Broadnax lived with them for about three years then moved back in with her around age sixteen, (12) by then, Broadnax was skipping class and truant, (13) Betty Eason always treated Broadnax like an outcast because James Broadnax was not Broadnax's biological father, (14) Broadnax's father was "some white man," (15) Betty Eason hated white people, (16) that was why Betty Eason did not like Broadnax, (17) Broadnax's mother was unstable and not the best mother, (18) Broadnax's mother was always in relationships that were not good, (19) Broadnax did well in school despite the fact no one motivated him to work hard in school, (20) Broadnax was "pretty intelligent" but when he grew

older did smoke pot occasionally, and (21) she was unaware that Broadnax had been arrested for possession of marijuana prior to his arrest for capital murder. Testimony of Teresa Thompson, 50 S.F. Trial at 240-72 [41-24 ECF at 71-79 of 90].

Another of Broadnax's aunts testified that she saw Broadnax daily when he lived in Michigan for a few months and she never had any trouble with him. Testimony of Vicki Biggs, 51 S.F. Trial at 187-98 [Volume 51 of the Statement of Facts from Broadnax's trial was not filed electronically by Respondent but does appear on the CD-ROM marked "Volumes 1-54 & Supp. Volumes" submitted by Respondent along with the audio and video recordings admitted into evidence at Broadnax's trial.]

A cousin of Broadnax's mother testified that (1) Broadnax's mother has a good heart but falls short as a mother at times, (2) Broadnax did not have a lot stability in his life, (3) Broadnax's mother was not a mother figure to Broadnax and dropped Broadnax off with others to raise far too often, (4) Broadnax's mother abandoned Broadnax, leaving him to stay with Betty Eason on multiple occasions, (5) Broadnax grew up somber, quiet, and reserved, (6) Broadnax was not physically abused by his mother but was abused verbally, especially by Betty Eason, who had abused Broadnax's mother when she was growing up, (7) Broadnax's mother was physically abused by the men in her life but she never saw any of those men abuse Broadnax, (8) when Broadnax's mother was charged with a crime, specifically abusing her daughter NiQuia, Broadnax's older sisters went to Michigan to live with their father, (9) Broadnax's mother abused marijuana, pills, and alcohol and once experimented with crack, (10) Betty Eason was both verbally and physically abusive toward Broadnax, locking Broadnax outside her house on multiple occasions when he was a teenager and refusing to allow him inside to get water or food on extremely hot days, (11) Betty Eason often threw objects at Broadnax, including a glass ash tray,

(12) Betty Eason called Broadnax "half breed," "nasty," and "trifling," and called Broadnax's mother a disgrace for having borne Broadnax, (13) Betty Eason loved and doted on Broadnax's older brother Aaron but had no love for Broadnax, (14) Broadnax was hurt by Betty Eason's words and actions, (15) Betty Eason told the children she raised not to play with white people because they meant them no good, (16) Broadnax never retaliated when Betty Eason struck him, he just cried, and still respected and loved her, (17) she last saw Broadnax two years before that in Hope, when Broadnax was doing well, (18) as far as she was aware, prior to his capital offense, Broadnax had never been violent, had not been involved in any criminal activity, and was always respectful, (19 Broadnax was not involved in gang activity, and (20) Broadnax's family let him down. Testimony of Jackie Aaron, 51 S.F. Trial at 255-76.

Broadnax's mother testified at great length and in great detail that (1) when she very young her father took her and her older brother to live with his sister-in-law and her husband (Betty and Glen Eason) in Hope, Arkansas, (2) she never saw her parents again, (3) Betty and Glen Eason adopted her and raised her as their own, (4) as an adult, she had joined the Army and lived in California, Texas, Georgia, Michigan, and Arkansas, (5) she was now working as a long haul trucker, (6) her oldest child, Aaron was then in custody in McLennan County in connection with a parole revocation proceeding relating to a sexual assault conviction, specifically for failing to register as a sex offender, (7) Aaron was born when she was sixteen years old, (8) Aaron's father was her high school crush, whom she never married, (9) she became married at age eighteen to a man in the Air Force, who lived in England for three years while she remained at home, (10) she and her first husband had a daughter, NiQuia Marie, (11) they moved to Michigan after her first husband left the Air Force, where they had a second daughter, Kerrin, (12) in March 1987 she joined the Army and was sent to Fort Sam Houston in San Antonio for training in pharmacy work,

(13) she was then sent to Fort Ord, California outside Monterrey, (14) she and her first husband divorced in 1988, (15) while at Fort Ord, she met and had a liaison with a white co-worker that resulted in Petitioner's conception, (16) her father Glen Eason died in November, 1988, shortly after Petitioner's birth, (17) she married a man named James Broadnax in 1989, (18) her then-husband, a black man, without her knowledge put his name on Petitioner's birth certificate as Petitioner's father, (19) Petitioner never met his biological father but she told Petitioner about him, (20) she was honorably discharged from the Army, (21) two years after marrying James Broadnax, she became pregnant with her last child, Michael, who was born in November 1989, (22) she divorced James Broadnax in July 1990, (23) when she attempted to leave James Broadnax prior to their divorce, he rammed his vehicle into the vehicle in which she and her children were driving, causing her vehicle to flip three times, and forcing her to the go to the hospital, (24) James Broadnax was arrested for ramming her vehicle but a few months later, James Broadnax grabbed and fled with baby Michael, (25) police in California refused to help her, telling her that he ex-husband James Broadnax had a right to his son, (26) she was unable to hire an attorney to fight for Michael's custody, (27) Michael grew up with her ex-husband James Broadnax in Tulsa, Oklahoma, (28) she moved back to Hope, Arkansas with Petitioner and, in 1991, joined the Army Reserves, (29) she later married Darryl Maxwell and lived with him in Arkadelphia, Arkansas, with Petitioner, (30) after three years, in 1996, she divorced Maxwell and moved back to Hope, Arkansas, (31) she experienced alcohol-related problems, (32) child protection authorities brought charges against her for injury to a child when her daughter NiQuia was seven years old, (33) as a result, both of her daughters went to live with their father in Michigan, (34) she experimented with drugs occasionally, including crack once, (35) she lived with Richard Wimbley for six years, (36) she wrote bad checks while living with Wimbley and went to prison in February 2001 for six

months, (37) Broadnax was twelve or thirteen at the time of her incarceration, (38) Wimbley and many of her other male partners were physically abusive toward her, (39) Broadnax witnessed those men treating her abusively, (40) when she was released from prison, Broadnax was no longer a happy child, (41) her mother (Betty Eason) treated Broadnax poorly because he was half-white, on one occasion when she was in jail, Wimbley attempted to molest NiQuia, (42) Wimbley went to prison in 2001, (42) when she was released from prison, she went to live in Texarkana and, later, Dallas in 2003, where she lived with her sister, Raleshia Cummings, the mother of Demarius, (43) she and Broadnax moved to San Antonio for six months when Broadnax was fourteen or fifteen and then back to Texarkana for a few months and then back to Dallas in 2004, (44) she married Russell Kelly in June 2004, (45) Broadnax stayed with her sister in Arkansas while she went on the road with Kelly, (46) Kelly was verbally and physically abusive toward her and Broadnax saw bruises on her several times, (47) she later learned Kelly had a drug problem (crack cocaine) and had done time in prison for drug trafficking, (48) Broadnax did not like Kelly, (49) after she and Kelly separated, Kelly went to Memphis and she went to Mt. Vernon, (50) by the time they reached Mt. Vernon, Broadnax was two years behind in school, (51) after she found a job in Mt. Vernon, Kelly moved back in with her, (52) later, she, Broadnax, and Kelly moved to Fort Worth, (53) she and Kelly separated again and she and Broadnax moved back to Arkansas, (54) in Texarkana, Broadnax briefly lived with Betty Eason and then moved out on his own, (55) she went to truck driving school and then moved to Memphis in 2006, (56) she later got back with Kelly while Broadnax was living in Dallas with Alice Gatewood, (57) she later went to Georgia to live with one of her daughters, (58) Broadnax visited them in Georgia, (59) she wired money for the bus fare Broadnax used to travel to Georgia, (60) she later went on the road and left Broadnax in Georgia in the Fall of 2007, (61) at that time, Broadnax was attempting to find a job and needed

his California birth certificate, (62) Broadnax left Georgia for Michigan to take NiQuia's son Treybeon to see his father (Darnell Wynn), (63) she lived with Alice Gatewood in Dallas in April 2008 and sent Broadnax money to come there from Michigan, (64) Broadnax lived in Dallas with Alice Gatewood, (65) she has never known Broadnax to be violent, (66) both Broadnax and Demarius Cummings are good persons, (67) Broadnax held one job, did not have a driver's license, and wanted to be an architect.  Testimony of Audrey Kelly, 50 S.F. Trial at 274-308 [41-24 ECF at 80-90 of 90]; 51 S.F. Trial at 28-93, 133-37.

On cross-examination, Broadnax's mother (1) admitted Broadnax knew the difference between right and wrong and was not mentally retarded, (2) testified Broadnax was always well-clothed and well-fed, (3) claimed she had never beaten or abused Broadnax, (4) Broadnax's "Aunt Betty" loved Broadnax and Broadnax loved his "Aunt Betty" but Aunt Betty did not believe in mixing the races, (5) after Broadnax's "Aunt Betty" died, Broadnax called his mother  from jail and said he was going to tattoo Aunt Betty's name and date of birth on himself, (6) she had counseled Broadnax not to talk with Demarius Cummings's sister Lakarrame Cole, (7) Broadnax had asked her advice on pursuing "the crazy defense," and (8) Broadnax asked her to send him a copy of *The Art of War.  Id.*, 51 S.F. Trial at 93-133, 137-40.

The estranged husband of NiQuia Wynn testified that (1) Broadnax came to Michigan in January 2008 to escort his son Treybeon, (2) Broadnax remained in Michigan until the end of April, (3) he met Broadnax in Hope, Arkansas in 2007, (4) in Arkansas, Broadnax lived with them and watched their son, (5) Broadnax did a good job taking care of their son, (6) Gangsta rap music has violence and drugs as common themes, (7) he had never known Broadnax to be violent or in a gang, and (8) he is aware that the Gangster Disciples use a pitchfork and "GD" as symbols. Testimony of Darnell Wynn, 51 S.F. Trial at 155-86.

Broadnax's high school age cousin from Eldorado, Arkansas testified that (1) he has been close to Broadnax since he was four or five years old, (2) Broadnax always wanted to be an architect, (3) Broadnax's mother is "sweet" but Russell Kelly is abusive and has a history of "putting hands on" Broadnax's mother, (4) there is plenty of gang activity in Eldorado, (5) Broadnax said he was involved in "74G" at one point, (6) Broadnax writes free style rap lyrics similar to those of major rap performers, and (7) Broadnax has counseled him to stay in school and get his education and stay away from gangs. Testimony of Gary Aaron, 51 S.F. Trial at 203-24.

Broadnax's college age cousin testified (1) he attends Arkansas State University, (2) Broadnax was a "normal" kid despite never having a stable home, (3) after Broadnax moved to Texarkana, he shared a room with Broadnax, (4) Broadnax told him and his sister that he felt misplaced and unwanted, (5) Broadnax was sad and lonely, often cried, and felt unloved, (6) Betty Eason belittled Broadnax and often called Broadnax "half baked" and said Broadnax's mother did not want him, (7) Broadnax once began working toward a GED but stopped because of a lack of transportation, (8) Broadnax draws well and wanted to become an architect, (9) Broadnax also wanted to get into the Job Corps, (10) he was unaware of any gang involvement by Broadnax, who was never violent, (11) Broadnax's only guidance when living in Arkadelphia was Darryl Maxwell, and (12) "Big Mama" Betty Eason treated Aaron better than she treated Broadnax. Testimony of Kevon Eason, 51 S.F. Trial at 225-54.

The Dallas County Jail inmate with whom Broadnax fought on January 21, 2009 testified that (1) he and Broadnax fought in the recreational area after he had been angrily yelling from his cell and Broadnax yelled back for him to "give it up to God" and "let it go," (2) he struck Broadnax

with his fists in an attempt to take out his anger on Broadnax, and (3) Broadnax got the better of him during their fight. Testimony of Tre'vaun Miller, 51 S.F. Trial at 277-98.

One of Broadnax's neighbors in Arkansas testified via deposition that (1) the neighborhood in which Broadnax resided as a child was "crack infested," (2) Broadnax was always hungry as a child, (3) Broadnax's mother did not take good care of him but did feed him, (4) she observed Broadnax on one occasion with bruises and a knot on his head, (5) she once asked to let Broadnax live with her family but Broadnax's mother demurred, (6) she took Broadnax to church with her family for about three to four months, (7) Broadnax had no structure in his home life and seemed troubled, (8) Broadnax spoke little as a child and was withdrawn, and (9) she last saw Broadnax two years before as he rode a bicycle in Hope, Arkansas. Testimony of Francine Mazone (as read by Keri Mallon), 52 S.F. Trial at 8-36 [40-1 ECF at 11-18 of 83].

Another former neighbor of Broadnax's family testified via deposition that (1) Broadnax's older brother Aaron was locked up somewhere in Texas, (2) Broadnax's mother did not have a relationship with Broadnax, never bonded with Broadnax, and was never very stable in her personal life, (3) the best time Broadnax enjoyed growing up was when he lived with Darryl Maxwell – which was Broadnax's only stable childhood relationship, (4) Broadnax moved around a lot growing up, (5) Broadnax's mother left him with whoever would take him in, (6) as a child, Broadnax acted afraid and would clam up, (7) Broadnax's mother once beat him so badly his back looked like a slave's, (8) Broadnax's mother was unstable, (9) Betty Eason was mean to Broadnax and refused to allow him to eat with the other children, forcing Broadnax to sneak food, (10) Betty Eason did not like Broadnax because he was half-white, (11) Betty Eason would verbally and physically abuse Broadnax (slapping him so hard that she left hand prints on Broadnax's face), (12) Betty Eason was equally cruel and abusive toward Broadnax's mother, (13) Betty Eason also

locked Broadnax outside on hot days without access to food or water, (14) Broadnax's mother dropped Broadnax off with people she didn't know, (15) the men in her life ruled Broadnax's mother, (16) Broadnax's mother never showed any love to Broadnax – no one did, (17) Broadnax quit school in the tenth grade because he had nothing to wear to school, (18) Broadnax was never violent and never argued with anyone, (19) she had never seen Broadnax under the influence of drugs or alcohol, (20) on one occasion when Broadnax was three or four, Broadnax's mother beat him so badly his back split open, (21) Broadnax's mother wanted her own life so she dropped Broadnax off with others, (22) Broadnax's mother was "mental," and (23) Broadnax never retaliated when he was beaten.  Testimony of Juanita Mayes, 52 S.F. Trial at 37-83 [40-1 ECF at 18-29 of 83].  On cross-examination, she admitted that, despite the abuse she witnessed Broadnax suffering, she never called child protective services or law enforcement to report any of that abuse. *Id.*, 52 S.F. Trial at 82 [40-1 ECF at 4964].

Broadnax's sister NiQuia testified that (1) their mother physically abused both her and her sister to the point she and her sister both went to live with their father in Michigan, (2) their family moved around a lot when she was young, (3) "Big Mama" Betty Eason beat both her and her sister, (4) Broadnax's mother was equally abusive, on one occasion, grabbed her by the throat and throwing her against a wall when she very young, breaking her arm in the process, (5) Broadnax, who was in diapers at that time, witnessed that incident, (6) despite that history of abuse, when she was in high school she moved in with her mother in Texarkana, (7) after high school she married and moved to Georgia, (8) during his teenage years, Broadnax became romantically involved with a young woman whose family did not approve of Broadnax, (9) after a fight with his girlfriend, Broadnax moved in with her family in Georgia, (10) while in Georgia, Broadnax took care of her children, (11) Broadnax's girlfriend later talked him into moving back to live with her, (12) after

another fight with his girlfriend Broadnax again moved to Georgia to live with her and her family and to take care of her son Tre'vaun, (13) in January 2008 Broadnax took Tre'vaun to Michigan to see Tre'vaun's father, (14) Broadnax and Tre'vaun accompanied her friend Trina on that trip, (15) Broadnax talked about gangs but she did not believe he was actually in one, (16) she believes that Broadnax is a "Wannabe" gang member, (17) their older brother Aaron is a member of the Gangster Disciples, (18) Broadnax knows about that gang through their older brother, (19) Broadnax would hang out with a friend named Mario who she believes is a "wannabe" Blood, (20) since Bloods and Gangster Disciples do not hang out together, she believes Broadnax is not a gang member, (21) she has never seen Broadnax violent and had never heard Broadnax called women "bitches," but (22) she does know Broadnax smokes weed.  Testimony of NiQuia Wynn, 52 S.F. Trial at 99-113 [40-1 ECF at 33-37 of 83].  [Please note the spelling of Niquia Wynn's son's name appears in the trial record at various points as either "Treybeon" or "Tre'vaun."].  On cross-examination, she admitted that (1) Broadnax is quick-witted, loquacious, and has no problem getting girlfriends, (2) members of the Gangster Disciples call each other "Folk," (3) the letters "OG" refer to a Gangster who has been around awhile, (4) their brother Aaron is in jail, (5) Broadnax's friend Mario is a "wannabe" Blood, (6) Broadnax has never rapped about killing anybody, (7) you don't have to be in the Gangster Disciples to know their signs and symbols, (8) the Gangster Disciples is a ruthless street gang, (9) the clothing Broadnax had with him when arrested is not inexpensive but, rather, included a number of items of expensive brands, and (10) while their mother abused them, she always made sure they had what they needed.  *Id.*, 52 S.F. Trial at 113-44 [40-1 ECF at 37-45 of 83].

Broadnax's mother's third husband testified that (1) he is currently an assistant minister, (2) he went to high school with Broadnax's mother but was a few years behind her and did not

know her at that time, (3) they met again years later when they worked together, (4) Broadnax's mother got in trouble for hot checks and he tried to help her out, (5) they married in the early nineties, (6) he did not know Broadnax was her son, (7) Broadnax's mother seemed to have three very different personalities, was very jealous, and at times violent, (8) on one occasion, Broadnax's mother hit him with a glass jar and cut him, (9) on another occasion when they were visiting Betty Eason's home, Broadnax's mother bit him on the chest, (10) on another occasion, Broadnax's mother bit his hand, (11) about a year and a half after they married, Broadnax's mother informed him that Broadnax was her son and brought Broadnax over to live with them, (12) at that time, Broadnax was a young boy and a mess, in need of a bath, (13) while bathing Broadnax, he found a fully grown cockroach inside Broadnax's ear, (14) Broadnax was never a problem for him, (15) he bonded with Broadnax and they went fishing and to church together, (16) Broadnax's older brother Aaron later came to live with them, (17) Broadnax's mother was prone to sudden mood swings and would suddenly start throwing things, (18) on one occasion, Broadnax's mother beat Broadnax savagely, (19) after that beating, Aaron came and brought him to see Broadnax's bloody back, (20) he became so distraught, he threw Broadnax's mother out of his home, and (21) Broadnax's mother left with Aaron and Broadnax. Testimony of Darryl Maxwell, 52 S.F. Trial at 146-73, 184-87 [40-1 ECF at 45-52, 55 of 83]. On cross-examination, Maxwell admitted that he never reported Broadnax's mother's abuse of Broadnax to law enforcement authorities and never took Broadnax to the hospital for treatment of the injuries inflicted by Broadnax's mother. *Id.*, 52 S.F. Trial at 173-84 [40-1 ECF at 52-55 of 83].

Called in rebuttal by the prosecution, an investigator for the Dallas County District Attorney's Office identified call logs (State Exhibit nos. 890 & 591) and a set of recordings of Broadnax's telephone conversations from August 12, 2009 (State Exhibit no. 592) that were

admitted into evidence.  Testimony of David Barger, 52 S.F. Trial at 199-212 [40-1 ECF at 58-62 of 83].   State Exhibit no. 592 contains recordings of eight different telephone conversations between Broadnax and a female acquaintance on August 12, 2009.  In the first such conversation, which commenced at approximately 4:34 PM, Broadnax can be heard laughing and joking while he and his friend discuss the fact the jury returned its guilty verdict after deliberating only forty minutes.  In the next conversation, which began at approximately 4:55 PM, Broadnax asks his friend to contact one of his relatives and find out why that relative has been called to testify at the punishment phase of his trial.  The next such conversation, which began around 5:31 PM, includes Broadnax giving detailed instructions to his friend regarding how to complete a three-way telephone call to a female acquaintance of Demarius Cummings and Broadnax's instructions regarding passing along a message from Cummings to that young woman.  In the next such conversation, which began around 8:55 PM, Broadnax explained to his friend that, during the trial, when the prosecution showed the crime scene photographs of his victims' bloody bodies, the victims' families became agitated, stood up, and began crying.  In the next such conversation, which began around 9:15 PM. Broadnax discussed how he "zoned out" during the trial and found himself wondering how he had gotten to that point in his life.  The three remaining telephone conversations, which began around 9:30 PM, 11:19 PM, and 11:34 PM, respectively, are progressively more lurid in content and do not justify summarization.  It will suffice to explain that Broadnax's vocal demeanor throughout all of his conversations on that day reflected that of a teenager seemingly far more interested in flirting shamelessly with his female acquaintance than in discussing the seriousness of his legal situation.

Another rebuttal witness, a legal adviser to the Dallas County Sheriff, identified Broadnax's jail commissary record and testified that Broadnax received multiple deposits into his

inmate trust account from his mother, as well as from two other women, including the young woman with whom Broadnax carried on his conversations on August 12, 2009. Testimony of Elizabeth Lutton, 52 S.F. Trial at 231-38 [40-1 ECF at 66-68 of 83].

The clinical and forensic psychologist called by the prosecution in rebuttal testified that (1) he would not testify that Broadnax is a psychopathic personality, (2) he was not going to express an opinion as to Broadnax's state of mind at the time of his offense, (3) psychopathy or "psychopathic personality" is a label roughly comparable to what is known as ASPD, (4) it consists of a cluster of traits that describe a person's behavior, emotions, the way they interact with others, i.e., long-standing personality traits or a personality disorder, (5) psychopathic personality traits include (a) "glibness," i.e., a superficial charm and superficial knowledge of any area and the ability to speak in an amusing, entertaining manner, (b) "grandiosity," i.e., a grandiose sense of self-worth, an inflated ego, which can be reflected in an insensitivity to their own legal problems, (c) "stimulus seeking," i.e., a need for excitement, desire for life in the fast lane, a tendency to become bored easily, which can often lead to alcohol or drug abuse, (d) "pathological lying," i.e., the tendency to lie when the truth would serve them better and the tendency to lie frequently without embarrassment, (e) "manipulative," i.e., tendency to employ scheme and scams to get what they want, in other words, "the ability to engage in fast talking to slow people," (f) "lack of remorse or guilt," i.e., a lack of concern over what their behavior has done to others, lack of sense of guilt or remorse, the tendency to blame others or "the system," (g) "shallow affect," i.e., little expression of emotion other than anger, a cold and unemotional demeanor, and an inability to describe their emotions or to express any emotion other than anger, (h) "callous; lack of empathy," i.e., selfish, lack of concern for others, tendency to be a loner by choice, (i) "parasitic lifestyle," i.e., financial dependence on others as a way of life, a lack of interest in regular jobs or steady employment,

tendency to find someone whom they can live off of, (j) "poor behavioral controls," i.e., a bad temper, tendency to be angered easily and to become aggressive over small things, (k) "promiscuous sexual behavior," i.e., tendency to see sex as impersonal, casual, trivial, viewing sex as an end in itself, not as part of a relationship, and tendency to have multiple sexual partners, (l) "early behavioral problems," i.e., criminal lifestyle (whether caught or not, whether incarcerated or not) starting at an early age (around age twelve), (m) "lack of realistic long term goals," i.e., the tendency to live day-to-day with no long term plans and a lack of concern over not having achieved goals in the past, (n) "impulsivity," i.e., tendency to act without thinking, without understanding or considering consequences, a lack of reflection on the impact of their actions on others, tendency to act on the spur of the moment, (o) "irresponsibility," i.e., little sense of loyalty or duty to family or others and a lack of commitment, both financially and otherwise, to others, (p) "failure to accept responsibility for their own actions," i.e., an inability or unwillingness to accept full responsibility for their own criminal or non-criminal behavior, tendency to give excuses and make rationalizations, (q) "many short term marital relationships," i.e., tendency to display a lack of commitment to others, a lack of loyalty to others, (r) "early problems at school," i.e., truancy prior to age twelve, (s) "revocation of conditional release," i.e., tendency to fail to fulfill conditions or probation or parole, and (t) "criminal versatility," i.e., escalation of criminal behavior over time, movement from less violent to more violent behaviors, (6) a true psychopathic personality is an exceedingly rare condition, and (7) there is no effective treatment for a psychopathic personality, i.e., while it can be managed it cannot be cured.  Testimony of Dr. Jack Randall Price, 52 S.F. Trial at 239-65 [40-1 ECF at 68-75 of 83].  On cross-examination, Dr. Price (1) admitted the definition of "psychopathic personality" is not found in the DSM-IV-TR and is not an official diagnosis but is still recognized within the psychological community, (2) testified the closest diagnosis in the

DSM-IV-TR is ASPD, (3) testified not everyone with the traits he listed has a psychopathic personality, (4) about eighty-five percent of the people in jails qualify as ASPD whereas between fifteen to twenty-five percent of the general population displays ASPD, and (5) immaturity can result in some psychopathic traits, including impulsivity and self-centeredness. *Id.*, 52 S.F. Trial at 259-63 [40-1 ECF at 73-74 of 83].

Swan's sister testified that (1) Swan had been her best friend, (2) she learned to play the guitar early on thanks to him, (3) she had experienced "a hard time" since his death in playing guitar, (4) when law enforcement officers notified her of her brother's murder, she became so emotional she was unable to pass that information on to her mother over the telephone and handed her phone to the police officers who were present, (5) because she was responsible for putting together the funerals for Swan and Butler, she was unable to grieve until after the joint funeral, and (6) her late brother had successfully fought Hodgkins Lymphoma. Testimony of Deborah Swan, 52 S.F. Trial at 273-86 [40-1 ECF at 77-80 of 83]. Swan's younger brother testified that (1) Swan was a good brother, a good musician, a programmer, and a gentle man and (2) he was no longer able to smile the same way since his brother's murder. Testimony of Michael Swan, 52 S.F. Trial at 265-72 [40-1 ECF at 75-77 of 83].

### III. SYNOPSIS OF EVIDENCE FROM STATE HABEAS PROCEEDING

Broadnax presented a wide array of evidence to the state habeas court.  A criminal defense attorney testified that (1) Dallas County policy called for appointment of counsel in capital cases within one working day of the defendant's filing of a request for appointment of counsel, (2) the current Dallas County plan called for the "prompt appointment of counsel," (3) she believed arraignment is a critical stage of the criminal justice process and immediate appointment of counsel in capital cases is preferred, (4) most capital defendants are not high functioning mentally, (6) if she had been appointed to represent Broadnax promptly she would have advised him against giving any interviews, and (7) one of her clients gave an interview prior to learning of her appointment. Testimony of Catherine Bernhardt, State Habeas Corpus Evidentiary Hearing December 7, 2012 (henceforth "S.F. State Habeas Hearing"), at 22-50 [42-17 ECF at 7-14 of 44].

A second criminal defense attorney testified that (1) her practice is to visit her clients in jail as soon as possible after appointment, (2) most capital defendants are not high functioning, (3) she has represented one capital defendant who was schizophrenic and another who was mentally retarded, (4) she once stopped the police from taking a statement from one of her clients, (5) jailers frequently encouraged inmates to talk to the press, and (6) she had six capital defendants who had experienced considerable delay in appointment of counsel.  Testimony of Brooke Busbee, S.F. State Habeas Hearing at 51-69 [42-17 ECF at 14-19 of 44].

A third, even more veteran criminal defense attorney testified that (1) his first priority at every initial meeting with a criminal client is to tell that client "keep your mouth shut," (2) his clients run the gamut in terms of intelligence, (3) currently, it is common for a delay of one to two days in him learning that he has been appointed in a high profile case, which often results in his clients being interviewed before he is even aware of his appointment, (4) on one occasion, he was

notified within two hours of his appointment yet his client had already given a media interview, (5) the media are not under the same restrictions as law enforcement when it comes to interviewing a criminal suspect, (6) the Dallas County Sheriff's Office makes available to jail inmates a form that asks a jail inmate if he wants to "tell his side of the story" to the media, (7) in his opinion, media interviews are a critical stage of the criminal justice process, and (8) the Dallas County Sheriff's Department encourages jail inmates to give media interviews. Testimony of William E. Karo Johnson, S.F. State Habeas Hearing at 88-113 [42-17 ECF at 23-30 of 44].

The court-appointed investigator for Broadnax's defense team, Clifton Jenkins, furnished an affidavit accompanying Broadnax's state habeas corpus application. In his affidavit Jenkins stated that (1) he undertook an investigation prior to Broadnax's trial to attempt to find evidence showing the television and newspaper reporters who interviewed Broadnax were acting as "state agents" which could be used to help Broadnax's attorneys to suppress Broadnax's media interviews, (2) he met with attorneys for one station who refused to give him any helpful information, (3) he was told by an employee at another station that he would not be allowed to enter the building without an appointment, (4) his subsequent efforts to obtain an appointment proved unsuccessful, (5) employees of two other stations informed him their stations relied upon public databases, telephone calls to public information officials with law enforcement agencies, and online sources to learn when a suspect had been arrested. 42-3 ECF at 111-13 of 263.

At Broadnax's state habeas hearing, Jenkins testified that (1) he was denied access to the television stations of the reporters he attempted to serve with subpoenas, (2) employees at some of those stations refused to inform him how they gained information regarding Broadnax's arrest and subsequent transfer from Garland to the Dallas County Jail, (3) he was told by persons at those stations that they did not know who informed them of Broadnax's arrest, and (4) his efforts to

contact law enforcement to discover the same information proved equally fruitless. Testimony of Clifton Jenkins, S.F. State Habeas Hearing at 7-19 [42-17 ECF at 3-6 of 44]. More significantly, Jenkins did not offer any testimony suggesting he was able to locate any evidence showing that any of the television stations or newspapers that interviewed Broadnax acted in concert with, at the behest of, or in cooperation with any law enforcement agency.

In an affidavit accompanying Broadnax's state habeas corpus application, Broadnax's gang expert, Dwight Stewart (who possessed a bachelor's degree in criminal justice and experience as a testifying expert on gang affiliation) opined that prosecution gang expert Detective Nelson had created a false and misleading impression that Broadnax is a member of the Gangster Disciples street gang. Stewart opined in his affidavit that (1) Detective Nelson's trial testimony identifying Broadnax as a member of the Gangster Disciples did not satisfy the criteria for establishing gang membership set forth in Chapter 61 of the Texas Code of Criminal Procedure, (2) there was no evidence Broadnax had ever engaged in any gang-related criminal enterprise or gang-related activity, (3) Broadnax's fascination with gang culture did not establish membership in a street gang, (4) many young men from poor, socially isolated backgrounds, are attracted to gangs in an effort to find identity and belonging in a surrogate-type gang family, (5) Broadnax's trial counsel did not cross-examine the prosecution's witnesses regarding the nature of the gang signs found inside Broadnax's jail cell, (6) Broadnax's trial counsel did not check to see if Broadnax were listed in the Dallas Gang database, and (7) in his opinion, the prosecution failed to present credible and sufficient evidence of Broadnax's gang membership. 42-3 ECF at 115-22 of 263.

When called by the State to testify at the evidentiary hearing held in Broadnax's state habeas corpus proceeding, however, Stewart admitted that (1) he was not a member of law enforcement and did not know if the National Gang Center of which he was affiliated has a

database on street gangs, (2) he was unaware that Chapter 61 of the Texas Code of Criminal Procedure does not govern the admissibility of evidence at trial, (3) the Gangster Disciples are a recognized street gang in the Dallas area, (4) the Gangster Disciples are one of the largest street gangs in the United States, (5) there are members of the Gangster Disciples in the military, (6) he uses a power point presentation which shows the Gangster Disciples are affiliated with a six-pointed star, pitchforks, hearts with wings, and the term "Folk Nation," (7) he was unaware that Broadnax's notebooks were filled with drawings of such items, (8) he was unaware of the other evidence relating to Broadnax's gang affiliation admitted into evidence at trial, (9) he was unaware that Detective Nelson was asked to examine numerous trial exhibits which included gang symbols and references to the Gangster Disciples, (10) there is a fine line between a gang member and a gang wannabe, (11) he was unaware that Broadnax's older brother was a Gangster Disciple, (12) he was unaware of Gangster Disciples in Texarkana, and (13) he was unaware that Broadnax had only been in the Dallas area a few weeks prior to committing capital murder. Testimony of Dwight Stewart, S.F. State Habeas Hearing at 70-88 [42-17 ECF at 19-23 of 44].

The attorney who served as second chair for the defense during Broadnax's capital murder trial testified at Broadnax's state habeas corpus evidentiary hearing that (1) the defense team attempted to show there was "state action" in connection with the interviews of Broadnax to get the interviews suppressed, (2) the Supreme Court's *Rothgery* decision came down the same day Broadnax was interviewed, (3) he believed further investigation by the defense into suppression of the interviews would have been fruitless because a constitutional violation requires state action and they were unable to prove state action in Broadnax's case, and (4) he cross-examined Dr. Price regarding whether psychopathy was defined in the DSM-IV-TR. Testimony of Doug Parks, S.F. State Habeas Hearing at 114-30 [42-17 ECF at 30-34 of 44].

Broadnax's lead trial counsel testified at the same hearing that (1) he believed they were able to establish that jailers at the Dallas County Jail knew Broadnax had requested appointment of counsel prior to the time Broadnax was interviewed by the media, (2) he was notified of his appointment in Broadnax's case around nine to nine thirty AM on June 24, 2008, the day after Broadnax gave his interviews and after he had seen broadcasts of Broadnax's interviews on local television, (3) Broadnax was booked into the Dallas County Jail at 2:51 AM on June 21, 2008 and appeared before a Magistrate at 5:45 AM the same date, (4) some of the media requests to interview Broadnax predated Broadnax's arrival at the Dallas County Jail, (5) two hours before Broadnax gave his interviews, a jail psychiatrist (Dr. Lane) diagnosed Broadnax with psychosis due to polysubstance abuse and ordered Broadnax to be kept in closed behavioral observation, (6) he believed the defense established all of the foregoing at trial, (7) he called Kim Leach to testify to establish the foregoing, (8) the reporters who interviewed Broadnax would not talk with the defense prior to trial, (9) he believed the Dallas County Sheriff's Department facilitated the interviews and that was sufficient to establish state action, (10) he objected to admission of the interviews and obtained a pretrial hearing on the matter of their admissibility, (11) at trial, the defense called four mental health experts, including a brain development expert, (12) the defense also had two other mental health experts (Dr. Kessner and Dr. McGarrahan) on call and ready to testify but decided not to call them because Dr. Price did not testify that Broadnax was either ASPD or a psychopath and the defense team feared that calling additional mental health experts might furnish the prosecution with an opportunity via hypothetical questions to get the defense's experts to opine that Broadnax either displayed ASPD or was a psychopath, (13) for those reasons, the defense team chose not to rebut Dr. Price's testimony regarding psychopathy, (14) he was aware of no valid basis for objecting to the testimony of prosecution gang expert Detective Nelson,

(15) the defense made a strategic decision not to call its own gang expert because there was little use in trying to convince the jury that Broadnax was "not at least a wannabe gang member," and (16) the defense's trial strategy was to attempt to show the Dallas County Sheriff's Department facilitated Broadnax's media interviews prior to the appointment of counsel. Testimony of Brad Lollar, S.F. State Habeas Hearing at 131-65 [42-17 ECF at 34-43 of 44].

More specifically with regard to the issue of why the defense chose not to challenge Detective Nelson's opinion that Broadnax was a gang member, attorney Lollar explained the defense team's decision-making as follows:

> Well, B.K. Nelson was called by the State. He is a gang expert for the Dallas Police Department, and he testified basically, in his opinion, that James was a member or wannabe member of the GD's, Gangster Disciples.
>
> We, having the same information that the State had already shown the jury, which is the combination of one of the media interviews where James said that he was a member of the Folk Nation and he wrapped his flag around his gun.
>
> They had presented a telephone call that James had made from the jail where he is talking to his mother's boyfriend, and he is talking about being a member of the GD's and asking the boyfriend if it wasn't true that he had also been a member of that back in his younger age.
>
> We had all of the journals that were found with James in the car in Texarkana which were introduced that contained all sorts of references to GD's and contained the pitchfork, the three-tined pitchforks and the six-pointed star of David, all sorts of writings about that organization in his journals. The State had presented testimony from the -- well, from his jail cell where there's all sorts of six-pointed stars and pitchforks drawn on his jail cell.
>
> We felt that in light of that, that there was little use in trying to convince the jury that he was not at least a wannabe gang member in GD's, if not a full-fledged member. Also, part of the testimony provided by our witnesses, the witnesses we called in punishment, including the sister, she testified that James' older brother, Aaron, was a GD and James was a wannabe GD.
>
> Okay? So we felt that it would be useless and futile and would irritate the Judge and irritate the jury if we tried to convince the jury that he really wasn't, in light of all this evidence.
>
> Now, the main thing about all of that is this: We did not feel the offense had anything to do with James being either in or out of a gang. This was two guys, two cousins who went out to hit a lick. It had nothing to do – it was not a gang initiation. It was not an order from a gang member. It wasn't an order to, you know, elevate the gang in any way.

We felt that whether James was a member of GD or not was irrelevant really to the evidence in this case. And those were the arguments we made to Judge Snipes that the testimony of B.K. Nelson was irrelevant to this case. *Id.*, at 161-63 [42-17 ECF at 42 of 44].

In an affidavit accompanying Broadnax's state habeas corpus application, Dr. John Edens opined that (1) there was no scientific justification for introducing a diagnosis of ASPD or testimony concerning the characteristics of a psychopathic personality, (2) testimony concerning psychopathy, in particular, has the potential to stigmatize the defendant with an irrelevant and pejorative label having little to do with the likelihood of future dangerousness, (3) at the time of Broadnax's trial there existed scientific literature and scholarly reviews criticizing the use of an ASPD diagnosis and psychopathy in capital murder trials, (4) the PCL-R list from which Dr. Price read the list of psychopathic personality traits is not the equivalent of a DSM-IV diagnosis but, rather, a commercially-marketed, proprietary rating scale based on a conceptual model constructed by a Canadian psychology professor, (5) while there is some overlap, the DSM-IV-TR's ASPD diagnosis is not the same thing as the psychopathy reference used by Dr. Price during his trial testimony, (6) not every prison inmate who meets the criteria for ASPD also meets the criteria for psychopathy, (7) more recent scientific studies suggest there may be "interventions" that can significantly reduce the likelihood of future violence among individuals with psychopathic traits, (8) use of the list employed by Dr. Price has been shown to artificially increase the perception that a capital defendant will be dangerous in the future, (9) there is little evidence linking the psychopathy checklist with accurate predictions of future violent behavior of life-sentenced capital offenders in prison, (10) a growing body of scientific knowledge suggests the checklist employed by Dr. Price is actually a highly unreliable predictor of future violence. 42-3 ECF at 125-29 of 263. At the evidentiary hearing held in Broadnax's state habeas corpus proceeding, when called by the State, Dr. Edens testified (1) he was aware of no one who diagnosed Broadnax with either

ASPD or a psychopathic personality during Broadnax's trial and (2) he was unaware of the strategic reasons Broadnax's trial counsel gave for not cross-examining Dr. Price and not challenging the testimony concerning ASPD and psychopathic personality during Broadnax's capital murder trial. Testimony of Dr. John Edens, S.F. State Habeas Hearing at 165-68 [42-17 ECF at 43 of 44].